**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| _____ x | : | |
| In re: | : | **Chapter 11** |
| | : | |
| QUORUM HEALTH CORPORATION, *et al*., | : | **Case No. 20-10766 (BLS)** |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |
| _____ | : | |
| | : | |
| DANIEL H. GOLDEN, AS LITIGATION | : | |
| TRUSTEE OF THE QHC LITIGATION TRUST, | : | **Adversary Proceeding** |
| AND WILMINGTON SAVINGS FUND | : | |
| SOCIETY, FSB, SOLELY IN ITS CAPACITY AS | : | **Case No. 21-51190 (BLS)** |
| INDENTURE TRUSTEE, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **Re: Adv. Docket Nos. 1 & 47** |
| | : | |
| COMMUNITY HEALTH SYSTEMS, INC.; | : | |
| CHS/COMMUNITY HEALTH SYSTEMS, INC.; | : | |
| REVENUE CYCLE SERVICE CENTER, LLC; | : | |
| CHSPSC, LLC; PROFESSIONAL ACCOUNT | : | |
| SERVICES, INC.; PHYSICIAN PRACTICE | : | |
| SUPPORT, LLC; ELIGIBILITY SCREENING | : | |
| SERVICES, LLC; W. LARRY CASH; RACHEL | : | |
| SEIFERT; ADAM FEINSTEIN; AND CREDIT | : | |
| SUISSE SECURITIES (USA) LLC, | : | |
| | : | |
| Defendants. | : | |
| _____ x | | |

**MEMORANDUM OF LAW IN SUPPORT OF CREDIT SUISSE SECURITIES (USA)**
**LLC'S MOTION TO DISMISS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT .................................. 1

NATURE AND STAGE OF PROCEEDINGS ........................................................................ 4

THE COMPLAINT'S ALLEGATIONS .................................................................................. 4

ARGUMENT ............................................................................................................................. 7

    I.      THE SAFE HARBOR BARS ALL OF PLAINTIFF'S CLAIMS
           AGAINST CREDIT SUISSE ........................................................................ 7

    II.     THE COMPLAINT FAILS TO STATE ANY CLAIM FOR
           FRAUDULENT TRANSFER AGAINST CREDIT SUISSE .......................... 10

           A.     The Complaint Fails to State Any Fraudulent Transfer Claim
                  Because It Does Not Allege the Existence of a "Triggering"
                  Creditor ........................................................................................... 10

           B.     The Court Should Dismiss the Constructive Fraudulent
                  Transfer Claims Because the Complaint Fails to Plead Lack of
                  Reasonably Equivalent Value ......................................................... 13

           C.     The Court Should Dismiss the Intentional Fraudulent Transfer
                  Claims Because the Complaint Fails to Plead the Requisite
                  Badges of Fraud ............................................................................. 16

    III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR AIDING
           AND ABETTING AN UNLAWFUL DIVIDEND AGAINST CREDIT
           SUISSE ....................................................................................................... 21

    IV.    THE COMPLAINT FAILS TO STATE A CLAIM FOR UNJUST
           ENRICHMENT AGAINST CREDIT SUISSE ............................................. 28

CONCLUSION ....................................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*In re Adelphia Recovery Tr.*,
   634 F.3d 678 (2d Cir. 2011)....................................................................11

*In re Agape World, Inc.*,
   467 B.R. 556 (Bankr. E.D.N.Y. 2012)......................................................13n

*In re AgFeed USA, LLC*,
   546 B.R. 318 (Bankr. D. Del. 2016) ........................................................10n

*In re Am. Bus. Fin. Servs.*,
   384 B.R. 66 (Bankr. D. Del. 2008) ............................................................17

*AP Servs. LLP* v. *Silva*,
   483 B.R. 63 (S.D.N.Y. 2012).....................................................................10

*Asarco LLC* v. *Ams. Mining Corp.*,
   396 B.R. 278 (S.D. Tex. 2008) .................................................................12n

*AT&T Corp.* v. *Walker*,
   2006 WL 3019980 (W.D. Wash. Oct. 17, 2006) ......................................23

*Barnes* v. *Sauers*,
   546 F. App'x 83 (3d Cir. 2013) .................................................................19

*In re Bernard L. Madoff Inv. Sec. LLC*,
   454 B.R. 317 (Bankr. S.D.N.Y. 2011).......................................................16

*In re Bernard L. Madoff Inv. Sec. LLC*,
   773 F.3d 411 (2d Cir. 2014).....................................................................8-9

*BFP* v. *Resol. Tr. Corp.*,
   511 U.S. 531 (1994)..................................................................................14

*In re Bolan*,
   538 B.R. 391 (S.D. Ohio 2015) ................................................................10

*In re Brown Schools*,
   368 B.R. 394 (Bankr. D. Del. 2007) ..........................................................17

*Brug* v. *Enstar Grp., Inc.*,
   755 F. Supp. 1247 (D. Del. 1991)........................................................24, 27

ii

*In re Charys Holding Co.*,
  2010 WL 2774852 (Bankr. D. Del. July 14, 2010) ........................................................17, 19

*In re Churchill Mortg. Inv. Corp.*,
  256 B.R. 664 (Bankr. S.D.N.Y. 2000)...................................................................................13

*Ciser* v. *Nestle Waters N. Am., Inc.*,
  596 F. App'x 157 (3d Cir. 2015) ...........................................................................................29

*Contemp. Indus. Corp.* v. *Frost*,
  564 F.3d 981 (8th Cir. 2009) ...................................................................................................9

*Cornell Glasgow, LLC* v. *La Grange Props., LLC*,
  2012 WL 2106945 (Del. Super. Ct. June 6, 2012) ................................................................21

*Diceon Elecs., Inc.* v. *Calvary Partners, L.P.*,
  772 F. Supp. 859 (D. Del. 1991)...........................................................................................8n

*In re Direct Response Media, Inc.*,
  466 B.R. 626 (Bankr. D. Del. 2012) ......................................................................................15

*In re DSI Renal Holdings, LLC*,
  617 B.R. 496 (Bankr. D. Del. 2020) ........................................................................................9

*Edgewater Growth Cap. Partners, L.P.* v. *H.I.G. Cap., Inc.*,
  2010 WL 720150 (Del. Ch. Mar. 3, 2010)...........................................................................24n

*In re Enron Corp.*,
  341 B.R. 451 (Bankr. S.D.N.Y. 2006)..................................................................................8n

*In re Fedders N. Am., Inc.*,
  405 B.R. 527 (Bankr. D. Del. 2009) ............................................................................... 18-20

*In re First Alliance Mortgage Company*,
  471 F.3d 977 (9th Cir. 2006) ...............................................................................................12n

*Genrette* v. *Bank of New York Mellon Tr. Co., N.A.*,
  2019 WL 4917890 (D. Del. Oct. 4, 2019) .............................................................................27

*Giuricich* v. *Emtrol Corp.*,
  449 A.2d 232 (Del. 1982) ......................................................................................................22

*Goodwin* v. *Live Ent., Inc.*,
  1999 WL 64265 (Del. Ch. Jan. 25, 1999)..............................................................................26

iii

*HBE Leasing Corp.* v. *Frank*,
48 F.3d 623 (2d Cir. 1995)................................................................................15

*Heartland Payment Sys., Inc.* v. *Hickory Mist Luxury Cabin Rentals, LLC*,
2011 WL 6122371 (E.D. Tenn. Dec. 8, 2011).................................................16

*In re Hechinger Inv. Co. of Del.*,
274 B.R. 71 (D. Del. 2002).................................................................................9

*In re Hill*,
342 B.R. 183 (Bankr. D.N.J. 2006) ..................................................................18

*HSBC Bank USA, Nat'l Ass'n* v. *Adelphia Commc'ns Corp.*,
2009 WL 385474 (W.D.N.Y. Feb. 12, 2009) ...................................................12

*Husky Int'l Elecs., Inc.* v. *Ritz*,
578 U.S. 356 (2016)........................................................................................12n

*Hussain* v. *PNC Fin. Servs. Grp.*,
692 F. Supp. 2d 440 (D. Del. 2010)..................................................................26

*Image Masters, Inc.* v. *Chase Home Fin.*,
489 B.R. 375 (E.D. Pa. 2013) ...........................................................................13

*In re Innovation Fuels, Inc.*,
2013 WL 3835827 (Bankr. D.N.J. July 22, 2013)............................................20

*J.A. Moore Constr. Co.* v. *Sussex Assocs. Ltd. P'ship*,
688 F. Supp. 982 (D. Del. 1988)........................................................................29

*In re Lyondell Chem. Co.*,
503 B.R. 348 (Bankr. S.D.N.Y. 2014) ..............................................................11

*In re Magnesium Corp. of Am.*,
399 B.R. 722 (Bankr. S.D.N.Y. 2009) ................................................ 4, 22-23, 23n

*Malpiede* v. *Townson*,
780 A.2d 1075 (Del. 2001) ...............................................................................27

*Mellon Bank, N.A.* v. *Metro Commc'ns, Inc.*,
945 F.2d 635 (3d Cir. 1991)..............................................................................14

*MFS/Sun Life Trust-High Yield Series* v. *Van Dusen Airport Servs. Co.*,
910 F. Supp. 913 (S.D.N.Y. 1995)...............................................................21, 25

iv

*In re Millennium Lab Holdings*,
    2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019) ................................................12n, 16, 16n

