EXHIBIT A

# STATE OF TENNESSEE
# SUMMONS



---

## IN THE CIRCUIT COURT FOR WILLIAMSON COUNTY, TENNESSEE

---

R² Investments, LDC,
**Plaintiff**

**vs.**

Community Health Systems, Inc.
**Defendant**

CIVIL ACTION NO. **2017-578**

**Service By:**
☐ Sheriff
☐ Attorney
☐ Sec. of State
    ☐ Comm. Of Insurance

---

To the above named Defendant:

Community Health Systems, Inc.
c/o Justin Pitt (Registered Agent)
Community Health Systems
4000 Meridian Blvd.
Franklin, TN 37067-6325

    You are hereby summoned and required to serve upon <u>Russ Heldman,</u> plaintiff's attorney, whose address is <u>218 4ᵗʰ Ave N, Franklin, TN 37064</u>, and whose phone number is <u>(615) 599-9420</u>, an answer to the complaint which is herewith served upon you within thirty (30) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

    Witnessed and issued Debbie McMillan Barrett, Circuit Clerk for said Court at office this ⸻ day of October, 2017.

                              _____
                                Circuit Court Clerk

---

## NOTICE:

To the defendant(s): Tennessee law provides a ten thousand dollar ($10,000.00) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the terms you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible,



COPY

FILED
WILLIAMSON COUNTY
CIRCUIT COURT

**IN THE CIRCUIT COURT OF WILLIAMSON COUNTY, TENNESSEE**
**TWENTY-FIRST JUDICIAL DISTRICT AT FRANKLIN**

2017 OCT 25  AM 8: 27

| | |
|---|---|
| R$^2$ INVESTMENTS, LDC, | ) |
| | ) ENTERED |
| *Plaintiff,* | ) DOCKET NO: 2017-578 |
| | ) DIVISION: 2017-578 |
| v. | ) |
| | ) ORIGINAL COMPLAINT |
| QUORUM HEALTH CORPORATION; | ) |
| COMMUNITY HEALTH SYSTEMS, | ) |
| INC.; WAYNE T. SMITH; W. LARRY | ) JURY TRIAL OF SIX (6) PERSONS |
| CASH; THOMAS D. MILLER; | ) DEMANDED |
| MICHAEL J. CULOTTA; JOHN A. | ) |
| CLERICO; JAMES S. ELY, III; JOHN A. | ) |
| FRY; WILLIAM NORRIS JENNINGS; | ) |
| JULIA B. NORTH; H. MITCHELL | ) |
| WATSON, JR.; H. JAMES WILLIAMS, | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## ORIGINAL COMPLAINT

1.      This case concerns securities fraud in which Defendants, in order to sell their securities, intentionally hid from investors the truth about poor performance and high operating costs of the issuer of the securities, Defendant Quorum Health Corporation ("Quorum"). Defendants knew these costs full well—in fact, many of them were costs that Defendant Community Health Systems, Inc. ("CHS") itself was charging to the issuer or had negotiated itself.

2.      This case is brought by an individual investor, Plaintiff R$^2$ Investments, LDC, under the Tennessee Securities Act.  Defendants are two Tennessee corporations and eleven officers and directors of those corporations.  Quorum is a former subsidiary of Defendant CHS.

1

In April 2016, CHS "spun off" Quorum as an independent company. As a direct result of that spin-off, CHS received $1.2 billion in cash that CHS needed to pay down its large debt (which was excessive in comparison to CHS's assets and projected earnings).

3.     In order for the spin-off to generate this cash for CHS, Defendants needed to convince investors to purchase $400 million of bonds issued by Quorum concurrently with the "spin off." The only way for Defendants to accomplish this was to make Quorum look as profitable as possible. Defendants committed securities fraud by intentionally and willfully creating fictitious financial projections in order to mislead investors into purchasing Quorum securities.

