# EXHIBIT 2

# ROBBINS | RUSSELL

Robbins, Russell, Englert, Orseck & Untereiner LLP

Gary A. Orseck

202.775.4504
gorseck@robbinsrussell.com

December 15, 2021

**BY FEDERAL EXPRESS**

Don Esposito
Chief Legal Officer and Secretary
Quorum Health
1573 Mallory Lane
Suite 100
Brentwood, TN 37027

Re:    *Golden, et al. v. Community Health Systems, Inc., et al.*, Adv. Proc. No.
21-51190-BLS (Bankr. D. Del.)

Don:

My firm represents Larry Cash, Rachel Seifert, Community Health Systems, Inc.
("CHSI"), and certain of its affiliates (together, with Cash and Seifert, the "CHSI Parties") in the
above-captioned litigation (the "Litigation"). This letter is to provide notice that the CHSI Parties
are entitled to, and hereby request, indemnification under the April 29, 2016 Separation and
Distribution Agreement by and between CHSI and Quorum Health Corp. ("Quorum") (the "Spin-
Off Agreement").

As reflected in the enclosed complaint, Daniel H. Golden, as litigation trustee for the QHC
Litigation Trust, and Wilmington Savings Fund Society, FSB, as indenture trustee for certain
senior notes, filed a lawsuit against, among others, the CHSI Parties, alleging various claims
relating to Quorum's spin-off from CHSI. The claims relate to: (1) Quorum's issuance of debt in
connection with the spin-off; (2) Quorum's obligations under the Spin-Off Agreement; and (3)
Quorum's obligations under the Transition Services Agreements. The Plaintiffs are seeking to set
aside and recover various transfers made to (or for the benefit of) CHSI and its affiliates, in addition
to damages, disgorgement, restitution, pre- and post-judgment interests, attorneys' fees, expenses,
and costs.

The CHSI Parties are entitled to indemnification in connection with this Litigation. Section
4.02 of the Spin-Off Agreement requires that Quorum "indemnify, defend and hold harmless each

# ROBBINS | RUSSELL

Don Esposito
December 15, 2021
Page 2

of the CHS Indemnitees[1] from and against all QHC Indemnity Obligations." The QHC Indemnity Obligations include "all Losses[2] incurred by a CHS Indemnitee to the extent such Losses relate to, arise out of or result from, directly or indirectly" any of the "QHC Liabilities." (Spin-Off Agreement at 12). "QHC Liabilities" are in turn defined to include, among other things[3]:

- "all Liabilities relating to, arising out of or resulting from the QHC Financing Transactions [*i.e.*, the loan and note offerings to which these claims relate]," *id.* at 13;

- "all Liabilities expressly allocated to QHC or a QHC Subsidiary pursuant to [the Spin-Off Agreement] or any [Transition Services Agreement], and the obligations of QHC or a QHC Subsidiary under such agreements," *id.*; and

- "the Liabilities relating to, arising out of, or resulting from Proceedings [including lawsuits and any proceeding before a judicial body] to the extent such Proceedings relate to, arise out of, or result from" any of the other QHC Liabilities (including both of the preceding categories), *id.*

Please confirm that Quorum intends to honor its QHC Indemnity Obligations. These include advancement of the CHSI Parties' fees and expenses incurred in defending this Litigation. In that regard, please note that the CHSI Parties' codefendants, Credit Suisse Securities (USA) LLC ("Credit Suisse") and Adam Feinstein, have sought indemnification from CHSI. Because the claims against Credit Suisse and Mr. Feinstein likewise relate to Quorum's issuance of debt in connection with the spin-off, CHSI's indemnification expenses in favor of Credit Suisse and Mr. Feinstein are among the "Losses" for which CHSI is in turn entitled to indemnification from Quorum.

In addition, Mr. Cash and Ms. Seifert are former directors of Quorum who are being sued in their capacity as such. They therefore may be entitled to indemnification under Quorum's corporate governance documents and/or Quorum's director and officer insurance policies (the "D&O Policies"). We therefore request that you promptly provide us with copies of the applicable

---

[1] The CHSI Indemnitees include CHSI and its subsidiaries, as well as former directors and officers of CHSI and its subsidiaries, such as Ms. Seifert and Mr. Cash.

[2] Losses means "any and all losses, damages, settlements, claims, fines, penalties, costs and expenses (including reasonable attorneys' fees . . .) actually incurred by such person arising from such matter, but excluding consequential damages."

[3] We identify these provisions only by way of example. These are not, however, the exclusive grounds on which the CHSI Parties are entitled to indemnification. For example, the QHC Indemnity Obligations also include all Losses that "relate to, arise out of or result from, directly or indirectly" the "failure of QHC or a QHC Subsidiary or any other Person to pay, perform or otherwise promptly discharge any QHC Liabilities in accordance with their terms, whether prior to, at or after the Effective Time."

ROBBINS | RUSSELL

Don Esposito
December 15, 2021
Page 3

corporate governance documents and D&O Policies so that we may evaluate our clients' rights
thereunder.

Very truly yours,

Gary A. Orseck

cc (by email):

       Justin Pitt (justin_pitt@chs.net)
       Senior Vice President and Chief Litigation Counsel
       CHSPSC, LLC

       Michael S. Neiburg (mneiburg@ycst.com)
       Young Conaway Stargatt & Taylor LLP

