## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

---------------------------------------------------------------x

| | |
|---|---|
| In re: | : |
| QUORUM HEALTH CORPORATION, *et al.*, | : **Case No. 20-10766 (BLS)** |
| Debtor. | : |
| ---------------------------------------------------------------: | **Chapter 11** |
| | : |
| DANIEL H. GOLDEN, AS LITIGATION TRUSTEE | : |
| OF THE QHC LITIGATION TRUST, AND | x |
| WILMINGTON SAVINGS FUND SOCIETY, FSB, | : |
| SOLELY IN ITS CAPACITY AS INDENTURE | : |
| TRUSTEE, | : |
| Plaintiffs, | : **Adv. Pro. No. 21-51190 (BLS)** |
| | : |
| v. | : |
| | : **BRIEF OF PLAINTIFFS DANIEL** |
| COMMUNITY HEALTH SYSTEMS, INC.; | : **H. GOLDEN, AS LITIGATION** |
| CHS/COMMUNITY HEALTH SYSTEMS, INC.; | : **TRUSTEE OF THE QHC** |
| REVENUE CYCLE SERVICE CENTER, LLC; | : **LITIGATION TRUST, AND** |
| CHSPSC, LLC; PROFESSIONAL ACCOUNT | : **WILMINGTON SAVINGS FUND** |
| SERVICES, INC.; PHYSICIAN PRACTICE | : **SOCIETY, FSB, SOLELY IN ITS** |
| SUPPORT, LLC; ELIGIBILITY SCREENING | : **CAPACITY AS INDENTURE** |
| SERVICES, LLC; W. LARRY CASH; RACHEL | : **TRUSTEE, IN OPPOSITION TO** |
| SEIFERT; ADAM FEINSTEIN; AND CREDIT | : **DEFENDANTS' MOTIONS TO** |
| SUISSE SECURITIES (USA) LLC, | : **DISMISS** |
| | : |
| Defendants. | : |

---------------------------------------------------------------x

<table>
<tr><td>PACHULSKI STANG ZIEHL & JONES LLP</td><td>QUINN EMANUEL URQUHART & SULLIVAN, LLP</td></tr>
<tr><td>Laura Davis Jones (No. 2436)<br>Timothy P. Cairns (No. 4228)<br>919 North Market Street 17th Fl.<br>Wilmington, DE 19801<br>Telephone: (302) 778-6401<br>ljones@pszlaw.com<br>tcairns@pszlaw.com</td><td>Andrew J. Rossman<br>Deborah J. Newman<br>Victor Noskov<br>Jordan Harap<br>Ben Odell<br>51 Madison Avenue, 22nd Floor<br>New York, New York  10010<br>Telephone: (212) 849-7000<br>andrewrossman@quinnemanuel.com<br>deborahnewman@quinnemanuel.com<br>victornoskov@quinnemanuel.com<br>jordanharap@quinnemanuel.com</td></tr>
<tr><td>Dated:  April 1, 2022</td><td>benodell@quinnemanuel.com</td></tr>
</table>

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ..................................................................................1

THE FACTUAL ALLEGATIONS IN THE COMPLAINT ....................................7

ARGUMENT .........................................................................................................10

I.  STANDARD OF LAW....................................................................................10

II.  THE COMPLAINT STATES A CLAIM FOR BREACH OF CONTRACT
BASED ON ALTER EGO LIABILITY............................................................12

    A.  Prong #1: From QHC's Creation Until The Spin-Off, QHC And CHS
Operated As A Single Economic Entity .................................................12

        1.  Solvency/Capitalization: From Get-Go, QHC Was Insolvent,
Inadequately Capitalized, And Could Not Pay Its Debts As They
Came Due...................................................................................13

        2.  Corporate Formalities: CHS And QHC Did Not Observe Corporate
Formalities .................................................................................15

        3.  Siphoning of Funds:  The Spin-Off Was Designed To Siphon Funds
From QHC For The Sole Benefit Of CHS...................................16

        4.  Corporation As Façade: QHC Was Created For The Sole Purpose
Of Effectuating The Spin-Off Scheme To Pay Down CHS's Debt...........16

    B.  Prong #2: The Spin-Off Scheme Was Based On CHS's Fraudulently
Inflated Projections And Left QHC's Creditors Holding The Bag........17

III.  THE COMPLAINT STATES CLAIMS FOR AVOIDANCE .........................19

    A.  The Complaint Adequately Alleges A Triggering Creditor ...................19

    B.  The Complaint Adequately Alleges That QHC Did Not Receive Reasonably
Equivalent Value For The Payments To Credit Suisse...........................21

    C.  The Complaint Adequately Pleads A Claim For Intentional Fraudulent
Transfer Against Credit Suisse ..............................................................26

IV.  THE COMPLAINT STATES A CLAIM FOR ILLEGAL DIVIDEND...........28

V.  THE COMPLAINT STATES A CLAIM FOR UNJUST ENRICHMENT .....32

VI.  THE COMPLAINT STATES A CLAIM FOR AIDING AND ABETTING
ILLEGAL DIVIDEND ...................................................................................34

VII.  SECTION 546(E) DOES NOT APPLY TO THIS ACTION ...........................35

    A.  Section 546(e) Of The Bankruptcy Code Does Not Apply To The Claims
Against CHS and CHS-2 ........................................................................35

        1.  The SDA Is Not A Securities Contract ......................................36

2.      The Alleged Note Purchase Agreement And Alleged Open Market Purchases Are Not Integral To The Complaint And May Not Be Considered In Connection With The Motions ............................................37

3.      The Spin-Off Dividend Was Not Made "In Connection With" The Note Purchase Agreement Or Open Market Repurchases ........................38

4.      The Spin-Off Dividend Was Paid To BridgeCo, Which Is Not A Financial Participant ...............................................................................42

5.      Whether CHS-2 Is A Financial Participant Cannot Be Determined On A Motion To Dismiss .........................................................................43

B.      Section 546(e) Does Not Apply To The Claims Against Credit Suisse ...............43

C.      Even if Section 546(e) Otherwise Applied, It Would Not Bar The Illegal Dividend and Unjust Enrichment Claims .................................................43

VIII.   THE ARBITRATION ORDER DOES NOT BAR PLAINTIFFS' CLAIMS FOR ILLEGAL DIVIDEND, AIDING AND ABETTING ILLEGAL DIVIDEND, OR UNJUST ENRICHMENT ...................................................................................44

IX.     IF THE ESTATE CANNOT PURSUE CLAIMS FOR AVOIDANCE, UNJUST ENRICHMENT, OR ILLEGAL DIVIDEND, PLAINTIFFS MAY PURSUE THOSE CLAIMS IN THEIR CAPACITIES AS THE NOTEHOLDERS' ASSIGNEE ...............................................................................................47

A.      The Senior Noteholder Claims Are Not Preempted By Section 546(e) ...............48

1.      Contrary To *Tribune*, The Presumption Against Preemption Applies In Bankruptcy Proceedings .........................................................48

2.      Section 546(e) Does Not Reveal A Clear Intent To Preempt State-Law Remedies Pursued By Creditors ..........................................................50

(a)     *Tribune*'s Preemption Holding Is Contrary to Section 546(e)'s Plain Language .................................................50

(b)     *Tribune*'s Preemption Holding Is Inconsistent With The Structure Of The Code .....................................................52

(c)     *Tribune*'s Preemption Holding Ignores The Competing Purposes of Section 546(e) And The Code ....................................53

3.      *Tribune*'s Preemption Decision Has Been Rejected By Courts Within This Circuit ...............................................................................55

B.      Plaintiffs Have Standing To Pursue The Complaint's Claims In Their Capacities As The Senior Noteholders' Assignee/Representative .......................57

C.      This Court Has Jurisdiction Over Claims Brought By Plaintiffs In Their Capacities As The Senior Noteholders' Assignee/Representative .......................58

CONCLUSION ....................................................................................................60

# TABLE OF AUTHORITIES

**Page**

## Cases

AT&T Corp. v. Walker
    2006 WL 3019980 (W.D. Wash. Oct. 17, 2006) ...................................................... 35
Beasley v. Howard,
    14 F.4th 226 (3d Cir. 2021) ...................................................................................... 47
BFP v. Resolution Trust Corp.,
    511 U.S. 531 (1994) ................................................................................................... 49
Blair v. Infineon Techs. AG,
    720 F. Supp. 2d 462 (D. Del. 2010) ......................................................................... 18
Bruni v. City of Pittsburgh,
    824 F.3d 353 (3d Cir. 2016) ..................................................................................... 10
Buchwald Capital Advs. LLC v. Schoen (In re OPP Liq. Co., Inc.),
    2022 WL 774063 (Bankr. D. Del. March 14, 2022) ................................................ 24
Comm'r v. Clark,
    489 U.S. 726, 739 (1989) ........................................................................................... 40
Crosby v. Nat'l Foreign Trade Council,
    530 U.S. 363 (2000) ................................................................................................... 54
Cybergenics Corp. v. Chinery (In re Cybergenics Corp.),
    226 F.3d 237 (3d Cir. 2000) ............................................................................... 54, 55
DeBuono v. NYSA-ILA Med. & Clinical Servs. Fund,
    520 U.S. 806 (1997) ................................................................................................... 49
Delaware v. BP Am. Inc.,
    2022 WL 58484 (D. Del. Jan. 5, 2022) .................................................................... 40
Development Specialists, Inc. v. Kaplan (In re Irving Tanning Co.),
    No. 12-010245, Doc. 43 (Bankr. D. Me. Feb. 7, 2013) .......................................... 57
E.I. du Pont de Nemours and Co. v. Agfa-Gavaert NV,
    335 F. Supp. 3d 657 (D. Del. 2018) ......................................................................... 13
E.I. du Pont de Nemours and Co. v. Agfa-Gevaert N.V.,
    2018 WL 7360650 (Fed. Cir. Nov. 27, 2018) .......................................................... 13
Fagin v. Gilmartin,
    432 F.3d 276 (3d Cir. 2005) ..................................................................................... 10
Fed. Deposit Ins. Corp. v. Davis,
    733 F.2d 1083 (4th Cir. 1984) .................................................................................. 53
Fid. Nat'l Info. Services, Inc. v. Plano Encryption Techs., LLC,
    2016 WL 1650763 (D. Del. Apr. 25, 2016), *report and recommendation adopted*, 2016 WL
    11695472 (D. Del. June 23, 2016) ........................................................................... 13
Fowler v. UPMC Shadyside,
    578 F.3d 203, 210 (3d Cir. 2009) ............................................................................. 10
Hall v. United States,
    132 S. Ct. 1882 (2012) .............................................................................................. 54
Hartford Underwriters Ins. Co. v. Union Planters Bank, NA,
    530 U.S. 1 (2000) ...................................................................................................... 51

*Hatchett v. United States*,
 330 F.3d 875 (6th Cir. 2003) ............................................................. 53
*Henglein v. Colt Indus. Operating Corp.*,
 260 F.3d 201 (3d Cir. 2001).............................................................. 47
*Holliday v. Credit Suisse Sec. (USA) LLC*,
 2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021)................................... 39, 48
*HSBC Bank USA Nat'l Ass'n v. Adelphia Commc'ns Corp.*,
 2009 WL 385474 (W.D.N.Y. Feb. 12, 2009) .......................................... 21
*IBP, Inc. v. Alvarez*,
 546 U.S. 21 (2005)........................................................................... 51
*In re APF CO.*,
 274 B.R. 634 (Bankr. D. Del. 2001) .................................................... 21
*In re Applebaum*,
 422 B.R. 684 (B.A.P. 9th Cir. 2009)................................................... 50
*In re AstroPower*,
 335 B.R. 309 (Bankr. D. Del 2005) ..................................................... 60
*In re Bernard L. Madoff Inv. Sec. LLC*,
 773 F.3d 411 (2d Cir. 2014)............................................................... 39
*In re Burlington Coat Factory Sec. Litig.*,
 114 F.3d 1410 (3d Cir.1997)............................................................... 37
*In re Charys Holding Company, Inc.*,
 2010 WL 2774852 (Bankr. D. Del. Jul. 14, 2010)................................. 26
*In re Cont'l Airlines*,
 203 F.3d 203 (3d Cir. 2000)............................................................... 45
*In re Cornerstone Homes, Inc.*,
 567 B.R. 37 (Bankr. W.D.N.Y. 2017) ................................................. 24
*In re DBSI, Inc.*,
 477 B.R. 504 (Bankr. D. Del. 2012) ................................................ 6, 36
*In re Fed.-Mogul Glob.*,
 684 F.3d 355 (3d Cir. 2012)................................................... 49, 50, 53
*In re Good Time Charley's, Inc.*,
 54 B.R. 157 (Bankr. D. N.J. 1984) ..................................................... 46
*In re Hellas Telecommunications (Luxembourg) II SCA*,
 526 B.R. 499 (Bankr. S.D.N.Y. 2015).................................................. 44
*In re Irving Tanning Co.*,
 496 B.R. 644 (B.A.P. lst Cir. 2013)..................................................... 50
*In re Lehman Bros. Holdings Inc.*,
 469 B.R. 415 (Bankr. S.D.N.Y. 2012).............................................. 39, 44
*In re LGI, Inc.*,
 322 B.R. 95 (Bankr. D.N.J. 2005) ...................................................... 60
*In re Lyondell Chem. Co.*,
 503 B.R. 348 (Bankr. S.D.N.Y. 2014), *as corrected* (Jan. 16, 2014)................ 21, 51
*In re Magnesium*,
 399 B.R. 722 (Bankr. S.D.N.Y. 2009).................................................. 35
*In re Millenium Lab Holdings*,
 2019 WL 1005657 (Bankr. D. Del Feb. 28, 2019) ...................... 24, 25, 26

*In re Montgomery Ward, LLC*,
   634 F.3d 732 (3d Cir. 2011)..............................................................45, 46

*In re Physiotherapy Holdings Inc.*,
   2016 WL 3611831 (Bankr. D. Del. June 20, 2016).........................passim

*In re Physiotherapy Holdings, Inc.*,
   2017 WL 6524524 (D. Del. December 21, 2017).....................54, 55, 57

*In re Pitt Penn*,
   2011 WL 4352373 (Bankr. D. Del. 2011) .......................................37, 39

*In re Refco, Inc. Sec. Litig.*,
   2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009)......................................21

*In re Resorts Int'l, Inc.*,
   372 F.3d 154 (3d Cir. 2004)...............................................................59

*In re Schafer*,
   689 F.3d 601 (6th Cir. 2012) .............................................................50

*In re Seven Fields Dev. Corp.*,
   505 F.3d 237 (3d Cir. 2007)...............................................................60

*In re Swan Transportation Co.*,
   596 B.R. 127 (Bankr. D. Del. 2018) ..................................................60

*In re Trib. Co. Fraudulent Conv. Litig.*,
   818 F.3d 98 (2d Cir. 2016)................................................................21

*In re Tribune Co. Fraudulent Conveyance Litig.*,
   946 F.3d 66 (2d. Cir. 2019)..........................................................passim

*In re Tribune Co. Fraudulent Conveyance*,
   2014 WL 1509491 (2d Cir. April 11 2014) ........................................55

*In re Tzanides*,
   574 B.R. 489 (Bankr. D.N.J. 2017) ..................................................46

*In re Verizon Ins. Coverage Appeals*,
   222 A.3d 566 (Del. 2019) .................................................................19

*In re Wilton Armetale, Inc.*,
   968 F.3d 273 (3d Cir. 2020 ...............................................................58

*Integrated Sols., Inc. v. Serv. Support Specialties, Inc.*,
   124 F.3d 487 (3dCir.1997)................................................................49

*Jordan v. Fox, Rothschild, O'Brien & Frankel*,
   20 F.3d 1250 (3d Cir. 1994)..............................................................10

*Laventhol, Krekstein, Horwath & Horwath v. Tuckman*,
   372 A.2d 168 (Del. 1976) .................................................................34

*Law v. Siegel*,
   134 S. Ct. 1188 (2014)......................................................................54

*Lupin Atlantis Holdings v. Ranbaxy Lab's, Ltd.*,
   2011 WL 1540199 (E.D. Pa. Apr. 21, 2011)................................11, 43

*LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*,
   2018 WL 1559936 (Del. Ch. Mar. 28, 2018).....................................33

*Maracich v. Spears*,
   570 U.S. 48 (2013)......................................................................39, 40

*Mason v. Network of Wilmington, Inc.*,
   2005 WL 1653954 (Del. Ch. July 1, 2005)........................................13

*Maxus Energy Corp.*,
  2019 WL 647027 (Bankr. D. Del. Feb. 15, 2019) ................................................ 46
*MC Asset Recovery, LLC v. S. Co.*,
  2009 WL 10666059 (N.D. Ga. Feb. 5, 2009) ................................................ 30, 31
*McPadden v. Sidhu*,
  964 A.2d 1262 (Del. Ch. 2008)................................................................. 33
*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996)............................................................................ 49
*Merit Management Group, LP v. FTI Consulting, Inc.*,
  138 S.Ct. 883 (2018) .......................................................................... 40
*Midlantic Nat'l Bank v. N.J. Dept of Envt'l Prot.*,
  474 U.S. 494 (1986)............................................................................ 50
*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000)............................................................... 11, 43
*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*,
  998 F.2d 1192 (3d Cir. 1993) .................................................................. 37
*PG&E Co, v. California*,
  350 F.3d 932 (9th Cir. 2003) .................................................................. 50
*PHP Liquidating, LLC v. Robbins*
  291 B.R. 592 (D. Del. 2003)................................................................... 52
*Puerto Rico Dept of Consumer Affairs v. Isla Petroleum Corp.*,
  485  U.S. 495 (1988)....................................................................... 49, 50
*Quadrant Structured Prods. Co., Ltd, v. Vertin*
  102 A.3d 155 (Del. Ch. Ct. 2014)............................................................. 31
*RadLAX Gateway Hotel ,LLC v. Amalgamated Bank*,
  132 S. Ct. 2065 (2012)........................................................................ 54
*Refco Grp. Ltd., LLC v. Cantor Fitzgerald, L.P.*,
  2014 WL 2610608 (S.D.N.Y. June 10, 2014) ................................................. 34
*Renault v. L. N. Renault & Sons*,
  188 F.2d 317 (3d Cir. 1951)............................................................... 19, 20
*Russello v. United States*,
  464 U.S. 16 (1983)............................................................................. 53
*Schmidt v. Skolas*,
  770 F.3d 241 (3d Cir. 2014)................................................................... 37
*Seborowski v. Pittsburgh Press Co.*,
  188 F.3d 163 (3d Cir. 1999)................................................................... 45
*Securities Investor Protection Corp. v. Bernard L. Madoff Inv.*,
  505 B.R. 135 (S.D.N.Y. 2013)................................................................. 42
*Southern Track & Pump, Inc. v. Terex Corp.*
  722 F. Supp. 2d 509 (D. Del. 2010)........................................................... 38
*Stardyne, Inc. v. N.L.R.B.*,
  41 F.3d 141 (3d Cir. 1994).................................................................... 19
*Suppan v. Dadonna*,
  203 F.3d 228 (3d Cir. 2000)................................................................... 47
*TL of Fla., Inc. v. Terex Corp.*,
  54 F. Supp. 3d 320 (D. Del. 2014)............................................................ 32

