**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | |
| QUORUM HEALTH CORPORATION, *et al.*, | Chapter 11 |
| Debtor. | Case No. 20-10766 (BLS) |
| | |
| DANIEL H. GOLDEN, AS LITIGATION TRUSTEE OF THE QHC LITIGATION TRUST, AND WILMINGTON SAVINGS FUND SOCIETY, FSB, SOLELY IN ITS CAPACITY AS INDENTURE TRUSTEE, | Adv. Pro. No. 21-51190 (BLS) |
| Plaintiffs, | |
| v. | |
| COMMUNITY HEALTH SYSTEMS, INC.; CHS/COMMUNITY HEALTH SYSTEMS, INC.; REVENUE CYCLE SERVICE CENTER, LLC; CHSPSC, LLC; PROFESSIONAL ACCOUNT SERVICES, INC.; PHYSICIAN PRACTICE SUPPORT, LLC; ELIGIBILITY SCREENING SERVICES, LLC; W. LARRY CASH; RACHEL SEIFERT; ADAM FEINSTEIN; AND CREDIT SUISSE SECURITIES (USA) LLC, | |
| Defendants. | |

**REPLY BRIEF IN SUPPORT OF DEFENDANTS COMMUNITY HEALTH SYSTEMS, INC., CHS/COMMUNITY HEALTH SYSTEMS, INC., REVENUE CYCLE SERVICE CENTER, LLC, CHSPSC, LLC, PROFESSIONAL ACCOUNT SERVICES, INC., PHYSICIAN PRACTICE SUPPORT, LLC, ELIGIBILITY SCREENING SERVICES, LLC, W. LARRY CASH, RACHEL SEIFERT, AND ADAM FEINSTEIN'S <u>MOTION TO DISMISS</u>**

YOUNG CONAWAY STARGATT
  & TAYLOR LLP

Michael S. Neiburg (DE No. 5275)
Christopher M. Lambe (DE No. 6846)
Rodney Square
1000 North King St.
Wilmington, DE 19801
Tel.: (302) 571-6600
Fax: (302) 571-1253
mneiburg@ycst.com

*Counsel for Defendants Community Health
Systems, Inc., CHS/Community Health
Systems, Inc., Revenue Cycle Service Center,
LLC, CHSPSC, LLC, Professional Account
Services, Inc., Physician Practice Support,
LLC, Eligibility Screening Services, LLC, W.
Larry Cash, Rachel Seifert, and Adam
Feinstein*

KRAMER LEVIN ROBBINS RUSSELL

Gary A. Orseck (admitted *pro hac vice*)
Alison C. Barnes (admitted *pro hac vice*)
William J. Trunk (admitted *pro hac vice*)
Jack A. Herman (admitted *pro hac vice*)
Lauren C. Andrews (admitted *pro hac vice*)
Jason A. Shaffer (admitted *pro hac vice*)
2000 K Street, N.W., 4th Floor
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
gorseck@kramerlevin.com

*Counsel for Defendants Community Health
Systems, Inc., CHS/Community Health Systems,
Inc., Revenue Cycle Service Center, LLC,
CHSPSC, LLC, Professional Account Services,
Inc., Physician Practice Support, LLC,
Eligibility Screening Services, LLC, W. Larry
Cash, and Rachel Seifert*


ROLNICK KRAMER SADIGHI LLP

Marc B. Kramer (admitted *pro hac vice*)
Matthew Peller (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 597-2800
Fax: (212) 597-2801
mkramer@rksllp.com

Sheila Sadighi (admitted *pro hac vice*)
300 Executive Drive
West Orange, New Jersey 07052

*Counsel for Defendant Adam Feinstein*

May 2, 2022

# TABLE OF CONTENTS

**Page(s)**

Table of Authorities ............................................................................................... iii

ARGUMENT ............................................................................................................ 1

I.  PLAINTIFFS' CLAIMS TO RECOVER THE DISTRIBUTION ARE BARRED BY THE BANKRUPTCY CODE'S SAFE HARBOR PROVISION (COUNTS I, II, XIII, XIV & XV) ......................................................................................................... 1

    A.  Plaintiffs' Fraudulent Transfer Claims Are Barred By The Safe Harbor ...................... 1

        1.  The Distribution Was Made "In Connection" With Various "Securities Contracts" ............................................................................................... 1

        2.  The Distribution Was Made To, And For The Benefit Of, A Financial Participant (CHS-2) .................................................................................. 4

    B.  Plaintiffs' Additional Claims Are Likewise Barred By The Safe Harbor ..................... 5

        1.  The Safe Harbor Precludes The Trustee's Claims For Unjust Enrichment And Illegal Dividend .......................................................................... 5

        2.  The Safe Harbor Also Precludes The Individual Noteholders' Tagalong Claims .................................................................................................... 6

II.  EVEN IF THE SAFE HARBOR DID NOT APPLY, THE ILLEGAL DIVIDEND CLAIMS WOULD STILL FAIL ........................................................................ 8

    A.  The Distribution Was Not A Dividend .......................................................... 9

    B.  The Illegal Dividend Claims Are Barred By Claim And Issue Preclusion, In Any Event ...................................................................................................... 10

        1.  Plaintiffs' Claims Are Barred By Claim Preclusion ........................... 11

        2.  Plaintiffs' Claims Are Barred By Issue Preclusion As Well ................ 12

III.  PLAINTIFFS' UNJUST ENRICHMENT CLAIM (COUNT XV) IS BOTH PRECLUDED AND TIME-BARRED ............................................................. 14

    A.  The Unjust Enrichment Claim Is Foreclosed By Claim And Issue Preclusion ........... 14

    B.  The Unjust Enrichment Claim Is Largely Time-Barred ................................ 15

**TABLE OF CONTENTS—Continued**

**Page(s)**

IV.  THE INDIVIDUAL NOTEHOLDER CLAIMS SHOULD BE DISMISSED.................... 15

    A.  The Court Lacks Jurisdiction Over The Individual-Noteholder Claims...................... 15

    B.  All But One Noteholder Claim Is Precluded Until The Litigation Trustee Relinquishes His Purported Authority To Assert General Estate Claims.................... 18

    C.  The Individual Noteholders' Remaining Claim For Breach Of Contract (Count XII) Fails Because They Do Not Adequately Plead Alter Ego Liability...................... 19

CONCLUSION......................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re AstroPower Liquidating Tr.*,
    335 B.R. 309 (Bankr. D. Del 2005) ...............................................................17, 18

*In re Bernard L. Madoff Inv. Sec. LLC*,
    773 F.3d 411 (2d Cir. 2014)...........................................................................2, 3

*Blair v. Infineon Techs. AG*,
    720 F. Supp. 2d 462 (D. Del. 2019).................................................................19

*In re BWI Liquidating Corp.*,
    437 B.R. 160 (Bankr. D. Del. 2010) ................................................................18

*Chicago Florsheim Shoe Store Co. v. Cluett, Peabody & Co.*,
    826 F.2d 725 (7th Cir. 1987) .........................................................................19

*Connors v. Peles*,
    724 F. Supp. 1538 (W.D. Pa. 1989)................................................................19

*Contemporary Indus. Corp. v. Frost*,
    564 F.3d 981 (8th Cir. 2009), 138 S. Ct. 883 (2018)....................................4, 5, 6, 8

