## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

———————————————————————— x
:
In re: : **Chapter 11**
:
QUORUM HEALTH CORPORATION, *et al.*, : **Case No. 20-10766 (BLS)**
:
Debtor. :
:
———————————————————————— :
:
DANIEL H. GOLDEN, AS LITIGATION :
TRUSTEE OF THE QHC LITIGATION TRUST, : **Adversary Proceeding**
AND WILMINGTON SAVINGS FUND :
SOCIETY, FSB, SOLELY IN ITS CAPACITY AS : **Case No. 21-51190 (BLS)**
INDENTURE TRUSTEE, :
: **Re:  Adv. D.I. 47, 48**
Plaintiffs, :
:
v. :
:
COMMUNITY HEALTH SYSTEMS, INC.; :
CHS/COMMUNITY HEALTH SYSTEMS, INC.; :
REVENUE CYCLE SERVICE CENTER, LLC; :
CHSPSC, LLC; PROFESSIONAL ACCOUNT :
SERVICES, INC.; PHYSICIAN PRACTICE :
SUPPORT, LLC; ELIGIBILITY SCREENING :
SERVICES, LLC; W. LARRY CASH; RACHEL :
SEIFERT; ADAM FEINSTEIN; AND CREDIT :
SUISSE SECURITIES (USA) LLC, :
:
Defendants. :
———————————————————————— x


## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF CREDIT SUISSE
## SECURITIES (USA) LLC'S MOTION TO DISMISS

## Table of Contents

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 3

    I.    THE SAFE HARBOR BARS ALL OF PLAINTIFF'S CLAIMS AGAINST
    CREDIT SUISSE. ................................................................................................. 3

    II.    THE COMPLAINT FAILS TO STATE ANY CLAIM FOR FRAUDULENT
    TRANSFER AGAINST CREDIT SUISSE. .................................................... 6

    III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR AIDING AND
    ABETTING AN UNLAWFUL DIVIDEND AGAINST CREDIT SUISSE. ............. 11

    IV.    THE COMPLAINT FAILS TO STATE A CLAIM FOR UNJUST
    ENRICHMENT AGAINST CREDIT SUISSE. ........................................................ 14

CONCLUSION ............................................................................................................. 15

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*AT&T Corp.* v. *Walker*,
    2006 WL 3019980 (W.D. Wash. Oct. 17, 2006) ....................................................................13

*In re Boston Generating LLC*,
    617 B.R. 442 (Bankr. S.D.N.Y. 2020) .........................................................................................5

*In re Cornerstone Homes, Inc.*,
    567 B.R. 37 (Bankr. W.D.N.Y. 2017) .........................................................................................9

*Edgewater Growth Capital Partners, L.P.* v. *H.I.G. Capital, Inc.*,
    2010 WL 720150 (Del. Ch. Mar. 3, 2010)...............................................................................12n

*FTC* v. *Shire ViroPharma, Inc.*,
    917 F.3d 147 (3d Cir. 2019).......................................................................................................4n

*In re Hellas Telecommunications (Luxembourg) II SCA*,
    526 B.R. 499 (Bankr. S.D.N.Y. 2015) .........................................................................................5

*Kiger* v. *Mollenkopf*,
    2021 WL 5299581 (D. Del. Nov. 15, 2021) ...............................................................................3

*In re Lehman Bros. Holdings Inc.*,
    469 B.R. 415 (Bankr. S.D.N.Y. 2012).....................................................................................4, 5

*LVI Grp. Invs., LLC* v. *NCM Grp. Holdings, LLC*,
    2018 WL 1559936 (Del. Ch. Mar. 28, 2018)............................................................................15

*In re Lyondell Chem. Co.*,
    503 B.R. 348 (Bankr. S.D.N.Y. 2014).........................................................................................7

*In re Magnesium Corp. of Am.*,
    399 B.R. 722 (Bankr. S.D.N.Y. 2009) ......................................................................................12

*McPadden* v. *Sidhu*,
    964 A.2d 1262 (Del. Ch. 2008)................................................................................................15

*In re Millennium Lab Holdings II, LLC*,
    2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019) .................................................................8, 9

*In re Millennium Lab Holdings II, LLC*,
    562 B.R. 614 (Bankr. D. Del. 2016) ...........................................................................................9

*In re OPP Liq. Co., Inc.*,
    2022 WL 774063 (Bankr. D. Del. Mar. 14, 2022).....................................................................9

*In re Parker Sch. Uniforms, LLC,*
    2021 WL 4553016 (Bankr. D. Del. Oct. 5, 2021) ...................................................6n

*In re Petters Co., Inc.,*
    495 B.R. 887 (Bankr. D. Minn. 2013) ....................................................................6n