*Monroe Cnty. Emps.' Retire Sys.* v. *Carlson*,
    2010 WL 2376890 (Del. Ch. June 7, 2010)...........................................................................29

*Monsen* v. *Consol. Dressed Beef Co. Inc.*,
    579 F.2d 793 (3d Cir. 1978)................................................................................................24

*MSKP Oak Grove, LLC* v. *Venuto*,
    875 F. Supp. 2d 426 (D.N.J. 2012) ......................................................................................19

*In re Nat'l Serv. Indus., Inc.*,
    2015 WL 3827003 (Bankr. D. Del. June 19, 2015)...............................................................19

*Nemec* v. *Shrader*,
    991 A.2d 1120 (Del. 2010) .................................................................................................28

*In re Our Alchemy, LLC*,
    2019 WL 4447545 (Bankr. D. Del. Sept. 16, 2019) .............................................................20

*Palese* v. *Del. State Lottery Off.*,
    2006 WL 1875915 (Del. Ch. 2006) .....................................................................................28

*Penn. Emp. Benefit Tr. Fund* v. *Zeneca, Inc.*,
    710 F. Supp. 2d 458 (D. Del. 2010).....................................................................................28n

*In re PennySaver USA Publ'g, LLC*,
    587 B.R. 445 (Bankr. D. Del. 2018) ....................................................................................10n

*In re Plassein Int'l Corp.*,
    405 B.R. 402 (Bankr. D. Del. 2009) .....................................................................................14

*In re Refco Sec. Litig.*,
    2010 WL 5129011 (S.D.N.Y. Dec. 14, 2010) ......................................................................10

*In re Refco, Inc. Sec. Litig.*,
    2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009).......................................................................12

*Rei Holdings, LLC* v. *LienClear*,
    2020 WL 6544635 (D. Del. Nov. 6, 2020) ...........................................................................28

*In re Route 70 & Mass., L.L.C.*,
    2011 WL 1883856 (Bankr. D.N.J. May 17, 2011) ........................................................ 15-16

*In re Rural Metro Corp.*,
    88 A.3d 54 (Del. Ch. 2014)...................................................................................24n

*In re Syntax-Brillian Corp.*,
    573 F. App'x 154 (3d Cir. 2014) .........................................................................15

*Truinject Corp.* v. *Nestle Skin Health, S.A.*,
    2020 WL 70981 (D. Del. Jan. 7, 2020)................................................................21

*U.S. Bank Nat'l Ass'n* v. *Verizon Commc'ns Inc.*,
    479 B.R. 405 (N.D. Tex. 2012)....................................................................... 11-12

*U.S. Bank Nat'l Ass'n* v. *Verizon Commc'ns, Inc.*,
    2012 WL 3100778 (N.D. Tex. July 31, 2012) ................................................ 11-12

*In re United Tax Grp.*,
    2016 WL 7235622 (Bankr. D. Del. Dec. 13, 2016)............................................14

*In re USDigital, Inc.*,
    443 B.R. 22 (Bankr. D. Del. 2011) .....................................................................13

*VFB LLC* v. *Campbell Soup Co.*,
    482 F.3d 624 (3d Cir. 2007)................................................................................14

*Vichi* v. *Koninklijke Philips Elecs. N.V.*,
    62 A.3d 26 (Del. Ch. 2012).................................................................................28

*vMedex, Inc.* v. *TDS Operating, Inc.*,
    2020 WL 4925512 (D. Del. Aug. 21, 2020) .......................................................17

*In re Winstar Commc'ns, Inc.*,
    435 B.R. 33 (Bankr. D. Del. 2010) .....................................................................27

*In re Zambrano Corp.*,
    478 B.R. 670 (Bankr. W.D. Pa. 2012) ................................................................19

*Zazzali* v. *Hirschler Fleischer, P.C.*,
    482 B.R. 495 (D. Del. 2012)...............................................................................18

**Rules**

Fed. R. Civ. P. 9(b) ........................................................................................ 16-17

vi

**Statutes**

11 U.S.C.

§ 101(22A)(A) ....................................................................................................8
§ 101(49)(A)(i) ..................................................................................................9
§ 544........................................................................................................ *passim*
§ 546(e) ....................................................................................................1, 7, 9
§ 548...................................................................................................10n, 13n
§ 550...........................................................................................................10n
§ 741(7)(A)(i) ..................................................................................................9

Del. Code Ann. tit. 6

§ 1304.....................................................................................................13n, 17

Del. Code Ann. tit. 8

§ 102(b)(7) ....................................................................................................24n
§ 141(e) .........................................................................................................24n
§ 170....................................................................................................... *passim*
§ 173......................................................................................................3, 21-23
§ 174...............................................................................................22-23, 23n

Tenn. Code Ann. § 66-3-305(a)(2) ...........................................................................13n

## PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT[1]

This is a case of buyer's remorse in search of a viable cause of action.  There is none—and certainly none against Credit Suisse, which is not a proper defendant.  Plaintiff asserts claims against Credit Suisse for constructive (Counts 16, 18, 20) and intentional (Counts 17, 19, and 21) fraudulent transfer, aiding and abetting an allegedly illegal dividend (Count 22), and unjust enrichment (Count 23).  Each of these claims is fatally flawed and should be dismissed.

Plaintiff is a Litigation Trustee who represents investors in a 2016 note offering by QHC.  Those investors do not dispute that they knew full-well that (i) the bulk of the proceeds from the note offering and related financing would be transferred to CHS, and (ii) CHS would spin off QHC immediately after the financing.  But now that QHC has filed for bankruptcy—four years after the transactions at issue—Plaintiff claims the investors were "defrauded into lending into the Spin-Off Debt" (Compl. ¶ 12) because CHS supposedly inflated QHC's financial projections to unrealistic levels to induce them to purchase the notes.  Whether that story is true or not, there is no basis to proceed against Credit Suisse, which served as QHC's investment banker on the financing and allegedly earned $20-30 million in fees for its services.  (*See id.* ¶ 66.)

*First*, Plaintiff's claims to avoid and recover the alleged $20-30 million in investment banking fees paid to Credit Suisse are barred by the Bankruptcy Code's "Safe Harbor" provision because they are (i) transfers to a "financial participant" (Credit Suisse) made (ii) "in connection

---

[1] In this brief, (i) "Credit Suisse" refers to Defendant Credit Suisse Securities (USA) LLC; (ii) "Plaintiff" or "Trustee" refers to Plaintiff Daniel H. Golden, as Litigation Trustee of the QHC Litigation Trust; (iii) "QHC" refers to Quorum Health Corporation; (iv) "CHS" refers to Community Health Systems, Inc.; (v) the "CHS Defendants" refer to all Defendants except Credit Suisse; (vi) all other capitalized terms have the same definitions as those in the Complaint; and (vii) "Moss Decl." refers to the Declaration of Edward Moss.  Unless noted, emphasis is added and internal citations and quotations are omitted.

1

with a securities contract" (the note offering).  11 U.S.C. § 546(e).  Under well-settled law, the "Safe Harbor" bars both the claims for fraudulent transfer (Counts 16-21) and the other state law claims (Counts 22 and 23) that seek to avoid the same transfers.

*Second*, Plaintiff fails to state any claim for fraudulent transfer (Counts 16-21) against Credit Suisse for several additional reasons.  As a preliminary matter, Plaintiff fails to plead, as required under § 544 of the Bankruptcy Code, the existence of any "triggering creditors."  The Complaint does not identify any creditors besides the noteholders, who cannot qualify as triggering creditors because they purchased the notes knowing that the proceeds would be transferred to CHS.

The constructive fraudulent transfer claims (Counts 16, 18, and 20) should be dismissed for the additional reason that the Complaint fails to allege, as required, that QHC did not receive "reasonably equivalent value" from Credit Suisse.  In exchange for investment banking fees, Credit Suisse provided investment banking services to QHC.  Plaintiff does not allege that Credit Suisse failed to perform any services it was asked to perform, or charged an above-market rate, or that QHC did not raise the financing on which it engaged Credit Suisse to advise.  Plaintiff's attempt to invalidate the fees to Credit Suisse based on the contention that a separate transaction—the $1.21 billion distribution to CHS[2] that Plaintiff is seeking to avoid under separate causes of action (Counts 1 and 2)—was a fraudulent transfer does not change the analysis, because the equitable "collapsing doctrine" does not apply.

---

[2] The Complaint incorrectly dubs this a dividend.  (*See* Compl. ¶ 3) (referring to the "Spin-Off Dividend").  This brief will refer to it as the "CHS Distribution."

The intentional fraudulent transfer claims (Counts 17, 19, and 21) also fail for the additional reason that they require a showing that QHC paid fees to Credit Suisse with the "actual intent to hinder, delay, or defraud" creditors.  In assessing claims for intentional fraudulent transfer on a dismissal motion, courts consider whether the plaintiff has adequately alleged a "confluence" of several "badges of fraud."  The Complaint pleads ***none***.