4.     Specifically, Defendants deliberately hid the truth about Quorum's high operating costs and about the poor performance of Quorum's hospitals. This hiding of the truth is indefensible and unconscionable because Defendants, who prepared and made the statements to investors about Quorum's financial performance as a stand-alone entity, knew about the higher and undisclosed costs. Defendants knew about these costs because Defendant CHS was the one charging Quorum for many of these costs and CHS negotiated the Quorum contracts for others of these costs.

5.     Plaintiff relied on Defendants' misleading and fraudulent statements to purchase approximately $6.7 million of Quorum stock, and $49.7 million of Quorum Senior Notes (bonds).[1] The truth about Quorum's costs came to light on August 10, 2016 when Quorum had to release its second quarter 2016 earnings report. Quorum's stock price immediately dropped by almost 50%, and the value of Plaintiff's investments plummeted. Plaintiff brings this lawsuit

---

[1] These estimates are net amounts (purchases net of proceeds) as of August 10, 2016, and are calculated using first-in, first-out accounting ("FIFO").

to recover the losses it suffered as a result of Defendants' fraud.

## PARTIES

6.      Plaintiff $R^2$ Investments, LDC, is an investment fund that bought shares of stocks and bonds issued by Defendant Quorum.

7.      Corporate Defendant Quorum is incorporated in Delaware, and the Company's principal executive offices are located at 1573 Mallory Lane, Brentwood, Williamson County, Tennessee 37027.  Quorum operates hospitals and outpatient healthcare services in 16 states. Quorum and its subsidiaries own or lease 36 hospitals with a total of more than 3,400 licensed beds.  Quorum actively directed and participated in the sale of $45 million of Senior Notes to Plaintiff, and is therefore named as a "Seller Defendant."

8.      Corporate Defendant CHS is incorporated in Delaware, and its principal executive offices are located at 4000 Meridian Boulevard, Franklin, Williamson County, Tennessee 37067. CHS is one of the nation's largest operators of general acute-care hospitals.  CHS and its affiliates own, operate or lease 155 hospitals in 21 states, with a total of more than 26,000 licensed beds.  CHS actively directed and participated in the sale of $45 million of Senior Notes to Plaintiff, and is therefore named as a "Seller Defendant."

9.      Individual Defendant Wayne T. Smith ("Smith") is CHS's President and CEO. Smith signed each of CHS's quarterly reports filed with the federal Securities and Exchange Commission ("SEC") on Form 10-Q and annual reports filed on Form 10-K from August 2015 through August 2016.  He has served on CHS's board of directors since 1997.

10.     Individual Defendant W. Larry Cash ("Cash") was CHS's CFO until on or about May 16, 2017.  He signed each of CHS's quarterly reports filed with the federal Securities and Exchange Commission ("SEC") on Form 10-Q and annual reports filed on Form 10-K from

August 2015 through August 2016.  He served on CHS's board of directors from 2001 to 2017.

11.     Individual Defendant Thomas D. Miller ("Miller") has been Quorum's CEO since the spin-off of Quorum from CHS.  Prior to the spin-off, Miller served as Division President— Division V Operations for CHS and oversaw the operations of affiliated hospitals. Both of these positions qualify Miller as a "principal executive officer" of Quorum and CHS.  *See* Tenn. Code Ann. § 48-1-122(g).  Miller actively directed and participated in the sale of $45 million of Senior Notes to Plaintiff, and is therefore named as a "Seller Defendant."

12.     Individual Defendant Michael J. Culotta ("Culotta") has been Quorum's CFO and Executive Vice President since the spin-off of Quorum from CHS.   Prior to the spin-off, Culotta served as Vice President of Investor Relations for CHS.  Both of these positions qualify Culotta as a "principal executive officer" of Quorum and CHS.   *See* Tenn. Code Ann. § 48-1-122(g). Culotta actively directed and participated in the sale of $45 million of Senior Notes to Plaintiff, and is therefore named as a "Seller Defendant."