Enclosure

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
------------------------------------------------------------------- x
In re:                                             :
                                                   :   Case No. 20-10766 (BLS)
QUORUM HEALTH CORPORATION, et al.,                 :
                                                   :   Chapter 11
                        Debtor.                    :
                                                   :
------------------------------------------------------------------- x
                                                   :
DANIEL H. GOLDEN, AS LITIGATION TRUSTEE            :
OF THE QHC LITIGATION TRUST, AND                   :
WILMINGTON SAVINGS FUND SOCIETY, FSB,              :   Adv. Pro. No. _____
SOLELY IN ITS CAPACITY AS INDENTURE                :
TRUSTEE,                                           :   COMPLAINT
                                                   :
                        Plaintiffs,                :
                                                   :
                v.                                 :
                                                   :
COMMUNITY HEALTH SYSTEMS, INC.;                    :
CHS/COMMUNITY HEALTH SYSTEMS, INC.;                :
REVENUE CYCLE SERVICE CENTER, LLC;                 :
CHSPSC, LLC; PROFESSIONAL ACCOUNT                  :
SERVICES, INC.; PHYSICIAN PRACTICE                 :
SUPPORT, LLC; ELIGIBILITY SCREENING                :
SERVICES, LLC; W. LARRY CASH; RACHEL               :
SEIFERT; ADAM FEINSTEIN; AND CREDIT                :
SUISSE SECURITIES (USA) LLC,                       :
                                                   :
                        Defendants.                :
------------------------------------------------------------------- x
```

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

II.  PARTIES ...............................................................................................................6

III.  JURISDICTION AND VENUE ...........................................................................10

IV.  FACTUAL ALLEGATIONS ...............................................................................10

A.  CHS Faces Challenging Prospects.......................................................10

B.  CHS Creates QHC In Order To Alleviate Its Liquidity Crunch And Avert A Ratings Downgrade ...........................................................................11

C.  CHS's and QHC's Financial Conditions Deteriorate Sharply While CHS Plans the Spin-Off..................................................................................15

D.  QHC's Cost of Debt Increases Markedly, Rendering the Spin-Off Even More Misguided....................................................................................17

E.  CHS Manipulates the QHC Projections in Order to Consummate the Spin-Off and Effectuate the $1.21 Billion Spin-Off Dividend.......................18

F.  CHS Causes QHC to Incur $1.28 Billion in Spin-Off Debt Obligations.............23

G.  CHS Takes Other Steps That Preclude QHC from Succeeding as a Stand-Alone Company ....................................................................................24

1.  CHS Forces QHC to Enter into Onerous and One-Sided TSAs. ...............24

2.  CHS Neglects the QHC Assets Prior to the Spin-Off..............................27

3.  CHS Forbids QHC's Future Management from Preparing QHC to Operate as a Stand-Alone Company. ......................................................28

4.  CHS Transfers its Costs to QHC. ..........................................................29

H.  The Spin-Off and Spin-Off Dividend are Approved by CHS Representatives Masquerading as QHC Board Members, Leaving QHC Balance Sheet Insolvent, Inadequately Capitalized, and Unable to Pay its Debts as They Came Due..........................................................................29

I.  Predictably, QHC's Post-Spin Performance Falls Far Below the QHC Projections.............................................................................................32

J.  QHC Files for Bankruptcy ...................................................................34

V.      CAUSES OF ACTION ....................................................................................................35

PRAYER FOR RELIEF .............................................................................................................69

Plaintiffs Daniel H. Golden., as Litigation Trustee of the QHC Litigation Trust (the "Trust"), and Wilmington Savings Fund Society, FSB ("WSFS" or the "Indenture Trustee"), solely in its capacity as the Indenture Trustee under that certain indenture (the "Indenture"), dated as of April 22, 2016 for the unsecured 11.625% Senior Notes due April 2023 (the "Senior Notes"), through their undersigned counsel, bring this action and allege as follows:[1]

## I.     INTRODUCTION[2]

1.       In 2015, Community Health Systems, Inc. ("CHS"), a publicly traded owner and operator of U.S. hospitals, was in desperate need of a lifeline.  Its debt had grown to more than $17 billion, resulting in a leverage ratio more than 150% greater than the median of its peers.  $1.2 billion of its debt was set to mature in 2016 and 2017, and $3.8 billion would mature in 2018. Making matters worse, the company was facing deteriorating operating performance driven primarily by declining utilization and volumes across its portfolio of hospitals, and secular headwinds were trending sharply downward.  CHS had been forced to lower its earnings guidance twice throughout the year, and in the third quarter alone, its stock price dropped 39%, wiping out $1.6 billion in market capitalization.  It was unable to access traditional sources of capital to refinance its maturing debt given its high leverage, and it faced ratings downgrades that would have further increased its already burdensome cost of debt.

2.       Against the backdrop of this increasingly precarious financial condition, CHS devised a plan that would enable the company to raise the money it so badly needed to pay down its debt, while simultaneously divesting some of its worst-performing assets—all at no cost to CHS.  The plan was to create Quorum Health Corporation ("QHC") as a wholly owned subsidiary

---

[1]  WSFS serves as plaintiff herein only with respect to Counts One through Fifteen, and is not pursuing any claims against Credit Suisse Securities (USA) LLC ("Credit Suisse").

[2]  Capitalized terms not defined in this section are defined later in the Complaint.

1

of CHS, and to contribute to QHC (1) 38 hospitals located primarily in rural areas with populations of 50,000 or less (the "QHC Hospitals"), and (2) a small consulting business called Quorum Health Resources ("QHR," and together with the QHC Hospitals, the "QHC Assets"). CHS was happy to divest the QHC Assets, as many of the QHC Hospitals underperformed CHS's other hospitals—with some even generating negative annual EBITDA—and QHR placed a drain on CHS's balance sheet because it regularly incurred significant litigation expense.

3.      The real pièce de résistance of CHS's plan, however, was that CHS would cause QHC to raise $1.21 billion in debt, which QHC would then pay to CHS as a tax-free dividend (the "Spin-Off Dividend") so that CHS could pay down the over one billion dollars of its own debt that was coming due in the next two years. Then, once the Spin-Off Dividend was paid, CHS would distribute QHC's stock to CHS's shareholders, so that QHC would be a publicly traded company that was no longer owned by CHS (the contribution of the QHC Assets and the distribution of QHC stock to CHS shareholders, collectively, the "Spin-Off"), and CHS would have no responsibility for QHC's obligations.

4.      The rub was that the value of the QHC Assets did not even come close to the value necessary to raise or service the $1.21 billion of debt proceeds CHS needed to pay down its own debt, and no reasonable fiduciary acting in QHC's best interest would have agreed to burden QHC with that amount of debt, or to pay the proceeds to CHS as a dividend without receiving any value in return. But CHS had a solution to these problems as well. First, it ensured that the Spin-Off and Spin-Off Dividend would be a fait accompli, by constituting the initial QHC Board of Directors (the "QHC Board") only with CHS senior officials, who approved the Spin-Off and Spin-Off Dividend without holding a single in-person meeting, and who resigned from the QHC Board once the Spin-Off Dividend was approved and/or paid.

2

5.      Second, it created fraudulently inflated projections for QHC (the "QHC Projections") that significantly overstated projected revenues, margins, and the number and proceeds of asset sales, and significantly understated costs, at a time when QHC's actual operating results showed that these projections defied reality.  Indeed, while the QHC Assets missed their 2015 earnings budget by $64.7 million (23%), and adjusted EBITDA for the QHC Assets during the first quarter of 2016 was 15% below its first quarter 2015 adjusted EBITDA, the QHC Projections predicted that QHC would undergo a miraculous recovery the moment it was spun off. And when the credit markets began to tighten in November 2015, CHS systematically increased projected free cash flow in order to offset the increasing cost of debt, ultimately inflating that number by *approximately $118 million*.

6.      Lee Fleck, the CHS employee who worked under the direction of CHS Chief Financial Officer Larry Cash to create the QHC Projections, was so uncomfortable with Cash's directives that he began keeping a log of them in order to have a written record of the changes he was being instructed to make.  Fleck later stated that he had "never been pressured in a transaction like this before," that Cash's directives were "borderline absurd," that he "didn't think the numbers [being demanded by Cash] were doable," and that the Spin-Off "didn't seem economically feasible."

7.      CHS also took other steps that ensured consummation of the Spin-Off and Spin-Off Dividend and QHC's demise.  In order to further solidify its absolute control over the Spin-Off process, CHS tapped Credit Suisse, its long time investment banker, to nominally serve as QHC's investment banker in connection with the Spin-Off Debt.  Credit Suisse, motivated by its lucrative relationship with CHS, then assisted CHS in the fraudulent machinations necessary to

raise the funds needed to pay the Spin-Off Dividend, notwithstanding Credit Suisse's knowledge that QHC would not be able to sustain that level of debt.

8.      CHS also appointed CHS executives Thomas Miller and Michael Culotta as Chief Executive Officer and Chief Financial Officer of QHC, respectively, but informed them that they would not formally take those roles until the Spin-Off was completed, and forbade them from preparing QHC to operate as a stand-alone company.  Instead, CHS mandated that the QHC Assets remain within their divisions at CHS prior to the Spin-Off, in order to obscure QHC's declining financial performance.  Miller and Culotta's primary purpose prior to the Spin-Off was to attend meetings with prospective QHC lenders and rating agencies regarding the QHC debt that would finance the Spin-Off Dividend (the "Spin-Off Debt"), so that it would appear that there were QHC fiduciaries involved in the process.  In reality, however, Miller and Culotta played no role in formulating the QHC Projections shown to the lenders and ratings agencies at those meetings, and had no insight into the assumptions on which the QHC Projections were premised.

9.      Further, CHS caused significant damage to QHC by sharply curtailing investments in the QHC Hospitals in the months leading up to the Spin-Off, neglecting ordinary maintenance and improvements in order to prioritize the hospitals that would remain with CHS post-spin.  Two weeks after the Spin-Off was consummated, Culotta observed that the QHC Hospitals had "just been in a stalled position" for the past seven or eight months.  CHS also burdened QHC with a series of onerous transition services agreements ("TSAs"), which afforded CHS a steady stream of payments from QHC for the next five years, regardless of the level of CHS's performance under the TSAs.  In total, the TSAs required QHC to pay CHS over $150 million over the course of less than four years.

10.     CHS completed the Spin-Off in April 2016.  The result of the transaction was that CHS had simply offloaded its own unsolvable debt problem onto QHC.  From the moment that CHS spun it off, QHC was cash-strapped and overleveraged.  QHC violated its debt covenants almost immediately after the Spin-Off was consummated, and was forced to enter into costly amendments to its Term Loan and dedicate virtually all available cash flows to debt repayment. Left with less than $14 million of cash on hand and a collection of underperforming assets that could never generate anywhere near the annual cash flows required to service its exorbitant annual interest expense, QHC was insolvent, inadequately capitalized, unable to pay its debts as they came due, and doomed to fail from the moment it was spun off.

11.     While QHC was able to muddle along for the next four years through expensive amendments to its credit agreement that ensured it would never be able to execute on its stated business plan, it succumbed to its inevitable fate on April 7, 2020 (the "Petition Date"), when the company and its affiliated Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.  As Alfred Lumsdaine, QHC's Executive Vice President and Chief Financial Officer explained, QHC was doomed to failure from its creation, as the company was "bordering on bankruptcy" shortly after it was spun off in April 2016, and the bankruptcy filing was "driven by the financial obligations produced by the capital structure it has operated with since its inception, rather than the underlying business performance."

12.     In light of the foregoing, Plaintiffs, acting on behalf of or for the benefit of QHC's creditors—who were defrauded into lending into the Spin-Off Debt and have received less than 10 cents on the dollar in repayment—file this complaint to hold CHS and certain of its affiliates, Credit Suisse, and the CHS directors who masqueraded as QHC directors to approve the Spin-Off and Spin-Off Dividend, liable for the hundreds of millions of dollars of harm caused by these

5

transactions. The $1.21 billion Spin-Off Dividend, related transaction fees, and TSA payments are avoidable as actually and constructively fraudulent transfers. Likewise, the Spin-Off Dividend was illegal under Delaware law, and liability flows to the three nominal QHC directors who approved it, the shareholder who received it (CHS and/or its affiliates), and Credit Suisse for aiding and abetting its payment. In addition, CHS and/or its affiliates—as alter egos of QHC—should be liable for the full amount outstanding under QHC's Senior Notes Indenture. Finally, CHS, its affiliates, and Credit Suisse were unjustly enriched by the proceeds they received as a result of the Spin-Off, including but not limited to the Spin-Off Dividend, transaction and financing fees, and payments under the TSAs —all of which should be disgorged for the benefit of QHC's creditors.

## II.    PARTIES

13. Plaintiff Daniel H. Golden is the Litigation Trustee for the Trust formed under the plan of reorganization (the "Plan") of QHC and 134 affiliated debtors (collectively, the "Debtors"). Under the Plan, the Debtors contributed to the Trust all Debtor Causes of Action (as defined in the Plan) (i) arising under or based on sections 542, 543, 544 through 548, 550, or 553 of the Bankruptcy Code, any state law fraudulent transfer, fraudulent conveyance, or voidable transaction law, or any statute limiting or prohibiting transfers to shareholders or (ii) relating to fraudulent transfer, fraudulent conveyance, voidable transaction, illegal dividend, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, alter ego, or unjust enrichment.

14. Additionally, noteholders (the "Contributing Claimants") holding 94.23% of the Debtors' 11.625% Senior Notes due April 2023 (the "Senior Notes") assigned to the Trust all of their prepetition Causes of Action arising under or based on state, federal, or common law, including but not limited to fraudulent transfer, fraudulent conveyance, voidable transaction law, any statute limiting or prohibiting transfers to shareholders, and alter ego. The Trust is the Holder of a Definitive Note issued under the indenture governing the Senior Notes that allows the Trust

to assert and prosecute the Causes of Action that have been assigned to it by the Contributing Claimants.

15.     Plaintiff WSFS, solely in its capacity as Indenture Trustee under the Senior Notes Indenture, is a federal savings bank organized and existing under the laws of the United States of America and having a corporate trust office at 500 Delaware Avenue, Wilmington, Delaware 19801.[3]

16.     Defendant CHS is incorporated in Delaware and maintains its principal executive offices at 4000 Meridian Boulevard, Franklin, Tennessee, 37076.

17.     Defendant CHS/Community Health Systems, Inc. ("CHS-2") is a wholly owned subsidiary of CHS and the successor-in-interest to CHS-QHC Bridge Company, LLC ("BridgeCo"), which merged with and into CHS-2 following the Spin-Off.  Upon information and belief, CHS-2 is incorporated in Delaware and maintains its principal executive offices at 4000 Meridian Boulevard, Franklin, Tennessee, 37076.  CHS-2 is named as a Defendant herein both in its individual capacity and as the successor to BridgeCo.

18.     Defendant W. Larry Cash was the Chief Financial Officer of CHS from 1997 until 2017.  On July 27, 2015, Cash became QHC's President and a member of QHC's board of directors.  As a QHC director, Cash voted to approve the Spin-Off and the Spin-Off Dividend. Cash resigned from his role as QHC's President effective April 1, 2016, and resigned from his role as a QHC director on April 29, 2016, immediately after voting to approve the Spin-Off Dividend. Cash remained the CFO of CHS until his retirement in 2017.  Following his retirement, Cash and

---

[3]   No defendant that is subject to suit by both the Litigation Trustee and the Indenture Trustee shall be subject to the same liability more than once.

CHS entered into a consulting agreement, pursuant to which Cash advised CHS's management team through March 2020.

19.    Defendant Rachel Seifert was CHS's Executive Vice President, Secretary, and General Counsel from 1998 until 2017. On July 27, 2015, Seifert became QHC's Executive Vice President and a member of its board of directors. As a QHC director, Seifert voted to approve the Spin-Off and the Spin-Off Dividend. Seifert resigned from her role as a QHC officer effective April 1, 2016, and resigned from her role as a QHC director on April 29, 2016, immediately after voting to approve the Spin-Off Dividend.

20.    Defendant Adam Feinstein is the founder and managing partner of Vesey Street Capital Partners, where Cash currently serves as a member of the Strategic Advisory Board. Feinstein was appointed to the QHC board on or around April 19, 2016, and voted to approve the Spin-Off Dividend on April 29, 2016.