*Tolliver v. Christina Sch. Dist.*,
  564 F. Supp. 2d 312 (D. Del. 2008) ..................................................................... 33
*Trevino v. Merscorp, Inc.*,
  583 F. Supp. 2d 521 (D. Del. 2008) ..................................................................... 12
*U.S. Bank Ass'n v. Verizon Comm's Inc.*,
  817 F.Supp. 2d 934 (2011) ................................................................................... 30
*U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*,
  2012 WL 3100778 (N.D. Tex. 2012) ............................................................... 18, 21
*United States v. Tabor Court Realty Corp.*,
  803 F.2d 1288 (3d Cir. 1986) ............................................................................... 25
*Vichi v. Koninklijke Philips Elecs., N.V.*,
  85 A.3d 725 (Del. Ch. 2014) ................................................................................ 32
*West Virginia Univ. Hosps., Inc. v. Casey*,
  499 U.S. 83 (1991) ............................................................................................... 50
*Wyeth v. Levine*,
  555 U.S. 555 (2009) ................................................................................... 49, 50, 53

## **Statutes**

11 U.S.C. § 101(49) ................................................................................................ 41
11 U.S.C. § 1109(b) ................................................................................................ 52
11 U.S.C. § 323(a) ................................................................................................. 51
11 U.S.C. § 341(c) ................................................................................................. 52
11 U.S.C. § 541(c)(1) ............................................................................................. 52
11 U.S.C. § 544(b)(2) ............................................................................................. 52
11 U.S.C. § 546(e) ....................................................................................... 36, 42, 51
11 U.S.C. § 741(7) ................................................................................................. 36
Bankruptcy Code, 11 U.S.C. 101 .......................................................................... 21

## **Other Authorities**

18 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Federal Practice & Procedure §
  4425, at 253 (1981) .............................................................................................. 47
57 N.Y. Jur. 2d Estoppel, Ratification and Waiver § 87 (2007) .................................... 20
DGCL §§ 170, 173 ........................................................................................... 46, 47

Plaintiffs Daniel H. Golden (the "Trustee"), as Litigation Trustee of the QHC Litigation Trust (the "Trust"), and Wilmington Savings Fund Society, FSB ("WSFS" or the "Indenture Trustee"), solely in its capacity as the Indenture Trustee under that certain indenture (the "Indenture"), dated as of April 22, 2016 for the unsecured 11.625% Senior Notes due April 2023 (the "Senior Notes"), submits this response to the Motion to Dismiss (the "CHS Motion" or "CHS Mot.") filed by Defendants Community Health Systems, Inc. ("CHS"), CHS/Community Health Systems Inc. ("CHS-2"), Revenue Cycle Service Center, LLC, CHSPSC, LLC, Professional Account Services, Inc., Physician Practice Support, LLC, Eligibility Screening Services, LLC, W. Larry Cash, Rachel Seifert, and Adam Feinstein (collectively, the "CHS Defendants"), and the Motion To Dismiss The Complaint For Failure To State A Claim (the "CS Motion" or "CS Mot." and, together with the CHS Motion, the "Motions") filed by Credit Suisse Securities (USA) LLC ("Credit Suisse").

## SUMMARY OF ARGUMENT[1]

The Complaint in this matter alleges in disturbing detail how a struggling CHS defrauded QHC's creditors for its own benefit and doomed QHC to fail. *First*, CHS created QHC as a wholly-owned subsidiary. *Second*, CHS transferred to QHC some of its worst-performing assets—including some generating negative annual EBITDA. *Third*, using its complete control and domination over QHC, CHS prepared inflated and manipulated projections for the standalone company—hiding QHC's weak financial outlook from prospective lenders—to raise $1.28 billion in debt, an amount QHC could not sustain, all so that CHS could pay itself a $1.21 billion dividend to solve its own debt problem. Of the $1.28 billion in incurred obligations, QHC retained a mere $14 million, and was spun off to fend for itself as a standalone business, with funded debt

---

[1] Capitalized terms not defined herein have the meanings ascribed to them later in this brief.

obligations that it would never be able to pay upon maturity.

To do this, CHS populated the QHC board with CHS loyalists who rubber-stamped the incurrence of debt and payment of the dividend; leveraged its lucrative relationship with Credit Suisse so that Credit Suisse would assist in raising the QHC debt even though it knew that the projections defied reality and the debt it was working to raise would render QHC insolvent, unable to pay its debts as they came due, and inadequately capitalized; further guaranteed QHC's inevitable failure by neglecting ordinary maintenance and improvements in the period leading up to the Spin-Off and ensuring that anyone with a vested interest in QHC's post-spin success would be kept in the dark until after the Spin-Off; and burdened QHC with a series of onerous transition services agreements that afforded CHS a steady stream of payments going forward.  As anyone with full knowledge of the facts could have predicted, QHC filed for bankruptcy as the Spin-Off Debt maturities approached, leaving the holders of the Senior Notes that were fraudulently raised to fund the Spin-Off Dividend with a recovery of only cents on the dollar.

The facts alleged in the Complaint demonstrate paradigmatic cases of constructive and intentional fraudulent transfer, illegal dividend, and unjust enrichment, and the exact type of injustice and abuse of the corporate form that warrants alter ego liability.  In response, Defendants nominally invoke Rule 12(b)(6) of the Federal Rules of Civil Procedure, but barely even reference the allegations in the Complaint, let alone accept them as being true.  Instead, Defendants ask the Court to simply ignore the Complaint's allegations, and to accept their own version of events. Defendants also ask the Court to apply out-of-Circuit, non-binding law that has been rejected by courts within this Circuit and conflicts with Supreme Court and Third Circuit precedent.  And Defendants request that the Court apply broad interpretations of Section 546(e) of the Bankruptcy Code and claim and issue preclusion that rely on materials outside of the Complaint, and conflict

with well-settled law.

As set forth in greater detail below and throughout this brief, each of Defendants' arguments fails.

1. **Alter Ego Liability Against CHS on the Senior Note Debt**.  The CHS Defendants assert that the Complaint fails to state a basis for alter ego liability because QHC operated independently from CHS *after* the Spin-Off debt was incurred, and that the allegations regarding the period before the Spin-Off "pertain *any* time a parent company spins off a subsidiary into a new company." CHS Mot. at 27-30.  But the Complaint contains detailed allegations establishing (1) that QHC and CHS operated as a single economic entity when the Spin-Off Debt was incurred, and (2) the existence of an overall element of injustice and unfairness.  On the first prong, the Complaint alleges, among other things, that (1) QHC was insolvent and inadequately capitalized from inception, (2) CHS's only functioning officers and directors prior to the Spin-Off were CHS employees who would either resign from QHC or retire shortly before or immediately after the Spin-Off, and a QHC director who was appointed to the board days before the Spin-Off Dividend was paid, and executed a written consent approving it within only an hour of receiving it and without even seeing its final terms, and (3) prior to the Spin-Off, QHC existed only as a façade for CHS, which masqueraded as QHC in order to falsely convince prospective lenders that QHC had prepared reliable projections that accurately depicted the company's prospects.  On the second prong, the Complaint is replete with allegations that CHS abused the corporate form to defraud lenders into lending to QHC, and that the very creation of QHC, its incurrence of the Spin-Off Debt, and the Spin-Off itself were part of a fraudulent scheme to transfer CHS's own unsolvable debt problem to QHC.

2. **Fraudulent Transfer**.  Defendants assert that the Complaint fails to state claims for

intentional and constructive fraudulent transfer because it does not identify a triggering creditor. And Credit Suisse argues further that the Complaint fails to allege that QHC did not receive reasonably equivalent value in exchange for its payments to Credit Suisse (the "Transaction Fee"), or any badges of fraud regarding those transfers.  CHS Mot. at 10, n. 6; CS Mot. at 10-21.  But the Complaint identifies the Senior Noteholders—who were defrauded regarding QHC's post-Spin-Off financial condition, and thus could not have ratified the Spin-Off Dividend—as triggering creditors.  The Complaint also plainly alleges that QHC did not receive reasonably equivalent value in exchange for its payments to Credit Suisse, which worked to raise the Spin-Off Debt even though it knew QHC would not be able to repay it.  Finally, the Complaint not only pleads multiple badges of fraud—including insolvency, lack of reasonably equivalent value, a non-arms' length relationship between the transferor and transferee, and a contemporaneous incurrence of debt—it also pleads direct evidence of an intent to hinder, delay, or defraud creditors by QHC (operating under CHS's domination and control), by alleging that it retained Credit Suisse because it knew that Credit Suisse—with whom CHS had a lucrative historical relationship—would turn a blind eye to CHS's machinations and work to raise the Spin-Off Debt even though it understood the detrimental impact it would have on QHC.

3. **Illegal Dividend and Aiding and Abetting Illegal Dividend**.  Defendants argue that the Complaint fails to state a claim for illegal dividend under Delaware law because the Spin-Off Dividend was not a dividend.  CHS Mot. at 16-18; CS Mot. at 21.  Additionally, Credit Suisse argues that no claim for aiding and abetting illegal dividend exists, and that even if it did, the Trustee has not alleged that Credit Suisse "knowingly and substantially" participated in the Spin-Off Dividend.  CS Mot. at 22-27.  But the Complaint is replete with well-founded allegations based on Defendants' own internal documents that the Spin-Off Dividend was a dividend under

Delaware law.  As cases addressing this exact same issue have held, this disputed issue of fact cannot be determined on a motion to dismiss.  Further, Credit Suisse does not (and cannot) cite any controlling authority for its contention that no claim for aiding and abetting an illegal dividend exists, which conflicts with the Delaware Supreme Court's holding that co-conspirators must be jointly and severally liable for the acts of their confederates.  Finally, Credit Suisse's "knowing and substantial" participation in the illegal dividend is amply demonstrated by the Trustee's allegations that Credit Suisse knew that QHC's projections presented a fraudulently inflated picture of QHC's financial health, turned a blind eye to that fact to preserve its lucrative relationship with CHS, worked to raise the Spin-Off Debt based on those fraudulent projections, and sought to erase any record of its participation in the fraudulent scheme.

4.  **Unjust Enrichment**.  Defendants argue that the Complaint's unjust enrichment claim is largely time-barred, and Credit Suisse argues further that QHC's contractual relationship with Credit Suisse precludes the claim.  CHS Mot. at 24; CS Mot. at 28-30.  But where, as here, a complaint alleges fraudulent conduct that may warrant tolling of the statute of limitations, resolution on a motion to dismiss is improper.  Additionally, whether QHC's relationship with Credit Suisse was governed by a contract (which the Trustee is not in possession of) cannot be determined at this juncture.  And in any event, any such contract was negotiated solely by CHS, was necessarily "unjust" to QHC, and should not be binding on QHC.

5.  **Affirmative Defense of Section 546(e)**.  Defendants argue that the Complaint's claims for fraudulent transfer, illegal dividend, and unjust enrichment are barred by Section 546(e), because, they allege, (1) the contract governing the Spin-Off (the "SDA"), a notes purchase agreement governing the sale of the initial Senior Notes, and CHS-2's tender offer and open-market purchases of debt funded by the Spin-Off Dividend, are "securities contracts" that the Spin-

Off Dividend and Transaction Fee were "made in connection with," and (2) CHS-2 and Credit Suisse are "financial participants." CHS Mot. at 9-16; CS Mot. at 7-10. But application of Section 546(e) is a "fact-based inquiry" that is properly considered on a motion to dismiss only if "the defense is clearly established on the face of the complaint." *In re DBSI, Inc.*, 477 B.R. 504, 515 (Bankr. D. Del. 2012). That plainly is not the case here, as the Complaint alleges that the SDA is not a securities contract; the notes purchase agreement, tender offer, and open market purchases may not be considered on these Motions; and it cannot be determined from the face of the Complaint whether CHS-2 is a financial participant. Further, the Spin-Off Dividend and the Transaction Fee were not made "in connection with" the notes purchase agreement or CHS-2's tender offer or open market debt purchases, and the Spin-Off Dividend was paid to CHS subsidiary BridgeCo, not CHS-2. Finally, even if section 546(e) applied (it does not), it would not preclude the Complaint's illegal dividend and unjust enrichment claims, which are grounded in actual fraud.

6. **Affirmative Defenses of Claim and Issue Preclusion**. The CHS Defendants argue that the Complaint's illegal dividend and unjust enrichment claims are barred by claim and issue preclusion due to an order issued in a prepetition arbitration between QHC and CHS. CHS Mot. at 18-23. But in order for issue and claim preclusion to apply, there must be privity between the party to the prior action and the party against whom the doctrines are being asserted. There certainly is no privity between prepetition QHC and the Senior Noteholders that have assigned their claims to the Trust. And the Third Circuit has held that where, as here, the interests of a trustee in bankruptcy (or his or her assignee) diverge from those of a prepetition debtor, privity is also lacking. Moreover, the claim and issue preclusion defense fails for the additional reasons that the unjust enrichment claim had not accrued at the time of the arbitration, and the arbitration panel did not decide a claim of illegal dividend.

7.    **Plaintiffs' Ability to Assert Direct Claims Under State Law as the Assignee or Representative of the Senior Noteholders**.  The CHS Defendants argue that the individual Senior Noteholder claims brought by the Trustee and Indenture Trustee should be dismissed because they are preempted by Section 546(e), Plaintiffs do not have standing to bring them until the Trustee abandons them, and the Court does not have jurisdiction over them.  CHS Mot. at 24-27.  But courts in this district have correctly held that under Supreme Court and Third Circuit law, individual creditor claims are not preempted by section 546(e) where, as here, (1) the transaction sought to be avoided poses no threat of 'ripple effects' in the relevant securities market; (2) the transfer did not involve public securities, and (3) the transferees were corporate insiders that allegedly acted in bad faith.  Additionally, the Trustee and Indenture Trustee are pursuing claims in their capacity as the Senior Noteholders' assignee and representative, respectively, in the alternative to the claims the Trustee is pursuing as the assignee of estate claims.  If necessary, the Trustee will abandon the estate claims in favor of the Senior Noteholder claims if the court finds that the Trustee is precluded from pursuing the estate claims.  Finally, where, as here, a litigation trust is an important component of a plan, and the trust is tasked with investigating the claims at issue, the bankruptcy court retains "related to" jurisdiction over claims prosecuted by the trust.

For the foregoing reasons and those set forth below, Plaintiffs respectfully request that Defendants' Motions be denied in their entirety.

## THE FACTUAL ALLEGATIONS IN THE COMPLAINT

1.    Defendants' "Statement of Facts" bears little resemblance to the factual allegations in the Complaint.  A summary of the Complaint's allegations follows.

2.    In 2015, CHS's stock was in free-fall, due to its declining operating performance and more than $17 billion in debt, $1.2 billion of which was coming due in 2016 and 2017.  Compl. ¶¶ 1, 32.  Without access to any traditional sources of capital to refinance its maturing debt, and

facing rating downgrades and the prospects of its own bankruptcy (*id*. ¶¶ 1, 2, 33, 96), CHS devised a scheme to raise $1.21 billion of debt while simultaneously divesting some of its worst-performing assets (the "Spin-Off"). *Id*. ¶¶ 2, 36.

3.    To effectuate the scheme, CHS created QHC as a wholly-owned subsidiary to which it transferred those assets (the "QHC Assets"). CHS then proceeded to manipulate the financial projections for a standalone QHC so that QHC could incur $1.28 billion in debt (the "Spin-Off Debt"). Most of the proceeds of that debt would be paid to CHS (*id*. ¶¶ 3, 54-63), with less than $14 million—about 1% of the total debt incurred—left for QHC. Compl. ¶ 10. The victims of CHS's scheme were QHC's creditors—CHS and its shareholders benefitted because CHS received a $1.21 billion dividend without incurring any corresponding repayment obligations (*id.*. ¶¶ 3-4, 37), and QHC's shares were simply distributed *pro rata* to CHS's existing shareholders. *Id*. ¶¶ 3, 37.