*Contemporary Indus. Corp. v. Frost*,
    564 F.3d 981, 988 (8th Cir. 2009) ....................................................................5

*FTC v. Shire ViroPharma, Inc.*,
    917 F.3d 147 (3d Cir. 2019)..............................................................................4

*Fulweiler v. Spruance*,
    222 A.2d 555 (Del. 1966) ..................................................................................9

*In re Good Time Charley's, Inc.*,
    54 B.R. 157 (Bankr. D.N.J. 1984) ...................................................................11

*In re Hechinger Inv. Co. of Del.*,
    274 B.R. 71 (D. Del. 2002)...............................................................................6

*In re IAC/InterActive Corp.*,
    948 A.2d 471 (Del. Ch. 2008)...........................................................................9

*Ieradi v. Mylan Labs., Inc.*,
    230 F.3d 594 (3d Cir. 2000)..............................................................................4

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*John A. Roebling's Sons Co. v. Mode*,
    43 A. 480 (Del. Super. Ct. 1899) ..........................................................................12

*In re Lehman Bros. Holdings Inc.*,
    469 B.R. 415 (Bankr. S.D.N.Y. 2012) ....................................................................6

*Lehman Bros. Holdings, Inc. v. Kee*,
    268 A.3d 178 (Del. 2021) ......................................................................................20

*In re LGI, Inc.*,
    322 B.R. 95 (Bankr. D.N.J. 2005) ..........................................................................18

*In re Maxus Energy Corp.*,
    2019 WL 647027 (Bankr. D. Del. Feb. 15, 2019) ..................................................11

*Montana v. United States*,
    440 U.S. 147 (1979)................................................................................................13

*In re Montgomery Ward, LLC*,
    634 F.3d 732 (3d Cir. 2011)...................................................................................11

*Peloro v. United States*,
    488 F.3d 163 (3d Cir. 2007)...................................................................................13

*In re Physiotherapy Holdings, Inc.*,
    2016 WL 3611831 (Bankr. D. Del. June 20, 2016).........................................3, 7, 8

*In re Physiotherapy Holdings, Inc. (Physiotherapy II)*,
    2017 WL 6524524 (D. Del. Dec. 21, 2017)........................................................7, 8

*In re Pitt Penn Holding Co.*,
    2011 WL 4352373 (Bankr. D. Del. Sept. 16, 2011) ............................................2, 3

*In re Plassein Int'l Corp. v. B.A. Capital Co. LP*,
    590 F.3d 252 (3d Cir. 2009)....................................................................................8

*In re PWS Holding Corp.*,
    303 F.3d 308 (3d Cir. 2002)....................................................................................7

*In re QSI Holdings, Inc.*,
    571 F.3d 545, 550 (6th Cir. 2009) ..........................................................................8

*Quadrant Structured Prods. Co. v. Vertin*,
    102 A.3d 155 (Del. Ch. 2014)............................................................................9, 10

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*In re Rabinowitz*,
    2011 WL 6749068 (Bankr. D.N.J. Dec. 21, 2011) ..........................................................12, 14

*Raytech Corp. v. White*,
    54 F.3d 187 (3d Cir. 1995)...........................................................................................13

*In re Resorts Int'l, Inc.*,
    372 F.3d 154 (3d Cir. 2004).................................................................................16, 17, 18

*In re Samson Res. Corp.*,
    625 B.R. 291 (Bankr. D. Del. 2020) ................................................................................4

*In re Seven Fields Dev. Corp.*,
    505 F.3d 237 (3d Cir. 2007).....................................................................................16, 18

*In re SunEdison, Inc.*,
    620 B.R. 505 (Bankr. S.D.N.Y. 2020) ..............................................................................5

*In re Swan Transportation Co.*,
    596 B.R. 127 (Bankr. D. Del. 2018) ..............................................................................17

*In re Tribune Co. Fraudulent Conv. Litig.*,
    946 F.3d 66 (2d Cir. 2019)........................................................................................4, 7

*In re Tzanides*,
    574 B.R. 489 (Bankr. D.N.J. 2017) ................................................................................11

*U.S. Bank National Association v. Verizon Communications Inc.*,
    892 F. Supp. 2d 805, 816 (N.D. Tex. 2012), *aff'd*, 761 F.3d 409 (5th Cir.
    2014) ...........................................................................................................................6

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*,
    860 A.2d 312 (Del. 2004) ............................................................................................15

*In re Wilton Armetale, Inc.*,
    968 F.3d 273 (3d Cir. 2020).....................................................................................7, 18

*Witkowski v. Welch*,
    173 F.3d 192 (3d Cir. 1999).....................................................................................13, 14

*In re Worldcom, Inc.*,
    401 B.R. 637 (S.D.N.Y. 2009).................................................................................12, 14

v

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

**Statutes**

11 U.S.C. § 544(b) ..................................................................................6, 7

11 U.S.C. § 546(e) ................................................................................. *passim*

11 U.S.C. § 548(a) ...............................................................................5, 6, 7

11 U.S.C. § 741 ......................................................................................1, 3

8 Del. Code § 170 ....................................................................................13

8 Del. Code § 174 ...........................................................................9, 10, 12, 13

**Rules**

Federal Rule of Evidence 201 ...................................................................4

**Other Authorities**

R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations
and Business Organizations* § 5.32 (3rd and 4th eds., 2021-2 Supp. 1998)...........................12

Edward P. Welch et al., *Folk on the Delaware General Corporation Law* (7th ed.
2022-1 Supp.)..............................................................................4, 9, 10

# ARGUMENT

## I.    PLAINTIFFS' CLAIMS TO RECOVER THE DISTRIBUTION ARE BARRED BY THE BANKRUPTCY CODE'S SAFE HARBOR PROVISION (COUNTS I, II, XIII, XIV & XV)

The Distribution was a "transfer" (i) made "in connection with" a "securities contract" (several, in fact); (ii) "to" and "for the benefit of" a "financial participant" (*i.e.*, CHS-2). Plaintiffs' claims to recover the Distribution—whether cloaked as avoidance actions or otherwise—are thus barred by 11 U.S.C. § 546(e)'s Safe Harbor. *See* Mot. 9-16. Plaintiffs cannot defeat application of the Safe Harbor by denying the central features of the transaction.

### A.    Plaintiffs' Fraudulent Transfer Claims Are Barred By The Safe Harbor

#### 1.    The Distribution Was Made "In Connection" With Various "Securities Contracts"

The Distribution was made "in connection" with several securities contracts—namely, the Spin-Off Agreement and its attendant securities transactions. Mot. 10-11.

*The Distribution Was Made In Connection With The Spin-Off Agreement.* Plaintiffs *concede* that the Distribution was made "in connection with" the Spin-Off Agreement. Opp. ¶ 54 ("[T]he actual transfer of the [Distribution] was made solely in connection with the terms of the [Spin-Off Agreement].").  The only question, then, is whether the Spin-Off Agreement is a "securities contract"—which is to say, at least "similar to" a "contract for the purchase, sale, or loan of a security." 11 U.S.C. § 741(7)(A)(i), (vii).  That question is not debatable.  It is indisputable that, pursuant to the Spin-Off Agreement—a bilateral agreement containing a host of reciprocal undertakings—CHSI transferred securities to Quorum.  If the Spin-Off Agreement is not a securities contract, it is hard to know what is.