*In re Physiotherapy Holdings, Inc.,*
    2016 WL 3611831 (Bankr. D. Del. June 20, 2016)......................................4n, 6, 7

*Renault* v. *L.N. Renault & Sons,*
    188 F.2d 317 (3d Cir. 1951)......................................................................................7

*In re The IT Grp., Inc.,*
    2005 WL 3187865 (Bankr. D. Del. Nov. 17, 2005) ............................................3, 5

*U.S. Bank Nat'l Ass'n* v. *Verizon Commc'ns Inc.,*
    479 B.R. 405 (N.D. Tex. 2012)............................................................................7, 8

*Com. of Pa. ex rel. Zimmerman* v. *PepsiCo, Inc.,*
    836 F.2d 173 (3d Cir. 1988).....................................................................................6n

**Statutes**

11 U.S.C.
    § 544(b) .....................................................................................................................6
    § 546(e) ............................................................................................................ *passim*
    § 548(a)(1)(A) ...........................................................................................................5

Del. Code Ann. tit. 6 § 73-605(b) ..................................................................................12n

Del. Code Ann. tit. 8
    § 170..................................................................................................................11, 13
    § 173......................................................................................................................11

Del. Code Ann. tit. 10 § 7133(a).................................................................................12n

## INTRODUCTION[1]

Credit Suisse demonstrated in its Motion that it is not a proper Defendant in this case, and that all of Plaintiff's claims against it should be dismissed.  Plaintiff's Opposition does not even address, and therefore concedes, several of Credit Suisse's dismissal arguments.  And the arguments Plaintiff does make lack merit and should be rejected.

*First*, the Bankruptcy Code's "Safe Harbor" bars all the claims against Credit Suisse.  11 U.S.C. § 546(e).  Plaintiff concedes that Credit Suisse is a "financial participant," and it does not refute Credit Suisse's showing that it received fees "in connection with" the purchase agreement for the sale of the Senior Notes—a paradigmatic "securities contract" under the Safe Harbor. Moreover, Plaintiff's argument that the Safe Harbor does not bar common law claims grounded in fraudulent intent is wrong.  Rather the Safe Harbor exception on which Plaintiff relies applies only to intentional fraudulent transfer claims brought under the Bankruptcy Code.

*Second*, the Complaint fails to state any claim for fraudulent transfer against Credit Suisse for several reasons.  The Court should dismiss all the fraudulent transfer claims against Credit Suisse (Counts 16–21) because Plaintiff does not rebut Credit Suisse's showing that the Senior Noteholders ratified the transaction and thus cannot serve as "triggering creditors."  The constructive fraudulent transfer claims (Counts 16, 18, and 20) should be dismissed because the Complaint fails to plead that Credit Suisse did not provide "reasonably equivalent value" for the fees it earned.  Because Plaintiff cannot dispute this, the Opposition instead argues that QHC received no value from the distribution it made to CHS—even though the claim against Credit

---

[1] In this brief, (i) "Motion" or "Mot." refers to Credit Suisse's Motion to Dismiss (Dkt. No. 48); (ii) "Opposition" or "Opp." refers to Plaintiffs' Opposition to Defendants' Motions to Dismiss (Dkt. No. 68); (iii) "Moss Decl." refers to the Declaration of Edward Moss (Dkt. No. 49); and (iv) unless otherwise defined, all other capitalized terms have the same definition as in the Complaint or the Motion.  Unless noted, emphasis is added and internal citations and quotations are omitted.

1

Suisse does not seek to void that distribution—and ignores Credit Suisse's cases showing that the analysis must focus on the specific transaction to be avoided.  The intentional fraudulent transfer claims (Counts 17, 19, and 21) should also be dismissed because the Complaint fails to allege either actual fraudulent intent or the requisite "badges of fraud."

*Third*, the Opposition fails to rebut Credit Suisse's showing that there is no cause of action for aiding and abetting an illegal dividend (Count 22) under the Delaware General Corporation Law.  The Opposition cannot dispute that the statute limits liability only to primary violators, or that the only courts to have considered motions to dismiss this (non-existent) cause of action have granted them.  Without any legitimate opposition, Plaintiff hypothesizes that because Delaware recognizes a cause of action for civil conspiracy, that must mean this Court should be the first to recognize a claim for aiding and abetting an illegal dividend.  But Plaintiff cites no authority for this argument that no court has ever adopted.