Plaintiff's inability to state any fraudulent transfer claim is unsurprising because the Complaint is trying to fit a square peg into a round hole.  The crux of the claim is that noteholders were fraudulently induced to invest in the note offering by QHC's alleged misrepresentations.  Even if Plaintiff were not issue-precluded from this precise theory,[3] that is not a claim for fraudulent transfer, but rather an (untimely) claim for securities fraud (*e.g.*, under § 11 and 12 of the Securities Act or state securities laws) that the noteholders could have brought years ago—but apparently chose not to.[4]

*Third*, the Complaint's attempt to hold Credit Suisse liable for aiding and abetting QHC's allegedly unlawful dividend (Count 22) lacks merit because (i) as the CHS Defendants demonstrate in their motion, Plaintiff cannot state a claim for a primary violation,[5] and (ii) there can be no aiding and abetting without a primary violation.  Additionally, ***no court*** in this country

---

[3] *See* CHS Defendants' Motion at 19-24.

[4] One noteholder brought these precise claims (but not against Credit Suisse), under Tennessee law, before the statute of limitations had run.  *See* Moss Decl. Ex. A (Complaint, No. 2017-578, *R2 Invs. LDC* v. *Quorum Health Corp. et al.*, (Tenn. Cir. Oct. 25, 2017)) ¶¶ 3, 5 ("In order for the spin-off to generate this cash for CHS, Defendants ***needed to convince investors to purchase $400 million of bonds*** issued by Quorum concurrently with the spin off. . . . Defendants committed securities fraud by intentionally and willfully ***creating fictitious financial projections in order to mislead investors into purchasing Quorum securities***.") ("Plaintiff ***relied on Defendants' misleading and fraudulent statements*** to purchase approximately . . . ***$49.7 million of Quorum Senior Notes*** (bonds).").  That case has settled.

[5] *See* CHS Defendants' Motion at 10-19.

has ever recognized aiding and abetting liability for violations of §§ 170 and 173. Indeed, the only court to consider the issue expressly held—based on sound logic and the statute's plain language—that an aiding and abetting cause of action ***does not exist***. *See In re Magnesium Corp. of Am.*, 399 B.R. 722, 776-78 (Bankr. S.D.N.Y. 2009).

*Finally*, the Complaint fails to state a claim against Credit Suisse for unjust enrichment (Count 23) for three reasons. First, the claim is untimely. Second, Delaware courts routinely reject quasi-contractual remedies when there is a contract, and here there was a contract (which was attached to SEC filings that the Court can consider on this motion). Third, the Complaint has no allegations that Credit Suisse was "unjustly" enriched. Just the opposite—it concedes that Credit Suisse was paid a fee for investment banking services that it actually performed.

For these and the other reasons set forth below, the Court should dismiss all the claims against Credit Suisse with prejudice.

## NATURE AND STAGE OF PROCEEDINGS

On October 25, 2021, Plaintiff Daniel H. Golden, as Litigation Trustee of the QHC Litigation Trust, and Wilmington Savings Fund Society, FSB, filed the Complaint against the CHS Defendants and Credit Suisse. Only the Trustee is asserting claims against Credit Suisse (*see* Compl. n.4), and Credit Suisse is moving to dismiss all those claims. The CHS Defendants have moved to dismiss, and Credit Suisse joins in their motions and arguments where appropriate.

## THE COMPLAINT'S ALLEGATIONS

Plaintiff, on behalf of the Litigation Trust, filed this lawsuit against Credit Suisse based on its alleged role as "QHC's investment banker in connection with the Spin-Off Debt."

4

(Compl. ¶¶ 7, 44.)  The sole beneficiaries of the Litigation Trust are the investors in QHC's approximately $400 million note offering, which now also own QHC, as reorganized.  (*Id.* at ¶¶ 13-14.)  The Complaint's allegations relevant to Credit Suisse's dismissal motion are as follows:

The Complaint alleges that, in 2014 and 2015, CHS, a publicly traded owner and operator of U.S. hospitals, was "significantly more highly leveraged" than its peers (*id.* at ¶ 32) and had a "deteriorating operating performance" (*id.* at ¶¶ 1, 34) that left it in "desperate need of a lifeline" (*id.* at ¶ 1).  According to the Complaint, CHS "devised a plan" in 2015 (*id.* at ¶¶ 1, 2) to solve its alleged problems by (i) creating QHC and divesting to it CHS's "worst-performing assets" (*id.* at ¶ 2); (ii) causing QHC to raise financing (including from the note offering) and transfer $1.21 billion of the proceeds of that financing to CHS to be used to pay off the bulk of CHS's allegedly outsized debt (*see id.* at ¶ 3); and (iii) spinning off QHC into a new public company that would be owned by CHS's shareholders (*see id.*).

The Complaint alleges that QHC's underperformance and tightening credit markets threatened its ability to raise the amount of debt that CHS allegedly desired to consummate the transactions (*see id.* at ¶¶ 45-50), but rather than lower the debt amount, CHS induced investors to purchase the notes by (i) manipulating QHC's financial projections upward to try to demonstrate that QHC would be able to support the debt, and (ii) offering above-market interest rates and discounts to par (*see id.* at ¶¶ 51-65).  As a result, the Complaint alleges that the noteholders were "defrauded into lending into the Spin-Off."  (*Id.* ¶ 12.)

The Complaint further alleges that CHS hired "its long time investment banker [Credit Suisse] to nominally serve as QHC's investment banker in connection with the Spin-Off Debt"— the $1.239 billion in debt that QHC would raise and (mostly) transfer to CHS as part of the spin-

5

off.  (*Id.* at ¶ 7.)  The Complaint speculates that because Credit Suisse was "motivated by its lucrative relationship with CHS," it either "assisted CHS in the fraudulent machinations" or "turn[ed] a blind eye" to them.  (*Id.* ¶¶ 7, 44.)  It further speculates that Credit Suisse "knew that the [CHS Distribution] would render QHC balance sheet insolvent, inadequately capitalized, and unable to pay its debts when they came due, [and] that CHS had fraudulently inflated the QHC Projections in order to consummate the Spin-Off and the [CHS Distribution] . . . ."  (*Id.* ¶ 196.)

But the Complaint pleads no facts to support those conclusory allegations against Credit Suisse.  Rather, it alleges only that: (i) Credit Suisse concluded that the debt amount needed to be reduced and conveyed that view in "heated conversations" with CHS, which "refused to change course" (*id.* ¶ 51); (ii) Credit Suisse advised that certain cash flows in the projections "looked too weak" (*id.* ¶ 58); (iii) the lead Credit Suisse investment banker described the deal as "the most difficult of his career" (*id.* ¶ 53); and (iv) unidentified Credit Suisse bankers asked a CHS employee to delete Credit Suisse's name from a log of changes to the projections that he was being instructed to make by someone at CHS—not by anyone at Credit Suisse (*see id.* ¶ 55).  These allegations, however, do not support, and do not even address, Plaintiff's speculation about Credit Suisse's supposed knowing participation.  For example, they do not show that Credit Suisse played any role in, or received any fees relating to, the CHS Distribution, let alone that Credit Suisse knew that the distribution would (supposedly) render QHC insolvent, or that the projections were (supposedly) inflated.

Ultimately, CHS and QHC consummated the following series of transactions that the Complaint refers to collectively as the "Spin-Off":

- On April 22, 2016, QHC issued approximately $400 million of Senior Notes, with an interest rate of 11.625%, due in 2023.  (*See id.* ¶ 64.)

6

- On April 29, 2016, QHC entered into approximately $880 million of senior term loan credit facilities.  (*See id.*)

- On April 29, 2016, QHC entered into a revolving credit facility of up to an aggregate amount of approximately $100 million.  (*See id.*)

- On April 29, 2016, QHC entered into an asset-based revolving credit facility providing for up to an aggregate principal amount of approximately $125 million. (*See id.*)

- On April 29, 2016, QHC transferred $1.21 billion (what the Complaint refers to as the "Spin-Off Dividend") to CHS.  (*See id.* ¶ 85.)

According to the Complaint, Credit Suisse "received between $20-30 million in fees" for its work on the financing.  (*Id.* at ¶ 66.)

The Complaint goes on to allege that QHC "was insolvent . . . and doomed to fail from the moment it was spun off," and that it "was forced to enter" into two amendments to its senior term credit facilities—one in April 2017 and another in March 2018.  (*Id.* at ¶¶ 10, 90-91.) According to the Complaint, Credit Suisse also received fees for its work on these two amendments—approximately $2.8 million for the first and $1.8 million for the second (for an approximate total of $4.6 million).  (*See id.*)  Despite Plaintiff's allegation that QHC was "doomed" since the April 2016 transactions, it did not file for bankruptcy until April 2020 (*see id.* at ¶ 95), a full four years later.

## **ARGUMENT**

## I.    **THE SAFE HARBOR BARS ALL OF PLAINTIFF'S CLAIMS AGAINST CREDIT SUISSE**

Section 546(e) of the Bankruptcy Code prohibits the Trustee from avoiding any transfer (i) to a "financial participant" (ii) made "in connection with a securities contract."  11 U.S.C. § 546(e).  In every cause of action against Credit Suisse (Counts 16-21, 22, 23), Plaintiff seeks to

7

avoid and recover "between $20-30 million" that "QHC paid [to] Credit Suisse for services that Credit Suisse provided *in connection with* the Spin-Off Transaction and Spin-Off Debt." (*Id.* ¶ 26.)[6]  The Complaint then defines the Spin-Off Debt as "the QHC debt that would finance the [CHS Distribution]" (*id.* ¶ 8), which includes the proceeds from the note offering.  (*See* Compl. ¶ 66) (alleging that proceeds from "Senior Notes" were used to help fund the [CHS Distribution]). These allegations make plain that the Bankruptcy Code's "Safe Harbor" applies.