13.     Individual Defendant John A. Clerico has served on CHS's board of directors since 2003.

14.     Individual Defendant James S. Ely, III has served on CHS's board of directors since 2009.

15.     Individual Defendant John A. Fry has served on CHS's board of directors since 2004.

16.     Individual Defendant William Norris Jennings has served on CHS's board of directors since 2008.

17.     Individual Defendant Julia B. North has served on CHS's board of directors since 2004.

4

18.     Individual Defendant H. Mitchell Watson, Jr., has served on CHS's board of directors since 2004.

19.     Individual Defendant H. James Williams has served on CHS's board of directors since 2015.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action under the Tennessee Securities Act, Tenn. Code Ann. § 48-1-101 *et seq.*, because Defendants sold the bonds, and made misleading and fraudulent statements about the stocks and bonds, in Tennessee. *See* Tenn. Code Ann. § 48-1-124(a), (b) & (d).

21.     This Court has personal jurisdiction over the Corporate Defendants (Quorum Health Corporation and Community Health Systems, Inc.) because these Defendants have their principal places of business in Williamson County, Tennessee.

22.     Venue is proper in this Court because a substantial portion of the misleading statements giving rise to this action were made by Defendants at the Corporate Defendants' principal places of business in Williamson County. *See* Tenn. Code Ann. § 20-4-104(1). Furthermore, the Corporate Defendants' registered agents are located in this county. *See id.* § 104(3)(A).

23.     This Court has personal jurisdiction over Individual Defendants Wayne Smith, Larry Cash, Michael J. Culotta and Thomas Miller because, on information and belief, these Defendants reside in Tennessee. Furthermore, on information and belief, these Individual Defendants regularly conduct and/or conducted business at the principal places of business, in Williamson County, Tennessee, of one or more of the Corporate Defendants, and participated in the fraud alleged herein at those locations.

24.     This Court also has personal jurisdiction over all Individual Defendants under Tenn. Code Ann. § 20-2-223(a)(7), because all Defendants were officers or directors of one or both Corporate Defendants at the times of the fraudulent misstatements alleged herein.

## FACTS

25.     On August 3, 2015, CHS announced plans to "spin off" Quorum as an independent company.   The spin-off was completed on April 29, 2016.   On that date, shareholders of CHS received one share of Quorum common stock for every four shares of CHS stock.  On May 2, 2016, Quorum shares began trading on the New York Stock Exchange under the ticker symbol "QHC."

26.     As part of the spin-off transaction, Quorum issued $400 million of Senior Notes (bonds) on April 22, 2016.   These bonds were sold to accredited investors including Plaintiff. The proceeds of this bond issue were paid to CHS as a one-time cash distribution.   In total, Quorum paid $1.2 billion in cash to CHS in connection with the spin-off.  (The remaining $800 million of this cash payment came from debt Quorum raised from bank lenders.)

27.     Defendants CHS, Quorum, Miller, and Culotta (the "Seller Defendants") acted as "sellers" of the Senior Notes.   These Seller Defendants were at all times in control of the sale process and played an active role in marketing the Senior Notes.   These Seller Defendants successfully solicited Plaintiff's purchase of $45 million of Senior Notes.    These Seller Defendants did so because that purchase, by Plaintiff, served these Defendants' own financial interests.

28.     The purchases of Senior Notes (by Plaintiff and other investors) generated cash that CHS desperately needed.  Between the time CHS announced the spin-off and the completion of the spin-off, CHS's stock price fell from $46.56 to just $15.71.  A key reason for this fall in

6

stock price was that CHS was over-leveraged with debt. In 2015, CHS held much more debt, relative to its assets and earnings, than most similarly situated health care companies. CHS needed cash to pay off this excessive debt.

29.     In order to raise cash from the Quorum spin-off, Defendants knew that they had to attract investors to purchase the $400 million bond issue. Defendants also knew that if investors knew the truth about the costs that Quorum would face as a stand-alone company, and the truth about Quorum's hospital's operating performance, then investors would not buy the bonds (or would not buy the bonds at the price Defendants desired), the $400 million bond issue would fail, and CHS would not receive the much-needed cash.