21.    Defendant Revenue Cycle Service Center, LLC ("RCSC"), a wholly owned subsidiary of CHS, is a Delaware limited liability company that maintains its principal executive offices at 4000 Meridian Boulevard, Franklin, Tennessee, 37076. RCSC was a party to the Shared Services Centers Transition Services Agreement, dated April 29, 2016, and received over $57 million from Debtor QHCCS, LLC ("QHCCS") in the four years prior to the Petition Date.

22.    Defendant CHSPSC, LLC ("CHSPSC"), a wholly owned subsidiary of CHS, is a Delaware limited liability company that maintains its principal executive offices at 4000 Meridian Boulevard, Franklin, Tennessee, 37076. CHSPSC is party to the Computer Data and Processing Transition Services Agreement, dated April 29, 2016, and received over $53 million in transfers from QHCCS in the four years prior to the Petition Date.

23.     Defendant Professional Account Services, Inc. ("PASI"), a wholly owned subsidiary of CHS, is a Delaware liability company that maintains its principal executive offices at 4000 Meridian Boulevard, Franklin, Tennessee, 37076.  PASI is party to the Receivables Collection Agreement, dated April 29, 2016, and received over $27 million in transfers from QHCCS in the four years prior to the Petition Date.

24.     Defendant Physician Practice Support, LLC ("PPSI"), a wholly owned subsidiary of CHS, is a Delaware limited liability company that maintains its principal executive offices at 4000 Meridian Boulevard, Franklin, Tennessee, 37076.  PPSI is party to the Billing and Collection Agreement, dated April 29, 2016, and received over $24 million in transfers from QHCCS in the four years prior to the Petition Date.

25.     Defendant Eligibility Screening Services, LLC ("ESS"), a wholly owned subsidiary of CHS, is a Delaware limited liability company that maintains its principal executive offices at 4000 Meridian Boulevard, Franklin, Tennessee, 37076.  ESS is party to the Eligibility Screening Services Agreement, dated April 29, 2016, and received over $10 million in transfers from QHCCS in the four years prior to the Petition Date.

26.     Defendant Credit Suisse is a Delaware limited liability company that maintains its principal place of business at 11 Madison Avenue, New York, New York, 10010.  Credit Suisse is a wholly owned subsidiary of Credit Suisse Group AG, a Swiss banking and financial services company headquartered in Zurich, Switzerland.  QHC paid Credit Suisse between $20-$30 million for services that Credit Suisse provided in connection with the Spin-Off Transaction and Spin-Off Debt, and approximately $4.6 million in connection with amendments to QHC's credit agreement.[4]

---

[4]  The Trust is the sole plaintiff with respect to claims against Credit Suisse, as Plaintiff WSFS is not pursuing claims against Credit Suisse.

27.     QHC was incorporated in Delaware and maintained its principal place of business at 1573 Mallory Lane Brentwood, Tennessee, 37027.

### III.     JURISDICTION AND VENUE

28.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 because this is a civil proceeding arising under or relating to the bankruptcy petitions filed by QHC under Chapter 11 of the United States Bankruptcy Code.  *See In re Quorum Health Corporation*, No. 20-10766 (Bankr. D. Del. filed April 7, 2020).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

29.     Venue is proper in this Court under 28 U.S.C. § 1409(a).

30.     This Court has personal jurisdiction over each of the defendants because they are each incorporated in Delaware or served as a director of an entity incorporated in Delaware.

### IV.     FACTUAL ALLEGATIONS

#### A.     CHS Faces Challenging Prospects

31.     CHS is a large, publicly traded hospital company and operator of general acute care hospitals and outpatient facilities.  As of December 31, 2014, CHS owned or leased 197 hospitals, comprising 193 general acute care hospitals and four standalone rehabilitation or psychiatric hospitals that spanned 28 states.

32.     By 2014, CHS faced bleak prospects.  Its debt had increased from $9.5 billion to $16.9 billion as the result of an acquisition, which made it significantly more highly leveraged than any of its peer hospital services companies.  In 2015 and 2016, CHS's debt grew to more than $17 billion, and by 2016 its leverage ratio was more than 150% the median of its peers.  $1.2 billion of CHS's debt was set to mature in 2016 and 2017, and $3.8 billion of debt would mature in 2018.

33.     Given its high leverage, CHS was unable to access traditional sources of capital to refinance its maturing debt, and faced ratings downgrades that would have further increased its

cost of debt.  In early 2016, Moody's changed its outlook for CHS's rating to "negative" due in large part to CHS's high leverage, and stated that it would consider a further ratings downgrade if CHS did not meaningfully reduce its indebtedness.

34.     CHS's precarious financial condition was exacerbated by its deteriorating operating performance, which was driven primarily by declining utilization and volumes across CHS's portfolio of hospitals.  In 2015, CHS was forced to lower its own earnings guidance twice.  In the third quarter of 2015 alone, CHS's stock price dropped 39%, wiping out $1.6 billion in market capitalization.

35.     As CHS's own financial and operating performance declined, the broader hospital industry faced significant headwinds due to myriad factors and trends, including:  (1) flattening of volume gains that were attributable to the passage of the Affordable Care Act in 2010; (2) a movement toward high-deductible health plans that increased hospitals' levels of bad debt; (3) an industry-wide shift from in-patient to out-patient treatment, reducing the volume and duration of patients' hospital stays; and (4) growing competition and consolidation across the health care sector, leading to industry-wide margin compression.

**B.      CHS Creates QHC In Order To Alleviate Its Liquidity Crunch And Avert A Ratings Downgrade**

36.     Against the backdrop of these operating challenges and impending debt maturities, CHS Chief Financial Officer Larry Cash and Chief Executive Officer Wayne Smith devised a solution that would enable CHS to raise money to pay down its debt while simultaneously divesting some of its worst-performing assets.  Their plan was that CHS would create QHC as a wholly owned subsidiary of CHS, and contribute to QHC (1) the 38 QHC Hospitals located primarily in rural areas with populations of 50,000 or less, and (2) QHR, a small consulting business.  Many of the QHC Hospitals underperformed CHS's other hospitals, with some

generating negative annual EBITDA. Similarly, QHR placed a drain on CHS's balance sheet because it regularly incurred significant litigation expense.

37. Cash's and Smith's plan contemplated further that once the QHC Assets were contributed to QHC, CHS would consummate the Spin-Off by distributing QHC's stock to CHS shareholders, so that QHC would be a publicly traded company that was no longer owned by CHS. And, most importantly for Cash's and Smith's purposes, CHS would cause QHC to raise $1.21 billion in debt, which QHC would then pay to CHS as a tax-free dividend so that CHS could pay down over one billion dollars of its own debt that would be coming due in the next two years.

38. Publicly, CHS articulated the rationale for the Spin-Off as enabling QHC to focus on smaller markets, streamline its management structure, and optimize its hospital portfolio by recruiting physicians, expanding services, divesting underperforming hospitals, making strategic acquisitions, and improving EBITDA margin. CHS claimed that the Spin-Off would follow the successful roadmap set by HCA Healthcare Corp. ("HCA") in 1999, when HCA spun off its LifePoint Health ("LifePoint") and Triad Hospitals ("Triad") into stand-alone entities. In reality, however, CHS's true motivation for the Spin-Off was that it would enable CHS to pay down more than $1 billion of debt while simultaneously shedding some of its worst-performing assets. And the nature of the assets being contributed to QHC, the neglect those assets suffered in the period preceding the Spin-Off, and the crushing debt load CHS imposed on QHC in order to fund the Spin-Off Dividend, ensured that QHC would never look anything like LifePoint or Triad.

39. CHS incorporated QHC on July 27, 2015, and appointed CHS senior officers Cash, Rachel A. Seifert, and Martin G. Schweinhart as QHC's sole directors. That same day, pursuant to a "Written Consent of Board of Directors in Lieu of an Organizational Meeting," the QHC board

appointed themselves and three other senior CHS officers as officers of QHC. The dual roles of QHC's initial slate of officers and directors are set forth in Table 1, below.

**Table 1.  QHC Officers and Directors Appointed on July 27, 2015**

| Individual | Role at CHS | Role at QHC Pre-Spin | Role at QHC Post-Spin |
|---|---|---|---|
| W. Larry Cash | Chief Financial Officer | President; Director | None |
| Martin G. Schweinhart | Executive Vice President of Administration | Executive Vice President; Director | None |
| Rachel A. Seifert | Executive Vice President, Secretary, and General Counsel | Executive Vice President; Director | None |
| Kevin J. Hammons | Vice President of Financial Reporting | Senior Vice President | None |
| Christopher G. Cobb | Vice President, Legal and Assistant Secretary | Assistant Secretary | None |
| James W. Doucette | Vice President, Finance and Treasurer | Senior Vice President and Treasurer | Senior Vice President and Treasurer (until planned retirement shortly after Spin-Off) |

40.     QHC's initial directors and officers did not prepare QHC to operate as a successful stand-alone company. Rather, CHS continued to operate the QHC Assets within their existing divisions at CHS, and QHC's initial directors and officers served as rubber stamps for CHS's fraudulent scheme. Immediately after the Spin-Off was consummated, all of QHC's initial directors and officers, other than James Doucette, resigned from their QHC roles and remained in their positions at CHS. Doucette was transferred to QHC only because he planned to retire shortly after the Spin-Off, and transferring him to QHC meant that QHC—rather than CHS—would be responsible for paying his multi-million dollar retirement package.

41.     On September 2, 2015, pursuant to another written consent in lieu of a board meeting, the QHC board passed resolutions authorizing QHC to proceed with the Spin-Off and to elect Thomas D. Miller, a CHS Division President, and Michael J. Culotta, a Vice President in CHS's Investor Relations department, as QHC's Chief Executive Officer and Chief Financial

13

Officer, respectively. In an effort to imbue CHS's fraudulent scheme with an imprimatur of legitimacy, the September 2, 2015 written consent stated that Miller and Culotta were "authorized and directed to proceed with all reasonably necessary actions to implement and effect the Spin-Off Transaction," including by hiring legal and financial advisors and preparing and negotiating documents and agreements necessary to effectuate the Spin-Off. Incredibly, however, Miller and Culotta were never informed of these purported delegations of authority, and were instead told that they would not formally become officers of QHC until the Spin-Off was consummated, and should continue functioning in their CHS roles until that time. QHC's incoming management did not hold any meetings relating to the planning or management of QHC until the last week of April 2016, when the Spin-Off was consummated.

42. Additionally, while CHS ordered Miller and Culotta to appear as the face of QHC in meetings with prospective QHC lenders and rating agencies regarding the Spin-Off Debt that would finance the Spin-Off Dividend, Miller and Culotta played no role in formulating the QHC Projections shown to the lenders and ratings agencies at those meetings, and had no insight into the assumptions on which the QHC Projections were premised. Miller and Culotta also were denied access to other basic information about QHC in the period leading up to the Spin-Off, such as which CHS employees would be transferred to QHC, and were forbidden from preparing a budget for the company they would soon manage.

43. CHS leadership made it clear to Miller and Culotta that, until the Spin-Off was completed, they were CHS employees who could be fired at CHS's will. And when Miller attempted to participate in QHC staffing discussions, CHS made it clear that it was willing to exercise that will if necessary, with one member of CHS senior management wondering aloud whether Miller was "the right man for the job."

44.     In order to further cement CHS's absolute control over the Spin-Off process, CHS
tapped Credit Suisse to nominally serve as QHC's investment banker in connection with the Spin-
Off Debt.  Credit Suisse had served as CHS's investment banker in the past, and hoped that its
lucrative relationship with CHS would continue into the future.  Thus, CHS understood and
expected that Credit Suisse would turn a blind eye to the machinations necessary to effectuate the
Spin-Off, including fraudulently inflating the QHC Projections on which the Spin-Off was
premised and burdening QHC with a debt load it could not possibly bear.  And Credit Suisse did
not disappoint, as that is exactly what it did.

   **C.      CHS's and QHC's Financial Conditions Deteriorate Sharply While CHS
            Plans the Spin-Off**

45.     CHS's financial condition plummeted during the period leading up to the Spin-Off.
Between July 2015 and April 2016, CHS's stock price declined 77%, from $64.04 per share to
$14.87 per share.  CHS's Q4 2015 financial results showed declining net operating revenues, a net
loss from operations of $74 million (compared with positive net income of $129 million in Q4
2014), and adjusted EBITDA of $527 million, which was a 32.9% decrease from Q4 2014 adjusted
EBITDA.  The day after CHS announced its 2015 earnings, CHS stock fell 22%.  As shown in the
graph below, following year-end 2015, CHS's stock price significantly lagged its peers.



46.     CHS's performance continued to deteriorate in 2016. Following the announcement of its first quarter 2016 results, CHS lowered its 2016 guidance for net revenue and EBITDA and reduced its projected cash flow from operations. Ultimately, the combination of deteriorating operating performance, declining EBITDA, increasing leverage, increasing industry headwinds, and tightening credit markets (discussed below) led CHS management to view the Spin-Off as its last and only hope to salvage its declining equity value.

47.     However, the Spin-Off was complicated by the fact that the QHC Assets were faltering at an even more alarming rate than CHS as a whole. Because the QHC Hospitals were located primarily in rural areas, they faced more headwinds than the hospital industry at large. More specifically, the QHC Hospitals were subject to greater competition from larger hospitals, had difficulty recruiting and retaining physicians and specialists, and had only a limited number of patients due to smaller and declining patient populations. Moreover, the QHC Hospitals serviced a greater portion of patients who were either uninsured, underinsured, or relied on Medicare or Medicaid rather than commercial insurance. These patient populations typically used

16

emergency room services in lieu of primary care providers, resulting in higher costs, and were more likely to rely on Medicare and Medicaid, which provided lower reimbursement rates.

48.     The QHC Assets missed their 2015 earnings budget by $64.7 million (23%). The QHC Assets' adjusted EBITDA for the first quarter of 2016 was 15% below its first quarter 2015 adjusted EBITDA. CHS knew this information prior to the Spin-Off—indeed, CHS received updated financials on a regular basis—but disregarded it when preparing the QHC Projections. CHS was able to conceal the QHC Assets' disastrous financial results because the QHC Assets were still being consolidated within CHS's financials, rather than being reported as a separate division within CHS. QHC's first quarter 2016 financial results were not publicly disclosed until after the Spin-Off was completed and the Spin-Off Dividend was paid.

**D.     QHC's Cost of Debt Increases Markedly, Rendering the Spin-Off Even More Misguided**

49.     The folly of CHS's plan to consummate the Spin-Off was further exacerbated when the credit markets tightened sharply in the fall of 2015, causing the cost of the Spin-Off Debt to increase significantly. Additionally, in the first quarter of 2016, QHC's debt received a "C" rating from Moody's, which further increased QHC's cost of borrowing.

50.     This new and worsened credit environment added between $30 and $35 million per year in additional interest expense for QHC. Some CHS employees concluded that QHC would not be able to support the level of Spin-Off Debt needed for the Spin-Off Dividend, and that either the size of the debt (and therefore the Spin-Off Dividend) would need to be reduced or the Spin-Off would need to be abandoned. Miller also expressed his view that the amount of the Spin-Off Debt needed to be lowered in order to alleviate QHC's interest burden post-Spin-Off.

51.     Market analysts shared this view. On a February 3, 2016 investor call, an analyst remarked that in light of the deteriorating credit markets and increased cost of debt, he expected

QHC's post-spin debt-to-EBITDA ratio would need to be 4.0x, rather than the 5.0x target envisioned by CHS. Credit Suisse reached the same conclusion. This led to a series of heated conversations between CHS and Credit Suisse, in which Cash steadfastly refused to change course or reduce the amount of the Spin-Off Dividend.

52. Cash knew that if CHS did not meaningfully reduce its own debt, it would face a ratings downgrade within the next 6 months. Accordingly, Cash refused to abandon the Spin-Off, as it was the only available means by which CHS, which could no longer access the capital markets, could obtain the funding necessary to pay down its maturing debt. Lowering the amount of the Spin-Off Dividend was also out of the question in Cash's view, as CHS's contribution of the QHC Assets to QHC in the Spin-Off would necessarily reduce CHS's own EBITDA. Thus, CHS needed the $1.2 billion to achieve its desired goal of reducing net debt in a manner that the markets would view as credit positive for CHS. The Spin-Off also provided CHS with a means to increase revenue on a go-forward basis, by forcing QHC to enter into above-market transition services agreements, and offloading excess overhead and administrative costs onto QHC.

53. The Spin-Off was delayed from January 2016 to April 2016, as CHS clamored to find a way for QHC to raise enough debt to pay the $1.2 billion Spin-Off Dividend to CHS. In recognition of the magnitude of this challenge, Credit Suisse's lead investment banker described the Spin-Off as the most difficult deal of his career.

**E.    CHS Manipulates the QHC Projections in Order to Consummate the Spin-Off and Effectuate the $1.21 Billion Spin-Off Dividend**

54. Ultimately, CHS solved this problem not by reducing the size of the Spin-Off Debt, but instead by fraudulently manipulating the QHC Projections so that they falsely suggested that QHC could support the predetermined level of debt necessary to pay the Spin-Off Dividend. CHS inflated QHC's post-Spin-Off cash flows by systematically inflating revenues, margins, and asset

sales and understating costs, at a time when QHC's actual results of operations and other external events showed that these projections defied reality. Credit Suisse witnessed these strategic manipulations, and knew that they were motivated by CHS's desire to consummate the Spin-Off rather than any realistic expectations of QHC's future performance.