4.    CHS's fraud was brazen. To mislead the market into believing that the QHC Assets could support $1.28 billion of debt, CHS: (1) constituted the initial QHC Board only with CHS senior officials, who rubber-stamped the Spin-Off and Spin-Off Dividend without holding a single in-person meeting, and who resigned from the QHC Board once the Spin-Off Dividend was approved and paid (*id*. ¶¶ 4, 39-43, 82-86); (2) created fraudulently inflated projections for QHC that significantly overstated projected revenues, margins, and the number and proceeds of asset sales, while significantly understating costs, at a time when QHC's actual operating results showed that these projections defied reality (*id*. ¶¶ 5-6, 54); (3) systematically increased QHC's projected free cash flow when the credit markets began to tighten to offset the increasing cost of debt, ultimately inflating that number by approximately $118 million (*id*. ¶¶ 5-6, 62); (4) retained Credit Suisse to serve as QHC's investment banker and leveraged its longstanding relationship with

Credit Suisse so that Credit Suisse would turn a blind eye to the fact that the debt it was helping CHS raise would render QHC insolvent, inadequately capitalized, and unable to pay its debts as they came due (*id.* ¶¶ 7, 44); (5) appointed CHS executives to serve as the leaders of QHC post-Spin-Off, and used its control over those executives prior to the Spin-Off to prevent them from preparing to operate QHC as a standalone company or otherwise take steps that would reveal the fraudulent nature of the transaction (*id.* ¶¶ 8, 78-79); (6) curtailed investments in the QHC Assets in the months leading up to the Spin-Off, neglecting ordinary maintenance and improvements to prioritize the hospitals that would remain with CHS post-spin (*id.* ¶¶ 9, 74-77); and (7) burdened QHC with onerous transition services agreements that afforded CHS a steady stream of payments regardless of the level of CHS's performance under the agreements. *Id.* ¶¶ 9, 68-73.

5.      Unsurprisingly, QHC fared poorly immediately after the Spin-Off was completed in April 2016, as CHS had simply offloaded its own unsolvable debt problem onto QHC (and left QHC with less than $14 million of cash on hand). *Id.* ¶ 10. QHC violated its debt covenants almost immediately after the Spin-Off was consummated, and was forced to enter into costly amendments to its term loan and dedicate virtually all of its paltry available cash flows to debt repayment. *Id.* ¶¶ 10, 89-92. Although QHC was able to muddle along for several years through expensive and onerous amendments to its credit agreements and long-dated maturities of its funded debt, it succumbed to its inevitable fate on April 7, 2020, when the company filed for bankruptcy. QHC's CFO testified in the bankruptcy that the chapter 11 filing was "driven by the financial obligations produced by the capital structure [QHC] has operated with since its inception, rather than the underlying business performance." *Id.* ¶¶ 11, 95.

6.      On June 30, 2020, the Bankruptcy Court confirmed the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization (the "Plan"), which became effective on July 7, 2020. The

Trust was established pursuant to the Plan that same day.  The primary purpose of the Trust is to prosecute or settle, on behalf of the Trust's beneficiaries, all claims and causes of action of the Debtors or their bankruptcy estates that have been transferred to the Trust.  The claims transferred to the Trust include (a) causes of action arising under or based on sections 542, 543, 544 through 548, 550, and 553 of the Bankruptcy Code, any state law fraudulent transfer, fraudulent conveyance, and voidable transaction law, and any statute limiting or prohibiting transfers to shareholders, (b) causes of action relating to fraudulent transfer, fraudulent conveyance, voidable transaction, illegal dividend, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, alter ego, and unjust enrichment, and (c) causes of action assigned to the Trust by holders (the "Senior Noteholders") of over 90% Quorum Health Corporation's unsecured 11.625% Senior Notes due April 2023 (the "Senior Notes").  On October 25, 2021, the Trustee and WSFS, in its capacity as the Indenture Trustee for the Senior Notes, filed the Complaint.[2]

## ARGUMENT

## I.    STANDARD OF LAW

7.    It is well settled that, "[i]n considering a Rule 12(b)(6) motion, courts must 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'"  *Bruni v. City of Pittsburgh*, 824 F.3d 353, 360 (3d Cir. 2016)  (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)); *see also Fagin v. Gilmartin*, 432 F.3d 276, 284-85 (3d Cir. 2005) (in determining a motion to dismiss, the Court must "ensure its analysis does not rely on any information derived from outside materials"); *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994) (in determining a motion to dismiss, the

---

[2]    WSFS is not pursuing any claims against Credit Suisse.

Court "looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record").

8.        Defendants flout this basic tenet of civil procedure, positing their own versions of the facts to challenge the allegations in the Complaint throughout their Motions.  For example, in an effort to establish their own narrative regarding the purpose of the Spin-Off (CHS Mot. at 4), and the reasons for QHC's poor financial performance (*id*. at 6), Defendants cite to the same SEC filings and press releases that CHS relied on to justify the misguided Spin-Off at the time of the transaction.  But the Complaint directly contradicts the self-serving statements contained in these documents, and they may not be considered by the Court for the truth of the matter asserted on a motion to dismiss.  *Lupin Atlantis Holdings v. Ranbaxy Lab's, Ltd.*, 2011 WL 1540199, at *3 n.8 (E.D. Pa. Apr. 21, 2011) ("a district court, in ruling on a motion to dismiss … can only consider materials outside the pleadings to establish the truth of their existence, not the truth of their contents.") (citing *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000)).[3]  These self-serving and contested statements, which Plaintiffs will ultimately prove to be demonstrably false, should be

---

[3]        Adding insult to injury, Defendants also misrepresent several of the outside statements on which they impermissibly rely.  For example, the CHS Defendants assert that "a major international law firm, Orrick, Herrington and Sutcliffe LLP," concluded "there was no legal basis for legal action" against CHS," and that "the analyzed Causes of Action would lack a viable legal basis."  CHS Mot. at 1, 6, 9.  But the Orrick investigation to which Defendants refer (1) was undertaken on behalf of QHC *shareholders*, (2) assumed that prior to the Spin-Off, QHC was a solvent company that owed fiduciary duties only to its sole shareholder CHS, and (3) did not consider creditor actions of the nature asserted in this action.  *See* Letter from QHC to R² Investments, LDC dated March 31, 2017 ("the assertion of claims against CHS or its management in connection with the matters referred to in the Letter would not be in the best interest of *the corporation and its shareholders* because such claims would lack a viable legal basis … *The officers and directors of CHS owed fiduciary duties only to CHS*.") (emphasis added).  Additionally, QHC's independent directors stated that although the investigation "did not produce *conclusive* evidence of intentional misconduct or fraud by CHS … the facts arising from the investigation suggest (*at a minimum*) several bases for questioning CHS's operational competence in connection with the planning and execution of the spin-off, and the formulation of financial projections."  *Id.* (emphasis added).  And—as CHS itself points out in its Motion— *Orrick*, acting on behalf of QHC, later asserted many of the same allegations underlying Plaintiffs' claims in this action.  CHS Mot. 20-21, Ex. 10 at 65-85.  Moreover, the CHS Defendants claim that "Quorum advised the Court that it 'attributed no material value' to the claims asserted here," but fail to disclose QHC's further statements that the establishment of the Litigation Trust was "an important consideration" for noteholders designed to "ensure that no claims or Causes of Action were inadvertently forfeited before the QHC Litigation Trust had an opportunity to examine the history of the Debtors' books and records with respect to such claims, since the Senior Noteholders did not have the opportunity to do so prepetition."  D.I. 477 ¶ 33.

disregarded.

## II.    THE COMPLAINT STATES A CLAIM FOR BREACH OF CONTRACT BASED ON ALTER EGO LIABILITY[4][5]

9.      The CHS Defendants' argument that QHC was not CHS's alter ego fails.  As a threshold matter, the CHS Defendants appear to confuse Plaintiffs' position as to the relevant period during which QHC and CHS were alter egos, arguing that "following the spin-off, Quorum autonomously managed the hospitals in its portfolio, negotiated debt instruments, divested assets, and eventually filed for bankruptcy—all without involvement by its former parent."  CHS Mot. at 28.  But the legally relevant time period for the Court's analysis of the alter-ego relationship is at the time the Spin-Off Debt was incurred.  That, of course, is the time period to which Plaintiffs' allegations relate.  And those allegations are plentiful, more than satisfying the two-pronged alter-ego test applied under Delaware law.  *See, e.g., Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008) (explaining that to pierce the corporate veil and state a claim based on an alter ego theory, a party must show (1) that the corporation and its shareholders operated as a single economic entity, and (2) that an overall element of injustice or unfairness was present).

### A.    Prong #1: From QHC's Creation Until The Spin-Off, QHC And CHS Operated As A Single Economic Entity

10.     Delaware courts apply a multi-factor test to determine whether a corporation and its shareholder operated as a single economic entity, examining whether: the corporation was adequately capitalized/solvent; corporate formalities were observed (*e.g.*, whether dividends were paid, corporate records kept, or officers and directors functioned properly); the controlling shareholder siphoned company funds; and the corporation functioned as merely a facade for the

---

[4]      The Trustee brings the alter ego claims in its capacity as the assignee of estate claims and, in the alternative, along with WSFS, as the representative or assignee of the Senior Noteholders.

[5]      CHS, as used in this section, refers to both CHS and CHS-2.

controlling shareholder.  *See, e.g., Fid. Nat'l Info. Services, Inc. v. Plano Encryption Techs.*, *LLC*, 2016 WL 1650763, at \*4 (D. Del. Apr. 25, 2016), *report and recommendation adopted*, 2016 WL 11695472 (D. Del. June 23, 2016).   No single factor is dispositive or necessary, but some combination of factors must be present.  *E.I. du Pont de Nemours and Co. v. Agfa-Gavaert NV*, 335 F. Supp. 3d 657, 675 (D. Del. 2018), *appeal dismissed sub nom. E.I. du Pont de Nemours and Co. v. Agfa-Gevaert N.V.*, 2018 WL 7360650 (Fed. Cir. Nov. 27, 2018).   Here, the Complaint's allegations overwhelmingly show that CHS ignored corporate formalities and exercised complete control over QHC to consummate the Spin-Off Dividend that would render QHC insolvent and undercapitalized.   These allegations are more than enough to satisfy Delaware's multi-factor test.

1. <u>Solvency/Capitalization: From Get-Go, QHC Was Insolvent, Inadequately Capitalized, And Could Not Pay Its Debts As They Came Due</u>

11.    From the very moment QHC was created in July 2015, its assets (38 CHS Hospitals located primarily in rural areas with populations of 50,000 or less and a small consulting business that regularly incurred significant litigation expense) were underperforming in relation to CHS's other hospitals.  Compl. ¶ 36.  The assets were geographically disbursed, making them difficult to integrate from day one, and some even generated negative annual EBITDA.  *Id.* ¶¶ 36, 95.  Despite this tenuous operational foundation and the QHC Assets' poor financial performance, CHS was determined to solve its own debt problems by effectuating the Spin-Off scheme.  The central piece of that scheme, of course, was to force QHC to raise $1.28 billion in debt—an amount it could not support—and use the funds for its own benefit by forcing QHC to issue a $1.21 billion dividend to CHS. *Id.* ¶ 37.  Incredibly, of the $1.28 billion raised, QHC was permitted to retain only $14 million in cash on hand (approximately 1% of debt incurred), but was left with the entirety of the obligation.

12.    Not surprisingly, the amount of debt was not based on QHC's needs, but rather was

designed for one thing only: to offload CHS's debt problem onto QHC, with no regard for QHC's financial well-being. *Id.* ¶¶ 49-53. And because QHC could not, as a standalone entity, service this amount of debt (*id.* ¶¶ 50-51), CHS fraudulently inflated QHC's projections to dupe lenders into lending the funds anyway. The ways in which CHS inflated the projections and falsified financials are described at length in the Complaint. *See id.* ¶¶ 54-63.

13.      CHS did not stop there. In addition to burdening QHC with unsustainable debt (*id.* ¶¶ 64-65), CHS also took steps that further undermined QHC's ability to succeed as a standalone company, including causing QHC to enter into onerous and one-sided transition services agreement (the "TSAs") (*id.* ¶¶ 68-73), neglecting the QHC Assets prior to the Spin-Off (*id.* ¶¶ 74-77), forbidding QHC's future management from preparing QHC to operate as a standalone entity (*id.* ¶¶ 78-79), and shifting CHS's other costs onto QHC as part of the Spin-Off (*id.* ¶¶ 80-81). All of this guaranteed QHC's demise from the get-go, as confirmed by QHC's Executive Vice President ("EVP") and Chief Financial Officer ("CFO"), Alfred Lumsdaine, who explained in his first day declaration that QHC's April 2020 bankruptcy filing was "***driven by the financial obligations produced by the capital structure it has operated since its inception, rather than the underlying business performance***." *Id.* ¶ 95 (emphasis added). He further explained that "the assets [QHC] received in the Spin-off were not initially set up as an integrated, stand-alone enterprise and presented certain day-one integration challenges, including addressing significant geographic dispersion that resulted in a lack of scale in key markets." *Id.* ¶ 95.

14.      The CHS Defendants half-heartedly dispute QHC's insolvency by pointing out that it "operated independently for nearly four years before filing its bankruptcy petition." CHS Mot. at 29. But while it is true that QHC was ultimately able to avoid bankruptcy until April 2020, that was only because QHC's debt was not scheduled to mature until 2023, and it was able to stave off

a default only by resorting to expensive and value-destructive amendments to its debt documents. Those amendments further exacerbated QHC's financial troubles by introducing onerous new covenants, reducing QHC's available borrowing capacity, and causing QHC to spend millions of dollars of its limited remaining capital to pay bankers and other professionals. *See* Compl. ¶¶ 87-92. Moreover, the terms QHC was forced to accept for the amendments forced QHC to abandon necessary growth initiatives in lieu of an aggressive divestiture program and other cost reductions that were required to pay down the refinanced (even more expensive) debt. *See id.* ¶¶ 92, 96 (QHC's "debt-service obligations diverted management's attention and strained the ability to reinvest in [QHC's] hospitals."). That QHC was able to "trudge along" (*id.* ¶ 93) from 2016 to 2020 does not relieve CHS from liability at the time the debt was incurred, in the same way that a ship maker whose ship is designed to make it out of the harbor before sinking in the open seas cannot escape liability for faulty engineering.

15.      Given that the Complaint's allegations make it clear that QHC was doomed from the get-go, and undercapitalized and insolvent as a result of the $1.28 billion in debt it incurred for CHS's benefit, the insolvency/capitalization factors weigh heavily in favor of a finding of alter ego here.

2.      <u>Corporate Formalities: CHS And QHC Did Not Observe Corporate Formalities</u>

16.      The next factor—whether CHS and QHC observed corporate formalities—also weighs heavily against dismissal. For starters, CHS populated the initial QHC Board of Directors entirely with CHS senior officials, who approved the Spin-Off Dividend without holding a single in-person meeting. Compl. ¶¶ 4, 82-86. Indeed, the allegations are clear that prior to the Spin-Off, QHC had **no** functioning officers or directors other than CHS officials who resigned immediately before or after the Spin-Off Dividend was paid and then continued working for CHS,

15

except for (1) Defendant Feinstein, who was appointed to the QHC board days before the Spin-Off Dividend, and executed a written consent approving it only an hour after receiving it and without even seeing its final terms, and (2) a single CHS officer who retired from QHC shortly after the Spin-Off.  *See* Compl. ¶¶ 39-40, 42-43, 82-85.

17.    CHS also operated the QHC Assets within their existing divisions at CHS, and QHC's initial directors and officers served as rubber stamps for CHS's scheme.  *Id.* ¶ 40.  And CHS appointed QHC officers who were CHS employees, who had no knowledge of the projections, and who were instructed by CHS that they could not act on QHC's behalf until the Spin-Off was complete.  *Id.* ¶¶ 42-43.

        3.      <u>Siphoning of Funds:  The Spin-Off Was Designed To Siphon Funds From QHC For The Sole Benefit Of CHS</u>

18.    CHS also does not dispute that it siphoned funds from QHC.  Indeed, the entire Spin-Off scheme was designed for this purpose.  As described above and in the Complaint, CHS officers took myriad steps to manipulate QHC's projections to falsely suggest that QHC could support the level of debt necessary to pay the Spin-Off Dividend.  *Id.* ¶¶ 54-63.  And once the funds were obtained, most of the money was transferred to CHS for its own benefit, leaving QHC with a mere $14 million (out of a total $1.28 billion in incurred debt).  Moreover, CHS also took other steps to leverage QHC for its own benefit, including causing QHC to enter into onerous TSAs, neglecting QHC's assets prior to the Spin-Off, forbidding QHC's future management from preparing it to act as a stand-alone company, and transferring costs onto QHC.  *Id.* ¶¶ 67-81.  In sum, CHS took advantage of its position of control to extract as much value from QHC as it could, all to the detriment of QHC's defrauded creditors.

        4.      <u>Corporation As Façade: QHC Was Created For The Sole Purpose Of Effectuating The Spin-Off Scheme To Pay Down CHS's Debt</u>

19.    Finally, the allegations make clear that the entire purpose of the Spin-Off—and

indeed the creation of QHC—was for QHC to borrow $1.28 billion dollars and transfer most of it to CHS, rendering QHC insolvent, inadequately capitalized, and unable to pay its own debts as they came due. Here again, other than to dispute QHC's insolvency, the CHS Motion is silent. But the allegations in the Complaint adequately plead that QHC was created solely for CHS's benefit: to separate CHS's bad assets from good and to alleviate CHS's unbearable debt load. In pursuing this goal, CHS abused the corporate form for its own benefit, including by continuing to operate the QHC Assets within its existing divisions at CHS, with QHC's initial directors and officers serving as rubber stamps for CHS's scheme (Compl. ¶ 40), instructing QHC's appointed officers that they could not act on QHC's behalf until after the Spin-Off (*id.* ¶¶ 42-43), and directing QHC's officers to attend meetings with prospective lenders and rating agencies so that it would appear—falsely—that there were QHC fiduciaries involved in the preparation of QHC's projections, when in reality, the QHC officers played no role in preparing the QHC projections, which were prepared solely by CHS, and had no knowledge of the assumptions on which they were based (*id.* ¶¶ 8, 42). There is therefore no doubt that this factor weighs against dismissal.