Plaintiffs nevertheless suggest that the Spin-Off Agreement might not be a securities contract.  They ask the Court to ignore the "self-serving" text of the Spin-Off Agreement, which

1

defines the Distribution as contractual consideration that Quorum paid in exchange for the transferred securities.  Opp. ¶ 50.  Plaintiffs say that the Court should instead let them proceed to discovery on the theory that the Distribution was just a "gratuitous," unrelated tribute to Quorum, such that there was no exchange of consideration to support the existence of any contract.  But Plaintiffs cannot avoid application of the Safe Harbor on the basis of the preposterous assertion that the simultaneous Distribution "was not paid in exchange for the QHC Assets."  Opp. ¶ 39.  If that were enough to escape the Safe Harbor, there would be nothing left of it.[1]

*The Distribution Was Made In Connection With Other Securities Contracts As Well.*  Per the Spin-Off Agreement, CHS-2 used the Distribution—which included proceeds of Quorum's senior notes issuance—to fund repurchases of its own debt securities.  Plaintiffs do not seriously dispute that the notes issuance and debt repurchases were securities contracts;[2] rather, Plaintiffs argue that the Distribution was not made "in connection with" those transactions.  But a transfer need only clear the "low bar" of being "related to" or "associated with" a securities contract to qualify.  *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 422 (2d Cir. 2014).  And Plaintiffs have cleared that bar for us:  their Complaint alleges that CHSI caused Quorum "to *raise $1.21 billion in debt*," which proceeds Quorum "would then pay to" CHS-2 so it could "*pay down the*

---

[1] *In re Pitt Penn Holding Co.*, cited at Opp. ¶ 50, is inapposite.  There, the plaintiff alleged that two individuals illegally used an employee stock option plan as a "conduit for distributing millions of shares to various non-employees"—creating a factual dispute whether the transfers were made pursuant to the plan, or instead were extra-contractual gifts to third parties.  2011 WL 4352373, at *1 (Bankr. D. Del. Sept. 16, 2011).  It is on zero fours with our case.

[2] A common refrain from Plaintiffs is that even the most basic and incontrovertible of facts cannot be considered unless Plaintiffs decided to put them in their Complaint.  So, for example, Plaintiffs quibble that it "cannot be determined at this stage of the litigation" whether these transactions were "securities contracts" because the contracts themselves are not "properly before the Court."  Opp. ¶¶ 51-53.  Plaintiffs do not explain why the contracts themselves are necessary— the Court may simply take judicial notice of the publicly available documents in which the transactions are disclosed.  *See* Mot. 4 n.4.

*over one billion dollars of [CHS-2's] own debt*." Cplt. ¶ 3 (emphasis added).  Having alleged a *direct* connection between the Distribution and these securities contracts, Plaintiffs can scarcely claim now that the transactions were not even "related" to one another.

Plaintiffs counter that courts in this district require a "closer nexus." Opp. ¶ 55.  But they identify only a single, unpublished opinion that suggested, in unexplained *dicta*, that the relevant transfer must be made "pursuant to" a securities contract. *See Pitt Penn*, 2011 WL 4352373, at *12 n.17.  Such a crabbed reading is irreconcilable with the plain text of the statute.  Section 546(e) contains "broad reaching language." *In re Physiotherapy Holdings, Inc.*, 2016 WL 3611831, at *11 (Bankr. D. Del. June 20, 2016).  Congress "could have raised the bar by requiring that the transfer be made 'pursuant to,' or 'in accordance with the terms of,' or 'as required by,' the securities contract, but it did not." *Madoff*, 773 F.3d at 422; *compare with, e.g.*, 11 U.S.C. § 741(2) (using phrase "pursuant to a purchase").  "Instead, Congress merely required that the transfer have a connection to the securities contract."  773 F.3d at 422.  Here, accepting Plaintiffs' own allegations at face value, the Distribution readily satisfies that standard.[3]

Last, Plaintiffs' policy concerns about the breadth of the Safe Harbor are overwrought. Opp. ¶ 59.  The Safe Harbor extends only to certain securities-related transfers involving a narrow list of qualifying entities enumerated in Section 546(e)—entities that Congress deemed especially significant to the stability and predictability of the securities markets.  Whether Plaintiffs' policy

---

[3] As a fallback, Plaintiffs urge that they should be permitted to avoid whatever *portions* of the Distribution that cannot be directly traced to either the notes issuance or debt repurchases. *See* Opp. ¶ 59.  But they cite no authority for this proposition, which is also irreconcilable with the plain text of Section 546(e):  the Safe Harbor protects any qualifying "*transfer*."  Here, the "transfer" the Trustee seeks to avoid is the Distribution.  Were it necessary to unwind every complex securities transaction to disentangle the safe-harbored bits from the non-safe-harbored bits—a fool's errand, given the fungibility of money—then the Safe Harbor would proliferate the very market disruption and uncertainty which Congress set out to prevent.

3

preference or not, that includes major market players, like CHS-2, that Congress deemed worthy of protection when it amended Section 546(e) to include "financial participant[s]." *See In re Samson Res. Corp.*, 625 B.R. 291, 301 n.36 (Bankr. D. Del. 2020).

### 2.    The Distribution Was Made To, And For The Benefit Of, A Financial Participant (CHS-2)

Plaintiffs argue that the Distribution was not made to a "financial participant" because BridgeCo, not CHS-2, was the "direct recipient." Opp. ¶ 60. True enough, but irrelevant. There is no dispute that BridgeCo merged into CHS-2 in connection with the Spin-Off, at which point they became the same company. *See* Edward P. Welch et al., *Folk on the Delaware General Corporation Law* § 259.01 (7th ed. 2022-1 Supp.) (When a merger has taken place, "the old corporations have their identity absorbed into that of . . . one into which they were merged."). The relevant question, therefore, is whether CHS-2 (the surviving entity) meets the definition of "financial participant." And the answer is plainly yes. *See* Mot. 12-13.[4]

Regardless, the "relevant transfer for purposes of the" Safe Harbor is the "overarching transfer that the trustee seeks to avoid"—not its component parts. *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 892-93 (2018). Here, the "transfer" that Plaintiffs seek to

---

[4] Plaintiffs do not dispute that, based on the high-value transactions identified in Defendants' opening brief, CHS-2 is a "financial participant." Instead, Plaintiffs argue that the Court may not rely upon public SEC filings to establish that those transactions actually occurred. Opp. ¶ 62. But many courts *will* rely upon publicly available materials to assess, at the motion-to-dismiss stage, whether a party was a qualifying entity for purposes of the Safe Harbor. *See, e.g.*, *In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 78 (2d Cir. 2019). Indeed, the Third Circuit has taken judicial notice of the content, and not just the existence, of SEC filings. *See FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 151 n.5 (3d Cir. 2019). While Plaintiffs request "discovery" on this issue, they do not say what facts they could possibly unearth that would call into question whether CHS-2 was a financial participant. *See Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 600 n.3 (3d Cir. 2000) (taking judicial notice of stock prices as reported by third-party service because under Federal Rule of Evidence 201, the court "may take judicial notice at any stage of the proceeding of a fact not subject to reasonable dispute that is capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned").

avoid is the Distribution from Quorum to CHS-2, which was accomplished through the CHS-2 / BridgeCo merger. *See, e.g.*, Cplt. ¶¶ 98 & 102. Plaintiffs cannot "escape the reach of the safe harbor by seeking to avoid an intermediate transfer between non-qualifying participants [Quorum and BridgeCo] and sue the qualifying participants of the true overarching transfer as subsequent transferees." *See In re SunEdison, Inc.*, 620 B.R. 505, 513 (Bankr. S.D.N.Y. 2020).