*Finally*, Plaintiff's unjust enrichment claim (Count 23) is untimely, and the Opposition's tolling arguments should be rejected because QHC fully litigated these precise issues years ago in its arbitration with CHS.  The unjust enrichment claim should also be dismissed for the independent reason that the Complaint fails to plead the lack of a governing contract, and documents the Court can consider on this Motion demonstrate that such a contract exists.  Plaintiff also argues that a contract does not bar an unjust enrichment claim when it was procured by fraud.  But the Complaint here contains no such allegations of fraud.  For these and the other reasons below, the Court should dismiss all the claims against Credit Suisse with prejudice.

2

# ARGUMENT

## I.    THE SAFE HARBOR BARS ALL OF PLAINTIFF'S CLAIMS AGAINST CREDIT SUISSE.

Credit Suisse demonstrated in its Motion that the Bankruptcy Code's Safe Harbor bars all the claims against it.  (*See* Mot. at 7–10.)  Plaintiff's response lacks merit.

**Fraudulent Transfer Claims (Counts 16–21)**.  The Safe Harbor requires dismissal of the fraudulent transfer claims because (i) Credit Suisse is a "financial participant"; and (ii) the transfers were made "in connection with a securities contract"—the April 8, 2016 agreement under which the Senior Notes were offered and purchased.  (*See id.* at 7–9.)  Plaintiff concedes some of this, and the Court can easily reject Plaintiff's response on the points it does contest.

*First*, Plaintiff does not dispute that Credit Suisse is a "financial participant," and it has, therefore, waived any argument on this issue.  *In re The IT Grp., Inc.*, 2005 WL 3187865, at *3 (Bankr. D. Del. Nov. 17, 2005) ("Having not addressed this issue, Plaintiff has certainly not refuted it, but rather has conceded it."); *Kiger* v. *Mollenkopf*, 2021 WL 5299581, at *2 n.2 (D. Del. Nov. 15, 2021) (finding that certain arguments were "waived because they were not presented in Plaintiffs' opposition brief").

*Second*, the Court should reject Plaintiff's only argument on the "securities contract" prong—that because the purchase agreement cannot be considered on a motion to dismiss, the Court cannot determine on this Motion whether the "purchase agreement between Quorum and certain initial purchasers . . . [is a] securities contract[]." (Opp. at 37–38.)  The Court does not need to consider the contents of the purchase agreement (which, as Plaintiff correctly notes, is not public and was not filed with the SEC) to determine that it is a "securities contract" under the Safe Harbor.  The Indenture under which the notes were issued, and which was filed with the SEC, makes clear that the notes were "being offered and sold by the Issuer [Quorum] pursuant to

3

the Purchase Agreement," defined as the April 8, 2016 agreement "between the Issuer and Credit Suisse Securities (USA) LLC, as representative of the Initial Purchasers."[2]  Moss Decl. Ex. C at 30, 39.  And as Credit Suisse demonstrated in its Motion, an agreement to purchase notes is a quintessential "securities contract" under the Safe Harbor.  (Mot. at 8–9.)

*Third*, despite conceding that the fees were paid to Credit Suisse "in connection with the Spin-Off Debt"—which according to the Complaint itself ***includes*** the note offering (*see* Compl. ¶ 64 n.5)—Plaintiff suggests that the fees nevertheless may not have been paid "in connection with any contract governing the [note offering]."  (Opp. at 43.)  Not only does Plaintiff's argument contradict ***its own allegation*** that Credit Suisse was paid fees for the Spin-Off Debt that included the note offering, Plaintiff's argument that "in connection with" should be read to apply only if the "transfer at issue was actually required or governed by a securities contract" (*see id.* at 41) invents a razor-thin standard that does not actually exist.  Rather, *In re Lehman Bros. Holdings Inc.*, 469 B.R. 415 (Bankr. S.D.N.Y. 2012)—a case on which Plaintiff heavily relies (*see* Opp. at 43–44)—says just the opposite.  As Judge Peck explained, "the words 'in connection with' are to be interpreted ***liberally***," and "[i]t is proper to construe [them] ***broadly*** to mean 'related to.'"[3]  469 B.R. at 442.  Plaintiff's concession that the transfers were made "***in connection with*** the Spin-Off Debt" (*see* Opp. at 43)—which includes the note offering that was undisputedly made under a "securities contract"—meets that standard.

---

[2] The Court can consider the Indenture on this Motion because it was filed with the SEC.  *See FTC* v. *Shire ViroPharma, Inc.*, 917 F.3d 147, 151 n.5 (3d Cir. 2019) (judicial notice of fact from SEC filing).

[3] Plaintiff's argument that Third Circuit courts construe Section 546(e) more narrowly than Second Circuit courts is based on a misleading discussion of *In re Physiotherapy Holdings, Inc.*, 2016 WL 3611831, at *1 (Bankr. D. Del. June 20, 2016).  (*See* Opp. at 39.)  Contrary to Plaintiff's suggestion, *Physiotherapy* did not even construe the Safe Harbor's "in connection with" language.  And in discussing a different Safe Harbor provision, the *Physiotherapy* court noted the "Third Circuit's position that section 546(e) ***should be interpreted liberally***."  2016 WL 3611831 at *11.