*First*, Credit Suisse easily qualifies as, among other things, a "financial participant" under the Bankruptcy Code because it is an entity that "at the time of the date of the filing of the petition, ha[d] one or more agreements or transactions . . . with . . . any . . . entity (other than an affiliate) of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties) . . . on any day during the 15-month period preceding the date of the filing of the petition."  11 U.S.C. § 101(22A)(A).  Indeed, according to SEC filings, in 2019 alone (just part of the fifteen-month period), the total fair value of its "resale agreements and securities loaned transactions" was approximately $7 billion, and the notional amount of total derivative contracts totaled over $175 billion.[7]  *See* Moss Decl. Ex. B (Statement of Financial Condition) at 21, 25.

*Second*, the notes were offered and purchased under a "securities contract," a term the Bankruptcy Code defines with "extraordinary breadth."  *In re Bernard L. Madoff Inv. Sec. LLC*,

---

[6] The only cause of action that seeks to avoid fees besides the alleged "$20-30 million" relating to the spin-off is for unjust enrichment (Count 23), through which Plaintiff also seeks to avoid $4.6 million in fees paid to Credit Suisse for its work on credit amendments.  (*See* Compl. ¶¶ 26, 222.)  The unjust enrichment claim to avoid the $4.6 million in fees is the only one not affected by this argument.

[7] The Court may take judicial notice of an entity's status as a qualifying entity under the Bankruptcy Code.  *See In re Enron Corp.*, 341 B.R. 451, 458 (Bankr. S.D.N.Y. 2006) (taking judicial notice of status as a "stockbroker" or "financial institution" based on "records of various public or quasi-public bodies").

8

773 F.3d 411, 417 (2d Cir. 2014).  It includes any "contract for the purchase, sale, or loan of a security," 11 U.S.C. § 741(7)(A)(i), and "security" is defined to include "note[s]." 11 U.S.C. § 101(49)(A)(i); *see also In re DSI Renal Holdings, LLC*, 617 B.R. 496, 506 n.39 (Bankr. D. Del. 2020) (citing *Madoff* for proposition that definition of securities contract is "expansive[]").  (*See also* Compl. ¶¶ 154-59) (alleging "breach of contract" based on "unpaid amounts due on the senior notes").  Here, the notes were offered and purchased under an April 8, 2016 purchase agreement between QHC and certain initial purchasers, including Credit Suisse.  *See* Moss Decl. Ex. C (April 22, 2016 Indenture) at § 2.1(b); *see also* Moss Decl. Ex. D (April 22, 2016 Registration Rights Agreement) at 1.  This is a quintessential "securities contract."

*Third*, the Complaint uses the statute's **precise language**, alleging that Credit Suisse earned fees "**in connection with** . . . the Spin-Off Debt," which includes the note offering. (Compl. ¶ 26.)  This easily meets the "low bar for the required relationship between the securities contract and the transfer sought to be avoided."  *In re Madoff*, 773 F.3d at 421-22 (explaining that a transfer is made "in connection with" a securities contract if it is merely "related to" or "associated with" the contract").

The "Safe Harbor" also requires dismissal of Plaintiff's claims for aiding and abetting and unjust enrichment (Counts 22 and 23) because they "seek to recover the same payments" that are "unavoidable" under § 546(e), and thus "[a]llowing recovery" would "wholly frustrate the [Safe Harbor's] purpose" and "render [the] exemption meaningless."  *Contemp. Indus. Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009), abrogated on other grounds by *Merit Mgmt. Grp.*,

---

"Securities and Exchange Commission ('SEC') filings fall within this category of public records that can be judicially noticed."  *Diceon Elecs., Inc.* v. *Calvary Partners, L.P.*, 772 F. Supp. 859, 861 (D. Del. 1991).

*L.P.* v. *FTI Consulting, Inc.*, 138 S.Ct. 883 (2018); *see also In re Hechinger Inv. Co. of Del.*, 274

B.R. 71, 96-98 (D. Del. 2002) (finding unjust enrichment claim preempted by safe harbor); *AP*

*Servs. LLP* v. *Silva*, 483 B.R. 63, 71 (S.D.N.Y. 2012) (dismissing unjust enrichment claim).

## II.    THE COMPLAINT FAILS TO STATE ANY CLAIM FOR FRAUDULENT TRANSFER AGAINST CREDIT SUISSE[8]

Even if they were not otherwise barred by the "Safe Harbor," all six fraudulent transfer

claims against Credit Suisse (Counts 16-21)—seeking principally to avoid and recover the

investment banking fees that Credit Suisse earned for its work on the financing[9]—should also be

dismissed for the additional reasons discussed below.

### A.    The Complaint Fails to State Any Fraudulent Transfer Claim Because It Does Not Allege the Existence of a "Triggering" Creditor

The Court should dismiss all the fraudulent transfer claims under § 544(b)(1) because

Plaintiff does not plead the requisite element of a "triggering creditor."  *See In re Refco Sec.*

*Litig.*, 2010 WL 5129011 (S.D.N.Y. Dec. 14, 2010) (dismissing fraudulent transfer claim for

failure to adequately allege existence of legitimate triggering creditor).  To have standing under §

544(b), "there must be a creditor who can avoid the transfer under applicable state law who also

---

[8] Plaintiff asserts constructive and intentional fraudulent transfer claims against Credit Suisse under 11 U.S.C. § 544, which allows the Trustee to avoid any transfer "that is voidable under applicable law," 11 U.S.C. § 550, and the Complaint also (vaguely) references "Delaware, New York, and Tennessee law, as [the] applicable [law]."  (Compl. ¶¶ 187, 191, 197, 201, 207, 211.)  In this section, Credit Suisse cites cases interpreting and applying claims under § 548 of the Bankruptcy Code, the reasoning of which also apply to Plaintiff's state-law fraudulent transfer claims.  *See, e.g.*, *In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 455 (Bankr. D. Del. 2018) (Delaware and federal claims "identical" except for duration of lookback); *In re AgFeed USA, LLC*, 546 B.R. 318, 338 (Bankr. D. Del. 2016) (elements of Tennessee law "substantially similar to those of a fraudulent conveyance claim under § 548 of the Bankruptcy Code").

[9] Plaintiff also seeks to invalidate releases and indemnification and arbitration rights that Credit Suisse allegedly received from QHC.  (*See* Counts 18-21.)  These claims should be dismissed for the same reasons as the claims to avoid the fees, and Credit Suisse reserves its rights to assert any defenses based on any applicable release, indemnification, and arbitration rights.

10

holds an unsecured claim that is allowable under 11 U.S.C. § 502." *In re Bolan*, 538 B.R. 391, 404 (S.D. Ohio 2015); *see also* 11 U.S.C. § 544(b)(1). But Plaintiff has failed to allege the existence of such a creditor.

The only creditors identified in the Complaint—the noteholders—have no valid fraudulent transfer claims under state law because they became creditors knowing full-well that the proceeds of the note offering would be transferred to CHS. *See* Moss Decl. Ex. E (QHC Press Release) at 1. And "[a] fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance." *In re Adelphia Recovery Tr.*, 634 F.3d 678, 691 (2d Cir. 2011). "Creditors who authorized or sanctioned the transaction, or, indeed, participated in it themselves, can hardly claim to have been defrauded by it, or otherwise to be victims of it." *In re Lyondell Chem. Co.*, 503 B.R. 348, 383–84 (Bankr. S.D.N.Y. 2014), as corrected (Jan. 16, 2014) and abrogated on other grounds by *In re Trib. Co. Fraudulent Conv. Litig.*, 818 F.3d 98 (2d Cir. 2016).

Courts regularly dismiss fraudulent transfer claims when creditors, like the noteholders here, knew how the debtor would utilize the loan proceeds, including where the proceeds will be transferred to a related party. *See, e.g.*, *Lyondell*, 503 B.R. at 383–84; *U.S. Bank Nat'l Ass'n* v. *Verizon Commc'ns Inc.*, 479 B.R. 405, 411 (N.D. Tex. 2012) (concluding that banks and bondholders were estopped from serving as triggering creditors because they had full knowledge that their loans would be used to finance an acquisition). In *Verizon*, the litigation trustee sued Verizon in connection with its spin-off of its print and online directories business to Idearc and asserted, among other things, fraudulent transfer claims under § 544(b) and applicable state law. *U.S. Bank Nat'l Ass'n* v. *Verizon Commc'ns, Inc.*, 2012 WL 3100778, at \*4 (N.D. Tex. July 31,

11

2012). Idearc filed for bankruptcy relief twenty-eight months after the spin-off, and the

beneficiaries of the trust were the bank and bondholders that lent to Idearc in the spin-off. *See*

*id.* at *2. The defendants argued that because the lenders made loans to Idearc for the express

purpose of financing Idearc's acquisition of Verizon's business, they were precluded from being

triggering creditors under § 544. *Verizon,* 479 B.R. at 410. The Court agreed, holding that

Idearc's lenders would have been barred from bringing fraudulent transfer claims on the date of

the bankruptcy petition and therefore could not serve as the triggering creditors. *See id.* at 411.