30.     In order to hide the truth about Quorum's costs and operating performance, Defendants intentionally and willfully made a series of misleading statements to Plaintiff and other investors.

31.     On March 22, 2016, CHS issued a press release containing earnings guidance for the soon-to-be spun-off Quorum. In this guidance, CHS stated Quorum's annual adjusted EBITDA (a measure of earnings relied upon by Plaintiff and other investors) for the year ending December 31, 2016, as a "range from $265 million to $275 million." Plaintiff relied on this press release in later deciding to purchase Quorum's bonds and stock.

32.     On March 29, 2016, Quorum and CHS gave a "Presentation to Lenders." This presentation took place over the phone and was accompanied by a detailed written document. Defendants Miller and Culotta both spoke during this presentation. In this presentation, Defendants again stated that Quorum's adjusted EBITDA was between $265 million and $275

million for the year ending December 31, 2016.[2]  Defendants further stated, in this presentation, that Quorum's increased costs, as a stand-alone company, would be only $8.0 million.  Plaintiff relied on these statements by Defendants in later deciding to purchase Quorum's Senior Notes and stock.

33.     Defendants CHS, Quorum, Culotta and Miller actively participated in the March 29 presentation to lenders and in other activities designed to induce investors to purchase Quorum's bonds.

34.     On April 8, 2016, Plaintiff purchased $45 million of Senior Notes from Seller Defendants in the primary bond offering.  In the next three weeks, Plaintiff purchased an additional $5.5 million of bonds on the secondary market.

35.     On April 14, 2016, Defendant Culotta participated in a conference call with investors (including Plaintiff).  Culotta repeated that adjusted EBITDA guidance for the year 2016 was $265 million to $275 million, and he noted that this guidance represented an *increase* over the previous year's adjusted EBITDA.  Culotta stated that the increased EBITDA guidance was due to reduced insurance costs (as a result of the separation from CHS) and incoming benefits from the Affordable Care Act.  Plaintiff relied on these statements in later deciding to purchase Quorum's stock, and in continuing to hold Plaintiff's previous purchases.

36.     On May 11, 2016, Quorum issued a press release announcing Quorum's financial and operating results for the quarter ended March 31, 2016 (i.e., prior to the April 2016 spin-off). This press release was filed with the SEC on a Form 8-K.  In the press release, Defendant Miller stated, in part:

---

[2] The document stated an EBITDA of $272 million to $282 million, but that did not account for a $7 million expense of stock-based compensation.

We are pleased that our financial results for the first quarter were consistent with our expectations for the full year, and today we are affirming our established financial guidance for 2016. We are very confident and optimistic about the longterm future of this new company.

Plaintiff relied on this statement in later deciding to purchase Quorum's stock, and in continuing to hold Plaintiff's previous purchases.

37.     Quorum's May 11, 2016, 10-Q report contained signed certifications by the Individual Defendants, stating that the financial information contained in the report was accurate and disclosed any material changes to the Company's internal control over financial reporting.

38.     The next day (May 12, 2016), Quorum's CEO and CFO, Defendants Miller and Culotta, participated in a conference call with investors (including Plaintiff).    Culotta "reconfirm[ed]" the adjusted EBITDA guidance of "$265 million to $275 million."    Plaintiff relied on that statement in later deciding to purchase Quorum's stock, and in continuing to hold Plaintiff's previous purchases.

39.     Between May 5, 2016, and August 10, 2016, Plaintiff purchased Quorum stock on the secondary market in a net investment of approximately $6.73 million.

40.     On August 10, 2016, Quorum filed its 10-Q report with the SEC, relating to Quorum's performance during its first full quarter as a stand-alone company (April 1 to June 30, 2016).    Quorum also issued a press release, on the same date, describing the information contained in the 10-Q report.    These documents revealed the truth about Quorum's actual operating performance as a stand-alone company.    In particular, these documents revealed that Quorum's hospitals had incurred far higher costs than previously stated by Defendants.