55.     The QHC Projections were managed by Lee Fleck, a director of corporate finance at CHS, under Cash's control and supervision. Fleck has explained that he "didn't think the numbers [being demanded by Cash] were doable," that the Spin-Off "didn't seem economically feasible," and that Cash's directives were "borderline absurd" at a time "when the market was falling apart [and] when the interest rates were blowing out." Fleck has said that he had "never been pressured in a transaction like this before," and that he was so uncomfortable with Cash's directives that he began keeping a log of them in order to have a written record of the changes he was being instructed to make. Fleck had modeled over $40 billion worth of transactions in his decades-long career, and had never before felt compelled to create such a log. When the Credit Suisse bankers became aware of the log, they asked Fleck to delete all references therein to Credit Suisse.

56.     CHS's unreasonable assumptions became even more pronounced in late 2015, when the deteriorating credit markets increased QHC's annual interest expense by $30-$35 million. CHS also needed to show that QHC could withstand a reduction in initial capital due to original issue discount ("OID") that was necessary in order to induce prospective lenders to lend. CHS insisted that the lower principal reduce QHC's initial cash balance rather than the Spin-Off Dividend.

57.     Cash issued myriad unreasonable directives to Fleck. To take one example, Fleck had originally assumed that negative-EBITDA hospitals could be sold for 20% of their revenue.

On November 13, 2015, however, Cash directed Fleck to increase that assumption to 30% of revenue.  Then, on the very same day, Cash ordered Fleck to increase that assumption to 40% of revenue.  This inflated QHC's anticipated proceeds far higher than CHS's own proceeds from negative EBITDA hospital divestitures, which were approximately 18% of revenue in the year leading up to the Spin-Off.  The purpose of these adjustments was to offset QHC's increased interest expense so that the size of the Spin-Off Dividend would not change.  Ultimately, Fleck's initial projection of 20% proved to be almost precisely correct.

58.     Similarly, on November 14, 2015, Cash unilaterally declared that QHC's margins needed to grow to 14-15% more quickly than in the then-current iteration of the projections.  On or around November 16, 2015, Credit Suisse advised that—even after revising the QHC Projections upwards—cash flows still looked "too weak."  Cash reiterated that point on November 22, 2015, and ordered that margins be increased to 15% even faster in order to "offset dyssynergies"—*i.e.*, the unavoidable corporate overhead and administrative costs that QHC would incur as a standalone company.  On November 24, 2015, Cash again directed that margins and revenue needed to grow more quickly, stating that QHC "needs to grow like LifePoint; it needs to have LifePoint-like margins and also to grow revenue faster."

59.     Notwithstanding Cash's instructions, there was no world in which QHC's financial performance or operating margins would ever resemble those of the successful  Lifepoint spin-off.  Unlike CHS, LifePoint's parent, Hospital Corporation of America, allowed LifePoint's new management to operate it as a separate standalone entity for at least a year prior to its spin-off.  Moreover, Hospital Corporation of America ensured that LifePoint had a sustainable capital structure and sufficient cash to execute on an acquisition strategy that QHC's indebtedness foreclosed.  In fact, QHC's projected margins were already higher than those of CHS, despite the

fact that QHC was comprised of some of CHS's poorest performing assets. There was no conceivable basis to expect that QHC would have larger margins than CHS.

60. A non-exhaustive list of other fraudulent manipulations and unreasonable assumptions Cash made in the QHC Projections include:

- QHC's adjusted EBITDA margin for 2016 was increased from 11.9% in the version of the projections dated August 11, 2015 to 12.2% in the final March 9, 2016 version of the QHC Projections. Likewise, 2017 adjusted EBITDA was increased from 12.3% in the August 11 model to 15.0% in the final version. By comparison, from 2013-2015, QHC's adjusted EBITDA margin averaged 11.5%. In light of the significant industry and operational headwinds and the dissynergies that the CHS entities and Credit Suisse knew would result from the Spin-Off, these manipulations were entirely divorced from business reality and operated only to defraud QHC's creditors.

- QHC's same store net revenue compound annual growth rate (CAGR) was increased from 3.9% in November 2015 to 4.4% in the final version of the model. Even the 3.9% starting assumption was unrealistic—to say nothing of the upward revision—given that in the first quarter of 2016, QHC's actual same-store growth rate was only 0.3%.

- CHS increased the number of divestitures that QHC would be able to consummate in 2016 from 5-7 (with a 0.2x multiple of revenue assumption) on November 11, 2015 to 7-9 (with a 0.4x multiple of revenue assumption) on November 24, 2015, and then to 11 (with a 0.4x multiple of revenue) in the final March 9, 2016 version of the QHC Projections. These manipulations increased QHC's projected 2016 cash flow by $70 million at a time that interest expenses were also increasing by tens of millions of dollars, and resulted in projected EBITDA that was $10 million higher (due to the elimination of negative adjusted EBITDA for the additional hospitals that were assumed to be sold).

- Capital expenditures as a percentage of revenues were decreased from 4% per year to 3.5% per year. In reality, however, if QHC was ever going to achieve growth—let alone the unrealistic growth expectations that CHS had injected into the QHC Projections—then capital expenditures needed to increase dramatically. This was especially true because, as discussed below, in the year leading up to the Spin-Off, CHS cut costs by neglecting the assets that it planned to spin into QHC.

- CHS decreased QHC's projected costs, including by slashing the $18 million in projected "dissynergy" costs by $10 million, to only $8 million per year. Among other things, CHS decreased the projected costs under the onerous TSAs by assuming, for purposes of calculating the TSA charges, that QHC's cash collections would remain stagnant. This assumption was diametrically inconsistent, however, with the unrealistically aggressive levels of growth on which the QHC Projections were premised.

- CHS understated the costs of medical specialist vendors for 2016 by approximately $19 million annually, notwithstanding that (i) CHS had negotiated the specialist vendor

contracts and had complete visibility into what these costs would be, and (ii) was aware that at the end of 2015, medical specialist providers had threatened to leave QHC hospitals if they did not receive additional compensation.

61.     CHS was aware that the QHC Hospitals had missed their internal budget by $61 million (18.5%) in 2015 and $37.8 million (45.5%) in the first quarter of 2016.  There was no reasonable explanation for CHS's assumptions that the QHC Assets would somehow undergo a dramatic recovery the moment they were spun off, especially given the myriad ways CHS was positioning QHC for failure, as discussed in greater detail below.  Nevertheless, CHS consistently modeled QHC's future financial performance in a manner that was completely untethered to what it actually knew about the QHC Assets.

62.     As a result of these manipulations, between November 11, 2015 and November 24, 2015, CHS inflated QHC's projected free cash flow by $52 million.  Ultimately, between November 2015 and the final version of the QHC Projections dated March 16, 2016, total projected free cash flow was increased by approximately $118 million.  This was enough to offset the increased interest expenses and to address Credit Suisse's concern that CHS needed to present stronger QHC cash flows in order to raise the $1.2 billion of Spin-Off Debt.

63.     The final version of the QHC Projections predicted that QHC's adjusted EBTIDA for 2016 would be $277 million, and that adjusted EBITDA for 2017 would equal $318 million. No reasonable person with knowledge of the QHC's Assets' actual performance could have believed that QHC could achieve these projections, and both CHS and Credit Suisse knew that they were unattainable.  Moreover, if the QHC Projections had not been fraudulently inflated, they would have revealed that the Spin Off Dividend would leave QHC balance sheet insolvent, inadequately capitalized, and unable to pay its debts as they came due.  As the CHS entities and Credit Suisse could easily have predicted prior to the Spin-Off, QHC's actual results for 2016 and

2017 fell far short of these benchmarks, with adjusted EBITDA of only $163 million for 2016, and only $141.8 million for 2017.

### F. CHS Causes QHC to Incur $1.28 Billion in Spin-Off Debt Obligations

64.    On April 22, 2016, CHS caused QHC to borrow approximately $400 million aggregate principal amount of 11.625% Senior Notes due 2023 (the "Senior Notes" and the debt thereunder the "Senior Note Debt").    On April 29, 2016, CHS caused QHC to enter into (i) approximately $880 million of senior term loan credit facilities (the "Term Loan"); (ii) a revolving credit facility of up to an aggregate of approximately $100 million (the "RCF"); and (iii) an asset-based revolving credit facility providing for up to an aggregate principal amount of approximately $125 million (the "ABL").[5]

65.    Given the declining state of the hospital industry at this time, prospective lenders were reluctant to lend to QHC even after CHS and Credit Suisse provided them with the fraudulent QHC Projections.    Accordingly, CHS and Credit Suisse resorted to attracting lenders by offering high interest rates and discounts to par.    The 11.625% interest rate on QHC's Senior Notes was the highest rate paid by any borrower in the healthcare sector from 2014-2016, and the rate on the Term Loan was among the highest as well.    These interest rates would impose over $100 million in annual interest expense on QHC.    In 2017, due to interest rate increases from post-Spin-Off amendments (discussed below), QHC paid approximately $130 million in interest expenses in a single year.

66.    Although QHC incurred obligations totaling $1.28 billion on account of the Senior Notes and Term Loan, it ultimately retained less than $14 million of cash on hand.    Of the $1.28 billion of debt raised, QHC received only $1.239 billion after various  fees and expenses (including

---

[5]    The Senior Note Debt, the Term Loan, the RCF, and the ABL comprise the Spin-Off Debt.

OID) were paid or deducted. Of that $1.239 billion, CHS caused QHC to pay $1.21 billion to fund

the Spin-Off Dividend to CHS, and an additional $14.5 million went to pay CHS for refunds, fees,

and expenses. Meanwhile, Credit Suisse received between $20-$30 million in fees, and QHC paid

CHS $1.15 million to reimburse it for fees that were paid to Moody's and S&P in connection with

the Spin-Off Debt.

### G. CHS Takes Other Steps That Preclude QHC from Succeeding as a Stand-Alone Company

67.     While the level of debt CHS imposed on QHC in the Spin-Off ensured QHC would

never be able to succeed as a stand-alone company, other pre-Spin-Off actions taken by CHS also

contributed to QHC's demise.

### 1.     CHS Forces QHC to Enter into Onerous and One-Sided TSAs.

68.     CHS caused QHC subsidiary QHCCS to enter into a series of onerous TSAs that

afforded CHS a steady stream of payments from QHC for the next five years. CHS drafted the

TSAs so that CHS would receive these payments regardless of the level of CHS's performance

under the TSAs. The TSAs consisted of the following agreements:

- **Shared Services Center TSA (the "SSC TSA")**. Under the SSC TSA, CHS subsidiary RSCS operated six shared service centers that were created to provide billing and collections services to CHS and QHC hospitals. The services to be provided by RSCS included billing and receivables management, statement processing, denials management, cash posting, patient customer service, and credit balance and other account research. QHCCS was required to pay a fee of 1.25% of the amounts collected each month through CHS's efforts.

- **Computer and Data Processing TSA (the "IT TSA")**. Under the IT TSA, CHS subsidiary CHSPSC provided certain information technology infrastructure, support and maintenance, including operational support for various applications, oversight, maintenance, and information technology support services, such as helpdesk, product support, network monitoring, data center operations, service ticket management, and vendor relations. QHCCS was required to pay a fixed charge for labor costs, as well as direct charges for all third-party vendor contracts entered into by CHS on QHC's behalf.

- **PASI Receivables Collection Agreement (the "PASI TSA")**. Under the PASI TSA, CHS subsidiary PASI served as a third-party collection agency to QHC for active and bad debt accounts receivables. The services to be provided by PASI included self-pay collections, insurance follow-up, collection letters and calls, payment arrangements, payment posting, dispute resolution, and credit balance research.

- **PPSI Billing and Collection Agreement (the "PPSI TSA")**. Under the PPSI TSA, CHS subsidiary PPSI provided services related to collections of certain accounts receivable generated from outpatient healthcare services. The services to be provided by PPSI included self-pay collections, insurance follow-up collection letters and calls, payment arrangements, payment posting, dispute resolution, and credit balance research.

- **Eligibility Screen Services Agreement (the "ESS TSA").** Under the ESS TSA, CHS subsidiary ESS provided services for financial and program criteria screening related to Medicaid or other program eligibility for self-pay patients.

69. The terms of the TSAs were unilaterally imposed by CHS, with no representative negotiating on QHC's behalf. As Smith acknowledged, although Culotta was instructed to sign the TSAs on QHC's behalf, "there was really not another side" for CHS to negotiate against.

70. The result was a series of one-sided TSAs that benefitted CHS to QHC's detriment. For example, while the industry standard for agreements of this nature is one-to-two years, all of the TSAs had an initial term of five years. Additionally, service-provider contracts like the TSAs typically include service level agreements ("SLAs") that define the standards of service the provider is obligated to provide. The TSAs include no such provisions, however, and thus QHC had no recourse if the performance under the TSAs was subpar. As a result, CHS was contractually entitled to receive guaranteed payments irrespective of whether it performed its obligations in a manner that harmed QHC. Moreover, CHS ensured that it would profit handsomely from the TSAs it secured for itself pre-spin, by drafting the TSAs to require QHC to make millions of dollars' worth of payments in return for below-market services.

71. CHS understood that, as a result of the contracts it wrote unilaterally, QHC had limited recourse in the event that CHS failed to adequately perform under the TSAs. Secure in

that knowledge, CHS provided QHC with significantly inferior service that resulted in tens of millions of dollars of lost revenue for QHC. For example, CHS did not fulfill its basic billing and collections obligations under the SSC TSA. Among other things, CHS consistently made late filings that resulted in nonpayment to QHC; chose to write-off QHC bills rather than pursue collections; and prohibited QHC staff from accessing systems to rebill accounts that were ignored by CHS. In addition, CHS employees routinely prioritized CHS's outstanding accounts receivable over QHC's, and often failed to perform the kinds of basic follow-up on QHC accounts that would have resulted in payment (though such follow-up was performed with respect to the CHS accounts). Additionally, CHS refused to provide basic installation, support, and maintenance services required by the IT TSA, and prevented QHC from timely implementing certain initiatives, including a telemedicine project to connect patients at rural hospitals to specialists via video link.

72.    Ultimately, QHC paid CHS over $150 million in payments under the TSAs between the close of the Spin-Off and the date of QHC's bankruptcy filing. CHS received tens of millions of dollars in profit under these TSAs, which included above-market payments and profits that CHS retained for levels of service that actually cost QHC (*e.g.*, in the form of uncollected revenue and operational delays). QHC was also forced to pay millions of dollars to external vendors and in additional salary expenses to duplicate and supplement the work of CHS's shared services centers.

73.    Unsatisfied with the tens of millions of dollars in annual profits that it had secured itself under the TSA contracts, CHS attempted to coerce QHC into paying additional extra-contractual sums. For example, CHS took the extraordinary position that it was entitled to a percentage fee of all revenue collected—irrespective of whether CHS's services centers played any role in collecting the revenue. Ultimately, CHS commenced an arbitration against QHC in an attempt to maintain its leverage over a cash-strapped and overleveraged QHC. While the

arbitration panel rejected CHS's fanciful reading of the applicable contracts, the panel also held that QHC was bound by the plain language of the oppressive TSAs that CHS imposed on QHC.

### 2. CHS Neglects the QHC Assets Prior to the Spin-Off.

74.     CHS also caused significant damage to QHC by neglecting the QHC Assets in the months leading up to the Spin-Off.  Once CHS identified the 38 hospitals that would be transferred to QHC, CHS sharply curtailed investments in those hospitals, neglecting ordinary maintenance and improvements in order to prioritize the hospitals that would remain with CHS post-spin.  QHC's basic infrastructure needs and maintenance, such as operating room lights and nurse call systems, were completely neglected between July 2015 and April 2016.  CHS withheld approval for new equipment, delayed payments of existing invoices, and dramatically curtailed physician recruitment, in order to transfer as many costs as possible away from CHS and onto QHC.  Indeed, a CHS employee stated expressly that CHS "would rather [QHC] spend money later than us [CHS] spend now."

75.     CHS also took steps to defer already-planned capital projects for the QHC Assets.  For example, prior to selecting which hospitals would be contributed to QHC, CHS approved an $88 million project to build a new patient tower at a hospital in Springfield, Oregon.  Documents created in July 2014 showed that CHS planned to spend $45 million on the project through the end of 2015.  Once CHS decided that the Springfield hospital would be contributed to QHC, however, CHS sharply curtailed spending on the project.  By the end of 2015, CHS had spent only $10 million—far shy of the projected $45 million—and also curbed spending on the project in the first quarter of 2016.