**B.    Prong #2: The Spin-Off Scheme Was Based On CHS's Fraudulently Inflated Projections And Left QHC's Creditors Holding The Bag**

20.    As to prong 2—that an overall element of injustice or unfairness was present—the Complaint is once again on all fours. Indeed, the Complaint is replete with allegations that the very creation of QHC, incurrence of the Spin-Off Debt, and the Spin-Off itself were designed to improperly rid CHS of unwanted, underperforming assets and to manipulate the corporate form to free CHS from over a billion dollars of its own debt—to the detriment of QHC's creditors. What is more, this scheme could be effectuated only by fraudulently inflating CHS's financials, as detailed in the Complaint. *See id.* ¶¶ 54-63. The CHS Defendants' assertion that these allegations involve "basic facts that pertain any time a parent company spins off a subsidiary into a new

company" (CHS Mot. at 30) is preposterous on its face.  The contention that it is typical for a parent company to create bogus financial statements to disguise its subsidiary's true financial health, so that the subsidiary can raise debt that it cannot sustain in order to pay a dividend to the parent, simply is not credible and should not be given any weight by this Court.

21.     To the contrary, CHS's creation of a new entity to carry out the fraudulent scheme alleged in the Complaint is a quintessential example of abuse of the corporate form to perpetrate injustice, unfairness, and fraud that warrants alter ego liability.  Courts within and outside of this district, applying Delaware law, have consistently denied motions to dismiss under similar circumstances.  For example, in *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 473 (D. Del. 2010), the court held that defendants' use of the corporate form to "misdirect[] funds, exercise[] crippling control, and purposely siphon[] profits from the [subsidiary company] in favor of propping up [the parent]" satisfied the element of fraud or injustice under the alter ego test.  *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 473 (D. Del. 2010) (noting that the "nature and extent of the dominion and control exercised by the [parent] defendants over the [subsidiaries] is a question of fact, not subject to resolution on a motion to dismiss").

22.     Likewise, in *U.S. Bank v. Verizon*, a case governed by Delaware law involving facts remarkably similar to those here (a spinoff of Idearc from its former parent Verizon), the Northern District of Texas likewise denied defendant's motion to dismiss.  There, Idearc's litigation trustee alleged that the challenged spin-off transaction was "a scheme devised by Verizon" to extract $9.5 billion of value by appointing a Verizon officer as the sole board member of Idearc, fraudulently inflating Idearc's balance sheet, stripping it of cash, and burdening it with massive debt that rendered it insolvent.  *U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*, 2012 WL 3100778, at *1 (N.D. Tex. 2012).  The Court held that these facts indicated that "up and until the spin-off, Idearc

and Verizon were operated as a single economic entity," which was sufficient to state an alter ego claim. *Id.* at *16.

23.     The same is true here.  At bottom, "[t]he alter ego doctrine is used to pierce the corporate veil when a corporation has created a 'sham entity designed to defraud investors and creditors.'" *In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 577 (Del. 2019).  Given the allegations in the Complaint, which detail substantial abuses of corporate form and complete domination of decision making by CHS, and ultimately expose a fraud carried out by CHS for its own benefit, the alter ego claim cannot be dismissed on the pleadings.  *See Stardyne, Inc. v. N.L.R.B.*, 41 F.3d 141, 151 (3d Cir. 1994) ("The determination whether two companies are alter egos is a question of fact.").

## III.     THE COMPLAINT STATES CLAIMS FOR AVOIDANCE

### A.     The Complaint Adequately Alleges A Triggering Creditor

24.     Defendants' assertion that the Trustee's claims must be dismissed because the Trustee fails to plead the existence of a triggering creditor is without merit.  CS Mot. at 11, CHS Mot. at 10 n.6.  Defendants contend that the "only creditors identified in the Complaint" are the Senior Noteholders, and that the Senior Noteholders ratified the Spin-Off Dividend "because they became creditors knowing full-well that the proceeds of the note offering would be transferred to CHS."  *Id.*  As the Third Circuit has held, however, "there can be no ratification unless the ratifying [actors] have knowledge of all material facts connected with the transaction."  *Renault v. L. N. Renault & Sons*, 188 F.2d 317, 321 n.11 (3d Cir. 1951).  The Complaint is replete with allegations that the Senior Noteholders were given inflated projections that presented an inaccurate picture of QHC's financial health.  They thus did not have "knowledge of all material facts connected with" the Spin-Off Dividend.  *See, e.g.,* Compl. ¶¶ 54-66 (alleging that if the QHC Projections provided to the noteholders "had not been fraudulently inflated, they would have revealed that the Spin-Off

Dividend would leave QHC balance sheet insolvent, inadequately capitalized, and unable to pay

its debts as they came due"); *In re Physiotherapy Holdings Inc.*, 2016 WL 3611831, at *12 (Bankr.

D. Del. June 20, 2016) ("Ratification 'is the act of **knowingly** giving sanction or affirmance to an

act which would otherwise be unauthorized and not binding.'") (emphasis added) (quoting 57 N.Y.

Jur. 2d Estoppel, Ratification and Waiver § 87 (2007))).

25.     The *Physiotherapy* case is instructive.  Like Defendants here, the *Physiotherapy*

defendants argued that "because the Secured Noteholders were aware that the proceeds from the

issuance would be used to cash out Selling Shareholders, they are estopped from seeking to avoid

the very transfer they allegedly approved."  2016 WL 3611831, at *12.  Rejecting the argument,

the Court held that "the use of proceeds is simply one piece of the entire fraud alleged in the

complaint," that a "borrower's financial health may be the most material fact" regarding a bond

issuance, and that the allegations were sufficient to allege that "Senior Noteholders may have been

misled into lending money to a company whose financial health was poorer than represented." *Id.*

Finding that "intent is the central element of ratification," and that it was "far from certain that the

Senior Noteholders intended to extend credit to an insolvent company," the court concluded that

"a finding of ratification is inappropriate at this juncture." *Id.*

26.     Here, as in *Physiotherapy*, the fact that the Senior Note debt proceeds were to be

used to pay CHS was "simply one piece" of information regarding the Spin-Off Debt.  QHC's

financial condition, and concomitant ability to service the Senior Notes, was likely "most material"

to the Senior Noteholders, and was materially misrepresented to them.  *See, e.g.,* Compl. ¶¶ 54-

66.  Without accurate information regarding QHC's financial condition, the Senior Noteholders

could not possibly have had "knowledge of all material facts connected with the" Spin-Off

Dividend, and could not have ratified the transfer.  *See Renault*, 188 F.2d at 321 n.11.

27.    The cases cited by Defendants are inapposite and unpersuasive.  *See* CS Mot. at 9-12.  In *Refco*, the court found that the creditor at issue was not a triggering creditor because—unlike the Senior Noteholders here—it was a "material participant[]" that was "heavily involved in structuring" the allegedly fraudulent transaction.  *In re Refco, Inc. Sec. Litig.*, 2009 WL 7242548, at *10-11 (S.D.N.Y. Nov. 13, 2009), *report and recommendation adopted sub nom.*, 2010 WL 5129072 (S.D.N.Y. Jan. 12, 2010) ("Refco is not a legitimate creditor because it was ***an active party to the fraud*** alleged in the complaint.") (emphasis added).  *Lyondell* did not involve allegations that creditors were misled by inflated financial statements as the Senior Noteholders were here.  *In re Lyondell Chem. Co.*, 503 B.R. 348, 385 (Bankr. S.D.N.Y. 2014), *as corrected* (Jan. 16, 2014), *and abrogated by In re Trib. Co. Fraudulent Conv. Litig.*, 818 F.3d 98 (2d Cir. 2016).  In *HSBC,* the court found that the disqualified creditor "did in fact have 'full knowledge' of the facts surrounding the allegedly fraudulent transfer.'"  *HSBC Bank USA Nat'l Ass'n v. Adelphia Commc'ns Corp.,* 2009 WL 385474, at *7 (W.D.N.Y. Feb. 12, 2009).  And to the extent that the summary judgment decision from the District Court for the Northern District of Texas, *U.S. Bank Nat. Ass'n v. Verizon Comm's Inc.*, 2012 WL 3100778, at *412 (N.D. Tex. 2012), may be interpreted to hold that a creditor may ratify a transfer even where it is defrauded regarding the transferor's post-transfer creditworthiness and financial condition, the decision is inconsistent with binding precedent of this Circuit, the weight of authority on this issue, and the equitable principles underlying the Bankruptcy Code (11 U.S.C. 101 *et seq.* (the "Code")), and should not be followed.[6]

**B.    The Complaint Adequately Alleges That QHC Did Not Receive Reasonably**

---

[6]    Dismissal would be unwarranted here even if the Senior Noteholders did not qualify as triggering creditors (and they do).  "When analyzing the sufficiency of a complaint for purposes of Rule 12(b)(6), courts do not generally require a trustee to plead the existence of an unsecured creditor by name, although the trustee must ultimately prove such a creditor exists."  *In re APF CO.*, 274 B.R. 634, 639 (Bankr. D. Del. 2001).  Given QHC's liabilities both at the time of the Spin-Off Dividend and the commencement of the chapter 11 proceedings, the Trustee would be able to establish the existence of triggering creditors other than the Senior Noteholders if necessary.

**Equivalent Value For The Payments To Credit Suisse**

28.     Credit Suisse's argument that the Trustee's constructive fraudulent transfer claim must be dismissed because the Complaint fails to adequately allege that QHC did not receive reasonably equivalent value in exchange for the Transaction Fee also fails.  Credit Suisse's argument is primarily that the Complaint (1) purportedly  concedes that Credit Suisse provided investment banking services to QHC, including with regard to its projections, and (2) does not allege that Credit Suisse "failed to do anything it was asked" or "charged anything other than arms'-length, market rates for its services," or that "the desired financing was not raised on behalf of QHC."  CS Mot. at 14.  But Credit Suisse misses the point entirely; it ignores the Complaint's numerous allegations that Credit Suisse performed investment banking services for ***CHS's*** benefit rather than QHC's, and actually ***harmed*** QHC, by enabling CHS to burden QHC with an unsustainable debt load for the sole purpose of funding the Spin-Off Dividend.

29.     For example, the Complaint alleges that:

- "In order to further cement CHS's absolute control over the Spin-Off process, CHS tapped Credit Suisse to nominally serve as QHC's investment in connection with the Spin-Off Debt.  Credit Suisse had served as CHS's investment banker in the past, and hoped that its lucrative relationship with CHS would continue into the future."  Compl. ¶ 44.

- "CHS understood and expected that Credit Suisse would turn a blind eye to the machinations necessary to effectuate the Spin-Off, including fraudulently inflating the QHC Projections on which the Spin-Off was premised and burdening QHC with a debt load it could not possibly bear. And . . . that is exactly what it did." *Id.*

- "On a February 3, 2016 investor call, an analyst remarked that in light of the deteriorating credit markets and increased cost of debt, he expected QHC's post-spin debt-to-EBITDA ratio would need to be 4.0x, rather than the 5.0x target envisioned by CHS. Credit Suisse reached the same conclusion. This led to a series of heated conversations between CHS and Credit Suisse, in which Cash steadfastly refused to change course or reduce the amount of the Spin-Off Dividend." *Id.* ¶ 51.

- "CHS … fraudulently manipulat[ed] the QHC Projections so that they

22

falsely suggested that QHC could support the predetermined level of debt necessary to pay the Spin-Off Dividend. CHS inflated QHC's post-Spin-Off cash flows by systematically inflating revenues, margins, and asset sales and understating costs, at a time when QHC's actual results of operations and other external events showed that these projections defied reality. Credit Suisse witnessed these strategic manipulations, and knew that they were motivated by CHS's desire to consummate the Spin-Off rather than any realistic expectations of QHC's future performance." *Id.* ¶ 54

- "The QHC Projections were managed by Lee Fleck, a director of corporate finance at CHS, under Cash's control and supervision … Fleck has said that he had "never been pressured in a transaction like this before," and that he was so uncomfortable with Cash's directives that he began keeping a log of them in order to have a written record of the changes he was being instructed to make … When the Credit Suisse bankers became aware of the log, they asked Fleck to delete all references therein to Credit Suisse. *Id.* ¶ 55.

- "QHC's adjusted EBITDA margin for 2016 was increased from 11.9% in the version of the projections dated August 11, 2015 to 12.2% in the final March 9, 2016 version of the QHC Projections. Likewise, 2017 adjusted EBITDA was increased from 12.3% in the August 11 model to 15.0% in the final version. By comparison, from 2013-2015, QHC's adjusted EBITDA margin averaged 11.5%. In light of the significant industry and operational headwinds and the dissynergies that the CHS entities and Credit Suisse knew would result from the Spin-Off, these manipulations were entirely divorced from business reality and operated only to defraud QHC's creditors." *Id.* ¶ 56

- "Ultimately, between November 2015 and the final version of the QHC Projections dated March 16, 2016, total projected free cash flow was increased by approximately $118 million. This was enough to offset the increased interest expenses and to address Credit Suisse's concern that CHS needed to present stronger QHC cash flows in order to raise the $1.2 billion of Spin-Off Debt." *Id.* ¶ 62

- "The final version of the QHC Projections predicted that QHC's adjusted EBTIDA for 2016 would be $277 million, and that adjusted EBITDA for 2017 would equal $318 million. No reasonable person with knowledge of the QHC's Assets' actual performance could have believed that QHC could achieve these projections, and both CHS and Credit Suisse knew that they were unattainable. Moreover, if the QHC Projections had not been fraudulently inflated, they would have revealed that the Spin Off Dividend would leave QHC balance sheet insolvent, inadequately capitalized, and unable to pay its debts as they came due. As the CHS entities and Credit Suisse could easily have predicted prior to the Spin-Off, QHC's actual results for 2016 and 2017 fell far short of these benchmarks, with adjusted EBITDA of only $163 million for 2016, and only $141.8 million for 2017."

      *Id.* ¶ 63.

- "Given the declining state of the hospital industry at this time, prospective lenders were reluctant to lend to QHC even after CHS and Credit Suisse provided them with the fraudulent QHC Projections. Accordingly, CHS and Credit Suisse resorted to attracting lenders by offering high interest rates and discounts to par." *Id.* ¶ 65.

Credit Suisse's assertion that the Complaint fails to allege that QHC received reasonably equivalent value in exchange for the Transaction Fee cannot be squared with these allegations.

      30.    The allegations also demonstrate that Credit Suisse failed to act in good faith, which is another basis for establishing lack of reasonably equivalent value. *See In re Cornerstone Homes, Inc.*, 567 B.R. 37, 52 (Bankr. W.D.N.Y. 2017) (denying motion to dismiss based on failure to plead reasonably equivalent value because "the Trustee has adequately alleged the bank's lack of good faith" by alleging that the defendant banks "knew or should have known" that the debtor "was insolvent," had an "unsustainable" business model, and was operating a Ponzi scheme, and that "private investors would be left wholly unsecured"); *Buchwald Capital Advs. LLC v. Schoen (In re OPP Liq. Co., Inc.)*, 2022 WL 774063, at *13 (Bankr. D. Del. March 14, 2022) (denying motion to dismiss on issue of reasonable equivalent value because "[t]he allegations of the Amended Complaint that the Defendants failed to act in good faith or to perform their essential fiduciary duties in conducting and monitoring the Debtor's operations and expansion do raise a question as to the value of the services the Defendants provided to the Debtor").[7]

      31.    The *Millenium Lab* case on which Credit Suisse relies so heavily underscores the

---

[7]    As a legal matter, Credit Suisse's contention that "payment of a valid contractual debt 'presumptively constitutes reasonably equivalent value'" also fails to warrant dismissal of the Trustee's claim. Additionally, the Trustee is not in possession of any contract between QHC and Credit Suisse and does not know that any such contract exists. And even if it does exist, it certainly may not be considered at this juncture and would likewise be avoidable by QHC because, among other things, it would have been negotiated solely by CHS for its own benefit. To the extent Credit Suisse is in possession of an agreement between Credit Suisse and QHC to provide investment banking services, the Trustee requests that that Credit Suisse provide it to the Trustee and reserves all rights to amend the Complaint to seek to avoid it.

viability of the Trustee's claims.  CS Mot. at 12, n. 10, 16 (citing *In re Millenium Lab Holdings*,

2019 WL 1005657, at *5 (Bankr. D. Del Feb. 28, 2019).  The plaintiff in *Millenium Lab*, the trustee

of a creditors' trust, sought to avoid as intentional and constructive fraudulent transfers the debtor's

payments of fees to banks that had facilitated the debtor's borrowing of $1.775 billion, $1.2 billion

of which was used to pay dividends and/or bonuses to the debtor's controlling persons.  *Millenium*

*Lab,* 2019 WL 1005657, at *5.  The defendants moved to dismiss the constructive fraudulent

transfer claim, arguing—as Credit Suisse does here—that the Complaint failed to allege that the

fees were not market value, and improperly collapsed the fees with the payment of the dividend to

the controlling persons.  *Id.* at *5-6.

      32.    The court rejected these arguments.  First, the court held that under Third Circuit

precedent, "payment to a bank of a market-based fee is not equivalent to a receipt of value," and

that the plaintiff had adequately placed the defendants on notice of his theory that the debtor had

not received reasonably equivalent value for the fees because "at the end of the day, the

[transaction] provided no value to [the debtor]."  *Id.* at *6.  Second, the court noted that under

Third Circuit precedent, where "a series of transactions' were all part of 'one integrated

transaction,'" a court may look beyond the exchange of funds in one transaction and consider the

***aggregate*** transaction."  *Id.* at *6 (citing *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288,

1302 (3d Cir. 1986)) (emphasis in original).  The court explained that in determining whether

collapsing applies, courts look to the "substance rather than to the form of the transactions" and

"focus[] on the overall financial consequences of the transactions and how they impact creditors,"

and consider: (1) "whether all of the parties involved had knowledge of the multiple transactions;"

(2) "whether each transaction would have occurred on its own;" and (3) "whether each transaction

was dependent or conditioned on other transactions."  *Id.* at *6. Based on these factors, the court

concluded that "[a]ssuming the need to use the collapsing doctrine, Trustee has pled sufficient facts to demonstrate that incurring the obligation to pay and/or payment of the Fee may be a proper transfer to collapse with the loan of funds and the payment of the Dividend." *Id.* at *7.[8]

33.    Here, as in *Millenium Labs*, that the Trustee does not allege that QHC paid Credit Suisse an above-market rate has no bearing on the sufficiency of the Trustee's allegations, which demonstrate that "at the end of the day," QHC received **no value whatsoever** from Credit Suisse's investment banking services, because the Spin-Off Debt provided no value to QHC.  Further, although the collapsing doctrine is not necessary for the Court to find for the Trustee on this point, its application here certainly would be warranted, given that Credit Suisse understood that virtually all proceeds raised would be immediately sent to CHS and render QHC insolvent; and that the only purpose of raising the Spin-Off Debt (and by extension, paying the Transaction Fee) was CHS's desire to receive the Spin-Off Dividend.