In the end, however, it is inconsequential whether the Distribution went directly "to" CHS-2. That is because the Safe Harbor equally protects transfers made "*for the benefit*" of a "financial participant." 11 U.S.C. § 546(e) (emphasis added). And the Court need look no further than the Complaint to see that the Distribution was made "for the benefit of" CHS-2: Plaintiffs allege that the Distribution was "undertaken" for "*CHS-2's sole benefit*." Cplt. ¶ 110 (emphasis added).

### B.    Plaintiffs' Additional Claims Are Likewise Barred By The Safe Harbor

Plaintiffs try to circumvent the Safe Harbor by throwing state-law claims and individual noteholders at the problem. That gambit fails.

#### 1.    The Safe Harbor Precludes The Trustee's Claims For Unjust Enrichment And Illegal Dividend

Courts routinely dismiss state-law claims arising from transfers otherwise protected by the Safe Harbor. *See* Mot. 14-15 (collecting cases). For good reason: To "[a]llow[] recovery" would "wholly frustrate the purpose" of Section 546(e) and "render the . . . exemption meaningless." *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009), *abrogated on other grounds by Merit*, 138 S. Ct. 883 (2018).

Plaintiffs do not dispute that well-worn proposition. Instead, they argue there is an exception when the state-law claims "have more in common with claims grounded in actual fraudulent intent." Opp. ¶ 64. No such exception exists. Section 546(e) contains only a narrow carve-out for actual fraudulent transfer actions brought "*under Section 548(a)(1)(A)*" of the

5

Bankruptcy Code.  11 U.S.C. § 546(e) (emphasis added).  Plaintiffs have not brought a Section

548(a)(1)(A) claim relating to the Distribution, because it would be time-barred.  And courts have

rightly refused to rewrite that carve-out, as Plaintiffs invite, to include any claim under the sun that

has features "in common with" a Section 548(a)(1)(A) claim.  So, for example, courts have refused

to extend the carve-out to *state-law* actual avoidance actions, like those brought by Plaintiffs here,

under 11 U.S.C. § 544(b).  *See* Mot. 10 n.8 (collecting cases).[5]  Plaintiffs do not challenge those

cases and similarly cannot evade the Safe Harbor by pursuing unjust enrichment and illegal

dividend claims that are, at bottom, state-law avoidance claims in disguise.  *See In re Hechinger*

*Inv. Co. of Del.*, 274 B.R. 71, 96-98 (D. Del. 2002).[6]

> **2.**     **The Safe Harbor Also Precludes The Individual Noteholders' Tagalong**
> **Claims**

Nor can Plaintiffs evade the Safe Harbor by bringing fraudulent transfer claims in their

capacity as individual noteholders.  (To say nothing of the fact that individual noteholders lack

both the authority and jurisdiction to assert such claims.  *See infra* pp. 15-18.)

In support of their argument that individual noteholders are excused from the Safe Harbor,

Plaintiffs point out that Section 546(e) uses the word "trustee."  Opp. ¶ 80.  But that nomenclature

---

[5] As a fallback, Plaintiffs argue that the Safe Harbor would not bar the claims for illegal dividend.  But it does not address the cases, such as *U.S. Bank National Association v. Verizon Communications Inc.* (which it cites favorably elsewhere), holding that the Safe Harbor *does* preclude such causes of action.  892 F. Supp. 2d 805, 816 (N.D. Tex. 2012), *aff'd*, 761 F.3d 409 (5th Cir. 2014); *see Contemporary*, 564 F.3d at 988-89 (Safe Harbor prohibits claims for illegal and/or excessive shareholder distributions, in addition to unjust enrichment).

[6] One case cited by Plaintiffs sought to distinguish *Hechinger* on the ground that those plaintiffs' unjust enrichment claims were based on the same facts as their constructive (as opposed to actual) fraud claims.  *In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 451 (Bankr. S.D.N.Y. 2012).  It is true that the plaintiffs in *Hechinger* relied on a constructive fraud theory.  But the court nevertheless expressly rejected the argument Plaintiffs make here: that the unjust enrichment claims were not foreclosed "because Congress has exempted from section 546(e) intentionally fraudulent transfer claims arising under section 548(a)(1) of the Code that have a similar scienter requirement as that of unjust enrichment claims."  274 B.R. at 95-96, 98.

does not exclude claims by individual creditors.  Once a debtor files for bankruptcy, the trustee (or other representative of the estate) stands "in the shoes of" creditors.  *In re PWS Holding Corp.*, 303 F.3d 308, 314 (3d Cir. 2002).  As such, it is the trustee (not individual creditors) who is empowered to bring fraudulent transfer actions.  *See* 11 U.S.C. §§ 544(b), 548(a); Mot. 26-27 (citing *In re Wilton Armetale, Inc.*, 968 F.3d 273, 283 (3d Cir. 2020)).  It therefore makes sense that the Safe Harbor contemplates claims by the "trustee."  Granted, the ability to bring fraudulent transfer actions may, if abandoned by the trustee, revert to creditors.  But there is no reason to suppose that, in that circumstance, creditors would somehow succeed to greater rights than the estate itself had.  *See, e.g.*, *PWS*, 303 F.3d at 315 (creditors bound by estate's settlement or extinguishment of a cause of action).

Even if Section 546(e) did not expressly bar individual creditors' claims, it would impliedly foreclose them, for the reasons the Second Circuit persuasively explained in *Tribune*.[7]  In short, the "idea of preventing a trustee from unwinding specified transactions while allowing creditors to do so . . . is a policy in a fruitless search of a logical rationale." *Tribune*, 946 F.3d at 90-91.

Plaintiffs counter that "[e]ach court within this Circuit that has confronted *Tribune's* preemption decision has concluded that it was wrongly decided."  Opp. ¶ 88 (citing *Physiotherapy* and *Physiotherapy II*).  But the *Physiotherapy* decisions, in addition to being unpersuasive and distinguishable, did not go so far.  Instead, *Physiotherapy* declined to apply the Safe Harbor to individual creditor claims where: (1) "the transaction sought to be avoided pose[d] no threat of 'ripple effects' in the relevant securities markets"; (2) "the transferees received payment for non-

---

[7]  Plaintiffs criticize *Tribune* for supposedly "disregard[ing] th[e] well-recognized presumption" against preemption.  Opp. ¶ 75.  But the Second Circuit did not hold that the presumption was inapplicable in bankruptcy.  Instead, it expressly acknowledged its existence and explained that it "usually goes to the weight to be given to the lack of an express statement overriding state law."  946 F.3d at 82.

public securities"; and (3) "the transferees were corporate insiders that allegedly acted in bad faith." *See Physiotherapy*, 2016 WL 3611831, at *10; *see also In re Physiotherapy Holdings, Inc. (Physiotherapy II)*, 2017 WL 6524524, at *10 (D. Del. Dec. 21, 2017) (observing that bankruptcy court's "*case-specific* preemption analysis is not a substantial ground for difference of opinion that justifies interlocutory appeal") (emphasis added).