4

**Aiding and Abetting (Count 22) and Unjust Enrichment (Count 23)**.  The Opposition's argument that the Safe Harbor does not bar Plaintiff's common law claims against Credit Suisse (*see* Opp. at 43–44) is also wrong.  To begin, although Plaintiff argues that the Safe Harbor does not bar its claim for illegal dividend against CHS (*see id.*),[4] Plaintiff does not respond to Credit Suisse's argument that the Safe Harbor bars the derivative aiding and abetting an illegal divided claim (Count 22) against Credit Suisse.  Thus, Plaintiff has waived that argument.  *See In re The IT Grp., Inc.*, 2005 WL 3187865, at *3.

The Court should also reject Plaintiff's argument that the Safe Harbor does not bar the unjust enrichment claim against Credit Suisse because it is "grounded in actual fraudulent intent."  (Opp. at 44 (citing *Lehman Bros.*, 469 B.R. at 451).)  To support this argument, Plaintiff relies on the logic of two cases from the Southern District of New York—*Lehman Bros.*, 469 B.R. 415 and *In re Hellas Telecommunications (Luxembourg) II SCA*, 526 B.R. 499 (Bankr. S.D.N.Y. 2015)—that explain that because the Safe Harbor has an exception for actual fraudulent conveyance claims brought under 11 U.S.C. § 548(a)(1)(A), similar common law claims (*i.e.*, those grounded in fraudulent intent) likewise should not be barred.  But Plaintiff ignores a more recent case from the same jurisdiction that takes the opposite view.  In *In re Boston Generating LLC*, the court rejected the argument that the Safe Harbor's section 548(a)(1)(A) exception extends to intentional fraudulent transfers brought under state law because "the plain language of section 546(e) . . . provides an exception ***only for intentional fraudulent transfer claims brought under the Bankruptcy Code and no more***."  617 B.R. 442, 479 (Bankr. S.D.N.Y. 2020), *aff'd*, 2021 WL 4150523, at *1 (S.D.N.Y. Sept. 13, 2021).

---

[4] Plaintiff characterizes the claim as "seek[ing] to hold ***CHS and the director Defendants*** liable for their intentionally wrongful and fraudulent acts" (Opp. at 44) and nowhere in this section mentions the derivative claim against Credit Suisse.

Following that logic, the Safe Harbor would also bar common law claims, including those "grounded in actual fraudulent intent."

## II.    THE COMPLAINT FAILS TO STATE ANY CLAIM FOR FRAUDULENT TRANSFER AGAINST CREDIT SUISSE.

The Opposition fails to rebut Credit Suisse's showing that the Complaint does not state any claim for fraudulent transfer against it.

*First*, as Credit Suisse demonstrated in its Motion, (i) a trustee can assert claims under 11 U.S.C. § 544(b) only if there is a "triggering" unsecured creditor holding an allowable claim as of the date of the bankruptcy petition; and (ii) the noteholders—the only creditors identified in the Complaint—cannot be triggering creditors because they entered into the transaction knowing that the offering's proceeds would be transferred to CHS.[5]  (*See* Mot. at 10–12.)  This pleading failure requires dismissal of the fraudulent transfer claims against Credit Suisse (Counts 16–21).

Plaintiff argues that the noteholders could not have ratified the transaction because they lacked knowledge of "all material facts connected with the transaction" since the financial statements disclosed to investors were supposedly "inflated" and "inaccurate."  (Opp. at 19.) Relying heavily on *Physiotherapy*, 2016 WL 3611831, at *1, Plaintiff argues that the noteholders' knowledge about how the financing proceeds would be used is insufficient for ratification because that was "simply one piece of information regarding the Spin-Off Debt."

---

[5] Plaintiff also argues that even though it has failed to plead the existence of triggering creditors other than the Senior Noteholders, it "would be able to do so" if necessary.  (Opp. at 21 n.6.)  But Plaintiff cannot amend its pleading through briefing. *Com. of Pa. ex rel. Zimmerman* v. *PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss").  Moreover, while a trustee is not required to allege the existence of an unsecured creditor by name, a "trustee's generic pleading as to the existence of a predicate creditor does not satisfy Rule 8(a)." *In re Petters Co., Inc.*, 495 B.R. 887, 901 (Bankr. D. Minn. 2013); *see also In re Parker Sch. Uniforms, LLC*, 2021 WL 4553016, at *10 (Bankr. D. Del. Oct. 5, 2021) (citing *Petters* and finding conclusory allegation that debtor "has creditors whose claims arose before" the challenged transfers insufficient to plead existence of a triggering creditor).