The court explained that the lenders, like the noteholders here, "knew" the loan proceeds would

be used to pay Verizon and "consented" to that arrangement. *See id.*

Importantly, the Idearc lenders argued that they were "tricked" into the arrangement and

thus should not be disqualified as triggering creditors, but the court found this argument was

***irrelevant because "[t]he plaintiff's claims [were] for fraudulent transfers, not for fraud."*** *Id*.

Other courts have also declined to recognize participating lenders as triggering creditors,

applying similar logic. *See, e.g.*, *In re Refco, Inc. Sec. Litig.*, 2009 WL 7242548, at *11

(S.D.N.Y. Nov. 13, 2009), report and recommendation adopted by, 2010 WL 5129072 (S.D.N.Y.

Jan. 12, 2010) (lender "cannot be the triggering creditor, because it was a material participant in

the alleged fraudulent transaction"); *HSBC Bank USA, Nat'l Ass'n* v. *Adelphia Commc'ns Corp*.,

2009 WL 385474, at *6 (W.D.N.Y. Feb. 12, 2009) (finding fraudulent transfers not voidable

where benefit would run to creditor that ratified or acquiesced to transfer).[10]

---

[10] In *In re Millennium Lab Holdings*, Judge Silverstein pondered (but did not decide, because the issue
had not been briefed) an even broader claims exclusion, highlighting defense counsel's contention at oral
argument that "perhaps a fraudulent conveyance action, generally, should not be brought for the benefit of
parties to the challenged transactions," where the litigation trust beneficiaries were "lenders to whom the
term loan was syndicated, not unrelated unsecured creditors." 2019 WL 1005657, at *7 (Bankr. D. Del.

12

**B.    The Court Should Dismiss the Constructive Fraudulent Transfer Claims Because the Complaint Fails to Plead Lack of Reasonably Equivalent Value**

Plaintiff also fails to state a claim for constructive fraudulent transfer (Counts 16, 18, and 20) for the independent reason that the Complaint lacks facts showing that Credit Suisse did not provide "reasonably equivalent value"[11] in exchange for those fees.  *See, e.g.*, *In re USDigital, Inc.*, 443 B.R. 22, 39 (Bankr. D. Del. 2011) (dismissing constructive fraudulent transfer claim where "[t]rustee fail[ed] to provide any factual allegations supporting the assertion that [debtor] did not receive reasonably equivalent value").

"The proper focus of the reasonably equivalent value inquiry is *the specific transaction sought to be avoided*, not the transfer's collateral effects on the welfare of a debtor's business." *See, e.g.*, *Image Masters, Inc.* v. *Chase Home Fin.*, 489 B.R. 375, 390 (E.D. Pa. 2013); *see also In re Churchill Mortg. Inv. Corp.*, 256 B.R. 664, 681 (Bankr. S.D.N.Y. 2000) (explaining that even though "improvident purchases," for example, "may be said to exacerbate the harm to creditors and diminish the debtor's estate from an overall perspective [that] does not mean that

---

Feb. 28, 2019).  *See also Asarco LLC* v. *Ams. Mining Corp.*, 396 B.R. 278, 316 (S.D. Tex. 2008) ("[E]ach Plaintiff must prove [] *at the time of the challenged transfer*, there was *in existence* one or more creditors holding unsecured claims against the debtor"); *In re First Alliance Mortgage Company*, 471 F.3d 977, 1008 (9th Cir. 2006) ("The purpose of fraudulent transfer law is *to protect creditors from last-minute diminutions in the pool of assets in which they have interests*."); *see also Husky Int'l Elecs., Inc.* v. *Ritz*, 578 U.S. 356, 361-62 (2016) ("As a basic point, fraudulent conveyances are not an inducement-based fraud," but rather "typically involve a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration.  In such cases, *the fraudulent conduct is not in dishonestly inducing a creditor to extend a debt*.")

[11] Although Plaintiff is not suing under § 548 of the Bankruptcy Code, the "reasonably equivalent value" requirement in that section is also a requirement under Delaware, Tennessee, and New York law.  *See* Del. Code Ann. tit. 6, § 1304(a)(2); Tenn. Code Ann. § 66-3-305(a)(2); *In re Agape World, Inc.*, 467 B.R. 556, 571 (Bankr. E.D.N.Y. 2012) ("Courts have concluded that reasonably equivalent value under § 548(a)(1)(B) and fair consideration under the DCL [the New York standard that applied to alleged fraudulent transfers in 2016] are fundamentally the same.").

13

the debtor received less than reasonably equivalent value of each particular transaction"). Here, the "specific transaction sought to be avoided" is the payment of investment banking fees to Credit Suisse, in exchange for which Credit Suisse provided investment banking services. But there are *no* allegations—not even conclusory ones—relating to the services Credit Suisse provided or suggesting that QHC did not receive reasonably equivalent value from those services.

"[A] party receives reasonably equivalent value for what it gives up if it gets roughly the value it gave." *VFB LLC* v. *Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007). The "touchstone" of this inquiry is "whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred." *Mellon Bank, N.A.* v. *Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991); *see also BFP* v. *Resol. Tr. Corp.*, 511 U.S. 531, 545 (1994) ("[T]he reasonably equivalent value criterion will . . . ordinarily [have] a meaning similar to fair market value.").

The Complaint concedes that Credit Suisse provided services, alleging that Credit Suisse (i) "serve[d] as QHC's investment banker in connection with the Spin-Off Debt" (Compl. ¶¶ 7, 44); (ii) reviewed and provided advice regarding QHC's projections (*id.* ¶¶ 51, 58); and (iii) advised on the appropriate interest rate and discount to par (*id.* ¶ 65). It even alleges that Credit Suisse's work was a "challenge" and "difficult." (*Id.* at ¶ 53.) There is no allegation that Credit Suisse failed to do anything it was asked, that the desired financing was not raised on behalf of QHC, or that Credit Suisse charged anything other than arm's-length, market rates for its services. The Complaint, therefore, fails to plead a lack of "reasonably equivalent value." *See, e.g.*, *In re Plassein Int'l Corp.*, 405 B.R. 402, 413 (Bankr. D. Del. 2009), *aff'd* 428 B.R. 64 (D.

14

Del. 2010) (entering judgment in favor of defendants after bench trial and finding reasonably equivalent value where investment and management fees paid to defendants were in the "range of usual and customary fees payable in [such] a []transaction"); *In re United Tax Grp.*, 2016 WL 7235622, at *4 (Bankr. D. Del. Dec. 13, 2016) (dismissing constructive fraudulent conveyance claim based on conclusory allegation where "the Trustee fail[ed] to set out a factual basis for his contention that the Debtor received less than a reasonably equivalent value for the transfers"). Indeed, payment of a valid contractual debt "presumptively constitutes reasonably equivalent value." *In re Direct Response Media, Inc.*, 466 B.R. 626, 660 (Bankr. D. Del. 2012).

Because the Complaint does not and cannot point to any facts showing that Credit Suisse failed to provide reasonably equivalent value in exchange for its fees, it pivots to the conclusory allegation that QHC "received no value or consideration for the transfers" because they were "made to facilitate the [CHS Distribution] that was made for the benefit of . . . CHS and harmed QHC and its creditors." (Compl. ¶¶ 110, 184.)  By ignoring the "specific transaction to be avoided" and instead focusing on the distribution to CHS, Plaintiff is asking this Court to collapse multiple transactions—the multi-part financing, QHC's payment of fees to Credit Suisse for its work on the financing, and QHC's transfer of the financing proceeds to CHS—into one. But the "collapsing doctrine"—an equitable doctrine that allows courts, under certain circumstances, to "collapse multiple . . . transactions for the purpose of a fraudulent transfer analysis [to] consider the economic reality of the integrated whole," *In re Syntax-Brillian Corp.*, 573 F. App'x 154, 160 (3d Cir. 2014)—does not apply here.  The doctrine is designed to address a "series of separate transactions [that] achieved a result that could have been properly achieved by a simpler transaction." *In re Route 70 & Mass., L.L.C.*, 2011 WL 1883856, at *7 (Bankr.

15

D.N.J. May 17, 2011).  Thus, the "paradigmatic" situation is where "one transferee gives fair value to the debtor in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee." *HBE Leasing Corp.* v. *Frank*, 48 F.3d 623, 635 (2d Cir. 1995).