41.     In Quorum's first two months as a stand-alone company, Quorum incurred $28 million in annualized stand-alone costs—a staggering 3.5 times, or $20 million higher than, the

9

$8 million Defendants disclosed in the March 29, 2016 presentation, and reconfirmed in the May 11, 2016 10-Q report.  These additional costs are as follows:  $10 million more in corporate staff expense that Community Health's management team burdened Quorum with before the spinoff; an inexplicable $6 million increase in higher payments directly back to Community Health; and $4 million in higher costs due to Quorum's inability to participate in a purchase organization associated with Community Health.  Defendants knew about all of these costs at the time of their fraudulent statements, described above, because Defendants were intimately familiar both with the details of Quorum's business and the method by which Quorum would be spun off from CHS.  Further, expenses of this type would have been generally known by Defendants at the time of the "spin off," unlike expenses entirely outside of Defendants' control such as commodity prices. Defendants knowingly omitted these costs from their fraudulent statements described above.

42.     Quorum's higher costs were also due to a 22% increase in medical specialist fees—which resulted in an additional annualized cost of $18 million.     At the time of Defendants' fraudulent statements, described above, Defendants knew that medical specialist costs would be incurred because CHS itself, in late 2015, had negotiated the contract or contracts that led directly to these higher costs.

43.     These increased costs ($38 million) were *not* incurred by the hospitals that remained part of CHS; they *only* were incurred by the 38 hospitals "spun off" into Quorum. Defendants knowingly omitted these costs from their fraudulent statements described above.

44.     Quorum's August 10 filing also disclosed that Quorum's 38 hospitals performed poorly in Quorum's first quarter as a stand-alone company.  This poor performance caused an additional $45 million annualized decline in earnings.  At the time of Defendants' fraudulent

statements, described above, Defendants knew that these hospitals were performing poorly. Further, at the time of Defendants' fraudulent statements, Defendants had themselves selected these hospitals (rather than other, better-performing hospitals) for inclusion in the Quorum spin-off. Defendants knowingly omitted the poor performance of these hospitals from Defendants' disclosures to investors described above.

45.    As a direct result of Quorum's higher costs and poor performance, described above, Quorum's earnings for the second quarter of 2016 (the three months ending June 30, 2016, and measured using the adjusted EBITDA measure) was $29.2 million, compared to $59.6 million for the same period in 2015.  That is a quarterly earnings miss of 54%.  (Once annualized, Quorum's adjusted EBITDA based on this quarter's results was just $116.8 million, as compared to the midpoint of $270 million Defendants stated on March 29, 2016.)

46.    Among publicly traded hospital companies, an earnings miss of this magnitude (in percentage terms) is staggering and unprecedented. For example, since the second quarter of 2009, the worst EBITDA miss by a public hospital peer company is 36% by Health Management Associates (in the third quarter of 2013), and that miss was caused by many unique issues that are not present in Quorum's case.  The average of the 10 worst quarterly misses in the public hospital sector in recent history is 15%, so Quorum's 54% miss is nearly quadruple this average.

47.    Also as a direct result of Quorum's higher costs and poor performance, described above, Quorum was forced to revise downward two key indicators of its performance and financial health.  These revisions were also disclosed in the August 10-Q report.  *First*, Quorum stated that its guidance for annual adjusted EBITDA, in 2016, now "range[d] from $175 million to $200 million."  The midpoint of this guidance was ***$82.5 million lower*** (in dollar terms) and ***30.5% lower*** (in percentage terms) than the midpoint of the guidance issued just five months

11

earlier (in the March statements prior to the spin-off) and then repeated two months later (in Quorum's May 2016 10-Q). As with the quarterly earnings miss, among publicly traded hospital companies, an adjustment of this magnitude (in both dollar terms and percentage terms) is staggering and unprecedented.