76.     CHS's neglect of the QHC Assets became immediately apparent once the Spin-Off was complete.  On May 12, 2016, less than two weeks after the Spin-Off, Culotta reported that the QHC hospitals had "been in a holding pattern for the last 7 or 8 months … They really haven't

generated much capital to generate new product lines. They've just been in a stalled position." Additionally, a QHC analysis of capital expenditures showed that during the three months preceding the Spin-Off, CHS's capital expenditure spend for the QHC Assets was only approximately one-half of the industry average.

77.     As a result of CHS's neglect of the QHC Assets prior to the Spin-Off, QHC was required to use the small reserves of capital available to it after paying the Spin-Off Dividend and Spin-Off transaction fees to invest in the types of routine maintenance that CHS should have been performing in the 9 months preceding the Spin-Off. The QHC Projections, however, did not incorporate the additional expense QHC was required to incur in order to rectify the impact of CHS's neglect.

### 3.     CHS Forbids QHC's Future Management from Preparing QHC to Operate as a Stand-Alone Company.

78.     CHS's decision to forbid QHC's future management from preparing to operate the QHC Assets as a stand-alone company in advance of the Spin-Off also contributed to QHC's ultimate failure. CHS organized transition teams where doing so was strictly necessary to facilitate the corporate steps needed to effectuate the spin (*e.g.*, to prepare necessary tax documentation), but forbade any organized transition activities focused on the operation of a stand-alone QHC. Miller, Culotta, and Doucette appeared on QHC's behalf in meetings with prospective lenders and ratings agencies, but behind the scenes, QHC's incoming management was precluded from doing anything to manage QHC. Instead, they were ordered to remain focused only on their CHS positions until the Spin-Off was consummated.

79.     This measure was necessary in order to conceal CHS's fraudulent inflation of the QHC Projections. But it also meant that QHC's management was woefully unprepared to operate the company at its inception. Indeed, one industry analyst contemporaneously described it as

"shocking" that CHS "would spin off a company that was so raw and new without giving it a chance to at least run the assets as if it were separate for a month or two, much less a quarter." And in November 2016, a KPMG auditor said that the lack of planning for stand-alone QHC rendered the transaction the most poorly executed spin-off he had ever seen. By contrast, Lifepoint and Triad, the companies CHS touted as models for QHC, had been separated into their own divisions and operated by their future management many months before they were spun-off from their parent company.

### 4. CHS Transfers its Costs to QHC.

80. CHS also set QHC up for failure by offloading dozens of unwanted employees. CHS transferred approximately 200 corporate office personnel to QHC, including some highly compensated executives and middle managers. When incoming QHC management finally learned of this number and protested that it should be lower, CHS responded that QHC should simply fire the employees it did not want. Ultimately, QHC was forced to incur millions of dollars in severance obligations to employees that should never have been transferred to QHC to begin with.

81. CHS also transferred corporate overhead to QHC. On a CHS earnings call following the Spin-Off, Cash bragged that the transaction enabled CHS to reduce its administrative and operating costs by approximately $100 million annually by transferring costs to QHC.

### H. The Spin-Off and Spin-Off Dividend are Approved by CHS Representatives Masquerading as QHC Board Members, Leaving QHC Balance Sheet Insolvent, Inadequately Capitalized, and Unable to Pay its Debts as They Came Due

82. On April 1, 2016, Schweinhart resigned from the QHC board, and QHC's remaining board members—Cash and Seifert—approved the Spin-Off and payment of the Spin-Off Dividend pursuant to another written consent in lieu of a meeting. A Separation and Distribution Agreement between CHS and QHC purported to set forth the terms governing the

legal and structural separation of QHC from CHS and the structure of the Spin-Off (the "SDA"). As with the TSAs, the SDA was drafted entirely by CHS and was heavily one-sided in CHS's favor. Pursuant to the SDA, CHS purported to cause QHC to provide CHS and its directors, officers, agents, and employees (among others) releases from certain liabilities, and to enter into certain indemnification and arbitration obligations in favor of CHS and its affiliates. QHC received no benefits whatsoever in exchange for agreeing to these provisions, the sole purpose of which was to insulate CHS from the repercussions of its fraudulent and exploitative conduct.

83. Also on April 1, 2016, Cash, Seifert, Schweinhart, Hammons, and Cobb resigned as QHC officers, with all of them continuing in their positions at CHS. For the majority of April 2016, QHC's only board members were Cash and Seifert, and its only officers were Miller and Culotta, who CHS forbid from meaningfully participating in any pre-Spin-Off planning or management until the Spin-Off was completed. As discussed above, Cash—in his capacity as CHS's CFO—was the primary architect of the fraudulent QHC Projections. Likewise, Seifert—in her capacity as CHS's General Counsel—dedicated extensive time and effort to matters relating to CHS's technical and regulatory compliance, in order to ensure that CHS was able to execute the Spin-Off and receive the Spin-Off Dividend. Although Seifert was purportedly a member of the QHC board, she willfully or negligently ignored that the QHC Projections defied reality and approved the Spin-Off and Spin-Off Dividend to benefit CHS, notwithstanding that the transaction ensured QHC's demise.

84. At the end of April 2016, Defendant Feinstein was named as QHC's third board member. Feinstein was placed on the QHC Board by CHS days before the Spin-Off in order to simply approve the transaction. On April 22, 2016, Feinstein received a written consent in lieu of a board meeting of the QHC Board—which was already signed by Cash and Seifert—for his

30

execution.  The written consent—which was still in draft form, and which contained placeholders and bracketed material terms—authorized QHC to distribute the Spin-Off Dividend to CHS without any accompanying analysis or justification.  Less than fifteen minutes after receiving the draft written consent, Feinstein replied that he would "sign it in a few minutes."  Feinstein never purported to conduct any inquiry into QHC's financial condition or the QHC Projections, either prior to his appointment to the QHC Board or the execution of the Spin-Off.   Nevertheless, Feinstein executed the draft written consent—which was ultimately dated April 29, 2016—less than an hour after receiving it and without even seeing its complete and final terms.

85.     Pursuant to this written consent, QHC's three-member board unanimously approved the Spin-Off and the $1.21 billion Spin-Off Dividend.  That same day, the Spin-Off was consummated, and QHC paid the Spin-Off Dividend to CHS's wholly owned indirect subsidiary BridgeCo, which then merged with and into CHS-2, which is also wholly owned by CHS.[6]  QHC's incurrence of the Spin-Off Debt and payment of the Spin-Off Dividend left QHC balance sheet insolvent, unable to pay its debts as they came due, and inadequately capitalized.

86.     Immediately following consummation of the Spin-Off and payment of the Spin-Off Dividend, Cash and Seifert resigned from QHC's board of directors, and continued in their roles as senior executives of CHS.  Seven other individuals then joined Feinstein as the directors of QHC.  Smith openly bragged that he had hand-selected every QHC board member so that he could control the QHC board in the years to come.

---

[6]  On April 28 and April 29, Cash and Seifert took additional steps to ensure that QHC would be required to pay an additional $1.5 million to CHS—over and above the Spin-Off Dividend.  Indeed, Seifert insisted that CHS was "not signed off" on a proposed wire from QHC to CHS of more than $1.2 billion because she was "still working on some additional proceeds that need to come to CHS [from QHC]."  This conduct, during her final days as a QHC director, was consistent with her singular focus on consummating a transaction that resulted in the greatest possible windfall for CHS, notwithstanding her duties to QHC.

## I.      Predictably, QHC's Post-Spin Performance Falls Far Below the QHC Projections

87.     CHS's deliberate inflation of the QHC Projections is corroborated by QHC's post-Spin-Off performance, which never came anywhere close to CHS's pie-in-the-sky projections.  In August 2016, QHC reported that adjusted EBITDA for the second quarter of 2016—QHC's first as an independent company—was $29.2 million—51% below adjusted EBITDA for the same period in 2015, and that the company had suffered a net operating loss of $259.3 million.

88.     QHC's adjusted EBITDA for the year 2016 was approximately $163 million—$114 million below the $277 million set forth in the QHC Projections.  And QHC's adjusted EBITDA margin for the year was around 7.6%—significantly below the 12.2% adjusted EBITDA margin that CHS had shown in the QHC Projections.  By the end of 2016, QHC's actual debt-to-adjusted EBITDA ratio was 8x, far in excess of the 4x ratio market analysts believed was the maximum the company could bear, and even the 5x ratio CHS had targeted.  QHC's performance in 2017 was even worse, with adjusted EBITDA of only approximately $142 million (as compared to the $318 million shown in the QHC Projections), and an adjusted EBITDA margin of 6.8% (as compared to the 15.0% shown in the QHC Projections).

89.     Within months of the close of the Spin-Off, QHC was facing a potential near-term default under its debt covenants, and as a result, faced a potential going concern qualification on its first audited financial statements.  The default risk was due to QHC's potential breach of its minimum Secured Net Leverage Ratio, for which the debt documents' covenant calculation actually allowed for significant EBITDA add-backs.  In fact, for 2016, QHC is estimated to have added back approximately $50 million of costs to its EBITDA for covenant calculation purposes.  Notwithstanding those add-backs, however, QHC was likely to breach its covenants, as a result of

having raised debt on the basis of projected financial performance that it could never have achieved.

90.     On April 11, 2017—less than one year after CHS caused QHC to enter into the Term Loan credit agreement—QHC was forced to enter into an amendment to the agreement (the "First Amendment") that (i) reduced the revolver capacity from $100 million to $87.5 million until December 31, 2017, and $75 million thereafter, and (ii) raised the minimum Secured Net Leverage Ratio required for QHC to remain in compliance and changed the calculation for compliance for specified periods.  The First Amendment cost QHC $8 million per year in additional interest expense, and imposed significant restrictions on QHC's use of proceeds from hospital divestitures—effectively requiring that all such proceeds be used to repay secured lenders.  QHC paid $5.4 million in professional fees in connection with the First Amendment, $2.8 million of which was paid to Credit Suisse.

91.     The covenant relief afforded by the First Amendment was not enough to bring QHC into compliance, given QHC's financial performance and unsustainable levels of debt.  On March 14, 2018, QHC was forced to enter into a second amendment to the Term Loan credit agreement (the Second Amendment" and together with the First Amendment, the "Term Loan Amendments").  The Second Amendment afforded QHC further covenant relief in exchange for additional amendments to the Secured Net Leverage Ratio and a further reduction in revolver capacity to $62.5 million.  QHC spent approximately $4.1 million in fees in connection with the Second Amendment, approximately $1.8 million of which was paid to Credit Suisse.

92.     A key premise of CHS's advertised business strategy for QHC after the Spin-Off was the divestiture of underperforming hospitals, the acquisition of additional hospitals, and the addition of service lines and physicians to the QHC Hospitals QHC did not intend to sell.  But the

Term Loan Amendments struck a death knell for this strategy, as QHC was forced to end growth initiatives and abandon acquisition negotiations, and to shift its focus to hospital divestitures and cost reductions that would enable it to pay down the mountain of debt it had been forced to incur for CHS's sole benefit.

### J.     QHC Files for Bankruptcy

93.     The Spin-Off Debt did not come due until 2023, and thus QHC managed to trudge along for the next few years.  In a scramble to pay down its debt, QHC engaged in an aggressive divestiture program—ultimately selling or closing 15 of the 38 QHC Hospitals.  However, these divestitures led to higher short-term expenses, continued absorption of losses from negative-EBITDA hospitals until they were sold or closed, and significant transaction and closing costs.

94.     Meanwhile, consistent with the industry headwinds that were apparent in advance of the Spin-Off, demand for rural hospital facilities continued to decline between 2016 and 2020.  As demand was decreasing, QHC's revenue cycle performance deteriorated, as CHS neglected its obligations to the QHC Hospitals under the TSA agreements.  The impact of receiving lower collections on already-depressed volumes was evident in QHC's post-spin financial performance.  QHC's adjusted EBITDA for 2017, 2018, and 2019 was $142 million, $126 million, and $96 million, respectively.  Based on its total funded debt of $1.2 billion, QHC's debt-to-adjusted EBITDA ratio was more than 12x by the end of 2019.  With such high leverage, not to mention its rapidly diminishing liquidity, QHC's capital structure was unsustainable, and no further amendments or covenant relief could have created the runway necessary to turn its business around.

95.     By April 2020, QHC had defaulted under its debt documents.  On April 7, 2020, QHC and its affiliated Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.  As Alfred Lumsdaine, QHC's Executive Vice President and Chief Financial Officer explained,

QHC's bankruptcy filing was "driven by the financial obligations produced by the capital structure it has operated with since its inception, rather than the underlying business performance." Lumsdaine explained further that QHC's "debt-service obligations [had] diverted management's attention and strained the ability to reinvest in the Debtor's hospitals," and that "[t]he assets [QHC] received in the Spin-off were not initially set up as an integrated, stand-alone enterprise and presented certain day-one integration challenges, including addressing significant geographic dispersion that resulted in a lack of scale in key markets." As Lumsdaine's statements make clear, CHS's actions doomed QHC to failure from inception.

96.     Meanwhile, the Spin-Off Dividend afforded CHS the additional liquidity and runway that it needed to avert its own bankruptcy. After using the proceeds of the Spin-Off Dividend to pay down over one billion dollars of maturing debt, CHS used the proceeds of strategic divestitures of profitable hospitals (which commanded significantly higher prices than the QHC Assets) to further reduce its outstanding indebtedness. At the same time, CHS engaged financial advisors who facilitated a series of exchange offers, amendments to its credit agreement, and related liquidity enhancing measures. None of these measures would have been possible had CHS not divested its underperforming assets and used the QHC Projections to defraud QHC's lenders into financing the Spin-Off Dividend. As a result, CHS was able to correct course. Today, it has a market capitalization in excess of $1.6 billion and strong liquidity, with over $1.2 billion of cash and over $750 million available under its ABL facility.

## V.     CAUSES OF ACTION

## COUNT ONE
### Avoidance And Recovery Of The Spin-Off Dividend As A Constructive Fraudulent Transfer Under 11 U.S.C. §§ 544 and 550 and Applicable State Law
*(Against CHS and CHS-2)*

97.    Plaintiffs repeat and reallege the allegations in all prior paragraphs as if fully set forth herein.

98.    On April 29, 2016, QHC transferred $1.21 billion to BridgeCo, which then merged with and into CHS-2.

99.    QHC received less than reasonably equivalent value or fair consideration in exchange for the Spin-Off Dividend.  Indeed, QHC did not receive any value for the Spin-Off Dividend, which was a gratuitous transfer from QHC to BridgeCo that conferred no value on QHC.

100.    The Spin-Off Dividend was not paid in exchange for the QHC Assets, which CHS repeatedly referred to as being "contributed" by CHS to QHC.  But even if the Spin-Off Dividend was paid in exchange for the QHC Assets, QHC would have received less than reasonably equivalent value because the QHC Assets were worth significantly less than $1.28 billion.

101.    At the time the Spin-Off Dividend was paid or as a result of the Spin-Off Dividend, QHC (i) was insolvent; (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

102.    CHS and CHS-2 did not receive the Spin-Off Dividend in good faith.  To the contrary, at the time that BridgeCo received the Spin-Off Dividend, CHS and CHS-2 knew that the Spin-Off Dividend would render QHC balance sheet insolvent, inadequately capitalized, and unable to pay its debts as they came due, and that CHS had fraudulently inflated the QHC Projections in order to consummate the Spin-Off and the Spin-Off Dividend.

103.  The Spin-Off Dividend is voidable as constructively fraudulent by QHC's creditors.  Accordingly, the Spin-Off Dividend should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550 and Delaware, New York, and Tennessee law, as applicable.[7]

## COUNT TWO
### Avoidance And Recovery Of Spin-Off Dividend As Intentional Fraudulent Transfer Under 11 U.S.C. §§ 544 And 550 And Applicable State Law
*(Against CHS and CHS-2)*

104.  Plaintiffs repeat and reallege the allegations in all prior paragraphs as if fully set forth herein.

105.  On April 29, 2016, QHC transferred $1.21 billion to BridgeCo, which then merged with and into CHS-2.

106.  QHC, by and through its directors Cash, Seifert, and Feinstein—who were beholden to and acting on behalf of CHS, and had complete control over QHC, at the time the Spin-Off Dividend was made—paid the Spin-Off Dividend with actual intent to hinder, delay, and defraud QHC's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)  QHC received less than reasonably equivalent value and fair value (and in fact, received no value or consideration) in exchange for the Spin-Off Dividend;

(b)  At the time that the Spin-Off Dividend was paid or as a result of the Spin-Off Dividend, QHC (i) was insolvent; (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due;

---

[7]  *See* 6 Del. C. §§ 1304 - 1305; N.Y. Debtor and Creditor Law §§ 273 - 276; Tenn. Code Ann. §§ 66-3-305 - 66-3-306 *et. seq.*

(c)     The initial recipient of the Spin-Off Dividend, BridgeCo, was wholly owned by CHS; CHS, in turn, owned and controlled QHC, was operated and controlled by the same individuals who operated and controlled QHC, and was desperate for the cash provided by the Spin-Off Dividend in order to avoid ratings downgrades and repay maturing debt;