C.    **The Complaint Adequately Pleads A Claim For Intentional Fraudulent Transfer Against Credit Suisse**

34.    Credit Suisse argues that the Trustee's intentional fraudulent transfer claims against it should be dismissed because the Complaint "pleads none" of the badges of fraud courts typically consider.  CS Mot. at 3 (emphasis in original).  This argument fails.

35.    As an initial matter, courts consider "badges of fraud" where the plaintiff is unable to provide direct evidence of fraudulent intent.  *See, e.g.*, *In re Charys Holding Company, Inc.*,

---

[8]    Credit Suisse's assertion that *Millenium Labs* is distinguishable because "the transferee … had not contributed any assets (like the hospital assets that CHS contributed here) to the transferor in exchange for the transfer," and "the *Millenium* court focused on allegations of self-dealing" by the debtor's controlling person "that "are entirely absent here" is significantly misplaced.  CS Mot. at 16, n.12.  First, the Complaint alleges that the value of the QHC Assets were outweighed by the Spin-Off Debt, which left QHC insolvent, inadequately capitalized, and balance sheet insolvent notwithstanding the contribution of the assets.  Compl. ¶¶ 10, 63, 102.  Second, the Complaint alleges that the precise purpose of the Spin-Off was CHS's self-dealing, as CHS needed the Spin-Off Dividend to prevent a ratings a downgrade.  *Id.* ¶¶ 33-37, 52.  And Credit Suisse's suggestion that Judge Silverstein somehow endorsed **defendants'** contention that fraudulent transfer actions "should not be brought for the benefit of parties to the challenged transactions" is belied by the actual decision.  CS Mot. at 12 n.10.

2010 WL 2774852, at *5 (Bankr. D. Del. Jul. 14, 2010) ("In the *absence* of direct evidence, courts often rely on 'badges of fraud' as circumstantial evidence of actual fraudulent intent.") (emphasis added).   Here, the Complaint includes allegations that go *beyond* the badges of fraud and will ultimately be supported by direct evidence of CHS's intentional scheme to defraud creditors into lending over a billion dollars to an insolvent QHC and to then extract those funds from QHC to CHS.   Among other things, the Complaint alleges that:

- CHS's CFO (and a pre-Spin-Off QHC director) directed a CHS employee to manipulate financial projections in ways that made him highly uncomfortable so that CHS could ensure that QHC would be able to raise the Spin-Off Debt even though the debt would render QHC insolvent, unable to pay its debts, and inadequately capitalized (Compl. ¶¶ 6, 52-55); and

- CHS, in control of QHC in all respects, prevented QHC's incoming management from participating in planning, budgeting, forecasting, staffing, or management of the QHC Assets prior to the Spin-Off in order to conceal the fraudulent scheme from individuals who had a vested interest in QHC's post-Spin-Off success(*id.* § IV.G.3);

36.    Next, Credit Suisse appears to argue that evidence of fraudulent intent must be linked to transfers made to Credit Suisse particularly, as if intent to undertake the fraudulent scheme to receive the Spin-Off Dividend somehow could be separated from intent to pay the investment bank that was hired to facilitate the scheme.  CS Mot. at 17.  Such additional allegations are not required for intentional fraudulent transfer claims to survive motion to dismiss. Nevertheless, the Trustee pleads them as well, including as follows:

- "In order to further cement CHS's absolute control over the Spin-off, CHS tapped Credit Suisse to nominally serve as QHC's investment banker in connection with the Spin-Off Debt.  Credit Suisse, motivated by its lucrative relationship with CHS, then assisted CHS in the fraudulent machinations necessary to raise the funds needed to pay the Spin-Off Dividend, notwithstanding Credit Suisse's knowledge that QHC would not be able to sustain that level of debt." (Compl. ¶ 7);

- "Credit Suisse had served as CHS's investment banker in the past, and hoped that its lucrative relationship with CHS would continue into the future.  Thus, CHS understood and expected that Credit Suisse would turn a blind eye to the machinations necessary to effectuate the Spin-Off, including fraudulently inflating

the QHC Projections on which the Spin-Off was premised and burdening QHC with a debt load that it could not possibly bear." (*id.* ¶ 44);

- After Credit Suisse reached same conclusion as other market participants, that the debt load was unbearable, Cash and Credit Suisse had "heated conversations … in which Cash steadfastly refused to change course or reduce the amount of the Spin-Off Dividend." (*id.* ¶ 51); and

- Credit Suisse was in fact aware of the fraudulent nature of the scheme and the CHS's fraudulent intent, as evidenced by, *inter alia*, Credit Suisse's lead investment banker describing the Spin-Off as the most difficult deal of his career, and Credit Suisse's bankers requesting that Fleck delete all references to Credit Suisse in his log (*id.* ¶¶ 53-55).

37. These allegations leave no doubt that the payments to Credit Suisse and releases and indemnification protections that CHS included in the SDA to ensure that QHC rather than CHS or Credit Suisse bore the repercussions of CHS's and Credit Suisse's conduct were intended to hinder, delay, and defraud QHC's creditors.

38. Finally, while the allegations of CHS's fraudulent intent in connection with the transfers to Credit Suisse alleviates the need to allege badges of fraud, the Trustee nevertheless pleads multiple such badges, which are alone enough to survive a motion to dismiss here. In particular, the Trustee alleges: (1) the transferor's insolvency (*see, e.g.*, *id.* ¶¶ 54-66, 87-96); (2) lack of reasonably equivalent value—or, for that matter, any value—given that Credit Suisse's facilitation of the Spin-Off doomed QHC to fail (*see, e.g.*, *id.*. ¶ 190); (3) a non-arm's length relationship between the transferor and transferee (*i.e.*, CHS and QHC, which was beholden to it) (*id.* ¶¶ 7, 44, 54); and (4) that the payments to Credit Suisse occurred contemporaneously with the incurrence of a substantial debt (*i.e.*, the Spin-Off Debt). *Id.* ¶¶ 26, 66. The intentional fraudulent transfer claim against Credit Suisse must survive.

## IV.    THE COMPLAINT STATES A CLAIM FOR ILLEGAL DIVIDEND

39. Defendants assert that the illegal dividend claim must be dismissed because the Spin-Off Dividend was not a "dividend" under Delaware law. The argument is that the SDA—

which was drafted solely by CHS— states the distribution was made "in partial consideration" for the transferred assets.  CHS Mot. at 17; *see also* CS Mot. at 21.  But the Complaint is replete with well-founded allegations that the language in the SDA is self-serving window dressing that does not accurately represent the true nature of the Spin-Off Dividend and is contradicted by CHS's and QHC's internal documents and SEC filings.  *See* Compl. ¶ 3 (the Spin-Off Dividend was paid to CHS as a "tax-free dividend"), ¶ 52 (the amount of the Spin-Off Dividend was determined solely by the amount necessary for CHS to "reduce its own debt" to avoid "a ratings downgrade within the next 6 months"), ¶ 165 ("The Spin-Off Dividend was repeatedly referred to as a 'dividend' or 'distribution' by CHS, including in the press release announcing the Spin-Off, QHC's preliminary and final offering memoranda for its Senior Notes, and in CHS's annual SEC filings"), ¶ 99 ("QHC did not receive any value for the Spin-Off Dividend, which was a gratuitous transfer from QHC to BridgeCo that conferred no value on QHC"), ¶ 100 ("The Spin-Off Dividend was not paid in exchange for the QHC Assets, which CHS repeatedly referred to as being 'contributed' by CHS to QHC."), *see also* CHS Mot. Ex. 12 (CHS 2016 10-K) at 74 ("The increase in cash provided by investing activities for the year ended December 31, 2016 was primarily due to the ***distribution*** received from QHC of $1.2 billion as part of the spin-off transaction…."), 102 (listing "***Distribution*** from Quorum Health Corporation" of $1.219 billion).[9]  Thus, whether the Spin-Off

---

[9]    These allegations are well supported.  For example, the corporate authorizations treat the spin-off of CHS's assets to QHC as a ***contribution, not a sale***, and the Spin-Off Dividend as a ***cash distribution***.  *See* Action by Written Consent In Lieu Of A Meeting Of The Board Of Directors Of Quorum Health Corporation dated April 13, 2016 ("CHS Intends to ***contribute*** the assets and operations of 38 of its hospitals and the operations of Quorum Health Resources, LLC, an indirect wholly-owned subsidiary of CHS to the Company") (emphasis added); Action by Written Consent In Lieu Of A Meeting Of The Board Of Directors Of Quorum Health Corporation dated April 29, 2016 (under "Acceptance of Contribution from CHS-QHC Bridge Company, LLC": "WHEREAS, the board of directors of Bridge Co. has approved a ***capital contribution*** of (i) all, if any, of Bridge Co.'s stock, membership interests, partnership interests or other evidence of equity ownership in the legal entities listed on Exhibit A (the 'Contribution Subsidiaries') and (ii) certain other assets previously owned by CHS/CHS, that Bridge Co. received from CHS/CHS on the date hereof (the 'Assets'), to the capital of the Company (collectively, the 'Contribution')"), (under "***Distribution*** of Cash Proceeds to CHS-QHC Bridge Company, LLC": "WHEREAS, the Company desires to ***distribute to Bridge Co***. approximately $1,217,336,000 of cash  proceeds (the 'Cash Proceeds') from the sale of QHC Notes and borrowings under the QHC Credit Agreement (***the 'Cash Distribution'***), (WHEREAS, the Board has determined that it is in the

Dividend was a dividend is a disputed issue of fact that cannot be resolved on a motion to dismiss.

40.    Additionally, Defendants' position is expressly contradicted by two cases addressing the exact same question presented here, each of which elevate substance over form and adopt a much broader interpretation of "dividend" than Defendants urge.  *See U.S. Bank Ass'n v. Verizon Comm's Inc.*, 817 F.Supp. 2d 934, 945-46 (2011); *MC Asset Recovery, LLC v. S. Co.*, 2009 WL 10666059, at *12-13 (N.D. Ga. Feb. 5, 2009).  In *Verizon*, defendants asserted that an unlawful dividend claim under Delaware law based on Idearc's transfers to Verizon in Verizon's spin-off of Idearc should be dismissed because the distribution was made "in exchange for the contribution from Verizon to Idearc of the directories business."  817 F.Supp.2d at 945.  The plaintiff argued in response that the spin-off transaction could not "be a purchase [by Idearc] of [Verizon's] directory business because the transaction was structured as a tax free reorganization, not a purchase and sale, and the amount Verizon took from Idearc grossly exceeded the value of the business," and "urge[d] the court to look to the 'substance of these transactions."  *Id.* at 945-46.  The court denied the motion to dismiss, noting that plaintiff's position was "amply supported by persuasive authority," and that most courts have "adopted a more expansive view of what constitutes a 'dividend' under Delaware's unlawful dividend statute" than the interpretation urged by defendants.  The court concluded that "the expansive view of 'dividend' propounded by [the plaintiff] [was] the correct one."  *Id.* at 946.

41.    Similarly, in *MC Asset Recovery*, the defendant sought summary judgment dismissing the plaintiff's claims for illegal dividend based on transfers made in connection with a

---

best interests of the Company to make the Cash Distribution, and WHEREAS, the Company will obtain benefits from the ***Cash Distribution***, which benefits are necessary and convenient to the conduct, promotion and attainment of the business of the Company.  NOW, THEREFORE BE IT RESOLVED, that ***the Cash Distribution*** is hereby authorized.")  (emphasis added).  There is no indication whatsoever in these corporate authorizations that the Spin-Off Dividend was being paid as consideration for the QHC Assets.

debtor's spin-off from its corporate parent, on the ground that the transfers "[were] made in exchange for valuable consideration and d[id] not constitute 'dividends' under Delaware law." 2009 WL 10666059, at *12.  The plaintiff argued in response that the transfers were "in substance, dividends, because there was no real consideration to support the transfers."  *Id.*  The court denied the motion, noting that "[i]n determining whether a particular transaction constitutes a 'dividend' to shareholders, Delaware courts have placed an emphasis on substance over form and focused on the 'economic reality of the transactions,'" and holding that although the transfers "were not 'designated as dividends by the [debtor's] board,' there [was] sufficient evidence to indicate the presence of a factual dispute" regarding "the consideration received by [the debtor] in exchange for the transfers" and "whether [the transfers] were illegal dividends."  *Id.* at 13.

42.     As in *Verizon* and *MC Asset Recovery,* the allegations here are clear that the Spin-Off Dividend was a dividend.  The sole case on which Defendants rely for their assertion to the contrary—*Quadrant Structured Prods. Co., Ltd, v. Vertin*,—is inapposite.  The issue there was whether the plaintiff could pursue an illegal dividend claim based on allegedly excessive compensation paid to a shareholder under a services agreement and a licensing agreement.  102 A.3d 155, 169, 201-202 (Del. Ch. Ct. 2014); CHS Mot. at 17.  By contrast here, there is no allegation that the Spin-Off Dividend constituted compensation, and the Complaint expressly alleges that both CHS and QHC acknowledged, publicly and internally, that the $1.21 billion transfer to CHS was a dividend.  Finally, CHS's factual assertions that the Spin-Off Dividend "was not a 'return on [CHSI's] investment'" and "Quorum's Board never declared a dividend" are subject to material dispute, and inappropriate for consideration on a motion to dismiss.[10]

---

[10]     As noted *supra* ¶ 39, the QHC Board of Directors did in fact authorize the Spin-Off Dividend as a dividend.

## V.    THE COMPLAINT STATES A CLAIM FOR UNJUST ENRICHMENT

43.    Each of Defendants' arguments to dismiss the unjust enrichment claims also fails. First, CHS and Credit Suisse both argue that portions of the unjust enrichment claims are outside the applicable statute of limitations.[11]  This argument fails because limitations periods are tolled where fraudulent activity prevented the injury from being discovered,[12] and the Complaint alleges that CHS and Credit Suisse participated in a fraud against QHC's creditors (*see* Compl. ¶¶ 7, 44, 54, 60, 65) and took steps to conceal the fraudulent nature of their projections and QHC's disastrous financial condition. *See id.* ¶¶ 79, 106.  While it is true that QHC discovered certain of the facts regarding the fraud prior to the prepetition arbitration between CHS and QHC (the "Arbitration"), the Arbitration was confidential, and thus QHC's creditors remained unaware of the fraudulent conduct.  Where, as here, the applicability of the "discovery rule" or another tolling doctrine presents questions of fact, resolution on motion to dismiss is improper.  *See TL of Fla., Inc. v. Terex Corp.*, 54 F. Supp. 3d 320, 329 (D. Del. 2014) ("Frequently, determining whether the statute of limitations has been tolled pursuant to the 'discovery rule' or due to fraudulent concealment requires a factual inquiry not amenable to resolution on a motion to dismiss.").  Additionally, creditors' claims did not accrue until QHC defaulted on its debt, which happened after the Arbitration concluded.

44.    Second, Credit Suisse argues that the existence of a contract dooms the unjust enrichment claims.  First, the Trustee is not in possession of any contract between QHC and Credit Suisse and is not aware whether such a contract exists—and if there is a contract, whether QHC

---

[11]    CHS argues that unjust enrichment is time-barred as to the Distribution, Transaction Fee, and TSA payments preceding April 7, 2017.  CHS Mot. at 24.  Credit Suisse argues that the portion of the claim seeking to invalidate the Transaction Fee is time-barred (Credit Suisse concedes that the unjust enrichment claims relating to both amendments are timely).  CS Mot. at 28 & n.18.

[12]    *See Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 789 (Del. Ch. 2014).

or CHS is the counterparty.  To the extent QHC is not a party to any such contract, Credit Suisse's argument falls flat before leaving the gate.  And to the extent there is a contract that QHC was forced to sign at CHS's direction, it cannot preclude the unjust enrichment claim here since QHC did not negotiate (and could not have negotiated) any such contract, any such contract was entered into at CHS's direction with the intent to perpetrate a fraud, and any such contract did not provide **any value whatsoever** to QHC.  *See supra* footnote 7 (reserving rights to amend Complaint to seek avoidance of any contract identified by Credit Suisse).  Indeed, Delaware and other courts allow unjust enrichment claims to survive even where there is a contract "when the validity of the contract is in doubt or uncertain." *Tolliver v. Christina Sch. Dist.*, 564 F. Supp. 2d 312, 315 (D. Del. 2008); *Refco Grp. Ltd., LLC v. Cantor Fitzgerald, L.P.,* 2014 WL 2610608, at \*30 (S.D.N.Y. June 10, 2014) ("The mere existence of a contract, however, is insufficient to preclude an unjust enrichment claim, since a defendant's misconduct may enrich that defendant in the form of an unjust contract.").  For example, in *McPadden v. Sidhu*, the court declined to dismiss an unjust enrichment claim because the plaintiff alleged "that it is the [contract], itself, that is the unjust enrichment; that is, defendants' manipulative conduct … unjustly enriched him in the form of the contract" itself.  964 A.2d 1262, 1276 (Del. Ch. 2008).  Similarly, in *LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, the court concluded that "the existence of [a] contract does not bar [an] unjust enrichment claim where the plaintiffs alleged that they "would never have entered into the agreement but for the Defendants' falsification of [] financial statements" and the "agreement itself arose from the Defendants' fraud."  2018 WL 1559936, at \*17 (Del. Ch. Mar. 28, 2018) ("[T]he contract itself is not necessarily the measure of the plaintiff's right where the claim is premised on an allegation that the contract arose from wrongdoing (***such as breach of fiduciary duty or fraud***) or mistake and the defendant has been unjustly enriched by the benefits flowing from the

contract.") (emphasis added).  The allegations in the Complaint that CHS and Credit Suisse entered into a scheme to defraud QHC are sufficient to permit a claim for unjust enrichment even if QHC (at the direction of CHS) entered into a contract with Credit Suisse for the provision of services.[13]

45.    Third, Credit Suisse argues that the Complaint fails to allege the "unjust" nature of Credit Suisse's receipt of its fees, because Credit Suisse performed services.  This argument again does not engage with the Complaint's well-pled allegations that the services were requested by and performed for the benefit of CHS.  In other words, in return for tens of millions of dollars in present and future fees, Credit Suisse participated with its longtime client, CHS, in perpetrating a fraud against QHC and its creditors.  The cases Credit Suisse cites, which stand for the unremarkable proposition that a cause of action for unjust enrichment cannot lie against a party who performed exactly as it promised, are inapposite.