This reasoning is tenuous, given that, among other things, there is no "bad faith" exception to the Safe Harbor, and the Third Circuit has previously extended to private-market securities the same Safe Harbor protections it has afforded public-market securities. *In re Plassein Int'l Corp. v. B.A. Capital Co. LP*, 590 F.3d 252, 258-59 (3d Cir. 2009) ("settlement payment" includes payment made for securities in private securities markets). But even if the *Physiotherapy* standard were valid, it would not apply here: Plaintiffs' claims *do* pose a threat of "ripple effects" to the public securities markets. Plaintiffs seek to unwind a complex, multi-billion-dollar transaction involving a publicly traded company and its subsidiary that, in Congress's estimation, is vital to the orderly operation of the securities markets. To sustain such an action could have far-reaching consequences for CHSI, its public equity and debt holders, and the broader financial markets. *See, e.g.*, *In re QSI Holdings, Inc.*, 571 F.3d 545, 550 (6th Cir. 2009), *abrogated on other grounds by Merit*, 138 S. Ct. 883 ("The value of the privately held securities at issue is substantial and there is no reason to think that unwinding the settlement would have any less of an impact on financial markets than publicly traded securities.").

## II.    EVEN IF THE SAFE HARBOR DID NOT APPLY, THE ILLEGAL DIVIDEND CLAIMS WOULD STILL FAIL

Beyond the Safe Harbor, the illegal dividend claims (Counts XIII and XIV) fail for two additional reasons. *First*, the Distribution was not a "dividend"—and, *a fortiori*, not an "illegal" one—as a matter of Delaware law. *Second*, the illegal dividend claim is precluded by *res judicata*

and collateral estoppel.

### A.    The Distribution Was Not A Dividend

The illegal dividend claims suffer from a fundamental problem: the Distribution was not a dividend.  *See* Mot. 16-18.  Rather, the Distribution was self-evidently one side of a bilateral exchange between CHSI and Quorum.  A claim seeking to unwind such a transaction is not cognizable under 8 Del. Code § 174, and Plaintiffs' arguments to the contrary are unavailing.

*First*, Plaintiffs urge that the Spin-Off Agreement's characterization of the Distribution as "consideration" for the QHC Assets is "self-serving window dressing that does not accurately represent [the Distribution's] true nature."  Opp. ¶ 39.  In support, Plaintiffs tout that certain corporate authorizations referred to the Distribution as a "distribution."  Opp. 29 n.9.  So what? "Not every distribution to stockholders is properly characterized as a dividend."  Edward P. Welch et al., *Folk on the Delaware General Corporation Law* § 170.01 (7th ed. 2022-1 Supp.).  Instead, the "declaration of a dividend is a specific corporate act governed by specific sections of the DGCL." *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 201-02 (Del. Ch. 2014).  Here, there is no allegation that Quorum's Board formally declared a dividend,[8] nor any suggestion that the Distribution was somehow a return on CHSI's investment.  To the contrary, Plaintiffs acknowledge that the Spin-Off was consummated through a series of transfers from Quorum to

---

[8] That CHSI and Quorum imprecisely referred to the Distribution as a "dividend" in certain documents is equally immaterial.  *See In re IAC/InterActive Corp.*, 948 A.2d 471, 511 (Del. Ch. 2008) (ignoring use of term "dividend" by third-party consultant and company employees because it would be "entirely inappropriate" and "contrary to the controlling and persuasive authority" to treat transaction as a "stock dividend merely because that term was misused in a board presentation and in draft press releases").  Notably, Plaintiffs do not allege that the companies ever referred to the distribution as a dividend in formal corporation authorizations.  *See Fulweiler v. Spruance*, 222 A.2d 555, 559 (Del. 1966) (resolution "carefully refrained from describing the distribution as a dividend, but in fact described it for what in fact it was—a partial distribution of duPont income-producing assets pursuant to the order of a court").

9

CHSI and reciprocal transfers from CHSI to Quorum (Opp. ¶ 29 n.9)—the quintessential bilateral exchange.

*Second*, doubtless aware that no dividend was formally declared or issued, Plaintiffs (citing non-binding, non-Delaware authority) urge an "expansive view" of Section 174 that would, in effect, treat as a "dividend" any transaction in which a shareholder receives some benefit from the company. *See* Opp. ¶¶ 40-42. That is precisely the sort of boundless theory that Delaware courts have rejected in refusing to recognize so-called "constructive" dividends. *See Quadrant*, 102 A.3d at 201-02. Instead, Delaware law commands a "formal and technical approach": Because the declaration of a dividend is a specific corporate act governed by a specific provision in the DGCL, "[n]o section of the DGCL extends the restrictions governing . . . dividends to other transactions between a corporation and stockholders." *Id.*[9] When a formal dividend is absent, Delaware law evaluates claims of shareholder self-dealing "under the rubric of fiduciary duty." *Id.* Here, any breach-of-fiduciary-duty claim would be time-barred. *See* Mot. 18. The Court should reject Plaintiffs' effort to shoehorn their time-barred claim into an inapplicable statutory provision.[10]

## B.    The Illegal Dividend Claims Are Barred By Claim And Issue Preclusion, In Any Event

Quorum could have brought an illegal dividend claim in the arbitration. *See* 8 Del. Code § 174 (directors are liable "to the corporation"). Indeed, Quorum affirmatively litigated in the arbitration many of the same issues that Plaintiffs rehash here, while electing *not* to assert a claim

---

[9] The statutory text also undermines Plaintiffs' theory. "Clos[ing] a loophole in the common law," § 174 extends liability to unlawful stock purchases and redemptions, "which are often in fact disguised dividends." Edward P. Welch et al., *Folk on the Delaware General Corporation Law* § 174.05 (7th ed. 2022-1 Supp.). That language would be otiose if, as Plaintiffs suggest, Section 174 *already* covers every transaction in which a stockholder receives cash from the company.

[10] Count XIV (aiding-and-abetting) should also be dismissed because no such cause of action exists. *See* Mot. 18 n.12; Credit Suisse Mot. (Dkt. 48) at 22-27.

for illegal dividend.  The Litigation Trustee, successor-in-interest to Quorum, is now bound by that decision.

### 1.    Plaintiffs' Claims Are Barred By Claim Preclusion

Plaintiffs' chief argument against claim preclusion is that they are not in privity with prepetition Quorum.  Opp. ¶¶ 67-69.  But this argument misapprehends the law and is contradicted by Plaintiffs' own Complaint.

It is noncontroversial that a trustee in bankruptcy (including a litigation trustee) is a successor-in-interest to the debtor and therefore the debtor's privy for purposes of preclusion.  *See In re Montgomery Ward, LLC*, 634 F.3d 732, 737 (3d Cir. 2011) ("*Res judicata* may apply to a successor in interest . . . .  A trustee in bankruptcy, including a debtor-in-possession, may thus be considered the privy of the prebankruptcy debtor for *res judicata* purposes.").