(Opp. at 20.)  But Plaintiff ignores an important element of the court's reasoning in *Physiotherapy*—that even "the most cursory glance" at the offering memorandum revealed that the investors may have believed the Debtor was a "***non-risky borrower***."  2016 WL 3611831, at *12.  In fact, the *Physiotherapy* court distinguished *In re Lyondell Chem. Co.,* 503 B.R. 348 (Bankr. S.D.N.Y. 2014), in part because the creditors there "knew they were participating in a leveraged buyout that carried potential risk."  *Id.* at *13.

   This case is much more like *Lyondell* than *Physiotherapy*.  The Complaint is replete with allegations demonstrating that the noteholders were on notice that they were entering into a risky transaction with a risky borrower.  *See, e.g.*, Comp. ¶ 49 (alleging that QHC's debt "received a 'C' rating from Moody's" in the first quarter of 2016); *id.* ¶ 65 ("Given the declining state of the hospital industry at this time, prospective lenders were reluctant to lend to QHC . . . . CHS and Credit Suisse resorted to attracting lenders by offering high interest rates and discounts to par. The 11.625% interest rate on QHC's senior Notes was the highest rate paid by any borrower in the healthcare sector from 2014-2016 . . . .").  Thus, unlike in *Physiotherapy*, the Complaint alleges that the noteholders had knowledge of material risks well beyond the use of the proceeds.

   Credit Suisse also explained in its motion why this Court should apply the logic of *U.S. Bank Nat'l Ass'n* v. *Verizon Commc'ns Inc.*, 479 B.R. 405 (N.D. Tex. 2012), a well-reasoned case with many factual similarities to this one.  (*See* Mot. at 11–12.)  Unable to distinguish *Verizon*, Plaintiff argues only that it is "inconsistent with binding precedent of this Circuit" (Opp. at 21).  But the only controlling authority Plaintiff cites is *Renault* v. *L.N. Renault & Sons*, 188 F.2d 317 (3d Cir. 1951), a 1951 case, and only for the unremarkable proposition that ratification requires knowledge of material facts (*see* Opp. at 19).  Credit Suisse does not dispute that general proposition and, as discussed above, the noteholders here were—in light of the Complaint's own

7

allegations about risk—sufficiently on notice to be able to ratify the transaction. Accordingly, the Court should adopt *Verizon*'s logic and dismiss the fraudulent transfer claims.

*Second*, Plaintiff fails to rebut Credit Suisse's showing that the constructive fraudulent transfer claims (Counts 16, 18, and 20) should be dismissed because the Complaint fails to plead that Credit Suisse did not provide "reasonably equivalent value" for the fees it earned. (*See* Mot. at 13–16.) Plaintiff does not (and cannot) dispute that the Complaint lacks allegations showing that (i) Credit Suisse did not provide the services it was engaged to provide, or (ii) charged an above-market rate for those services. Nor does Plaintiff offer any authority to even try to rebut Credit Suisse's cases within this District holding that the payment of a valid contractual debt constitutes reasonably equivalent value. (*See id.* at 14–15.)

Instead, without even addressing Credit Suisse's showing that this Court must analyze the specific transaction to be avoided (*see id.* at 13)—here, QHC's payment of customary fees to Credit Suisse for its work on the financing—Plaintiff switches field and argues that QHC received no value from the financing because the financing's proceeds were distributed to CHS in a separate transaction while QHC was saddled with the debt. (*See* Opp. at 22–24.) Yet that argument would require the Court to collapse several transactions—the multipart financing, the payment of fees to Credit Suisse, and QHC's transfer of the financing proceeds to CHS—into one. And Plaintiff does not even address, let alone refute, any of Credit Suisse's cases showing that the collapsing doctrine does not apply to the facts here. (*See* Mot. at 15–16.)

Plaintiff's sole authority is *In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *1 (Bankr. D. Del. Feb. 28, 2019) (*see* Opp. at 24–26), but as Credit Suisse already explained (*see* Mot. at 16, n.12) and Plaintiff does not refute, that case is distinguishable. In *Millennium*, (i) the debtor received nothing in return for the challenged distribution and filed for bankruptcy

8

only 18 months after the transaction, *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 618 (Bankr. D. Del. 2016); and (ii) there were allegations of self-dealing because part of the distribution went to augment the "personal fortunes" of the debtor's controlling persons.  2019 WL 1005657 at *4.  But here, (i) QHC received a diversified portfolio of 38 hospitals and other assets as partial consideration for the distribution and operated for four years post-transaction before filing for bankruptcy, and (ii) the Complaint lacks any allegations that any individuals benefitted personally.  (*See* Compl. ¶ 2.)