This situation is far different.  QHC's payment of fees to Credit Suisse for its services is a separate transfer from the financing itself and from QHC's transfer of the financing proceeds to CHS.  It is not part of some multi-step scheme "that could have been properly achieved by a simpler transaction." *Route 70 & Mass.*, 2011 WL 1883856, at *7.  Thus, there is no basis for the Court to extend the collapsing doctrine to the present situation—*i.e.*, to avoid the payment of market-rate investment banking fees because investors who became creditors through the allegedly voidable series of transactions later decide they were unhappy with their investment.  Judge Silverstein highlighted this argument in her opinion in *Millennium*, but like other arguments defendants raised only at the hearing, the court declined to consider it because it had not been briefed.  *Millennium*, 2019 WL 1005657, at *7 (noting defendants' contention that "the collapsing doctrine . . . should not be brought for the benefit of parties to the challenged transactions").[12]

### C.    The Court Should Dismiss the Intentional Fraudulent Transfer Claims Because the Complaint Fails to Plead the Requisite Badges of Fraud

---

[12] While Judge Silverstein denied defendants' motion to dismiss claims for intentional and constructive fraudulent transfer, *Millennium* is easily distinguishable because (i) unlike here, the transferee in *Millennium* had not contributed any assets (like the hospital assets that CHS contributed to QHC here) to the transferor in exchange for the transfer (*see* Compl. ¶ 36 *and* CHS Defendants' Motion at 18); and (ii) the *Millennium* court focused on allegations of self-dealing—that part of the dividend was put "into the hands" of the debtor's controlling persons because they "were [] focused on the improvement of their personal fortunes and those of their families" *Millennium*, 2019 WL 1005657, at *4—that are entirely absent here.

16

The Complaint also fails to state a claim for intentional fraudulent transfer (Counts 17, 19, 21) for yet another reason: the allegations do not come close to pleading the requisite fraudulent intent.

Plaintiff's intentional fraudulent transfer claims under all three state laws are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *See In re Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011); *Heartland Payment Sys., Inc.* v. *Hickory Mist Luxury Cabin Rentals, LLC*, 2011 WL 6122371, at *4-5 (E.D. Tenn. Dec. 8, 2011); *vMedex, Inc.* v. *TDS Operating, Inc.*, 2020 WL 4925512, at *10 (D. Del. Aug. 21, 2020). Moreover, while some courts apply a "relaxed" version of Rule 9(b) to claims brought by a trustee on behalf of creditors, "this is not to say that a measure of particularity is not required." *In re Charys Holding Co.*, 2010 WL 2774852, at *3 (Bankr. D. Del. July 14, 2010); *see also In re Am. Bus. Fin. Servs.*, 384 B.R. 66, 75 (Bankr. D. Del. 2008) ("The claimant must allege more than mere conclusory allegations of fraud or the technical elements of the same. In a case involving multiple defendants, the complaint should inform each defendant of the nature of his alleged participation in the fraud, and should not vaguely attribute allegedly fraudulent statements simply to all defendants.").

To state a claim for intentional fraudulent transfer, therefore, the Complaint must plead particularized facts showing that the transfer at issue—here, the investment banking fees that QHC paid to Credit Suisse—was made with the "actual intent to hinder, delay, or defraud" creditors. *See, e.g.*, Del. Code Ann. tit. 6, § 1304(a)(1). But the Complaint has no such facts. Instead, the Complaint merely includes the conclusory allegations that Credit Suisse participated in the alleged fraud, and that the fees QHC paid to Credit Suisse were transferred for the purpose

17

of facilitating the CHS Distribution.  (*See* Compl. ¶ 190.)  That is not sufficient.  The allegations about Credit Suisse's participation are entirely conclusory, *see discussion infra* pp. 24-27, and the distribution was a separate transfer that Plaintiff is seeking to avoid in separate causes of action against different defendants (Counts 1 and 2).  *See In re Brown Schools*, 368 B.R. 394, 413-14 (Bankr. D. Del. 2007) (dismissing fraudulent transfer claim against law firm for fees earned for advising on allegedly wrongful transaction, because the complaint focused on the underlying transaction and alleged no facts that the legal fees defrauded creditors).

In an attempt to allege actual intent, Plaintiff asserts the existence of "badges of fraud." In performing this analysis, courts in this district consider the following: "(1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction." *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009).  It is not sufficient to plead just one "badge"; rather, courts generally require a "confluence of several in one transaction." *Id.* (dismissing claim where only badge pleaded was insolvency).  For the reasons below, the Complaint here, however, fails to plead a single badge. The Court should, therefore, dismiss the intentional fraudulent transfer claims.  *See, e.g.*, *Zazzali* v. *Hirschler Fleischer, P.C.*, 482 B.R. 495, 520 (D. Del. 2012) (dismissing fraudulent transfer claims where complaint "fail[ed] to allege with any specificity facts or other supporting information which would establish the fraudulent nature of these transactions" and instead "merely provide[d] a recitation of the statutory requirements").

18

**Relationship Between QHC and Credit Suisse**.  The Complaint does not even try to plead a close relationship between Credit Suisse and QHC.  The best it can muster are allegations of a commercial relationship between Credit Suisse and CHS—that (i) Credit Suisse was CHS's "long time investment banker," and (ii) CHS selected Credit Suisse to work for QHC on the financing because Credit Suisse would be "motivated by its lucrative relationship with CHS" to supposedly "turn a blind eye" to CHS's alleged fraud.  (Compl. ¶¶ 7, 44.)

But "courts have found the essential question is the degree to which the transferee is able to exert control or influence over the debtor."  *In re Hill*, 342 B.R. 183, 199 (Bankr. D.N.J. 2006).  And here, there are no allegations (nor could there be) that Credit Suisse controlled QHC (or CHS).  Thus, this case is nothing like those in which courts have found a close relationship.  *See, e.g.*, *In re Nat'l Serv. Indus., Inc.*, 2015 WL 3827003, at *5 (Bankr. D. Del. June 19, 2015) (close relationship where transfers were made to "officers and members of the Debtor's board"); *In re Zambrano Corp.*, 478 B.R. 670, 692 (Bankr. W.D. Pa. 2012) (close relationship where debtor and transferee were both controlled by members of the same family).  The Complaint contains no allegations that Credit Suisse had anything other than an arm's-length commercial relationship with QHC (and CHS), and it therefore fails to plead this badge of fraud.  *See, e.g.*, *In re Fedders*, 405 B.R. at 545-46 (finding "arm's length relationship" was not badge of fraud).

**Consideration for Transfer**.  Not only does the Complaint concede that Credit Suisse provided the requested investment banking services (*see, e.g.*, Compl. ¶¶ 7, 44, 51, 58, 65), it alleges no facts to even suggest that the fees it charged were above market or otherwise not commercially reasonable.  Such arm's-length give-and-take is a far cry from cases in which courts have found this badge of fraud.  *See, e.g.*, *MSKP Oak Grove, LLC* v. *Venuto*, 875 F. Supp.

19

2d 426, 437 (D.N.J. 2012) (denying motion to dismiss where complaint alleged that debtor received "no consideration" for transfer); *Charys*, 2010 WL 2774852, at *6 (denying motion to dismiss where complaint alleged that debtor received "no meaningful services" for transfer).

**Insolvency of QHC**.  Despite repeating the conclusory allegation that the alleged distribution (but not the payment of fees to Credit Suisse) instantly rendered QHC "insolvent" and "unable to pay its debts as they came due" (*see, e.g.*, Compl. ¶¶ 10, 63, 85, 101, 102, 106, 111, 112, 121), the Complaint has no supporting facts, and it even concedes that QHC did not file for bankruptcy until *four years after the transactions* (*see id.* at ¶ 11).  The Complaint, therefore, also fails to plead this "badge of fraud."  *See Barnes* v. *Sauers*, 546 F. App'x 83, 84 (3d Cir. 2013) ("It is not enough for a plaintiff to offer only conclusory allegations or a simple recital of the elements of a claim.").

**Portion of QHC's Estate Transferred**.  The Complaint alleges that QHC raised $1.239 billion in the financing and paid Credit Suisse $20-30 million in fees for its financing-related investment banking services.  (*See* Compl. ¶ 66.)  A fee in the range of 1.6-2.4% of the financing raised was plainly not a significant portion of QHC's estate at the time, and the Complaint does not allege otherwise.  *See, e.g.*, *In re Innovation Fuels, Inc.*, 2013 WL 3835827, at *13 (Bankr. D.N.J. July 22, 2013) (dismissing intentional fraudulent transfer claim where there were "no allegations that the amount transferred was a substantial portion of the Debtor's estate"); *see also In re Our Alchemy, LLC*, 2019 WL 4447545, at *7 (Bankr. D. Del. Sept. 16, 2019) (finding badge of fraud sufficiently pleaded on motion to dismiss where "a substantial portion of [Debtor's] estate—*i.e.*, *all capital available* to fund operations—was transferred away").

**Secrecy of Transfer**.  The Complaint does not allege that QHC paid fees to Credit Suisse in secret.  In fact, the Complaint concedes that Credit Suisse had a public-facing role in connection with the financing (*see, e.g.*, Compl. ¶ 65 (alleging interactions between Credit Suisse and "prospective lenders")), and the Credit Agreement for part of the financing—filed publicly with the SEC[13]—expressly discloses that QHC would pay fees to Credit Suisse.  *See* Moss Decl. Ex. F (QHC Credit Agreement) at 47.  Nor does the Complaint allege that the financing or the spin-off were structured in any unusual manner.  Thus, this factor, like all the others, weighs in favor of dismissal.  *See, e.g.*, *In re Fedders*, 405 B.R. at 545 (dismissing intentional fraudulent transfer claim where "the facts pled in the complaint show that Fedders' dealings with Lenders were anything but concealed.  Fedders' borrowing was disclosed in a public filing with the SEC, as was the fact that it was seeking the refinancing it ultimately obtained from the Lenders"); *see also MFS/Sun Life Trust-High Yield Series* v. *Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995) (badges of fraud absent in "arm's-length transaction by sophisticated businesspeople" that was "not secretive" and not "structured in a manner unusual for an LBO").