48. *Second*, this massive downward revision of its annual adjusted EBITDA led directly, and entirely caused, a similarly enormous "impairment" (i.e., write-down) of the company's "goodwill." This was an impairment of ***$200 million*** (in dollar terms) and ***34%*** (in percentage terms). Quorum treats its "goodwill" as an asset, and measures it based on the expected operating performance of Quorum's hospitals.[3] Quorum and CHS typically recalculate "goodwill" at the end of each year. Quorum's shocking costs and performance, in its first quarter as a stand-alone company, forced it to perform this recalculation much earlier, and to report the impairment in its August 2016 10-Q. The impairment of Quorum's goodwill was directly due to management's acknowledgement that, because of its hospitals' true operating costs and true performance, Quorum's hospital operations were worth far less ($200 million less)

---

[3] Quorum's August 10, 2016 press release confirmed that "goodwill" is measured based on the company's operating performance. An SEC filing, dated April 1, 2016, states that Quorum measures goodwill based on the "fair value" of the company. "Fair value," in turn, is measured based on

> both a discounted cash flow model as well as a multiple model based on earnings before interest, taxes, depreciation and amortization ("EBITDA"). The cash flow forecasts are adjusted by an appropriate discount rate based on the Company's best estimate of a market participant's weighted-average cost of capital. Both models are based on the Company's best estimate of future revenues and operating costs.

Quorum Amendment No. 6 to Form 10 (Apr. 1, 2016). The August 10, 2016 press release stated: "[T]he Company recorded a goodwill impairment charge of $200 million relating to the carryover allocation of goodwill at the time of the Spin-off Transaction, which represents management's best estimate of fair value and the resulting implied goodwill related to its hospital reporting unit in step two of its interim goodwill impairment evaluation."

than previously represented by Defendants.[4]

49.     As a direct result of Quorum's higher operating costs, poor performance, and impairment of goodwill, described above, Quorum's August 10-Q report also reported a huge operating loss of $259.3 million for Quorum's first quarter as a stand-alone company.

50.     As a result of Quorum's disclosures on August 10, 2016, the stock price and bond price plummeted.  Quorum's stock price fell by a staggering 50% on August 11, 2016 (the day after the earnings announcement).  The bond price fell by 18% by the end of August 12, 2016. This chart shows the drop in Quorum's stock price, compared to the prices of comparable securities:

---

[4] For the avoidance of doubt:  Plaintiff is not (at present, and without yet having the benefit of discovery) alleging that Quorum's and CHS's earlier public statements about "goodwill" calculations were fraudulent misrepresentations.   Instead, the specific fraudulent misrepresentations that Plaintiff alleges are those statements (regarding operating costs and EBITDA guidance) that are set forth in earlier paragraphs of this complaint.  In this paragraph, Plaintiff includes this description of the "goodwill" impairment, issued in the August 10, 2016 press release, in order to make clear that this impairment of "goodwill" is directly attributable to the revelation of the fraud that was also announced in the same press release.  When Quorum admitted the truth about its drastically higher operating costs, and much lower earnings guidance, the direct result of this admission was a simultaneous impairment of goodwill.



51. Plaintiff sold nearly all of Plaintiff's Quorum stock and Senior Notes soon after the August 10, 2016 disclosure. These sales resulted in significant losses for Plaintiff (measured as the difference between the purchase price and the sale price). Plaintiff lost approximately $4.4 million on Plaintiff's purchases of Quorum stock, and approximately $6.7 million on Plaintiff's purchases of Quorum's Senior Notes—for a total of approximately $11.1 million lost as the result of Defendants' fraud.[5]

### COUNT ONE – VIOLATION OF T.S.A. § 48-1-122(a)
### (IN CONNECTION WITH SELLER DEFENDANTS' SALE OF $45 MILLION OF SENIOR NOTES TO PLAINTIFF IN THE PRIMARY OFFERING)

---

[5] These estimates are based on Plaintiffs' sales of these securities after August 10, 2016. They are calculated using first-in, first-out accounting ("FIFO").