(d)     The Spin-Off Dividend transferred virtually all of QHC's cash to BridgeCo for CHS's sole benefit and at the expense of QHC and its creditors;

(e)     QHC, acting under the control of CHS, was able to make the Spin-Off Dividend only by fraudulently inflating the QHC Projections and concealing QHC's true financial condition from QHC's creditors, incoming management and ratings agencies;

(f)     The Spin-Off Dividend was not undertaken in the regular course of QHC's business;

(g)     The Spin-Off Dividend occurred essentially at the same time as the incurrence of, and was made from the proceeds of, the Spin-Off Debt;

(h)     Cash, Seifert, and Feinstein approved the Spin-Off Dividend notwithstanding that they knew, or recklessly disregarded, that at the time of the Spin-Off Dividend or as a result of its payment, QHC was balance sheet insolvent, inadequately capitalized, and/or unable to pay its debts as they came due;

(i)     QHC's directors approved the Spin-Off Dividend notwithstanding that they knew it required QHC to incur unacceptably high and expensive levels of debt compared to its actual projected EBITDA; and

(j)     QHC, acting under the control of CHS, prevented incoming management from participating in planning, budgeting, forecasting, staffing, or management of the QHC Assets prior to the Spin-Off, in order to conceal the fraudulent scheme from the individuals who had a vested interest in QHC's post-Spin-Off success.

107.    The Spin-Off Dividend is voidable as intentionally fraudulent by QHC's creditors. Accordingly, the Spin-Off Dividend should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550 and Delaware, New York, and Tennessee law, as applicable.

**COUNT THREE**
**Avoidance And Recovery Of Transaction Fee Transfers As Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550 and Applicable State Law**
*(Against CHS and CHS-2)*

108.    Plaintiffs repeat and reallege the allegations in all prior paragraphs as if fully set forth herein.

109.    On May 1, 2016, QHC paid CHS-2 $1.15 million to reimburse it for fees paid to Moody's and S&P in connection with the Spin-Off Debt, so that QHC could pay the Spin-Off Dividend to CHS.  Upon information and belief, CHS caused QHC to transfer additional sums to CHS-2 as purported reimbursement for transaction fees necessary to effectuate the Spin-Off.

110.    QHC received less than reasonably equivalent value or fair consideration in exchange for these transfers.  Indeed, QHC received no value or consideration for the transfers, which were made to facilitate the Spin-Off and Spin-Off Dividend, which were undertaken for CHS's and CHS-2's sole benefit and harmed QHC and its creditors.

111.    At the time that QHC made these transfers, QHC (i) was insolvent; (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

112.     CHS and CHS-2 did not receive the payments or the benefit of the payments in good faith.  To the contrary, at the time they received the payments or their benefit, they knew that the Spin-Off Dividend would render QHC balance sheet insolvent, inadequately capitalized, and unable to pay its debts as they came due, and that CHS had fraudulently inflated the QHC Projections in order to consummate the Spin-Off and the Spin-Off Dividend.

113.     These transfers are voidable as constructively fraudulent by QHC's creditors.  Accordingly, the payments should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550 and Delaware, New York, and Tennessee law, as applicable.

**COUNT FOUR**
**Avoidance And Recovery Of Transaction Fee Transfers As Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550 and Applicable State Law**
*(Against CHS and CHS-2)*

114.     Plaintiffs repeat and reallege the allegations in all prior paragraphs as if fully set forth herein.

115.     On May 1, 2016, QHC paid CHS-2 $1.15 million to reimburse it for fees paid to Moody's and S&P in connection with the Spin-Off Debt.  Upon information and belief, CHS caused QHC to transfer additional sums to CHS-2 as purported reimbursement for transaction fees necessary to effectuate the Spin-Off.

116.     QHC, by and through its directors Cash, Seifert, and Feinstein—who were beholden to and acting on behalf of CHS, and had complete control over QHC, at the time of the Spin-Off—made these payments with actual intent to hinder, delay, and defraud QHC's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)     The purpose of the payments was to consummate the Spin-Off so that QHC could pay the Spin-Off Dividend.  The Spin-Off Dividend was paid solely to benefit CHS-

2 and CHS, to the detriment of QHC and its creditors.  Accordingly, QHC received less than reasonably equivalent value and fair value (and in fact, received no value or consideration) in exchange for these payments;

(b)     At the time that the payments were made, QHC (i) was insolvent; (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due;

(c)     CHS stood on both sides of the transfer, as it owned and controlled QHC, and was desperate for the cash provided by the Spin-Off Dividend that the transaction fee transfers facilitated, in order to avoid ratings downgrades and repay maturing debt;

(d)     The purpose of the transfers was to facilitate the Spin-Off Dividend, to the detriment of QHC and its creditors;

(e)     CHS was able to facilitate the Spin-Off Dividend only by fraudulently inflating the QHC Projections and concealing QHC's true financial condition from QHC's creditors and incoming management and ratings agencies;

(f)     The transfers were not paid in the regular course of QHC's business; and

(g)     The transfers were paid at essentially the same time as the incurrence of, and from the proceeds of, the Spin-Off Debt;

117.    The transfers are voidable as intentionally fraudulent by QHC's creditors. Accordingly, the transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550 and Delaware, New York, and Tennessee law, as applicable.

## COUNT FIVE
### Avoidance Of Purported Releases As Constructive Fraudulent Transfers
### Under 11 U.S.C. § 544 and Applicable State Law
*(Against CHS, CHS-2, CHSPSC, RCSC, PASI, PPSI, ESS, Cash, Seifert, and Feinstein)*

118.    Plaintiffs repeat and reallege the allegations in all prior paragraphs as if fully set forth herein.

119.    Pursuant to the SDA that was drafted and negotiated solely by CHS, CHS purported to cause QHC to provide releases to CHS and certain of its affiliates.

120.    QHC received less than reasonably equivalent value or fair consideration in exchange for the releases.  Indeed, QHC received no value or consideration for the releases, which were granted solely to make it more difficult for QHC to recover against CHS and its affiliates for the damage caused by their fraudulent conduct.

121.    At the time that QHC purportedly granted the releases, QHC (i) was insolvent; (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

122.    To the extent that any Defendant received a release, they did not receive the release in good faith.  To the contrary, at the time they received the releases, they knew that the Spin-Off Dividend would render QHC balance sheet insolvent, inadequately capitalized, and unable to pay its debts as they came due, that CHS had fraudulently inflated the QHC Projections in order to consummate the Spin-Off and the Spin-Off Dividend, and that the purpose of the release was to help them escape liability for the harm that they caused.

123.    To the extent they are otherwise valid, the releases are voidable as constructively fraudulent by QHC's creditors.  Accordingly, to the extent any of the Defendants allege that the

releases bar any of the causes of action asserted herein, the releases should be set aside and avoided under 11 U.S.C. § 544 and Delaware, New York, and Tennessee law, as applicable.

**COUNT SIX**

**Avoidance Of Purported Releases As Intentional Fraudulent Transfers
Under 11 U.S.C. § 544 and Applicable State Law**
*(CHS, CHS-2, CHSPSC, RCSC, PASI, PPSI, ESS, Cash, Seifert, and Feinstein)*

124.     Plaintiffs repeat and reallege the allegations in in all prior paragraphs as if fully set forth herein.

125.     Pursuant to the SDA that was drafted and negotiated solely by CHS, CHS purported to cause QHC to provide releases to CHS and certain of its affiliates.

126.     To the extent QHC granted any releases at all, QHC, acting by and through its directors Cash, Seifert, and Feinstein—who were beholden to and acting on behalf of CHS, and had complete control over QHC, at the time of the Spin-Off—granted such releases with actual intent to hinder, delay, and defraud QHC's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)     QHC received less than reasonably equivalent value and fair consideration (and in fact, received no value or consideration) in exchange for the releases;

(b)     At the time the releases were purportedly granted, QHC (i) was insolvent; (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due;

(c)     The purported recipients of the releases were CHS and its affiliates, who were the very same entities and individuals who caused QHC to grant the releases in the first place;

(d)     The purported releases were not granted in the regular course of QHC's business;

(e)     The whole purpose of the releases was to insulate the purported recipients from the ramifications of their fraudulent, reckless, and exploitative conduct, all to the detriment of QHC's creditors; and

(f)     To the extent that the releases were granted to any Defendant, the Defendants did not receive the releases in good faith, as they knew or recklessly disregarded that the Spin-Off would render QHC balance sheet insolvent, inadequately capitalized, and unable to pay its debts as they came due, that CHS had fraudulently inflated the QHC Projections in order to consummate the Spin-Off and the Spin-Off Dividend, and that the sole purpose of the releases was to insulate them from the ramifications of this fraudulent and exploitative conduct, all to the detriment of QHC's creditors.

127.    To the extent they are otherwise valid, the releases are voidable as intentionally fraudulent by QHC's creditors.  Accordingly, to the extent any of the Defendants allege that the releases bar any of the causes of action asserted herein, the releases should be set aside and avoided under 11 U.S.C. § 544 and Delaware, New York, and Tennessee law, as applicable.

**COUNT SEVEN**
**Avoidance Of Purported Indemnification and Arbitration Obligations As Constructively Fraudulent Under 11 U.S.C. § 544 and Applicable State Law**
*(CHS, CHS-2, CHSPSC, RCSC, PASI, PPSI, ESS, Cash, Seifert, and Feinstein)*

128.    Plaintiffs repeat and reallege the allegations in all prior paragraphs as if fully set forth herein.

129.    Pursuant to the SDA that was drafted and negotiated solely by CHS, CHS purported to cause QHC to incur indemnification and arbitration obligations to CHS and certain of its affiliates.

44

130.     QHC received less than reasonably equivalent value and fair value (and in fact received no value or consideration) in exchange for the indemnification and arbitration obligations, which CHS caused QHC to incur solely to make it more difficult for QHC to recover against CHS and its affiliates for the damage caused by their fraudulent conduct.

131.     At the time QHC purportedly incurred the indemnification and arbitration obligations, QHC (i) was insolvent; (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

132.     To the extent that the indemnification and arbitration obligations are owed to any Defendant, the Defendants did not receive the benefit of the obligations in good faith, as they knew or recklessly disregarded that the Spin-Off would render QHC balance sheet insolvent, inadequately capitalized, and unable to pay its debts as they came due, that CHS had fraudulently inflated the QHC Projections in order to consummate the Spin-Off and the Spin-Off Dividend, and that the sole purpose of the indemnification and arbitration obligations was to insulate them from the ramifications of this fraudulent, reckless and exploitative conduct, and to transfer any associated costs to QHC, all to the detriment of QHC's creditors.

133.     To the extent they are otherwise valid, the indemnification and arbitration obligations are voidable as constructively fraudulent by QHC's creditors.  Accordingly, to the extent any of the Defendants allege that the indemnification or arbitration obligations apply to any of the causes of action asserted herein, the indemnification and arbitration obligations should be set aside and avoided under 11 U.S.C. § 544 and Delaware, New York, and Tennessee law, as applicable.

## COUNT EIGHT
**Avoidance Of Purported Indemnification and Arbitration Obligations As Intentionally
Fraudulent Under 11 U.S.C. § 544 and Applicable State Law**
*(Against CHS, CHS-2, CHSPSC, RCSC, PASI, PPSI, ESS, Cash, Seifert, and Feinstein)*

134.    Plaintiffs repeat and reallege the allegations in all prior paragraphs as if fully set

forth herein.

135.    Pursuant to the SDA that was drafted and negotiated solely by CHS, CHS purported

to cause QHC to incur indemnification and arbitration obligations to CHS and certain of its

affiliates.

136.    QHC, by and through its directors Cash, Seifert, and Feinstein—who were

beholden to and acting on behalf of CHS, and had complete control over QHC, at the time of the

Spin-Off—incurred the purported indemnification and arbitration obligations with actual intent to

hinder, delay, and defraud QHC's creditors, which intent is demonstrated by, among other things,

the following badges and direct indications of fraud:

(a)     QHC received less than reasonably equivalent value or fair consideration (and in

        fact, no value or consideration) in exchange for the indemnification and arbitration

        obligations;

(b)     At the time the indemnification and arbitration obligations were purportedly

        incurred, QHC (i) was insolvent; (ii) was engaged in a business or transaction for

        which its remaining assets were unreasonably small in relation to the business or

        transaction; and/or (iii) intended to incur, or believed or reasonably should have

        believed that it would incur, debts beyond its ability to pay as they became due;

(c)     The purported beneficiaries of the purported indemnification and arbitration

        obligations were CHS and its affiliates, who were the very same entities and

individuals who caused QHC to grant the purported indemnification and arbitration obligations;

(d)     The purported indemnification and arbitration obligations  were not granted in the regular course of QHC's business; and

(e)     The whole purpose of the purported indemnification and arbitration obligations was to insulate the purported beneficiaries from the ramifications of their fraudulent, reckless, and exploitative conduct, all to the detriment of QHC's creditors.

137.     To the extent they are otherwise valid, the indemnification and arbitration obligations are voidable as intentionally fraudulent by QHC's creditors.  Accordingly, to the extent any of the Defendants allege that the releases bar any of the causes of action asserted herein, the releases should be set aside and avoided under 11 U.S.C. § 544 and Delaware, New York, and Tennessee law, as applicable.

## COUNT NINE
### Avoidance of TSA Obligations as Constructively Fraudulent Under 11 U.S.C. §§ 544 and Applicable State Fraudulent Transfer Law
*(Against CHSPSC, RCSC, PASI, PPSI, and ESS)*

138.     Plaintiffs repeat and reallege the allegations in all prior paragraphs as if fully set forth herein.

139.     On April 29, 2016, CHS caused QHCCS, a wholly owned subsidiary of QHC, to incur payment obligations under the SSC TSA, the IT TSA, the PASI TSA, the PPSI TSA, and the ESS TSA.

140.     QHCCS received less than reasonably equivalent value or fair consideration in exchange for the payment obligations it incurred under the TSAs.  Pursuant to the one-sided TSAs, QHC and QHCCS were obligated to make payments under the TSAs without any practical rights,

remedies, or safeguards to ensure that CHS performed its services in good faith and consistent with market standards.

141.    QHCCS was a guarantor on the Spin-Off Debt, and had fewer assets than QHC, at the time it incurred the payment obligations under the TSAs.  Accordingly, at the time QHCCS incurred the payment obligations under the TSAs, QHCCS (i) was insolvent; (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

142.    CHSPSC, RCSC, PASI, PPSI, and ESS did not receive the benefit of the payment obligations in good faith, as these entities, which were operated and controlled by CHS, knew that there had been no QHCCS representative negotiating the TSAs on QHCCS's behalf, and that CHS was causing QHCCS to enter into the TSAs on terms that were unfair, exploitative, and below-market.

143.    The payment obligations under the TSAs are voidable as constructively fraudulent by QHCCS's creditors.  Accordingly, the payment obligations under the TSAs should be set aside and avoided under 11 U.S.C. § 544 and applicable state law.

**COUNT TEN**
**Avoidance of TSA Obligations as Intentionally Fraudulent Under 11 U.S.C. §§ 544 and Applicable State Fraudulent Transfer Law**
*(Against CHSPSC, RCSC, PASI, PPSI, and ESS)*

144.    Plaintiffs repeat and reallege the allegations in all prior paragraphs as if fully set forth herein.

145.    On April 29, 2016, CHS caused QHCCS, a wholly owned subsidiary of QHC, to incur payment obligations under the SSC TSA, the IT TSA, the PASI TSA, the PPSI TSA, and the

ESS TSA. The TSA obligations were a key component of CHS's scheme to control QHC for years after the Spin-Off and to defraud, delay, and hinder QHC's creditors.

146. QHCCS, by and through QHC directors Cash, Seifert, and Feinstein—who were beholden to and acting on behalf of CHS, and had complete control over QHC, at the time QHC entered into the payment obligations under the TSAs—caused QHC to incur the TSA obligations with actual intent to hinder, delay, and defraud QHC's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)  QHCCS received less than reasonably equivalent value or fair consideration in exchange for the payment obligations it incurred under the TSA;

(b)  At the time the TSAs were entered into, QHCCS and QHC were (i) insolvent; (ii) engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due;

(c)  The beneficiaries of the TSA obligations were CHS and its wholly owned subsidiaries, who stood to earn hundreds of millions of dollars in revenue from the TSAs;

(d)  QHC's directors approved QHCCS's entry into the TSAs notwithstanding that they knew, or recklessly disregarded, that the TSAs contained unfair, exploitative, and below-market terms, that there was no QHCCS representative negotiating on QHCCS's behalf in connection with the TSAs, that the TSAs were heavily weighted in the CHS entities' favor, and that QHCCS was balance sheet insolvent,

inadequately capitalized and/or unable to pay its debts as they came due when it

incurred the TSA obligations;

(e)   The purported TSA obligations were not granted in the regular course of QHC's

business;

(f)   The purpose of the TSA obligations was to obligate QHC and QHCCS to provide

an ongoing revenue stream for CHS even after the Spin-Off was executed and the

Spin-Off Dividend was paid;

(g)   The TSAs were one-sided agreements that benefitted CHS at QHC's expense,

which was evidenced by, among other things, the fact that the TSAs did not impose

SLAs setting forth the minimum level of acceptable service that each CHS