## VI.    THE COMPLAINT STATES A CLAIM FOR AIDING AND ABETTING ILLEGAL DIVIDEND

46.    Credit Suisse's arguments that the Trustee's claim for aiding and abetting illegal dividend should be dismissed are without merit.  First, Credit Suisse argues that no cause of action for aiding and abetting illegal dividend exists.  CS Mot. at 22; *see also* CHS Mot. at 18 n.12.  But Credit Suisse does not (and cannot) cite any controlling authority for this contention.  And the Delaware Supreme Court has explained that "[i]t is a fundamental principle of our jurisprudence that co-conspirators are jointly and severally liable for the acts of their confederates committed in furtherance of the conspiracy." *Laventhol, Krekstein, Horwath & Horwath v. Tuckman*, 372 A.2d

---

[13]    *See, e.g.*, Compl. ¶¶ 154-59 (outlining CHS's scheme to use QHC to perpetrate fraud on QHC's creditors), ¶ 156 ("CHS hired Credit Suisse as "QHC's investment banker because CHS knew that Credit Suisse was beholden to CHS, and would turn a willfully blind eye to the fraudulently inflated QHC Projections…."), ¶ 215 ("Credit Suisse knowingly assisted CHS, Cash, Seifert, and Feinstein in causing QHC to make the unlawful Spin-Off Dividend by, among other things, fraudulently inflating the QHC Projections, presenting the fraudulently inflated projections to prospective lenders and ratings agencies, and taking other steps to ensure that QHC would be able to pay the Spin-Off Dividend.").

168, 170 (Del. 1976). There is no reasoned basis why this holding would not operate to render parties who aided and abetted the issuance of an illegal dividend jointly and severally liable.

47. The non-binding decisions cited by Credit Suisse do not help its cause. The court in *In re Magnesium*, which held only that a claim for aiding and abetting an illegal dividend may not be maintained against a corporation's professionals or officers, simply did not grapple with the Delaware Supreme Court's holding that liability shall be imposed upon joint conspirators. 399 B.R. 722, 776-78 (Bankr. S.D.N.Y. 2009). And *AT&T Corp. v. Walker* did not decide the question of whether a claim for aiding and abetting an illegal dividend may be maintained, as the plaintiff there voluntarily consented to dismissal of the claim after the court found the he had stated a claim for primary liability against the defendant shareholder. 2006 WL 3019980 (W.D. Wash. Oct. 17, 2006) ("The Trustee does not oppose dismissal of this claim, and Defendants' motion will, therefore, be granted as to this claim.").

48. Second, Credit Suisse's assertion that "the Complaint fails to plead the required facts showing that Credit Suisse 'knowingly and substantially participated' in the alleged violation" cannot be reconciled with the Complaint's allegations, as set forth above, *see supra* at ¶¶ 29, 36: The Complaint's allegations show that Credit Suisse knew that the projections had been manipulated so to present a fraudulently inflated picture of QHC's financial health, turned a blind eye to those manipulations to preserve its lucrative relationship with CHS, assisted CHS in raising the Spin-Off Debt based on those fraudulent projections so that the Spin-Off Dividend could be paid, and sought to erase any record of its participation in the fraudulent scheme. The Complaint thus adequately alleges that Credit Suisse "knowingly and substantially participated" in the Spin-Off scheme.

## VII.    SECTION 546(E) DOES NOT APPLY TO THIS ACTION

### A.    Section 546(e) Of The Bankruptcy Code Does Not Apply To The Claims

**Against CHS and CHS-2**

49.     The CHS Defendants argue that the claims predicated on the Spin-Off Dividend are barred by section 546(e) of the Bankruptcy Code ("Section 546(e)"), which, as relevant here, prohibits a trustee from avoiding a transfer "made by or to (or for the benefit of) a … financial institution [or] financial participant … in connection with a securities contract."  11 U.S.C. § 546(e).  The CHS Defendants' arguments are premised on their assertions that (1) the SDA, an alleged "purchase agreement between Quorum and certain initial purchasers" of the Senior Notes, and alleged "CHSI Tender Offer & Open Market Repurchases" are "securities contracts," (2) the Spin-Off Dividend was made "in connection with" these alleged securities contracts, and (3) CHS-2 is a "financial participants."   CHS Mot. at 11-13.  Application of Section 546(e), however, is a "fact-based inquiry" that is properly considered on a motion to dismiss only if "the defense is clearly established on the face of the complaint." *In re DBSI, Inc.*, 477 B.R. 504, 515 (Bankr. D. Del. 2012).  Here, the CHS Defendants' Section 546(e) arguments must be rejected, as the defense not only is indiscernible from the face of the Complaint, it also is expressly contradicted by the Complaint's allegations.

> 1.     The SDA Is Not A Securities Contract

50.     The Bankruptcy Code defines the term "securities contract," as it is used in Section 546(e), as, *inter alia*, "a contract for the purchase, sale, or loan of a security."  11 U.S.C. § 741(7).  The CHS Defendants' assertion that the SDA is a securities contract is predicated on self-serving language contained in the SDA—which was drafted solely by CHS—that the Spin-Off Dividend was made "in partial consideration for" the QHC Assets, which included the shares of certain CHS subsidiaries.  CHS Mot. at 11; *see also* CS Mot. at 8-9; Compl. ¶ 82.  But as noted above, the SDA's language is directly contradicted by the well-founded and extensive allegations in the Complaint (which, among other things, point to statements made by CHS itself) that the Spin-Off

Dividend was a gratuitous "*dividend*" that was not paid in consideration for the QHC Assets, which continued to be owned, indirectly, by CHS's shareholders*. See supra* ¶¶ 39-42.  At this stage of the litigation, these allegations are more than sufficient to preclude a finding by this Court that the SDA was a securities contract under Section 546(e). *See, e.g., In re Pitt Penn,* 2011 WL 4352373 at *12 (Bankr. D. Del. 2011) ("[T]he Court notes, however, that the material facts relating to the transfer … at issue are not undisputed, such that further proceedings may be required to determine … the nature of these transfers.  At this stage, however, the Court must take the factual allegations in the Complaint in the light most favorable to the Plaintiff.  Here, the Plaintiff has alleged that the transfers … were made in the form of charitable gifts and not pursuant to a securities contract.  Accordingly, the Court finds that the Plaintiff has alleged sufficient facts that could operate to make § 546(e) inapplicable and thus prevent Tabor from successfully availing itself of this defense.").

        2.    <u>The Alleged Note Purchase Agreement And Alleged Open Market Purchases Are Not Integral To The Complaint And May Not Be Considered In Connection With The Motions</u>

51.    The question of whether the alleged "purchase agreement between Quorum and certain initial purchasers" of the Senior Notes, and alleged "CHSI Tender Offer & Open Market Repurchases" are "securities contracts" likewise cannot be determined at this stage of the litigation.  To decide a motion to dismiss, courts may consider only "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  Exhibits attached to a motion to dismiss may be considered only if they are "integral to or explicitly relied upon in the complaint." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997)).

52.    Here, the "purchase agreement between [QHC] and certain initial purchasers" of

the Senior Notes and any contracts governing the alleged "CHSI Tender Offer & Open Market Repurchases" are not alleged in the Complaint, attached to the Complaint, or matters of public record.  And even if these agreements are, as CHS contends, "contemplated by the Spin-Off Agreement" (CHS Mot. at 11), that does not suffice to render them appropriate for consideration on a motion to dismiss.

53.     The District of Delaware case of *Southern Track & Pump, Inc. v. Terex Corp.* is instructive.  722 F. Supp. 2d 509, 515 (D. Del. 2010).  There, the complaint sought a declaratory judgment based on obligations in a financing agreement, which was attached to the complaint.  *Id.* In support of its motion to the dismiss, the defendant requested that the court consider certain "Transaction Statements" that were referenced in the agreement.  *Id.*  The court concluded that it could not consider the Transaction Statements on the motion to dismiss, because they did not "represent a central element of Plaintiff's claims" and were "not needed to support Plaintiff's claims."  *Id.*  The same result is mandated here.  The note purchase agreement and documents governing open-market repurchases are not a central element of Plaintiffs' claims, and are not needed to support Plaintiffs' claims.  Such documents are not part of the record properly before the Court, and thus cannot be considered in deciding the Motions.

        3.     The Spin-Off Dividend Was Not Made "In Connection With" The Note Purchase Agreement Or Open Market Repurchases

54.     Even if the CHS Defendants could rely on the alleged note purchase agreement and/or tender off and open market purchases at this stage of the litigation (they cannot), their Section 546(e) argument still would fail to the extent it is predicated on these agreements, as the Spin-Off Dividend was not "made in connection with" them.  To the contrary, while the proceeds of the Senior Notes were used to fund the Spin-Off Dividend, and the proceeds of the Spin-Off Dividend were then allegedly used to fund the tender offer and open market purchases, the question

is not whether the Spin-Off Dividend has any connection whatsoever to the proceeds of the notes purchase agreement or the funding of the tender off and open market purchases. The relevant question is whether the Spin-Off Dividend was "***made in connection with***" any alleged notes purchase ***agreement***, or any ***alleged contracts*** governing the alleged tender off or open market purchases. The answer to that question is plainly no, as the actual transfer of the Spin-Off Dividend was ***made*** solely in connection with the terms of the SDA (which is not a securities contract).

55. Defendants rely solely on non-binding case law from the Second Circuit—which, as discussed in greater detail below, affords Section 546(e) a more expansive application than courts within this circuit, *see, e.g., Physiotherapy*, 2016 WL 3611831, at *7 —for their assertion that the Court should apply a "low bar" to the "in connection with" prong of section 546(e) that may be satisfied merely if a transfer is "related to" or "associated with" a securities contract in any way. CHS Mot. at 12 (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 422 (2d Cir. 2014); *Holliday v. Credit Suisse Sec. (USA) LLC*, 2021 WL 4150523 at *4 (S.D.N.Y. Sept. 13, 2021); *In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 439-42 (Bankr. S.D.N.Y. 2012)). This Court has previously indicated, however, that Section 546(e)'s "in connection with" language requires a closer nexus than the loose and boundless affiliation suggested by the CHS Defendants. *See In re Pitt Penn,* 2011 WL 4352373 at *12 (Bankr. D. Del. 2011) (rejecting Section 546(e) defense at motion to dismiss stage based on plaintiff's allegation that transfers were not made "***pursuant to*** a securities contract") (emphasis added).

56. The higher standard applicable to the "made in connection with" language posited by this Court comports with guidance from the Supreme Court regarding the appropriate way to interpret "in connection with" in legislation. In *Maracich v. Spears*, 570 U.S. 48, 59-60 (2013), the Supreme Court instructed that because "[t]he phrase 'in connection with' is essentially

'indeterminat[e]' because connections, like relations, 'stop nowhere,'" it must be interpreted under "a limiting principle consistent with the structure of the statute and its other provisions."  *See also Delaware v. BP Am. Inc.*, 2022 WL 58484, at *14 (D. Del. Jan. 5, 2022) ("[A]s the Supreme Court has observed, 'the phrase "in connection with" provides little guidance without a limiting principle.'") (quoting and relying on *Maracich*).  This limiting principle, the Supreme Court held, is especially important where, as here, the statutory provision at issue operates as an exception to a more general statutory provision.  *See Maracich* 570 U.S. at 60.  In such instances, the exception should be "read ... **narrowly** in order to preserve the primary operation of the provision," and the "exceptions ought not operate to the farthest reach of their linguistic possibilities if that result would contravene the statutory design."  *Id.* at 60 (emphasis added); *see also Comm'r v. Clark*, 489 U.S. 726, 739 (1989) ("In construing provisions … in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision.  Given that Congress has enacted a general rule …, we should not eviscerate that legislative judgment through an expansive reading of a somewhat ambiguous exception.") (citations omitted)..

57.     Here, Section 546(e) operates as an exception to the "more general statutory provision[s]" of chapter 5 of the Bankruptcy Code, the "primary operation" of which is to allow for the avoidance and disgorgement of fraudulent transfers and preferences for the benefit of creditors.  *Id.* at 60; *Merit Management Group, LP v. FTI Consulting, Inc*., 138 S.Ct. 883, 888 (2018) ("Chapter 5 of the Bankruptcy Code affords bankruptcy trustees the authority to "se[t] aside certain types of transfers ... and ... recaptur[e] the value of those avoided transfers for the benefit of the estate....[T]he § 546(e) safe harbor operates as a limit to the general avoiding powers of a bankruptcy trustee.").  The purpose of Section 546(e), conversely, "is to ensure that the swap and

forward contract financial markets are not destabilized by uncertainties regarding the treatment of their financial instruments under the Bankruptcy Code." *Physiotherapy*, 2016 WL 3611831, at *8 (quoting H.R. Rep. 101-484 (1990)).  Interpreting the "made in connection with" language of section 546(e) to apply to every transfer with any tie to a securities contract, regardless of whether the transfer at issue was actually required or governed by a securities contract, would significantly "contravene" chapter 5's statutory design of enabling creditors to avoid and recover improper transfers, and do nothing to further section 546(e)'s goal of "protecting market intermediaries and protecting the markets" in order to "avoid problems of 'ripple effects.'"  *See id.*

58.    This point is well illustrated by the matter at hand.  The Spin-Off Dividend was a single transfer made by a wholly-owned subsidiary to its corporate parent, in order to benefit the corporate parent at the expense of the subsidiary's creditors.  The avoidance and recovery of the Spin-Off Dividend poses no risk whatsoever of any "ripple effects" on the financial markets.  Extending Section 546(e) to the Spin-Off Dividend, simply because the Spin-Off Dividend was funded by or funded *other transactions* that are governed by securities contracts, would significantly "contravene" chapter 5's "statutory design" of allowing for the avoidance of improper transfers made at creditors' expense, and do nothing to further Section 546(e)'s objectives.

59.    Finally, approximately $880 million of the Spin-Off Dividend derives from the proceeds of a senior term loan credit facility that does not constitute a security under the Bankruptcy Code, and it cannot be determined at this stage of the litigation if any portion of the Spin-Off Dividend was used by CHS for purposes other than to fund open market purchases, or to repurchase debt that that was not a security.  Compl. ¶ 64; *see* 11 U.S.C. § 101(49).  Even if the Court were to accept the CHS Defendants' boundless interpretation of the Section 546(e)'s "made in connection with" language, avoidance of these portions of the Spin-Off Dividend would not be

precluded.

    4.    <u>The Spin-Off Dividend Was Paid To BridgeCo, Which Is Not A Financial Participant</u>

60.    The CHS Defendants' Section 546(e) argument fails for the additional reason that the Spin-Off Dividend was paid to BridgeCo—not CHS-2. *See* Compl. ¶ 85. CHS does not dispute that BridgeCo was the direct recipient of the Spin-Off Dividend, and does not contend that BridgeCo is a financial participant under the Bankruptcy Code. Instead, CHS argues that CHS-2 "both received and was the beneficiary of" the Spin-Off Dividend because BridgeCo merged with CHS-2 ***after*** it received the Spin-Off Dividend. CHS Mot. at 12. But the fact that BridgeCo merged (and apparently then ceased to exist, *see* CHS Mot. Ex. 1 (SDA) Schedule 2.02) with an alleged financial participant after the Spin-Off Dividend was made does not render the Spin-Off Dividend "a transfer ….made … to …. a financial participant." 11 U.S.C. § 546(e). Rather, CHS-2 is akin to a subsequent transferee, to which Section 546(e) does not apply by its plain terms. *See, e.g., Securities Investor Protection Corp. v. Bernard L. Madoff Inv.,* 505 B.R. 135, 143-44 (S.D.N.Y. 2013) (holding that principles of interpretation applying to Section 546(e) apply to section 546(g) of the Code as well, and that based on the prefatory language in both section 546(g) and Section 546(e), section 546(g) does not apply to subsequent transferees unless the ***initial*** transfer is protected by the safe harbor).

61.    Additionally, if the Spin-Off Dividend had been made for CHS-2's benefit, there would have been no need for CHS-2 to subsequently merge with BridgeCo. In truth, transfer of the Spin-Off Dividend to BridgeCo alone (which was likely to reap certain tax benefits for CHS) did not benefit CHS-2, which is why CHS-2 merged with BridgeCo following the transfer. CHS undoubtedly structured the Spin-Off in this way intentionally, in order to derive tax or other corporate benefits. Having done so, it must now live with the repercussions of the structure.

5.    Whether CHS-2 Is A Financial Participant Cannot Be Determined On A Motion To Dismiss

62.    The CHS Defendants' sole support for their contention that CHS-2 is a financial participant for purposes of Section 546(e) are SEC filings that are not referenced in, relied on by, nor integral to the Complaint.  Such materials may be considered by a court on a motion to dismiss "only … to establish the truth of their existence, not the truth of their contents."  *Lupin Atlantis Holdings v. Ranbaxy Labs., Ltd.*, Civil Action No. 10–3897, 2011 WL 1540199, at *3 n.8 (E.D. Pa. Apr. 21, 2011) (citing *Oran*, 226 F.3d at 289).  Thus, CHS-2's alleged financial participant status cannot be accepted as true at this juncture, and Plaintiffs must be afforded an opportunity to test it through discovery.