Resisting that truism, Plaintiffs cite a smattering of cases in which bankruptcy trustees were held *not* to be in privity with the prepetition debtor.  Opp. ¶ 68.  Every one of those cases is irrelevant, however, because they involved the application of preclusion to a trustee's *fraudulent conveyance* claims.  When evaluating creditor claims in bankruptcy, "[t]he distinction between claims that once belonged to creditors and those that [only] later became property of a debtor's estate is an important one."  *In re Maxus Energy Corp.*, 2019 WL 647027, at *5 (Bankr. D. Del. Feb. 15, 2019).  Prepetition debtors have no standing to bring fraudulent conveyance claims; such claims belong uniquely to creditors (and, in the event of bankruptcy, the estate).  So, naturally, a prepetition debtor's failure to assert a fraudulent conveyance claim—which it had no standing to bring in the first place—is not preclusive of the trustee's ability to do so.  *See Maxus Energy Corp.*, 2019 WL 647027, at *5 (no privity because debtor "had no actionable prepetition fraudulent conveyance claims"); *In re Good Time Charley's, Inc.*, 54 B.R. 157, 160 (Bankr. D.N.J. 1984) (same); *see also In re Tzanides*, 574 B.R. 489, 522 (Bankr. D.N.J. 2017).

Here, by contrast, the Trustee brings a "claim . . . based on state law" that is "more or less equivalent to the remedy forgone by the Debtor," and the aligned interests of the Trustee and the prepetition debtor create the requisite privity. *In re Rabinowitz*, 2011 WL 6749068, at *9 (Bankr. D.N.J. Dec. 21, 2011); *see also In re Worldcom, Inc.*, 401 B.R. 637, 651 (S.D.N.Y. 2009) (trustee "is a successor in interests to causes of actions that are derivative of OneStar's rights").

Plaintiffs maintain that the Trustee's and prepetition Quorum's interests were *not* aligned, because Quorum was disincentivized from "publicly acknowledg[ing]" its financial difficulties. *See* Opp. ¶ 69. Nonsense. The arbitration was confidential—Quorum did not "publicly acknowledge" anything. And Quorum was hardly bashful trumpeting its financial struggles to gain a litigation advantage. *See* Dkt. 44, Ex. 10 (Quorum Post-Hearing Brief) at 86 (Quorum "was in default on the debt . . . within months of the Spin-Off" and had to "renegotiate its debt covenants" twice); *id.* at 87 (Quorum experienced "financial distress . . . almost immediately following the Spin-Off"); *see also id.* at 85, 92, 95 (more of the same).

As a fallback, Plaintiffs urge that individual creditors may still bring illegal dividend claims, either on their own or through the Trustee as their assignee. *See* Opp. ¶¶ 67-69. That does not work, either. It is contradicted by the face of the Complaint, which identifies the illegal dividend claims as "Debtor Causes of Action." Cplt. ¶¶ 13-14.[11]

### 2.    Plaintiffs' Claims Are Barred By Issue Preclusion As Well

For much the same reasons, issue preclusion likewise bars the Trustee's illegal dividend

---

[11] Even if the illegal dividend claims were asserted by individual creditors, they would still fail. The creditors lack standing to bring the claims under Section 174 unless they bring a class action "for the benefit of all creditors." *See John A. Roebling's Sons Co. v. Mode*, 43 A. 480, 482 (Del. Super. Ct. 1899); *see also* R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 5.32 (3rd and 4th eds., 2021-2 Supp. 1998). And this subset of creditors also lacks the right to unwind the entire $1.21 billion Distribution "without respect to any of the other creditors." *See Roebling's Sons*, 17 Del. at 520-21.

claims.  The claims are "in substance the same" as those that Quorum already litigated—and lost—in the arbitration.  *See Raytech Corp. v. White*, 54 F.3d 187, 193 (3d Cir. 1995) (quoting *Montana v. United States*, 440 U.S. 147, 155 (1979)); *see also Witkowski v. Welch*, 173 F.3d 192, 200 (3d Cir. 1999) (issues are identical where claim in second proceeding "was necessarily based on the same alleged fraudulent scheme" as the claims dismissed in arbitration).  The gravamen of the Trustee's claims is that CHSI and its officers "[n]ever investigated the reasonableness of the QHC Projections," let "the QHC Assets deteriorate[] substantially prior to the Spin-Off," and "prohibited QHC's new management from participating in Spin-Off planning."  Cplt. ¶ 167.  Those are precisely the issues that Quorum litigated in the arbitration as fodder for its tortious interference claim.  *See* Dkt. 44, Ex. 10, at 65-83 (pressing identical allegations in the arbitration).  If the illegal dividend claims were to go forward, the Trustee would necessarily marshal the same documentary evidence and witness testimony that Quorum already adduced in the arbitration.  *See Peloro v. United States*, 488 F.3d 163, 175 n.12 (3d Cir. 2007) (in considering issue preclusion, "a court should ask, *inter alia*, 'Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first?'").

Plaintiffs have no substantial response to this.  Misapprehending how issue preclusion works, they offer that the arbitration could have preclusive effect only if the arbitral panel affirmatively considered Delaware's illegal dividend statute.  *See* Opp. ¶ 71.  But this confuses an "issue" with a "claim."  The *issue* subject to preclusion is not whether Quorum paid the Distribution "[o]ut of its surplus" or "out of its net profits for the fiscal year" pursuant to 8 Del. Code § 170.  *See id.*  The *issue* is whether, as the Trustee alleges, Quorum's directors "acted willfully or negligently when they approved" the Distribution because of CHSI's alleged misconduct leading up to the Spin-Off.  *See* Cplt. ¶ 167; 8 Del. Code § 174 (directors are liable for

13

"wilful or negligent violation[s]" of § 173).  Because that *issue* is indistinguishable from one

Quorum already litigated (and lost), the Trustee is precluded from resurrecting it.

## III.    PLAINTIFFS' UNJUST ENRICHMENT CLAIM (COUNT XV) IS BOTH PRECLUDED AND TIME-BARRED

### A.    The Unjust Enrichment Claim Is Foreclosed By Claim And Issue Preclusion

The Trustee and prepetition Quorum are likewise in privity with respect to the unjust

enrichment claim.  Unjust enrichment is not a claim, like fraudulent conveyance, that belongs only

to creditors and the trustee.  Prepetition Quorum had every ability to bring such a claim, and the

Trustee is now successor-in-interest to that cause of action.  *See Worldcom*, 401 B.R. at 651.  The

Complaint expressly identifies the unjust enrichment claim as a "Debtor Cause[ ] of Action."  *See*

Cplt. ¶ 13.  Furthermore, "there is substantial identity between the incentives" of Quorum in the

arbitration and the Trustee in this action.  *Rabinowitz*, 2011 WL 6749068, at *9.  Quorum was not

merely "incentivized" to allege in the arbitration that CHSI unjustly impoverished Quorum for its

own benefit; Quorum *made* those allegations.  *See* Dkt. 44, Ex. 10, at 85-95.  Claim preclusion

therefore bars this claim.[12]

The Trustee's claim is barred by issue preclusion as well.  The arbitration involved the

same issues on which the unjust enrichment claim is based.  *See Witkowski*, 173 F.3d at 200 (issue

preclusion where both claims were "based on the same alleged fraudulent scheme").  Indeed,

---

[12] Plaintiffs suggest that the unjust enrichment claim cannot be precluded because it had not yet accrued at the time of the arbitration.  *See* Opp. ¶ 70.  That is incorrect.  Unlike Plaintiffs' breach of contract claim, which did not accrue until Quorum defaulted on its debt (*see infra* p. 20), the unjust enrichment claims are expressly predicated on the $1.21 billion Distribution (made on April 29, 2016), the Transaction Fee Transfers (made on May 1, 2016), and the TSA payments (most of which preceded the arbitration).  *See* Cplt. ¶¶ 109, 176-80, Ex. A; *see also* Mot. 24 (identifying the dates of the alleged acts underlying the unjust enrichment claim).  Quorum's briefing in the arbitration makes plain that this claim had already accrued.  *See* Dkt. 44, Ex. 10, at 89-95 (Quorum's claimed damages included interests and costs on "excess debt" that "CHS forced QHC to assume" and excess payments "charged by CHS under the TSAs").