Plaintiff also argues that the Complaint sufficiently pleads lack of reasonably equivalent value because its allegations demonstrate that Credit Suisse acted in bad faith.  (*See* Opp. at. 24.) Not so—Plaintiff's cases are distinguishable.  In *In re Cornerstone Homes, Inc.*, a case involving an alleged Ponzi scheme, the court denied a motion to dismiss filed by banks that had entered into transactions with the debtor because the complaint specifically alleged that the banks had possession of the debtor's financial statements and tax returns that showed the debtor was insolvent.  567 B.R. 37, 52 (Bankr. W.D.N.Y. 2017).  And in *In re OPP Liq. Co., Inc.*, the court found the lack-of-good-faith allegations against the debtor's former officers and directors sufficient because the complaint had also alleged facts sufficient to show that those defendants had breached their fiduciary duties.  2022 WL 774063, at *13 (Bankr. D. Del. Mar. 14, 2022). But here, the Complaint (i) includes only conclusory allegations that Credit Suisse must have known that QHC was insolvent (four years before it entered bankruptcy); and (ii) lacks allegations that would demonstrate that Credit Suisse breached any fiduciary duties (which, as an arm's-length service provider, it did not owe).

*Third*, the Opposition does not rebut Credit Suisse's showing that the Court should dismiss the intentional fraudulent transfer claims (Counts 17, 19, and 21) because the Complaint

fails to plead the requisite intent.  (*See* Mot. at 16–21.)  Plaintiff argues first that it need not plead

"badges of fraud" because the Complaint includes direct allegations of actual fraudulent intent.

(*See* Opp. at 26–27.)  But Plaintiff's entire discussion—including the only two allegations it uses

to support its argument—focuses on CHS's alleged intent with respect to the alleged scheme in

general.  (*See id.* at 27.)  Plaintiff does not even mention the payments to Credit Suisse.

      Plaintiff then argues that, to the extent Credit Suisse-specific allegations are necessary,

the Complaint has them because it alleges that (i) CHS believed that Credit Suisse would go

along with its alleged scheme; (ii) Credit Suisse had "heated conversations" in which it tried to

convince CHS to lower the debt amount, but CHS "refused to change course"; (iii) the lead

Credit Suisse banker described the deal as "the most difficult of his career"; and (iv) unidentified

Credit Suisse bankers asked a CHS employee to delete Credit Suisse's name from a log of

changes to the projections that he had been instructed to make by someone at CHS (and not by

anyone at Credit Suisse).  (*Id.* at 27-28.)  But Plaintiff does not respond to—let alone refute—

Credit Suisse's detailed showing that these allegations fail to state a claim for fraud.  (*See* Mot. at

6, 27.)  For example, Credit Suisse explained why having "heated conversations" in which it

allegedly tried to convince CHS to reduce the debt amount shows the antithesis of fraud.  (*Id.* at

27.)  The Opposition has no response.

      Plaintiff relegates to one paragraph its fallback argument that the Complaint sufficiently

pleads the "badges of fraud."  (*See* Opp. at 28.)  That argument also fails.  As an initial matter,

the Opposition does not even address, and thus concedes, Credit Suisse's showing that the

Complaint fails to plead three of the six badges of fraud—(i) "how much of the debtor's estate

was transferred"; (ii) "reservation of benefits, control or dominion by the debtor over the

property transferred"; and (iii) "secrecy or concealment of the transaction."  (*See* Mot. at 18.)

And the Court should reject Plaintiff's arguments on the prongs it does address:

- In arguing that the Complaint adequately alleges the badge of "insolvency," Plaintiff just repeats the Complaint's conclusory allegations and fails to address Credit Suisse's argument that QHC's operation outside of bankruptcy for four years post-transaction makes it implausible that QHC was insolvent as a result of the transaction.

- In addressing "reasonably equivalent value," Plaintiff focuses on the distribution and does not address the lack of allegations showing that Credit Suisse either did not provide the requested investment-banking services or charged an above-market rate.

- Plaintiff's argument that CHS and QHC had a "non-arm's length relationship" misses the point, because the relevant inquiry is the relationship between Credit Suisse and QHC—which the Opposition does not even attempt to address.

## III.   THE COMPLAINT FAILS TO STATE A CLAIM FOR AIDING AND ABETTING AN UNLAWFUL DIVIDEND AGAINST CREDIT SUISSE.

Credit Suisse demonstrated in its Motion that (i) the Delaware General Corporation Law does not provide for aiding and abetting liability for illegal dividend claims, but rather its express language limits liability only to primary violators; (ii) no Delaware court—and no court anywhere—has ever recognized a claim for aiding and abetting an illegal dividend under DGCL §§ 170 and 173; and (iii) the only two courts to have ruled on motions to dismiss aiding and abetting claims have granted those motions.  (*See* Mot. at 21–25.)  Plaintiff cannot dispute any of this.[6]  Instead, it advances two weak arguments that this Court should reject.