III.     **THE COMPLAINT FAILS TO STATE A CLAIM FOR AIDING AND ABETTING AN UNLAWFUL DIVIDEND AGAINST CREDIT SUISSE**

Plaintiff fails to state a claim against Credit Suisse for aiding and abetting an unlawful dividend under §§ 170 and 173 of the DGCL (Count 22) for three independent reasons.

*First*, as the CHS Defendants demonstrate in their opening brief, the Complaint does not state an underlying claim (Count 13) for violation of §§ 170 or 173.  That failure requires dismissal of Plaintiff's derivative aiding and abetting claim against Credit Suisse.  *See, e.g.*,

---

[13] *See supra* n.6.

*Truinject Corp.* v. *Nestle Skin Health, S.A.*, 2020 WL 70981, at *10 (D. Del. Jan. 7, 2020) (dismissing aiding and abetting claim where complaint failed to adequately allege underlying wrong); *Cornell Glasgow, LLC* v. *La Grange Props., LLC*, 2012 WL 2106945, at *11 (Del. Super. Ct. June 6, 2012) ("Like civil conspiracy, aiding and abetting is a derivative tort, [and] there must be an actionable underlying wrong to which the claim of aiding and abetting can attach.").

*Second*, even if Plaintiff had stated an underlying claim, there is no such thing under Delaware law as a claim for aiding and abetting a violation of §§ 170 or 173. To begin, the statute itself does not mention aiding and abetting liability—or anything about claims against non-primary violators. Just the opposite: the statute's plain language limits liability to a corporation's directors. DGCL § 170 expressly provides that "*[t]he directors of* every corporation" may "declare and pay dividends," while § 173 provides that "*[n]o corporation* shall pay dividends except in accordance with this chapter." Del. Code Ann. tit. 8 §§ 170, 173. Moreover, § 174 makes plain precisely who can be a defendant in an unlawful dividend claim: "*[T]he directors under whose administration the same may happen* shall be jointly and severally liable" for "any willful or negligent violation" of § 173. Section 174 does not mention underwriters, financial advisers, or anything of the sort. Thus, this Court should dismiss the claim based on the statute's plain language. *See Giuricich* v. *Emtrol Corp.*, 449 A.2d 232, 238 (Del. 1982) ("There is judicial discretion to construe a statute when its language is obscure and ambiguous; but when no ambiguity exists, and the intent is clear from the language of the statute, there is no room for statutory interpretation or construction.").

In light of that plain language, there is no case-law support for an aiding and abetting claim.  And Credit Suisse is not aware of *any* court that has allowed a claim for aiding and abetting an unlawful dividend under the DGCL to proceed past a motion to dismiss.  To the contrary, the *only* court to have considered the issue dismissed aiding and abetting claims—against investment bankers in a bond offering, no less—at the pleading stage based on the statute's plain and unambiguous language.

*In re Magnesium*, decided by Bankruptcy Judge Gerber of the Southern District of New York, is on all fours.  399 B.R. 722.  That case involved a bond offering by an entity that used the proceeds to pay a dividend to an affiliate and later wound up in bankruptcy.  *See id.* at 736-37.  The trustee brought claims under DGCL § 170 against several defendants, including the debtor-entity and the transferee-affiliate, and aiding and abetting claims against the (i) investment banking firms that underwrote (DLJ) and provided a solvency opinion in connection with (Houlihan Lokey) the bond offering, and (ii) auditor (KPMG) of the financial statements contained in the offering materials.  *See id.* at 735.  Applying Delaware law, Bankruptcy Judge Gerber dismissed all the aiding and abetting claims, explaining that §§ 170 and 174 were "unambiguous," and "[t]he Delaware legislature clearly provided that the right to declare dividends and liability for unlawfully issued dividends attached ***to one group—a corporation's directors***."[14]  *Id.* at 777-78.  The court also noted that "the Trustee has failed to cite any authority

---

[14] The court also held that, in addition to directors, claims for unlawful dividends could proceed against shareholders who received the dividend—based on § 174(c)'s language regarding the "rights of the corporation against stockholders who received the dividend."  *In re Magnesium*, 399 B.R. at 778.  That holding is irrelevant to Credit Suisse, which is not alleged to have been a QHC or CHS stockholder.

that holds **professionals** or officers liable for unlawful dividends under §§ 170, 173, 174—either directly or on a theory of aiding and abetting." *Id.* at 778.

*AT&T Corp.* v. *Walker*, 2006 WL 3019980 (W.D. Wash. Oct. 17, 2006) is the only other case to decide a motion to dismiss a claim for aiding and abetting an alleged violation of DGCL § 174, and the court there also granted the motion. In fact, the trustee in *Walker* did not even oppose the defendants' motion to dismiss because he conceded that aiding and abetting an unlawful dividend had never been recognized as a cause of action.

In *Walker*, the trustee alleged that two shareholders in an entity that had paid a dividend, both of which received portions of the dividend, (i) violated § 174 themselves, and (ii) aided and abetted the dividend-payer's violation. *Id.* at *1. The court denied the motion to dismiss the primary violation because other courts had—in light of specific language about shareholders in § 174—recognized an implied right of action against **shareholders** that received an allegedly unlawful dividend.[15] *Id.* But it **granted** those same shareholders' motion to dismiss the aiding and abetting claim against them. *Id.* at *2. As the shareholders explained in their motion to dismiss, "[n]either the statute nor any Delaware court has ever recognized such a cause of action," and "[t]o do so would be an unwarranted expansion of the statute, which explicitly provides for private actions only against directors who were involved in declaring the dividend." Moss Decl. Ex. G (Neptune Mot. to Dismiss, 2006 WL 2376763, at 7 (W.D. Wash. July 3, 2006)). The shareholders also explained that the trustee had conceded at deposition that (i) "[w]e never found any cases alleging that cause of action"; and (ii) "I don't think that the aiding and abetting [an] [il]legal dividend has been recognized as a cause of action anywhere that I know

---

[15] *See supra* n.13.

24

of." *Id.* at 10-11 n.7.  Given the strength of the shareholders' arguments, the trustee did not even oppose dismissal, and so the court dismissed the claim without discussion.[16]

*Third*, even if Plaintiff could clear these other hurdles (and he cannot), the Complaint fails to plead the required facts showing that Credit Suisse "knowingly and substantially participated" in the alleged violation.  *See Brug* v. *Enstar Grp., Inc.*, 755 F. Supp. 1247, 1256 (D. Del. 1991) ("To prove a claim of aiding and abetting, a plaintiff must demonstrate that (1) a wrongful act was committed; (2) the defendant had knowledge of the act; and (3) the defendant knowingly and substantially participated in or provided substantial assistance for the wrongful act."); *see also Monsen* v. *Consol. Dressed Beef Co. Inc.*, 579 F.2d 793, 799 (3d Cir. 1978) (noting that knowledge requirement "is a critical element in proof of aiding-abetting liability, for without this requirement financial institutions, brokerage houses, and other such organizations would be virtual insurers of their customers against security law violations").

Here, the Complaint pleads no facts to show that Credit Suisse either (i) knew that QHC lacked sufficient "surplus" to pay the CHS Distribution in compliance with DGCL § 170,[17] or (ii)

---

[16] Similarly, based on clear statutory language, the Court of Chancery has declined to extend to aiders and abettors (i) liability under the Delaware Fraudulent Transfer Act, *see Edgewater Growth Cap. Partners, L.P.* v. *H.I.G. Cap., Inc.*, 2010 WL 720150, at *3 (Del. Ch. Mar. 3, 2010) ("Given that the text of the Delaware Fraudulent Transfer Act does not provide for an aiding and abetting claim, and that the Delaware Act's text is indistinct from the Uniform Fraudulent Transfer Act which has been held not to create an aiding and abetting claim, I perceive no legitimate basis for me to create such an implied statutory cause of action by judicial innovation when the General Assembly is free to do so itself . . . ."); and (ii) the liability limitations provided in DGCL § 102(b)(7) and § 141(e), *see In re Rural Metro Corp.*, 88 A.3d 54, 86 (Del. Ch. 2014) ("The literal language of Section 102(b)(7) only covers directors; it does not extend to aiders and abettors.").

[17] § 170 provides that the "directors . . . may declare and pay dividends upon the shares of its capital stock either: (1) Out of [the corporation's] surplus . . . or (2) in case there shall be no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year."  Del. Code Ann. tit. 8 § 170(a).

25

substantially participated in the payment of the distribution.  As for knowledge, the Complaint

contains only the conclusory allegation that Credit Suisse "knew that the [CHS Distribution]

would render QHC balance sheet insolvent, inadequately capitalized, and unable to pay its debts

when they came due" (Compl. ¶¶ 186, 196), but it lacks *any* supporting facts.  And, of course,

the Complaint's concession that QHC continued as a going concern for *four years* after the spin-

off (*see id.* at ¶ 95) guts Plaintiff's speculation about the spin-off's supposedly immediate effects.

*See Sun Life Trust-High Yield Series*, 910 F. Supp. at 944 ("That the company remained viable

so long after the LBO strongly suggests that its ultimate failure cannot be attributed to

inadequacy of capital as of the date of the buyout.").