14

52.     The allegations set forth in the previous paragraphs are adopted and incorporated herein by reference.

53.     Defendants CHS, Quorum, Culotta and Miller (the "Seller Defendants") actively (a) offered to sell, (b) solicited Plaintiff's offer to buy, and (c) sold, Senior Notes with a par value of $45 million to Plaintiff in the primary offering of these securities, on or about April 8, 2016.  Plaintiff paid approximately $44.2 million for these securities.

54.     Various banks (led by Credit Suisse) also acted as intermediaries in facilitating this sale of Senior Notes to Plaintiff.  The Seller Defendants acted as agents of these banks by actively participating in the banks' marketing of the Senior Notes and the banks' solicitations of offers to buy.

55.     The Seller Defendants' (a) offer to sell; (b) solicitation of Plaintiff's offer to buy; and (c) sale of the $45 million of Senior Notes, were each in violation of Tenn. Code Ann. § 48-1-121(a) because, by means of the fraudulent statements described above, the Seller Defendants intentionally and willfully concealed and misstated the true costs and performance of Quorum. By means of these statements, the Seller Defendants employed a device, scheme, or artifice to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices, and a course of business which operated as a fraud or deceit upon Plaintiff and other investors.

56.     Plaintiff was unaware of the Seller Defendants' violation of Tenn. Code Ann. § 48-1-121(a) at the time of Plaintiff's purchase of these Senior Notes from Seller Defendants.

57.     Seller Defendants sold the Senior Notes from Tennessee and gave advice regarding this sale while located in Tennessee.  Seller Defendants performed numerous acts in

Tennessee that were instrumental to effecting their violation of Tenn. Code Ann. § 48-1-121(a), including but not limited to creating and disseminating the fraudulent statements described above.

58.      All remaining (non-Seller) Defendants are vicariously liable for the violations of the Seller Defendants alleged herein, because the non-Seller Defendants were at all relevant times either "principal executive officers" or "directors" of CHS and/or Quorum. *See* Tenn. Code Ann. § 48-1-122(g).

59.      Therefore, Plaintiff is entitled to rescissionary damages from all Defendants, specifically, the difference between the price at which Plaintiff purchased the $45 million of Senior Notes, and the price at which Plaintiff later sold those bonds, plus pre-judgment and post-judgment interest at the legal rate.

## COUNT TWO – VIOLATION OF T.S.A. § 48-1-122(c)
## (IN CONNECTION WITH *ALL* PURCHASES OF SECURITIES BY PLAINTIFF)

60.      The allegations set forth in the previous paragraphs are adopted and incorporated herein by reference.

61.      In addition to the fraudulent statements made by Defendants in connection with the $45 million of Senior Notes that Plaintiff purchased on or about April 8, 2016, Defendants also made additional fraudulent statements deceiving Plaintiff as to the true performance and costs of Quorum, as alleged in detail herein.  All of Defendants' fraudulent statements alleged herein were made in connection with the offer, sale, or purchase of a security within Tennessee. By means of these statements, Defendants intentionally employed a device, scheme, or artifice to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made,

16

not misleading; and engaged in acts, practices, and a course of business which operated as a fraud or deceit upon Plaintiff and other investors.

62.     Plaintiff was unaware of Defendants' violation of Tenn. Code Ann. § 48-1-121(a) at the time of all Plaintiff's purchases of securities.

63.     Defendants' violation of Tenn. Code Ann. § 48-1-121(a) was willful. Defendants' violation of Tenn. Code Ann. § 48-1-121(a) was intended to, and did: deceive Plaintiff and other investors; artificially inflate and maintain the price of Quorum securities; cause Plaintiff and other investors to purchase Quorum bonds and stock; cause Plaintiff and other investors to pay higher prices than they would otherwise have paid had they known the truth; and cause Plaintiff and other investors to purchase the securities at artificially inflated prices.