subsidiary was required to provide, as is customary in the industry;

(h)   The TSA obligations were specifically designed to maximize payments to CHS and

its subsidiaries while minimizing their service obligations and expenses, to the

detriment of QHC and its creditors; and

(i)   Incoming management of QHC was not permitted to participate in the negotiation

of the TSAs on QHCCS's behalf.

147.   The payment obligations under the TSAs are voidable as intentionally fraudulent

by creditors.   Accordingly, the payment obligations under the TSAs should be set aside and

avoided under 11 U.S.C. § 544 and applicable state law.

### COUNT ELEVEN
### Avoidance of TSA Payments As Constructively Fraudulent Under
### 11 U.S.C. §§ 544, 548, and 550 and Applicable State Fraudulent Transfer Law
*(Against CHSPSC, RSCS, PASI, PPSI, and ESS)*

148.   Plaintiffs repeat and reallege the allegations in all prior paragraphs as if fully set

forth herein.

149.     Between May 31, 2016 and March 31, 2019, QHCCS made payments to CHSPSC, RSCS, PASI, PPSI, and ESS in connection with the SSC TSA, the IT TSA, the PASI TSA, the PPSI TSA, and the ESS TSA, as shown on Exhibit A (the "TSA Payments").

150.     QHCCS received less than reasonably equivalent value or fair consideration in exchange for the TSA Payments, as the value of the services provided by CHSPSC, RSCS, PASI, PPSI, and ESS were significantly below the value of the payments QHCCS made in exchange for them.

151.     At all times since its inception, QHC (i) was insolvent; (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.  QHCCS was a guarantor on the Spin-Off Debt, and had fewer assets than QHC, when it made the TSA Payments. Accordingly, at the time QHCCS made the TSA Payments, QHCCS also (i) was insolvent; (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

152.     CHSPSC, RCSC, PASI, PPSI, and ESS did not receive the TSA Payments in good faith, as these entities, which were operated and controlled by CHS, knew that there had been no QHCCS representative negotiating the TSAs on QHCCS's behalf, that CHS had caused QHCCS to enter into the TSAs on unfair, exploitative, below-market terms, and that the value of the services provided was worth significantly less than the TSA payments they were receiving.

153.    The TSA Payments are voidable as constructively fraudulent by QHC's creditors. Accordingly, the TSA Payments should be set aside, avoided and recovered under 11 U.S.C. §§ 544, 548, 550, and applicable state law.

**COUNT TWELVE**
**Breach Of Contract For Unpaid Amounts**
**Due On The Senior Notes**
*(Against CHS and CHS-2 as QHC's Alter Egos)*

154.    Plaintiffs repeat and reallege the allegations in all prior paragraphs as if fully set forth herein.

155.    At the time that the Senior Note Debt was incurred, QHC and CHS operated as a single economic unit.  QHC's only board members were Cash and Seifert, who were officers of CHS, were beholden to CHS, and were acting in the best interest of CHS rather than QHC. Additionally, QHC's only officers were Miller and Culotta, who were prohibited from exercising authority as QHC officers or participating in any pre-Spin-Off planning or management, and were required to continue acting solely in their capacity as CHS officers, until the Spin-Off was completed.

156.    Furthermore, CHS utilized QHC's corporate form to perpetrate a fraud and injustice, as evidenced by, among other things, the following factors:

(a)      CHS knew that it would suffer a ratings downgrade if it did not pay down its debt, but also knew that it could not access the capital markets given the amount of debt it had already incurred.  Accordingly, CHS created QHC as a wholly owned subsidiary for the sole purposes of raising cash to pay down CHS's debt and shedding some of its worst-performing assets and unwanted liabilities, to the detriment of QHC and its creditors;

(b)      In order to induce prospective lenders to lend to QHC, CHS systematically and fraudulently inflated the QHC Projections, which CHS then fraudulently presented to prospective lenders and ratings agencies as having been created by QHC management;

(c)      CHS kept any CHS employees with a vested interest in QHC's future performance in the dark regarding the assets that CHS would contribute to QHC; the financial performance of those assets; and the QHC Projections;

(d)      The QHC directors who approved the Spin-Off, the incurrence of the Spin-Off Debt, and the payment of the Spin-Off Dividend, never held an actual board meeting, and approved these corporate actions in order to siphon funds away from QHC and into CHS;

(e)      Cash and Seifert resigned from the QHC Board on the same day that the Spin-Off Dividend was paid;

(f)      Feinstein was appointed as a QHC director only days before he voted to approve the Spin-Off Dividend, and was installed by CHS so that he could rubber-stamp the Spin-Off Dividend;

(g)      CHS hired Credit Suisse as QHC's investment banker because CHS knew that Credit Suisse was beholden to CHS, and would turn a willfully blind eye to the fraudulently inflated QHC Projections;

(h)      The incurrence of the Spin-Off Debt and payment of the Spin-Off Dividend left QHC balance sheet insolvent, inadequately capitalized, and unable to pay its debts as they came due;

53

(i)     CHS neglected the QHC Assets pre-spin, demonstrating that the only purpose of creating and spinning off QHC was so that it could serve as an off balance sheet financing vehicle for CHS, and further dooming QHC to failure.

157.    Approximately $421,829,166 million was due and owing on the Senior Notes as of the Petition Date.

158.    Under the Plan, Noteholders received distributions totaling approximately $35,600. Accordingly, approximately $421,793,566 (the "Unpaid Senior Note Amount") remains outstanding and unpaid on the Senior Notes.

159.    CHS, as QHC's alter ego, should be liable for the Unpaid Senior Note Amount, plus interest.

## COUNT THIRTEEN
### Illegal Dividend Under Delaware Law
*(Against Cash, Seifert, Feinstein, CHS, and CHS-2)*

160.    Plaintiffs repeat and reallege the allegations in all prior paragraphs as if fully set forth herein.

161.    On April 29, 2016, QHC transferred $1.21 billion to BridgeCo, which then merged with and into CHS-2.

162.    Section 170 of the Delaware General Corporation Law (the "DGCL") provides, in relevant part, that "directors … may declare and pay dividends upon the shares of its capital stock either … [o]ut of its surplus [or] [i]n case there shall be no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year." Surplus is defined as "[t]he excess, if any, at any given time, of the net assets of the corporation over the amount so determined to be capital." Net assets "means the amount by which total assets exceed total liabilities," and capital for par value stock equals the par value of consideration received for

the issuance of such stock. Section 173 of the DGCL provides that "[n]o corporation shall pay dividends except in accordance with this chapter."

163. Pursuant to Section 174 of the DGCL, the directors of a corporation are jointly and severally liable for "willful or negligent violations of … § 173."

164. Shareholders who receive an unlawful dividend are also liable for the amount of the dividend.

165. The Spin-Off Dividend was a dividend under Delaware law. The Spin-Off Dividend was repeatedly referred to as a "dividend" or "distribution" by CHS, including in the press release announcing the Spin-Off, QHC's preliminary and final offering memoranda for its Senior Notes, and in CHS's annual SEC filings.

166. The Spin-Off Dividend was illegal at the time that it was made because QHC lacked the surplus or net profits from which to issue the Spin-Off Dividend.

167. Cash, Seifert, and Feinstein each acted willfully or negligently when they approved the Spin-Off Dividend. Cash orchestrated the intentional inflation of the QHC projections, and knew that QHC did not have the necessary surplus or net profits to lawfully make the Spin-Off Dividend. Seifert and Feinstein also knew, or recklessly disregarded, that QHC could not lawfully make the Spin-Off Dividend. Neither Seifert nor Feinstein ever investigated the reasonableness of the QHC Projections, and ignored or willfully blinded themselves to numerous red flags, including but not limited to the fact that the QHC Assets deteriorated substantially prior to the Spin-Off; CHS prohibited QHC's new management from participating in Spin-Off planning; QHC hired Credit Suisse as QHC's investment banker and then proceeded to control Credit Suisse; and the Spin-Off needed to be delayed on account of deteriorating credit markets, which ultimately added tens of millions of dollars to QHC's borrowing costs. Additionally, the QHC directors never

held an actual board meeting to assess whether the Spin-Off or Spin-Off Dividend was in QHC's

best interest, and simply rubber-stamped the Spin-Off and Spin-Off Dividend because it was in

CHS's—rather than QHC's—best interest.

168.     BridgeCo and CHS-2 received the Spin-Off Dividend in bad faith, as they were

operated and controlled by CHS, and thus knew that QHC did not have the necessary surplus or

net profits to lawfully pay the Spin-Off Dividend.

169.     Accordingly, Cash, Seifert, Feinstein, CHS, and CHS-2 are each jointly and

severally liable to the Trust for the full amount of the Spin-Off Dividend, plus interest.

## COUNT FOURTEEN
### Aiding and Abetting Illegal Dividend
*(Against CHS and CHS-2)*

170.     Plaintiffs repeat and reallege the allegations in all prior paragraphs as if fully set

forth herein.

171.     Section 170 of the Delaware General Corporation Law (the "DGCL") provides, in

relevant part, that "directors … may declare and pay dividends upon the shares of its capital stock

either … [o]ut of its surplus [or] [i]n case there shall be no such surplus, out of its net profits for

the fiscal year in which the dividend is declared and/or the preceding fiscal year."  Surplus is

defined as "[t]he excess, if any, at any given time, of the net assets of the corporation over the

amount so determined to be capital."  Net assets "means the amount by which total assets exceed

total liabilities," and capital for par value stock equals the par value of consideration received for

the issuance of such stock.  Section 173 of the DGCL provides that "[n]o corporation shall pay

dividends except in accordance with this chapter."

172.     The Spin-Off Dividend was unlawful under Sections 170 and 173 of the DGCL,

because QHC did not have the necessary surplus or net profits to pay the Spin-Off Dividend.

173.     CHS, CHS-2, and BridgeCo knew that QHC did not have the necessary surplus or net profits to lawfully pay the Spin-Off Dividend.  Nevertheless, Credit Suisse, CHS, CHS-2, and BridgeCo knowingly assisted Cash, Seifert, and Feinstein in causing QHC to make the unlawful Spin-Off Dividend, by, among other things, fraudulently inflating the QHC Projections, presenting the fraudulently inflated projections to prospective lenders and ratings agencies, and taking other steps to ensure that QHC would be able to pay the Spin-Off Dividend.

174.     As a result of QHC's payment of the Spin-Off Dividend, QHC and its creditors suffered harm.  Accordingly, in the event that CHS, and CHS-2 are deemed not to be liable on a theory of direct shareholder liability, they should be held liable in an amount to be determined at trial for aiding and abetting the illegal dividend.

### COUNT FIFTEEN
### Unjust Enrichment
*(Against CHS, CHS-2, CHSPSC, RCSC, PASI, PPSI, and ESS)*

175.     Plaintiffs repeat and reallege the allegations in all prior paragraphs as if fully set forth herein.

176.     On April 29, 2016, QHC transferred the $1.21 billion Spin-Off Dividend to BridgeCo, which then merged with and into CHS-2.

177.     Between May 2016 and the Petition Date, QHCCS paid CHS-2 over $150 million in payments under the TSA Agreements that QHC's subsidiary, QHCCS, entered into with CHS subsidiaries CHSPSC, RCSC, PASI, PPSI, and ESS.

178.     CHS and CHS-2 benefitted from the tax-free Spin-Off Dividend by using the proceeds to pay down over one billion dollars of maturing debt.  CHS, CHS-2, CHSPSC, RCSC, PASI, PPSI, and ESS earned tens of millions of dollars of profit in connection with the TSA Agreements that CHS caused QHC to enter into prior to the Spin-Off.

179.   CHS, CHS-2, CHSPSC, RCSC, PASI, PPSI, and ESS  have been unjustly enriched by the payments they received that arise out of and relate to the Spin-Off.  CHS orchestrated the Spin-Off on the basis of the fraudulent QHC Projections, which resulted in the $1.21 billion Spin-Off Dividend and over $150 million in payments under the TSA Agreements that QHCCS paid to CHS, CHS-2, CHSPSC, RCSC, PASI, PPSI, and ESS.

180.   Plaintiffs seek restitution from CHS, CHS-2, CHSPSC, RCSC, PASI, PPSI, and ESS and an order of this Court disgorging all payments, transfers, profit, fees, benefits, incentives, and other things of value obtained by them as a result of their wrongful conduct relating to the fraudulent Spin-Off transaction, including but not limited to the Spin-Off Dividend and the Transaction Fee Transfers, and the payments made pursuant to the unfair TSA Agreements that CHS forced QHCCS to enter into.

## COUNT SIXTEEN[8]
### Avoidance And Recovery Of Transaction Fee Transfers As Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550 and Applicable State Law
*(Against Credit Suisse)*

181.   The Trust repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

182.   On April 29, 2016, QHC paid Credit Suisse between $20 and $30 million for services it rendered in connection with the Spin-Off Debt.

183.   The purpose of this transfer was to consummate the Spin-Off so that QHC could pay the Spin-Off Dividend to CHS.

184.   QHC received less than reasonably equivalent value or fair consideration in exchange for this transfer.  Indeed, QHC received no value or consideration for the transfer, which

---

[8]  The Trust is the only Plaintiff pursuing Counts Sixteen through Twenty-Three, which are not being pursued by Plaintiff WSFS.

was made to facilitate the Spin-Off Dividend that was made for the benefit of CHS-2 and CHS and harmed QHC and its creditors.

185.     At the time that QHC made this transfer, QHC (i) was insolvent; (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

186.     Credit Suisse did not receive the transfer in good faith.  To the contrary, at the time it received the transfer, Credit Suisse knew that the Spin-Off Dividend would render QHC balance sheet insolvent, inadequately capitalized, and unable to pay its debts as they came due, and that CHS had fraudulently inflated the QHC Projections in order to consummate the Spin-Off and the Spin-Off Dividend.

187.     The transfer is voidable as constructively fraudulent by QHC's creditors.  Accordingly, the transfer should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550 and Delaware, New York, and Tennessee law, as applicable.

## COUNT SEVENTEEN
**Avoidance And Recovery Of Transaction Fee Transfers As Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550 and Applicable State Law**
*(Against Credit Suisse)*

188.     The Trust repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

189.     On April 29, 2016, QHC paid Credit Suisse between $20 and $30 million for services it rendered in connection with the Spin-Off Debt.

190.     QHC, by and through its directors Cash, Seifert, and Feinstein—who were beholden to and acting on behalf of CHS, and had complete control over QHC, at the time of the Spin-Off—made this transfer with actual intent to hinder, delay, and defraud QHC's creditors,

which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)    The purpose of the transfer was to consummate the Spin-Off so that QHC could pay the Spin-Off Dividend. The Spin-Off Dividend was paid to benefit CHS and CHS-2, to the detriment of QHC and its creditors. Accordingly, QHC received less than reasonably equivalent value and fair value (and in fact, received no value or consideration) in exchange for the transfer;

(b)    At the time that the transfer was made, QHC (i) was insolvent; (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due;

(c)    The purpose of the transfer was to facilitate the Spin-Off Dividend, to the detriment of QHC and its creditors;

(d)    Credit Suisse was able to facilitate the Spin-Off Dividend only by fraudulently inflating the QHC Projections and concealing QHC's true financial condition from QHC's creditors and incoming management and ratings agencies;

(e)    The transfer was not made in the regular course of QHC's business; and

(f)    The transfer was made at essentially the same time as the incurrence of, and from the proceeds of, the Spin-Off Debt.

191.    The transfer is voidable as intentionally fraudulent by QHC's creditors. Accordingly, the transfer should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550 and Delaware, New York, and Tennessee law, as applicable.

**COUNT EIGHTEEN**
**Avoidance Of Purported Releases As Constructive Fraudulent Transfers**
**Under 11 U.S.C. § 544 and Applicable State Law**
*(Against Credit Suisse)*

192.    The Trust repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

193.    As set forth above, in connection with the Spin-Off, CHS purported to cause QHC to provide certain releases.

194.    To the extent that Credit Suisse received such a release, QHC received less than reasonably equivalent value or fair consideration in exchange for the release.  Indeed, QHC received no value or consideration for the release, which was granted solely to make it more difficult for QHC to recover for the damage caused by CHS's and Credit Suisse's fraudulent conduct.

195.    At the time that QHC purportedly granted the releases, QHC (i) was insolvent; (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

196.    To the extent that Credit Suisse received a release, it did not receive the release in good faith.  To the contrary, at the time it received any release, it knew that the Spin-Off Dividend would render QHC balance sheet insolvent, inadequately capitalized, and unable to pay its debts as they came due, that CHS had fraudulently inflated the QHC Projections in order to consummate the Spin-Off and the Spin-Off Dividend, and that the purpose of the release was to help Credit Suisse escape liability for the harm that it caused.

197.    To the extent otherwise valid, any release is voidable as constructively fraudulent by QHC's creditors.  Accordingly, to the extent Credit Suisse alleges that a release bars any of the

causes of action asserted herein, the release should be set aside and avoided under 11 U.S.C. § 544

and Delaware, New York, and Tennessee law, as applicable.

**COUNT NINETEEN**
**Avoidance Of Purported Releases As Intentional Fraudulent Transfers**
**Under 11 U.S.C. § 544 and Applicable State Law**
*(Against Credit Suisse)*

198.   The Trust repeats and realleges the allegations in in all prior paragraphs as if fully

set forth herein.

199.   As set forth above, in connection with the Spin-Off, CHS purported to cause QHC

to provide certain releases.

200.   To the extent QHC granted any release to Credit Suisse, QHC, acting by and

through its directors Cash, Seifert, and Feinstein—who were beholden to and acting on behalf of

CHS, and had complete control over QHC, at the time of the Spin-Off—granted such release with

actual intent to hinder, delay, and defraud QHC's creditors, which intent is demonstrated by,