## B.    Section 546(e) Does Not Apply To The Claims Against Credit Suisse

63.    Credit Suisse's argument that Section 546(e) bars the Trustee's avoidance claims against it, because Credit Suisse is a financial participant, and the Transaction Fee was "made in connection with" the notes purchase agreement, also fails.  As discussed above, the notes purchase agreement may not be considered in connection with the Motions.  Further, while the Trustee concedes that the Transaction Fee was made in connection with the Spin-Off *Debt*, it cannot be determined at this phase of the litigation whether it was also made in connection with any *contract governing* the *Senior Note* debt.  For example, the Trustee does not know if Credit Suisse simply assisted CHS in securing the commitments necessary to raise the Spin-Off Debt, or was also involved in the memorialization and execution of the commitments to fund the Senior Note debt.  Discovery is needed before any defense predicated on Section 546(e) may be determined.

## C.    Even if Section 546(e) Otherwise Applied, It Would Not Bar The Illegal Dividend and Unjust Enrichment Claims

64.    Even if Section 546(e) otherwise applied (it does not), it still would not bar the illegal dividend and unjust enrichment claims.  As Judge Peck stated in *Lehman Bros.*, "the plain

language of Section 546(e), read literally, provides limited immunity but does not bar Plaintiffs from maintaining all common law claims, intentional fraud claims and any other claims not expressly embraced by Section 546(e)." *In re Lehman Bros. Holdings, Inc.*, 469 B.R. 415, 450 (Bankr. S.D.N.Y.).  Thus, claims that "have more in common with claims grounded in actual fraudulent intent … are not to be treated as replicas of claims to recover constructively fraudulent transfers …" *Id*. at 451; *see also In re Hellas Telecommunications (Luxembourg) II SCA*, 526 B.R. 499, 510 (Bankr. S.D.N.Y. 2015) (where a "common law claim alleges facts substantially identical to an **actual** fraudulent conveyance claim under section 548(a)(1)(A)" that is excepted from section 546(e), the claim is not barred or preempted by 546(e)) (emphasis in original).

65.     Here, the illegal dividend and unjust enrichment claims are not "identical to the [Complaint's] constructive fraudulent transfer claims," and "have more in common with claims grounded in actual fraudulent intent." *Lehman Bros.*, 469 B.R. at 450-51.  Additionally, the illegal dividend claim does not seek to "avoid" a transfer as section 546(e) precludes when its requirements are met, but instead seeks to hold CHS and the director Defendants liable for their intentionally wrongful and fraudulent acts of causing QHC to pay the Spin-Off Dividend notwithstanding that they knew, or should have known, that doing so would render QHC insolvent, inadequately capitalized, and unable to pay its debts as they came due.  There is nothing about Section 546(e)'s language that expressly or implicitly bars such a claim.

## VIII.   THE ARBITRATION ORDER DOES NOT BAR PLAINTIFFS' CLAIMS FOR ILLEGAL DIVIDEND, AIDING AND ABETTING ILLEGAL DIVIDEND, OR UNJUST ENRICHMENT[14]

66.     The CHS Defendants argue further that the Complaint's illegal dividend, aiding

---

[14]     Plaintiffs note at the outset that due to confidentiality concerns regarding the pre-petition arbitration (the "Arbitration") between CHS and QHC, prior to receiving CHS's Motion, Plaintiffs did not have access to the order issued by the arbitration panel (the "Arbitration Order").  Nevertheless, as set forth herein, the Arbitration Order does not bar Plaintiffs' illegal dividend, aiding and abetting, and unjust enrichment claims.

and abetting illegal dividend, and unjust enrichment claims are precluded under theories of claim and issue preclusion (*i.e., res judicata* and collateral estoppel), because QHC could have asserted these claims in the Arbitration, and the underlying issue of CHS's fraudulent conduct was already decided by the arbitration panel when it ruled that QHC "had not met its burden of proving an intentional interference" by CHS.  CHS Mot. at 21-23.  Both arguments are wrong.

67.    First, for either claim or issue preclusion to apply, the party against whom the doctrine is asserted must have been a party or in privity with a party in the prior action.  *In re Cont'l Airlines*, 203 F.3d 203, 208 (3d Cir. 2000) ("Claim preclusion requires a final judgment on the merits in a prior suit involving the same parties, or their privities . . . ."); *Seborowski v. Pittsburgh Press Co.*, 188 F.3d 163, 169 (3d Cir. 1999) ("[T]he party against whom [issue preclusion] is asserted must have been a party or in privity with a party to the prior adjudication and have had a full and fair opportunity to litigate the issue in question in the prior action").  Here, to the extent that the Trustee and WSFS are pursuing claims as representative or assignee of the Senior Noteholders, there plainly is no privity between them and pre-petition QHC.[15]  And privity is also lacking to the extent the Trustee is pursuing claims in his capacity as the assignee of estate claims.

68.    In *In re Montgomery Ward, LLC*, 634 F.3d 732, 738 (3d Cir. 2011), the Third Circuit held that there was no privity between the debtor in the first bankruptcy proceeding of Montgomery Ward, LLC ("Ward") and a bankruptcy plan administrator in Ward's second bankruptcy proceeding, and thus the plan administrator was not barred by *res judicata* from challenging a lease that the Ward debtor assumed in the first bankruptcy.  The court explained that:

> even though a trustee in bankruptcy has a substantive legal relationship with the pre-bankruptcy debtor, the '[t]rustee is not simply the successor in interest to the Debtor: he represents the interests of all creditors of the Debtor's bankruptcy estate.'  Because the trustee also represents the general creditors' interests, the legal

---

[15]    Under Section 174 of the DGCL, creditors have independent claims against directors.

relationship between the trustee and the pre-bankruptcy debtor is incomplete, particularly when the interests of the creditors diverge from those of the debtor.

*Id.; see also Maxus Energy Corp.*, 2019 WL 647027, at *5 (Bankr. D. Del. Feb. 15, 2019) (rejecting argument that trustee of liquidating trust was barred by *res judicata* from pursuing claims that could have been brought by debtor in pre-petition action); *In re Tzanides*, 574 B.R. 489, 522 (Bankr. D.N.J. 2017) (holding that a trustee and debtor were not in privity for purposes of *res judicata* because "the [t]rustee's interest in asserting this claim for the benefit of creditors is directly opposite to the Debtor's interest in shielding property from his creditors"); *In re Good Time Charley's, Inc.*, 54 B.R. 157, 160 (Bankr. D. N.J. 1984) (holding that bankruptcy trustee was not in privity with prepetition debtor for *res judicata* or collateral estoppel purposes because the trustee was "seeking to protect the rights of creditors who did not have the opportunity to challenge the mortgage in the state court proceedings").

69.     The interests of the Trustee, acting in his capacity as the successor-in-interest to the QHC estate or assignee of the Senior Noteholders, and WSFS, acting in its capacity as the Indenture Trustee under the Senior Notes indenture plainly "diverge from those of the [QHC] debtor" such that Plaintiffs cannot be barred by claim or issue preclusion from pursuing claims that could have been brought in the Arbitration or that are predicated on issues raised in the Arbitration. *See Montgomery Ward*, 634 F.3d at 738.  The illegal dividend claim is predicated on the claim that QHC did not have surplus or net profits from which to issue the Spin-Off Dividend. *See* DGCL §§ 170, 173.  Prior to QHC's decision to publicly acknowledge that it was "bordering on bankruptcy" shortly after the Spin-Off, and that the financial obligations incurred in connection with the Spin-Off left QHC doomed to fail, QHC was disincentivized to pursue any claims predicated on insolvency, lest it further undermine its already doomed attempts to restructure its debt.  Compl. ¶11.

46

70.     Similarly, the Complaint's unjust enrichment claims are based on the allegations that certain of the CHS Defendants were unjustly enriched at the expense of QHC's creditors, who were ultimately left with a recovery of only cents on the dollar.  Such an argument plainly would not have been asserted by QHC prior to its default of its funded debt.  Nor could it have been, as the default had not yet happened.  Thus, the CHS Defendants' claim preclusion defense fails for this additional reason as well.  *See Beasley v. Howard*, 14 F.4th 226, 237 n.7 (3d Cir. 2021) ("We have also been reluctant to apply claim preclusion where it is not established that the claims in a plaintiff's second lawsuit 'had accrued ... or were even justiciable' at the time of the first.").

71.     Second, issue preclusion applies only if "the ***identical issue*** was previously adjudicated."  *Henglein v. Colt Indus. Operating Corp.*, 260 F.3d 201, 209 (3d Cir. 2001) (emphasis added).  "Identity of the issue is established by showing that the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules." *Suppan v. Dadonna*, 203 F.3d 228, 233 (3d Cir. 2000) (quoting 18 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Federal Practice & Procedure § 4425, at 253 (1981)).   Here, the illegal dividend claims turn on whether QHC paid the Spin-Off Dividend "[o]ut of its surplus [or] [i]n case there shall be no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year."  DGCL § 173.  There is no dispute that the arbitration panel never considered this issue, and thus the Arbitration Order cannot preclude the Trustee from bringing the illegal dividend claim.  Likewise, the unjust enrichment claim turns on whether CHS rendered QHC insolvent through its fraud and other machinations, which the arbitration panel did not consider.  The unjust enrichment claim, therefore, also cannot be precluded.

## IX.     **IF THE ESTATE CANNOT PURSUE CLAIMS FOR AVOIDANCE, UNJUST ENRICHMENT, OR ILLEGAL DIVIDEND, PLAINTIFFS MAY PURSUE THOSE CLAIMS IN THEIR CAPACITIES AS THE NOTEHOLDERS' ASSIGNEE**

72.     As noted *supra* in sections II through VIII, each of Defendants' efforts to preclude

the Trustee from asserting claims in his capacity as the assignee of the QHC estate fails.   In the

event that the Court finds that the estate is barred from asserting these claims, however, the Trustee,

who is the assignee not only of causes of action held by the QHC estate but also those contributed

by approximately 95% of the Senior Noteholders, may pursue the causes of action in his capacity

as the Senior Noteholders' assignee.[16]   The CHS Defendants' arguments that (1) such claims are

preempted by section 546(e), (2) the Trustee and Indenture Trustee lack standing to pursue claims

in their capacity as the Senior Noteholders' assignee or representative, and (3) this Court lacks

jurisdiction over such claims, are without merit and should be rejected.

### A.    The Senior Noteholder Claims Are Not Preempted By Section 546(e)

73.    Relying solely on the Second Circuit's decision in *In re Tribune Co. Fraudulent

*Conveyance Litig.*, 946 F.3d 66 (2d. Cir. 2019) and a case from the Southern District of New York

that was bound by it, *Holliday v. Credit Suisse Sec. (USA)* LLC, 2021 WL 4150523, at *8

(S.D.N.Y. Sept. 13, 2021), the CHS Defendants assert that Section 546(e) impliedly preempts the

Plaintiffs, in their capacities as the Senior Noteholders' assignee and representative, from pursuing

claims that the Trustee is barred from bringing in his capacity as the assignee of estate claims.   But

the *Tribune* court's preemption holding is wrong, conflicts with the express language of Section

546(e) and binding Supreme Court and Third Circuit precedent, and has been rejected by courts

within the Third Circuit.   *See infra* § IX.A.3.   This court should join those courts in declining to

adopt it.

### 1.    Contrary To *Tribune*, The Presumption Against Preemption Applies In Bankruptcy Proceedings

74.    Generally, there is a strong presumption against implied federal preemption of

---

[16]    The Indenture Trustee joins the Trustee in pursuing Senior Noteholder claims other than those asserted against Credit Suisse.

state-law rights. "[B]ecause the States are independent sovereigns in our federal system," the Supreme Court has "long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). A party arguing for preemption "bear[s] the considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law.'" *DeBuono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997). "[A] 'clear and manifest purpose' of pre-emption is always required." *Puerto Rico Dept of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988); *see also, e.g., Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (similar).

75.     *Tribune* disregarded this well-recognized presumption, ruling that it does not apply in bankruptcy because the "area" of creditors' rights is not "recognized as traditionally one of state law alone" and, moreover, "the Bankruptcy Code constitutes a wholesale preemption of state laws regarding creditors' rights." 946 F.3d at 82. This left the court free, it determined, to infer congressional intent with "no measurable concern about federal intrusion into traditional state domains" and no "countervailing pressures of state law concerns." *Id*. at 83.

76.     The Supreme Court has ruled, however, that the presumption against preemption *does* apply in bankruptcy cases. *See BFP v. Resolution Trust Corp*., 511 U.S. 531, 540, 544-45 (1994) ("Absent a clear statutory requirement to the contrary, we must assume the validity of [a] state-law regulatory background .... To displace traditional state regulation in such a manner, the federal statutory purpose must be 'clear and manifest.' Otherwise, the Bankruptcy Code will be construed to adopt, rather than to displace, pre-existing state law.") (citations omitted). So has the Third Circuit. *See In re Fed.-Mogul Glob*., 684 F.3d 355, 365 (3d Cir. 2012) ("This 'strong presumption against inferring Congressional preemption' also applies 'in the bankruptcy context.'") (quoting *Integrated Sols., Inc. v. Serv. Support Specialties, Inc*., 124 F.3d 487, 493 (3d

Cir. 1997)).  And so have other Circuits.  *See PG&E Co, v. California*, 350 F.3d 932, 943 (9th Cir.

2003) ("[T]he presumption against displacing state law by federal bankruptcy law is just as strong

in bankruptcy as in other areas of federal legislative power."); *In re Irving Tanning Co.*, 496 B.R.

644, 663 (B.A.P. lst Cir. 2013) (same).

77.    The *Tribune* court did not distinguish, or even cite, any of these authorities.[17]

Accordingly, the *Tribune* court clearly erred in disregarding the "strong presumption against

inferring Congressional preemption," which should apply here.  *In re Fed.-Mogul Glob.*, 684 F.3d

at 365.  This error fatally undermines the *Tribune* court's ultimate finding of preemption.

    2.    <u>Section 546(e) Does Not Reveal A Clear Intent To Preempt State-Law</u>
        <u>Remedies Pursued By Creditors</u>

78.    Congress's intent is the touchstone of a preemption analysis: state laws can be

impliedly preempted only if Congress's "clear and manifest purpose" was to preempt them.  *Isla*

*Petroleum*, 485 U.S, at 503.  "The best evidence of [Congress's] purpose is the statutory text."

*West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98-99 (1991).  Here, neither the text,

structure, history, or purpose of Section 546(e) or of the Code more generally reveals any

purpose—let alone a "clear and manifest" one—to preempt creditors' state-law fraudulent transfer

claims.

    (a)    <u>*Tribune*'s Preemption Holding Is Contrary to Section 546(e)'s Plain</u>
        <u>Language</u>

79.    Section 546(e) provides that, "[n]otwithstanding sections 544, 545, 547,

---

[17]    These authorities applying the presumption in the context of bankruptcy make perfect sense.  Contrary to *Tribune*'s understanding (946 F.3d at 82), the presumption applies in "all pre-emption cases" where state and federal laws traditionally coexisted (*see Medtronic*, 518 U.S. at 485), not just those where federal regulation traditionally was absent. *Wyeth*, 555 U.S. at 565 n.3.  And the Bankruptcy Code does not effect a "wholesale preemption of state laws" (946 F.3d at 83) such that preemption can be presumed. *See Midlantic Nat'l Bank v. N.J. Dept of Envt'l Prot.*, 474 U.S. 494, 505 (1986) (Congress "did not intend for the Bankruptcy Code to pre-empt all state laws."); *see also In re Schafer*, 689 F.3d 601, 614 (6th Cir. 2012) (The Code is "not so pervasive, nor is the federal interest so dominant, as to wholly preclude state legislation in the area.") (quoting *In re Applebaum*, 422 B.R. 684, 689 (B.A.P. 9th Cir. 2009)).

548(a)(1)(B), and 548(b) ... *the trustee* may not avoid a transfer that is a ... settlement payment ... except under section 548(a)(1)(A) of this title." 11 U.S.C. § 546(e) (emphasis added).  By its terms, the provision only circumscribes the powers of the "*trustee*."  The Code defines "the trustee" as the statutory "representative of the estate" (11 U.S.C. § 323(a)), which is obviously distinct from an estate's creditors.  And the Supreme Court has confirmed (in another decision that the *Tribune* court does not cite) that a Code provision addressing the "trustee" applies only to an estate representative, since Congress "could easily have used [a broader] formulation" if it wanted to encompass others.  *See Hartford Underwriters Ins. Co. v. Union Planters Bank, NA*, 530 U.S. 1, 6-7 (2000).[18]

80.     The prefatory clause of Section 546(e) further confirms that creditor claims under state law are not affected by the statute.  Section 546(e) starts with a "notwithstanding" clause that references "sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title," all of which are federal-law avoidance claims that *only the "trustee,"* and not an estate's creditors, may pursue.  The *Tribune* court's conclusion that Section 546(e) bars state-law avoidance claims by creditors to the same extent as claims by a trustee effectively rewrites the statutory language to provide that "[n]otwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) **and any avoidance claim authorized under state law** ... the trustee **and the creditors of an estate** may not avoid a transfer [described by the statute] except under section 548(a)(1)(A) of this title."  But it violates every tenet of statutory construction to distort the plain text of a statute in this way.  Because the language of § 546(e) is clear in not applying to claims by creditors under state law, the Second Circuit's preemption analysis should have ended there.  *Casey*, 499 U.S. at 98-99; *see In re Lyondell Chem.*,

---

[18]     The fact that *Hartford* construed "trustee" in a different Code section (§ 506(c)) is irrelevant.  *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) ("[I]dentical words used in different parts of the same statute are generally presumed to have the same meaning.").

503 B.R. at 358 ("[I]f Congress intended section 546(e) to be more broadly applicable, 'it could simply have said so.'"); *PHP Liquidating LLC v. Robbins*, 291 B.R. 592, 607 (D. Del. 2003).