14

Plaintiffs' description of the key issue underlying the unjust enrichment claim—"whether CHS rendered QHC insolvent through its fraud and other machinations" (Opp. ¶ 71)—could just as well have been lifted from Quorum's arbitration brief. *See* Dkt. 44, Ex. 10, at 87 (alleging that "CHS's intentional actions" caused Quorum's "financial distress" and "inability to service the debt that CHS placed on it to finance the Spin-Off and cash dividend").

### B.    The Unjust Enrichment Claim Is Largely Time-Barred

Under Delaware's three-year statute of limitations, Plaintiffs' unjust enrichment claim is largely time-barred. *See* Mot. 24.  In an effort to solve that problem, Plaintiffs fall back on the "discovery rule"—professing that they could not possibly have learned the facts of their claim during the limitations period.  That does not work here.  The discovery rule applies only "in certain limited circumstances": the injury must be "inherently unknowable," and the plaintiff must be "blamelessly ignorant of the wrongful act and the injury complained of." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004).  And, importantly, the Trustee stands in *Quorum's* shoes for purposes of this claim.  The question, then, is whether Quorum was "blamelessly ignorant" as to an "inherently unknowable" injury.  To ask the question is to answer it:  Quorum pressed—indeed, *fully litigated*—identical allegations in the arbitration.  And Plaintiffs concede that Quorum "discovered certain of the facts" underlying the unjust enrichment claim "prior to" the arbitration.  Opp. ¶ 43.  If there was anything to be discovered, Quorum found it years ago.  The discovery rule cannot now rescue the Trustee.

## IV.    THE INDIVIDUAL NOTEHOLDER CLAIMS SHOULD BE DISMISSED

### A.    The Court Lacks Jurisdiction Over The Individual-Noteholder Claims

Plaintiffs concede that "related to" jurisdiction is the only potential hook for the individual-noteholder claims.  Opp. ¶¶ 94-95.  The claims therefore must satisfy the "close nexus" test for

this Court to have jurisdiction—meaning the claims "must affect an integral aspect of the bankruptcy process." *In re Resorts Int'l, Inc.*, 372 F.3d 154, 167 (3d Cir. 2004).

As explained (Mot. 25-26), the individual noteholder claims flunk the close nexus test. As in *Resorts*, resolving these claims "will not affect the estate," would "have only incidental effect on the reorganized debtor," *Resorts*, 372 F.3d at 169, and "will not require a court to interpret or construe the Plan or the incorporated Litigation Trust Agreement," *id.* at 170. And, though the claims may "affect the former creditors as Litigation Trust beneficiaries, they no longer have a close nexus to the bankruptcy plan or proceeding because they exchanged their creditor status to attain rights to the litigation claims." *Id.* at 169.

Plaintiffs offer little in response. They first chastise us for "[r]elying only on" the *Resorts* decision. Opp. ¶ 93. This one is a headscratcher. The *Resorts* decision—which *created* the close nexus test—is binding Third Circuit precedent, squarely on point, and dispositive of the legal question presented. What else would Plaintiffs have us cite? Their brief offers no insight; they fail to cite a single Third Circuit case, much less one contrary to *Resorts*.

Plaintiffs attempt to distinguish *Resorts* by conjuring a distinction between claims involving *post*-confirmation conduct (like those in *Resorts*) and claims involving *pre*-confirmation conduct (like the individual-noteholder claims). Opp. ¶¶ 93-94. But the Third Circuit has already rejected that argument: For purposes of the close nexus test, "[t]he time when the conduct raised in the post-confirmation complaint occurred is of no consequence." *In re Seven Fields Dev. Corp.*, 505 F.3d 237, 265 (3d Cir. 2007).

Next, Plaintiffs profess that the litigation trust was "a central pillar of the Plan," and that it was "important" to creditors that the Litigation Trustee be able to pursue these claims as their assignee. Opp. ¶ 94. That may well be, but heartfelt desires do not create subject matter

jurisdiction.  And that a trust siphoned away the claims militates *against* jurisdiction.  As the Third

Circuit aptly put it:

> "[T]he Litigation Trust was created in part so that the Plan could be confirmed and the debtor freed from bankruptcy court oversight without waiting for the resolution of the litigation claims.  *The deliberate act to separate the litigation claims from the bankruptcy estate weakens the Trustee's claim that the Litigation Trust has the same jurisdictional nexus as that of the estate*."

*Resorts*, 372 F.3d at 169 (emphasis added).

Plaintiffs cite no cases to the contrary.  Their first case, *In re Swan Transportation Co.*, 596

B.R. 127 (Bankr. D. Del. 2018), is inapposite.  It involved plaintiffs seeking "to materially revise

the Trust Document, most tangibly by removing the Trustees and appointing a single receiver."

*Id.* at 134.  The court held that such relief "cuts to the very heart of the Confirmation Order and

Plan because it relates to the officers appointed by th[e] Court and to the procedures for appointing

new trustees."  *Id.* at 135.  Here, by marked contrast, the individual-noteholder claims are

garden-variety state-law claims against third parties.  Resolving them will not "affect the

interpretation, implementation, consummation, execution, or administration of the confirmed

plan." *Resorts*, 372 F.3d at 167.

Plaintiffs' next case, *In re AstroPower Liquidating Tr.*, 335 B.R. 309 (Bankr. D. Del 2005),

misapplies precedent and was wrongly decided.  It held that if the court had "'related to'

jurisdiction *pre*-confirmation" over a claim, and if the plan "specifically describes" that claim and

"expressly provides for the retention of such jurisdiction to liquidate that claim for the benefit of

the estate's creditors," then "there is a sufficiently close nexus with the bankruptcy proceeding to

support jurisdiction post-confirmation."  335 B.R. 309 at 325 (emphasis added).  That rule is

unworkable.  "[R]etention of jurisdiction provisions in a plan of reorganization or trust agreement

are fundamentally irrelevant" to whether jurisdiction exists.  *Resorts*, 372 F.3d at 161.  As the

Third Circuit held in *Resorts*, pre-confirmation jurisdiction does not translate to post-confirmation

17

jurisdiction; either the post-confirmation claims have a close nexus to the plan, or they don't.  *Id.* at 168-70.  These don't.