*First*, Plaintiff argues that Credit Suisse does not cite any controlling authority to support its position (*see* Opp. at 34), but Plaintiff has ***no authority at all***.  The best Plaintiff can muster is the general statement that "co-conspirators are jointly and severally liable for the acts of their confederates committed in furtherance of the conspiracy," coupled with Plaintiff's own opinion

---

[6] Plaintiff likewise does not dispute that the aiding and abetting claim against Credit Suisse must be dismissed if the Court dismisses the underlying illegal dividend claim (Count 13)—which it should do for the reasons that the CHS Defendants have explained.

11

that "[t]here is no reasoned basis why" this holding would not create out of whole cloth a new cause of action that has never been recognized by any court anywhere. (*See id.* at 34–35.) Plaintiff's novel theory—in addition to lacking any case-law support—proves too much. If Plaintiff were correct, then the mere existence of a cause of action under Delaware law for civil conspiracy (a claim which Plaintiff does not allege here) would somehow create a cause of action for aiding and abetting every violation of a Delaware statute. But that has not happened. Rather, Delaware courts repeatedly have ***refused*** to recognize causes of action for aiding and abetting as to several Delaware statutes. (*See* Mot. at 25, n.16.)[7]

*Second*, Plaintiff's attempts to distinguish Credit Suisse's cases (*see* Opp. at 35) are unavailing. Plaintiff does not dispute that *In re Magnesium Corp. of Am.*, 399 B.R. 722 (Bankr. S.D.N.Y. 2009), dismissed aiding and abetting claims against investment banks and others based on the statute's plain and unambiguous language that demonstrated the legislature's intent to impose liability for illegal dividends only on "one group—a corporation's directors." (*See* Mot. at 23 (citing *Magnesium*, 399 B.R. at 777-78).) Instead, Plaintiff argues only that Judge Gerber failed to "grapple with the Delaware Supreme Court's holding that liability shall be imposed on joint conspirators." (Opp. at 35.) But that is a complete *non sequitur* that only underscores how far Plaintiff is reaching here. The *Magnesium* court did not "grapple" with Plaintiff's argument (which, of course, was never even asserted in that case) because it has no basis in any legal

---

[7] As Delaware courts have noted when refusing to create an implied statutory cause of action in other contexts, "[t]he General Assembly obviously could have explicitly provided for liability for aiding and abetting . . . but it did not." *Edgewater Growth Capital Partners, L.P.* v. *H.I.G. Capital, Inc.*, 2010 WL 720150, at *2 (Del. Ch. Mar. 3, 2010). And in many cases, the General Assembly has explicitly done so. *See, e.g.*, Del. Code Ann. tit. 6 § 73-605(b); Del. Code Ann. tit. 10 § 7133(a) (permitting civil action "against any person who knowingly . . . aided, [or] abetted . . . criminal nuisance.").

12

authority whatsoever—and it runs directly counter to the Delaware cases that have refused to recognize aiding and abetting liability for other statutory violations.

*Third*, Plaintiff argues that *AT&T Corp.* v. *Walker*, 2006 WL 3019980 (W.D. Wash. Oct. 17, 2006), should be discounted because "the plaintiff there voluntarily consented to dismissal." (Opp. at 35.) But Plaintiff ignores that the plaintiff-trustee in *Walker* consented to dismissal only after (i) the defendants had explained in their motion to dismiss that neither the statute nor any Delaware court had ever recognized a cause of action for aiding and abetting an illegal dividend, and (ii) the trustee had conceded at deposition that (a) "I don't think that the aiding and abetting [an] [il]legal dividend has been recognized as a cause of action anywhere that I know of," and (b) "[w]e never found any cases alleging that cause of action." (Mot. at 24–25.) In other words, the *Walker* plaintiff consented to dismissal of its aiding and abetting claim only because *it conceded that no such cause of action exists*.