       As for substantial participation, the Complaint is even weaker.  Plaintiff tries to meet this

element based on the allegation that Credit Suisse assisted CHS in inflating QHC's projections

(*see id.* at ¶ 215) but, at best, that would have helped QHC to obtain the financing—not to use

the proceeds to make a transfer to CHS.  The Complaint pleads ***no facts*** to suggest that Credit

Suisse had any role in the distribution; it does not even allege that Credit Suisse advised on that

portion of the transactions or received any fees relating to it (as opposed to the financing).

       To the extent the Complaint seeks to collapse the financing and the distribution, that

gambit fails too.  The Complaint's only alleged facts on this point do not allege that Credit

Suisse knew the projections were (supposedly) inflated.  *See Hussain* v. *PNC Fin. Servs. Grp.*,

692 F. Supp. 2d 440, 443 (D. Del. 2010) ("A well-pleaded complaint must contain more than

mere labels and conclusions. . . . In other words, the complaint must do more than allege

plaintiff's entitlement to relief; rather it must show such an entitlement with its facts.  A claim is

facially plausible when its factual content allows the court to draw a reasonable inference that the

26

defendant is liable for the misconduct alleged."). For example, the allegation that Credit Suisse had "heated conversations" in which it tried to convince CHS to reduce the debt amount (*see* Compl. ¶ 51)—in other words, that Credit Suisse pushed back on the alleged scheme—is the antithesis of "substantial participation." Nor is it surprising or nefarious that Credit Suisse (i) advised on whether the cash flows in the projections looked correct (*see id.* ¶ 58); (ii) had a team member who believed the deal—a billion-dollar financing in a credit market that the Complaint itself alleges was "tightened sharply" (*id.* ¶ 49)—was "the most difficult of his career" (*id.* ¶ 53); or (iii) had other team members who asked a CHS employee to delete Credit Suisse's name from a log of changes that Credit Suisse (according to the Complaint) had not directed (*see id.* ¶ 55).

Delaware courts routinely dismiss aiding and abetting claims based on similarly innocuous alleged facts. *See, e.g.*, *Goodwin* v. *Live Ent., Inc.*, 1999 WL 64265, at *28 (Del. Ch. Jan. 25, 1999) (granting motion for judgment on pleadings and dismissing aiding and abetting claim because "[a]ccepting this contention [of knowingly participating] without evidence that the third-parties purposely induced the breach of the duty of care by a [] director for illicit reasons would in essence permit [Plaintiff] to assert a direct negligence claim against them. Here, the record does not support a finding that the third-parties, for improper motives of their own, intentionally duped the [] directors into breaching their duty of care."); *Malpiede* v. *Townson*, 780 A.2d 1075, 1096-98 (Del. 2001) (affirming dismissal of aiding and abetting breach of fiduciary claim against acquirer absent any allegations that it had "participated in the [target] board's decisions, conspired with the board, or otherwise caused the board to make the decisions at issue"); *Brug*, 755 F. Supp. at 1256 (dismissing aiding and abetting claim where "plaintiffs [had] not pled sufficient facts to meet the substantial assistance and knowledge elements").

27

## IV.    THE COMPLAINT FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT AGAINST CREDIT SUISSE

Plaintiff's attempt to repackage his (insufficiently pleaded) fraudulent transfer claims as a claim for unjust enrichment (Count 23) likewise fails.

*First*, the claim is untimely.  "[T]he law of the forum generally determines whether an action is barred by the statute of limitations."  *In re Winstar Commc'ns, Inc.*, 435 B.R. 33, 44 (Bankr. D. Del. 2010).  And "[u]nder Delaware law, the statute of limitations for a claim of unjust enrichment is three years and the claim accrues when the wrongful act causing the enrichment and impoverishment occurred."  *Genrette* v. *Bank of New York Mellon Tr. Co., N.A.*, 2019 WL 4917890, at *4 (D. Del. Oct. 4, 2019).  Because the Bankruptcy Code tolls the limitations period, the claim is untimely if the "wrongful act" occurred more than three years before the April 7, 2020 petition date—*i.e.*, before April 7, 2017.  Thus, the portion of this claim seeking to invalidate the alleged "$20-30 million" in fees paid to Credit Suisse in connection with the April 2016 transaction (Compl. ¶ 26) is time-barred.[18]

*Second*, "Delaware courts[19] . . . have consistently refused to permit a claim for unjust enrichment when the alleged wrong arises from a relationship governed by a contract."  *Nemec* v. *Shrader*, 991 A.2d 1120, 1130 (Del. 2010); *see also Vichi* v. *Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 58 (Del. Ch. 2012) ("It is a well-settled principle of Delaware law that a party cannot recover under a theory of unjust enrichment if the contract governs the relationship between the

---

[18] The Complaint also seeks to avoid and recover through the unjust enrichment claim 2017 and 2018 transfers to Credit Suisse.  (*See* Compl. ¶ 219.)  That portion of the claim is not time-barred but should be dismissed for the other reasons above and below.

[19] *See Penn. Emp. Benefit Tr. Fund* v. *Zeneca, Inc.*, 710 F. Supp. 2d 458, 477 (D. Del. 2010) (concluding that the unjust enrichment laws across states are substantially the same and the court need not engage in a choice of law analysis).

28

contesting parties that gives rise to the unjust enrichment claim.").  The Complaint fails to plead the absence of a contract (*e.g.*, an engagement letter or underwriting agreement) under which QHC paid fees to Credit Suisse in exchange for its investment banking services.  Nor could it; among other things, the Credit Agreement that governs part of the financing expressly provides for payment of fees to Credit Suisse.[20]  The claim should, therefore, be dismissed.  *See, e.g.*, *Palese* v. *Del. State Lottery Off.*, 2006 WL 1875915, at *5 (Del. Ch. 2006) ("Courts developed unjust enrichment, or quasi-contract, as a theory of recovery to remedy the absence of a formal contract.  A party cannot seek recovery under an unjust enrichment theory if a contract is the measure of the plaintiff's right."); *Rei Holdings, LLC* v. *LienClear*, 2020 WL 6544635, at *10 (D. Del. Nov. 6, 2020) (dismissing unjust enrichment claims and holding that "Plaintiff's allegations against the parties to the contracts . . . [were] inadequate" where "Plaintiff [had] not pleaded anything to suggest that the contracts at issue do not comprehensively govern the parties' relationship").

*Third*, the Complaint does not adequately allege an unjust enrichment claim because there is no allegation that Credit Suisse was "unjustly" enriched.  Rather, the Complaint pleads only that Credit Suisse was paid fees for the services it performed.  (*See* Compl. ¶¶ 218-21.) Delaware courts routinely dismiss unjust enrichment claims under similar circumstances.  *See, e.g.*, *J.A. Moore Constr. Co.* v. *Sussex Assocs. Ltd. P'ship*, 688 F. Supp. 982, 988 (D. Del. 1988) ("[P]laintiff may not be compensated on the ground of unjust enrichment if he received from the other what it was agreed [that] the other should give in return."); *see also Ciser* v. *Nestle Waters*

---

[20] *See* Moss Decl. Ex. F at 47.

*N. Am., Inc.*, 596 F. App'x 157, 159, 163 (3d Cir. 2015) (dismissing unjust enrichment claim based on allegedly "excessive" fees that were "competitive with an industry standard").

The Complaint tries to overcome this fatal flaw by alleging that Credit Suisse "knowingly participated" in CHS's efforts to allegedly "orchestrate[] the Spin-Off" on the basis of supposedly "fraudulent QHC projections."  (Compl. ¶ 221.)  In other words, the Complaint's theory is that Credit Suisse was unjustly enriched because it received fees for assisting with financing that conferred no value on QHC (*i.e.*, because QHC immediately sent the proceeds to CHS), but rather was just a part of CHS's alleged fraud.  But that would be a claim for aiding and abetting fraud—a cause of action Plaintiff does not (and cannot, based on the razor-thin factual allegations in the Complaint) assert.  Even if he had, the unjust enrichment claim would hinge on the success of that (not-asserted) fraud claim, a circumstance that provides an independent basis for dismissal.  *See Monroe Cnty. Emps.' Retire Sys.* v. *Carlson*, 2010 WL 2376890, at *2 (Del. Ch. June 7, 2010) (dismissing unjust enrichment claim that "depends on the success" of a dismissed breach of fiduciary duty claim).

## CONCLUSION

For the foregoing reasons, Credit Suisse respectfully requests that the Court dismiss all claims against it (Counts 16-23) with prejudice.

RLF1 26647216v.1

Dated: Wilmington, Delaware
    January 14, 2022

**RICHARDS LAYTON & FINGER, P.A.**

*/s/ Robert C. Maddox*
Mark D. Collins (No. 2981)
Robert C. Maddox (No. 5356)
One Rodney Square, 920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
collins@rlf.com
maddox@rlf.com

**CAHILL GORDON & REINDEL LLP**

*/s/ Edward Moss*
Herbert S. Washer
Edward Moss
Joel H. Levitin
John MacGregor
32 Old Slip
New York, New York 10005
(212) 701-3000
hwasher@cahill.com
emoss@cahill.com
jlevitin@cahill.com
jmacgregor@cahill.com

*Attorneys for Defendant Credit Suisse Securities
(USA) LLC*

31