64.     All Individual Defendants, in addition to being directly liable for the statements alleged herein, are also vicariously liable because the Individual Defendants were at all relevant times either "principal executive officers" or "directors" of CHS and/or Quorum. *See* Tenn. Code Ann. § 48-1-122(g).

65.     Therefore, Plaintiff is entitled to damages in the amount of the difference between the price at which Plaintiff purchased all stocks and bonds ("Senior Notes") issued by Quorum, and the substantially lower market value which those securities would have had at the time of the purchases absent Defendants' fraud, plus pre-judgment and post-judgment interest at the legal rate.

## COUNT THREE – COMMON-LAW FRAUD
## (IN CONNECTION WITH *ALL* PURCHASES OF SECURITIES BY PLAINTIFF)

66.     The allegations set forth in the previous paragraphs are adopted and incorporated herein by reference.

17

67.     By means of the misleading statements identified herein, Defendants intentionally concealed and misrepresented material facts and produced a false impression. Defendants did so by knowingly omitting the true costs of Quorum as a stand-alone company and knowingly omitting the true performance of Quorum. This information was known to Defendants at the time of Defendants' misleading statements but Defendants deliberately concealed this information in order to hide the truth and mislead Plaintiff.

68.     Plaintiff relied on Defendants' misleading statements in purchasing Quorum stocks and bonds.

69.     Plaintiff was injured by Defendants' misleading statements because those statements caused Plaintiff to make purchases that Plaintiff would not otherwise have made; caused Plaintiff to pay higher prices on those purchases than Plaintiff would otherwise have paid; and caused Plaintiff's investments to lose substantial value when the truth was disclosed to Plaintiff and other investors on August 10, 2016.

70.     Therefore, Plaintiff is entitled to compensatory damages in the amount of the difference between the prices Plaintiff paid for the Quorum stocks and bonds and the substantially lower prices at which Plaintiff sold those securities, plus interest at the legal rate. In the alternative, Plaintiff is entitled to compensatory damages in the amount of the difference between the price at which Plaintiff purchased all stocks and bonds issued by Quorum, and the substantially lower market value which those securities would have had at the time of these purchases absent Defendants' fraud, plus pre-judgment and post-judgment interest at the legal rate.

71.     Furthermore, Plaintiff is entitled to punitive damages because of Defendants' willful, reckless and wanton conduct, in *at least* the amount of $33.3 million.

18

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays:

A.       that summons issue and that Defendants be served and made to answer herein;

B.       that a jury trial be held wherein Plaintiff is awarded compensatory damages of *at least* $11.1 million, and punitive damages in *at least* the amount of $33.3 million;

C.       that Plaintiff be awarded prejudgment and postjudgment interest;

D.       that Plaintiff be awarded attorneys fees, expert fees, and other costs pursuant to Tenn. Code Ann. § 48-1-122(f) and any other applicable law;

E.       that Plaintiff be awarded such other and further relief, both general and specific, to which Plaintiff may be entitled under the premises.

**PLAINTIFF DEMANDS A TRIAL BY JURY OF SIX (6) PERSONS FOR ALL CLAIMS ALLOWABLE BY TENNESSEE STATUTE, COMMON LAW, AND THE STATE CONSTITUTION, WHEN THE ISSUES ARE JOINED HEREIN.**

Date:   October 25, 2017

19

Respectfully submitted,

Russ Heldman (TN Bar No. 009989)
Phone: (615) 599-9420
Facsimile: (615) 599-9421
218 Fourth Avenue North
P.O. Box 826
Franklin, TN 37064

SUSMAN GODFREY L.L.P.

Steven M. Shepard*
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone:  (212) 336-8330
Facsimile:  (212) 336-8340
sshepard@susmangodfrey.com

Ashley McMillian*
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
amcmillian@susmangodfrey.com

*Pro hac vice application will be filed
contemporaneously with this complaint

Attorneys for Plaintiff

20