among other things, the following badges and direct indications of fraud:

(a)   QHC received less than reasonably equivalent value and fair consideration (and in

fact, received no value or consideration) in exchange for the release;

(b)   At the time the release was purportedly granted, QHC (i) was insolvent; (ii) was

engaged in a business or transaction for which its remaining assets were

unreasonably small in relation to the business or transaction; and/or (iii) intended

to incur, or believed or reasonably should have believed that it would incur, debts

beyond its ability to pay as they became due;

(c)   The purported release was not granted in the regular course of QHC's business;

(d)   The whole purpose of the release was to insulate the purported recipients from the

ramifications of the Spin-Off, all to the detriment of QHC's creditors; and

(e)     To the extent that the releases were granted to Credit Suisse, it did not receive the

releases in good faith, as it knew or recklessly disregarded that the Spin-Off would

render QHC balance sheet insolvent, inadequately capitalized, and unable to pay its

debts as they came due, that CHS had fraudulently inflated the QHC Projections in

order to consummate the Spin-Off and the Spin-Off Dividend, and that the sole

purpose of the releases was to bar recovery based on this fraudulent and exploitative

conduct, all to the detriment of QHC's creditors.

201.    To the extent they are otherwise valid, any releases granted to Credit Suisse are

voidable as intentionally fraudulent by QHC's creditors.  Accordingly, to the extent Credit Suisse

alleges that a release bars any of the causes of action asserted against it herein, the release should

be set aside and avoided under 11 U.S.C. § 544 and Delaware, New York, and Tennessee law, as

applicable.

## COUNT TWENTY
### Avoidance Of Purported Indemnification and Arbitration Obligations As Constructively Fraudulent Under 11 U.S.C. § 544 and Applicable State Law
### *(Against Credit Suisse)*

202.    The Trust repeats and realleges the allegations in all prior paragraphs as if fully set

forth herein.

203.    In connection with the Spin-Off, CHS purported to cause QHC to incur

indemnification and arbitration obligations.

204.    To the extent QHC granted indemnification or arbitration obligations in favor of

Credit Suisse, QHC received less than reasonably equivalent value and fair value (and in fact

received no value or consideration) in exchange for the indemnification and arbitration obligations,

which make it more difficult for QHC to recover for the damage caused to it by the Spin-Off.

205.     At the time QHC purportedly incurred the indemnification and arbitration obligations, QHC (i) was insolvent; (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

206.     To the extent that any indemnification and arbitration obligations are owed to Credit Suisse, Credit Suisse did not receive the benefit of the obligations in good faith, as it knew or recklessly disregarded that the Spin-Off would render QHC balance sheet insolvent, inadequately capitalized, and unable to pay its debts as they came due, that CHS had fraudulently inflated the QHC Projections in order to consummate the Spin-Off and the Spin-Off Dividend, and that the sole purpose of the indemnification and arbitration obligations was to bar any recovery on account of this fraudulent, reckless and exploitative conduct, and to transfer any associated costs to QHC, all to the detriment of QHC's creditors.

207.     To the extent they are otherwise valid, any indemnification and arbitration obligations are voidable as constructively fraudulent by QHC's creditors.  Accordingly, to the extent Credit Suisse alleges that an indemnification or arbitration obligation applies to any of the causes of action asserted against it herein, the indemnification and arbitration obligation should be set aside and avoided under 11 U.S.C. § 544 and Delaware, New York, and Tennessee law, as applicable.

## COUNT TWENTY-ONE
**Avoidance Of Purported Indemnification and Arbitration Obligations As Intentionally Fraudulent Under 11 U.S.C. § 544 and Applicable State Law**
*(Against Credit Suisse)*

208.     The Trust repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

209.    In connection with the Spin-Off, CHS purported to cause QHC to incur indemnification and arbitration obligations.

210.    QHC, by and through its directors Cash, Seifert, and Feinstein—who were beholden to and acting on behalf of CHS, and had complete control over QHC, at the time of the Spin-Off—incurred the purported indemnification and arbitration obligations with actual intent to hinder, delay, and defraud QHC's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)    QHC received less than reasonably equivalent value or fair consideration (and in fact, no value or consideration) in exchange for the indemnification and arbitration obligations;

(b)    At the time the indemnification and arbitration obligations were purportedly incurred, QHC (i) was insolvent; (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due;

(c)    The purported indemnification and arbitration obligations were not granted in the regular course of QHC's business; and

(d)    The whole purpose of the purported indemnification and arbitration obligations was to insulate the purported beneficiaries from the ramifications of the Spin-Off, all to the detriment of QHC's creditors.

211.    To the extent they are otherwise valid, the indemnification and arbitration obligations are voidable as intentionally fraudulent by QHC's creditors.  Accordingly, to the extent Credit Suisse alleges that an indemnification or arbitration obligation applies to any of the causes

of action asserted against it herein, the indemnification and arbitration obligation should be set aside and avoided under 11 U.S.C. § 544 and Delaware, New York, and Tennessee law, as applicable.

## COUNT TWENTY-TWO
### Aiding and Abetting Illegal Dividend
*(Against Credit Suisse)*

212.     The Trust repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

213.     Section 170 of the Delaware General Corporation Law (the "DGCL") provides, in relevant part, that "directors … may declare and pay dividends upon the shares of its capital stock either … [o]ut of its surplus [or] [i]n case there shall be no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year."  Surplus is defined as "[t]he excess, if any, at any given time, of the net assets of the corporation over the amount so determined to be capital."  Net assets "means the amount by which total assets exceed total liabilities," and capital for par value stock equals the par value of consideration received for the issuance of such stock.  Section 173 of the DGCL provides that "[n]o corporation shall pay dividends except in accordance with this chapter."

214.     The Spin-Off Dividend was unlawful under Sections 170 and 173 of the DGCL, because QHC did not have the necessary surplus or net profits to pay the Spin-Off Dividend.

215.     Credit Suisse knew that QHC did not have the necessary surplus or net profits to lawfully pay the Spin-Off Dividend.  Nevertheless, Credit Suisse knowingly assisted CHS, Cash, Seifert, and Feinstein in causing QHC to make the unlawful Spin-Off Dividend, by, among other things, fraudulently inflating the QHC Projections, presenting the fraudulently inflated projections

66

to prospective lenders and ratings agencies, and taking other steps to ensure that QHC would be able to pay the Spin-Off Dividend.

216.    As a result of QHC's payment of the Spin-Off Dividend, QHC and its creditors suffered harm.  Accordingly, Credit Suisse should be liable in an amount to be determined at trial.

### COUNT TWENTY-THREE
### Unjust Enrichment
*(Against Credit Suisse)*

217.    The Trust repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

218.    QHC paid Credit Suisse between $20 and $30 million for services it rendered in connection with the Spin-Off Debt.

219.    On or after April 11, 2017, Credit Suisse received $2.8 million in fees in connection with the First Amendment, and on or after March 14, 2018, Credit Suisse received $1.8 million in fees in connection with the Second Amendment.

220.    Credit Suisse made tens of millions of dollars of profit from the services it rendered in connection with the Spin-Off, including initial transaction fees and supplemental Term Loan Amendment fees.

221.    Credit Suisse has been unjustly enriched by the payments it received that arise out of and relate to the Spin-Off.  CHS orchestrated the Spin-Off on the basis of the fraudulent QHC Projections, which resulted in the $1.21 billion Spin-Off Dividend and over $150 million in payments under the TSA Agreements that QHCCS paid to CHS-2.  Credit Suisse knowingly participated in those efforts and raised the Spin-Off Debt that was used to finance the Spin-Off Dividend.  QHC's need for the Term Loan Amendments was preordained from the moment that the Spin-Off Debt was incurred on the basis of the fraudulent QHC Projections, and QHC never

would have incurred such fees had Credit Suisse not wrongfully facilitated the fraudulent Spin-Off.

222.    Plaintiffs seek restitution from Credit Suisse and an order of this Court disgorging all payments, transfers, profit, fees, benefits, incentives, and other things of value obtained by it as a result of its wrongful conduct relating to the fraudulent Spin-Off transaction, including but not limited to the Transaction Fee Transfers and Term Loan Amendment fees paid to Credit Suisse.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that the Court enter judgment in favor of Plaintiffs and against Defendants CHS, CHS-2, CHSPSC, RCSC, PASI, PPSI, ESS, Cash, Seifert, and Feinstein as follows:

A. awarding Plaintiffs damages against, and disgorgement and restitution from, CHS, CHS-2, CHSPSC, RCSC, PASI, PPSI, ESS, Cash, Seifert, and Feinstein, in an amount to be determined at trial;

B. setting aside, avoiding, and granting recovery of the Spin-Off Dividend;

C. setting aside, avoiding, and granting recovery of the Transaction Fee Transfers paid to CHS or CHS-2;

D. setting aside and avoiding the purported releases under the SDA to the extent CHS, CHS-2, CHSPSC, RCSC, PASI, PPSI, ESS, Cash, Seifert or Feinstein alleges that they bar the causes of action asserted herein;

E. setting aside and avoiding the purported indemnification and arbitration obligations to the extent CHS, CHS-2, CHSPSC, RCSC, PASI, PPSI, ESS, Cash, Seifert or Feinstein alleges that they apply to any of the causes of action asserted herein;

F. setting aside and avoiding the payment obligations under the TSAs;

G. setting aside, avoiding, and granting recovery of the TSA Payments;

H. ordering disgorgement of all payments, transfers, profit, fees, benefits, incentives, and other things of value obtained by CHS, CHS-2, CHSPSC, RCSC, PASI, PPSI, and ESS as a result of their wrongful conduct relating to the fraudulent Spin-Off transaction;

I. awarding Plaintiffs pre- and post-judgment interest at the maximum rate permitted by law;

J. awarding Plaintiffs their attorneys' fees, costs, and other expenses incurred in this action; and

K. awarding Plaintiffs such other and further relief as the Court deems just and proper.

Additionally, Plaintiff the Trust requests that the Court enter judgment in its favor and against Credit Suisse as follows:

A. awarding the Trust damages against, and disgorgement and restitution from, Credit Suisse, in an amount to be determined at trial;

69

B.    setting aside, avoiding, and granting recovery of the Transaction Fee Transfers paid to Credit Suisse;

C.    setting aside and avoiding the purported releases under the SDA to the extent Credit Suisse alleges that they bar the causes of action asserted herein;

D.    setting aside and avoiding the purported indemnification and arbitration obligations to the extent Credit Suisse alleges that they apply to any of the causes of action asserted herein;

E.    ordering disgorgement of all payments, transfers, profit, fees, benefits, incentives, and other things of value obtained by Credit Suisse as a result of its wrongful conduct relating to the fraudulent Spin-Off transaction;

F.    awarding the Trust pre- and post-judgment interest at the maximum rate permitted by law;

G.    awarding the Trust its attorneys' fees, costs, and other expenses incurred in this action; and

H.    awarding the Trust such other and further relief as the Court deems just and proper.

DATED:    October 25, 2021

PACHULSKI STANG ZIEHL & JONES LLP


*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400
Email:     ljones@pszjlaw.com
               tcairns@pszjlaw.com


and

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

Andrew J. Rossman
Deborah J. Newman
Jordan Harap
Ari Roytenberg
51 Madison Avenue, 22nd Floor
New York, New York  10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
andrewrossman@quinnemanuel.com
deborahnewman@quinnemanuel.com
jordanharap@quinnemanuel.com
ariroytenberg@quinnemanuel.com


*Counsel for Daniel H. Golden, as Litigation Trustee*
*for the QHC Litigation Trust and Wilmington Savings*
*Fund Society, FSB, solely in its capacity as Indenture*
*Trustee*

71

# EXHIBIT A

| Shared Services Center TSA Payments | |
| --- | --- |
| **Date** | **Amount** |
| 5/31/16 | $ 1,976,982.72 |
| 6/30/16 | $ 1,970,133.73 |
| 7/31/16 | $ 1,853,544.81 |
| 8/31/16 | $ 1,979,516.89 |
| 9/30/16 | $ 1,829,173.11 |
| 10/31/16 | $ 1,436,369.29 |
| 11/30/16 | $ 1,805,856.06 |
| 1/31/17 | $ 1,317,359.68 |
| 2/28/17 | $ 1,421,990.32 |
| 3/31/17 | $ 1,662,277.89 |
| 4/30/17 | $ 1,418,581.69 |
| 5/31/17 | $ 1,506,245.31 |
| 6/30/17 | $ 1,490,453.99 |
| 7/31/17 | $ 1,380,165.97 |
| 8/31/17 | $ 1,554,716.02 |
| 9/30/17 | $ 1,367,042.56 |
| 10/31/17 | $ 1,357,613.08 |
| 11/30/17 | $ 1,866,373.19 |
| 12/31/17 | $ 1,453,670.51 |
| 1/31/18 | $ 1,446,764.45 |
| 2/28/18 | $ 1,370,167.40 |
| 3/31/18 | $ 1,376,281.98 |
| 4/30/18 | $ 1,010,740.95 |
| 5/31/18 | $ 1,394,795.85 |
| 6/30/18 | $ 1,365,382.80 |
| 7/31/18 | $ 1,280,414.59 |
| 8/31/18 | $ 1,430,470.79 |
| 9/30/18 | $ 1,235,212.90 |
| 10/31/18 | $ 1,269,402.25 |
| 11/30/18 | $ 1,359,168.51 |
| 12/31/18 | $ 1,303,009.51 |
| 1/31/19 | $ 1,339,129.59 |
| 2/28/19 | $ 1,186,563.73 |
| 3/31/19 | $ 1,310,377.60 |
| 4/30/19 | $ 1,356,940.60 |
| 5/31/19 | $ 1,320,722.93 |
| 6/30/19 | $ 1,294,688.70 |
| 7/31/19 | $ 1,367,370.77 |
| 8/31/19 | $ 1,318,332.38 |
| 9/30/19 | $ 1,106,768.80 |
| | |
| **FY2016** | **$ 12,851,576.62** |
| **FY2017** | **$ 17,796,490.21** |
| **FY2018** | **$ 15,841,811.98** |
| **FY2019** | **$ 11,600,895.08** |
| **Total** | **$ 58,090,773.88** |

| PPSI TSA Transfers | |
|---|---|
| **Date** | **Amount** |
| 5/31/16 | $ 835,588.35 |
| 6/30/16 | $ 850,606.46 |
| 7/31/16 | $ 877,589.09 |
| 8/31/16 | $ 906,947.58 |
| 9/30/16 | $ 855,005.31 |
| 10/31/16 | $ 869,340.28 |
| 11/30/16 | $ 912,119.76 |
| 12/31/16 | $ 981,003.35 |
| 1/31/17 | $ 729,297.24 |
| 2/28/17 | $ 777,779.79 |
| 3/31/17 | $ 935,012.80 |
| 4/30/17 | $ 822,593.99 |
| 5/31/17 | $ 836,902.09 |
| 6/30/17 | $ 852,297.35 |
| 7/31/17 | $ 742,250.11 |
| 8/31/17 | $ 837,403.43 |
| 9/30/17 | $ 887,966.59 |
| 10/31/17 | $ 832,111.26 |
| 11/30/17 | $ 1,068,708.76 |
| 12/31/17 | $ 908,904.26 |
| 1/31/18 | $ 781,493.45 |
| 2/28/18 | $ 756,739.12 |
| 3/31/18 | $ 870,937.33 |
| 4/30/18 | $ 753,891.02 |
| 5/31/18 | $ 815,399.60 |
| 6/30/18 | $ 796,834.38 |
| 7/31/18 | $ 731,246.69 |
| 8/31/18 | $ 818,528.21 |
| 9/30/18 | $ 738,349.80 |
| 10/31/18 | $ 41,352.49 |
| | |
| **FY2016** | **$ 7,088,200.18** |
| **FY2017** | **$ 10,231,227.67** |
| **FY2018** | **$ 7,104,772.09** |
| **Total** | **$ 24,424,199.94** |

| PASI TSA Transfers | |
|---|---|
| **Date** | **Amount** |
| 5/31/16 | $ 1,004,393.71 |
| 6/30/16 | $ 1,106,479.39 |
| 7/31/16 | $ 927,761.98 |
| 8/31/16 | $ 1,037,211.40 |
| 9/30/16 | $ 1,069,027.21 |
| 10/31/16 | $ 1,023,134.04 |
| 11/30/16 | $ 1,074,753.20 |
| 12/31/16 | $ 913,598.46 |
| 1/31/17 | $ 967,978.00 |
| 2/28/17 | $ 1,034,260.05 |
| 3/31/17 | $ 1,204,150.91 |
| 4/30/17 | $ 926,380.61 |
| 5/31/17 | $ 1,023,944.25 |
| 6/30/17 | $ 920,000.62 |
| 7/31/17 | $ 905,952.19 |
| 8/31/17 | $ 973,415.82 |
| 9/30/17 | $ 897,830.12 |
| 10/31/17 | $ 920,424.37 |
| 11/30/17 | $ 851,029.19 |
| 12/31/17 | $ 801,013.11 |
| 1/31/18 | $ 852,257.98 |
| 2/28/18 | $ 906,796.45 |
| 3/31/18 | $ 1,014,025.97 |
| 4/30/18 | $ 971,849.70 |
| 5/31/18 | $ 950,751.18 |
| 6/30/18 | $ 792,515.61 |
| 7/31/18 | $ 781,644.91 |
| 8/31/18 | $ 872,547.12 |
| 9/30/18 | $ 671,636.96 |
| | |
| **FY2016** | **$ 8,156,359.39** |
| **FY2017** | **$ 11,426,379.24** |
| **FY2018** | **$ 7,814,025.88** |
| **Total** | **$ 27,396,764.51** |

| Eligibility Screening Services TSA Transfers | |
| --- | --- |
| **Date** | **Amount** |
| 5/31/16 | $ 445,395.84 |
| 6/30/16 | $ 445,395.84 |
| 7/31/16 | $ 445,395.84 |
| 8/31/16 | $ 445,395.84 |
| 9/30/16 | $ 445,395.84 |
| 10/31/16 | $ 445,395.84 |
| 11/30/16 | $ 445,395.84 |
| 12/31/16 | $ 445,395.84 |
| 1/31/17 | $ 449,849.80 |
| 2/28/17 | $ 449,849.80 |
| 3/31/17 | $ 449,849.80 |
| 4/30/17 | $ 449,849.80 |
| 5/31/17 | $ 449,849.80 |
| 6/30/17 | $ 409,512.82 |
| 7/31/17 | $ 397,670.77 |
| 8/31/17 | $ 397,670.77 |
| 9/30/17 | $ 397,670.77 |
| 10/31/17 | $ 397,670.77 |
| 11/30/17 | $ 384,348.47 |
| 12/31/17 | $ 384,348.47 |
| 1/31/18 | $ 390,513.60 |
| 2/28/18 | $ 390,513.60 |
| 3/31/18 | $ 382,016.00 |
| 4/30/18 | $ 374,496.00 |
| 5/31/18 | $ 350,056.00 |
| 6/30/18 | $ 268,376.27 |
| | |
| **FY2016** | **$ 3,563,166.72** |
| **FY2017** | **$ 5,018,141.86** |
| **FY2018** | **$ 2,155,971.47** |
| **Total** | **$ 10,737,280.04** |

| IT TSA Transfers ||
|:---:|:---:|
| **Date** | **Amount** |
| 5/31/16 | $ 1,336,879.17 |
| 6/30/16 | $ 1,336,879.17 |
| 7/31/16 | $ 1,336,879.17 |
| 8/31/16 | $ 1,336,879.17 |
| 9/30/16 | $ 1,336,879.17 |
| 10/31/16 | $ 1,336,879.17 |
| 11/30/16 | $ 1,336,879.17 |
| 12/31/16 | $ 798,937.23 |
| 1/31/17 | $ 1,234,962.11 |
| 2/28/17 | $ 1,234,962.12 |
| 3/31/17 | $ 1,234,962.12 |
| 4/30/17 | $ 1,234,962.11 |
| 5/31/17 | $ 1,234,962.12 |
| 6/30/17 | $ 1,234,962.12 |
| 7/31/17 | $ 1,185,225.87 |
| 8/31/17 | $ 1,185,225.87 |
| 9/30/17 | $ 1,185,225.87 |
| 10/31/17 | $ 1,152,208.01 |
| 11/30/17 | $ 1,137,360.01 |
| 12/31/17 | $ 1,137,360.01 |
| 1/31/18 | $ 1,155,890.86 |
| 2/28/18 | $ 1,155,890.86 |
| 3/31/18 | $ 1,101,798.85 |
| 4/30/18 | $ 1,064,808.49 |
| 5/31/18 | $ 1,824,255.84 |
| 6/30/18 | $ 1,520,109.79 |
| 7/31/18 | $ 1,592,481.99 |
| 8/31/18 | $ 1,529,919.29 |
| 9/30/18 | $ 1,350,443.36 |
| 10/31/18 | $ 1,532,387.23 |
| 11/30/18 | $ 1,414,377.02 |
| 12/31/18 | $ 1,111,173.96 |
| 1/31/19 | $ 1,142,205.66 |
| 2/28/19 | $ 1,142,205.66 |
| 3/31/19 | $ 1,142,205.66 |
| 4/30/19 | $ 1,075,534.37 |
| 5/31/19 | $ 1,075,534.37 |
| 6/30/19 | $ 1,047,762.83 |
| 7/31/19 | $ 1,047,762.83 |
| 8/31/19 | $ 1,047,762.83 |
| 9/30/19 | $ 1,047,762.83 |
| 10/31/19 | $ 1,047,762.83 |
| 11/30/19 | $ 962,405.08 |
| 12/31/19 | $ 962,405.08 |
| 1/31/20 | $ 977,216.99 |

| | |
|---|---|
| 2/29/20 | $ 977,216.99 |
| 3/31/20 | $ 977,216.99 |
| 4/30/20 | $ 977,216.99 |
| 5/31/20 | $ 977,216.99 |
| 6/30/20 | $ 1,112,806.99 |
| 7/31/20 | $ 1,112,806.99 |
| 8/31/20 | $ 1,112,806.99 |
| 9/30/20 | $ 1,112,806.99 |
| 10/31/20 | $ 1,112,806.99 |
| 11/30/20 | $ 1,112,806.99 |
| 12/31/20 | $ 1,112,806.99 |
| | |
| **FY2016** | **$ 10,157,091.42** |
| **FY2017** | **$ 14,392,378.35** |
| **FY2018** | **$ 16,353,537.54** |
| **FY2019** | **$ 12,741,309.99** |
| **FY2020** | **$ 12,675,733.85** |
| **Total** | **$ 66,320,051.15** |