> (b)   *Tribune*'s Preemption Holding Is Inconsistent With The Structure Of The Code

81.    *Tribune*'s preemption conclusion also conflicts with the structure of the Code. First, provisions in the Code other than Section 546(e) explicitly apply to "any person," "any creditor," or "any party in interest," showing that Congress knows how to write statutes to apply to creditors when it wants to.  *See, e.g.*, 11 U.S.C. § 1109(b) ("A party in interest, including the debtor, the trustee, a creditors' committee, ... a creditor,... or any indenture trustee, may raise and may appear and be heard on any issue in a case ..."); *id*. § 101(10) (defining "creditor").

82.    Second, provisions in the Code other than Section 546(e) explicitly preempt state law, showing that Congress also knows how to write statutes to address state-law claims when it so intends.  *See, e.g.,* 11 U.S.C. §341(c) ("Notwithstanding any local court rule, provision of a State constitution, any otherwise applicable nonbankruptcy law ...."); 11 U.S.C. § 541(c)(1) ("notwithstanding any nonbankruptcy law"); id. § 1123(a) (similar); *id.* §§ 366(c)(4), 704(c)(2)(B), 1123(a), 1142(a), 1302(d)(2)(B) (similar).

83.    Third, Congress specifically extended other safe harbors to claims by creditors, showing that its failure to extend Section 546(e)'s safe harbor to creditor claims was intentional. The first sentence of Section 544(b)(2) creates a safe harbor for charitable contributions that, like Section 546(e), operates solely against the trustee.  But the second sentence of Section 544(b)(2) expands the reach of that safe harbor to provide that "[a]ny claim by ***any person*** to recover [such] contributions] ... under Federal or State law ... shall be preempted."  11 U.S.C. § 544(b)(2) (emphasis added.)   The absence of an analogous preemption provision in Section 546(e) is "powerful evidence" that Congress did not intend that section to preempt state-law avoidance

claims.  *Wyeth*, 555 U.S. at 574-75; *see Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here

Congress includes particular language in one section of a statute but omits it in another section of

the same Act, it is generally presumed that Congress acts intentionally and purposely in the

disparate inclusion or exclusion."); *In re Fed.-Mogul Glob.*, 684 F.3d at 373 (similar).[19]

84.     Fourth, *Tribune's* interpretation of Section 546(e) conflicts with the rulings of

numerous Circuit courts interpreting section 546(a) of the Code, which is a related limitation on

trustee power found in the very same statute.  Section 546(a) provides that fraudulent transfer

claims brought "under section 544, 545, 547, 548, or 553 of this title may not be commenced"

after the expiration of a two-year limitations period.  If this reference to federal-law claims is to

be expanded to also include "any avoidance claim authorized under state law," as *Tribune* held

when interpreting Section 546(e), then the two-year limitations period of section 546(a) would bar

state-law fraudulent transfer claims of creditors in addition to claims brought by a trustee.  But

several courts of appeals have held that section 546(a)'s limitation "applies only to actions by

trustees," not creditors.  *Hatchett v. United States*, 330 F.3d 875, 887 (6th Cir. 2003); *see also,*

*e.g., Fed. Deposit Ins. Corp. v. Davis*, 733 F.2d 1083,1085 (4th Cir. 1984).  *Tribune* provides no

explanation for construing § 546(e) as limiting claims by creditors under state law while § 546(a)

limits only claims by a trustee under federal law.

(c)     *Tribune*'s Preemption Holding Ignores The Competing Purposes of
        Section 546(e) And The Code

85.     Additionally, without any real support in the text, structure, or history of the Code,

*Tribune* found an implied conflict between state and federal law by singularly focusing on the

---

[19]     The *Tribune* court's assertion that cases holding that the existence of an "express preemption provisio[n]" does not "make it more difficult to establish the preemption of laws falling outside the clause" does not undermine this rule of statutory interpretation, which shows that Congress recognized the difference between "trustee' and "any person."

policy it believed to underlie Section 546(e)—an interest in minimizing the displacement caused in the securities markets by avoidance claims.  946 F.3d at 92-93.  But as courts in this district have found (as discussed in greater detail below), *Tribune* adopted a broad interpretation of the statute's purpose that is not grounded in its legislative history.  *See Physiotherapy*, 2016 WL 3611831 at *8; *In re Physiotherapy Holdings, Inc.*, 2017 WL 6524524, at *9 (D. Del. December 21, 2017) ("*Physiotherapy II*") (agreeing with the Bankruptcy Court's conclusion that "*Tribune* and similar cases placed too much emphasis on policy concerns which find minimal support in the Congressional record").  Further, Congress pursues a host of other aims through the Code— including to make the creditors of a bankruptcy estate whole, *Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 241, 244 n.9 (3d Cir. 2000)—and a proper preemption analysis must consider the Code "as a whole."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

86.     Moreover, even focusing on Section 546(e) alone, it is clear that Congress itself recognized the competing interest in maximizing creditor recoveries, which is why ***actual*** fraudulent transfer claims brought by the trustee under Section 548(a)(1)(A) are excluded from the safe harbor.  Thus, Section 546(e) itself refutes the Second Circuit's conclusion that the Code elevates the immunity of protected settlement payments and payments made in connection with a securities contract above all other competing interests.  The Supreme Court has recognized that Congress balanced various competing interests—including avoiding "economic harm" to "creditors"—in the detailed provisions of the Code, and that "it is not for courts to alter the balance struck by the statute."  *Law v. Siegel*, 134 S. Ct. 1188, 1197-98 (2014); *see also RadLAX Gateway Hotel ,LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2073 (2012); *Hall v. United States*, 132 S. Ct. 1882, 1893 (2012).  If Congress wanted to insulate the financial markets from any potential

disruption caused by fraudulent transfer actions, it could have enacted a broader safe harbor.  It

chose not to do so.  And this reveals Congress's purpose, for as the Supreme Court has recognized,

"the purpose of a statute includes not only what it sets out to change, but also what it resolves to

leave alone."  *Casey*, 499 U.S. at 98.

87.     And there is nothing "anomalous" about Congress's decision to permit creditors to

bring state law avoidance claims while limiting claims by trustees in bankruptcy. *Contra Tribune*,

946 F.3d at 87.  Indeed, one might reasonably conclude that claims by a trustee, which carry the

potential to avoid a transfer even beyond "the extent necessary to satisfy the individual creditor

actually holding the avoidance claim," *Cybergenics*, 226 F.3d at 243, pose a more disruptive threat

to markets.  In any event, it is not the job of the courts to recalibrate the delicate balance between

minimizing disruption in securities markets and maximizing creditor recoveries that was struck by

Congress.

       3.      *Tribune*'s Preemption Decision Has Been Rejected By Courts Within This
           Circuit

88.     Each court within this Circuit that has confronted *Tribune's* preemption decision

has concluded that it was wrongly decided.[20]  *See In re Physiotherapy Holdings, Inc.*  2016 WL

3611831 (Bankr. D. Del. Jun. 20, 2016) ("*Physiotherapy*") and *In re Physiotherapy Holdings, Inc.*,

2017 WL 6524524, at *9 (D. Del. December 21, 2017) ("*Physiotherapy II*").  In *Physiotherapy*, a

litigation trustee, acting in his capacity both as the estate representative and the assignee of creditor

claims, sought to avoid payments made by the debtor in a leveraged buyout to controlling

---

[20]     In response to an order from the Supreme Court inviting it to share the United States' views regarding the *Tribune* plaintiffs' petition for *certiorari*, the Acting Solicitor General stated that it also believes that the Second Circuit "erred in finding that creditors' state-law avoidance actions are preempted by Section 546(e)." *See In re Tribune Co. Fraudulent Conveyance*, Brief for the United States as Amicus Curiae.  And counsel for the CHS Defendants has also persuasively argued that the statute does not preempt creditor claims. *See In re Tribune Co. Fraudulent Conveyance*, Response and Reply Brief of Plaintiffs-Appellants-Cross-Appellees, 2014 WL 1509491, at 58, 70-74, 81 (2d Cir. April 11 2014).

shareholders whom the trustee alleged to have fraudulently inflated the debtor's value in order to complete the transaction.  2016 WL 3611831 at *4.  The controlling shareholders moved to dismiss the claims brought by the trustee in his capacity as the creditors' assignee, arguing that the claims were barred by Section 546(e).  *Id.* at 5.

89.    The court rejected *Tribune's* preemption holding and held that the creditor claims were not precluded by Section 546(e).  *Id.* at *11.  First, the court held that "[s]tates have traditionally occupied the field of fraudulent transfer law, and applying the presumption against preemption is therefore appropriate."  *Id.* at *7.  Second, the court noted that *Tribune's* reliance on the theory that "the safe harbors were enacted to promote finality for individual investors" "find[s] minimal support when scrutinizing the Congressional record," and that the legislative history demonstrates instead that "the purpose of the safe harbors is to mitigate the potential systemic risk of certain complex financial transactions."  *Id.* at *8.  The court stated further that it was "hard to envision" that the claims against the controlling shareholders "would pose any sort of 'ripple effect' to the broader secondary market."  *Id.* at 9.  Third, the court noted that the plain language of the statute, which refers only to "a ***trustee's*** ability to bring a fraudulent conveyance action," "further bolstered" the argument against preemption.  *Id.* (emphasis added).  And fifth, the court stated that in the circumstances of the case, "permitting a defendant to evade liability … *vis-à-vis* the safe harbor would run counter to Congress' policy of providing remedies for creditors who have been defrauded by corporate insiders."  *Id..*  Thus, the court concluded that:

> a litigation trustee may assert state law fraudulent transfer claims in the capacity of a creditor-assignee when:  (1) the transaction sought to be avoided poses no threat of 'ripple effects' in the relevant securities market; (2) the transferees received payment of non-public securities, and (3) the transferees were corporate insiders that allegedly acted in bad faith.

*Id.* at *10.  The district court subsequently expressed its agreement with the bankruptcy court's decision, stating that it was "not convinced that a substantial ground for difference of opinion

exists, as the preemption analysis followed well-established Third Circuit and Supreme Court law. *Physiotherapy II*, 2017 WL 6524524 at *9.

90.     All of the factors articulated by the bankruptcy court in *Physiotherapy* and endorsed by the District Court in *Physiotherapy II* weigh in favor of permitting the Trustee and Indenture Trustee to pursue creditor claims here. All of the creditor claims are asserted against corporate insiders—CHS and its corporate affiliates, and Credit Suisse, who was purportedly acting as QHC's investment banker—and assert that these defendants acted in bad faith by creating and propounding fraudulently inflated projections for the purpose of siphoning a dividend of $1.2 billion out of QHC and additional payments associated with that transaction. There are no public securities involved, and no risk of "ripple effects" in the securities market. To the contrary, the claims pose no greater threat to securities markets that any other litigation claim against CHS or Credit Suisse would.[21] Thus, barring these claims from proceeding would do nothing to further Section 546(e)'s objective, and would run significantly counter "to Congress' policy of providing remedies for creditors who have been defrauded by corporate insiders." *Physiotherapy*, 2016 WL 3611831 at *10. *See also Development Specialists, Inc. v. Kaplan (In re Irving Tanning Co.)*, No. 12-01024, Doc. 43 at 7 (Bankr. D. Me. Feb. 7, 2013) (holding that claims of the liquidation trustee (as assignee of creditor claims) were not preempted by Section 546(e) because the "reference to trustee [in the statute] is to the statutory trustee or debtor in possession or direct successor").

**B.      Plaintiffs Have Standing To Pursue The Complaint's Claims In Their Capacities As The Senior Noteholders' Assignee/Representative**

91.     The CHS Defendants' assertion that Plaintiffs may not pursue the Complaint's

---

[21]     The CHS Defendants' assertion that the creditor claims "seek[] to effectively unwind a complex, multistep spin-off transaction" is misplaced, as the only transfers that are sought to be avoided here are the Spin-Off Dividend and related payments. In stark contrast to *Tribune*, Plaintiffs do not seek to avoid transfers made to public shareholders. *See Tribune*, 946 F.3d at 72.

claims in their capacities as the Senior Noteholders' assignee and representative until the Trustee has abandoned these claims on behalf of the QHC estate is misplaced.[22] *In re Wilton Armetale, Inc.*, 968 F.3d 273, 284 (3d Cir. 2020), the Third Circuit made clear that a trustee may abandon a cause of action, at which time the "'creditor's right to pursue' it 'springs back to life.'"  The Third Circuit stated further that "if the trustee wants to abandon any property during the bankruptcy, he must do so overtly." *Id.*

92.     Unlike the case at hand, however, *Armetale* involved a chapter 7 proceeding in which the trustee was charged with liquidating the Debtors' assets pursuant to the bankruptcy court's oversight. *Id.* at 279.  By contrast, here, the concept of abandonment no longer applies, as QHC's confirmed plan of reorganization assigned both estate and creditor claims to the Trustee, and granted the Trustee with discretion to maximize the value of those assets for the benefit of the Trust's beneficiaries as he saw fit.  Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization § IV.C.3.  Towards that end, the Trustee asserted claims against Defendants on alternative bases, in both his estate and creditor assignee capacities, in order to preserve the value of those claims to the maximum extent possible.  To the extent that the Court agrees that the Trustee may pursue these claims in his capacity as the estate assignee, the creditor claims will be rendered a nullity. In the event that any of the estate claims are ultimately dismissed, however, the Trustee will pursue them (with respect to the CHS Defendants, along with the Indenture Trustee) in his capacity as the Senior Noteholders' assignee.  Given the Plan's assignment of estate causes of action to the Trustee, no formal abandonment is required.  To the extent the Court finds otherwise, however, the Trustee will take whatever action is deemed necessary to effectuate the abandonment.

**C.     This Court Has Jurisdiction Over Claims Brought By Plaintiffs In Their**

---

[22]     The CHS Defendants do not assert this defense with respect to Count Twelve of the Complaint, which asserts a claim for breach of contract for unpaid amounts due on the Senior Notes against CHS and CHS-2 as QHC's alter egos.

**Capacities As The Senior Noteholders' Assignee/Representative**

93.     Relying only on the Third Circuit's decision in *In re Resorts Int'l, Inc.*, 372 F.3d 154, 169 (3d Cir. 2004), the CHS Defendants argue that the Court lacks subject matter jurisdiction over the claims brought by Plaintiffs in their capacity as the Senior Noteholders' assignee and representative.  But the facts considered by the *Resorts* court bear no resemblance to those here.  In *Resorts*, the Third Circuit considered whether a bankruptcy court had jurisdiction to consider a litigation trust's claims against PriceWaterhouse, the trust's accounting firm, that were brought "almost seven years after the Reorganization Plan confirmation" and arose out of conduct that occurred post-confirmation (the professional services rendered to the trust).  *Id.* at 159.

94.     Here, by contrast, the contributed creditor claims relate to the Defendants' ***preconfirmation*** fraudulent conduct, are alleged to have been the cause of the bankruptcy itself, and are brought alongside estate claims that arise out of the same facts and circumstances (over which Defendants concede the Court has jurisdiction).   Moreover, as the Debtors made clear in connection with confirmation of the Plan, the investigation and transfer of these claims to the Trust was a central pillar of the Plan.  *See* Reply of Debtors To Objections To The Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization And The Disclosure Statement Therefor (D.I. 477) (observing that "certain Holders of Senior Notes Claims negotiated for the creation of the QHC Litigation Trust," which was "an important consideration for those Senior Noteholders, who sought to ensure that no claims or Causes of Action were inadvertently forfeited before the QHC Litigation Trust had an opportunity to examine the history of the Debtors' books and records with respect to such claims, since the Senior Noteholders did not have the opportunity to do so prepetition").

95.     Where, as here, a litigation trust is an important component of a Plan, and the trust is tasked with investigating the claims at issue, the bankruptcy court retains "related to" jurisdiction

over actions prosecuted by the litigation trust because they bear a "close nexus" to the bankruptcy plan. *See In re Swan Transportation Co.*, 596 B.R. 127, 134-35 (Bankr. D. Del. 2018) ("If the Trust did not exist, or if it lacked the ability to properly deal with the claims, then the Debtor's Plan would have been untenable and possibly unconformable.  Due to the necessity of the Trust for a successful Plan, the Court finds that the dispute arising in this matter bears a 'close nexus to a bankruptcy plan or proceeding.'"); *see also In re AstroPower*, 335 B.R. 309, 324-25 (Bankr. D. Del 2005) (holding the court had "related to" jurisdiction over post-confirmation claims that concerned pre-petition conduct and would benefit creditors); *In re LGI, Inc.*, 322 B.R. 95, 102 (Bankr. D.N.J. 2005), *abrogated on other grounds by In re Seven Fields Dev. Corp.*, 505 F.3d 237 (3d Cir. 2007) (post-confirmation subject matter jurisdiction exists where action brought by trustee is "logically linked to the debtor's prepetition loss, and entrusted to the plaintiff via the Plan for the benefit of creditors").  The Court therefore has jurisdiction over the claims brought by Plaintiffs in their capacities as the Senior Noteholders' assignee and representative, and the CHS Defendants' argument to the contrary should be rejected.

## **CONCLUSION**

96.     For the forgoing reasons, Plaintiffs respectfully request that (1) the Motions be denied in their entirety, and (2) in the event any portions of the Motions are granted, Plaintiffs be granted leave to file an amended Complaint.

DATED:    April 1, 2022

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Laura Davis Jones*
Laura Davis Jones
Timothy P. Cairns
919 North Market Street 17th Fl.
Wilmington, DE 19801
Telephone: (302) 778-6401
ljones@pszlaw.com
tcairns@pszlaw.com

QUINN EMANUEL URQUHART &
 SULLIVAN, LLP

Andrew J. Rossman
Deborah J. Newman
Victor Noskov
Jordan Harap
Ben Odell
51 Madison Avenue, 22nd Floor
New York, New York  10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
andrewrossman@quinnemanuel.com
deborahnewman@quinnemanuel.com
victornoskov@quinnemanuel.com
jordanharap@quinnemanuel.com
benodell@quinnemanuel.com

*Counsel for Daniel H. Golden, as Litigation Trustee
for the QHC Litigation Trust and Wilmington
Savings Fund Society, FSB, solely in its capacity as
Indenture Trustee*