Even if *AstroPower* could coexist with *Resorts*, it still would not help Plaintiffs.  Unlike the plan in *AstroPower*, the Plan here "only broadly provided for retention of jurisdiction over causes of action."  *In re BWI Liquidating Corp.*, 437 B.R. 160, 166 (Bankr. D. Del. 2010) (citing *Resorts*, 372 F.3d at 167).  Plaintiffs assert nothing to the contrary.  *See* Opp. ¶¶ 93-95.  The Plan thus "provides no evidence of a sufficiently close nexus with the bankruptcy proceeding to support post-confirmation jurisdiction."  *BWI*, 437 B.R. at 166.[13]

### B.  All But One Noteholder Claim Is Precluded Until The Litigation Trustee Relinquishes His Purported Authority To Assert General Estate Claims

As explained (Mot. 26-27), the fraudulent transfer, illegal dividend, and unjust enrichment claims are "general" to the estate, so only the trustee (not individual noteholders) may pursue them.  *Wilton Armetale*, 968 F.3d at 283.  Not until the "trustee abandons a cause of action" general to the estate does "the 'creditor's right to pursue' it 'spring[ ] back to life.'"  *Id.* at 284 (quoting 5 Collier on Bankruptcy ¶ 548.02[5][a] (16th ed. 2020)).

Plaintiffs try to cast *Wilton* aside, asserting that this "concept of abandonment no longer applies" because the noteholders assigned their claims to the litigation trust—and now, the Trustee is asserting the claims "on alternative bases, in both his estate and creditor assignee capacities."  Opp. ¶¶ 91-92.  That cannot be.  Because the Trustee has not abandoned these claims, all the

---

[13] Plaintiffs' final case, *In re LGI, Inc.*, 322 B.R. 95 (Bankr. D.N.J. 2005), has been abrogated in relevant part by the Third Circuit.  *See Seven Fields*, 505 F.3d at 265 ("The time when the conduct raised in the post-confirmation complaint occurred is of no consequence . . . the 'close nexus' test applies in all disputes raised post-confirmation, regardless of when the conduct alleged in the complaint occurred.").

individual noteholders have—and therefore all they could have assigned to the Trustee—is a contingent right to bring such claims if and when they are abandoned by the Trustee.

Which brings us back to where we started: Either the Trustee is invoking his exclusive power to bring general estate claims, in which case the noteholder claims must be dismissed, or the Trustee must abandon those general estate claims, in which case the noteholders may bring them. Put another way, the Trustee must choose whether to pursue these claims in his "estate" capacity or his "creditor assignee" capacity. He cannot do both.

### C.    The Individual Noteholders' Remaining Claim For Breach Of Contract (Count XII) Fails Because They Do Not Adequately Plead Alter Ego Liability

Plaintiffs confuse the question presented. They assert, without explanation or support, that the alter ego analysis should be conducted "at the time the Spin-Off Debt was incurred." Opp. ¶ 9. That is mistaken. Alter ego is not a standalone cause of action; it is merely a theory of liability for an underlying claim. *See, e.g.*, *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 469 n.10 (D. Del. 2019). It follows that the question of alter ego must be evaluated as of the time the underlying cause of action accrued. *See Chicago Florsheim Shoe Store Co. v. Cluett, Peabody & Co.*, 826 F.2d 725, 727-28 (7th Cir. 1987) (rejecting plaintiff's argument that elements of alter ego "should be examined at the time of the [leveraged buyout] which [plaintiff] alleges caused [debtor's] subsequent collapse," and concluding instead that the defendant must satisfy the alter ego test at the time the "cause of action arose"); *Connors v. Peles*, 724 F. Supp. 1538, 1560 (W.D. Pa. 1989) (focusing alter ego inquiry on the time liability arose).

Here, the only claim for which Plaintiffs[14] seek to pierce the corporate veil is breach of

---

[14] Whether this claim is brought on behalf of the estate or the individual noteholders (whether by the Litigation Trustee or the Indenture Trustee) has no bearing on whether CHSI and Quorum were alter egos at the time of the breach.

contract (Count XII). It is black-letter law that a breach of contract claim accrues at the time of the *breach*—not when the contract is first executed, or some other date. *See, e.g.*, *Lehman Bros. Holdings, Inc. v. Kee*, 268 A.3d 178, 185 (Del. 2021). Plaintiffs' breach of contract claim is predicated on Quorum's default on its bonds. That default occurred in April 2020, *four years after the Spin-Off*, which is when Plaintiffs' claim accrued. Plaintiffs cannot seriously dispute this.

The question, then, is whether CHSI and Quorum were alter egos in April 2020. And Plaintiffs do not even attempt to argue that they were. Plaintiffs' only theory for alter ego liability is based on CHSI's supposed control of Quorum *prior to the Spin-Off*. *See* Opp. ¶¶ 9-23; *see also* Cplt. ¶ 155 ("*At the time that the Senior Note Debt was incurred*, QHC and CHS operated as a single economic unit.") (emphasis added); *id*. ¶ 156 (marshaling allegations in support of alter-ego theory, all predating the Spin-Off).

As noted, this is all beside the point. Plaintiffs concede that, following the Spin-Off, Quorum operated independently for fully four years before defaulting on its debt. *See* Opp. ¶ 14 (Quorum "was able to 'trudge along' from 2016 to 2020 . . ."). Throughout that time, Quorum indisputably existed as an autonomous public company—with its own board of directors, its own management, and with no involvement or oversight by its former parent. So autonomous, in fact, that Quorum commenced suit against CHSI and aggressively litigated many of the same grievances that Plaintiffs now rehash. If the two companies were "alter egos" in the years following the Spin-Off, someone neglected to inform Quorum.

In the end, Plaintiffs have pled no allegations that could support a claim that Quorum and CHSI were alter egos at the time Quorum defaulted on its debt, four years after it became an independent public company. That settles the matter.

## CONCLUSION

Defendants' motion to dismiss should be granted.

Date: May 2, 2022

/s/ *Michael S. Neiburg*
Michael S. Neiburg (DE No. 5275)
Christopher M. Lambe (DE No. 6846)
YOUNG CONAWAY STARGATT
   & TAYLOR LLP
Rodney Square
1000 North King St.
Wilmington, DE 19801
Tel.: (302) 571-6600
Fax: (302) 571-1253
mneiburg@ycst.com

*Counsel for Defendants Community Health Systems, Inc., CHS/Community Health Systems, Inc., Revenue Cycle Service Center, LLC, CHSPSC, LLC, Professional Account Services, Inc., Physician Practice Support, LLC, Eligibility Screening Services, LLC, W. Larry Cash, Rachel Seifert, and Adam Feinstein*

Respectfully submitted,

Gary A. Orseck (admitted *pro hac vice*)
Alison C. Barnes (admitted *pro hac vice*)
William J. Trunk (admitted *pro hac vice*)
Jack A. Herman (admitted *pro hac vice*)
Lauren C. Andrews (admitted *pro hac vice*)
Jason A. Shaffer (admitted *pro hac vice*)
KRAMER LEVIN ROBBINS RUSSELL
2000 K Street, N.W., 4th Floor
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
gorseck@kramerlevin.com

*Counsel for Defendants Community Health Systems, Inc., CHS/Community Health Systems, Inc., Revenue Cycle Service Center, LLC, CHSPSC, LLC, Professional Account Services, Inc., Physician Practice Support, LLC, Eligibility Screening Services, LLC, W. Larry Cash, and Rachel Seifert*


ROLNICK KRAMER SADIGHI LLP

Marc B. Kramer (admitted *pro hac vice*)
Matthew Peller (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 597-2800
Fax: (212) 597-2801
mkramer@rksllp.com

Sheila Sadighi (admitted *pro hac vice*)
300 Executive Drive
West Orange, New Jersey 07052

*Counsel for Defendant Adam Feinstein*