Credit Suisse also demonstrated in its Motion that, even if a cause of action for aiding and abetting did exist (and it does not), the Complaint does not plead the required facts showing that Credit Suisse "knowingly and substantially participated" in the alleged underlying violation. (Mot. at 25–27.) Specifically, the Complaint pleads no facts showing that Credit Suisse (i) knew that QHC lacked sufficient surplus to pay the CHS Distribution in compliance with DGCL § 170, or (ii) substantially participated in the payment of that distribution. (*Id.* at 25–26.) Instead of engaging with Credit Suisse's argument, the Opposition merely regurgitates the Complaint's conclusory allegations that Credit Suisse "knew that the projections had been manipulated," "turned a blind eye" to the supposed manipulation, helped "rais[e] the Spin-Off Debt based on those fraudulent projections," and "sought to erase any record of its participation in the fraudulent scheme." (Opp. at 35.) Under the logic of Credit Suisse's cases (*see* Mot. at 27)—

13

which Plaintiff does not distinguish or counter—those allegations would be insufficient to state a claim for aiding and abetting even if that cause of action existed.

## IV.    THE COMPLAINT FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT AGAINST CREDIT SUISSE.

For the reasons discussed below, the Opposition does not rebut Credit Suisse's showing that the Complaint fails to state a claim for unjust enrichment.  (*See* Mot. at 28–30.)

*First*, Plaintiff does not dispute that the unjust enrichment claim relating to the fees QHC allegedly paid to Credit Suisse for its work on the April 2016 transaction is untimely, but argues only that the statute of limitations should be tolled because CHS and Credit Suisse supposedly concealed the alleged fraud.  (*See* Opp. at 32.)  But as the CHS Defendants demonstrate in their reply brief, tolling is inapplicable because QHC fully litigated these precise issues years ago in its arbitration with CHS.  (*See* CHS Defendants' Reply at 15–16.)

*Second*, Credit Suisse demonstrated that Plaintiff's unjust enrichment claim should be dismissed because the Complaint fails to plead the lack of a governing contract.  (*See* Mot. at 28–29.)  The Opposition does not dispute this, nor does Plaintiff even suggest that QHC would have paid fees absent a contract.  Instead, Plaintiff argues that it is "not aware" whether a contract exists.  (*See* Opp. at 32).  This argument is confusing because Credit Suisse attached to its Motion the April 29, 2016 Credit Agreement between QHC and Credit Suisse (and other banks), which was filed with the SEC and which expressly provides that the "[Credit] Agreement, the Engagement Letter, and the other Loan Documents constitute ***the entire contract*** between the parties relative to the subject matter hereof."  *See* Moss Decl. Ex. F at 133.

Plaintiff further argues that even if a contract did exist (and it does), dismissal would still be unwarranted because "any such contract was entered into at CHS's direction with the intent to perpetrate a fraud." (Opp. at 33.)  But Plaintiff claims not even to know if a contract between

14

QHC and Credit Suisse existed, and so it cannot possibly have alleged in the Complaint (nor did it) that the contract was procured by fraud.  Accordingly, Plaintiff's cases, which involved specific allegations that the contract was procured by fraud, are distinguishable.  (*See id.* (citing *McPadden* v. *Sidhu*, 964 A.2d 1262 (Del. Ch. 2008) (reciting complaint's factual allegations and explaining that "it is the contract, itself, that is the [alleged] unjust enrichment") and *LVI Grp. Invs., LLC* v. *NCM Grp. Holdings, LLC*, 2018 WL 1559936, at *1 (Del. Ch. Mar. 28, 2018) (allegation that plaintiffs "would never have entered into the agreement but for Defendants' falsification of financial statements").)

*Finally*, Plaintiff's argument that Credit Suisse was unjustly enriched because it supposedly participated in CHS's alleged fraud (*see* Opp. at 34) again merely rehashes the Complaint's conclusory allegations and does not even attempt to rebut Credit Suisse's showing that those allegations do not adequately allege any sort of fraud by Credit Suisse.  (*See* Mot. at 6, 27.)  Nor does the Opposition mention, let alone try to distinguish or rebut, Credit Suisse's cases dismissing unjust enrichment claims under similar circumstances.  (*See id.* at 29–30.)

## CONCLUSION

For the reasons above and in Credit Suisse's Motion, the Court should dismiss all the claims against Credit Suisse (Counts 16–23) with prejudice.

15

Dated:  Wilmington, Delaware
        May 2, 2022

**RICHARDS LAYTON & FINGER, P.A.**

/s/ *Robert C. Maddox*
Mark D. Collins (No. 2981)
Robert C. Maddox (No. 5356)
One Rodney Square, 920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
collins@rlf.com
maddox@rlf.com

**CAHILL GORDON & REINDEL LLP**

/s/ *Edward Moss*
Herbert S. Washer
Edward Moss
Joel H. Levitin
John MacGregor
32 Old Slip
New York, New York 10005
(212) 701-3000
hwasher@cahill.com
emoss@cahill.com
jlevitin@cahill.com
jmacgregor@cahill.com

*Attorneys for Defendant Credit Suisse Securities (USA) LLC*

16