# Exhibit 22

Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In Re:                                ) Case No.
                                      ) 20-10766(BLS)
QUORUM HEALTH CORPORATION,            )
et al.,                               ) Chapter 11
                                      )
                Debtor.               )
_____     )
                                      )
DANIEL H. GOLDEN, AS                  )
LITIGATION TRUSTEE OF THE             )
QHC LITIGATION TRUST, AND             )
WILMINGTON SAVINGS FUND               )
SOCIETY, FSB, SOLELY IN ITS           )
CAPACITY AS INDENTURE                 )
TRUSTEE,                              )
                                      )
                Plaintiffs,           )
v.                                    ) Adv. Pro. No.
                                      ) 21-51190 (BLS)
COMMUNITY HEALTH SYSTEMS,             )
INC.; CHS/COMMUNITY HEALTH            )
SYSTEMS, INC.; REVENUE CYCLE          )
SERVICE CENTER, LLC; CHSPSC,          )
LLC; PROFESSIONAL ACCOUNT             )
SERVICES, INC.; PHYSICIAN             )
PRACTICE SUPPORT, LLC;                )
ELIGIBILITY SCREENING                 )
SERVICES, LLC; W. LARRY               )
CASH; RACHEL SEIFERT; ADAM            )
FEINSTEIN; AND CREDIT SUISSE          )
SECURITIES (USA) LLC,                 )
                                      )
                                      )
                Defendants.           )
_____     )

VIDEOTAPE DEPOSITION OF:
LARRY CASH, Corporate Representative
Taken on behalf of the Plaintiffs
October 10, 2024

Page 2

APPEARANCES:

For the Plaintiffs:
Deborah Newman, Esq.
Kenneth B. Hershey, Esq.
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Deborahnewman@quinnemanuel.com
Kenhershey@quinnemanuel.com

For the CHS Defendants and Larry Cash:
Gary A. Orseck, Esq.
Jack A. Herman, Esq. (Remote)
KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP
2000 K Street NW
4th Floor
Washington, DC 20006
Gorseck@kramerlevin.com
Jherman@kramerlevin.com

For Quorum Health Corporation:
H. Peter Haveles, Jr., Esq.
AKERMAN, LLP
1251 Avenue of the Americas
37th Floor
New York, NY 10020
Peter.haveles@akerman.com

For the Defendant Credit Suisse:
Edward Moss, Esq.
CAHILL, GORDON & REINDEL, LLP
32 Old Slip
New York, NY 10005
Emoss@cahill.com

For Defendant Adam Feinstein:
Marc B. Kramer, Esq.
Shane Kunselman, Esq. (Remote)
ROLNICK KRAMER SADIGHI, LLP
1251 6th Avenue
New York, NY 10020
Mkramer@rksllp.com
Skunselman@rksllp.com

Page 3

Also Present:

Russell Baldwin, Esq.
CHSPSC, LLC
4000 Meridian Blvd
Franklin, Tennessee 37067

Sam Karotkin, Esq.
PIPER SANDLER
1251 Avenue of the Americas
Sixth Floor
New York, NY 10020
Samuel.karotkin@psc.com

David Drummel - Videographer

Page 4

                    I N D E X
                         Page/Line
THE WITNESS:  LARRY CASH
EXAMINATION BY MS. NEWMAN            11   6
EXAMINATION BY MR. HAVELES           389  6


            INDEX OF EXHIBITS
Exhibits         Description           Page/Line
Exhibit 1    8/4/2015 CYH - Q2 2015        17   10
             Community Health Systems,
             Inc. Earnings Call, QHC
             30125 to 30142

Exhibit 2    8/26/2015 E-mail Chain        45   7
             with Attachment, CHSG
             577848 to 577868

Exhibit 3    11/3/2015 E-mail Chain        69   6
             with Attachment, CHSG
             581745 to 581748

Exhibit 4    8/25/2015 E-mail Chain,       75   10
             CHSG 228692 to 228705
Exhibit 5    3/9/2016 E-mail Chain         80   8
             with Attachment, CHSG
             115652 to 115657
Exhibit 6    11/15/2015 E-mail Chain,      102  8
             CHSG 116945

Exhibit 7    11/23/2015 E-mail Chain       107  12
             with Attachment, CHSG
             70108 to 70110

Exhibit 8    Excel Spreadsheet            119   1

Page 5

Exhibit 9    11/24/2015 E-mail Chain       123  14
             with Attachment, CHSG
             232725 to 232738
Exhibit 10   11/23/2015 E-mail Chain,      124  23
             CHSG 17820

Exhibit 11   4/1/2016 E-mail with          142  7
             Attachment Amendment No.
             6 to the Quorum Health
             Corporation Form 10, CHSG
             239203 to 239414

Exhibit 12   February 3, 2016 E-mail,      154  17
             CHSG 496183 to 496193
Exhibit 13   12/31/2015 QHC Management     167  14
             Fee Testing- Allocation
             Methodology, Tab 15 -  DT
             1285

Exhibit 14   3/6/2016 E-mail Chain         172  25
             with Attachment, QHC
             17443 to 17444

Exhibit 15   3/6/2016 E-mail Chain,        183  25
             CHSG 499753
Exhibit 16   1/15/2016 E-mail with         186  2
             Attachment, CHSG 582063
             to 582068
Exhibit 17   QHC Pro Forma Analysis        194  22
             TSA Agreements, DT 15 to
             21
Exhibit 18   Excel Spreadsheet            195   8
Exhibit 19   4/5/2016 E-mail Chain         199  7
             with Attachment, CHSG
             47948 to 47949
Exhibit 20   Excel Spreadsheet            199  10
Exhibit 21   4/28/2016 E-mail Chain,       201  21
             CHSG 497480 to 497490 and
             CHSG 259966 to 259973

2 (Pages 2 - 5)

Page 6

Exhibit 22  8/23/2015 E-mail Chain,   240   1
  CHSG 711719 to 711754

Exhibit 23  8/23/2015 E-mail Chain,   248   13
  CHSG 711755 to 711756

Exhibit 24  8/24/2015 E-mail Chain,   255   15
  QHC 101085

Exhibit 25  8/25/2015 E-mail Chain,   258   1
  QHC 101495

Exhibit 26  11/20/2015 E-mail Chain,   259   1
  CSSU_QUORUM_5778 ti 5780

Exhibit 27  8/14/2015 E-mail Chain   262   17
  with Attachment, CHSG
  34604 to 34610

Exhibit 28  4/23/14 Community Health   274   1
  Systems Major Capital
  Projects Review,
  Springfield, OR Master
  Planning Project, CHSG
  370526 to 370542

Exhibit 29  August 26, 2015 E-mail   282   19
  Chain, CHSG 34423

Exhibit 30  4/6/2016 E-mail with   285   9
  Attachment, CHSG 114630
  to 114636

Exhibit 31  12/1/2015 E-mail Chain,   289   5
  QLT 31574

Exhibit 32  11/15/2015 E-mail Chain,   313   9
  CHSG 118835 to 118837

Exhibit 33  11/16/2015 E-mail Chain   318   24
  with Attachment, CHSG
  45520 to 45522

Exhibit 34  6/29/2015 E-mail Chain   339   11
  with Attachment, QHC
  98916 to 98977

Exhibit 35  8/26/2015 E-mail Chain,   345   11
  CHSG 417807 to 417812

Page 7

Exhibit 36  11/11/2015 E-mail Chain,   357   6
  QHC 85978

Exhibit 37  11/18/2015 E-mail, CHSG   361   8
  692223 to 692224

Exhibit 38  1/27/2016 E-mail with   362   25
  Attachment, CHSG 582143
  to 582146

Exhibit 39  2/23/2016 E-mail Chain   364   25
  with Attachment, CHSG
  499750 to 499752

Exhibit 40  2/23/2016 E-mail, CHSG   369   7
  499749

Exhibit 41  3/3/2016 E-mail Chain,   372   21
  CHSG 711762 to 711764

Exhibit 42  3/23/2016 E-mail, CHSG   376   21
  692220

Exhibit 43  4/24/2016 E-mail Chain   379   13
  with Attachment, QHC
  35897 to 35899

Exhibit 44  Action by Written Consent   381   16
  in Lieu of a Meeting of
  the Board of Directors of
  Quorum Health Corporation
  Document, CHSG 711333 to
  711340

Exhibit 45  5/2/2016 E-mail, CHSG   387   3
  499767

Page 8

The video deposition of LARRY CASH, Corporate Representative, was taken by counsel for the Plaintiffs, on October 10, 2024, commencing at 9:11 a.m., in the offices of Bass Berry & Sims, PLC, 150 Third Avenue South, Suite 2800, Nashville, Tennessee, for all purposes under the Federal Rules of Civil Procedure.

The formalities as to notice, caption, certificate, et cetera, are not waived. All objections, except as to the form of the questions, are reserved to the hearing.

It is agreed that Carissa L. Boone, being a Notary Public and Court Reporter, may swear the witness, and that the reading and signing of the completed deposition by the witness are not waived.

* * *

Page 9

THE VIDEOGRAPHER: Good morning. We're going on the record at 9:11 a.m. on October 10th, 2024.

Please note that the microphones are sensitive and may pick up whispering and private conversations. Please mute your phones at this time.

This is Media Unit 1 in the video-recorded deposition of Larry Cash in the matter of In Regards to Quorum Health Corporation Litigation filed in the United States Bankruptcy Court, District of Delaware, Case No. 2010766-BLS.

The location of this deposition is Bass, Berry & Sims located at 150 3rd Avenue South in Nashville, Tennessee.

My name is David Drummel. I'm the videographer. The court reporter is Carissa Boone-Stephens. We're with Veritext.

Counsel, please state your appearances for the record, which will then be followed by the swearing of the witness by the court reporter.

3 (Pages 6 - 9)

Page 10

MS. NEWMAN:  Deborah Newman from Quinn Emanuel on behalf of the Plaintiffs.  Oh, and I'm here with my colleague Ken Hershey.

MR. HAVELES:  Peter Haveles of Akerman on behalf of Plaintiff Intervenor Quorum Health Corporation.

MR. KRAMER:  Marc Kramer, Rolnick Kramer Sadighi, on behalf of Adam Feinstein, with my colleague Shane Kunselman.

MR. ORSECK:  Gary Orseck for the CHS Defendants and the witness Larry Cash.

MR. MOSS:  Edward Moss from Cahill for Credit Suisse.  And with me is my colleague Elizabeth Wiseman, also from Cahill, also for Credit Suisse.

MR. ORSECK:  Would the other folks in the -- in the room identify themselves, please?

MR. BALDWIN:  I'm Russ Baldwin, in-house counsel at Community Health Systems.

MR. KAROTKIN:  Sam Karotkin,

Page 11

Piper Sandler.

LARRY CASH, having been first duly sworn, was examined and testified as follows:

THE WITNESS:  Yes, I do.

EXAMINATION

BY MS. NEWMAN:

Q.    Okay.  Great.

Good morning, Mr. Cash.  I'm Deborah Newman from Quinn Emanuel.  We met before the deposition.

I know you've been deposed before, so I'm not going to spend a lot of time going over the ground rules here.  I'm sure you're familiar with them, but I will just note a few to refresh your recollection.

If I ask you a question and you don't understand it, please let me know.  If you don't let me know that you don't understand my question, I will assume that you do.

Please, for the purpose of the court reporter and the -- and the transcript, let me finish my question before you begin to answer, and I'll endeavor to let you finish your answer before I speak.

Page 12

Please give oral responses, again for the -- for the transcript.  And you may hear objections from your counsel today.  Unless you are instructed not to answer, you must still go ahead and answer the question.

Is anything I've said problematic for you or -- or unclear?

A.    No, it's not.

Q.    Okay.  One other thing.  If you need a break at any time, please let me know.  I would just ask that you go ahead and finish any question that may be pending, and then we'll try to accom- -- accommodate your request.

A.    Thank you.

Q.    I'm going to show you a series of e-mails today.  If you are a recipient or a sender of the e-mail or copied on it, then I'm going to assume that you previously received the e-mail, unless you tell me that you don't think that you have.

Is that okay?  Do you understand that?

A.    Yes.

Q.    Okay.  And if -- and if you -- and if I show you an e-mail in which you are the

Page 13

sender or a recipient or are copied and -- and you believe that you've -- you've never received that e-mail, you'll let me know.

Is that okay?

A.    Yes.

Q.    Okay.  Great.

Mr. Cash, is there any reason that you would be unable to testify accurately and honestly today?

A.    No.

Q.    Okay.  What did you do to prepare for today's deposition?

A.    I went back and skimmed through the previous testimony that was done at various times.  And then I also had some meetings with some counsel, in-house counsel and external counsel.

Q.    Okay.  What previous testimony did you look at?

A.    April of '18, a deposition.  Then there's an arbitration in the summer of '18.  And there was some litigation in summer of '19 dealing with some debt holders.

Q.    Okay.  And this -- the litigation in the summer of '19, is that the securities class

4 (Pages 10 - 13)

Page 14

action litigation that you're referring to?

A. It's R2 and Zick (phonetic), I believe is the names of the -- R2 and Zick were the names of the two --

Q. Got it.

A. -- Plaintiffs.

Q. Okay. Thank you.

How often -- when you say you met with in-house counsel, is -- is that in-house counsel in the room today?

A. Yes.

Q. Okay. Can you identify him, please?

A. Mr. Gary Orseck here and Russell Baldwin.

MR. ORSECK: She asked you in- -- in-house counsel.

THE WITNESS: Oh, in-house counsel. Russell Baldwin.

BY MS. NEWMAN:

Q. Okay. And external counsel, who did you meet with?

A. Gary Orseck and also Jack Herman.

Q. Okay. Did you --

A. But I did -- I didn't meet with

Page 15

Mr. Herman, but he was on the phone call.

Q. Okay. Other than Mr. Baldwin, Mr. Orseck, and Mr. Herman, did you meet with anyone else?

A. No. I met with no other counsel.

Q. Okay. Did you meet with someone other than counsel?

A. I did run into Alfred, the CFO of Ardent at a -- at a social event Monday night and happened to mention that I was doing a deposition, and he mentioned he was the -- he was going to go to a healthcare conference, but he had a deposition. So we just happened to have a few drinks together, along with 25 other people.

And then there was some questions from the lawyers about how some acquisitions were handled, and I believe that we kept our accounts receivable and a lot of our divestitures -- I said acquisitions; I meant divestitures -- and I confirmed that with a -- a gentleman who's in charge of accounts receivable at Community Health.

Q. Okay. And what's the name of that gentleman?

A. Mike Lynd.

Q. Mike Lynd. Okay.

Page 16

A. And -- and then at times, people would ask me to do something socially or play golf or something, and I -- I would mention I've got a deposition coming up. No more than just -- nothing about the deposition, other than it was....

Q. Okay. And what was the question about how acquisitions were handled?

A. I meant divestitures.

Q. Excuse me, divestitures.

A. When we sold divestitures, the practice had been generally to sell it, the assets and inventory, for a sales price and -- and then we would keep the receivables and maybe a few liabilities, which would be extra compensation and extra cash we would get when we collected that. And that was the question.

Q. Extra compensation. You mean you're -- you're treating the -- the receivables that were on the books from the hospitals that were sold? That's what you're referring to --

A. Yes.

Q. -- as extra compensation?

A. Yeah.

Q. Okay. We'll talk about that a

Page 17

little bit later.

MS. NEWMAN: All right. Tab 4, please.

MR. HERSHEY: I'm going to introduce this on realtime first. Or through Exhibit Share, sorry.

MS. NEWMAN: Oh, don't worry about that.

Yes, Cash 1.

(Exhibit 1 was marked.)

MS. NEWMAN: Oh, and we need one more for Mr. Orseck.

MR. HERSHEY: Oh, Gary.

MR. ORSECK: Thanks.

BY MS. NEWMAN:

Q. Okay, Mr. Cash, can I ask you to turn to the attachment, please?

A. Okay.

Q. Have you seen this document before?

A. Yes. This is a recap of Ardent's transcript.

Q. Okay. And you participated in this call, correct?

A. Correct.

5 (Pages 14 - 17)

Page 18

Q. Okay. If you turn to page 3 of the transcript, please. Ms. [sic] Wayne Smith is listed here. He was the CEO of CHS at the time of this call; is that correct?

A. That's correct.

Q. Okay. And in the third paragraph of the transcription of his speaking, he says: "Quorum is expected to have an enhanced ability to drive growth by capitalizing on acquisition opportunities consistent with its portfolio."

Do you see that?

A. Yeah.

MR. ORSECK: I -- I don't, I'm sorry.

MS. NEWMAN: It's in the third paragraph at --

MR. ORSECK: On page 3?

THE WITNESS: Second sentence.

BY MS. NEWMAN:

Q. Yes. On page 3, the second sentence.

MR. ORSECK: I see.

MS. NEWMAN: Okay.

THE WITNESS: Yes, I see that.

BY MS. NEWMAN:

Page 19

Q. Okay. And that's something that QHC was -- oh, let me actually take a moment.

I'm going to refer to Quorum as "Quorum" or "QHC" today. You'll know what I'm talking about, right?

A. Correct.

Q. Okay. Capital- -- excuse me.

Capitalizing on acquisition opportunities is something that QHC was never actually able to do; is that right?

A. That's correct.

Q. Okay.

A. Well, they never did any acquisitions. They probably had some opportunities to do it with seller financing or stock or -- or maybe getting some help from a private equity fund, but they did not do any acquisitions, that I'm aware of, for at least the first couple of years.

Q. Okay. And you think during the first couple of years that they could have obtained seller financing or gotten private equity financing acquisitions?

A. I -- I don't know if they ever tried, but I -- I know we did some seller

Page 20

financing in our history when we were private.

Q. And when you say "we," you -- are you referring --

A. Community Health -- Community Health Systems.

Q. Okay. Okay. Can you turn to page 7, please.

A. (Witness complies.)

Q. Okay. Can you see that there's a -- a name, A.J. Rice, listed there?

A. Correct.

Q. Okay. And you see that he is asking -- I'm looking at the first line under his name. He's asking about "the disparity we continue to see between the volume trends in the urban markets versus the nonurban markets," and says that was "again pronounced this quarter."

Do you see that?

A. Yes.

Q. Okay. Do you remember what the volume trends were for urban hospitals versus nonurban hospitals in the second quarter of 2015?

A. What I remember about the second quarter of 2015 was that the HMA hospitals, which was an acquis- -- large acquisition we'd done in

Page 21

2014, their volume was -- performance was much less than the original CHS hospitals, other than HM- -- other than HMA.

Q. Okay. That's interesting.

But what I'm asking about is if you remember about the performance of urban hospitals versus nonurban hospitals in -- in the second quarter of 2014.

MR. ORSECK: 2015, you mean?

THE WITNESS: 2015.

BY MS. NEWMAN:

Q. 2015, excuse me.

A. I don't remember specific numbers. I don't remember the numbers sitting here today, recalling it specific.

Q. Okay. Do you remember trends?

A. Excuse me, trends?

Q. Trends.

A. Some trends, yes.

Q. What is it that you remember about the trends in volume in nonurban hospitals versus urban hospitals?

A. I believe the unemployment growth had grown some in the -- some of our markets.

Q. Which -- which markets?

6 (Pages 18 - 21)

Page 22

A.    (Witness reviews document.)

Q.    Sir, I'm just asking you what you remember sitting here, not what your -- not what your recollection is --

A.    Yeah, yeah.

Q.    -- refreshed from looking at the document.

MR. ORSECK:  Object to form.

THE WITNESS:  That --

MR. ORSECK:  You should read whatever you think you need to read.

THE WITNESS:  That a couple of things were happening.  The economy wasn't as strong, I believe, as I recall, in 2015.

Second, the managed care was a little bit more challenging in '15 than it was in prior periods.

But those are a couple of trends I remember.  The main trend why our volume was not as good as it was was the declining volume or the less than CHS volume for the HMA hospitals.  That's the main thing I remember.

BY MS. NEWMAN:

Page 23

Q.    Okay.

A.    I think that's in one of our slides in our slide presentation, which I don't think you have attached here.

Q.    Okay.  Mr. Rice goes on to ask -- and this is in the -- it starts in the penultimate line, but continues to the last line of that first blurb under his name.  And he asks:  "If it's just the nature of the markets, particularly on the inpatient" sign [sic] -- "side, that the urbans will grow faster than the nonurban."

Do you see that?

A.    Yes.

Q.    Okay.  And you answer:  "You always have a little bit of -- more of a movement from inpatient to outpatient in the smaller markets that are nonurban markets because of the change in technology and the activity going on."

Do you see that?

A.    Yes.

Q.    Okay.  Was that an accurate statement by you?

A.    Yes.

Q.    Okay.  And what is the difference between inpatient and outpatient from a revenue

Page 24

perspective for a hospital?

A.    Primarily, the -- you're talking about surgery here and inpatient surgery.  For Medicare, the reimbursement is a little bit higher than it is on outpatient.  On managed care, they're fairly close reimbursement, maybe a little bit of difference.  And that would be the primary difference, that -- that I remember.

Q.    Okay.  Putting aside the reimbursement rates, are inpatient surgeries more expensive to patients than outpatient surgeries?

A.    Well, that's what I meant by "rates," inpatient rates, being inpatient revenue for an inpatient surgery could be, especially for Medicare, a little bit better than it is on -- on the outpatient side.

Q.    Okay.  Please turn to the next page.

A.    (Witness complies.)

Q.    Okay.  I'm looking at the second blurb of text where Ms. [sic] -- Mr. Smith is talking.

Do you see that?

A.    Yes.

Q.    Okay.  And he says, beginning in

Page 25

the second line:  "Because of the rate of growth, we have not properly enhanced deployment of capital in the small markets."

Do you see that?

A.    Yes.

Q.    Okay.  Does the reference to small markets there refer to the hospitals that were going to become part of QHC?

A.    Well, some of -- I think -- a large percentage of the QHC hospitals would be nonurban markets, which I think that's what he's referring to in -- smaller.  CHS kept a -- a fair amount of smaller markets that were part of a network if they were in an area or state that we considered a network.

So, yes, QHC had 80-some-odd percent, roughly, in nonurban markets, but CHS probably ended up keeping some 40 or 50 percent of its hospitals in nonurban markets.

Q.    Okay.  And the nonurban markets are the smaller markets?

A.    That -- that's the reference here I think he's talking about.

Q.    Okay.

A.    And, of course, he's talking

7 (Pages 22 - 25)

Page 26

about some new services that can be available in those markets.

Q.   Okay.  You then say below that: "The margin will improve when the Quorum Health Corporation hospitals are removed."

Do you see that?

A.   Yes.

Q.   Okay.  And that's because the Quorum hospitals had lower margins than the CHS hospitals, right?

A.   That's correct.

Q.   Okay.  You say next that: "When you look at capital allocations, the higher margins would generally get a little bit more of the capital because there's a little bit of assured return.  There's generally a bit more managed care business that would be there."

Do you see that?

A.   Yes.

Q.   Okay.  Is -- is managed care business patients that are covered by private insurance?

A.   Correct.

Q.   Okay.  Do the urban hospitals typically have more managed care patients than

Page 27

rural hospitals do?

A.   A little bit more.  Not substantially more, but a little bit more.

Q.   Okay.  Is man- -- managed care business generally more profitable than other types of business?

A.   Yes.

Q.   Okay.  And you were saying here that historically, CHS's high-margin hospitals got a greater percentage of capital allocation than the lower-margin hospitals, right?

A.   Correct.

Q.   Okay.

A.   Just -- just would add that CHS has all kind of different margins per hospital, some high, some low.  QHC had lots of margins, some high and some low.  Even though the average was 12 percent, they had a fair amount of hospitals much greater than 12 percent.  But they also had some that brought it down to 12 percent.

Q.   You said they had a -- they had -- one second.  "They had a fair amount of hospitals much greater than 12 percent."

Do you remember how many hospitals greater than 12 percent margin QHC had?

Page 28

A.   Not specifically.  I know we added some after we -- there was a spinoff we started in 2010.  I know we added a couple of nice hospitals between that spinoff, CP1 and CP2.  We added one in Marion, Illinois of 25 percent margin and -- or better, and then we added one in Springfield, Oregon.  Both of them was -- one was $200,000 million in revenue and one was 110-.

Q.   Okay.  But when you say that QHC had a fair amount of hospitals much greater than 12 percent, do you remember what percentage was greater than --

A.   Not -- no --

Q.   -- 12 percent?

A.   No.  I just know that there was hospitals in Tooele and Evanston.  Tooele, Utah and Evanston, I remember.  And if I had a list, I could probably identify those, but I don't remember specifically how many.

Q.   Okay.  Turning back to what you were saying here on page 8 of the transcript, you were basically saying that the CHS hospitals had more of the more profitable managed care business than the Quorum hospitals, right?

MR. ORSECK:  Object to form.

Page 29

THE WITNESS:  The managed care revenue was a little bit higher than the QHC hospitals.  And -- and then the other thing that QHC hospitals -- it had a -- its revenue, I think, 78 percent was in Medicaid expansion states under the Affordable Care Act --

BY MS. NEWMAN:

Q.   Uh-huh.

A.   -- and about twice of what CHS was.  So you ended up with a little bit more Medicaid business, which would drive the percentage of managed care down.  Because as you had Medicaid expansion, you had more Medicaid business.

Q.   Looking at the next page -- and I'm focussed on the Whit Mayo text.

Do you see that?

A.   Yes.

Q.   Okay.  And he asks towards -- he asks how you plan on capitalizing Quorum.

Do you see that, in the first line?

A.   Yes.

Q.   Okay.  And you respond: "The

8 (Pages 26 - 29)

Page 30

plan would be that they will go do that road show themselves, and the management team will raise financing and it will be attractive financing."

Do you see that? It's the first line in your response.

A. Yes.

Q. Okay. The management team that you were referring to there was -- was Mr. Culotta and Mr. Miller; is that right?

A. And Mr. Doucette.

Q. And Mr. Doucette, okay.

Mr. Culotta and Mr. Miller and Mr. Doucette didn't decide what Quorum's capital structure would be, did they?

A. No. We had advice from Credit Suisse, and we generally followed the advice from Credit Suisse on the capital structure.

Q. Okay. And that -- that -- that decision about the capital structure was generally based on conversations that happened between you and Credit Suisse, right?

A. I had conversations with Credit Suisse. Credit Suisse also made a presentation to our board in July 2015. And also Mike Culotta and Jim both talked to Credit Suisse about the

Page 31

financing and the capital structure. But the decision was ultimately made by the board.

Q. Okay. And Mr. Culotta and Mr. Miller didn't create the QHC projections that were created in connection with the spinoff, did they?

A. Say that again, please.

Q. Mr. Culotta and Mr. -- Mr. Miller and Mr. Doucette, they didn't create the QHC projections that were created in connection with the spinoff?

A. That -- that's not correct.

Q. No, that's not correct?

A. Jim Doucette, it's done in his department under his supervision, and Mr. Culotta had massive input into the projections.

Q. Massive input? Okay.

A. Or -- or reasonable input. I don't -- I think "massive" is too big a word. But he had reasonable input. And specifically he had a strategy of "Let's divest some of the smaller hospitals and try to raise cash that way."

Q. Okay. And the -- but the projections were primarily created by -- by Lee Fleck at CHS --

Page 32

A. Lee Fleck --

Q. -- is that right?

A. -- was a --

MR. ORSECK: Object to form.

THE WITNESS: Lee Fleck was a director working for Jim Doucette, and Lee had done almost all the models for large transactions like Triad and HMA.

BY MS. NEWMAN:

Q. Okay. For purposes of the record and making sure that the record is clear, I'm going to refer to those projections today, and when I say "the projections," I mean the projections that were created in connection with the spin and shared with the ratings agencies and -- and banks. I'm going to -- and -- and used for purposes of the solvency opinion in the spin.

I'm going to just refer to those today as "the projections," okay?

A. Okay.

Q. If I'm referring to some other projections, I'll make that clear.

MR. ORSECK: Deb, since -- since we're clarifying for the record, are you -- when you say "projections," are you

Page 33

going to be referring to -- to those that were made publicly available or those --

MS. NEWMAN: No.

MR. ORSECK: -- that were made publicly and available to private lenders as well?

MS. NEWMAN: When you say "publicly available," you'll -- you're talking about the 2016 guidance?

MR. ORSECK: No, I'm not talking about the guidance. There are -- there are two parts to the projections that were treated differently.

We -- we can discuss it off the record.

MS. NEWMAN: Sure.

MR. ORSECK: I just --

MS. NEWMAN: Yeah.

MR. ORSECK: -- don't want there to be confusion.

MS. NEWMAN: I'm talking about the -- the model that Mr. Fleck prepared and the projections then that were shared with ratings agencies, banks that

9 (Pages 30 - 33)

Page 34

were private. Talking about private projections, private side projections.

MR. ORSECK: Okay. That was my question.

MS. NEWMAN: I'm not aware of any public side projections, but we can talk about that off the record.

BY MS. NEWMAN:

Q. And -- and let's actually be clear about this, Mr. Cash. The -- those projections were provided to the banks that underwrote the financing for the spin; is that right?

A. I -- I know they're provided to Credit Suisse. I believe the other banks also received them.

Q. Okay. If those projections had shown that QHC was going to be insolvent after raising the debt that financed the spinoff or wouldn't be able to service that debt, then QHC wouldn't have been able to raise that financing, right?

A. Well, that's a hypothetical, and I don't believe it was -- they were in an insolvent situation. But if it -- they had excess

Page 35

assets over the liabilities at the time of the spin, and -- and also in December of 2015, when Duff & Phelps did the original solvency work.

Q. But, Mr. Cash, you have a lot of experience in financing transactions, right?

A. Some.

Q. Okay. And -- and I'm asking you a hypothetical, which is: If those projections had shown that the company wasn't going to be insolvent after incurring the debt or not able to service the debt, then the spinoff would not have been able to have been consummated; is that right?

MR. ORSECK: Object to form.

THE WITNESS: In a hypothetical situation, I don't think we would've tried to do a transaction if the projections -- but you sort of got to look at the history of QHC. It was 2012 and 2013 and had about $190 million of EBITDA. EBITDA is the primarily [sic] financial indicator that's used in looking at projections.

And then in 2014 and '15, it had $250 million and $265 million. And so it -- it was -- it had a pretty strong

Page 36

financial position at the time that the projections were being done.

BY MS. NEWMAN:

Q. Okay. I'm going to ask my question again.

A. Okay.

Q. I'm going to ask that you answer my question, which is: If the projections that had been given to Credit Suisse and other banks that underwrote the spinoff had shown that QHC was going to be insolvent or unable to service its debt following the spinoff, the spinoff would not have been able to have been consummated; is that right?

A. Under your --

MR. ORSECK: Object to -- wait. Wait one second. Objection to form.

THE WITNESS: Yeah. Under your hypothetical, you're -- you are correct that that's what that showed.

BY MS. NEWMAN:

Q. Okay.

A. That's not what the projections showed, but correct.

Q. No. It's not what these

Page 37

projections showed, that's true.

And, in fact, Credit Suisse told you that not only did the projections need to show that QHC would be solvent and adequately capitalized following the spin transaction, but those projections also needed to show a certain amount of debt paydown; is that right?

A. Well, I had heard there was a certain amount of debt paydown. I'm not exactly for sure what that debt paydown cons- -- I think our projections through 2020 had about 46 percent of the debt paid off. But I -- I don't know what -- I don't know exactly what the benchmark was that Credit Suisse used.

Q. Okay. But you knew that there was a benchmark?

A. That there was some benchmark.

Q. I'm just going to remind you: I know it's not a -- a natural way of speaking, but you have to let me finish --

A. Sorry.

Q. -- for purposes of the record.

You knew that there was a benchmark of debt paydown that the projections needed to show in order for the spinoff to be

10 (Pages 34 - 37)

Page 38

consummated, correct?

A.   I -- I -- yes.

Q.   Okay.  Did you know that that was because of a Federal bank- -- banking rest- -- regulation?

A.   I knew there was some change in regulations that required that.

Q.   Okay.  Please turn to page 11.

And let me ask you a question, actually, that I should have asked at the beginning, which is:  You and Mr. Smith obviously endeavored to be as accurate and truthful as possible when speaking on this call, correct?

A.   Correct.

Q.   Okay.  At the top of the page, Mr. Smith says -- and he's talking about physician recruiting, and he says:  "It just takes a while to go through this process and get people lined up and get them working."

Do you see that?

A.   Correct.

Q.   Okay.  And is -- is that consistent with your understanding of physician recruiting?

A.   It does take a little while for

Page 39

physicians to be fully productive.

Q.   Okay.  And does it take a little while to both recruit them, and then once they're recruiting [sic], for them to be fully productive?

A.   Yes.  But we're -- you're doing recruiting every year.  So it's sort of like recruiting for a -- a basketball team.  You're always recruiting because you're going to need people coming into the next year when people are....

Q.   Okay.  And why is it that it takes time to get a -- a physician fully up and running once recruited?

A.   They're -- they're coming new to the market, and you've got to introduce them to the -- to the community they're in.  You've got to make sure they've got a provider number.  You got to make sure they get into the managed care contracts that you want to get into.  And then you probably have to introduce them to other physicians who may refer business to them, things of that nature.

Q.   Okay.  And -- and do you have a view as to how long that generally takes?

A.   Generally, somewhere under six

Page 40

months they could -- they should be able to be reasonably productive.  We would do some income guarantees.  And often sometimes under six months, they -- they'd be at a level that they didn't need any money from the income guarantees.

Q.   And can you just explain to me what an income guarantee is?

A.   Yeah.  You're guaranteeing them that they will reach a level to get $10,000 a month, and it may take them a few months after starting to get to that $10,000 a month.  And once they get that, we don't have to make up the difference for them.

Q.   So, essentially, you're just guaranteeing that they'll make a certain amount of income regardless of --

A.   Right.

Q.   -- the volume of patients that they see?

A.   Correct, correct.

Q.   Okay.  Does it take longer to recruit people to nonurban hospitals than it does to urban hospitals?

A.   It would --

MR. ORSECK:  Object to form.

Page 41

THE WITNESS:  It -- it could take a little longer.  It's not quite as -- you know, if -- if some physician is interested in arts and opera, some of these communities quite don't have the -- that kind of appeal.  But they're -- they're nice communities to live in, but it can take a little bit longer.

BY MS. NEWMAN:

Q.   Okay.  Please turn to page 13.

A.   (Witness complies.)

Q.   Okay.  There's a question about CapEx from Joshua Raskin towards the bottom of the page.

Do you see that?

A.   Yes.

Q.   And he asks if you guys have a target investment.

Do you see that?

A.   Yes.

Q.   Okay.  And you say:  "We try to spend around 5 percent of revenue."

Do you see that?

A.   Yes.

Q.   Okay.  And -- and that was the

11 (Pages 38 - 41)

Page 42

target revenue that CHS tried to spend on CapEx; is that right?

A. Yes. And I think I commented that last year we spent a little less than that, so....

Q. Okay. Do you know what the capital expenditure was as a percentage of revenue for the Quorum hospitals in 2014 and 2015?

A. It was probably around 3, 3 to 4 percent.

Q. 3 to 4, you think?

A. Yeah. And then the -- we had some maintenance capital. I know we did an Emergency Room late in '15 after we had announced the spin. We -- if a project came up from a QHC hospital, we would refer it back to the new management to decide if they wanted to do that project or some other projects. So that may have slowed down some of QHC's spending in the latter part of 2015 or '16.

Q. What do you mean when you say "We would refer it back to the new management to decide if they wanted to do that project or some other project"?

A. Yeah. If -- if a project came

Page 43

in, say it was an Emergency Room for a hospital in Illinois, we didn't think that the hospitals were split up in different divisions. And if a Division President, other than either Marty Smith or Tom Miller, who were two of the ones going to Quorum, if they were being managed by a different Division President, we didn't think he should make a decision for Tom Miller at the time.

And so Marty Smith, who was in charge of capital, Senior VP there, he would refer that project over to some of the management at QHC and say: Do -- do y'all want to do this project now or do you want to wait and do it at a later date? And whatever they decided is how we'd probably handle that for large projects.

Q. Sir, are you testifying that -- that Tom Miller could have said, yes, we want to do this now and CHS would have spent the capital at that time?

A. If -- if we had the -- now, once it's approved, it takes a little while to go get different approvals or drawings or things like that. But if Tom Miller found something he wanted to do and he let Marty know that, it would go in the pipeline to get done.

Page 44

Q. Are you testifying that there were projects between late 2015 and the spinoff where new projects that -- where capital was allocated -- or, excuse me, spent by CHS --

A. A --

Q. Let me finish my -- my question, please. I'm going to start over.

Are you testifying that there were projects between late 2015 and the spinoff where new projects were funded by CHS capital in that period?

A. There were some projects that I'm sure got approved. I don't know if the funding took place or not, depending on what kind of approvals you need after the corporate management approved something.

Q. Okay.

A. I know we spent some money on Springfield.

Q. In 2015?

A. Either 2015 or 2016.

Q. Okay. Do you know what the capital expenditure was projected to be as a percentage of revenue in each year of the Quorum projections?

Page 45

A. It was a little bit less than the 5 percent. There was a little bit more capital spend in '17 and '18, because you had the Springfield Tower project done, which was quite expensive. And then it dropped off a little bit in '19 and '20.

(Exhibit 2 was marked.)

BY MS. NEWMAN:

Q. Okay. Mr. Cash, you've just been handed what's been marked as Cash Exhibit 2. The bottom e-mail is an e-mail from Julie Coffman at Bain to Mr. Smith. And Ms. Coffman says: "We look forward to seeing you tomorrow afternoon to give you an update on our work with CHS to date."

Do you see that?

A. Yes.

Q. Okay. What work is Ms. Coffman referring to?

A. We asked Bain Capital to come in and do a -- a consulting project looking at various elements of their company and give us their thoughts about how we could operate the company maybe a little bit better.

Q. Okay. Please turn to the attachment.

12 (Pages 42 - 45)

Page 46

A.   (Witness complies.)

Q.   Do you recall seeing this document before?

A.   I -- I'm sure I've seen it.  I don't -- I don't recall it right offhand, but I do recall it.  I -- since it says I received it, I'm sure I received it.

Q.   Okay.  Did -- did Bain go through this document with you and Mr. Smith?

A.   I don't know if we had a sit-down with Mr. Smith on this document or not.

Q.   Okay.

A.   It -- it says -- sometimes people may walk in with a document, and all of a sudden they just start talking and you end up going through the presentation without turning each page of the document, so....

Q.   Okay.  Please turn to page 4.

A.   (Witness complies.)

Q.   Okay.  At the top, it says: "CHS's same store growth gap is driven by an adjusted admissions decline.  Net revenue adjusted admissions growth has been ahead of most peers."

Do you see that?

A.   Yes.

Page 47

Q.   Okay.  And the graph in the middle of the page shows that CHS had a decline in adjusted admissions between 2010 and 2014, right?

A.   Yes.

Q.   Okay.

A.   Well -- yes, it shows a 5 percent decline.

Q.   Okay.  And the chart on the left shows that this resulted in CHS having lower same store net revenue growth than its peers, right?

A.   Yes, that's what the chart shows.

Q.   Okay.  If you turn to page 5, at the top it says: "CHS's volume trends are driven both by the performance of its markets and its share performance within those markets."

And then below that in the first bullet on the left -- do you see where I'm looking at, under Key Insights? It says: Majority of lowest performing hospitals on volume in then CHS portfo- -- portfolio are sma- -- smaller and more rural.

Do you see that?

A.   Yes.

Q.   So this is saying that CHS's smaller and more rural hospitals were generally

Page 48

the lowest-performing hospitals on volume in the CHS portfolio.  Is that right?

MR. ORSECK: Objection, foundation.

THE WITNESS: Would you repeat the question, please?

BY MS. NEWMAN:

Q.   Sure.

This is saying that CHS's smaller and more rural hospitals were generally the lowest performing hospitals on volume in the CHS portfolio?

A.   That -- that's what this says.

Q.   Okay.  And if you look at the first bullet in the column on the right under Emerging Implications, it says:  "Needs some differential focus to succeed.  Quorum move will help that happen, though still significant number of small rural hospitals in portfolio to address."

Do you see that?

A.   Yes.

Q.   Okay.  So und- -- according to this presentation, the spinoff of CHS's smaller and more rural hospitals into Quorum was going to help CHS by eliminating many of those hospitals

Page 49

from the CHS portfolio, right?

MR. ORSECK: Objection, foundation.

THE WITNESS: Quorum had some pretty good revenue growth in the three years -- four -- four years '13 -- '12, '13, '14 and '15.  But this is saying it will help.  And -- and, again, I think we said earlier that the margin of the company would go up.  And I -- I don't remember a calculation about volume specifically, but that's what it's -- that says it will happen.

BY MS. NEWMAN:

Q.   Okay.  Well, that was one of the reasons that CHS did the spin, right?

A.   We did not do the spin because of Quorum not being -- being nonurban.  Well, we did the spin because we wanted to focus more on network hospitals that CHS had either in areas or states, and we had decided not to buy more nonurban markets for the last couple of years and trying to focus on having a -- more of a network strategy.

Although we had a lot of -- we

13 (Pages 46 - 49)

Page 50

had a fair amount of non-small rural hospitals we maintained in the company. We thought that QHC, similar to what LifePoint had done many years ago on its spin -- and we also thought that these hospitals probably needed a better focus, and -- and talking to our Divisional Presidents, it became evident they were spending more of their time on our larger hospitals or our network hospitals and Quorum was not getting the kind of -- as much management attention we thought they would get if they were separated. And we actually thought that there'd be some shareholder value created by creating QHC.

Q. Okay. We saw before that by consummating the QHC spin, QH- -- CHS's margins were going to improve, right?

A. Yes.

Q. Okay. And that was one of the reasons that CHS wanted to do the spin, correct?

A. It -- it was a byproduct of the spin, of a better margin. And I think what we had hoped to do was have better focus on the markets we thought we could be more successful in. And we also thought that QHC having a new management team focussed on QHC could create some value for QHC.

Page 51

Q. Okay. Mr. Cash, are you testifying that improving CHS's margins was not one of the reasons that CHS wanted to do the spin?

A. We -- we would have wanted to see our margins go up. That would help their financial performance, but I -- but it was -- it could have been one of the reasons, but it wasn't one of the main reasons.

Q. It wasn't one of the main reasons?

A. Well, we wanted our margins to go up, and -- but we also thought that we wanted to focus on a network strategy, and we also -- we would benefit from the margins going up.

Q. Okay. I'm going to ask my question again. The fact that the C- -- the QHC spin was going to improve CHS's margins was one of the reasons that CHS --

A. That -- that -- that --

Q. -- wanted to do the spin, correct?

A. -- that would one of the reasons --

MR. ORSECK: Object to form.

THE WITNESS: That would be one

Page 52

of the reasons that -- that we outlined on the spin.

BY MS. NEWMAN:

Q. Okay. Turning back to page 5 of the Bain presentation. I'm looking now at the sort of second block, kind of row of text that says "Market Attractiveness"?

A. Yes.

Q. Do you see that?

A. Yes.

Q. And it says: "CHS is in the -- a less attractive portfolio of markets than peers demographically, except LifePoint, and that accounts for some of the volume underperformance versus peers."

Do you see that?

A. Yes.

Q. Okay. And the -- the less attractive markets that Bain is talking about here, those were the markets that were going over to -- to QHC; is that right?

MR. ORSECK: Foundation.

THE WITNESS: There were some attractive markets and some not as attractive of markets in QHC. I

Page 53

wouldn't -- I wouldn't characterize it that all of QHC markets were unattractive.

BY MS. NEWMAN:

Q. Okay. The -- the third bullet on the right says: "No tailwinds available to help overcome challenging competitive dynamics in market trends."

Do you see that?

A. Yes.

Q. Okay. What does that mean?

MR. ORSECK: Object to form.

BY MS. NEWMAN:

Q. If you know.

A. Well, I think she meant -- tailwinds is something that existed that were going to help overcome some of the dynam- -- dynamics. Clearly, in -- we were being compared to HCA in some of other locations. HCA has a much better demographic growth and population growth and a -- and a better mix of population in their markets than -- than we had in our markets.

Q. So this is basically saying there's -- there's not much that can be done to overcome the challenging competitive dynamic and

14 (Pages 50 - 53)

Page 54

trends in those unattractive markets, right?

MR. ORSECK: Objection, foundation.

THE WITNESS: I -- I'm not for sure if it's nothing could be done. It just says "no tailwinds available." You can always, in markets that -- most of the smaller markets had less physicians in those markets per thousand population and you could -- you recruit physicians, which was done.

And you also could do other strategies. A lot of your business comes through the Emergency Room, and you could try to make your Emergency Room more attractive, more successful. Half your admissions come through there.

You could -- you -- in some of these markets, not all the doctors in the community use the hospitals, and you could have management go visit those doctors and try to see why that was the case.

You could have services like physical therapy and rehab as outpatient

Page 55

services would be good. And that -- that's just some of them. There's probably more, but that's what comes to mind right now.

BY MS. NEWMAN:

Q. Okay. But fair to say that what Bain was saying here is that in their view, there were no tailwinds that were available to overcome these challenging dynamics, correct?

MR. ORSECK: Object to form.

THE WITNESS: That -- that's the words here.

BY MS. NEWMAN:

Q. Okay. And -- and that's what it meant, right? That's what this means, is that there's -- from Bain's perspective -- let me finish my question, please.

From Bain's perspective, there were -- there weren't a lot of options to overcome the challenging competitive dynamic in market trends in these unattractive markets, right?

A. And I --

MR. ORSECK: Wait. Objection, foundation.

THE WITNESS: Yeah, I -- I don't

Page 56

quite agree with that. I think they were comparing us to other for-profit hospitals, as they did in the preceding chart, and we cannot make the population growth be faster. It is what it is, and -- and unfortunately, our market just didn't grow as fast from a population perspective. And it's well-known one of HCA's successes is they've got great population growth.

BY MS. NEWMAN:

Q. Okay. Mr. Cash, I want to ask you. So we've established that this is a document that you received from Bain, correct?

A. Yeah.

Q. Okay. And something that you would have talked through, maybe not page-by-page, but had a conversation with Bain about, right?

A. Right.

Q. Okay. Do you -- at the time that you had that conversation with Bain about this, did you have an understanding about what it meant, what they were saying in this document?

MR. ORSECK: Foundation.

THE WITNESS: I -- I -- it's

Page 57

pretty --

MS. NEWMAN: What's the foundation objection for that question, whether or not he had an understanding?

MR. ORSECK: He testified that he doesn't know whether he went through all the pages of this, and you're ask- -- that he testified to earlier. Now you're asking him what he understood at the time about what he meant --

MS. NEWMAN: No, I'm not asking him what I [sic] understood. I'm asking --

MR. ORSECK: -- without -- that's exactly --

MS. NEWMAN: -- if he had an understanding about what it meant. There's no foundation objection to a question about whether or not he had an understanding.

MR. ORSECK: You said: "At the time you had that conversation with Bain about this." He has not testified --

MS. NEWMAN: That was a different question.

15 (Pages 54 - 57)

Page 58

MR. ORSECK: No, that's the exact question. That's the exact question you ask- -- you asked. I'm just reading it off of the realtime.

Debbie, I've made my objection for the record. You're free to ask him any --

MS. NEWMAN: The question was: "At the time you had that conversation with Bain about this, did you have an understanding about what it meant -- what they were saying in the document?"

MR. ORSECK: Correct. And I'm saying his testimony was that he did not recall whether he had a conversation with Bain about any particular line in this document.

THE WITNESS: Yeah, yeah. It's very unusual when you -- when I meet with Wayne, that you'll go through page-by-page of a document. That's just his -- his style.

BY MS. NEWMAN:

Q. Yeah.

A. I don't remember going through

Page 59

page-by-page on this document. What was it -- what date, seven or eight years ago, so....

Q. Did you think you understood what it meant?

MR. ORSECK: Objection.

THE WITNESS: I -- I don't remember. My -- I cannot recall having a specific conversation with Bain seven or eight years ago about this document.

BY MS. NEWMAN:

Q. Yeah. Reading it now, do you have an understanding of what Bain meant?

A. I -- I -- I don't.

MR. ORSECK: Objection, foundation.

THE WITNESS: Read- -- reading it now, I disagree with the comment about tailwinds. I would have probably argued a little bit about that.

BY MS. NEWMAN:

Q. Yeah. But you understand what it meant --

A. Yeah.

Q. -- right?

A. Yeah. You -- you can make

Page 60

improvements. You -- you weren't going to create a nonurban hospital probably to be as successful as HCA --

Q. Uh-huh.

A. -- but there's things you can do to improve nonurban hospitals.

Q. Okay. But you understand what the line means, right?

MR. ORSECK: Object to form.

THE WITNESS: I -- "tailwinds available." Tailwinds, it -- tailwinds doesn't necessarily mean actions.

BY MS. NEWMAN:

Q. Yeah, but you understand what --

A. Tailwinds --

Q. -- Bain is trying to -- sir, I'm asking a question.

You understand --

MR. ORSECK: He was answering the last question.

BY MS. NEWMAN:

Q. -- what Bain is trying to communicate with had this line, right?

A. I -- I --

MR. ORSECK: Wait. Wait, Larry.

Page 61

THE WITNESS: Okay.

MR. ORSECK: Object to form.

BY MS. NEWMAN:

Q. I'm asking you a very simple question.

A. Yeah.

Q. Do you understand what they're trying to communicate?

A. I don't --

MR. ORSECK: Object to form.

THE WITNESS: -- think the word "tailwinds" doesn't include actions you could take. They're going to say there's nothing existing right now that's going to go, available. But I think you have actions you could take that would be different than -- that -- that would -- that you could improve volume in these kind of -- type of markets.

BY MS. NEWMAN:

Q. Okay.

A. And -- and we've done that.

Q. Okay. Who's -- what do you mean "We've done that," CHS?

16 (Pages 58 - 61)

Page 62

A.   Well, CHS has done it --

Q.   Okay.

A.   -- and I think Quorum made some progress in some markets, and some markets, it didn't.

Q.   Okay.  The next line says: "Volume challenges create pressure on other top line (e.g. pricing) and bottom line (e.g. expenses/levers), which over time have diminishing returns."

Do you see that?

A.   Yes.

Q.   Do you understand what that means?

MR. ORSECK:  Object to form.

THE WITNESS:  I -- sitting here today, I don't recall the discussion.  It's a -- vol- -- volume challenges always create a little pressure in -- in a business that needs volume.

BY MS. NEWMAN:

Q.   Can you help me, a non- -- you know, a person who is uninitiated in the hospital business, understand what this means?

A.   Well --

Page 63

MR. ORSECK:  Object to form.

THE WITNESS:  -- if -- if you have volume challenges, if -- if volume challenges are a good payor, then that would create an effect on a bottom line.  And if the volume challenges are a -- a relatively -- like a Medicaid business, then you probably could offset that with some cost reductions.

It depends on what type of volume it is.

BY MS. NEWMAN:

Q.   Okay.  Can you turn to page 6, please.

A.   (Witness complies.)

Q.   Okay.  This says, at the top: "Based on volume, CHS's lowest-performing hospitals tend to be more rural smorl [sic] hospitals -- smaller hospitals."

Do you see that?  At the top?  The heading?

A.   It says: "CHS profile has more rural small hospitals than public peers."

Q.   I'm on page 6.

A.   6.  I thought you said 7.  I'm

Page 64

sorry.

Q.   That's okay.

Okay.  And it says --

A.   Yes, I -- I see this.

Q.   Okay.  Great.

And as you can see here, there are two bar charts, one showing the top 20 percent of CHS's hospitals and one showing the bottom 20 percent of CHS's hospitals as measured by CAGR.

Do you see that?

A.   Yes.

Q.   And CAGR is -- is compounded annual growth rate, right?

A.   Correct.

Q.   Okay.  The footnote on the bottom says: "Seven Quorum hospitals fall into the bottom quintile and two fall into the top quintile."

Do you see that?  It's a -- it's at the very bottom of the page.

A.   Yes.

Q.   Do you know if that's correct?

A.   I -- I don't specifically.  Now, I do know there's two very good hospitals in Quorum.  This is -- is calling out nine out of 38

Page 65

hospitals.  But I -- I don't know if the math is right or not.

Q.   Okay.

A.   I assume it would be right, but I don't know.

Q.   Okay.  Can you turn to page 8, please?

A.   (Witness complies.)

Q.   There's a number of factors here listed on the left side of the page:  Population growth, age.

Do you see those factors?

A.   Yes.

Q.   Okay.  What is the significance of these factors to a hospital's ability to grow?

A.   Well, generally, the more population growth would give you a better opportunity to grow volume, because you're having more patients.

Age would be one that they drive a large percentage of your -- your volume, not necessarily always your -- your revenue.  So that would also drive a little bit better -- age could drive a little bit better volume.

I -- I think the Quorum's -- I

17 (Pages 62 - 65)

Page 66

thought in the Form 10 that the over age 65 was a higher percent than the national average, but....

Median income, that's probably not as significant of a variance here. I mean, a little bit -- shows that HCA's got a little bit better median income, probably income growth likewise.

Unemployment rate could affect more the success of a hospital. If someone is extremely older, employed or not, they get treated if they go to the Emergency Room by requirement.

Employment growth would be one that if employment growth was a little better, you'd get a little better.

Managed care. As we said, managed care is your best payor. And in attractive markets, CHS has a smaller percentage than everyone except LifePoint.

Q. Okay. On the next page, it says -- the -- the heading is: "Often because growth is shifting -- shifting to HRR center."

Do you see that? On the next page.

A. Yes, I see it.

Q. Okay. What's an HRR center?

Page 67

A. Well, I don't remember.

Q. You don't remember? Okay.

A. I'd like to think here a second if I can tell -- answer the question.

Q. Sure.

A. I -- I don't remember what HRR was.

Q. Okay. Can you turn to page 18, please?

A. (Witness complies.)

Q. At the bottom of the page, I'm looking at the footnote, the smaller text.

A. Uh-huh.

Q. It says: "Quorum has eight hospitals in attractive markets and 29 hospitals in unattractive markets."

Do you see that?

A. Did you say page 8?

Q. Page 18.

A. Okay. I see that.

Q. Okay. Do you -- do you remember what Bain was using to define what an attractive market and a nonattractive market was?

A. The definition here says they use a mix, but I don't remember how they weighted

Page 68

their mix.

Q. Do you -- do you have a view as to what you would deem an unattractive -- what factors you would use to deem a market attractive or unattractive?

A. You go back here to this other chart, and I'd say population growth -- if I can find it. It's -- it's -- several of the factors was on the page we just reviewed.

Q. Okay. So, let's see, I think that was page 8.

A. Yeah. Population growth, age over 65, unemployment rate, employment growth.

Q. Okay. So those would be the differentiators of an --

A. The --

Q. -- attractive versus a nonattractive --

A. Right.

Q. -- market?

A. Yeah. And -- and one -- one of the things about nonurban, it could be an unattractive market but the current marketshare of those hospitals is much smaller than the urban markets and you have an opportunity to cut off

Page 69

that out migration if you could improve your facilities.

Q. Okay. Let's see.

MS. NEWMAN: Let's do tab 7, please.

(Exhibit 3 was marked.)

BY MS. NEWMAN:

Q. Okay, Mr. Cash. You've just been handed, I think, Cash Exhibit 3. In the bottom of the page, Edward Lomicka is writing to you: "As you requested, Shelly Schussele has summarized the key takeaways from the healthcare sector outlook from Gary Taylor, equity analyst at J.P. Morgan."

Do you see that?

A. Yes.

Q. Who is Shelly Schussele? Schuss- -- Schussele, am I --

A. She works in the --

Q. -- saying that correctly?

A. She works in the Treasury department, and Ted did some work in both Treasury and Finance and some strategic activities and she did -- she did analytical work for Ted, I believe.

Q. Okay. And Mr. Lomicka goes by Ted?

18 (Pages 66 - 69)

Page 70

A.  Correct.

Q.  Okay.

A.  Lomicka.

Q.  Lomicka, thank you.

And are you familiar with the analyst Gary Taylor?

A.  Yes.

Q.  Okay.  Did you generally respect his work at the time he requested this summary?

A.  Sometimes.  He had a tendency to be favorable to hedge funds.

Q.  Be favorable to hedge funds? Okay.

Let's take a look at the summary, please.  So I'm looking at the document that has the number 1747 in the -- in the lower right-hand corner.

Okay.  So it says that in the view of Mr. Taylor as of October 30th, 2013 [sic], the hospital industry suffered from margin pressure concerns.

MR. ORSECK:  Deb, where -- where are you?

MS. NEWMAN:  I'm actually trying to find it myself.  Hold on a second.

Page 71

MR. ORSECK:  Do you mean 2015 or 2013?

MS. NEWMAN:  2015.  Did I say 2013?

MR. ORSECK:  Yeah.

You want to take a minute and just read it through, Larry.

THE WITNESS:  Yeah.  (Witness reviews document.)

BY MS. NEWMAN:

Q.  I'm going to ask you about the first page to start.  So it's -- in the first bullet, you can see that Mr. Taylor cited margin pressure concerns.

Do you see that, the lead-in to the bullets?

A.  Yes.

Q.  "Including hospitals returning to normalized growth, continuation of weak volume landscape, increasing copays and deductibles is a major trend for employees to bypass the Cadillac tax that begins in 2018 in a discounted price environment for providers."

Do you see that?

A.  Yes.

Page 72

Q.  Do you agree with Mr. Taylor's assessment that these were challenges for hospitals towards the end of 2015?

A.  Well, first of all, make sure you read that he described himself as historically bearish, which means he's historically been bearish on hospitals, and he was a pro managed care at the time that he wrote this.  Some analysts could -- like hospitals and managed care and some like either/or, and he was a managed care guy.

I -- I don't think -- and I think if you -- 2015 and 2014 was a period when the Affordable Care Act had come on, and it had helped create some more volume.  Unfortunately, a lot of that volume was Medicaid volume, which is a lower payment and doesn't help earnings quite as much.

But I -- I was never, nor most hospital management teams, agreeing with Gary Taylor as to some of his conclusions.  You -- you had population growth, employment growth and the -- you know, you could try to do a better job of managing your ER, but there's strategies you can try to do better than he describes here.  He only describes the negatives.

Page 73

Q.  Okay.  But those negatives were -- were issues for the -- for the hospital industry at this time, correct?

A.  Some were.

Q.  Which were?

A.  I'm not for sure that -- his -- his comment about returning to normalized growth, I'm not for sure that I agree that -- that we were returning to normalized growth.  We had some benefit from the Affordable Care Act, but it continued each year for several years.

Q.  Okay.

A.  A discounted price environment for providers, you were still getting managed care increases in -- maybe instead of 5 to 7, it was 4 to 6 percent, so....

Q.  Okay.

A.  If you read his second page, he's very pro managed care.

Q.  Turning back to the first page, there's a line that talks about labor cost issues in the last bullet.

Do you see that?  "Labor cost issues that arose in the quarter are also of concern"?

19 (Pages 70 - 73)

Page 74

A.    Yes, I see that.

Q.    Do you remember what was going on with labor cost issues in October of 2015?

A.    Well, I read in the second sentence that -- and it says:  "Taylor notes there has not been a negative labor cost cycle for providers in this millennium, implying one is due sooner than later."  So, I mean, it's sort of saying it's not a -- as big -- he did say that it's an issue in the quarter.

You generally have a little bit more of a labor challenge in the third quarter because it's the summer months.  There's less respiratory, patients take vacations, doctors take vacations, so you have a little bit more of volume which can create a little bit of an issue for payroll if you don't adjus- -- if you adjust your payroll.

But then his second sentence sort of implies that we haven't had a real negative lost cost cycle for almost a -- a millennium, which is a long time.

Q.    So do you remember at this time in 2015 there being concerns in the hospital industry about labor cost issues going forward?

Page 75

A.    Not long-term going forward.  Like I said, the third quarter is a difficult quarter because of the seasonality of the quarter.

Q.    You don't remember any long-term issues?

A.    No.

Q.    Okay.

MS. NEWMAN:  All right.  Let's do 8.

(Exhibit 4 was marked.)

BY MS. NEWMAN:

Q.    Okay, Mr. Cash, you've just been handed Cash Exhibit 4.  It's an e-mail in which Mr. Fleck is sending an updated version of the model that supported the QHC projections to Ryan Bondroff and Steven Schwartz at Credit Suisse on August 25th, 2015.

And I'm going to refer to the model that fed into the projections just as "the model" today, okay?

What was Credit Suisse's role in the spin?

A.    They were the investment banking advisor to -- for the spin.

Q.    They were the advisor.  And they

Page 76

also had roles in the financing, correct?

A.    They -- and they were -- as part of the advisor role, they were going to help do the financing --

Q.    Okay.

A.    -- along with other banks.

Q.    And how was Credit Suisse selected as the advisor?

A.    We had used Credit Suisse for Triad in 2007.  And in 2013 and '14, we'd used Bank of America for HMA.  And of the two banks, we'd just recently used, we decided to use Credit Suisse.

Q.    Okay.

A.    And they -- I believe they're also our administrative agent for our financing.

Q.    Okay.  Did CHS hire Credit -- Credit Suisse on other matters after the spinoff was consummated?

A.    I believe there was some matters of some amendments and refinancing done.  We did some successful fin- -- refinancing in March of 2017, and I think Credit Suisse was one -- one of the banking agents.

Q.    Okay.

Page 77

A.    And then after that, I think we used Citigroup and some -- and brought in some new banks.

Q.    Please turn to the attachment.

A.    (Witness complies.)

Q.    Okay.  You can see on the cover page -- I'm -- we're going to use an electronic version of this today throughout the day, but I'm going to try for wherever I can to just stick with paper copies.

A.    Okay.

Q.    So I think for -- for the purposes of this exhibit, we can do that.

You can see that on the first page that this is Draft 3 of the model.

Do you see that?

A.    Yes.

Q.    Okay.  And, actually, you know what, can you turn back to the cover page, please?  Mr. Fleck writes in the top e-mail -- I'm looking at the -- the second bullet.  And he says:  "The same store-adjusted admission and net revenue growth has been slowed a bit to conform more with historical growth rates."

Do you see that?

20 (Pages 74 - 77)

Page 78

A.    Yes.

Q.    Okay.  So let's look now at page 4 of the attachment.  And the -- the little number at the bottom of the page on the bottom right ends in -97 for the page that I'm looking at.

Are you there?

A.    Yes.

Q.    Okay.  So you can see at the top, this says, in the -- in the upper left-hand corner, it says: "Key Assumption Status."

Do you see that?

A.    Yes.

Q.    Okay.  Great.

Under the Actual Results for 2013, you can see that QHC's net revenue growth was 3 percent.

Do you see that?

A.    Yes.

Q.    Okay.  And in 2014, the number is 10.2 percent, but the same store revenue growth percentage was 2.7.

Do you see that?

A.    Yes.

Q.    Okay.  Did something happen in 2014 that caused the overall growth rate to be so

Page 79

much higher?

A.    We acquired the HMA hospitals in January of 2014.  I think there was 70 hospitals. And we only put four of those hospitals in the QHC 38 hospitals.

Q.    Okay.  But even though there were only four, is that what -- what is -- what is causing the number to be so much higher in 2014 on an overall basis versus 2013?

A.    We may have also had some partial year in '13 and a full year in '14 of Blue Island Hospital in Illinois.

Q.    Oh, there might have been another hospital?

A.    There might have been another one that was -- yeah.

Q.    Okay.  The projected growth rates that you see on this page are 3.5 percent in 2015, 3.7 percent in 2016, and then 4 percent for the remaining years.

Do you see that?

A.    Yes.

Q.    Okay.  All right.  Now we are going to have to use one of the electronic versions.  I'm going to give you a PDF version.

Page 80

You and I are going to be doing this together. It's my first time doing electronic versions, too, so we'll -- we'll -- we'll be in it in together, Mr. Cash.

A.    Okay.

Q.    But first I'll give you a hard copy document.

(Exhibit 5 was marked.)

MR. ORSECK:  Are you moving on from Exhibit 4?

MS. NEWMAN:  I -- I would set that aside, but -- but keep it close by.

MR. ORSECK:  Okay.

BY MS. NEWMAN:

Q.    So, Mr. Cash, you're not on this e-mail, but I will represent to you that it attaches pages from the final version of the model.  We have the full version of that -- of the final version of the model available electronically.  But some of the pages from that model are here.  And I think it's in --

MR. ORSECK:  Sorry, Deb, do you -- do you intend to mark what you just handed me as an exhibit?

MS. NEWMAN:  Oh, yes I do.  I'm

Page 81

sorry, did I not?  It's...

THE COURT REPORTER:  It's 5.

MR. ORSECK:  Okay.

MS. NEWMAN:  Cash 5.

BY MS. NEWMAN:

Q.    Okay.  So the second attachment -- so the document behind -- let's see.  I will get you there by referring you to the Bates number.  It's behind the blue sheet.  It actually doesn't have a Bates number.

MR. HAVELES:  Native files don't get Bates numbers.

MS. NEWMAN:  Yeah.  It's after the second blue sheet.  Yeah, you're there.

BY MS. NEWMAN:

Q.    So we're going to turn to the Key Assumption tab in that document, which is seven pages in.  Oh, actually the -- yeah.  And it looks like this (indicating).  It -- it's the page after Draft 17.  If you go to the second --

A.    Second blue tab.

Q.    It starts behind the second blue tab.

MR. ORSECK:  Yeah.

21 (Pages 78 - 81)

Page 82

THE WITNESS: I've got the second blue tab.

BY MS. NEWMAN:

Q. And now you're going to go seven pages in and you're going to get to the model.

A. This being the second blue tab right here (indicating).

Q. No. No.

A. There's one, two (indicting).

Q. Okay. So it's the third blue tab.

A. Okay. That's why --

Q. My apologies.

A. -- I can't find it.

Q. Keep going. There you go. There's the model. And I think you have to keep going, Mr. Cash. And that -- I think that was it. Yeah. I think. Let me see. I -- I can't see.

A. I'm on Summary Income Statement page.

Q. Okay. Keep going. No, back in the -- in the other direction.

A. This direction?

Q. No, the other direction.

A. No? Other direction?

Page 83

Q. Oh, here. I think --

MS. NEWMAN: Gary, maybe you can help him.

MR. ORSECK: Okay.

THE WITNESS: You found it?

MR. ORSECK: Yeah, I did. You want to hand it to me, and I'll....

THE WITNESS: Yeah. I did not see it.

MR. HAVELES: What is the heading on the page?

MS. NEWMAN: The heading on the page is Quorum Health Corporation Key Assumptions with no M.

MR. HAVELES: Okay.

BY MS. NEWMAN:

Q. Okay. So, actually, we're going to go two pages beyond that to the Key Assumptions Data. It says: "Quorum Health Corporation Key Assumptions Data."

A. Okay.

Q. Got it.

A. Yeah.

Q. Okay. All right. Okay. So I will represent just for the record that this is

Page 84

the Key Assump tab in the native version of the final version of the model.

So -- so this -- this version of the model now, this is a -- the same page we were looking at before in Version 3 of the model on the prior exhibit. This is the same page now in Version 17 of the model, the final version of the model.

So now we have actual revenue growth through 2015.

Do you see that?

A. Correct.

Q. Okay. And so 2013 is 3 percent and 2015 is 2 percent.

Do you see that?

A. Yes.

Q. Okay. So net revenue growth was actually lower in 2015 than it was in 2013, right?

A. Yes.

Q. Okay. And on a same store basis, net grev- -- net revenue growth was lower in 2015 than in 2014, correct?

A. Yes.

Q. Okay. Mr. Cash, do you recall that the projections assumed that 11 hospitals

Page 85

would be sold by December 31st, 2016?

A. That's -- that's correct. It's in the footnote here.

Q. Okay. All right. And that's why the projected growth shown here for 2017 is -- is negative 6.7, right?

A. Yes.

Q. Okay. So setting aside 2017, this model projects revenue growth of 3.7 percent -- actually, 3.8 percent in -- in 2016, 4.5 percent in 2018, 4.6 percent in 2019, and 4.7 percent in 2020, right?

A. Yes.

Q. Okay. So looking back at the --

MS. NEWMAN: Do you have any other, so I don't have to flip back and forth?

BY MS. NEWMAN:

Q. Looking back --

MS. NEWMAN: Actually, I got it.

BY MS. NEWMAN:

Q. Looking back at the third version of the model, what we were looking at. I think you have it right there on top.

A. Correct.

22 (Pages 82 - 85)

Page 86

Q.   Okay.  The lower growth rates projected in the third version of the model, these were more in line with the historical growth rates, right?

MR. ORSECK:  Object to form.

THE WITNESS:  There was different assumptions.  I -- I think you -- when you put in the divestitures, you increase your -- your volume assumptions going forward.  When you -- when you take the divestitures out, you increase your volume, you increase your revenue growth because usually the divestitures you're getting rid of have a lower revenue growth and lower volume.

And that was demonstrated by Mike Culotta in his fourth quarter 2016 analysis, by his admissions.  He said they were about 100 basis points worse due to the divestitures.

And so when you take the divestitures out, you have total revenue growth declining, you improve your EBITDA growth because they're negative performers, and you also include -- you

Page 87

increase your volume and your revenue growth going forward.

BY MS. NEWMAN:

Q.   Okay.  So you -- so you think that the improved revenue growth is based on the deve- -- excuse -- the improved revenue group [sic] -- growth is due to the divestitures?

A.   Some -- some of that would be due to divestitures.  I know that the margin improvement, which went from 12 percent to 15.7 percent, 220 basis points of that was from the divestitures and 50 basis points.

And you'll see you got a little bit better EBITDA growth in '18 and '19 because you finished your Springfield project, which was $88 million of spend.  And I think the model has something in the neighborhood of $45 million in revenue and it's got about a 40 percent margin, because it's new services and new -- new beds and things of that nature.

Q.   So the growth in the model was highly predicated on the dives- -- the assumptions regarding the divestitures and the Springfield Tower, correct?

A.   That, and --

Page 88

MR. ORSECK:  Object to form.

THE WITNESS:  -- they -- it -- those are two factors, especially that affect the margin growth and -- and some EBITDA growth.

BY MS. NEWMAN:

Q.   Okay.

A.   And then we also just believed, as we did not probably have -- factored in the original first projection, the -- the management team would be able to perform better going forward than history.  That was the -- that was a belief that they would operate the hospitals with better results going forward than history.

Q.   Okay.  When you came up with the improved revenue growth assumptions that are reflected in the final version of the model, did you look at the historical revenue growth for only the hospitals that were going to remain without the divested hospitals?

MR. ORSECK:  Objection, foundation.

THE WITNESS:  I -- I don't recall myself doing that kind of work.  Lee may have done that kind of work, but I -- I

Page 89

-- I do recall seeing schedules about the margin calculation.

BY MS. NEWMAN:

Q.   Okay.

A.   And I do rem-- - recall seeing a schedule that Culotta went public with about his volume, effect of the divestitures on volume in 2016.

Q.   Okay.  All right.  We're going to turn to the native version of the final version of the model now.  So maybe Ken can come over and help you navigate to that on the computer.

A.   Is it not in this document?

Q.   (Counsel moves head side to side.)  We're going to use the native.

A.   Okay.

MR. HERSHEY:  The Excel.

THE WITNESS:  If -- if I could add one thing.  I'm not copied on this e-mail.  As a practice, I didn't get a 75-page, or ever how many pages it is, model to review.  I got a summary, very brief summary, from Lee.

BY MS. NEWMAN:

Q.   Okay.

23 (Pages 86 - 89)

Page 90

MR. HERSHEY: What tab do you want, Debbie?

MS. NEWMAN: The Cover page. The Cover tab. Oh, not good.

BY MS. NEWMAN:

Q. Okay. All right. This is going to be a challenge for my eyes.

A. Mine are older than yours.

Q. Mine are going quick.

All right. So in the -- in the second block of text, it says: "LC Changes 8/28/15."

Do you see that?

A. Yes.

Q. Okay. And "LC" stands for Larry Cash, right?

A. Correct.

Q. Okay. You -- you've seen this -- this page of the model previously, right?

A. Yes.

Q. Okay. So just looking at the third version of the model, the one -- the paper copy that you have there on top, that exhibit (indicating). If you turn back to the first page, you can see you are copied on the cover e-mail.

Page 91

A. Yes.

Q. And that's the e-mail in which Mr. Fleck says that he has adjusted the revenue growth to be more in line with historicals, right?

A. I -- I believe this model was done on August 25th --

Q. Uh-huh.

A. -- and my changes were on August 28th.

Q. Right.

A. So....

Q. Okay. So three days after receiving the third version of the model from Mr. Fleck, you -- you instructed him to show higher growth in net revenue than he was projecting, correct?

MR. ORSECK: Object to form, foundation.

THE WITNESS: What -- it -- it says I -- you need more than two points, and I think the investor presentation showed a 2.5 percent net revenue per adjusted admission. And so I thought he ought to have a little bit more than two points.

Page 92

BY MS. NEWMAN:

Q. What's the investor presentation that you're referring to?

A. It's March of -- sometime in March of '16. The one that was done this -- on the term loans.

Q. Okay. So -- so, again, in August of [sic] 28th, three days after getting the e-mail in which Mr. Fleck said he had adjusted the net revenue growth to be more in line with historicals, you are telling him it should grow, it should be higher? The growth should be higher?

A. A little bit higher in the investor presentation. And there was drafts of that somewhere along the line that I had seen that -- but -- but it -- the final one -- the final one was in 2016.

Q. Okay. And the line actually says -- I'm looking at line 4- -- 41. It says: "Grow more than two points between same store adjusted admissions and net revenue with better hospitals."

Do you see that?

A. Yes.

Q. Okay. What did you mean by "better hospitals"?

Page 93

Well, actually you know what, let me take a step back. Do you dispute that you gave this instruction to Mr. Fleck?

MR. ORSECK: Objection, foundation.

THE WITNESS: I don't specifically remember it.

BY MS. NEWMAN:

Q. Okay.

A. But he's written it down, which means it's probably correct, you know.

Q. Okay. Okay. So what did you mean by "better hospitals"?

A. That if you -- you were getting -- there was a discussion -- we hadn't factored into the model yet, but there was some discussion about we were going to factor in divestitures, which should drive a little bit better admissions growth if the remaining hospitals were better. Now, that had not been factored into the model, but it was going to be.

And, you know, what -- what's strange here, I said that we ought to put some acquisitions in. We never did that, so.... And sometimes I'd make a suggestion and it may or may

24 (Pages 90 - 93)

Page 94

not be followed.

Q. Okay. That suggestion wasn't followed because the banks told you that you couldn't show acquisitions in this model, correct?

A. They didn't tell me. They probably told Lee --

Q. Excuse me, Credit Suisse.

A. They -- they may have told Lee that --

Q. Okay.

A. -- but -- but I -- I thought we were going to try to do some acquisitions, but we didn't.

Q. Okay.

A. And, again, we'd finished half the year, and the volume, I think, was a little less than we had thought. And so I said you probably ought to slow down 2015. I don't remember what number it was.

Q. You had to slow that in line -- you -- you had to slow that down to be in line with what you were actually seeing, correct?

A. Yeah, but it's like it didn't -- stayed 1-and-a-half percent, so -- well, I'm sorry. This one had 1-and-a-half percent. And

Page 95

the actual turned out to be 1 and 1.

Q. Okay. So in line 41, you say, as we've just established: "Grow more than two points between same store adjusted admissions and net revenue with better hospitals."

And the better hospitals -- by "better hospitals," you meant the hospitals that were not going to be slated to be sold, right?

A. That -- that'd be correct.

Q. Okay. But you don't --

A. Although that -- that number kept changing. But it -- the more -- the more divestitures you did, you probably would get a little bit better remaining hospitals.

Q. Okay. But you didn't go back and look at what the historical revenue growth had been for the hospitals that were not being sold, right?

A. No, this --

MR. ORSECK: Objection, foundation.

THE WITNESS: Not specifically. But history has shown as we've done divestitures inside the company, usually our revenue growth gets better. That we

Page 96

as a company have seen revenue get better as we sold hospitals with less margins.

But I didn't go back and take these 38 hospitals to 11 and do the math.

BY MS. NEWMAN:

Q. You didn't look to see what the --

A. I -- I --

Q. -- historical revenue growth -- let me finish my question please.

You did not go back to see what the historical revenue growth had been at the hospitals that were not slated for divestiture when instructing Mr. Fleck to make the revenue growth at those hospitals higher, correct?

MR. ORSECK: Foundation.

THE WITNESS: That -- there was a calculation done on the margin and it probably had the revenue on the page, but I didn't go back and do the calculation.

BY MS. NEWMAN:

Q. Okay. The final version of the

Page 97

model -- let's go back to the Key Assumptions tab in the -- in the -- well, actually, we can look at this. That's fine.

It's -- it's -- the -- the net revenue growth that you're showing here is 2-point -- now we're in the final version of the model. Yes.

It's -- it's 2 percent in 2015, and then it's nearly doubling in 2016 to go to 3.8 percent.

Do you see that?

A. Yes.

Q. Okay. What was the basis for the assumption that the net revenue growth was going to go up by that much?

A. This is Model 75. We had believed that they'd had a pretty good -- decent year on physician recruiting in 2015 that was -- that had been in some stats that -- that are around here somewhere, and that should help those doctors because they all went there. So you've got a bunch of new doctors coming in which should help '16.

You also were being affected in '14 and '15 on the revenue because a lot of volume

25 (Pages 94 - 97)

Page 98

was Medicaid.  If you look at their percent of revenue that we talked about earlier about managed care being what it was, their Medicaid percent of revenue went up 13 to 16 or 17 percent over a few years.  That percent of revenue brings your revenue growth down, and you probably aren't going to have as much Medicaid growth three years into the Affordable Care Act that you probably had in the first couple of years.

Q.   And you think that that's going to translate into higher revenue growth?

A.   Yeah.  Less Medicaid growth. It's the lowest payor that you've got, so....

Q.   Besides self-pay?

A.   Correct.  Well, that doesn't really count as revenue, but, yeah.

Q.   Okay.  And so you think that if Medicaid expansion is slowing, that there's going to be more private pay business?

A.   No.  The percentage of private pay will stay where it is, but the Medicaid growth is going to slow down.  And the managed care and the -- and the Medicare business are going to become the bigger percent if you're not growing the Medicaid as much, because the number of states

Page 99

expanding Medicaid had started to slow down by the end of '15.

Q.   Okay.  And -- okay.  And I think you said before that it was also based on the recruiting, the physician recruiting that had happened in 2015?

A.   Yes.  There's a chart of it.  And I don't remember the exact numbers, but there's a chart that's -- that they produced in some of these slides that show the -- the doctors recruited were greater in '15 and '14.

Q.   And you thought that that was -- those two factors were going to lead to almost doubling the revenue growth in 2016?

A.   Those would have been contributing factors to that.

Q.   Okay.  The -- the spin closed on April 29th, 2016, right?

A.   Yeah.

Q.   Okay.  Did you do anything to look and see what was happening with revenue growth in the first four months of -- let me finish my question -- in the first four months of 2016 to see whether that assumption about revenue growth nearly doubling was still reliable?

Page 100

A.   The first quarter was a little short from an EBITDA perspective.  I don't remember revenue perspective right offhand.  And we did not try to look at the business in April to see if it was -- the -- the model had been done by then.  The model got done -- it's got a date somewhere -- sometime in March.

Q.   Okay.  Did you do anything to look and see what the revenue growth or the statistics of the company had been for the first three months?

A.   We did look to see, and it wasn't substantially -- I don't recall exactly the first three months.  I recall the EBITDA.

Q.   Okay.

A.   And the model was done before the first three months were finished.

Q.   Okay.  Did you look at data regarding the communities within which the hospitals were located when you -- when you formulated the revenue growth assumptions?

MR. ORSECK:  Object to form.

THE WITNESS:  You know, the -- the Form 10 has some comments about population growth and some Medicare

Page 101

population growth, and I think that would appear to be a favorable comment for these 38 hospitals compared to national averages.

BY MS. NEWMAN:

Q.   So you looked at those statistics in formulating --

A.   So I read the --

Q.   Let me finish my question, please.  You really have to do that.

Did you look at those statistics in formulating the revenue growth assumptions?

A.   I had read some page of the Form 10, and -- and that was some I had read and -- and there was some favorable demographic comments in there.

Q.   Okay.  And did you look at the mix of the inpatient services versus outpatient services in formulating the revenue growth assumptions?

MR. ORSECK:  Object to form.

THE WITNESS:  I have looked at inpatient versus outpatient, and -- and I believe the outpatient percent for Quorum is a little less than it is for

26 (Pages 98 - 101)

Page 102

the -- the original CHS, but I did -- I didn't do a lot of focus on the inpatient/outpatient revenue mix. There wasn't that much difference in the CHS consolidated and the Quorum.

MS. NEWMAN: All right. Tab 10.

(Exhibit 6 was marked.)

THE VIDEOGRAPHER: If this is a good point, we need to take a break about every 90 minutes.

MS. NEWMAN: Sure.

THE VIDEOGRAPHER: Okay. Going off the record, the time is 10:44 a.m.

(Brief recess observed.)

THE VIDEOGRAPHER: We are returning to the record. The time is 10:58 a.m.

BY MS. NEWMAN:

Q. Okay. Mr. Cash, you've just been hand- -- handed what's been marked as Cash Exhibit 6. The bottom e-mail is an e-mail from you to Mr. Culotta, copying Mr. Fleck, Mr. Doucette, and Ms. Holmes on November 14th, 2015.

Do you see that?

A. Yes.

Page 103

Q. Is Ms. Holmes your assistant? Was she your assistant?

A. Yes.

Q. Okay. You say that: "It appears to me there is more long-term realistic upside in QHC long-term projections. I asked Lee and Jim to revisit."

On what basis had you concluded that there was more long-term realistic upside in QHC long-term projections as of Nov- -- on November 14th, 2015?

A. We had a -- an early-on projection of July of 2015 that we showed our board, and its EBITDA answer a few years out was about the same answer that we were having after we were starting to divest a lot of hospitals. So you had almost the same answer and you -- and you were improving the business by selling the hospitals and taking out some of the divestitures, which meant that in -- in July when we first did this, we had a better belief that the operating results would be better than -- than -- than we had. We -- we'd turn it into a lot of improvements being the divestiture strategy.

Second, we thought that these 38

Page 104

hospitals could be similar in performance to LifePoint. And if you go back to some other schedules we passed around, you know, LifePoint was a facility -- a group of similar-type hospitals, and -- and they had a little bit better margin. It got really good at one time and it deterior- -- it had gone down some.

So we thought we should be able to get to 14 percent a little faster than we had originally -- that -- like we had originally thought back in July.

Q. Okay. I'm going to try to take that in pieces. So at this point, on November 14th, 2015, you're testifying that you don't think that the projections at that point were incorporating any changed assumptions based on the fact that the model was now projecting to sell hospitals?

A. That the EBITDA answer in the first few years was about the same EBITDA in July as -- as this model here, as we had in November versus July. And between that, we decided to put in divestiture strategy which should drive up -- should drive up revenue volume and -- and EBITDA and margin, because you're taking out losses.

Page 105

And so some -- some early improvements that you sort of thought back in July had -- had sort of not stayed in the model. And -- and we thought that this management team was just as good as the management team at LifePoint, and LifePoint was running a little bit better results than where we -- than where we were getting to.

Q. Okay. What -- when did Lif- -- the LifePoint transaction happen?

A. 1999 had a 12 percent margin. They got to 18 or 19 in a few years. And I don't remember exactly where they were now. They were probably 14 or 15 percent or 16.

Q. Okay. Mr. Culotta responds to you: "Probably need to look at selling more hospitals."

Do you see that?

A. Yes.

Q. Okay. So -- so Mr. Culotta obviously thought that the in -- the divestitures that were already baked in would not lead to the additional revenue growth, right?

MR. ORSECK: Object to form.

BY MS. NEWMAN:

27 (Pages 102 - 105)

Page 106

Q. Or, excuse me, the additional upside.

A. No. I think what he's saying is that we needed to probably sell more hospitals to get our margin up faster.

Q. To realize the lon- -- the -- the upside that you were asking for in the bottom e-mail, right?

A. Yeah, the -- these are projections and -- and I think the 2015 or 2020 margin was 16 percent versus starting about 12. And at least 220 basis points of that was the divestitures. He -- he probably added some more divestitures since the November project -- November model.

Q. Okay. And you respond to that e-mail by saying: "I would grow margin to 14 to 15 percent faster."

A. Yeah.

Q. How did you come up with that number?

A. Thinking about LifePoint.

Q. Thinking about LifePoint?

A. Yeah.

Q. Okay.

Page 107

A. And -- and you were doing this to put focus on these hospitals, simple strategies, someone focussed on them. We knew that the -- they weren't focussed as much in our company with 190 hospitals as they would be with a good formulated management team on -- working on 38 hospitals. At least -- least that was -- that was the thought process.

Q. Okay.

MS. NEWMAN: Let's do 11.

(Exhibit 7 was marked.)

THE COURT REPORTER: Exhibit 7.

BY MS. NEWMAN:

Q. Okay, Mr. Cash, you've just been handed Exhibit 7, Cash 7. At the e-mail at the bottom of this page, which was sent seven days after the e-mail we just looked at, you say -- you say: "Margins look too low still."

Do you see that? I thought that -- that's the end of your --

A. Yeah.

Q. -- e-mail?

And you ask Mr. Fleck to show you QHC EBITDA, revenue, and margin for 2014 versus 2013 without sold hospitals and same store info on

Page 108

the model.

Do you see that?

A. Yes.

Q. Okay. And if you turn to the attachment that -- that's -- this is Mr. Fleck's response to that request, right?

A. Yes.

Q. Okay. Please turn to the second page. Okay. The third line in the top por- -- the top portion of the chart, the margin percentage.

Do you see that?

A. Yes.

Q. Okay. So this shows the historicals -- the historical and projected margins that reflected -- that were reflected in the model as of 11/23/15; is that correct?

And you can see it says up at the top: "QHC Financial Model 26, 11/23/2015."

Do you see that?

A. I'm just reading it.

Q. Sure. Take your time.

A. (Witness reviews document.) Yes, I see it.

Q. Okay. So the top portion is what

Page 109

was in the model as of 11/23/2015, and it shows margin -- the historical and projected margin percentages, right?

A. Yes. I -- he -- he's backed out some number of divested hospitals. And he's also backed out some dis-synergies in the model.

Q. I'm just asking you about the top. The top three lines, that's what's in the model at the time, correct?

A. I -- I believe so.

Q. Okay. And so then if you go down the chart, you can see he is backing out some things. So he's -- the margin with Dis-synergies line.

Do you see that?

A. Yes.

Q. Okay. So he is now backing out the impact of the eight hospitals to be divested from the historicals.

Do you see that?

A. Yes.

Q. Okay. The projections are the same, because they already back out the --

A. Right.

Q. -- the eight hospitals to be

28 (Pages 106 - 109)

Page 110

divested, correct?

A.    Correct.

Q.    Okay.  And then the Margin EX Dis-synergies.

Do you see that line?

A.    Yeah.

Q.    Okay.  So that shows the -- the margin backing out both the eight hospitals to be divested and dis-synergies, correct?

A.    That's what the calculation shows.

Q.    Okay.  And if you turn back to the cover e-mail, you can see in the second line of his -- of Mr. Fleck's e-mail to you, he's talking about $18 million a year of dis-synergies.

Do you see that?

A.    Right.

Q.    So that's what is backed out in the line Margin EX Dis-synergies, right, in addition to the eight hospitals?

A.    Yeah.

Q.    Okay.  So then the projection -- the -- the margin -- the projected margin actually changes in that line, because those $18 million of dis-synergies are -- are reflected in the

Page 111

projected years at the top, correct?

A.    Yeah.  What's got me a little confused, the 18 sounds like a number that later got changed.

Q.    Okay.

A.    Okay?  And so it -- it might have been 18 at this point in time, but I -- I think it turned out to be less than 18.

Q.    Okay.

A.    So that -- that's what I'm thinking about.

Q.    I'm just asking you about this --

A.    Yeah.

Q.    -- document for now.

A.    And he -- and he further says: "If you leave out the corporate overhead and EBITDA, you would get a better margin."  But corporate overhead is not something you can just make go away.

Q.    Okay.  The historical numbers that are shown here, those were derived from the financials that are in the Form 10 filed in connection with the spin, right?

A.    I -- I believe so, but I would think they would have been from the Form 10.

Page 112

Q.    Okay.  And hypothetically speaking, if the historical expenses in the Form 10 financials did not accurately reflect what QHC's expenses as a standalone company would have been if it had been operating on its own in those historical years, then that -- those actual historical margins would be overstated, correct?

MR. ORSECK:  Objection, foundation.

THE WITNESS:  I thought we had, in the Form 10, some pro formas, which added the extra cost for QHC as a separate company.  So the Form 10 had information in it where it added the $3 million for the auditors and Board of Directors and $5 million for some TSA cost.

So I -- I -- you said the Form 10 didn't have it.  I think it had both the historical numbers, then there was some pro forma financials in Form 10 as -- as I remember.

BY MS. NEWMAN:

Q.    Are the pro formas that were mentioned -- that you think were mentioned in the

Page 113

Form 10, is it your view that they're reflected in the historical margins that are listed here?

A.    I don't know about listed here, but they probably were listed in the final projections.

Q.    Okay.  Okay.  So the margin -- turning back to the -- the second page -- and now I'm looking at the -- the margin percentage that's reflected in the model as of 11/23/2015.  So that -- the -- the historicals that are derived, we think, from the Form 10.  There's a pretty big jump from 2013 to 2014.

Do you see that, from the 10 to the 12.3?

A.    On the second page?

Q.    Yes.  On the second page of the -- I'm looking at the second page of the attachment.

A.    This one (indicating)?

Q.    No.  The second page of that.

A.    Oh, okay.

MR. ORSECK:  No, just -- just the back of the page we're looking at.

BY MS. NEWMAN:

Q.    Yeah, just the back.  Yeah.

29 (Pages 110 - 113)

Page 114

A.   All right.

Q.   So the margin percentage in the third row that comes -- as we established, that comes from the model as of 11/23/2015?

MR. ORSECK:  Foundation.

BY MS. NEWMAN:

Q.   And I -- I'm --

A.   Yeah.  That -- that the -- the original numbers are the adjusted EBITDA numbers that came from the model, and they should be close to -- they're not exactly actual, but they're close.

Q.   So the -- the 10.1 and the 12.3 from 2013 to 2014.

Do you see that?

A.   Yes.

Q.   Okay.  So what was the tre- -- what was the cause of that large jump from 2013 to 2014, if you know?

A.   The -- the revenue grew better than the expenses grew in those periods.  You -- you would give some credit to the -- possibly to Affordable Care Act --

Q.   Okay.

A.   -- in '14 and '15.  But the --

Page 115

and I think the Marion facility and the Springfield facility had better years in '14 and '15 than it did in 2013.

Q.   Okay.  The 2016 margin listed here, the 12 percent -- do you see that?

A.   Yes.

Q.   Okay.  That's a projection, right?  Even though it's listed as an actual, it must be a projection.

A.   It's definitely a projection.

Q.   Yeah, okay.

A.   Yeah, it's definitely a projection.

Q.   Okay.  And the pro forma same store results -- hold on a second -- chart at the bottom predicts that without the --

A.   It was eight hospitals at this time.

Q.   Yeah.  Without those eight hospitals, okay.

A.   And it ultimately was 11.  And I thought the revenue number that was backed out was $250 million.

Q.   Okay.

A.   And --

Page 116

MR. ORSECK:  Larry, wait for a question.

BY MS. NEWMAN:

Q.   Yeah.  Thank you.

All right.  You can see the -- removing the eight hospitals -- actually, you know what?  Let's see.

Why did you want to see the margins without the dis-synergies?

A.   I -- I didn't think that made sense to me to do the margin without the dis-synergies.

Q.   So let's --

A.   It didn't -- that -- it's just something that Lee did.  Why he did it that way, I don't know.

Q.   Okay.

A.   I mean, it....

Q.   Okay.  You didn't ask him to do that?

A.   No.

Q.   Okay.  All right.  We're going to go -- we're going to go back to this.  And I'd like you to look at row 67.

MR. ORSECK:  Is it on your iPad

Page 117

or --

BY MS. NEWMAN:

Q.   It should be --

MR. ORSECK:  -- laptop?

BY MS. NEWMAN:

Q.   Yeah.  We can get it back on your --

A.   Yeah, I'm just seeing which row was 67.

Q.   Okay.

A.   I'm not quite --

MR. HERSHEY:  You need to scroll down there.

BY MS. NEWMAN:

Q.   You're going to have to scroll down.

MR. HERSHEY:  I can help you, if you....

MR. MOSS:  Are you marking the native as an exhibit, or not?

MS. NEWMAN:  That's a good question.  We sh- --

MR. HERSHEY:  We can add it as an exhibit.

MS. NEWMAN:  Yeah, we should mark

30 (Pages 114 - 117)

Page 118

it as an exhibit.

MR. HERSHEY: All right. Let's just do that now. Sorry.

MR. ORSECK: Larry, I think you manipulate it with your fingers on the screen.

MS. NEWMAN: Can we do that? How do we -- how do we do that?

MR. HERSHEY: I can't stamp it, but I can introduce it as an exhibit.

THE WITNESS: What'd I do?

MS. NEWMAN: Okay. Nothing. We're just going to pause --

MR. HERSHEY: I can send the file to Veritext Exhibit Share.

MS. NEWMAN: We're just going to pause to mark the exhibit, to mark the native as an exhibit.

MR. HERSHEY: Can people see it?

MR. MOSS: Yes, we have it now and have it open.

MR. HERSHEY: Okay. So that'll be Exhibit 8, I think.

THE COURT REPORTER: Correct.

(Exhibit 8 was marked.)

Page 119

MR. HERSHEY: Mr. Cash, do you need help getting to the --

MS. NEWMAN: Actually, no, I think he --

BY MS. NEWMAN:

Q. I'm going to actually ask you to navigate to the Key Assump tab on the bottom. You'll see it on the bottom. If you click on it, we'll go to that -- it will go to that page.

A. I'm not --

THE WITNESS: You want to navigate this?

MR. ORSECK: I could....

MR. HERSHEY: I can do it.

MS. NEWMAN: Ken can do it.

MR. ORSECK: I won't do it any better than you, Ken.

MR. HERSHEY: Is this what you want?

THE WITNESS: Okay.

BY MS. NEWMAN:

Q. Okay. So --

MR. ORSECK: Do I have this in my hard copy, or no, what we're looking at on the screen?

Page 120

MS. NEWMAN: No.

MR. ORSECK: No?

BY MS. NEWMAN:

Q. Okay. So this shows that in the final version -- this is the final version of the margin [sic] and -- of the model, and it shows that QHC's margins were projected to grow. And you see the Margin Improvement tab at row 13.

Do you see that?

A. Yes.

Q. And so were projected to grow --

THE COURT REPORTER: (Sneezes.)

Excuse me.

MS. NEWMAN: Bless you.

BY MS. NEWMAN:

Q. -- from 11.9 in 2016 -- actually, I'm using the whole numbers -- to 14.7 in 2017.

And that's because of the divestitures, right?

A. Correct.

Q. Okay. And then the margin grows then by .2 percent every year after that, right?

A. Right.

Q. Okay. And what was the basis for the assumption that the nondivested hospitals'

Page 121

EBITDA margin would grow by .2 percent in every -- in -- in each of 2018, 2019, and 2020?

A. You had a revenue growth of about 4 or 4-and-a-half percent, which probably meant the expenses were slightly less than that.

But also in '18 and '19 and '20, I -- I've said this earlier, that the Springfield project came in and probably generated 15 to 20-plus million dollars in '18, '19, and '20. I don't remember exact numbers, but it was a -- it -- it was an overall 50-basis-point improvement in the QHC margin by the end of 2020 for Springfield by itself.

Q. Okay. So was -- is all of the .2 percent the -- the Springfield project?

A. I don't -- it was -- what I remember was it was 50 basis points by 2020, and it would have grown a little bit each year.

Q. Okay. All right. Anything else that you considered in making the assumption about the .2 percent revenue growth in the out years?

MR. ORSECK: Object to form.

BY MS. NEWMAN:

Q. Excuse me. Excuse me. Margin growth in the out years?

31 (Pages 118 - 121)

Page 122

A. That probably you had a little bit better revenue over expenses. It doesn't show the expenses here, but you can see if the revenue is growing and EBITDA is growing a little faster, you had a little bit of margin improvement.

Q. But the revenue is just a projection, right?

A. All of it's a projection.

Q. Yeah. So I'm -- what I'm asking is, is are there --

A. Yeah.

Q. -- any other things, besides looking at the Springfield Tower --

A. Ahh --

Q. Just let me finish my question -- besides looking at the Springfield Tower that you looked at to form the -- the assumption that the EBITDA would grow by .2 -- the EBITDA margin would grow by .2 percent in '18, '19, and '20?

A. I don't remember something specifically. I -- Lee did the model with assumptions from various different people: Myself, Mike Culotta, Kevin Hammons, and I don't remember anything else.

But I -- the biggest change,

Page 123

probably since 2017, would have probably been -- from a margin perspective, would have been the 50 basis points over three years for the Springfield project.

Q. Okay.

A. There may be -- may be other items, but I do remember Springfield.

Q. Okay. Nothing else that you can think of, sitting here?

A. No, I don't.

Q. Okay.

MS. NEWMAN: 13.

(Exhibit 9 was marked.)

THE COURT REPORTER: Exhibit 9.

BY MS. NEWMAN:

Q. Okay, Mr. Cash. You've just been handed Cash Exhibit 9. And it's the same chain that we were just looking at, but now there's a response to you to Mr. Fleck's e-mail at the top. It says: "Thanks. It would seem you should be able to get to 15 percent faster and offset dis-synergies."

Do you see that?

A. I don't see that.

MR. ORSECK: I don't see --

Page 124

THE WITNESS: I don't see that.

MS. NEWMAN: Oh, do I not have the right document?

MR. HAVELES: This is the November 24th, 2013 e-mail.

MR. HERSHEY: This is not the right document.

MS. NEWMAN: Okay. We have the wrong document.

MR. HERSHEY: What's the number?

MS. NEWMAN: I'm at 12. Did I say 13?

MR. HERSHEY: You said 13.

MS. NEWMAN: Sorry. All right.

BY MS. NEWMAN:

Q. We'll -- we'll take that one.

MR. HAVELES: It's already been marked, so we'll just have to leave it there.

MR. HERSHEY: Yeah, we'll just come back to it.

(Exhibit 10 was marked.)

THE COURT REPORTER: Exhibit 10.

BY MS. NEWMAN:

Q. Okay.

Page 125

A. That's something that you....

Q. Thank you.

You should have Exhibit 10.

A. Okay.

Q. Okay. So now you should have in front of you a document. It's basically the same chain that we were just looking at, except now there is an e-mail from you at the top. It says: "Thanks. It would seem you should be able to get to 15 percent faster and offset dis-synergies."

Do you see that?

A. Yes.

Q. And on -- on what basis were you saying that you should be able to get to 15 percent faster?

A. Well, you had roughly 220 basis points from the divestitures. There's -- the calculation's right there. And you're at 12 percent. So that gets you up somewhere above 14 percent. And with those type of benefits from divested hospitals, although this may not be a full benefit here, it was eight hospitals. You would think that the operating improvement would be a little faster to get to 15 percent.

And the offset of dis-synergies,

32 (Pages 122 - 125)

Page 126

it just -- I -- I didn't quite agree with his comment the way he backed out the dis-synergies.

Q. So let's look -- do you still have the prior exhibit -- not this one, but the one we were looking at before -- handy?

MR. HAVELES: Exhibit 7.

BY MS. NEWMAN:

Q. Exhibit 7.

MS. NEWMAN: Thanks Peter.

THE WITNESS: Yes.

BY MS. NEWMAN:

Q. Okay. So if you look at the last page of the attachment.

A. Right.

Q. Flip it over to the last page of the attachment.

A. (Witness complies.)

Q. You can see the Margin with Dis-synergies line, which we've established is the projections model -- excuse me, the projections' margins and then backing out -- well, we know it backs out the eight divested hospitals.

Do you see that?

A. Yes.

Q. It only goes up to 14.5 percent.

Page 127

Do you see that?

A. I see 14.3 in '16.

Q. No, I'm looking at the Margins with Dis-synergies line. So not the actual --

A. Okay, correct. Correct.

Q. -- dis-synergies. So --

A. In 2020, it goes up to 14.

Q. It goes up to 14.5.

A. Right.

Q. So in response to that, you were saying, I think, that the margins should go up to 15 percent more quickly. And I'm trying to understand what was the basis for that statement?

A. As I said, first of all, you got the Springfield, which I don't know if he had the improvements in Springfield in this model. I know he got an e-mail from Credit Suisse sometime while we were doing this that they didn't think that they had the -- that he'd factored in the Springfield benefit. In the final model, the Springfield benefit's -- is in there.

He's got the -- the revenue moving up about $100 million a year, and his margin improvement off of that's, like, $21 million. You would think with $100 million of

Page 128

revenue, you -- you possibly could get a little bit better margin off that $100 million.

Q. So you were just looking at it and looking at the numbers and saying to yourself: I just think it should be better? We can get there more quickly, and how that --

A. I think --

MR. ORSECK: Objection, foundation.

THE WITNESS: I think if you are separating the hospitals, you're getting rid of the losing hospitals, you would get a little bit better growth in EBITDA in the remaining hospitals that he was projecting.

And -- and, again, you were -- saw the benchmarking against LifePoint and what LifePoint should be able to do, and we thought we should be able to at least do better or closer to them than -- than 14 percent.

BY MS. NEWMAN:

Q. How does backing out the divested hospitals make the EBITDA of the remaining hospitals better?

Page 129

A. Two things. One, the -- the historical numbers, the loss has been getting worse, okay? So you -- you got rid of that loss --

Q. Uh-huh.

A. -- growing loss in historical numbers.

Q. Uh-huh.

A. So when you get rid of that loss going up, you would help the future by not having an EBITDA divestiture loss increasing.

Q. Is there anything else?

A. You've got the -- the extra focus on these hospitals that should take place by being a separate individual company of their own.

Q. Okay. And when you said "offset dis-synergies" here, what did -- what -- what did you mean?

A. I -- I don't -- if -- No. 1, he had an $18 million number, which turned out to be something like 8. And I don't remember why he had gotten to $18 million. It -- it just didn't make sense. And I think later he -- he adjusted it -- he adjusted it based on better information.

Q. Okay. But I'm asking you, if you

33 (Pages 126 - 129)

Page 130

remember, you know, what you meant at the time that -- when you said: "You should be able to get to 15 percent faster and offset dis-synergies," I don't understand what it means in the --

A.   What --

Q.   -- context of that sentence.

A.   What that meant was if that was the dis-synergy number -- dis-synergy number, if you got a little bit faster, instead of going to 14, you got to 15, you'd have a little bit more profit, which would make the dis-synergies not be such a negative.

Q.   Got it.  Okay.

A.   As I remember what was -- meant by that.

Q.   Okay.  Sorry.  Now -- now we can look at this one (tendering).

A.   Is it staying 9?

Q.   Yes.  We'll go out of order.

Okay.  Just give me one second.

Okay.  So this is an e-mail chain.  You're on it.  Mr. Fleck is e-mailing Draft 7 of the model to Mr. Shorts from Credit Suisse and a -- and a number of other people.  Mr. Fleck writes:  "Please find attached Draft 7

Page 131

of the model," and notes that the Q4 2015 EBITDA has been reduced, but is largely mitigated in out years by reduced estimates of dis-synergies now at $8 million/$10-million-a-year drop.

Do you see that?

A.   Correct.

Q.   Okay.  The Q4 2015 EBITDA was being reduced because the third quarter results were lower than previously had been projected, right?

A.   I think we originally thought we made $275 million.  But I think we ended up thinking we'd make around 260-, or something like that, which would turn out to be -- it turned out to be a little bit better than that.  But at this point in time, the 275- that we originally had thought was -- was probably not going to be achieved.

Q.   Okay.  And this is -- that was why the -- the Q4 2015 EBITDA was being reduced, right?

A.   Correct.

Q.   Okay.  And this is one day after your e-mail saying that Quorum could offset dis-synergies, right?

Page 132

A.   Right.  But the -- the offset was -- the dis-synergy number of 18- was incorrect, and the $8 million was a correct number.

Q.   Okay.  It was you who instructed Mr. Fleck to reduce the dis-synergies from -- from 18- to 8-, right?

A.   No.

Q.   It wasn't you?

A.   No.

Q.   Okay.  Okay.  Let's look at the cover e-mail.

MR. HERSHEY:  Are you talking about the tab on the Excel?

MS. NEWMAN:  Yeah, the tab on the Excel.  I'm sorry, the Cover tab.

MR. HERSHEY:  Yeah.

BY MS. NEWMAN:

Q.   Okay.  In row 67, Mr. Fleck wrote:  "Changes 11/24/15 after MC/JWD and later LC/JWD discussion."

Do you see that?

A.   Yes.

Q.   Okay.  Mr. Fleck has previously testified that all of the changes listed in row 68 to 77 came from you or Mr. Doucette, and that the

Page 133

notation in row 7- -- oh, I'm sorry.  One second.  Yeah.  So 68 to 7- -- 77, and that the notation in row 70 was intended to indicate that he discussed the changes in those prior rows with Megan Moody and Mike Culotta.

Do you dispute that the changes in rows 68 to 77 came from you or -- or Mr. Doucette?

A.   Yeah.  If you go -- if you go back up here to --

Q.   Yeah.

A.   -- there's a discussion where -- where Kevin Hammons had said that the TSA should be lower.

Q.   You see that on the -- on the cover sheet?

A.   No.  It's -- it's not on the page.  Go -- go up some.

Q.   Oh, it's not on the -- got it.

A.   No, it's -- it's on the document.

Q.   I understand what you're saying.

A.   Yeah.  If you -- if you'll find the right comment.

MR. HERSHEY:  Sorry, you want me to....

34 (Pages 130 - 133)

Page 134

MS. NEWMAN: Can you scroll up?

THE WITNESS: Yeah. I -- I did not make a comment about the TSA. I think Kevin did that.

MS. NEWMAN: Up, I think.

MR. HERSHEY: Up here?

THE WITNESS: Yeah. He -- he's got the public company.

BY MS. NEWMAN:

Q. Yeah.

A. Then he's got some stuff about HPG. Then he added another $10 million, and then came back later and took that out.

Let's see where that came from. That didn't come from me. It came from Kevin.

Q. Right. So if you --

A. It -- it worked --

Q. So if you dropped down to --

MR. ORSECK: Wait, wait, wait. Have you finished your answer?

MS. NEWMAN: I -- I think this is going to be helpful for him.

BY MS. NEWMAN:

Q. If you drop down to 71 --

MR. ORSECK: I object.

Page 135

MS. NEWMAN: Okay. You can object.

MR. ORSECK: You can --

MS. NEWMAN: Noted for the record.

MR. ORSECK: All right. All right. All right.

BY MS. NEWMAN:

Q. If you go to 71 --

MR. ORSECK: You instructed him not to interrupt you a number of times. I'm just saying the same thing.

MS. NEWMAN: Okay, Gary.

BY MS. NEWMAN:

Q. If you go down to -- to line 71, it says: "Drop TSA from $10 million to $5 million."

A. Yes.

Q. Do you see that?

A. Right.

Q. And that comes under line 67, "Changes 11/24/15."

Do you see that?

A. Yes.

Q. Okay. So Mr. Fleck has testified

Page 136

that everything from row 68 to 70 came from either you or Mr. Doucette?

A. I --

Q. Do you disagree with that?

A. Yeah, yeah. I think -- I think Kevin gave him the changes. Kevin was doing the calculations --

Q. Okay.

A. -- on -- on the TSA. The bank says a term loan had issued 99-. I wouldn't have given this instruction. Maybe Jim Doucette did.

The -- the next one -- we'll just go through them. "Drop fourth quarter EBITDA from 79 to -- to low 60s." As I said, I think we did -- now, I may have said it looks like we're not going to make the $275 million. That may have come from me.

Q. Okay, Mr. Cash. I'm not asking you to go through every one.

A. Well, you said they all came from me.

Q. Yeah.

A. And I'm just telling you that --

Q. I asked you and you told me that you don't think they did.

Page 137

A. That's correct. Okay.

Q. Okay. Let's turn back to the cover e-mail from that document right there (indicating). 9, I think it is.

A. Yeah.

Q. Okay. In No. 3, Mr. Fleck says: "Additional cash is generated in the out years from improvement in AR days, three days."

Do you see that?

A. Yes.

Q. Okay. Did you make Mr. -- instruct Mr. Cash [sic] to make that change?

A. That would be one I did say, because we had been in the process of converting our hospitals to a central service center, and we had let our performance slip a little in all those conversions we did. I think in 2015, QHC did 11 hospitals, and then they also did five or six in 2016.

And -- and those type of conversions are a little challenging when you're taking it from the hospital and centralizing it. And as we got that done and got better at it, our AR days should have improved. We were a little bit of an outlier on some of the AR days. Not a

35 (Pages 134 - 137)

Page 138

lot, but -- but we thought we could do a little bit better than what he'd originally estimated. Which I think Lee Fleck agreed with.

Q. Okay.

A. And -- and everyone else agreed with.

Q. Okay. And then it also says in No. 3: "CapEx reductions now 3.8 percent of net revenue"?

A. Yeah. I think I said earlier they were not running at 5 percent, and -- and we didn't have them run at 5 percent in the model.

Q. Okay. Was that your -- did you instruct Mr. Fleck to reduce CapEx in the model?

A. I -- I don't know if I did that or someone else did. I don't -- I don't specifically remember.

Q. Okay. Okay. Let's look back at the cover e-mail in the mod- -- in the model. In row 77 --

MS. NEWMAN: We're going to have you scroll down.

MR. HERSHEY: Sure.

BY MS. NEWMAN:

Q. Okay. In row 77, it says:

Page 139

"Reduce CapEx if needed."

Do you see that?

A. Yes.

Q. Okay. And Mr. Fleck has testified that that's a change that came from you or Mr. Doucette. Do you know if it came from you?

A. I don't remember it. It also says that Mike Culotta and Jim Doucette did -- it -- it says: "Changes 11/24 after discussion with Mike Lomicka/Jim Doucette, Larry Cash and Jim Doucette."

I don't remember saying specifically reduce CapEx.

Q. You don't remember?

A. No.

Q. So you don't know one way or another whether it -- that came from you?

A. I mean, I -- I may have said that, but I don't recall specifically.

Q. Okay.

A. But I -- I didn't say it specifically to Lee Fleck, I know that.

Q. Did you say it to anyone else?

A. I don't think so.

Q. Okay. Did you think that CapEx

Page 140

should be at 3.8 percent in the out years, 3.8 percent of revenue in the out years?

A. That's what we ended up using in the -- in the projections. You -- you cover all your maintenance CapEx at that. You -- you can have left over a couple percent.

I do believe he had made sure he kept enough CapEx in the Springfield -- for the Springfield model, because initially when they were working on the model, Lee had reduced the CapEx project from $88 million to $50 million and that was an incorrect thing to be doing to have a correct model.

So I told -- I did tell him through Jim: You've got to put an entire project, because the project's going to be 80-something-million dollars. I do remember that discussion very -- very vividly.

Q. You've testified --

A. And it's probably --

Q. -- to that many times.

A. And it's probably the biggest change, negative change, made in this model --

Q. Uh-huh.

A. -- over the last four months it

Page 141

was worked -- four or five months it was worked on.

Q. Well, there's no way the tower project could have been completed for $50 million, right?

A. Not -- not if they did all the work. Up to that point, they said it's going to be 80-something-million dollars, so I don't know why he did that.

Q. That would have obviously been an incorrect assumption, right?

A. That's why I had him correct it. And, unfortunately, it caused the cash to go down.

Q. Why -- why did the model assume or the projections assume 3.8 in CapEx when you had previously testified -- or, excuse me, stated publicly that the target CapEx for -- for a hospital company should be 5 percent of revenue?

MR. ORSECK: Foundation.

THE WITNESS: You know, either myself or Mike Culotta or Jim -- Jim Doucette would have thought that was enough CapEx that they could accomplish what their objectives were. And, as I said, we made sure we had enough money

36 (Pages 138 - 141)

Page 142

in there for Springfield, which was the biggest project I had.

BY MS. NEWMAN:

Q. Okay.

MS. NEWMAN: 14.

(Exhibit 11 was marked.)

THE COURT REPORTER: Exhibit 11.

BY MS. NEWMAN:

Q. So we've included the e-mail, Mr. Cash, just to make sure that we have the final copy of the Form 10 and one that is Bates-stamped.

A. Uh-huh.

Q. I'm not going to ask you questions about the e-mail, just the document attached to it.

A. Okay. (Witness reviews document.)

Q. So it's a very long document, obviously. I'll ask -- give you an opportunity to look at any sections that I --

A. Okay.

Q. -- ask about.

A. Thank you.

Q. You've seen this document before, correct?

Page 143

A. Correct.

Q. Okay. Can you identify it for the record, please?

A. It's the Quorum Health Corporation Form 10, Amendment No. 6.

Q. Okay. And what --

A. I think that was the final --

Q. It was.

A. -- amendment.

Q. It was, sir.

What was the purpose of the Form 10?

A. It's a required document in -- in a spinoff transaction, provide public -- provide public information about the -- the spin company. And it's got some performance -- limited performance information in there.

Q. Okay. And is it correct to say that CHS did everything it could to make sure that all of the information in the Form 10 was accurate?

A. CHS and its advisors: Deloitte & Touche and probably Bass, Berry & Sims and -- and -- and the QHC management.

Q. Okay. Please turn to page F1,

Page 144

which is towards the back and has Bates Nos. ending in -380.

A. (Witness complies.)

Q. Okay. This is an index to financial statements for QHC, correct?

A. Correct.

Q. Okay. I'm going to refer to these as the "carveout financials," okay?

A. Okay.

Q. Will you understand what I'm talking about?

A. Yeah.

Q. Okay. How are the carveout financials created?

A. Kevin Hammons undertook the -- the effort as the Chief Accounting Officer, Senior VP at the time. And we had -- once we identified the 38 hospitals, we pulled their hospital information, and we also worked with Deloitte & Touche to do an audit of those 38 hospitals. We ended -- ended up verifying that the receivables were -- were appropriately stated and we had also made sure that all the other liabilities as part of the audit were stated.

And we did -- had some help from

Page 145

KPMG on some insurance allocations that we had, to make sure that was correct, and also KM- -- KMP- -- KMPG [sic] did some work on the goodwill. So, in essence, an audit was done of the books and records for the 38 hospitals.

Q. Okay. The corporate costs that were included in the carveout financials were corporate costs that had been historically allocated to QHC by CHS for corporate expenses and services, correct?

A. That, I think, is correct. Then we also added, from a pro forma perspective, $3 million for the -- for the directors and the, you know, insurance. And maybe a little bit extra audit expense.

Q. Okay. You think that $3 million was actually included in the carveout financials?

A. Not in the actual, but I think it's footnoted -- I thought it was in a pro forma somewhere in the document.

Q. You mean just in the text somewhere?

A. Yeah, yeah.

Q. Okay. Okay. The carveout financials did not include new or increased costs

37 (Pages 142 - 145)

Page 146

that QHC might incur as a standalone company, correct?

A.   Other -- well, it -- it didn't include the $3 million -- the foot- -- the -- somewhere in here there's a footnote about the $3 million and, of course, the TSA of $5 million. I think they were footnoted somewhere in the finan- -- in this document.

Q.   Okay. But other -- and that's not -- I think we just established, that's not actually in financial themselves.

A.   Right, right.

Q.   Okay.

A.   But -- but there was -- a lot had done -- and it stated the insurance allocation for Workers' Comp wasn't as correct as it needed to be, we'd make that adjustment in the historical financial statements.

Q.   Okay.

A.   If we determined that, which I don't think we did.

Q.   Okay. The carveout financials did not include the full amounts of the salaries of the CHS employees that were going to be transferred to QHC, correct?

Page 147

A.   I think we believed that the corporate overhead that we had included in here was adequate to cover most of the staff that went over there. I don't think there was extra cost over and above what the management fee -- as best we could -- as best we could determine.

And Kevin could probably answer that question better than I can, but that's my understanding.

Q.   Okay. So is it fair to say, then, that CHS made a determination that the allocation of corporate costs that was reflected in the financial statements were equivalent to the corporate costs that QHC would incur as a standalone company?

A.   I believe that is correct. And -- and at a point in time. You know, not at the end of 2016, but at a point in time when you were doing these [sic] work late in '15 or early in '16, it was what was representative of the 30 direct- -- 30 aud- -- 30 directors that were going over there, plus the staff that support that.

Q.   When you say "30 directors," what do you mean by that?

A.   That there was 30 VPs or

Page 148

directors --

Q.   I see.

A.   -- that were early identified in October of 2015. So people knew who those were. And then a number of other people -- number, not names -- were identified for staff and secretaries and clerks and managers, et cetera, and I -- and I believe that the -- the intent was that the allocations done would include those, is my -- is my understanding.

Q.   Okay. Was the $8 million in incremental costs that we've talked about as being discussed in the text of the Form 10, was that intended to represent all of the incremental costs that QHC would incur --

A.   Ahh --

Q.   Let me finish, please -- that QHC would incur as a standalone company?

A.   I believe there was a footnote in here -- I don't remember what page it was -- that said that that was -- there was a pro forma. It didn't -- it didn't mean to say that every dollar of cost was identified. And -- and it was what it was, a pro forma of what was known. And I think there's a -- a comment about that, I don't know,

Page 149

page 56 or 65, I forget. But there's -- there's a section here that addresses that.

Q.   Okay. So it's not as though that $8 million -- or let -- strike that.

It's not as though CHS sat down and said: Let's think about all the things that QHC might do as a public company, and here's what the costs of those would be, and that number is reflected in the text of the Form 10, correct?

A.   Well --

MR. ORSECK:  Object to form.

THE WITNESS:  -- for -- for instance, after the spinoff, the new board, a month or so later, gave salary increases to the officers of QHC. It increased the stock grants to them. That wasn't anticipated, and I think there was a comment in the 10-Q that you can't anticipate the future. And we knew what we thought was going to be extra costs, and those were footnoted.

But if they went and -- and they did give themselves, they -- instead of waiting till January of 2016, because they had gotten an increase in January

38 (Pages 146 - 149)

Page 150

of -- excuse me, January of 2017, they had got one in '16, there was some salary increases that were not anticipated in the 2016 work.

Also, I think there's -- looking at it in hindsight, there's a couple of departments that Tom Miller may have added, that he wanted different than what was originally -- I think there was an ER department. And they also bought a -- an airplane that -- that was not anticipated.

BY MS. NEWMAN:

Q. Okay. Please turn to page 56.

A. (Witness complies.)

Q. Okay. So this is the -- I'm sorry, sir.

MR. ORSECK: What does 56 mean? The Bates or F- --

MS. NEWMAN: It's -- no. It's -- 272 is the Bates.

MR. ORSECK: Are you on the Form 10?

MS. NEWMAN: Yeah.

THE WITNESS: Okay.

Page 151

BY MS. NEWMAN:

Q. You there? Okay.

This is the language that we've been talking about relating to the $8 million in the middle of the page, correct?

A. Yeah.

Q. Okay. Was that $8 million supposed to be a recurring $8 million an annually [sic] ba- -- annual basis going forward?

A. The $3 million would have been going forward. And as long as you probably had the Transitional Services Agreement in place, that would probably re- -- reoccur.

Q. And the Transition Service Agreements had a terms of five years each, right?

A. Yes.

Q. Okay. Okay. Can you turn to -- actually, you know what? I'm not going to do that. Actually, yes.

Let's go to F20, please.

A. (Witness complies.)

Q. Okay. You can see in the middle of the page that the Management Fee is listed there.

Do you see that?

Page 152

A. Yes.

Q. The 36.4?

A. Yeah, yeah.

Q. Okay. I want to look at the IS tab in the model, please.

Okay. So I have some technical questions about the model, which you may be able to answer, maybe not. We'll -- we'll see.

I can represent to you that the total expenses of 1940, they're at the bottom in the model for 2015.

Do you see that?

A. Yes.

Q. Okay. That matches the total expenses that's shown in the Form 10, but the Management Fee in 2015 in the model is $41 million, whereas in the Form 10, it's 36.4.

Do you know why -- obviously, some things were included in the Management Fee in the model that weren't included in the Management Fee in the Form 10. Do you know what that -- those are?

A. Well, each year's off a little bit. Yeah, '13's off a little bit. '14's off the other way a little bit. I -- I would have thought

Page 153

he would have put the $3 million in the model, because he -- you know, he was trying to get the -- and he probably also put the $5 million in the model. And the $3 million would not be in this -- these. So that's probably $3 million of it, but....

Q. Well, the 1940, it sums to the same number.

A. I -- then, I --

Q. So you don't know?

A. No, I don't -- I don't know.

Q. Okay.

A. I mean, he....

Q. Okay.

A. At least he got the total right.

Q. I think he just moved some things around, probably.

Okay. So I'm not going to ask you -- if I were to ask you questions about where things are housed in various categories on the model, sounds like that's not something --

A. No, I -- I didn't --

Q. -- that you would be familiar with?

A. -- do the model. I reviewed

39 (Pages 150 - 153)

Page 154

summary data.

Q. Okay.

A. You know, somewhere the $8 million is in this model, but....

Q. Okay.

MS. NEWMAN: Okay. Let's -- let's do tab 15.

THE WITNESS: We done with this one?

BY MS. NEWMAN:

Q. Yeah. Yes. Well, we're going to come back to that several times, so probably --

A. Okay.

Q. -- just keep it somewhere handy. Thank you.

(Exhibit 12 was marked.)

THE COURT REPORTER: Exhibit 12.

BY MS. NEWMAN:

Q. Okay. You've just been handed Cash Exhibit 12. Have you seen this document before, sir?

A. I may have seen it in looking at -- there, but I -- I don't remember the specific document. Let's see if I was copied on it.

Q. I can't -- you can't tell one way

Page 155

or another from looking at the document?

A. No. I mean, I -- I don't recall.

Q. Okay. Do you know what it is?

A. I think it's an effort for the Financial team and CHS to document an accounting memo to the files. I -- I think that's the purpose of what they're doing here.

Q. Okay. Can you turn to page 4, please?

A. (Witness complies.)

Q. So this memo explains at the top that when possible, management uses a direct cost method to assign costs which can be specifically identified by an invoice or other specific identification method.

Do you see that?

A. Yes.

Q. Okay. So -- so where possible, hospitals -- where -- where specific costs could be tied to a specific hospital, then that cost just was charged to the hospital in full, correct?

A. Correct.

Q. Okay. More towards the middle of the page, it says that: "Management has determined that in circumstances where specific

Page 156

identification of cost to a hospital is not practicable or possible, it is appropriate to perform an expense allocation across all hospitals based on proportional share of net revenues."

Do you see that?

A. Yes.

Q. Okay. And then it lists a number of services or expenses that are accounted for in that way.

Do you see that?

A. Yes.

Q. Okay. And do you -- QHC was about 12 percent of CHS's net revenue; is that correct?

A. Correct.

Q. Okay. Okay. So for these services, compliance expense, health information and information management, everything that's listed on page -- pages 4 and 5, 12 percent of CHS's costs would have been allocated to QHC historically; is that correct?

A. That's -- that's what I think this is saying.

Q. Okay.

A. There's a little bit up here

Page 157

about a cap of above $200 million, so it's not exactly. There's a couple of QHC hospitals that may have had it capped.

Q. Okay. So would the last two services the Man- -- on page 5, the Management Information Systems and Birmingham Data Center, were those services that were provided under the TSAs?

A. The Birmingham Data Center, I don't think it was. There was an MIS allocation that was done. And I believe what we did was carry the historical allocation forward and increased it by 4 percent. So, in other words, whatever they were getting allocated in 2015, the -- we upped it 4 percent. And -- and we may or may [sic] have had a couple of small margins on it, but I -- so it wasn't like it was going to reallocate based on different revenue assumptions, is -- is -- is my recollection.

Q. Okay. The other -- the -- the other -- besides -- besides MIS and the Birmingham Data Center, the other departments and expenses that are listed here, are these things that QHC was going to require as a standalone company?

A. The facilities management,

40 (Pages 154 - 157)

Page 158

someone else went over there to do the work. They -- and there was a person that went over there.

I don't remember about real estate.

Operation support, I believe they didn't get a person for that, but they did get a Quality person, back on page 4. They got someone for Marketing.

The HIM was a TSA service, I believe.

Q. Okay.

A. The Compliance, they got a Compliance person that went over there.

Q. Okay. So was any work done to determine whether the 12 percent allocation that was historically allocated to QHC was going to be equivalent to QHC's costs for these services on a go-forward basis?

A. I -- I -- I -- I don't know. Kevin and I probably did some work on that. I know he's done some work on the corporate overhead. If it was done, it was done under Kevin's guidance.

Q. Okay. Do you have any specific recollection of that?

Page 159

A. I -- he did some work on the corporate overhead, which identified some of the things I mentioned earlier about salary increases and a new department. And also the airplane. But -- but I don't -- he would be the better person to respond to that question.

Q. Well, the -- the work that you talked about before about salary increases and -- and an airplane and things, those were things that you said were unanticipated that QHC --

A. Right.

Q. -- incurred after it was spun, correct?

A. Correct.

Q. Okay. So I'm asking something slightly different, which is in preparing the projections, was any work done to assess whether the 12 percent of the cost that was allocated to QHC historically was equivalent to the cost that QHC would incur for these services on a go-forward basis as a standalone company?

A. I think Kevin may have done some work. I -- I did not get involved in that work, if it took place. But I think Kev- --

Q. Okay. So you don't know?

Page 160

A. I -- I think Kevin may have done some.

Q. But you don't know?

A. No.

Q. Okay. Can you turn to page 8, please.

A. (Witness complies.)

Q. The -- the third paragraph on the page talks about the Management Fee.

Do you see that?

A. Is it third or second?

Q. I'm focussed on -- they -- the second one does as well.

A. On the third one? Okay.

Q. I'm focussed on the third one.

A. All right.

Q. And that's because what the third one explains is that the Management Fee, or -- or certain services that were charged to hospitals as a Management Fee, the charge was based on the number of licensed beds that the hospital had, correct?

Actually, let me -- let me -- let me withdraw that, and I'll actually ask you to look at page 9. And I think page 9 explains that

Page 161

for the majority of the corporate departments that are embedded in the Management Fee, 100 percent of the costs incurred are allocated to the hospitals based on the number of licensed beds.

Do you see that?

A. Yes.

Q. Okay. And is that consistent with your understanding?

A. I believe it was licen- -- licensed beds.

Q. Okay. And do you recall that QHC had about 12 percent of -- of the total licensed -- well, let me strike that.

That -- that the licensed -- QHC's percentage of licensed beds was approximately 12 percent of CHS's licensed beds?

A. I remember the revenue being 12 percent. I'm not exactly sure of the licensed bed percent.

Q. Okay. I'm -- I will represent to you that it was approximately 12 percent.

A. I know the revenue was 12.

Q. Okay. Were the services that were part of the Management Fee services, services that QHC would need as a standalone company?

41 (Pages 158 - 161)

Page 162

Well, you know what, I'll -- let me withdraw that.

The -- the services that are listed on this page on page 9, these are the services that were charged through the Management Fee, correct?

A.    Right.

Q.    Okay.  And one of them, for example, is CEO, CEO's office.  That's something that QHC was going to need on a -- on a standalone basis, correct, a CH- -- a CEO's office?

A.    They would have a CEO's office.

Q.    Okay.  So -- so is it fair to say that several of the line items listed in these -- in these charts are things that QHC was going to need as a standalone company going forward?

A.    I know there was 30 different functions that we identified people for.  Some of these are listed here.  There's some that are more than enough listed here.

Like, Naples IT, they're not going to need a Naples IT.  Or they're not going to need six divisions.

Q.    Right.  So some that they wouldn't, but many that they would, correct?

Page 163

A.    Many, yes.

Q.    Okay.  And would your answer be the same for these services that you don't know whether QHC did any work to assess whether the 12 percent allocation -- excuse me, let me strike that.

Is it the case that you don't know whether CHS did any work to assess whether the 12 percent allocation that QHC received historically was equivalent to the cost for these services that QHC would -- would incur going forward?

A.    I believe some --

MR. ORSECK:  Objection.

THE WITNESS:  I believe someone in Kevin's staff probably did do some work.  I believe also the QHC management got the list of the 30 people that were going over and a list of other people going over, and most of this corporate cost, 75-80 percent, were salaries, benefits, and bonus.

So with the information that they had, probably by the end of fourth quarter, they could have gone through

Page 164

and done a verification themselves, if they wanted to.

BY MS. NEWMAN:

Q.    I -- I'm asking something different, which is in connection with the projections --

A.    Yeah.

Q.    -- did -- do you know if CHS did any work to determine whether the historical 12 percent allocation for the functions listed here was equivalent to the cost that QHC would incur as a standalone company going forward for these services?

A.    I don't know if he --

MR. ORSECK:  Objection.

THE WITNESS:  -- I don't know if he did or didn't do it.

BY MS. NEWMAN:

Q.    Okay.  Okay.  Page 9 also explains that only 50 percent of the costs of the CEO, CFO, Board of Directors, and aviation was allocated to the hospitals, correct?

Do you see that?

A.    Yes.

Q.    Okay.  I will represent to you

Page 165

that CHS's Form 10-K for 2015 disclosed that CHS's C- -- CEO made $1.6 million in 2015.

A.    Okay.

Q.    And I will also represent to you that if you multiply $1.6 million by 50 percent and then multiply that number by 12 percent, you get $96,000.

Do you know if $96,000 is the amount of CHS's CEO expense that was allocated to QHC in 2015?

MR. ORSECK:  Objection, foundation.

THE WITNESS:  Don't know.

BY MS. NEWMAN:

Q.    Okay.  Do you know if QHC's CEO, once CEO [sic] became a standalone company, made more than $96,000?

A.    Probably so.

Q.    All right.  You started to allude to this a little bit before, but I'm going to ask you again.  When were the QHC executive salaries set?

A.    Sometime after the spin.  Either in -- either at a board meeting in May or -- or a subsequent board meeting.

42 (Pages 162 - 165)

Page 166

Q. Okay. So the salaries weren't set before the spin?

A. Correct.

Q. Okay. And the projections don't incorporate any assumptions about what those salaries will be, right?

A. It was done after. The work on the projections probably finished sometime in February, March, and no one anticipated the -- the future salary increases. They'd gotten a salary increase in January of 2016.

Q. I'm not asking you about the salary increases, sir. I'm asking you about the executives' salaries, the QHC executive salaries.

Is there anything in the QHC projections that incorporate the QHC executive salaries, other than the Management Fee?

A. Well, there was no estimate of future unknown activity, such as the salary increase. However, looking at the guidance for 2016, the expenses were relatively very close to what was in the 2016 guidance versus what the actual was. So while it wasn't considered, somehow it got covered.

Q. It wasn't considered --

Page 167

MR. ORSECK: Objection, foundation.

THE WITNESS: The --

BY MS. NEWMAN:

Q. -- in the projections? Is that what you just said, it wasn't considered?

A. That there wasn't a specific line item that I'm aware of -- maybe Lee Fleck would have done something, I don't know -- that he put in for a future salary increase.

Q. Okay.

MS. NEWMAN: Tab 17, please.

(Exhibit 13 was marked.)

THE COURT REPORTER: Exhibit 13.

BY MS. NEWMAN:

Q. This is very small.

A. I meant to bring my magnifying glass.

Q. We'll struggle through it together, sir.

Have you seen this document before --

A. No.

Q. -- Mr. Cash?

A. No.

Page 168

Q. Okay. Okay. So the first page explains at Note A -- where is Note A -- which is in the middle of the page -- well, actually, you know what? Let's start actually with the top line.

It says -- it says: "As discussed in the company's corporate allocations memo," which I think we've looked at, "CHS, Inc. allocates corporate overhead expenses to the hospitals via Management Fee based on the pro rata number of licensed beds at each hospital."

Do you see that?

A. Yes.

Q. Okay. And if you drop down to Note A, it says: "As described by the company above, these departments represent functions that spend approximately 50 percent of their time/resources managing the facilities and the other half is related to investor relations and corporate development," and I'm skipping ahead a little bit. "50 percent of these departments to be appropriate estimates of shareholder activities, and thus not chargeable to the CHS hospitals."

Do you see that?

Page 169

A. Is that in the same --

Q. Yeah.

A. -- page?

Q. Basically, I think that what this note is saying is that --

A. Yeah.

Q. -- the -- the items that have an "A" next to them are items for -- for which only 50 percent of the cost was charged to the hospitals based on the licensed bed allocation.

A. Yes, I read that.

MR. ORSECK: Wait. You didn't get a question yet.

BY MS. NEWMAN:

Q. Okay. Do you -- is that how you read this?

MR. ORSECK: Objection.

THE WITNESS: Let me read it just a second.

BY MS. NEWMAN:

Q. Sure.

A. (Witness reviews document.) So it says they spend 50 percent of their time managing facilities and then other activities.

Q. You know what, I'll -- I'll

43 (Pages 166 - 169)

Page 170

withdraw the question.

I just want to ask you about a couple of the items that have an A next to them.

A.   Okay.

Q.   Do you know what "CEO other" would entail?

A.   I think that's got to do with shareholder meeting expenses --

Q.   Okay.

A.   -- and a catchall.

Q.   Okay.  And what -- and what about CEO's office?

And I'm asking that because at the bottom it says "office of the CEO."  So I'm trying to understand what the two -- what the difference between the two is.

MR. ORSECK:  Objection, foundation.

BY MS. NEWMAN:

Q.   If you know.

A.   It says:  "CEO other, CFO office, office of the CEO."  I -- I -- the office of the -- of the CEO would have the CEO in that department -- in this classification.

Q.   Do you know what the difference

Page 171

is between CEO's office and office of the CEO?

MR. ORSECK:  Objection, foundation.

THE WITNESS:  I'm not --

MR. HAVELES:  It doesn't say CF- -- CEO.  It says CFO.

MS. NEWMAN:  Ah, your eyes are pretty good, Peter.

MR. HAVELES:  Great glasses.

THE WITNESS:  There's a "CEO other" and then and "Office of the CEO."

BY MS. NEWMAN:

Q.   Of the CEO.

A.   Yeah.

Q.   And then a CFO's office, as Peter --

A.   That's --

Q.   -- has pointed out.

A.   Yeah, I know what that is.

Q.   Okay.  So "CEO other" you think is the shareholder meetings?

A.   Are you -- someone spent --

MR. ORSECK:  Foundation.

THE WITNESS:  It -- it -- that -- I'm not for sure, but it -- it's my

Page 172

recollection you put expenses there that we couldn't put somewhere else, like a contribution.

BY MS. NEWMAN:

Q.   Okay.

A.   Well, a corporate contribution probably could have gone in this department.

Q.   Okay.  And everything related to the C- -- CE's O [sic] -- CEO's office would be in "office of the CEO"?

MR. ORSECK:  Same objection.

THE WITNESS:  As I remember, but I could be incorrect.

BY MS. NEWMAN:

Q.   Okay.  And everything related to the CFO's office --

A.   That's just CFO.

Q.   -- would be in that "CFO's office" line?

A.   Correct, a secretary and the CFO.

Q.   Okay.

MS. NEWMAN:  All right.  18, please.

(Exhibit 14 was marked.)

THE COURT REPORTER:  14.

Page 173

BY MS. NEWMAN:

Q.   Mr. Cash, you've just been handed Cash Exhibit 14.  In the e-mail on the bottom of the page, you ask Ms. Mitchell to send you the detail by category of the $6 million increase in corporate allocations in first quarter.

Do you see that?

A.   Yes.

Q.   Okay.  Was there a $6 million increase in the corporate expenses that CHS was allocating to its hospitals in the first quarter of 2016?

A.   The confusion here -- I don't see here $6 million identified on the next page.

Q.   Okay.  So I can help you with that.  If you look at the top e-mail -- go back to the cover e-mail.

A.   Yeah.

Q.   She says:  "The 6 million number is just one-fourth of the year-over-year variance."

Do you see that?

A.   Yes.

Q.   Okay.  So I -- I think, and you can tell me if that's wrong, that the 26.6 million

44 (Pages 170 - 173)

Page 174

number that you see in the bottom right --

A.   Yes, I see what you're saying.

Q.   Okay -- that that's the annualized number for the 6 million.

Do you -- is that right?

A.   Right.

Q.   Do you know how that 26.6 annualized number was -- was calculated?  I mean, obviously we can see the -- the component numbers --

A.   She's --

Q.   -- but how they projected?

A.   She's -- these are allocations to her division, which I forget, I think it's Division 3.  And she compared the 2015 to the sum of 2016.  And one of her issues is you've got some cost in '16, like HIM services and SCC Corporate Management Services and a couple others to allot.  But those two didn't have a cost in '15.

And what we had done, I think I mentioned earlier, had been converted hospitals in '15 and in '16 and -- excuse me, SCC contract management, which is part of the S- -- SCC.

But the big one in here is the HIM, and we started centralizing all of the

Page 175

hospitals' HIM work sometime in '15 and got it done in '16.  So as we would have been incurring costs in a corporate service in '16, the hospitals were doing the work in '15.  So it's a -- it -- the one reason for the increase is the hospital's work should be going down as we centralized the work there.

The rest of them are just allocations.  The biggest one, malpractice insurance.  That's not a big increase, 4 million on 66.  Health insurance is a pretty big number on here somewhere.  It's another 5 million.  That's a 3 percent increase.  The corporate overhead itself is a -- the 4 million on a 26 million.  So it's -- it's up a little bit.

Q.   Okay.  Sir, this is only for Division 9?

A.   Division 3, I think, because that's where -- Lynne Mitchell, I think, was in Division 3.

Q.   Okay.  Was there other -- were other divisions seeing increases in their corporate costs?

A.   Most all divisions also increased in corporate cost.

Page 176

Q.   Okay.  And in 2016?

A.   Yeah.

Q.   Over 2015?

A.   Correct.

Q.   Okay.

A.   And it would have either have been -- property taxes could vary.  I mean, these are what we think are their property taxes.  And -- so one division could have more property taxes than others.  Most of the increases would be fairly consistent between divisions for the big categories.

Q.   Okay.  There's a notation at the bottom of the page that says:  "QHC spinoff facilities will not see allocations for," and then there's four items listed there.

Do you see that?

A.   Yes.

Q.   Okay.  What's Sg2?

A.   What?  Excuse me?

Q.   What's Sg2?

A.   That's a marketing firm that spent $256,000 that we used to identify patient data and analytical data.

Q.   Was --

Page 177

A.   It wasn't -- it wasn't a bigger cost.  It was -- it was, like, $200,000 a year, $300,000 a year.

Q.   Okay.  Was QHC going to require some kind of service like that as a standalone company?

A.   I -- I don't know if they would or would not.  $250,000 doesn't get you a lot.

And they had a Marketing department, which it wasn't decided if they wanted somebody else or didn't want it at all.

Q.   Was QHC going to need a cash management and bank service?

A.   I think they transferred some staff to do some of the treasury work for them.  And I know Jim Doucette transferred over, and I assume that they were going to manage their own.  I don't remember if that was part of TSA or not.  I don't think it was.

Q.   Okay.  Do you know why they weren't being allocated any cost for those services in 2015?

A.   Cash management/bank services.  This is probably trying to say they didn't get allo- -- thing -- anything allocated for '16.

45 (Pages 174 - 177)

Page 178

They probably would have been allocated something in '15. It doesn't -- it doesn't say that, but I think that's what it --

Q. Why wouldn't they be allocated anything for that in 2016?

A. Somebody must have said that the first couple of months we're going to do the spend -- I don't know the answer, and I don't want to speculate.

Q. Okay. So you don't really know if that's for 20- -- just for 2016 versus 2015, correct?

A. Don't -- don't know for sure.

Q. Okay. Nothing was incorporated into the projections to account for these increases in -- in corporate costs in 2016, correct?

A. All the --

MR. ORSECK: Object to form.

THE WITNESS: All the increases here are allocated to all of the hospitals, and so they have gotten a health insurance allocation. They'd have gotten an HIM allocation. They'd have gotten a malpractice allocation.

Page 179

Now, what we did not do, there was about $121 million of liabilities on the books of the audited QHC financials as on the parent -- for the -- we kept that liability on the books of CHS.

BY MS. NEWMAN:

Q. Okay. I'm asking you something different than I think the question that you answered.

My question was whether or not there were any changes made to the projections to account for the increases in corporate costs that the company was seeing in 2016?

A. The budgets were provided to the QHC management of all the hospitals, with the allocations. I believe the projections would have taken in consideration the expenses in '15 and any increase that could have taken place in '16, I think he was attempting to do.

And he -- and he -- and the actual projection, I think, of the expenses, here it is right here, $2 million and -- and the -- they ended up, for the QHC facilities for 2016, they had less expenses than $2 million.

Q. You talking about the $2 million

Page 180

a month notation on this page?

A. No, no, I'm talking about projections. You asked about the projections.

Q. What are you referring to when -- the record -- if you're going to refer to something, just please note it for the record.

A. Okay. I'm --

Q. What are you referring to?

A. -- referring to your projection that's on the screen here, $2 million in the Expenses.

Q. $2 million in expenses?

A. Total expense --

Q. Where do you see that?

A. -- for 2016.

Q. And you -- and you think that these increase -- I'm asking you -- I'm asking you if the increases that are reflected here that the company was experiencing in 2016 over 2015, if any change was made to the projections to account for these increases?

A. The projections would have taken into consideration inflationary costs, and I think that was -- and these were allocated to the hospitals. And I believe it was considered in the

Page 181

-- in the projections. And as a proof of that, the $2 million is greater than what the actual expenses turned out to be for 2016.

Q. You know, sir, that the -- that the -- that the projections were not a hospital's up projections, they were a -- top-down projections, right?

A. The hospitals did a projection, did a budget.

Q. Uh-huh.

A. And then they did a top-down projection.

Q. Right. So the hospital projections are not incorporated into the projections that we used --

A. No, no.

Q. -- in connection with the spinoff, correct?

A. The hospital projections are separate and different than the projection model.

Q. Thank you.

So my question is whether or not these increases that CHS was seeing in 2016 in corporate costs were reflected -- or let me strike that.

46 (Pages 178 - 181)

Page 182

My question is whether there were any changes made to the spinoff projections to account for the increased corporate costs that CHS was seeing in 2016 over 2015?

A. I -- I think there were.

Q. And how -- how was that -- what were they?

A. Well, I just -- proof of it was included, is that the --

Q. I'm not asking you for the proof, sir.

A. Okay.

Q. I'm asking you --

A. I think I --

Q. -- what happened --

A. I -- I think Lee Fleck did enough work to try to account for any expenses that were going to be incurred in 2016.

Q. But were any specific changes made in connection with the increased expenses that CHS was seeing in 2016 over 2015, that you are specifically aware of?

MR. ORSECK: Object to form.

THE WITNESS: I -- I -- I think Lee did this projection. He took the

Page 183

expenses up from a million-940 to 2 million, which should have accounted for the -- all expenses that were going to be incurred in '16.

BY MS. NEWMAN:

Q. But you do not know, correct, sir, whether any changes were made --

A. I --

Q. -- specifically with respect to the increased expenses that CHS was seeing in 2016 versus 2015 --

A. I -- I --

Q. -- correct?

MR. ORSECK: Objection, foundation.

THE WITNESS: I only know that they -- there was $60 million of extra expenses, which turned out to be adequate for what the actual results were.

BY MS. NEWMAN:

Q. Thank you, sir.

MS. NEWMAN: Let's do 19.

(Exhibit 15 was marked.)

THE COURT REPORTER: Exhibit 15.

Page 184

BY MS. NEWMAN:

Q. Okay. Mr. Cash, this is the same chain we were just looking at, but now it has a response from you. You say: "HIM is big increase. Some comes from cost reduced at hospitals, some are our not allocating last year."

Which costs are you referring to when you say "our not allocating last year"?

A. We had an HIM department that had started up sometime in '15 and we did not start an allocation. So the hospitals got a break on that for some portion for 2015, and then we did allocate it in 2016.

Q. And what -- what's HIM?

A. Health Information Management. It's coding, coding work --

Q. Okay. Is that --

A. -- of the medical charts.

Q. Is that something that QHC was going to need as a standalone company?

A. It was part of a TSA --

Q. It was part of a TSA?

A. -- and so they would have gotten a -- it was part of the TSA arrangement.

Q. Okay. When you say: "We are not

Page 185

trying to overallocate these costs from year to year," what do you mean by that?

A. We take what we're going to incur and we try to allocate it in a way that it's pretty much going to be what the actual expenses are incurred in these centralized services. It's not a profit center.

And, again, this is Division 3, I believe. Marty Smith's division, I think it was.

MS. NEWMAN: Tab 25, please.

MR. HERSHEY: Got another box for that.

MS. NEWMAN: Okay.

THE VIDEOGRAPHER: If you're switching exhibits, we've gone another 90 minutes. Is now a good time to take a break?

MS. NEWMAN: Sure.

THE VIDEOGRAPHER: We're going off the record. The time is 12:28 p.m.

(Lunch recess was observed.)

THE VIDEOGRAPHER: We are returning to the record. The time is 1:10 p.m.

THE COURT REPORTER: Exhibit 16.

47 (Pages 182 - 185)

Page 186

(Exhibit 16 was marked.)

BY MS. NEWMAN:

Q.   Okay, Mr. Cash, you've just been handed Cash Exhibit 16, which is an e-mail to you from Lola Davis.

Can you turn to the attachment, please.

A.   (Witness complies.)

Q.   I'm going to focus on the second page, which ends in the Bates -65, and No. 4 at the top of that page.

Do you see that, where I am?

A.   Yes.

Q.   Okay.  What's the west Tennessee CBO?

A.   There was a -- a CBO in Jackson, Tennessee that took care of the nearby hospitals in Jackson, Tennessee, I believe.

Q.   What's a CBO?

A.   Central Business Office.

Q.   Is the Central Business Office -- does Central Business Office serve the same function of a share service center?

A.   Correct.  Correct.

Q.   Okay.

Page 187

A.   And this was in existence longer than the Shared Service Centers.

Q.   Okay.  At this point, which is January of 2016, were all the Quorum hospitals in a Shared Service Center or a -- or a CBO?

A.   No.  There was a handful that got done in '16.  I think it was five or six got converted sometime in '16.

Q.   Okay.  Is there a difference in the cost to the hospitals based on whether the hospital's in a CBO or a Shared Service Center?

A.   Not significantly, no.

Q.   Okay.  For a hospital that is not in a CBO or a Shared Service Center, how do they handle their collections?

A.   They got their own staff and a Business Office Manager and billers and people that answer phone calls and things of that nature.

Q.   Okay.  And is -- were those people laid off when the hospital transitioned to a Shared Service Center or CBO?

A.   Some of them could have been.  Often they were reallocated to other functions, if the other functions existed that they were capable of doing the work.

Page 188

Q.   Okay.  Is there any analysis anywhere that shows the difference in cost to a hospital for collection services between when the hospital is not in an SCC or a CBO versus after the hospital transitions?

A.   There may be.  Something that Mike Lynd could have done.  He was the manager of all of it.  But I don't -- I don't remember one that was done prior to my departure.

Q.   Okay.  Are there averted costs at the hospital level when a hospital transitions to a CBO or a Shared Service Center?

A.   What -- what kind of cost?

Q.   Any kind of cost.  Does -- does -- let me ask it -- try to ask it in a better way.

A.   Yeah.

Q.   When a hospital transitions to a CBO or a Shared Service Center, are there costs that the hospital no longer has to incur?

A.   Corr- -- correct.

Q.   And is -- what is the net takeaway from that?  Is it a net -- let me -- let me -- I'm not doing a very good job with this. Let me try again.

Instead -- when a hospital

Page 189

transitions to a CBO or a Shared Service Center, obviously now the hospital has to pay the cost of the Shared Service Center or the CBO, correct?

A.   Right.

Q.   And it no longer has to pay some costs that it was previously incurring, to collect, right?

A.   Yes.

Q.   Okay.  Is that a net benefit or a net pos- -- or a -- a negative to the hospital --

A.   I believe there --

Q.   -- from a cost perspective?

A.   I believe there was some analysis done that it was a net benefit, but I don't know if it was done after all the CBOs was done.  But there was some work that was done that I think Mike Lynd may have done that said this is -- this is beneficial to the company.

We were pretty positive the outcome of the work is better.  A couple of things, managed care has a way of denying or challenging claims --

Q.   Sir, I'm just focussed on the finances.

A.   Yeah.  The --

48 (Pages 186 - 189)

Page 190

Q.   Just on the cost.

A.   Well, the -- I believe there's a -- should be a slight cost benefit.

Q.   Okay.

A.   But there should also be a performance benefit.

Q.   Okay.  I'm just focussing on the cost benefit.

A.   Yeah, yeah.

Q.   And do you have a sense of the size of that cost benefit --

A.   Not -- not --

Q.   -- to an individual hospital?

A.   Not that I -- not from seven or eight years ago.

Q.   Okay.

MS. NEWMAN:  Tab 14, please.  Do you remember what the exhibit number was?

BY MS. NEWMAN:

Q.   I'm going to ask you to look at the Form 10 again, please, Mr. Cash.

A.   Yeah.

Q.   And back to page 56.

A.   (Witness complies.)

Page 191

MR. HERSHEY:  Exhibit 11.

MS. NEWMAN:  Okay.

BY MS. NEWMAN:

Q.   It's the Bates ending in -272.

A.   That's funny.  It's not here.

Q.   It's not there?  I thought we -- I think we --

A.   I thought we just looked at it.

Q.   Yeah.

A.   Oh, it got out of order.

Q.   Okay.

A.   Somehow I got it out of order.

Q.   Okay.  So I just want to refresh your recollection.  You can see in the middle of the page -- or, actually, the -- I'm looking at the third paragraph that talks about the dis-synergies.

Do you see that?

A.   Correct.

Q.   And the sentence towards the end, I think it's the last sentence, says:

"Additionally, the cost and expenses associated with the Transition Services Agreements, which are expected to be provided by CHS to QHC, are estimated to be approximately $5 million higher

Page 192

annually than amounts previously allocated to QHC by CHS."

Do you see that?

A.   Yes.

Q.   Okay.  And so that $5 million number was supposed to represent the amount that QHC was projected to incur for the TSAs over and above the amount that had been allocated to it in 2015; is that correct?

A.   It's correct only that -- I think I mentioned this before -- there were 11 hospitals converted throughout the year, and you got to put them on a full-year basis, or else you would have, in '16, a full-year allocation versus a partial-year allocation.

If you -- if you convert it in April of 2015, you'd have eight months in '15 and 12 months in '16.  The $5 million doesn't take that in consideration, because the hospital costs should have gone down and the CBO or Share Service Centers would be there for a full 12 months.  So you're comparing it to a full 12 months.

Q.   So you're saying the $5 million didn't annualize the costs of the --

A.   It --

Page 193

Q.   Just let me finish -- the costs of the hospitals that had transitioned to Share Service Centers sometime in 2015?

A.   Or sometime in '16.  That -- you -- you want to make sure you got the same number of months you're servicing the hospitals in both years.

Q.   Okay.

A.   When you do that, the difference is $5 million.

Let me try it again.

Q.   Okay.

A.   If you convert during the middle of the year, you're going to have eight months --

Q.   Okay.

A.   -- of -- Shared Service Centers in '15.

Q.   Uh-huh.

A.   You're going to compare the -- there's to be an allocation next year of 12 months.

Q.   Uh-huh.

A.   When you convert the eight months to a full 12 months, the difference is $5 million.

Q.   Okay.

49 (Pages 190 - 193)

Page 194

A.    Okay?

Q.    So you had to adjust the -- the 2015 base --

A.    Right.

Q.    -- to treat it as though the hospitals that converted in the middle of 2015 had been there all year --

A.    Correct.

Q.    -- is that correct?

A.    Correct.

Q.    Okay.  Okay.

MS. NEWMAN:  Tab -- we're going to do tab 26.  Going to need it on the screen and in [sic] the computer.  I guess on the computer.

Okay.  We're going to mark the hard copy.  We can mark the native as well, right?

MR. HERSHEY:  We should.

MS. NEWMAN:  Okay.

(Exhibit 17 was marked.)

MR. ORSECK:  Are -- are the two the same?

MS. NEWMAN:  Yes.

MR. ORSECK:  The hard copy and

Page 195

the --

MS. NEWMAN:  Yes.

MR. ORSECK:  Okay.

MR. HERSHEY:  Do you need me to pull the Excel up for Larry?

MS. NEWMAN:  Yes.

(Exhibit 18 was marked.)

BY MS. NEWMAN:

Q.    Okay.  Mr. Cash, have you seen this document before?

A.    I've not seen this document before.

Q.    Okay.  Do you know what --

A.    I've -- I've seen a document, but not this document.

Q.    Okay.  Do you know what it is?

A.    Well, it's attempting to try to compare original cost versus revised cost, and he comes to the same $5 million that was discussed previously.

Q.    This is a review of -- I -- I think this is a -- this is Deloitte's review of the company's calculation of the $5 million.

A.    Okay.

Q.    Does that seem correct?

Page 196

A.    I -- like I say, I haven't seen the document, so I don't know if Deloitte requested it or....

Q.    Okay, that's totally fine.

A.    Gabe works for Kevin.  Kevin did the original schedule, which I've seen.

Q.    Okay.  All right.  We're going to have to try to work in the native on your computer.  And if -- if your counsel will allow it, I'm going to ask you to focus on certain cells.  If you have trouble, perhaps Ken can help you, if it's okay with your counsel.

MR. ORSECK:  It's fine to look at the native.

BY MS. NEWMAN:

Q.    Okay.  So we're in the Summary tab, and cell B6.  Well, actually, cell B6 says what the purpose is.  I think you've already looked at that.

If you go to cell H30.

Do you see that --

MR. ORSECK:  Do you --

THE WITNESS:  Yeah.

BY MS. NEWMAN:

Q.    -- that $4.8 million number?

Page 197

A.    Yes.

Q.    Okay.  That's the number that ties to the $5 million in incremen- -- incremental costs that was disclosed on the Form 10, correct?

MR. ORSECK:  Object to form.

THE WITNESS:  It's -- it's $5 million.  I assume it's a supporting schedule for it.  I've seen other schedules with $5 million.

BY MS. NEWMAN:

Q.    Okay.  Do you know if the 4.8 is what was the underlying number or the 5 million?  Just generally, not --

A.    Just --

Q.    -- not necessarily in connection with this document.

A.    Generally, assuming Gabe did this work and did it right, it's the same answer as other approaches that Kevin did schedules on.

Q.    Okay.  Note A under Original Cost, if you go down.  Let's see, it's in 34, if you scroll -- yeah, Ken's going to help you there.

MS. NEWMAN:  Are you able to make that -- yeah, perfect.

BY MS. NEWMAN:

50 (Pages 194 - 197)

Page 198

Q.    Okay.  It says: "In order to calculate the incremental costs of the TSA, the company calculated the difference between the 2016 budgeted amount of each service, assuming no spend, and the amount of the service per the details of the TSA."

Do you see that?

A.    Yes.

Q.    Okay.  Do you know if that's correct, that in order to calculate the incremental costs of the TSA, the company compared the difference between the 2016 budgeted amount versus the amount of the service per the details of the TSA going forward?

A.    I -- this is the first time I've seen this schedule.  I really can't comment about what was done.

Q.    Okay.

A.    But, like I said, there was a different schedule that Kevin has done, which I'm sure you've got, which was more the source of our using the $5 million.  But he's got the same answer.

Q.    He's got the same answer.

A.    Yeah.

Page 199

Q.    Okay.  So -- here, let's see.

MS. NEWMAN:  Why don't we skip ahead to tab 27.  Oh, actually, no, hold on a second.

Okay.  Let's do tab 28.

(Exhibit 19 was marked.)

MS. NEWMAN:  And we're going to have to use the native for this, too.

(Exhibit 20 was marked.)

BY MS. NEWMAN:

Q.    So, Mr. Cash, is this the schedule -- you've just been handed Cash Exhibit 19.  And if you turn to the attachment, is this the schedule that you were referring to?  Are you able to tell?

A.    No.

Q.    You're not able to tell?

A.    It's not the schedule that I remember seeing.

Q.    Oh, it's not?

A.    That -- that Kev- -- that Kevin did himself.

Q.    For the -- for the --

A.    For the TSA.

Q.    For the TSA, okay.

Page 200

All right.  All right.  Let's skip this for now, then.

Mr. Cash, were you involved in calculating the incremental $5 million number that's in- -- included in the Form 10?

A.    No.  The -- Kevin calculated it, and I see that some other people did also.  But Kevin Hammons calculated and provided it to me.

Q.    Okay.  So you don't know the detail, the underlying details, of that calculation; is that correct?

A.    It's fairly well laid out.  It's TSA annualized.  It -- here's what the -- I mean, it was -- it was a worksheet that sort of stands on its own, comes to an answer of $5 million with a little benefit from HPG.

Q.    Okay.  But you weren't involved in preparing it?

A.    No.

Q.    Okay.  Were you involved in preparing the projected impact on QHC of the -- of QHC's new contracts with HPG?

A.    I was not.  Tim Marlette, our Purchasing person, did the work, and we -- we had some issues, which you see in the model where it

Page 201

was one number, became another number, and Tim Marlette became involved in it.  And -- and I think it -- it was somewhere between a million and $2 million benefit to HPG [sic], is what I remember.

Q.    Benefit to HPG?

A.    Benefit to QHC, sorry.

Q.    Okay.  And so you wouldn't be the person to ask about the details of that calculation?

A.    No.  No.

Q.    Okay.  And you're not really the person to ask about the details of the $5 million calculation --

A.    Not -- not --

Q.    -- on the TSAs?

A.    -- not the details.

Q.    Okay.

MS. NEWMAN:  Tab 32.

(Exhibit 21 was marked.)

THE COURT REPORTER:  21.

MS. NEWMAN:  20, you said?

THE COURT REPORTER:  21.

BY MS. NEWMAN:

Q.    Okay.  Mr. Cash.  Who is Garen

Veritext Legal Solutions

212-279-9424                    www.veritext.com                    212-490-3430

Page 202

Throneberry?

A.   Garen is -- was a former employee who was in charge of contracts for the Physician Specialist Fees for ER, anesthesia, radiology, lab, and any un- -- unique physician contract that was done.

Q.   Okay. Mr. Throneberry says towards the bottom of the page: "Our best guess is that the ED and HM programs may have increased approximately $6 million in Q1 over prior year."

Do you see that? It's the first sentence on the bottom of the --

A.   Right.

Q.   -- the last page.

MR. ORSECK: Objection.

MS. NEWMAN: What's the objection?

MR. ORSECK: You just misspoke. It says "our best estimate."

MS. NEWMAN: Oh.

MR. ORSECK: Not "our best guess."

MS. NEWMAN: Thank you.

BY MS. NEWMAN:

Q.   "Our best estimate is that ED and

Page 203

HM programs may have increased approximately $6 million in Q1 over prior year."

Do you see that sentence?

A.   Yes.

Q.   What is ED?

A.   Well, he's talking about an increase in Q1 over the prior year. But if you read the second --

Q.   Sir, I'm just asking you a question: What is ED?

A.   Oh, I'm sorry. Emergency Room Department [sic].

Q.   Okay. And what is HM?

A.   Hospital management -- hospitalist management.

Q.   Hospitalists management? Okay. Thank you.

Mr. Throneberry says next: "The vast majority of this increase is in physician salaries both in the ED and HM. Specifically the Illinois, Texas, and Florida markets are the most challenging. "

Do you see that?

A.   Yes.

Q.   Okay. And all of CHS's eight

Page 204

Illinois hospitals were being transferred to QHC, correct?

A.   Correct.

Q.   Okay. And two hospitals in Texas were also going to QHC?

A.   Correct.

Q.   Mr. Throneberry says next: "We have had some increases in staffing levels for HM programs where volumes to the HM programs have grown, even if the total hospital volume has not grown."

Do you see that?

A.   Correct.

Q.   Okay. So that's saying that a hospital's salary expense could go up even if the volumes were going down, correct?

A.   The -- it's saying that there's more use of hospitalists, even though volume may not have been going up.

Q.   Okay. And that would increase expense, wouldn't it?

A.   What he says here, he -- he calls it $6 million. And these are salary increases predominantly, if you read the sentence -- second sentence. In other words, these were where we had

Page 205

contracted with one in a salary format. So the salaries would be going up, not necessarily nonsalaries.

Q.   Okay. Mr. Throneberry continues to say: "I do see that 2017 will be a very challenging year as many contracts will be coming up for renewal, and as we had discussed, many of our vendor partners are having to substantially increase physician comp at their expense, and the [sic] will" -- I think that's just a mistake -- "will be looking for increased subsidies to return their markets to acceptable levels."

Do you see that?

A.   Yes.

Q.   Was increasing physician staffing expenses an industry-wide phenomenon at this time?

A.   There was an increase predominantly in the ED and not so much in the hospital management, because as more people got insurance coverage, more people were using the Emergency Room because a lot of times they didn't have doctors. So the -- the increase in ED volume created a little bit of a challenge, which could -- could increase -- he's saying it could increase in 2017.

52 (Pages 202 - 205)

Page 206

Over time, this challenge has sort of disappeared and slowed down, but it was a -- it was a cost increase that could be growing and, you know, we attempted to put that in our expense projections. We're aware of that.

Q. In CHS's expense projections?

A. And in the projection, in the model, and -- and any work that we did, we tried to factor some cost increase for this.

Q. What was done to make sure that this cost -- pot- -- potential cost increase was factored into the projections?

A. In the salaries, you -- you got a salary increase that you would -- you would do. If you sort of look at the fourth quarter, which had a lot of cost in it, and you considered that when you're trying to project forward, not the whole year. In other words --

Q. So you think that the -- the -- the Salary and Benefits line in the projection included increases that took into consideration the potential increases in salaries --

A. Yeah.

Q. -- that you were contemplating at this point in time?

Page 207

A. Yeah. In other words, if you're incurring costs and they're going up, you take the most recent quarter, which is a higher cost than the whole year, and you take that in consideration.

Q. And you think that that's reflected into the projections?

A. I think so, by looking at the overall expenses and what they turned out to be. You know, it's not a line-item-by-a-line-item projection, so....

Q. What --

A. And I do think if you look at Quorum's other operating expense, which is what a nonsalary portion of it was, that from '16 to '15 on a comparable basis, it was only up a little under 2 percent, so....

Q. Okay. So can you tell me everything that you know about what was done to make sure that the projected increases in salaries was incorporated into the projections? Everything that was done.

A. Well, you -- Lee has done this a -- a fair amount of time. He's a -- I think he's aware that some of the salary costs are going up

Page 208

in the industry for EDs. We know that the ED volume was going up, requiring more contracts, and he would attempt to take knowledge like that and -- and factor into his looking forward on expense.

Q. Did you have any conversations with Mr. Fleck about that?

A. No, I -- I don't remember any specific conversation with Fleck.

Q. Do you remember having any conversations with Mr. Fleck about that?

A. I had some, but -- I had some conversations, but I don't think I had one about the ED or the hospital management cost.

Q. Okay. So you -- you didn't have any speci- -- you didn't have any conversations with Mr. Fleck in connection with the projections about increasing ED and hospital management costs, correct?

A. Correct. But one of his jobs is to sort of understand trends as he does projections, and I think he was aware of a trend going on in this category and should have tried to take that into consideration for his expense projection.

Q. Okay. And please tell me

Page 209

everything on which you are basing your view that Mr. Fleck was aware of this trend.

A. Well, you know, in reading -- in hearing some of his comments about being reasonable and industry averages and what's going on in the industry, I mean, I -- I'm -- I've read his depositions and he talked about his knowledge of industry, what was reasonable and what was not. And I think if he's got knowledge like that, he also would have some knowledge -- just my perception, he'd have some knowledge of trends.

And this is -- and this was a challenge, and he should have some knowledge about that.

Q. Okay. Anything else on which you're basing that view?

A. No.

Q. Okay. Let's look at -- let's go back to the --

MS. NEWMAN: Ken, can you help --

MR. HERSHEY: Yep.

MS. NEWMAN: -- Mr. Cash go back to the model, please?

MR. HERSHEY: Is this the tab you want, Debbie?

53 (Pages 206 - 209)

Page 210

MS. NEWMAN:  IS.

MR. HERSHEY:  Yeah, we're on IS.

MS. NEWMAN:  Yep.  Okay.  Thank you.

MR. HERSHEY:  And do you want to be down here, maybe, or do you want to stay up where this is?

MS. NEWMAN:  I want to go to row 63.

MR. HERSHEY:  Okay.  Yeah.

MS. NEWMAN:  Okay.  Great.

BY MS. NEWMAN:

Q.   Okay.  So looking at the model, Mr. Cash, the projections actually project that salaries and benefits were going to stay the same in 2016 and then go down every year thereafter.  Do you see that?

A.   Yes.  Can -- can we go up a little bit here to the --

Q.   Sure.

A.   -- actual income statement versus the percentages?

Thank you.

'14 to '15, it's roughly flat in salaries and benefits.  Other operating is up $24 million.  The -- there was a $40 million salary benefit factored into 2016, which is the -- probably one of the biggest -- it's much bigger than '14 to '15, which that's probably a 4 percent increase.  Which in -- I don't remember inflation at the time, but I don't think it was 4 percent.

Q.   So --

A.   So and -- but -- and the rev- -- and the revenue's up a little bit, which drives the no margin improvement.  The same expense is percentage of revenue.

But -- but -- but I -- I think -- you can ask Lee, but I think he would have been aware that the salaries needed to be a little bit better than just inflation with so many new ED doctors being hired.

Q.   So he's looking at it on a whole number basis rather than as a percentage of revenue?

A.   I would think he would be looking at it more the whole number than the percentage of revenues, whatever calculates out.

Q.   Okay.

A.   And -- and I would expect if they manage the 38 hospitals better over time, one of

Page 212

the opportunities is to have lower payroll and benefits as percentage of revenue.  It didn't happen in '16, but it did happen -- it was projected to happen in '17, '18, and '19.

Q.   And how would -- how would a hospital company do that?  How would they -- how would they, notwithstanding --

A.   It's --

Q.   -- projected increases in expenses and salary and increasing recruiting, how would -- can you help me understand how the --

A.   Yeah, well --

Q.   Just let me finish -- how the salary and benefits expense would go down as a percentage of revenue?

A.   That the revenue growth with some volume would be managed with the same staff it had.  If you're running a small hospital, you can have a few more patients and not necessarily have to have more nurses and dietitians and dietary -- I mean, there's relatively small -- a lot of them are small.  Some are larger.

Q.   Okay.  Wasn't --

A.   But --

Q.   -- one of the key premises on

Page 213

which the spin was made, that QHC was going to have increased physician recruiting going forward?

A.   Yeah, but that physician recruiting could either be a salary or could be an income guarantee.  On an income guarantee, it gets cut -- cut off within a few months after the start.

Q.   Well, you have to pay -- you still have to pay a salary, right?

A.   Not if they're not salaried.  There's two different ways to pay the doctor.

Q.   I see, okay.

A.   And -- and there's been a movement to have a little bit more employed doctors, which would increase that.  But, again, you get the rev- -- you revenue off those doctors.

Q.   Right.  But that wouldn't increase --

A.   And their -- in their practice.

Q.   That would increase the -- the salaries and benefits, right?

A.   Yeah.

Q.   Okay.

A.   And the revenue would be from both their own practice.  And then if they had any

54 (Pages 210 - 213)

Page 214

referrals to the hospital, you'd have the hospital revenue.

Q. Okay. Did you have conversations with Mr. Fleck about any of this?

A. I might have had some with Jim Doucette. I don't -- I generally talk to Jim.

Q. Okay.

A. Yeah.

Q. And -- and what conversations, if any, did you have with Mr. Doucette about what the projections should look for -- look like for salaries and benefits?

A. Well, that we would, over time, see some productivity. And by the fact that you would expect the 38 hospitals now have all the attention of a pretty good management team to try to drive the revenue faster than the salaries.

Q. Did you have this -- conversations with Mr. Doucette about the fact that the salaries and benefits expense should remain constant as a percentage of revenue?

A. I don't remember. I -- I had conversations, but it ought to be some productivity, meaning the percentage should drop a little bit.

Page 215

Q. Okay. And is the percentage -- which is -- which comes first, the whole numbers or percentage? Meaning the percentage drive the numbers in the projections or the other way around?

A. It's -- I think the dollars drive the -- the answers of percentage.

Q. You think the dollars drive the percentages?

A. Yeah.

Q. Okay.

A. Because the income statement's done first.

Q. Okay. Let's turn to the Cash Flow tab.

Okay. You can see on this page at line 22, there's a Physician Recruiting line.

Do you see that?

A. Yes.

Q. What's included in the Physician Recruiting line?

A. It's any dollars that you spent to relocate a physician or any dollars that you spent on an income guarantee.

Q. Okay.

Page 216

A. So....

Q. And you can see that those numbers are flat in '16 and '17 relative to 2015, and then go up to 7 and remain at 7 for the out years.

Do you see that?

A. Correct.

Q. Can you tell me what the -- the assumptions regarding the expense of physician recruiting were that -- were?

A. There -- there's two costs of physician recruiting. One, if you do an income guarantee. Then there's the cost if you do a salary. They're in salaries and benefits. This -- this cost is the cost to do the income guarantee for those type of physicians, and over time, we're doing less in -- well, the companies were doing less income guarantees and more salaries to get the physicians to be recruited.

Q. Okay. So this projection was based on the assumption that the new doctors that QHC was going to hire were going to be paid in salaries and benefits and not in income guarantees; is that correct?

A. Well, some -- some were income

Page 217

guarantees and some were employee doctors. And I -- I don't remember the breakout for the 38 hospitals. But for CHS, we had a little bit more employed doctors.

Q. Okay. Well, if -- if QHC was planning to increase physician recruiting, why wouldn't these numbers have gone up? It's all because it would be in salaries?

A. Two things. One, the -- the doctors could get off income guarantee a little faster if they got busy. And then, two, there was some that were in salaries.

Q. Okay.

A. And I don't know the breakout for those 38 hospitals.

Q. So from an accounting perspective, if there's an income guarantee to a doctor, once they meet their volume expectations, it's no longer accounted for in income guaran- -- in physician recruiting?

A. Once they meet their cash they got coming in the door, there's no cash --

Q. Oh, I see, because they're earning it?

A. They're earning it.

55 (Pages 214 - 217)

Page 218

Q.   I see.  Okay.

A.   And it -- why it looks like a small number, 6- or $7 million is a lot of money for recruiting.

Q.   Okay.  Let's look back at the Form 10, please.

A.   This one (indicating)?

Q.   Yep.

All right.  Can you turn to -- did I ask you to turn to page F6?  I just can't recall.

A.   You did not, but I happen to be right there.

Q.   Okay.  Can you focus on the line that says: "Changes in operating assets and liabilities net of effects of acquisitions."

Do you see that?  The working capital?

A.   Yes.  Okay.

Q.   Okay.  The Patients Accounts Receivable line becomes significantly more negative between 2013 and 2014, but the difference between 2014 -- hold on a second -- but the difference between 2013 and 2015 is -- is pretty similar.

Page 219

Do you see that?

A.   Yes.

Q.   Okay.  Do you know why?  What happened in 2014 that accounted for that significant change?

A.   My understanding was we had a California Medicaid supplement program that got approved in the fourth quarter of 2014 that was pretty significant.  The gross number was -- the -- the -- the net number was 25, and there was a gross number of 40 or something, and that was a build-up during that year.

And the second thing, that the Medicaid plan in Illinois ran out of money, and being the good Government State agent as they are, they just quit paying.  And -- and then that got resolved in '15.

No. 1, the -- the revenue for revenue Medicaid supp- -- Medicaid supplemental program got approved and it got recognized as revenue expense EBITDA in the fourth quarter, and then it got paid down in 2015.  And I think they solved some of the Medicaid issues in Illinois, I believe, in 2015.

And your observation's correct.

Page 220

You know, $29 million's not unreasonable for receivables to grow each year.  The $80 million is -- is -- is a bump, and that's -- that's the two main reasons.

And he -- and he may have had some of this conversion in the CBO that built it up a little bit.

Q.   Okay.

A.   Because that was going on, but....

Q.   Okay.  Looking at the Accounts Payable and Accrued Liabilities line, you can see that you have a big jump in 2015.

Do you see that?

A.   Yes.

Q.   Okay.  Do you know what accounted for that?

A.   I -- I don't remember the accounting issue for that.

Q.   Okay.  Do you -- you don't remember that allowed -- that enabled such a large paydown?

A.   Well, it's -- it's a -- let me think a second.

Q.   Sure.

Page 221

A.   As I sit here today, I don't remember the exact reason why it's flipped between a $13 million benefit and an $80 million -- $85 million drain.

I know Mike did some reconciliations and he believed his true cash flow for '15 was $95 million, but -- and that's probably got something to do with it.

Q.   Okay.  You -- when you say --

A.   And I understand that --

Q.   -- "Mike," you're talking about Mike Culotta?

A.   Right.  Yeah.

Q.   Okay.  And you say that Mike Culotta thinks that the true cash flow of the company was $95 million?

A.   He -- he did a reconciliation of the $40 million to the $95 million in one of his -- in some of his investor presentation work.

Q.   You're talking about the -- the free cash flow number?

A.   Not free cash flow.  Cash provided.

Q.   Oh, I'm sorry, cash provided, that's what I meant.

56 (Pages 218 - 221)

Page 222

A.  Yeah.

Q.  Okay.

A.  And I -- I just don't remember the change between '14 and '15.

Q.  Okay.  And Mr. Culotta is the one who created that reconciliation that you're talking about?

A.  I -- well, someone working for him or he did it, one of the two.

Q.  Okay.  This shows that in each of 2013, 2014, and 2015, the QHC hospitals did not have sufficient cash to fund their operations without support from CHS, correct?

MR. ORSECK:  Object to form.

THE WITNESS:  Well, there was $140 million allocated for acquisitions in 2014, which affected the cash flow.

BY MS. NEWMAN:

Q.  Okay.  Well, there was 40- -- in 2014, there was $43 million --

A.  Right.

Q.  -- of net cash provided by operating activities and $272 million of net cash used in investing activities, right?

A.  That -- that's correct.  And half

Page 223

of that was an acquisition.

Q.  Okay.

A.  So they -- they would have got the money from the parent company to pay for --

Q.  Right.  So I'm going to ask my question again.  This page shows that in 2013, 2014, and 2015, the QHC hospitals did not have sufficient cash to fund their operations without CH- -- CHS support, correct?

MR. ORSECK:  Object to form.

THE WITNESS:  Based on this cash flow statement, the investing activities were greater than the cash provided by operating activities.

BY MS. NEWMAN:

Q.  And so that means that QHC did not have sufficient cash to fund its operating activities without help from CHS, right?

MR. ORSECK:  Object to form.

THE WITNESS:  The -- the -- as I said, the investing activities were greater than the cash provided, and -- and the source of that difference would be at an increase in borrowings from the parent company.

Page 224

BY MS. NEWMAN:

Q.  Okay.  Let's turn to page F4, please.

A.  (Witness complies.)

Q.  Okay.  So this is the Balance Sheet.  If you look at the Accrued Liabilities line, there are two subcategories, Employee Compensation and Other.  And the Employee Compensation line shows approximately $83 million in 2015 and $104 million in 2014, correct?

A.  Correct.

Q.  What do the employee compensation numbers represent?

A.  If you're at the end of the year and you've had a payroll paid before any unpaid days for the year, it would become employee compensation.  So what this probably is saying, that you had less days accrued in payroll in 2015 than you had in 2014.  It's all based on when payroll's paid versus the end of the year.

Q.  Okay.  Is that -- is that number in line with what you -- is that number not unusual?  Is the difference between 2014 and 2015 not unusual to you?

A.  No.

Page 225

Q.  Okay.

A.  Because it's -- it deals with the unpaid payroll.

Q.  Okay.

A.  There could be a little bit of bonus accrual, too, but I'd say it's usually got more to do with the data payroll.

Q.  Okay.  And so that's not due to anything happening outside of the ordinary course?

A.  No.

Q.  Okay.  The Accrued Liabilities Other line went down from $106 million to $66 million between '24 [sic] and 2015.

Do you see that?

A.  Yes.

Q.  Okay.  Is -- was that due to anything that happened outside of the ordinary course?

A.  I believe that's where some of your malpractice and Workers' Comp liabilities would be.

Q.  Okay.

A.  And some of -- some of the same liabilities would be down here in Long-Term.

Q.  Okay.

57 (Pages 222 - 225)

Page 226

A.    Some would be current.  Some would be long-term.

Q.    I see.  Okay.

Let's go to the Cash Flow tab in the model, please.

MR. HERSHEY:  You're still on the Cash Flow tab.

MS. NEWMAN:  Oh, we still have it?  Great.  Okay.

BY MS. NEWMAN:

Q.    Let's see.  If you look at row -- we're going to look at the --

A.    Okay.

Q.    -- model.  And you'll -- you should -- you're on it.

If you look at rows 12 and 13, together those make up QHC's working capital, right?  From an accounting perspective, that's what you would refer to as the working capital?

A.    Yes.

Q.    Okay.  And working capital was negative 91- -- let's just see.  Trying to look -- in 2014.

Do I see that?

MR. ORSECK:  You -- you lost me.

Page 227

MS. NEWMAN:  Yeah, I lost myself.

MR. ORSECK:  Oh, I see where you are.  Okay.

MR. HERSHEY:  That's right.

THE WITNESS:  Well, no, this is the change.  This is the change.

BY MS. NEWMAN:

Q.    Right.

A.    It's not the absolute answer.

Q.    It's the change in the accounts at the end of the year, correct?

A.    Yeah, and -- and I think the $86 million is fairly comparable to what was on the schedule we just looked at that I described the California Medicaid program and the Illinois not getting paid.  I think that's the -- would be the same answer.

Q.    Okay.  And -- but -- but I'm asking -- I want to ask a more fundamental question, which is this just shows that QHC spent $91 million and $103 million of cash in 2014 and 2015 respectively, to fund working capital needs?

MR. ORSECK:  Object to form.

THE WITNESS:  Well, it's a -- the receivables are -- have gone up, which

Page 228

had caused the $30 million drain.

There's probably some answer for the $73 million, which I don't know right offhand what that is, or that I remember.

BY MS. NEWMAN:

Q.    But that represents $103 million of cash use for -- in -- in 20- --

A.    Yes.

Q.    -- '15, correct?

A.    That's expressed here.

Q.    Okay.  And the $91 million of cash used in 2014, correct?

A.    It -- it's a change in a receivable balance going up, so you didn't collect it.  So it's not necessarily a cash issue.  You didn't collect your receivables.  Receivables went up.

Q.    And so because you didn't collect it, you need that -- you need cash?

A.    Correct.

Q.    That's cash that you need to fund the business?

A.    I think they collected it the next year.

Page 229

Q.    Okay.

A.    There's probably a story behind the $73 million, but I'm surprised he didn't footnote that somewhere, but he didn't.

Q.    Okay.

MS. NEWMAN:  Can you scroll it down a little bit so we can see row 35?  Hold on a second.  I think -- can I see the model?  Does Sam have it up?

MR. HERSHEY:  I can show you.

(Discussion off the record.)

MS. NEWMAN:  That's fine.

BY MS. NEWMAN:

Q.    So the Patient Accounts Receivable, which you -- we have in line 12.  I'm on --

A.    Yes.

Q.    I'm in the model now.

A.    Yes.  Yeah.

Q.    Okay.  That shows that the Patients Account Receivable are going to go up only by $6 million in 2016.

Do you see that?

A.    Yes.

Q.    And that it's going to -- that

58 (Pages 226 - 229)

Page 230

number will grow even less in the following years, right? What was the basis for that assumption?

A. Two things. One, I -- I think your divestitures are a little more challenged to collect sometimes than your other hospitals.

Two, they were having an AR rate reduction that we talked about a couple of hours ago, about three AR days, and I think that's been factored into it. So there was a belief that as the service centers stabilized and operated better than they historically were done, you'd have a little lower AR days.

And there was also no real big build-up in the Medicaid programs anticipated going forward.

Q. Okay. And -- and cash used for working capital, that -- other, excuse me. That also falls in 2016 in the -- in the following years.

Do you see that?

A. Follows it actually becomes a negative in -- from -- that --

Q. The change is by less?

A. Yeah. The -- the 73's got a story. I just don't remember what the story is.

Page 231

Q. Okay.

A. It's the same question you asked on -- on the cash flow statement. There's story, which seven years ago, I can't remember what that was.

Q. Sure.

A. Let me see if he's got a footnote anywhere. He's got some big settlements factored in here, a -- a Baker settlement of $16 million.

Q. So --

A. It could have been some of the paydowns. In Footnote 1, he's trying to give you a little history of a settlement that was $26 million, which that's probably some of the -- what's flowing in --

MR. ORSECK: Larry, you have to testify to what you know.

THE WITNESS: I -- I know.

MR. ORSECK: Not a guess.

THE WITNESS: And I -- I -- I'm reading it.

MR. ORSECK: Okay.

THE WITNESS: Okay? It says a $26 million litigation settlement took place in fiscal year '15, which I

Page 232

believe that's what that year is.

BY MS. NEWMAN:

Q. Okay. So my question is just: What's the basis for the assumption that the Working Capital Other number will -- will change by such smaller amounts in the go-forward years?

A. It's a slight negative. It was actually a positive in '13 and '14. So he's got a slightly -- and '15, had a slight -- '14 had a slight negative. It's -- it's more comparable leaving out the settlements that probably took place --

Q. Okay.

A. -- in 2015.

MS. NEWMAN: Can we go to the Balance Sheet tab?

(Discussion off the record.)

BY MS. NEWMAN:

Q. Okay. Row 9, Accounts Receivable. That number went up every year from 2013 to 2015, correct?

A. Right. And -- and one reason it's up in '15, I -- well, it's up in '14, predominantly, from what we talked about --

Q. Right.

Page 233

A. -- on the provider tax -- or provider prog- -- Medicaid program in California and the -- and not getting paid in 2014 in Illinois, were the two big things that come to mind.

Q. Okay. And then it's going up in 2015 as well, right?

A. Yeah.

Q. Okay.

A. And that was probably a -- well, this is probably actual by now.

Q. I'm sorry, I didn't hear what you said.

A. I think it'd be actual by now. Because I think this is done in March, so we should --

Q. Yeah.

A. -- have the year closed.

Q. I think that's right.

A. Yeah.

Q. And then in 20- -- in 2016, you can see that accounts receivable were projected to go down to $434 million.

Do you see that?

A. Yes.

59 (Pages 230 - 233)

Page 234

Q. Okay. Why was that?

A. That's where I think we thought we were -- we would -- would be -- being better performing in the service centers and collecting our AR faster and not having such a build up. I think we had a three AR day improvement built into the program over a couple of years.

Q. Okay. Did the model -- you mentioned something about this earlier. Did the model assume that the purchasers of the divested hospitals were buying the accounts receivable and inventory and assuming accounts payable?

A. No, no, they didn't buy accounts receivable. So the model that we did, we assumed 40 basis points. I think we provided some proof to Credit Suisse and other people that the -- we took four hospitals with a loss since October of 2014, roughly $125 million in revenue, and they -- the sales price was 34 basis points or 34 -- 34 percent. And in most of those cases, we could also collect the receivables, which we ended up in an assumption of 40 basis points or 40 percent of the revenue would be cash coming in.

Because once you started getting rid of something, it is good cash that you can say

Page 235

it's extra cash you wouldn't normally have gotten, which would have pushed it up more like 50 percent. But we ended up staying with 40 bas- -- 40 percent of the revenue was a good target for the cash off the divestitures.

Q. So in the model, the accounts receivable at the 11 divested hospitals remained on the books after they were sold?

A. Yeah. And -- and we believe in most all cases.

Q. But I'm just asking about --

A. Yes. Yeah.

Q. -- what the projection showed?

A. Yeah.

Q. The projections kept the accounts receivable for the 11 divested hospitals on the books?

A. Yeah.

Q. Okay. What about the accounts payable for those hospitals?

A. Accounts payable. Some places wouldn't buy it, some places would buy it.

Q. I'm asking what the projections projected.

A. Projections probably had small

Page 236

payables being paid, much less than receivables.

Q. Were they the projections assuming that the purchasers were going to take on the -- the payables or were the projections assuming that QHC was going to retain the obligation to pay those payables?

A. What we did was we used -- we'd get 40 percent of revenue for selling it. Some of that comes from selling the fixed assets and the inventory. The rest of it comes from either collecting receivables net of the -- any liabilities.

A -- a better answer is probably a better than 40 basis points or 40 percent, but we ended up using 40.

Q. You think better than 40 basis points would have been more realistic?

A. Yeah.

Q. Okay. But back to my question. Is the -- the -- I think what you're saying is that the bump in the revenue percentage that you were assuming for the divested hospitals includes the net impact of retaining the receivables and the payables?

A. It was a -- it was a 6 percent

Page 237

bump from the actual to take place for four divested hospitals that came out to be 34 percent, and we used 40 percent, which was probably conservative compared to what -- what the -- don't laugh, now.

Q. Okay.

A. That -- that --

Q. It's very conservative.

Okay. I'm still not sure about those payables. Did they stay on books?

A. They -- they would have stayed on books in most cases.

Q. Okay. Okay. Rows 19 and 20. Let's see, can you see those? Accounts Payable and Other Current Liabilities. They went down by $4 million and $61 million in 2014 to 2015?

Hold on a second.

A. From '14 to '15?

Q. Yeah. What caused that?

A. The -- the $4 million is not a big issue to 210-. We simply had less current liabilities on the books at the time, and it stayed. And -- and the 191- and 210-, there's some liability there that got -- got paid out. That could be these settlements --

Page 238

Q. Okay.

A. -- that -- that was referred to a while ago in -- in the footnote.

Q. Okay. In the projection period, both of those balances are projected to increase in each year of the projection period other than 2016. What's the basis for that assumption -- those assumptions?

A. I -- I don't know the specific answer or recall that.

Q. Okay.

A. It's a relatively small --

Q. Do you know if --

A. -- change.

Q. -- the assumption about AP days -- or what the AP assumptions behind these accounts payable balances were?

A. Usually, it's in the neighborhood of 30 to 60 days, but -- but I don't know the specific number he used. He's got a model that he -- he throws it in some model and it calculates it.

Q. Okay. Do you know that the model was assuming that QHC would be slower in paying its bills on a go-forward basis than it had been

Page 239

historically?

A. I -- I'm not aware of that. But if it -- if it doesn't cost you to lose some discounts, if you -- if you could pay a little slower, then so be it.

Q. Okay. Are you aware of any analysis that was done to --

A. No.

Q. -- support that assumption?

A. That Jim -- Jim could have -- Jim managed the payables for the company, and he could have looked at what assumptions --

Q. I'm asking you, and I think your counsel --

A. I don't know.

Q. -- would probably tell you only testify to what you know.

A. I -- I don't know the assumptions there.

Q. And you don't know if any analysis was done?

A. No.

Q. Okay.

MS. NEWMAN: 73.

(Exhibit 22 was marked.)

Page 240

THE COURT REPORTER: Exhibit 22.

BY MS. NEWMAN:

Q. Okay, Mr. Cash. You've just been handed an e-mail from Ms. Moody to Mr. Ottinger. You're not on this e-mail, but Ms. Moody is forwarding a draft of the Form 10 to Mr. Ottinger that includes Mr. Culotta's comments.

Do you see that on the -- on the attachment? Actually, it's probably maybe more enlightening if you turn back to the cover page.

A. This page (indicating)?

Q. No. Just the -- the cover e-mail.

Ms. Moody says to Mr. Ottinger: "Mike's comments. We need to discuss some of these before 2:00 p.m. I'm guessing Kevin might not want to make some of them."

Do you see that?

A. Yes.

Q. Okay. And below that, actually, you can see the e-mail from Mr. Culotta. He says: "Here are my comments."

Do you see that?

A. Yes.

Q. Okay. We -- we've -- he -- the

Page 241

attachment to this e-mail is actually the comments from Mr. Culotta.

A. Okay.

Q. Do you see that?

A. Yes.

Q. Okay. And I'd like you to -- and can you -- or do you agree, Mr. Cash, that these are comments to the draft Form 10?

A. This is a -- certain pages. I know it was a lot of pages.

Q. Are you --

A. It's -- it's scattered pages, and it's -- he's got some comments, circling some questions and some activities. So he's -- it's Mike's comments, suggestions and changes.

Q. To the Form 10, correct?

A. Correct.

Q. Okay. Can you please turn to page 29.

A. (Witness complies.)

Q. In the -- in the margin, Mr. Culotta has written: "Our cash flows have been impacted by the del- -- delays in Illinois FYI."

Do you see that?

61 (Pages 238 - 241)

Page 242

A.    Yes, that's what I just -- we just talked about.

Q.    Right.  And I'm -- my question is:  At this time in August of 2015, was there an expectation that the delays on cash flow that were caused by Illinois were going to improve?

A.    Usually things approve at the -- at -- after a fiscal year occurs.  I don't remember exact fiscal year for Illinois, but once they're sort of slow on money and then the Government comes and reallocates more money, the payments pick back up.

Q.    Okay.  So -- so at this time, it's your belief that there was an expectation that the Illinois problems were going to improve?

A.    Yes, they're going to improve. They may not -- not stay improved, but I think they did get better.

Q.    Was the expectation that they would improve with the end of the fiscal year, but then potentially replicate themselves?

A.    There was a lot of lobbying done to try to get Illinois to allocate enough money to pay its money to its HMOs so they can pay the provider, so we thought it would get better.  And

Page 243

I -- and I think it did get better.

Q.    So at this time, your expectation was that the Illinois problems were going to be solved?

A.    Yeah.  And I -- I think they -- that there was some consultants hired to help.

Q.    Okay.  What's the name of those consultants?

A.    I think it was En- -- Ensemble.

Q.    And they were hired to help lobby?  Or what were they hired to do?

A.    Go after -- try to find ways to get Illinois to pay with the work of the HMOs.

Q.    Okay.  And what was the expectation, that the Illinois problem was going to be solved, based on?

A.    Historically, Illinois has, and other states, have had Medicaid shortfalls.  And then when the next budget year comes around or it gets allocated more money, and then hopefully it's enough to keep it out of trouble.

Q.    Okay.  Was there any written analysis done on that issue?

A.    I believe there was some.  I'm not aware of any analysis done.  I -- I know

Page 244

historically we've had troubles with states and it -- it works itself out in a year or so.

Q.    Okay.  If anyone was going to do that analysis, who would have done it?

MR. ORSECK:  Object to form.

THE WITNESS:  Probably, Mike Lynd.

BY MS. NEWMAN:

Q.    Okay.  Can you turn to page 31, please.

A.    (Witness complies.)

Q.    So Mr. Culotta wrote here:  "In addition, our negative free cash flow has been supplemented by CHS."

Do you see that?

A.    Yes.

Q.    And that's what we were just looking at in the Form 10 financials, correct?

A.    Correct.

Q.    Okay.

A.    And -- and some of that cash flow probably had to do with some of these litigation settlements that were paid.

Q.    Okay.  Can you turn to page 104, please?

Page 245

A.    (Witness complies.)

Q.    At the bot- -- in the middle, towards the middle, let's see, third paragraph.

A.    Just -- just -- I haven't quite got there yet.

Q.    I'm sorry, sir.

A.    That's -- I was looking at something.  Okay.

Q.    Okay.  In the third paragraph, the penultimate sentence says:  "In addition, we had an increase in net borrowings from parent of $67 million primarily used to fund the HMA hospitals' acquisition."

Do you see that?

A.    In the third paragraph?

Q.    In the third paragraph in the second-to-last sentence.

A.    Yes, I see that.

Q.    Okay.  And Mr. Culotta wrote in the margin:  "And fund CapEx!"

Do you see that?

A.    Yes.

Q.    Were they borrowings from parent used to fund QHC's CapEx?

A.    If you had other settlements

Page 246

happening. There's a reference to a settlement up here, $20 million.

Q. Are settlements considered CapEx?

A. No. I'm just -- if -- if you had other litigation settlements taking your cash that would have gone for CapEx, then you can take it from the parent to pay the CapEx.

Q. So was that increase in borrowings used to fund CapEx? Is Mr. Culotta's comment correct?

A. To some extent.

Q. Okay. Okay. Please turn to page 106.

A. (Witness complies.)

Q. The fourth paragraph says: "We believe that internally generated cash flows will be sufficient to finance capital expenditures and working capital requirements during the next 12 months."

Do you see that?

And it's stricken.

Do you see that?

A. Yes.

Q. Do you know why Mr. Culotta wanted to strike that sentence?

Page 247

A. I -- I -

MR. ORSECK: Object to form.

THE WITNESS: -- I'm not going to speculate. I -- I don't know why.

BY MS. NEWMAN:

Q. Did you have any conversations with Mr. Culotta about that?

A. No.

Q. How did CHS get comfortable that internally generated cash flows would be sufficient to finance capital expenditures and working capital requirements during the next 12 months when they had been insufficient to do so in the prior three years?

MR. ORSECK: Foundation.

THE WITNESS: That -- there was some -- as I said, there was some settlements, both from QHR litigation and the Baker settlement, that -- that ran through the '14 and '15 numbers. You had the slowdown in California, which later I believe corrected itself, and then you had the Illinois.

And this sort of says Illinois didn't get solved in 2015. I thought it

Page 248

got solved. So if you correct those sort of things -- and I go back to -- to Mike's work where I thought he showed that if you take certain reconciling items like this, the cash flow from operations for 2015 was $95 million. It was in one of his -- one of his presentations that he -- he prepared. I think it was a -- I think it was an investor presentation.

MS. NEWMAN: 34, please.

(Exhibit 23 was marked.)

THE COURT REPORTER: 23.

BY MS. NEWMAN:

Q. Okay, Mr. Cash, you're also not on this e-mail chain. Do you recall seeing it before?

A. No.

Q. Okay. I'd like you to go to the second page, please.

A. (Witness complies.)

Q. Mr. Ottinger, says: "Per Megan, he has voiced this" -- let's see -- "he has voiced this concern to Larry."

And that's -- the e-mail is -- is

Page 249

above the e-mail we just looked at that says "Mike's comments."

Do you see that?

A. Yeah.

Q. Okay. And does this refresh your recollection that you had conversations with Mr. Culotta in which he expressed concerns about QHC's cash flow?

A. I had a lot of conversations with Mike during this time frame, and -- and I don't remember this specific conversation.

Q. You don't --

A. I -- I do know that when they were talking about the Form 10 and there was talk about some of the strategies of things then important, I believe -- I believe I wrote a note that said we really ought to listen to Mike and his thoughts, if he had some suggestions. I do -- I -- I do remember sending that e-mail.

Q. You think you sent an e-mail saying: We should listen to Mike's suggestions?

A. Yep. Some- -- somewhere along the way, I remember seeing that e-mail in my reviews of all this various correspondence that -- because they were having some discussions about

63 (Pages 246 - 249)

Page 250

what type of information should be in the Form 10, and I said we ought to give -- give some consideration to Mike.

I think Kevin would have done anything that was reasonable and appropriate that Mike wanted to do. I never heard him -- I don't remember him calling saying: I got some issue here.

But he may have.

Q. Okay. Mr. Ottinger says -- and I am at the top e-mail now. And he -- this is an e-mail from Mr. Ottinger to Mr. Hammons.

Do you see that?

A. Yes.

Q. Okay. And he says: "We have the normalized cash flows for 2014 and, honestly, it's not enough."

Do you know what he's talking about there? What's the normalized cash flows that he's talking about?

A. I -- I --

MR. ORSECK: Objection, foundation.

THE WITNESS: -- I do not know what he's talking about. I wasn't on

Page 251

it. I wasn't involved in the
discussions and....

BY MS. NEWMAN:

Q. Okay. Do you ever recall Credit Suisse requesting a normalized version of cash flows?

A. They never requested that of me. I don't know if they requested it of someone else or not.

Q. Okay. Yes. If you actually turn back to the first page -- to the second page of that e-mail, it says: "We are working on a normalized version of cash flows that Credit Suisse has requested."

You're not familiar with that request?

A. No. I just now saw this e-mail, so....

Q. Okay.

A. And like I said, Mike put something in his investor presentation that -- that, as I remember, I thought it was 2015 and it had $95 million recon- -- reconciled to the actual reporting numbers.

Q. Right. And you -- you think that

Page 252

was prepared by Mr. Culotta?

A. That'd be my -- yes, I would think so.

Q. Okay.

A. Or under his supervision.

Q. Uh-huh. Okay.

So -- so you -- do you know anything about what Mr. Ottinger is talking about in this paragraph in the top e-mail?

A. No. No. I -- first time I've seen it.

Q. Were there one-time events in 2015 that resulted in additional cash for QHC that were not expected to replicate in future years?

A. In when?

Q. 2015.

A. I think that California was collected in 2015. It looks like I thought Medicaid Illinois was resolved, but this says it was still hanging out there.

Q. Okay. Anything else you can think of?

A. Not -- not off the top of my head.

Q. Okay. Are there typically

Page 253

one-time events in years that result in cash inflow into the business, into a hospital business?

A. Not in --

MR. ORSECK: Object to form.

THE WITNESS: -- not in every
year, but you had a -- you had a couple
of large litigation settlements that
took place, and -- and those would be
something you'd carve out. You'd
probably highlight to your investors the
issue with Illinois Medicaid.

BY MS. NEWMAN:

Q. I think you misunderstood the question, or perhaps I asked it in a --

A. Yeah.

Q. -- in an incoherent way. It's entirely possible.

I'm asking about one time events that actually bring cash into the business.

A. Yeah, like the Illi- --
collecting the California....

Q. Yeah.

A. Yeah.

Q. That's not unusual in any given

64 (Pages 250 - 253)

Page 254

year, correct?

A. It is -- it is a little unusual for that kind of situation. What it did, it -- it -- when you looked at the -- the more important -- you looked at the last 12 months trailing EBITDA, it was like $300 million in September because you had so much recognized. I think it was $25 million in the fourth quarter of '14.

So we had to be very careful of how we utilized the trailing 12 month's information, because we didn't want people to think we were going to make $300 million for the year just because we made it with an unusual adjustment in the fourth quarter of 2014.

Th- -- those things happen. It sometimes happens every few years that you -- and then you'll have adjustments to EBITDA that you described.

Q. You -- what you're talking about happened in 2014?

A. The mon- -- the recognition of the income was in 2014, in the fourth quarter, for longer than a -- one quarter's --

Q. Right.

A. -- business.

Page 255

Q. What about 2015, were there any one-time events that brought cash into the QHC hospitals in 2015?

A. I'm not -- I don't -- I'm not -- I -- I thought we solved some of the Medicaid, but it looks like in reading this, it's still an issue at the end of 2015.

Q. So nothing you can think of?

A. That -- not that I can think of sitting here.

Q. Okay.

MS. NEWMAN: Okay. 35. Oh, I'm -- hold on. Yes, 35.

(Exhibit 24 was marked.)

BY MS. NEWMAN:

Q. Okay. You're also not on this one, Mr. Cash, but you are referred to, so I'm going to ask you about that.

The top e-mail is an e-mail in which Mr. Culotta is sending Mr. Miller a -- a draft of the QHC Form 10. And Mr. Culotta says: "Have brought up the issues with free cash flows with Larry, Kevin, others in Accounting, Legal, investment bankers, and auditors. No one has responded. They just remain silent."

Page 256

Do you know what he's talking about?

A. Let's see here. What was the date of this other e-mail? Well, his first e-mail that you handed was 8/23. And then here on 8/24, he's writing his boss, which apparently nobody since 8/23's responded to him. So he writes an e-mail a day later that he -- he hasn't gotten any resolution to his satisfaction.

Q. Okay. But you still don't know what he's talking about here?

A. Well, he had a long page of -- of comments there, and -- and I just don't remember his phone call, if he said he made a phone call.

Q. Okay.

A. And -- and if he had made a phone call, I would have probably called Kevin and -- and asked: Hey, why don't you see if you can't resolve this?

Q. Okay.

A. But if he -- if he called me, I would have probably done something about it.

Q. Okay. There -- there are other e-mails where Mr. Culotta references talking to you about the cash flow issue that -- the

Page 257

mysterious cash flow issue. You don't recall that -- you don't recall discussing anything about cash flow with him at this time in August --

A. No.

Q. -- of 2015?

A. I don't --

MR. ORSECK: Objection. Objection, foundation.

BY MS. NEWMAN:

Q. You can answer.

A. He -- he may have called. I just don't remember any specifics. If he did call, I would have asked the Accounting staff to try to help resolve his issues.

It -- it did look like he was pretty quick to write a note that nobody -- one e-mail's dated August 23rd. The next one's August 24th when he says nobody's resolved it. That's a pretty quick --

MS. NEWMAN: 37.

THE WITNESS: Comment.

And -- and, ultimately, it must have got resolved, because Tom Miller signed Form 10.

(Exhibit 25 was marked.)

65 (Pages 254 - 257)

Page 258

THE COURT REPORTER: 25.

THE WITNESS: This is the next day.

BY MS. NEWMAN:

Q. Oh, I -- you know what? I -- I didn't intend to show you that. I was just going to ask you, that doesn't refresh your recollection about this issue, correct, Mr. Cash? I....

A. Let me look here at something. (Witness reviews document.)

MS. NEWMAN: 37. I want 37.

MR. HERSHEY: You want 37?

MS. NEWMAN: Yeah.

THE WITNESS: You -- you know, as you handed here, I -- we wanted the Form 10 to be reasonable and accurate, and I think we would have continued to work for it to be reasonable and accurate. So that -- that doesn't cause me to remember specifically.

MR. ORSECK: Did we -- did we mark this or --

MS. NEWMAN: Yeah.

MR. HERSHEY: Yeah, we did.

(Exhibit 26 was marked.)

Page 259

THE COURT REPORTER: 26.

MR. ORSECK: Yep.

BY MS. NEWMAN:

Q. Okay. I'm going to ask you, Mr. Cash, to focus on the last e-mail on the first page, from Michael McCarthy at Credit Suisse to a number -- number of people at CHS including you, Mr. Hammons, and Mr. Culotta.

In No. 1, Working Capital Projections -- well, actually before that, Mr. -- Mr. McCarthy says: "We're hoping to schedule a call Friday morning with the appropriate parties to discuss the below topics."

Do you see that?

A. Yes.

Q. And in No. 1, he says: "Working Capital Projections. In 2015, the current model assumes working capital used capital as a use of $71 million, which changes to a use of $20 million in 2016 and remains fairly constant as a use of 15- to $20 million in the our -- in the outer years. Wanted to discuss the main assumptions/ drivers behind this change. This point is particularly important, as this changes the primary driver of cash flow available for debt

Page 260

repayment. CFO increasing from $107 million as of LTM 9/30/15 to $155 million in 2016."

Do you see that?

A. Yes.

Q. Okay. And CFO is -- what does CFO stand for?

A. Cash flow from operations, I believe.

Q. Okay. Do you recall having a -- a call with Credit Suisse about this topic?

A. I do not recall a -- attending a call about this topic.

Q. Okay. What were the underlying assumptions behind the projection that QHC's working capital use would fall from $71 million in 2015 to only $20 million in 2016 and 15 to 20 million in the outer years?

A. Well, I think I saw just recently there were some settlements. That one $20 million settlement, and then there was a QHR settlement. So would -- that -- those litigation settlements would help explain some of that use of cash.

And then I think we had discussed that we thought the receivables would be better managed going forward from 12/31/15 and into '16

Page 261

because you'd slow down conversions, although you had a few in '16 and several in the 11. So I think we had a belief we could reduce our AR days by three, which is a pretty big reduction.

Q. And -- and that -- I -- I think you've testified to this, but can you just remind me? What was the basis for the belief that you were going to be able to achieve that AR reduction day?

A. That you'd gone through 11 converged -- 11 hospitals converted in '15 and six in '16, and it takes a little bit of time to get those to hit the ground running. And you -- you had most of your facilities converted sometime in '16 for QHC, I believe. And then you weren't doing conversions, so you could perfect your performance.

Q. Were the hospitals -- putting aside the conversions. If you looked at the AR days, just for the hospitals that had been converted, would that have supported the projection that you were going to be able to reduce collections by three days?

A. Well, keep in mind, the Service Center keeps doing more conversions that are all

66 (Pages 258 - 261)

Page 262

done, and -- and conversions in nature are a little challenging and they cause performance not to be as good as it would be -- could be in the future. So you sort of got to get conversions behind you. And once you get those behind you, we thought our Service Center performance would be better for the -- all the hospitals being serviced by the Service Center. So you wouldn't have conversions going on.

Q. Was there any written analysis detailing that?

A. Mike Lynd may have done some analysis on that.

Q. Okay.

MS. NEWMAN: Let's do 39.

(Exhibit 27 was marked.)

THE WITNESS: Oh, this is the famous -- on the second page here, this is our famous $88 million Springfield going down to $50 million.

BY MS. NEWMAN:

Q. I know that's a favorite of yours.

THE COURT REPORTER: Exhibit 27.

MS. NEWMAN: Oh, I'm sorry, Gary

Page 263

(tendering).

THE WITNESS: All right.

BY MS. NEWMAN:

Q. Okay. You're not on this e-mail either, Mr. Cash. Have you seen it before?

A. Let me look a second. (Witness reviews document.) I don't remember seeing the e-mail. I did see one from Credit Suisse that challenged that Lee had not put any benefit for the Springfield project in his early projections. And I do remember seeing that e-mail.

This e-mail here, I would have gotten as part of a review of a capital project, the one that's attached.

Q. Okay. So I want to focus on the e-mail for a minute. This is an e-mail from Mr. Fleck to Credit Suisse where he's saying that he -- the last line, he says: "I may add some more revenue and EBITDA in the QHC model in 2017-2018 projections for the project."

Do you see that?

A. Yes.

MR. ORSECK: Object to form.

BY MS. NEWMAN:

Q. Okay.

Page 264

A. Yes, I see it, and I said that he -- he originally put the $88 million in and then put the benefit in.

Q. Uh-huh. Okay.

A. And then --

Q. And then he --

A. And Credit Suisse said that's not right, and which he -- they're correct.

Q. Okay. Well, he's -- he's writing down: "Ryan, just wanted to copy you on this e-mail so you guys had some additional detail about this large project."

Do you see that?

A. Yes.

Q. So it's actually Mr. Fleck telling Credit Suisse that he's going to put the additional revenue in, not the other way around?

A. No. He got an e-mail that I've seen from Credit Suisse. Might have been the -- Ryan Bondroff said: Hey, we don't see in the model any benefit from the Springfield spending. And then he's --

Q. Okay.

A. -- he -- he ended up putting the benefit in.

Page 265

Q. Uh-huh. Okay. Let's turn to the attachment. You may have said this, Mr. Cash. If you did, I apologize, because I don't recall.

Have you seen this document before?

A. Yes, I -- I've seen this document before.

Q. Okay. Were documents like this created in connection with every large capital project that CHS wanted to undertake?

A. Most every large project, especially something $88 million. And then, you know, sometimes 5- or $10 million may not need as much detail.

Q. Okay. And what was the purpose of -- of -- of this document?

A. No. 1, we have to go to our board for projects over $50 million. I be- -- I believe it's either 40- or $50 million. I don't remember the number.

Two, you -- you want to make sure that the people who are going to manage this project or this division realize there's an expected return. Because what would happen is as we're doing future budgets, we would go back and

67 (Pages 262 - 265)

Page 266

pick the years that these would be done and we'd attempt to add these into our planned performance in future years, just like we did in Springfield here.

Q. Okay. Can you please turn the page ending in Bates No. -34606?

A. 3460- -- got it.

Q. Okay. The top half or so of the chart on the right shows the hospital's historical performance without the project; is that correct?

A. Yes.

Q. Okay. And it shows that the historical EBITDA margins for the hospital ranged -- well, went from 12 -- were at 12.3 percent in 2010, 16.7 percent in -- in 2011, 13.5 percent in 2012, and 12.9 percent in 2013, correct?

A. Correct. That's what's presented here.

Q. Okay. Okay. And then the -- the lower half of the chart, there are project pro forma projections; is that right?

Or, I'm sorry, it's the middle, really. You see the project pro forma projections?

A. Correct.

Page 267

Q. Okay. And that's the -- that shows the -- the Project Net Revenue line shows the projected net revenue for the hospital once complete -- or, excuse me, for the project once completed, correct?

A. Correct.

Q. Okay. And I can tell from Note A next to 2017, that 2017 was projected to be the first full year of operating results upon completion of the project, correct?

A. That's what Note A says.

Q. Okay. And this shows that the project was projected to generate 35.576 million in net revenue in the first year and 39.754 million in net revenue in the second year, correct?

A. Correct.

Q. Okay. Let's go to the page ending -34607.

Okay. Does this page show the projected performance of the hospital, only without the project?

A. The $141 million was the same as here. So it looks like starting in '17, they've got the project -- it -- it's hard to tell right

Page 268

offhand. It's the same $141 million, then it goes to 14- -- this is without the project.

Q. This is without the project?

A. Correct.

Q. Okay. So this shows that the EBITDA margins for the -- the projected EBITDA margins for the hospital without the project were 14.53 percent in 2017, 15.6 percent in '18, 16.65 in '19, 17.68 in '20 and 18.7 in '21, correct?

A. Correct.

Q. Okay.

A. Now, the hospital had $200 million in revenue in 2015 and about $50 million in EBITDA. That's in the financial statements for the hospital. So they did a lot better after 2013 actual and '14 and '15 than they -- than was projected they would be doing.

Q. Why is that?

A. They had better rev- -- revenue growth. No. 1, when -- when they announced the project, you can get the Halo Effect of its coming. Why don't you come here and be a good practicing --

Q. Oh, I see.

A. -- doctor.

Page 269

Q. I misunderstood what you were saying. You're saying '14 and '15 were better versus the projections for '14 and '15?

A. Yeah, than showing.

Q. I see.

A. But it shows '17. And -- and I think they also added a cath lab before they got the big project done, and that was a -- real successful....

And I believe Marty Smith had to do somewhat of a joint venture in the early part of '16, which happened to continue to do better.

Q. Okay. And then that improved performance for '14 and '15, that was taken to -- into account when preparing the projections for '17 through '21, correct?

A. Not -- not these projections.

Q. No?

A. No. Because these -- this was done sometime after '13 was done, before '14 was finished. Because the first year -- last year actuals --

Q. I see.

A. -- to 2013.

So just to clarify. There's a

68 (Pages 266 - 269)

Page 270

lot of discussions about Springfield. Springfield had a really good year in '14 ad a better year in '15, and that got carried forward with the benefit of the new tower.

Q. Okay. And that's because the community in Springfield understood that tower was coming and there was an --

A. Well, more doctors wanted to be part of --

Q. -- expectation that that was going to be --

A. The doctors wanted to be a part of it, and they recruited some doctors to the cath lab, and -- and it actually had a really good operating CEO.

Q. Okay.

THE VIDEOGRAPHER: I'm sorry to interrupt. It's that time again.

MS. NEWMAN: Okay.

THE VIDEOGRAPHER: Is that all right?

MS. NEWMAN: Sure.

THE VIDEOGRAPHER: Okay. Going off the record, the time is 2:46 p.m.

(Brief recess observed.)

Page 271

THE VIDEOGRAPHER: We are returning to the record, the time is 3:01 p.m.

BY MS. NEWMAN:

Q. Okay, Mr. Cash. Can you turn to -- we're going to -- we're still looking at the same document. Can you turn to the page with the Bates ending in -608, please? You should still have it in front of you.

A. This one (indicating)?

Q. It was the e-mail with the project application.

A. Oh, the project? Okay.

Q. Yes.

A. Yeah. 3-, what?

Q. -608.

A. Okay.

Q. So this page shows the projected performance of the project on a standalone basis, correct?

A. Correct.

Q. Okay. And they had projected EBITDA margins range from 42.06 percent in 2017 to 45.89 percent in 2021, correct?

A. Correct.

Page 272

Q. Okay. What was the basis for projecting margins for the project that were so much larger than the margins for the hospital?

A. The -- when you're bringing in incremental revenue and volume, volume driving revenue, the industry often has an assumption the HCA CFOs, or used to be the CFO, that it would generally be realistic to think that your margin could be twice on a good size revenue growth project.

Now, at this time, they didn't have a -- they had a 13 or 14 percent margin, which is a little more than that. But if you look at the margin to that, the margin at the end of '15, it was, like, 25 percent. You double that, you get 50. So this is sort of reasonable.

But the hospital did this, and Tim Hingtgen's a really sharp op- -- good operator. A lot of success. He -- he -- he was the Divisional President at the time, and he -- and he supported that that they could achieve these kind of margins off this project. And it -- it would sort of fit the reason if -- if your margin is 20 percent, you would probably do a 40 percent margin und- -- under that theory. And

Page 273

that's a theory that's -- that, you know, a lot of analysts ask questions, and I know the HCA guys said it more than once.

He's not the CFO today, but he was the CFO back then. So that -- that's where that concept comes from.

Q. Okay.

A. And a second thing, if I can.

MS. NEWMAN: 40.

BY MS. NEWMAN:

Q. Sure.

A. We take this information, and when you're doing your budget -- let's just take 18 because it was written in -- they're aware that we'll take your historical performance for the preceding year, and the next year budget is going to include this incremental EBITDA in your expected budget the following year.

So you would not want to be saying: Hey, I can get $17 million and really not think you could get it, knowing the strategy, how we build up budgets when we spend a lot of capital.

MS. NEWMAN: 40.

(Exhibit 28 was marked.)

69 (Pages 270 - 273)

Page 274

BY MS. NEWMAN:

Q. Okay. Mr. Cash, I'm going to represent to you that the exhibit that you've just been handed is an exhibit that Mr. Fleck put together that was used with him at the arbitration between Quorum and CHS and that -- that the document was produced to us with the handwritten markings already on it.

A. Okay.

Q. The first five pages -- pages of the exhibit is a copy of the Treasury presentation regarding the Springfield, Oregon Tower project that we just looked at, correct?

A. Correct.

Q. All right. Okay. Please turn to page 6. It's -- it has the Bates ending -531. This is an excerpt from a CHS Capital Spending Plan for fiscal year 2014, dated May 5th, 2014, correct?

A. Yes.

Q. Were Capital Spending Plans like this routinely prepared by CHS?

A. On a year -- on a yearly basis, I think we would do these.

Q. On a yearly basis?

Page 275

A. Yeah.

Q. Okay. Were they sometimes prepared more often than on a yearly basis?

A. Probably not.

Q. Okay. You can see here that the tower project is listed kind of halfway down the page. May be a little more than halfway down the page.

Do you see that?

A. Correct.

Q. Okay. And it shows that as of May 5th, 2014, CHS was projecting to spend $5 million in 2014 on the project, $40 million in 2015 on the project, and 43.5 -- approximately $43.5 million on the project in 2016.

Do you see that?

A. Correct.

Q. Okay. And it had not yet -- this project had not been approved by the board.

Do you see that? I'm looking at the -- the column with the heading "CER approved/board approval," and it says "no" for that line.

A. It looks to me like it says "Y, Y."

Page 276

Q. Do you see that there's a circled "no"?

Oh, let me make sure I'm looking -- yeah.

Do you see that there's a circled "no" next to the Patient Tower?

Are you on the Bates ending in -531?

A. I'm on -532.

Q. Okay. That's why.

A. Okay.

Q. So if you'll just go to the prior page --

A. There's two -- okay. I'm sorry, I'm on 6A.

Q. That's okay.

A. Yes.

Q. No problem. Do you see that?

A. Now, I see that.

Q. Okay. Now I'm going to ask you to turn the page to the next one.

A. Correct.

Q. Okay. And here, yes, the project has been approved.

Do you see that?

Page 277

A. Yes.

Q. Okay. And the -- and the projected capital spend is a little bit different.

Do you see that?

A. Yes.

Q. Okay. There is now $10 million projected to be spent in 2017.

Do you see that?

A. Correct.

Q. Okay. So that would indicate to me -- or does that indicate to you that the project is no longer going to be completed in advance of January 1, 2017?

A. Yes. And -- and if I can --

Q. Sure.

A. -- comment a second. Mr. Campbell, who was the CEO at the time, testified in the arbitration that there was delays in getting the approval inside of Springfield, which delayed the project. And he was asked: Was there any delays forced upon the project by Community Health, and the answer to that was no.

And he further want on to say that that -- Marty Smith had been helpful with some capital stuff for 2016. But that -- that

70 (Pages 274 - 277)

Page 278

this -- the very next year probably, or a year later, you'd see the same -- well, it may be in here. Let me see if it's in here.

But anyway, he -- he testified he couldn't get the approvals to meet the -- the outline spending dates here, and there was never any efforts to delay the project. Just couldn't get the approvals.

Q. Okay. Can you turn to the next page, please.

A. Sure.

Q. Okay. So this is another Capital Spending Plan, but this time dated as September 14th, 2015.

Do you see that, up in the left -- in the left --

A. Yes.

Q. -- upper left-hand corner?

Okay. And this is about a month after -- a month or so after the spinoff was announced publicly, correct?

A. Correct.

Q. Okay. So now if you look at this -- the Patient Tower line, it's a little closer to the bottom.

Page 279

Do you see it there?

A. Yes.

Q. Okay. And now the projected spend has changed again. So now you see that it's projected to -- to have $2.178 million spent before 2015.

Do you see that?

A. Yes.

Q. $8 million spent in 2015.

Do you see that?

A. Right.

Q. And nothing in the following years.

Do you see that?

A. Well, yes, that would have been -- yes, that's correct.

Q. Okay. And that's because after the spin, CHS determines not to allocate any further additional funding, other than $8 million in 2015, for the capital project? For the --

MR. ORSECK: Object to form.

BY MS. NEWMAN:

Q. -- Oregon project, correct?

A. On September 14th, we thought we would have QHC closed by December 15th.

Page 280

Q. Okay.

A. That's why there's no 2016. I would imagine if -- if one of these was done subsequently, there might have been some spending in '16.

Q. Okay. But the 2015 spending has now gone down from $40 million to -- to 8-, right?

A. It -- it -- it -- you can't spend without approval, and he didn't -- we didn't have the approval to start the project, the approval from the local regulatory authorities to go spend the $88 million. And that would -- that's what Mr. Campbell testified to, was the slowdown had to do with getting the local approvals.

Q. Okay. So there was only $8 million allocated in 2015 because the project was stalled because of the failure to get local regulatory approval, correct?

A. That -- that's -- that's what my understanding is.

Q. Okay. Was any work done to determine the impact that this delay would have on the completion of the project?

A. Yeah. I believe that was done in '17. I -- I thought -- because I thought we --

Page 281

well, Lee came back and put revenue and EBITDA in '18, '19, and '20, and I would only have thought he had a reasoning for doing that.

Q. And do you know what Mr. Fleck did to determine that the project would be completed in 2017, notwithstanding this delay?

A. I -- I don't know. I -- I know what he put in the model.

Q. Okay. Do you know if any work was done to determine if the projected cost of $88 million would be impacted by the delay in funding of the project?

A. There was no increase in the project. As I understood that, our Construction department does a fair amount of cushion in projects in case there is delays, and I think we'd spent -- it's in one of these schedules. I thought we'd spent, like, $7 million before the spinoff took place.

Q. So who -- who did the analysis to determine that the -- that the delay in the project was not going to increase the cost?

A. Our Construction department would get-- Gordon Carlyle, who worked for Marty Schweinhart, he would have stepped up and said we

71 (Pages 278 - 281)

Page 282

need to change the project because -- and he didn't do that, to my --

Q. Did anyone ask him to do that, to -- to -- to look at it?

A. I -- I didn't ask him. Someone may have asked him. I don't know.

Q. Okay. So you don't know whether Mr. Carlyle was asked to assess whether the delay in the project was going to increase --

A. He --

Q. -- the cost beyond $88 million, correct?

A. I don't know, but I do know that when projects are delayed, that we ask that question. But he puts cushions in it so we don't have to worry about going back to the board.

MS. NEWMAN: 41.

(Exhibit 29 was marked.)

THE COURT REPORTER: 29.

BY MS. NEWMAN:

Q. Okay. Mr. Cash, you're not on this e-mail. Have you seen it before?

A. No.

Q. In the bottom e-mail, Mr. Fleck writes: Megan, Marty Schweinhart has removed the

Page 283

Springfield Tower project from his CapEx plan due to the QHC spend. All Marty has is 8 million in 2015.

Do you see that?

A. Yes.

Q. Okay. And when -- at -- is the CapEx plan the documents that we were just looking at?

A. Yes.

Q. Okay.

A. And, again, this was August 26th so the thought process was come December, we could close to spend and -- which that's what most people believed in August 2015, it would be done in four months. The majority of this would be spent --

Q. Okay.

A. -- after spend.

Q. Okay. And in August of 2015 --

A. Uh-huh.

Q. -- Mr. Schweinhart was not -- well, actually, let me take a step back.

Who is Mr. Schweinhart?

A. He's the Senior Vice President in charge of construction, purchasing, other

Page 284

categories. He's the one that does the planning for both acquisitions, and in this case, to staffing for QHC.

Q. Okay. And as of August -- or late August of 2015, Mr. Schweinhart was removing QHC capital projects from the CHS spending plan, correct?

A. Because we thought that it would -- spend would take place by January 1st, yes.

Q. Who is Elizabeth Phelan, if you know?

A. I don't know.

Q. Okay.

A. I don't remember the name.

Q. Okay. I think Ms. Phelan is from Deloitte. Do you know why Moody would have been sending this information to Deloitte?

MR. ORSECK: Object to form, foundation.

THE WITNESS: Deloitte has a tendency to want to understand what major projects were planned, and they may or not -- may or may not put something in some of their public documents about it.

Page 285

BY MS. NEWMAN:

Q. We're going to use the model. The Free Cash tab. I'm going to be looking at row 17 and 27. Actually, you know, Ken, forget it. We're going to skip it. Sorry.

Okay.

MS. NEWMAN: 42.

(Exhibit 30 was marked.)

THE COURT REPORTER: Exhibit 30.

BY MS. NEWMAN:

Q. Okay, Mr. Cash. You're not on this e-mail. Have you seen it before?

A. I don't remember a cover e-mail that's on the front of this.

Q. Okay. Someone from Credit Suisse is telling Mr. Culotta and Mr. Doucette in the cover e-mail that he or she, I actually can't tell, is attaching a few pages Credit Suisse put together as potential discussion points with the investors.

Do you see that?

A. Yes.

Q. Okay. If you turn to the attachment, do you know if these pages were shared with investors?

72 (Pages 282 - 285)

Page 286

A.    It's a 40-page document, so I don't -- I don't know -- I don't know if it was or was not.

Q.    Okay.  Did you just say it's a 40-page --

A.    This is 2016.

Q.    Did you just say it's a 40-page document or a four page?

A.    The investor presentation --

Q.    Oh.

A.    -- that this would have gone in is a 30, 40-page document.

Q.    I'm not sure this is in the investor presentation.  It --

A.    And I -- I -- you know, I don't have it committed to memory.

Q.    Okay.  The first page says:  Year 1 investor free -- free cash flow.

Do you see that?

A.    Yes.

Q.    Okay.  And it's showing about halfway down the page that 40 million -- that 40 million is going to be spent on the tower project in 2016.

Do you see that?

Page 287

A.    Yes.

Q.    Okay.  And then it says 80 million over the next two to three years.

Do you see that?

A.    Yes.

Q.    Okay.  Do you know where that two to three years come from?

MR. ORSECK:  Foundation.

THE WITNESS:  I don't.  I mean, it's $88 million, I think there was some money spent before '16.  I thought the model had it being done in late '17, so -- which would be two years, I guess -- well, the next two years would be longer than that.

BY MS. NEWMAN:

Q.    The next two years would be 2018 to 2019 --

A.    Yeah.

Q.    -- correct?

A.    Yeah.  I don't know where that came from.

You know, it doesn't make sense if you spent 40 million in '16, you're not going to spend another 80 million, something done on

Page 288

here.  This project's $88 million.

And you -- you're saying I'm going to spend 40- in '16 and I'm going to spend another 80-.  That's 120-.

Q.    Do you know how much was ultimately spent on the tower project?

A.    I -- I assume it's close to 88-, but I don't know.

MS. NEWMAN:  Can I have 48, please?

BY MS. NEWMAN:

Q.    Do you know when the tower projects completed?

A.    The credit model had it sometime starting in '18, I think, so....

Q.    Do you know when it was --

A.    No.

Q.    -- ultimately, in reality, completed?

A.    The entire project?

Q.    Yeah.

A.    I don't know.  Was it done in parts, components?

Q.    I'm sorry?

A.    Was it done in components?

Page 289

Q.    I'm just asking you if you know.

A.    I don't know.

Q.    Okay.

(Exhibit 31 was marked.)

THE COURT REPORTER:  31.

BY MS. NEWMAN:

Q.    You know what?  You can put that aside.  I'm actually going to get you to turn to the Form 10 first.

A.    Okay.

Q.    We'll come back to that.  I'd like you to turn to page 3, which is the Bates ending in -219.  I think there's actually two 3s.  That's a little confusing.  If you look at the Bates, it's 219.

A.    Got it.

Q.    Thank you.

Okay.  In the second full paragraph on -- on page 3, it says:  "We have identified a number of hospitals for possible divestiture over the 12 to 18 months following the spinoff, based upon analysis of financial performance, current competitive conditions, expected demographic trends, joint venture opportunities and capital allocation

73 (Pages 286 - 289)

Page 290

requirements."

Do you see that?

A. Yes.

Q. Okay. So it wasn't a secret that the plan was for QHC to try to divest underperforming hospitals after the spin, right?

A. No.

Q. Okay. And based on this disclosure, the hospitals that were underperforming were likely able to discern that they were among the hospitals that were going to be sold after the spin, right?

MR. ORSECK: Foundation.

THE WITNESS: This is a little broader on which hospitals you would do because you don't say we did a fair number of hospitals which had losses.

BY MS. NEWMAN:

Q. So you don't think the hospitals that were performing with negative EBITDA would be able to tell based on this that they might have been on the chopping block?

A. That it --

MR. ORSECK: Foundation.

THE WITNESS: That -- it -- the

Page 291

comment that I thought was concerning was we've identified hospitals with losses for possible divestiture. This has got a broader comment.

BY MS. NEWMAN:

Q. That is based upon analysis of financial performance?

A. Yeah.

Q. We've identified hospitals for possible divestiture?

A. And it says current compe- -- competitive and demographic issues, joint ventures, allocations.

It -- it's not as narrow-minded as just say we've identified losses.

Q. Okay. So you don't think that the hospitals, the underperforming hospitals, knew, based on the disclosures that were made in the Form 10, that they were likely going to be sold?

MR. ORSECK: Foundation.

THE WITNESS: I don't know what the -- they could identify. The comment we made in discussions was that it would be better not to narrow it down just to

Page 292

ones with losses. This -- this is a little broader, although it does say these losses.

BY MS. NEWMAN:

Q. Who -- who did you have those conversations with?

A. I mentioned to Mike that you -- you'd prefer not to be so specific as to the -- you -- you got losses and you're probably out-- you're probably going to be in a divestiture list.

Q. And why didn't you want hospitals to be able to know that they were on the divestiture list?

A. Myself and my boss, we've always tried to keep the identification of someone being sold without becoming public because if that becomes public, there's a -- there could be a likelihood that those hospitals would not perform quite as well, could.

Q. Yeah, you testified in the arbitration hearing that once a hospital knows it's going to be sold, its operating results decline, correct?

A. Could decline, I said; not decline.

Page 293

Q. I think you said historically once -- well, we don't have to argue about it.

A. That's fine.

Q. And you testified in the arbitration that in your opinion, it was over -- overly communicated that QHC's plan was to sell underperforming hospitals, right?

A. It was described in the rating agency and I think it was described in the investor presentation and probably in the bond presentation. I don't -- it would have been better to have less -- personally, I think it would have been better to have less specifics.

Q. Okay. And -- and the reason you think that would have been better was because it would have minimized the possibility that the underperforming hospitals' performance would decline in the period before their sale, correct?

A. Correct. Correct.

Q. Was anything built in -- well, actually let me rephrase it.

Nothing was built into the projections to account for the underperforming hospitals' performance could decline in the period before they were sold, correct?

74 (Pages 290 - 293)

Page 294

A. I said it's just a theory that there is. It's a theory. And it may or may not be an actual theory. They -- they were going to be gone within the -- the model I think had within a year. This says 12 to 18 months. So if they're gone, whether they lost more money or not -- and I know they lost more money in '16 than they did in '15, which was a pretty good percentage of the drop in the EBITDA, but it -- it -- no one's tried to explain exactly what happened, but they -- they were identified and -- and there is losses.

Q. The model actually projected that they were going to be sold within eight months of the spin, right?

A. Well, the Ken King -- the Acquisition guy started to work on it early in January. He -- he was in our Acquisition department and I'm aware that he started working on QHC pretty much the first part of 2016 and maybe some in '15.

Q. What do you think he was doing in '15 and '16?

A. I --

MR. ORSECK: Object to form.

THE WITNESS: -- don't know. The

Page 295

first part was thinking about acquisitions, but he was also thinking about divestitures.

BY MS. NEWMAN:

Q. What was he doing in connection with potential divestitures?

A. He'd be looking at the hospitals. He probably would be lining up people he wanted to contact and see who the contacts were, see who -- see who was in a nearby market that might have an interest in it. And he -- he wasn't buying any hospitals for CHS, so he had -- sort of like Marty Smith, he had a lot of time on his hands to do work that would potentially identify divestiture candidates.

Q. Okay.

A. Buying/buyers, the divestitures.

Q. Okay. And I'm going to ask just a very simple question and repeat the very simple question that I asked before, which is that model actually assumed that the underperforming hospitals would be sold within eight months of the spin, correct?

A. If they were going to be sold by December 31, that's the first full year that was

Page 296

the first assumption.

Q. And that's eight months after the spin, correct?

A. Correct.

Q. Okay. And then the public disclosure says that they'll be sold within 12 to 18 months following the spin, correct?

A. That's correct.

Q. And -- and it actually also says, if you look at the last sentence of that same paragraph: We intend to complete our strategic review after the spinoff is completed and we may be able -- unable to divest any or all of these hospitals or realize proceeds from the sale of those hospitals.

Do you see that?

A. I see that.

Q. Okay. The model assumes that every single hospital that had been selected for possible vesti- -- divestiture was going to be sold within eight months, correct?

A. All 11 hospitals. Yes.

Q. Yes. And it also assumed that every single hospital that had been selected for possible divestiture was going to be sold, and a

Page 297

revenue multiple of .4, correct?

MR. ORSECK: Object to form, foundation.

BY MS. NEWMAN:

Q. I think you've testified to that several times today.

MR. ORSECK: Object -- objection foundation. That's incorrect.

THE WITNESS: I think what we testified was that the margin would improve to 20 basis points as those facilities were taken out based on their performance.

The model did not attempt to take these 11 hospitals and project them and these 27 hospitals and project them. It's one model. And it doesn't -- it doesn't identify in the model what's going to happen with hospitals with losses or hospitals with profit. It's a combined model. So it's hard to say that the model is done a certain way when it's a -- it's a projection of all three hospitals together.

BY MS. NEWMAN:

75 (Pages 294 - 297)

Page 298

Q. The model doesn't back out the performance of the 11 hospitals to be sold after 2016?

A. Right.

Q. It does not?

A. It backs -- it backs them out after 2016. It -- but when they're going from '15 to '16, it doesn't say they're going to get better or worse. It made some assumptions, what would be coming out, based on 2015's EBITDA, I believe.

Q. Is it your testimony that the model does not project that every single hospital --

A. I --

Q. -- that it was slate -- that every single one of the 11 hospitals slated for divestiture would be sold by December 31st, 2016?

A. That's not what I said.

Q. Okay.

A. I said the model doesn't separate the 11 hospitals into a separate calculation for what the EBITDA would be at the end of 2016.

Q. I -- un- -- understood.

A. Okay.

Q. But the model does assume that

Page 299

each of the 11 hospitals slated for divestiture will be sold by December 31, 2016, for a revenue multiple of .4, correct?

A. Correct.

MR. ORSECK: Objection, foundation.

THE WITNESS: And I still contend that Ken King had the whole year to work on it, if not longer, regardless of spin date.

BY MS. NEWMAN:

Q. Did he market the hospitals?

A. He -- he can contact people in a -- in a no-name basis. He could probably call people and say: The spin's likely going to happen here in a couple of months. Would you have an interest in it?

Q. In what?

A. In the hospitals. He could call --

Q. How could he do that on a no-name basis?

A. I mean, he can -- he can -- well, excuse me. Not on a no-name basis. But he could do a call to see if: Are you interested in some

Page 300

other hospitals in the market?

Q. Did he do that?

A. I don't know, but he was free to do it.

Q. Okay. You don't know if he did that or not?

A. He was free to do it. I know he was not working on anything, buying hospitals for CHS or buying for QHC. He had to spend some -- his time on something. Bright young man. He's going to get paid to sell them as incentive to do it. If -- I believe he would have spent time. He had to do some -- some work, and this is the work that was most -- most important.

Q. And this is all speculation, correct? You do not know --

A. Well, I did -- I do --

Q. -- what Mr. King did?

A. I do know he was starting to work on it. He stopped by and talked about stuff he was thinking of doing --

Q. Thinking --

A. -- at my --

Q. -- of doing?

A. -- office.

Page 301

Q. Do you know -- do you know whether Mr. King started to market the hospitals prior to the spin?

A. I know he was thinking about it.

Q. Okay. If Mr. King had started marketing the hospitals prior to the spend, that would have increased the likelihood that the hospitals became aware that they were going to be sold, wouldn't it have?

A. Do you know what a Confidentiality Agreement is?

Q. I'm aware of that, yeah.

A. That's what's you would get.

Q. You don't think if the hospital had been marketed prior to the spend that that would have increased the likelihood that the hospital would have become aware --

A. Not if you --

Q. -- that it was going to be sold?

A. Not if you do a Confidentiality Agreement. Then you wouldn't -- I don't think you'd go in and intentionally violate that. That would put you in a financial risk.

Q. If someone is interested in buying a hospital, would they be -- want

Page 302

information about the hospital?

A.   I --

MR. ORSECK:  Object to form.

THE WITNESS:  You -- you can do a lot of contacts about something and see if people are interested without giving them chapter and verse of the financial results.

BY MS. NEWMAN:

Q.   Okay.  Mr. Cash, the projections don't include any cost associated with selling the hospitals, right?

A.   That would come out of the -- no, there's no specific there, but any expenses, it would be predominantly Ken King's time and then if you had any legal fees.  So there could be some instances.

Q.   Did CHS retain an investment -- an investment banker to opine on the time in which it would take to sell 11 hospitals slated for the divestiture?

A.   Credit Suisse would have seen the strategy in the investor presentations that were done.  I don't think they would have let them go forward if they didn't think it was something that

Page 303

could be accomplished.

Q.   Okay.  Is it your testimony that Credit Suisse performed an analysis on the time in which it takes to sell negative EBITDA hospitals?

A.   I -- what I just said was an investor presentation which they reviewed --

Q.   I'm asking you a different question.

A.   Well, I'm answering the question as I -- as I understand it.

Credit Suisse doesn't put out presentations they don't think are reasonable and accurate.  And so I think if you're disclosing the time frame, I think they would have thought that was reasonable.

Q.   And do you know whether or not --

A.   I --

Q.   -- Credit Suisse did any analysis on that issue?

A.   It's not my job to ask them what kind of analysis they did.

Q.   So is the answer you do not know?

A.   I don't know.

Q.   Okay.  So going back to my original question, was:  Did CHS retain an

Page 304

investment bank to opine on the time in which it would take to sell these hospitals?  So other than Credit Suisse, which served as the advisor in connection with the spin, was there an investment bank retained specifically to opine on the time in which it would take to sell a negative EBITDA hospital?

A.   I'm not for sure --

MR. ORSECK:  Foundation.

THE WITNESS:  I'm not sure if any parent company would want to go forward and spend extra CHS --

BY MS. NEWMAN:

Q.   I'm not asking that question.  I was just asking if you did -- if you did it.

A.   I'm not aware of that.

MR. ORSECK:  Foundation.

BY MS. NEWMAN:

Q.   Did CHS do anything to look at how long it typically took to sell a negative EBITDA hospital?

A.   We've sold about ten hospitals in a couple of years, some -- some profit, some not profit, but --

Q.   Was any analysis done --

Page 305

MR. ORSECK:  Wait.  Hold on.

Were you finished?

THE WITNESS:  No.

There was a list of ten hospitals, four that they're in the analysis, two others with losses, three leases, and one successful hospital.  And they were all done within in a -- in a -- in probably 18 months.

BY MS. NEWMAN:

Q.   Does the list set forth the time in which those ten hospitals were sold?

A.   I don't think it shows a starting date, it just says this amount of hospitals got sold in a certain time frame.

Q.   In a certain time frame?

A.   Yeah.

Q.   You think there's a document that says this amount of hospitals got sold in a certain a time frame?

A.   Yeah, first -- first hospital sold on X.  Y's hospital sold on Y.

Q.   I'm asking a little bit of a different question which is:  How long would it take from the beginning of the process to sell a

77 (Pages 302 - 305)

Page 306

hospital until that hospital was sold?

A.   I'm not in the business of selling hospitals.  Ken King can better say if he could accomplish that.

Q.   Okay.  And did Ken King opine on that issue?

A.   Don't know.

Q.   Okay.  So you don't know if any work was done to assess the time in which it takes to sell a negative EBITDA hospital?

MR. ORSECK:  Object to form.

THE WITNESS:  CHS didn't do any work.

BY MS. NEWMAN:

Q.   Okay.  Did CHS do any work to assess how much cost and manpower it typically takes to sell a negative EBITDA hospital?

A.   One executive could pretty most -- pretty much manage most of that himself.  But for --

Q.   I'm not asking for your opinion of -- of how --

A.   Well, then --

Q.   -- of the answer to the question. I'm asking if at the time, prior to the spin, CHS

Page 307

did any work to assess that question?

MR. ORSECK:  Debbie, you're going to have to let him answer the questions. He's here to answer.

MS. NEWMAN:  He's going to have to start answering the questions.

A.   I don't -- I don't recall --

MR. ORSECK:  Hold on, Larry.

THE WITNESS:  Okay.

MR. ORSECK:  He's going to try not to interrupt you, and you need to try not to interrupt him, okay?

MS. NEWMAN:  I don't think that's what this is about.  He's going to have to try to answer my questions, or we're going to be here way past 5:45.

MR. ORSECK:  Well, that's not going to happen.

MS. NEWMAN:  Well --

MR. ORSECK:  And if you're going to continue interrupting him, we're not going to finish the deposition.

MS. NEWMAN:  Okay, Gary.

MR. ORSECK:  Why are you smiling and laughing at me?

Page 308

MS. NEWMAN:  Because we're going to finish the deposition.

MR. ORSECK:  Okay.  You need to behave appropriately, and so does the witness, okay?

THE WITNESS:  Okay.  Let me see if I can answer.

BY MS. NEWMAN:

Q.   Let's make a deal, Mr. Cash.

A.   Let's -- let's see if I can answer your questions.  The time frame was put in by QHC on the -- that was the time frame that QHC put into the model, I believe.  Most all the hospitals were identified by Culotta, and he would have seen the model.  I did not attempt to challenge what dates were put in the model.

Q.   That time frame was put in there by Mr. Culotta?

A.   I believe so.

Q.   Okay.

A.   I -- he didn't -- Lee Fleck, I don't think, would have made that up on his own.

Q.   Okay.

A.   I -- I --

Q.   Well, we'll ask --

Page 309

A.   -- didn't --

Q.   -- Mr. Culotta --

A.   -- get a --

Q.   -- how he came to that conclusion.

(Unintelligible overlapping.)

BY MS. NEWMAN:

Q.   Do you know if Mr. Culotta did any work to assess the time frame?

A.   I -- I can't tell you what Culotta did in the --

Q.   Because Mr. Culotta was a CHS employees at the time, correct?

A.   Yes, but he's spent a whole lot of time working on QHC matters.

Now, did I answer your question?

Q.   I -- I will accept that answer, yes.  Thank you, Mr. Cash.

A.   Okay, thank you.

Q.   How did CHS come up with the 12 to 18 months time frame that was listed in the Form 10.

A.   I don't know if it was Mike's comments or Kevin's comments or whose.  I saw it, but I didn't focus on it.

78 (Pages 306 - 309)

Page 310

Q. Okay. Did Ken King provide input into his view -- as to his view as to how likely it was that each of the 11 hospitals would be sold within eight months following the spin?

A. I don't know what Ken King provided.

Q. Okay. Okay.

MS. NEWMAN: 43.

MR. HERSHEY: Didn't we do 43?

MS. NEWMAN: Oh, yes. You already have it, the one I gave you earlier, and said we would do that in a little while.

MR. HERSHEY: Exhibit 31?

MS. NEWMAN: Yes, I think so. Is it --

THE WITNESS: Got it.

MS. NEWMAN: Thank you.

BY MS. NEWMAN:

Q. Okay. What was Mr. Lomicka's role with respect to CHS divestitures?

A. He was an executive in the Treasury department that worked on various projects. I think he didn't have -- Greg Overby did most of the work on divestiture. My

Page 311

assumption is Jim may have asked Ted to communicate this information, but I don't know.

Q. Okay. This is a December 1st, 2015 e-mail from Mr. Lomicka to Mr. Doucette. You are not copied on it. Mr. Lomicka says: Today CHS publicly announced the execution of a definitive agreement to sell the Memorial Hospital of Salem County in Salem, New Jersey to Prime Healthcare Foundation.

He goes on to say: We anticipate the divestiture will close by the end of the second quarter of 2016; however we can easily roll into the third quarter of 2016, given the protracted timetable of state officials who must review the transaction.

Do you know when CHS first started trying to sell the Memorial Hospital of Salem County?

A. I -- I don't know the specific date. I can tell you it took us about two years to buy a facility, so it's -- it's a difficult state to do business.

Q. Okay.

A. But much more difficult than the typical states we have.

Page 312

Q. Okay. And that's because of the regulatory approval process?

A. Yeah.

Q. Do all -- do most hospital divestitures and acquisitions require regulatory approval in the states in which they're located?

A. Some do; some don't. I don't know the breakdown. But I just know New Jersey is challenging.

Q. But it's not unusual to --

A. It's --

Q. -- have to give regulatory approval to a hospital sale?

A. I don't believe.

Q. You don't believe it's unusual?

A. No. It's -- it varies by state.

Q. Okay. Okay. Do you know if this -- this sale that's described here actually closed?

A. I believe we no longer own Salem hospital, so a conclusion would be that we sold it.

Q. Do you know if it was sold to Prime Healthcare Foundation?

A. I don't remember.

Page 313

Q. Okay.

A. Prime did buy some hospitals from CHS.

Q. But you don't know if -- where you know of those hospitals was the Salem hospital, correct?

A. No.

(Exhibit 32 was marked.)

THE COURT REPORTER: Exhibit 32.

BY MS. NEWMAN:

Q. Okay. Mr. Cash, you are on this e-mail. I'd like you to turn to the first e-mail in the chain, which is on the second page of the e-mail towards the bottom.

A. (Witness complies.)

Q. On September 20th, 2015, Mr. Bond from Credit Suisse write an e-mail to you and Mr. Doucette and Mr. Lomicka about the model.

Do you see that?

A. Yes.

Q. And in No. 2 of his e-mail he says: "Your divestiture assumptions seem very reasonable."

Do you know what the divestiture assumptions were at this time in September of

Page 314

2015?

A.    I believe they were less than 40 basis points --

Q.    Okay.

A.    -- or 40 percent at the time.

Q.    Do you know what they were other than being less than -- than --

A.    Not -- I don't know the exact number.

Q.    Mr. Bondroff asks if you have any example transactions that we can point to that show a lot of these types of deals occur and what those types of properties typically get sold for.

Do you see that?

A.    Yes.

Q.    And when Mr. Bondroff says "these types of properties," he's talking about negative EBITDA or otherwise underperforming hospitals, correct?

A.    Correct.

Q.    Please look at Mr. Fleck's e-mail to Jim Doucette on the first page of the e-mail.

A.    (Witness complies.)

Q.    Mr. Fleck writes:  "I assume QHC sells 140 million of revenue for 30 million, which

Page 315

is only about a .2 times revenue multiple. Perhaps we can increase more -- multiple to .3 times for a little extra cash."

Do you see that?

A.    Yes.

Q.    Okay.  Does that refresh your recollection that it -- at this time, the assumption was that the negative EBITDA hospitals would be sold for a .2 times revenue multiple?

A.    Well, it says .2 to .4, the hospital EBITDA --

Q.    Yes I'm --

A.    -- this multiple is .2 which was later changed based on further analysis of four hospitals sold with losses since 2014, for 125 million in revenue and 34 percent --

Q.    Mr. Cash?

A.    -- set price.

Q.    Mr. Cash, the question was:  Does this refresh your recollection that at this time the assumption was that the negative EBITDA hospitals would be sold for a .2 times revenue multiple?

A.    It refreshes my recollection.  It was an incorrect assumption.

Page 316

Q.    That's not the question.  The question is just --

A.    That's a --

Q.    -- does it refresh your recollection that that was the assumption at the time?

A.    This may have been an assumption at the time.  It was an incorrect assumption --

Q.    Sir?

A.    -- later changed --

Q.    Sir?

A.    -- with -- with the schedules.

Q.    I'm asking you if it refreshes your recollection about what the assumption was at the time.

A.    What -- what reflects my -- is Jim later says here, the e-mail sent:  I'm going to raise the sales proceeds to -- 35 to 40 percent.

And the memo does say "I use 20 percent at this time."

Q.    Okay.  So does this refresh your recollection -- refresh your recollection that it was 20 percent at this time?

A.    That was what's in the model --

Page 317

well, that's what's in this e-mail, I don't know if it made the model or not.  We later supported and Cre- -- Credit Suisse accepted 40 percent.

Q.    Okay.  I'd like you to look at the e-mail that starts Mr. Fleck's e-mail on the second page, and it carries over to the first page, but it starts on the second page.

Do you see that?  Do you see that?

A.    (Witness reviews documents.)

Q.    And Mr. Fleck is listing two e-mails -- excuse me, two sales here and they average to a revenue multiple of .3 times, correct?

A.    Correct.

Q.    Okay.  Did CHS sell other --

A.    Well, you -- you -- you'd have to weight that a little bit because one of them is twice as big as the other.

Q.    You think you should weight the bigger hospitals --

A.    If it's --

Q.    -- more?

A.    -- if it's revenue-weighted, the answer would be a little bit more than .3.

Page 318

Q.   Okay.  Were these the only negative EBITDA hospitals that CHS had sold in the years leading up to the spin?

A.   No.  We had one in Pennsylvania and one in Florida.

Q.   Okay.  Well, how come these on- -- are the only two that are listed here?

MR. ORSECK:  Object to form.

BY MS. NEWMAN:

Q.   Do you know?

A.   Don't know why they didn't have the other two there because it was later in one of the slide presentations that Culotta put together.

Q.   Okay.  In determining the appropriate assumption regarding the multiple at which the negative EBITDA hospitals would be sold, did CHS look at other sales of negative EBITDA hospitals other than CHS's?

A.   We wouldn't have the information readily available.  We looked at just what CHS sold.

Q.   Okay.  All right.

(Exhibit 33 was marked.)

THE COURT REPORTER:  33.

BY MS. NEWMAN:

Page 319

Q.   Okay.  You are on this e-mail.  Can you please turn to the first e-mail in the chain, which is on the second page?

A.   (Witness complies.)

Q.   Actually, you know what, let's -- yes.  Sorry.  You can go there to the second page.

A.   (Witness complies.)

Q.   Mr. Doucette -- this is an e-mail from Mr. Doucette to Mr. King.  You may have to look at the first page to see that it's from Mr. Doucette.  And Mr. Doucette is asking Mr. King to provide a percent of revenue QHC could expect from selling hospitals with no or negative EBITDA, correct?

A.   Correct.

Q.   And if you turn to the first page.

A.   (Witness complies.)

It's -- it's correct, but he's got Salem in here, and Salem's not a typical sale.

Q.   There's no question pending.

A.   Okay.  Never mind.

Q.   Mr. King responds that he would save 25 to 30 percent of revenue based on negotiated sale prices of four hospitals, correct?

Page 320

A.   Correct, which is Salem, which was not a typical sale.

Q.   Okay.  And why is -- why is Salem not a typical sale -- sale?

A.   It's a difficult state to operate in.  It's got very, very big regulatory authority.  It's hard for a for-profit hospital to operate in New Jersey.

Q.   Is it hard to operate a for-profit hospital in Illinois?

A.   Probably not as hard as in Jersey.

Q.   What about other states in which QHC was operating hospitals?

A.   New Jersey comes to mind as the most -- hardest, one of the hardest.  And Marion, Illinois is a 25 percent margin hospital for 100 million revenue?  It's --

Q.   I don't think Marion, Illinois was slated to be sold, was it?

A.   No, but it's operating in Illinois.

Q.   Mr. Doucette responds on November 15th:  "We reran the model late Friday raising sales proceeds from 20 percent to revenue to 30

Page 321

percent of revenue."

Do you see that?

A.   Yes.

Q.   And you were involved in that decision, correct?

A.   Probably so.

Q.   Okay.  He says:  "I can raise it to 35 to 40 percent, but with as many as will be needed to raise $140 million in revenue, it seems unlikely we would get 50 percent."

Do you see that?

A.   Correct.

Q.   Okay.

A.   I see it.

Q.   What does that mean?

A.   I thought the -- when you considered the actual sales proceeds for the loss hospitals, my recollection there was 34 basis points of revenue.  If you added the receivables net of liabilities, you'd probably get closer to 50 percent.  But the decision was made to use 40 percent.

Q.   Okay.  Was CHS trying to figure out at this time how to project that QHC would realize 140 million in the proceeds from the sales

81 (Pages 318 - 321)

Page 322

of hospitals?

A. I don't know where that number came from.

Q. Okay. Does the need to sell more hospitals in a short period of time bring down the price that could be realized from the sales?

MR. ORSECK: Objection, foundation.

THE WITNESS: I'm -- I'm not -- it's a hypothetical question. Does it bring it down? It depends if you find good buyers. If you find good buyers, you'll have a good price.

BY MS. NEWMAN:

Q. Did anybody do any analysis to think about that question?

A. The analysis was done on what the sales price was for loss hospitals for -- and that was 34 basis points of revenue, which we used 40.

Q. Okay.

A. Because the receivables were not -- were not generally part of the transaction.

Q. Okay. So no thought was given to the fact that CH- -- or excuse me, QHC was going to be trying to sell 11 negative EBITDA hospitals

Page 323

in eight months at the same time?

MR. ORSECK: Foundation.

THE WITNESS: But that they -- they were spread out in different states. You wouldn't be going to the same buyers for the 11 hospitals. And in most all circumstances, it would be a nearby successful hospital that wanted a referral base from a small loss hospital or they thought they could get more referrals, so that would have been what I believe the strategy would have been, so you weren't going to the same type of buyers for the most part. You were going to nonprofit buyers.

BY MS. NEWMAN:

Q. Was any analysis done to determine whether there was a -- a successful hospital that would want a referral base from any of the 11 hospitals that were slated for divestiture?

A. I'd have to speculate on that because I don't know what analysis that QHC, Ken King and Mike were doing. I don't know the analysis. They didn't share it with me.

Page 324

Q. They didn't share it with you, but you were the person that was involved in the decision to raise the -- the assumed revenue multiple, right?

A. Well, I --

MR. ORSECK: Objection, argumentative.

THE WITNESS: I thought it was 40 percent and went to 50 percent, which I still think is a reasonable assumption.

BY MS. NEWMAN:

Q. Do you know what the hospitals were actually sold for?

A. Don't know. Haven't taken the time to look at the public information, if it's available. I do know that Mike raised his sales proceeds from 100 million to 150 million sometime after 2016, so he was selling hospitals because he told publicly that he was going to go for 150 million instead of the original 100.

Q. Do you know if that was based on sales of negative EBITDA hospitals?

A. He changed his description of hospitals with no margin or low single digits. So he decided he would sell some single digit -- he

Page 325

did -- he changed his assumption.

Q. Mr. Doucette goes on to say: "CS is asking for historical sales to support the percentage we claim. I believe Lee had already sent them a list of sales supporting a lower percentage."

Do you see that?

A. Yeah.

Q. Do you know if the list of sales supporting the lower percentage that Mr. Doucette is referring to here is that e-mail that we looked at with the two hospitals listed?

A. Don't know.

Q. Okay. You write at the top: "I have a recent schedule for Jason on divestitures. Was that included?"

Do you see that?

A. Yes.

Q. And then the attachment that I think you've been looking at is -- that's the schedule that you're referencing, correct?

A. That's the one Jason did. I believe they did an analysis which picked the Specialty Care loss, Harris loss, the Mesquite loss, and Lehigh loss.

82 (Pages 322 - 325)

Page 326

And that's the four facilities that we ended up using as the basis to get the 34 percent of revenue rounded up to 40 because of the receivables.

Q. Do you know if -- if this schedule was shared with Credit Suisse?

A. Don't know. I know the one I just described, because they referenced it in their -- some of their investor presentation.

Q. So the ones that you used that you think are the basis for the point -- for revenue multiple are Harris, Mesquite, and Lehigh. What's the fourth, Specialty Care?

A. Specialty Care of Pennsylvania.

Q. Is Mesquite a rural hospital?

A. It's one of the ones we ended up selling.

Q. Is it a rural hospital?

A. I don't -- there may be another hospital in Mesquite which could make it harder to sell.

Q. Is Mesquite a rural city or --

A. I don't know Mesquite, Texas. I don't know Mesquite, Texas.

Page 327

Q. Okay. So this -- this gets you to the .5 revenue multiple. Is that what was the basis for your view that the point -- that the number should be .5?

MR. ORSECK: Objection.

THE WITNESS: No. The -- the -- the four losses that we -- that were chosen that I think we showed Credit Suisse were the Pennsylvania one; Harris, Arkansas; the one in Dallas, Texas; and then one in Lehigh, Florida, I believe. And that came out to 34 basis points.

And then my thought was that the receivables net of any payables would probably push it to 50 basis points, but we ended up using 40 basis points.

BY MS. NEWMAN:

Q. Okay. Do you know what year the revenue figures are from?

A. It would have been near the time of the sale, probably or the year before. I don't know.

Q. You don't know?

A. I didn't do the schedule and he

Page 328

didn't label it. Jason Johnson didn't label it.

Q. Okay. Why does this list -- when it was prepared, why does it include positive EBITDA hospitals?

MR. ORSECK: Objection, foundation.

THE WITNESS: It was a -- Jason provide -- provided it and he picked up all the hospitals that were divested between '14 and '15. And Jason just went to all of them.

BY MS. NEWMAN:

Q. You -- you talked about the fact that you thought that the larger hospitals should have a greater weighting in determining the average, right?

A. On the -- on the revenue multiple, I think they would have a -- they'd have a higher weighting as you did the accumulation of the average.

Q. Okay. Did you compare the -- the revenue of the hospitals that were slated to be divested to the four that you just said were the basis for the assumption of the .4 revenue multiple?

Page 329

A. There was a 125 million of four hospitals, so it's about 30 million. I don't know how much are here, but that's the four we chose.

Q. Let's go to the model and go to the cover tab. Yeah, let's do that. Go to line 53.

Okay. So line 53 says: Changes 11/13/15 after LC/JWD discussion.

Do you see that?

A. Yes.

Q. Okay. And then like 58, it says: Acquisition said can sell zero EBITDA hospitals for 30 percent of revenue, use three multiple up from time -- .2 times gets another 12 million proceeds up to 30 to 42 million.

Do you see that?

A. Yes.

Q. And right below that in line 60, it says: Changes L -- 11/13/15 -- well, actually, you know what? Let me ask you, it says "Acquisitions said."

Is that something that Acquisitions said to you and Mr. Doucette and that was communicated to Mr. Fleck?

A. I don't think it was said to me

Veritext Legal Solutions

212-279-9424　　　　　www.veritext.com　　　　　212-490-3430

Page 330

because I don't think I was copied on the Ken King e-mail.

Q. Okay. And then in line 60 it says: Changes 11/13/15 after LC/JWD discussion.

Do you see that?

A. Yes.

Q. Okay. And in line 62, it says: Sell another two hospitals, seven to nine total. Revenue sold now 180 million -- million at .4 revenue. More CapEx savings, too."

Do you see that?

A. Yes.

Q. Okay. And is that -- was that change made based on your view that the revenue multiple should include the AR?

A. I think it was made because we identified the four hospitals that we talked about that had losses. And the answer was 34 basis points of revenue and you would get over 40, even higher than 40 when you consider the cash you get from the receivables.

Q. Okay.

A. And I think that was the schedule that was sent to Credit Suisse.

Q. Were there changes to the model

Page 331

to lower the CapEx based on more sales of negative EBITDA hospitals?

A. He makes some comment here, "more CapEx savings." I think we did the model thinking that we needed to have a reasonable amount of CapEx in there. Clearly, it helps to have -- that hospitals have, but I don't know if they made any specific changes. You'd have to ask Lee that --

Q. Okay.

A. -- whether they'd make a specific change because of divestitures.

Q. Okay.

MS. NEWMAN: Let's scroll down to 109.

BY MS. NEWMAN:

Q. So line -- line 109 says: Changes 2/29/15, but it comes after the changes of December '15.

Do you see right above that?

A. Yes.

Q. Do you think that '15 was supposed to be a '16?

A. I would think so. Yeah, the first part would have a 29 on the non -- with that -- with the --

Page 332

Q. Yeah.

A. So it almost has to be '16.

Q. Okay.

A. We can agree on that.

Q. Okay. In line 113, it says: Sell another three hospitals. Center, Lock Haven, Sunbury, total 11 hospitals for 100 million or .4 revenue of 249.

Do you see that?

A. Yes.

Q. Do you know who gave the instruction that another three hospitals should be sold?

A. I would assume --

MR. ORSECK: Object to form.

THE WITNESS: I would assume Mike Culotta. But I'm just -- he was the one picking the hospitals.

BY MS. NEWMAN:

Q. Okay.

A. I know I didn't do it, and I think Mike would have made that -- made that decision.

Q. Okay.

A. Thanks for helping.

Page 333

MR. HERSHEY: No problem.

BY MS. NEWMAN:

Q. Okay. So this is a page in the model that lists eight hospitals. Eight -- and it yields a 43 percent revenue multiple for the four sales.

Do you see that?

A. Yeah.

Q. Okay. This isn't the support for the -- for the .4 revenue multiple?

A. No. There's a schedule, which you've got -- which I'm sure you've got somewhere. Harris, Dallas Regional, Lehigh, and the one in Pennsylvania Specialty Care Hospital. It's not on this list. If you go back to the Jason Johnson, those four are on here.

Q. Okay. Harris, Dallas Regional, Lehigh?

A. And Specialty Care at the --

Q. Is Specialty Care Memorial Hospital on line 8?

A. No, no, it's a -- it's in Pennsylvania.

Q. Okay. So it's -- it's not on here?

84 (Pages 330 - 333)

Page 334

A. It's not on this list.

Q. Do you know why this is in the model if this isn't the support?

A. Don't know.

Q. Okay. What does: Buyer purchasing all NWC mean?

A. Networking capital and Lehigh in Bartow. Bartow has not been used in the -- in any of the --

Q. Okay. But Lehigh -- Lehigh was?

A. Yeah.

Q. Okay. So in -- in the Lehigh sale actually, CHS did not keep the AR?

A. Right. But you can look at the size of the revenue and -- and working capital is at least 10 percent if there's any liabilities, or more if there's not any liabilities. You would still get above 40 percent. You only need more sales proceeds of $7 million in the schedule based on 125 million revenue. And 34 percent and 60 percent would be about 7 million. So it doesn't -- it probably takes one of these hospitals to do it.

Q. So in all of these instances where CHS kept the AR and the AP --

Page 335

A. Yeah.

Q. -- in each of those instances, the AR outweighed the AP?

A. Oh, yeah.

Q. Okay. And how would I know that?

A. Become a CFO, I guess.

Q. How could I verify that?

A. Someone could get the Balance Sheet of those hospitals if you wanted to see that. Networking capital usually averages 12 percent of revenue.

Q. Okay. So I haven't seen any schedule with those four hospitals on -- where do you think that might be?

A. There's a presentation that -- just a second.

It -- it's -- there's a comment that Credit Suisse made --

THE VIDEOGRAPHER: Just one moment.

THE WITNESS: Yeah, yeah, just a second.

There's a comment that Credit Suisse made about 34 percent.

THE VIDEOGRAPHER: I'm sorry. I

Page 336

couldn't hear you.

THE WITNESS: Can you hear me now?

THE VIDEOGRAPHER: Yes, sir.

THE WITNESS: Those four hospitals were listed. It shows 34 percent of revenue, about 125 million of revenue, and I don't know where that schedule is, but -- I mean, it's around.

BY MS. NEWMAN:

Q. Who -- who created it?

A. Probably someone under Mike's direction.

Q. Someone under Mike's direction?

A. Yeah, or possibly Lee Fleck completed something, but it's got a pretty big answer there in Bartow, which is probably -- I didn't think Bartow had a loss, but maybe it did.

Q. Was that sent to Credit Suisse?

A. I would think so.

Q. It was?

A. Yeah.

Q. Okay. And who do you think would have sent it, Mr. Culotta?

A. Probably someone in the Treasury

Page 337

department.

Q. Okay. I need a five-minute break.

THE VIDEOGRAPHER: Okay. We're going off the record. The time is 4:10 p.m.

(Brief recess observed.)

THE VIDEOGRAPHER: We are returning to the record. The time is 4:21 p.m.

BY MS. NEWMAN:

Q. Okay. Mr. Cash, I'd like to look back at the schedule, the Jason Johnson schedule. I don't recall what number it was.

A. Got it.

MR. HERSHEY: I believe it was Exhibit 33.

BY MS. NEWMAN:

Q. Great.

Okay. So you've identified that the .4 revenue multiple was based on Specialty Care, Harris, Dallas Regional, and Lehigh, correct?

A. Yes.

Q. Okay. Why wasn't Fallbrook

85 (Pages 334 - 337)

Page 338

included?

A.   Fallbrook was basically an abandoned facility without much operations. It had a large IP -- it's California -- had a big IP contract that fell apart and it basically was abandoned and we ended up selling it for -- not the hospital operation.

Q.   And why wasn't Marlboro Park?

A.   Chesterfield and Marlboro Park were both leased facilities. And so there really was no loan on asset, so you're -- when you're buying it, you're buying a lease. And that brings the price down.

Q.   Okay. Now, was any -- any work done to compare the four hospitals to the hospitals that were slated for -- let me start again.

Was any work done to compare the four hospitals that you've testified formed the basis for the .4 revenue multiple to the hospitals that were slated for divestiture, in terms of characteristics of the hospitals, operating performance, anything else?

A.   Other than these four had a negative EBITDA. All around $2 million, roughly.

Page 339

And the EBITDA of the 11, I believe, was a negative 8 million. It's in this work paper somewhere. Somewhere around 10 million. So 10 million had about an average of a million dollars each and these four had a $2 million loss, so they were probably a little bit worse facility than the 11 facilities looking at the average loss possibly.

MS. NEWMAN:  46.

(Exhibit 34 was marked.)

MS. NEWMAN:  Can -- actually, can you just put that one to the side? I'm going to start with a different document that you already have. I'm going to -- I'm going to start with a Form 10, actually.

BY MS. NEWMAN:

Q.   Can you turn to page F4 of the Form 10.

A.   (Witness complies.)  Okay.

Q.   So this shows that there was a due to parent from QHC of 1 -- approximately 1.5 million in 2014 and 1.8 million in 2015.

Do you see that?

A.   Yes.

Page 340

Q.   Okay. Do you -- do you know what gave rise to this intercompany debt?

A.   A few things. One would have been a couple of litigation settlements. Two was we bought the four hospitals from HMA. And then it would have been any other cash need that -- that we didn't have, but the big things would be the settlements and the acquisition of -- I think it was $120 million, something like that.

Q.   Okay.

A.   It's a couple pages back.

Q.   Do you know why the obligation went up about approximately 250 million between 2014 and 2015?

A.   Yeah. It went up because we spent 140 million in acquisitions. We had a bunch of settlements, Baker settlement, a QHC settlement. I don't remember the number -- it could have been $30 million or so -- and then any other shortfall of cash.

Q.   Was it -- weren't the acquisitions in 2014?

A.   Well, I -- you're asking about the change between 2014 and 2015?

Q.   Yeah.

Page 341

A.   We bought HMA in 20- -- okay. Excuse me. It is 2014. So it would be the litigation, and there was a little there, but not much. There was a couple of settlements, one called Baker and one a QHR settlement, and the rest would have been various purchases.

We bought some technology and we bought some equipment.

Q.   Okay. So the -- every time there's an event that gives rise to additional debt from QHC to CHS, is it documented somewhere other than the ledger, the corporate ledger?

A.   It's generally in the corporate ledger. And I think we -- we -- well, I'm not for sure if we still do it or not, so....

Q.   What happened to the debt in this spinoff?

A.   The parent company debt's eliminated.

Q.   I didn't hear you. So I'm just --

A.   We eliminate the parent company debt.

Q.   Thank you.

Did CHS treat that write-off as a

86 (Pages 338 - 341)

Page 342

loss?

A.   On a consolidated basis, it won't make any difference.

Q.   Okay.  Nevertheless, do you know if --

A.   You'd have to ask -- they were -- I don't think we have tax losses generated by intercompany transactions.  I know it's a -- we file a consolidated tax return, so it's a nonevent on a consolidated tax return.  I don't think it affects us on a tax basis, but you'd have to ask our tax guy that.

Q.   Okay.  Do you know if Quorum reported cancellation of indebtedness income in cancellation of the intercompany debt?  If you know.

A.   Don't think -- I don't know.

Q.   Okay.  All right.  Now I'd like you to turn to the document that I handed to you -- or that the court reporter handed to you a few minutes ago.

Have you -- you're not on the cover e-mails.  If you could turn to the attachment, take a look.  Have you seen it before?

A.   When we stopped work on CP1, I

Page 343

don't think I ever saw this document.  I mean, I -- I don't recall.

Q.   Okay.  Do you know who prepared it?

A.   This document was probably prepared by Deloitte & Touche with help from our Tax department.

Q.   Okay.  Can you turn to page 16 of 61, please.

A.   (Witness complies.)

Q.   Give you the Bates.  Its ending in -932.

So this document uses the terms Distributing Group 5 and Distributing Group 4.  And I will represent to you the Distributing Group 5 is defined as CHS and Distributing Group 4 is defined as CHS/Community Health Systems, Inc.

A.   Can you say that again?

Q.   Yes.  Distributing Group 5 -- so that we don't have to walk through the definitions, Distributing Group 5 is defined in the document as CHS.  And Distributing Group 4 is defined as the docu- -- in the document as CHS/Community Health Systems, Inc.

A.   Okay.

Page 344

Q.   And I'm going to refer to CHS/Community Health Systems, Inc., as CHS 2.  Okay?

A.   Okay.

Q.   The paragraph of intercompany accounts on page 16 of 61 says that when CHS acquires a hospital, one or more new legal entities are formed to acquire the new hospital.

Do you see that?

A.   Yes.

Q.   Okay.  And it also says that CHS 2 then establishes a resolving facility to fund the acquisition.

Do you see that it's in the same sentence?

A.   Yes.

Q.   Okay.  And that's referred to as "transaction debt" in this document.

Do you see that?

A.   Yes.

Q.   Okay.  Did the new entity that was formed to acquire the new hospital then record an intercompany payable to CHS 2 in the document used to purchase the hospital, if you know?

A.   I don't know.

Page 345

Q.   Would you not be the person to ask about details about the intercompany debt and how it was accounted for?

A.   Probably not the best person.

Q.   Who would be the best person?

A.   Probably -- if it's a tax question, it would be Craig Pickard.  If it was an accounting question, it would be Kevin Hammons, or his No. 2.

(Exhibit 35 was marked.)

THE COURT REPORTER:  35.

BY MS. NEWMAN:

Q.   Okay.  Mr. Cash, you're not on this e-mail.  Have you seen it before?

A.   No.

Q.   Okay.  Can you turn to the attachment, please.

A.   (Witness complies.)

Q.   Have you seen the attachment before?

A.   No.

Q.   Okay.  The purpose of the document as shown on the first page says:  To document how Quorum Health Corporation's net intercompany payable and related interest payable

87 (Pages 342 - 345)

Page 346

owed to Community Health Systems should be presented in the standalone U.S. GAAP financial statements.

Q. Do you see that?

A. Yes.

Q. Okay. In the middle of page 2, it says that -- and I'm in -- I'm in the paragraph that starts: "Quorum has reported."

Do you see that?

A. Yes.

Q. Okay. And at the end of that paragraph, it says: "The expectation is for Quorum to repay the majority of the amounts created with the spinoff transaction."

Do you see that?

A. Yes.

Q. Do you know when that expectation was formed?

MR. ORSECK: Objection, foundation.

THE WITNESS: No, I don't -- I'm not familiar with this document.

BY MS. NEWMAN:

Q. So you wouldn't be prepared to testify about anything in this document?

Page 347

A. About this document.

Q. Okay. All right. I'm going to ask you just a few more questions, though, and see if you know.

Do you know if -- other than in connection with the spin, if the intercompany debt -- well, let me ask you this: I assume that every CHS subsidiary had intercompany debt of the type that is reflected in the Form 10 as being owed by QHC to CHS.

Is that correct?

A. There would -- there could be some receivables going the other way, but there's been adequate cash flow and we've taken their cash. We owe them money.

Q. But it's not -- this wasn't something -- the creation of the intercompany debt wasn't something that was made just for QHC, correct?

A. No, it's a -- it's a company-wide approach to run intercompany receivables or intercompany debt between the individual ledgers and the parent company.

Q. Okay. And -- and did CHS do a cash sweep of its subsidiaries on a daily basis?

Page 348

A. Pretty much so.

Q. Okay. And so is it the case that on a daily basis, there was money flowing back and forth between CHS and its subsidiaries?

A. Not Saturdays and Sundays, probably.

Q. Okay.

A. But probably during the week, there was money we would collect and then we'd take their cash and then as we paid payables for payroll from them, they'll be allocated back out. They also had some special accounts that they could pay certain things out themselves that the hospital -- that wouldn't go through the intercompany account, and they had some petty cash.

Q. Okay. And other than in connection with the spin, are you aware of any instance in which a CHS subsidiary repaid intercompany debt owed to -- that it owed to CHS, other than in connection with the daily cash sweeps?

A. At one point in time we used to do tax allocations for the net income of facility and they'd have to pay the net income back. I

Page 349

don't know if that's still being done today or even if it was done in '14 or '15.

Many years ago, we did do a tax alloc -- a net tax allocation which would have paid for the taxes. And then -- and then we would ask them to also pay for the after tax.

Q. Okay. And what was the amount of net income -- how that was calculated, the amount of net income that the hospital would have to pay back?

A. Whatever -- whatever EBITDA less depreciation interest gives you pretax, whatever the tax allocation was, that that would be intercompany so they'd pay that back. And then at one point in time -- I don't know how long we have done it, but we would have taken the net income from the -- remaining net income and have that intercompany back.

Q. And was that for tax purposes?

A. I think we just did it to -- so there wouldn't be a big buildup in receivables.

Q. Okay.

A. But we may not have been doing that in '15 or '16. I know we did it in early 2000.

88 (Pages 346 - 349)

Page 350

Q.    Do you remember if you did it in 2010?

A.    I don't remember.

Q.    Or any year between 2011 and 2016?

A.    Don't remember, one did.

Q.    Okay.

A.    If we did it or stopped it.

Q.    Okay. And what if a hospital didn't have enough cash to fund that?

A.    It would be an intercompany liability.

Q.    Okay. Was that intercompany liability ever paid back, other than in connection with the daily cash sweeps?

A.    Generally intercompany liabilities is just kept carrying, going forth and -- other than if we took the net income back.

Q.    Okay. Yeah, okay. I'm going to ask you a few more questions about 34, Exhibit 34. I think it was the one before the document we were just looking at.

A.    Okay.

Q.    Can you turn to page 17, please.

A.    (Witness complies.)

Page 351

Q.    And it ends in -923.

A.    Got it.

Q.    Okay. The language under Section 2, in the first bullet, says that one of the reasons that CHS wanted to consummate the CPI transaction was to eliminate internal competitions for capital and other inherent managerial conflicts -- or managerial and operational conflicts.

Do you see that language? And you can take your time and read the whole bullet, if you'd like.

A.    I see it, yeah.

Q.    This was a reason that CHS wanted to consummate the spin in -- in 2016 as well, right?

A.    Similar. Similar type comments were made.

Q.    Okay. The -- the third -- the third bullet says that one of the reasons that CHS wanted to pursue CP1 was to permit the distributed hospital business to obtain greater access to capital marketing and pursue strategic acquisitions leading to increased growth.

Do you see that?

Page 352

A.    Yes.

Q.    That was also a reason that CHS wanted to consummate spinoff in 2016, correct?

A.    That's correct.

Q.    Turning to the next page. The third line in the first full paragraph says: Conflicts have developed over how best to use management time, limited capital, and other resources. Capital allocation is a particular problem for hospitals that are not compatible with the network infrastructure strategy since the allocation is based on investment return, which gives hospitals that are compatible with the group's network infrastructure strategy a decided advantage in competing for limited funds.

Do you see that?

A.    Yes.

Q.    And that was true in 2015 and 2016 as well, correct?

A.    Yes. Other than whatever maintenance or safety capital needed to be done, that was allocated regardless of the facilities so you could have the appropriate quality and safety and necessary maintenance.

Q.    Basically the things that

Page 353

absolutely had to be done, correct?

A.    Approximately 1 to 1-and-a-half percent of revenue.

Q.    Okay. Okay. And at the bottom of that first paragraph, it says: -- I'm looking, I think, at the last sentence in particular: "The separation will enable the management of Control 2 to focus on making the capital improvements to existing facilities that are needed to expand specialized services, invest in physicians and executive recruitment and retention, and improve outreach programs; in general, help initiatives based on the needs of the communities being served."

Do you see that?

A.    Yes.

Q.    Okay. And that was part of the motivation for the spin in 2016 as well, correct.

A.    I -- I believe that was one of the in- -- intents.

Q.    Okay. And Control 2 is QHC there in that sentence there, correct?

A.    I believe.

MR. ORSECK:  Object to form.

THE WITNESS:  I believe it's QHC.

89 (Pages 350 - 353)

Page 354

BY MS. NEWMAN:

Q.    Okay.  Primary to the spin, what did CHS or Quorum do to identify the capital improvements that were necessary at the QHC hospitals to enable the hospitals to expand specialized services?

MR. ORSECK:  Foundation.

THE WITNESS:  The -- there's a strategic plan was done each year by all the hospitals.  And that strategic plan would be for every one of the 190 hospitals in a 30-A -- QHC hospitals would also prepare that annually and that would be available for the divisions to look and think about what the strategies needed to be.

BY MS. NEWMAN:

Q.    And -- and would the expenses that the hospitals had budgeted for those strategies incorporate it into the projections?

A.    The -- well, they could have been a capital expense if it was a quality or activity.  The projections just one large QHC, and if something would have bubbled up that was really, really problematic, we would have had to take it

Page 355

into consideration.  But to my knowledge, nothing bubbled up as a big, big item that had to be considered.

Q.    Okay.  So nothing from the -- none of the expenses that were particular to the hospital that were in the 2016 budget would be in the projections, correct?

A.    The 2016 strategic plan to my knowledge -- as best I remember there was nothing that came from that from the divisions that needed to be specifically addressed.  It would be like a roof leaking into the operating room.

Q.    Got it.

A.    Yeah.

Q.    And so the things in those -- expenses in those strategic plans wouldn't have been incorporated into the projections?

A.    If -- if --

MR. ORSECK:  Foundation.

THE WITNESS:  -- if someone -- I don't recall what -- what -- and we would have addressed pretty immediately the roof leaking into the operating room if that was identified.

BY MS. NEWMAN:

Page 356

Q.    But other than that, nothing from the strategic plans would have been incorporated into the projections, correct?

MR. ORSECK:  Objection.

THE WITNESS:  I -- I don't know exactly what got incorporated.  It was provided to Marty Smith and Tom Miller and whether they gave information to Culotta that needed to be considered, I don't know.

BY MS. NEWMAN:

Q.    You don't know?

A.    No.  But they could have.

Q.    Okay.  Did Mr. Culotta put expenses into the projections that you weren't aware of?

A.    He could.

Q.    Did he?

A.    I don't know.

Q.    Okay.

A.    But he had -- you know, he had to be comfortable with the projections and he was comfortable.

Q.    55.

A.    Same document?

Page 357

Q.    You can put that aside.

A.    Huh?

Q.    You can put that aside.

A.    Oh.

(Exhibit 36 was marked.)

THE COURT REPORTER:  36.

BY MS. NEWMAN:

Q.    Okay.  Mr. Cash, I'd like you to look at the e-mail at the bottom of the page.  Mr. Fleck is -- is e-mailing Ms. Moody, Mr. Doucette, and Mr. Lomic- -- oh, I'm pronouncing it incorrectly.  How do you pronounce it?

A.    Lomicka.

Q.    Lomicka, thank you -- Mr. Lomicka: Megan, not sure what the borrowings will be at QHC, but after looking at your trailing 12 month, 9/30/15 normalized EBITDA of only 258 million, I dropped the total debt from 1.375 billion down to 1.315 billion.

Do you see that?

A.    Yes.

Q.    Okay.  And up at the top, you respond in all capital letters: "The debt should be 1375.  Our leverage has increased."

90 (Pages 354 - 357)

Page 358

Do you see that?

A.    Yes.

Q.    Okay.  And the "our" in that e-mail -- in your e-mail was CHS, correct?

A.    CHS consolidated.

Q.    Okay.  How -- why had CHS's leverage increased?

A.    Let's see.  What is this, November 11th?  The third quarter results weren't -- it caused the leverage to go up some.

Q.    Okay.  And what was the relationship between CHS's leverage and the amount of QHC debt?

A.    We got advice from Credit Suisse to be around five times and we were going to try to stay around five times, and our leverage going up was just a comment thing:  We are seeing our leverage go up.  We've got to stay real focussed to make sure we get the appropriate debt on QHC.  It's my recollection that the trailing 12 was $300 million at 9/30/15 because it had the fourth quarter pickup from the California provider tax.  And if you backed it out -- which I think was roughly 25 million -- you got 275, so I was bothered by why he thought it was going to be 258.

Page 359

And my recollection, it was going to be like 275 because we -- we had calculated 300 with California.  And we back it out, it was $25 million.  So I didn't want to make a premature change in the debt until I was comfortable that the 275 was not going to be achieved.

Subsequent to -- to this, we had more target -- we didn't have the October financials.  With the October and November financials, we changed our thought process that it would be somewhere short of 260.  And we lowered the debt a couple of times.  Once, we lowered it to a billion-325, and then we ultimately lowered it to a billion-280, which turned out -- the EBITDA turned out a little better than the 250-some-odd million.  It turned out to be 266.

So the answer was 4.8 times, is what the final number was.

Q.    Okay.  But you don't talk about any of those things in your e-mail at the top?

A.    No.

Q.    What you say in the e-mail at the top is that debt should be 1375, but our leverage --

A.    Yeah --

Page 360

Q.    -- has increased?

A.    Yeah, I -- I made an assumption you were going to ask me why, so I just decided to answer it.

Q.    Okay.  But what you were saying at the top was because CHS's leverage had increased, you had to make sure that QHC's debt was high -- was as high as it could be so that CHS would get the proceeds of that debt to pay down its own debt, correct?

A.    Yeah, it --

MR. ORSECK:  Objection, misstates the document.

THE WITNESS:  The -- at that point in time, I said let's leave the debt, the billion-375, and I just explained why.  Then I made an observation:  Hey, we got to be -- try to get the appropriate amount of debt at five times on QHC.

We ended up doing 4.8 times at the end of the process.

BY MS. NEWMAN:

Q.    Okay.  And the -- you think that the five times came from Credit Suisse?

Page 361

A.    Yes.

Q.    Okay.

A.    They did a July 15th presentation which the five times was recommended.

Q.    Okay.

MS. NEWMAN:  58.

(Exhibit 37 was marked.)

THE COURT REPORTER:  37.

BY MS. NEWMAN:

Q.    Okay.  Mr. Cash, you've just been handed an e-mail chain.  The bottom e-mail on the first page is an e-mail from Mr. Fleck to a number of people at Credit Suisse and others from CHS, who are copied.  The first point in his e-mail says that the debt is now 1.325 billion down from 1.375 billion.

Do you see that?

A.    Correct.

Q.    And at the time, you forward this e-mail to Mr. Smith, Wayne Smith, and you say:  "I slightly lowered debt to get model to work."

Do you see that?

A.    Yes.

Q.    What does that mean "to get model to work"?

Page 362

A. Well, we were trying to be at five times debt to EBITDA, and if we ended up sticking with a billion-375, that would make the model more challenging to work. And if it fit the million-dollar drop in the debt, it's large enough that I thought we should at least tell him. And we were trying to -- the premise of the model was that it would be a five times leverage on QHC when we're all said and done. And so I just said previously we ended up at 4.8 time.

Q. I'm focussed on the language "getting the model to work." What does that mean, "getting the model to work"?

A. That -- that the model was premised on a five times leverage for QHC, and if we had a billion-375 on it, it would probably be 5.2 or 5.3.

Q. You think that was designed to keep the leverage multiple at five?

A. We were working to keep the leverage no greater than five.

Q. Okay.

MS. NEWMAN: 61.

(Exhibit 38 was marked.)

THE COURT REPORTER: 38.

Page 363

BY MS. NEWMAN:

Q. Okay. Mr. Cash, you've just been handed an e-mail from Mr. Schwartz to you, copying Stewart Smith. And Mr. Smith -- Mr. Schwartz writes Larry: As a follow-up to our discussion, attached is a preliminary summary of a few potential financing alternatives for QHC.

Do you see that?

A. Yes.

Q. Okay. Why was Mr. Schwartz sending you a document with preliminary financing alternatives in January of 2016?

MR. ORSECK: Object to form.

THE WITNESS: They wanted to try to get the transaction done as soon as we could. We hoped to have it done by January 1, and I think he's simply saying: Here's some alternatives on January 27th, which I didn't spend a lot of time looking at it, but in looking at it, he thought these transactions could work at that point -- or work pretty soon.

BY MS. NEWMAN:

Q. Okay.

Page 364

A. And we elected not to consider these and wait till we could possibly get the original transaction done at around the five multiple.

Q. Okay. If you turn to page 1 of the attachment -- okay. The debt contemplated for Quorum is now 1.225 billion, correct?

A. We never contemplated that. He did some illustrations of what the debt could be and, you know, it's a -- if you want to go today, this is what we recommend you do.

Q. Okay. Because at this time, the market would not support a debt amount that's -- that's -- was 1.3 or above, correct?

A. He -- I don't think the markets would have supported anything at the time. This was just a shot that maybe, maybe if you lower the debt, you might be able to get it done. What they've said in December and January, especially January, that this is not the time to try to do financing.

Q. Okay.

MS. NEWMAN: 62.

(Exhibit 39 was marked.)

THE COURT REPORTER: 39.

Page 365

BY MS. NEWMAN:

Q. Okay, Mr. Cash. The bottom e-mail on the document that's just been handed to you is another e-mail from Mr. Schwartz to you, copying Mr. Smith.

Do you see that?

A. Yes.

Q. Okay. And Mr. Schwartz says: As a follow-up to our conversation yesterday, a patch -- attached please find preliminary thoughts and timing regarding QHC.

Do you see that?

A. Yes.

Q. Okay. And if you turn to the first page of the attachment, the first bullet says: Credit Suisse will work with CHS to include a quantum of debt in the Form 10 equivalent to approximately five times total leverage.

Do you see that?

A. Yes.

Q. Okay. And the reason that Credit Suisse was writing that is because you made it clear that you wanted to do a deal at five times total leverage, correct?

MR. ORSECK: Foundation.

Page 366

THE WITNESS: We targeted that from the very beginning. That would be preferable to do five times. We ended up doing 4.8 times.

BY MS. NEWMAN:

Q. Okay. And the next bullet says: "Given current credit market backdrop, continued selling pressure, and increased market volatility, there is some concern about ability to execute this financing at that leverage."

Do you see that?

A. Yes.

Q. And that was Credit Suisse that had a concern about executing the financing at that leverage, right?

MR. ORSECK: Objection.

THE WITNESS: This is Credit Suisse's comments to us that there's some market volatility still in existence.

BY MS. NEWMAN:

Q. Right. And Credit Suisse was referring to its own concern, not CHS's, correct?

MR. ORSECK: Objection.

THE WITNESS: I don't know if it

Page 367

was Credit Suisse's concern or -- or some investor's concerns. You know, it's -- they just had some concern.

BY MS. NEWMAN:

Q. But at this point, Credit Suisse wasn't sure the market would support five times the leverage?

A. Right.

MR. ORSECK: Objection.

BY MS. NEWMAN:

Q. Did you answer, sir?

A. I thought I said that they had -- that it's got a current market drop, lots of selling pressure, a lot of volatility. And their recommendation was not to try to do the deal at this point in time.

Q. Okay. And, in fact, in order to raise the -- the .48 leverage that CHS ultimately raised for QHC, CHS had to agree that QHC would pay interest rates that were among the highest in the healthcare industry at the time, correct?

A. The term loans were not substantially all that high. The bond rate was higher than we'd anticipated.

Q. The bond rate was actually the

Page 368

highest rate paid by any borrower in the healthcare sector -- sector between 2014 and 2016, right?

A. I don't know all the rates, but I know that it was a higher rate than we thought it would be.

Q. Okay.

A. And the rate we had seen in the marketplace was around 10 percent.

Q. Okay. Number 3 in the -- in the document we're looking at says: "For a traditional offering, B3/B- bond rating is important."

Do you see that?

A. Yes.

Q. And the rating given from the rating agency is an important factor when a company wants to raise debt, correct?

A. Correct.

Q. And the projections were shared with the ratings agencies in connection with CHS's effort to get a positive rating for QHC, correct?

A. I believe they were shared early in -- or late December and shared again -- they updated that in March.

Page 369

Q. Okay.

MS. NEWMAN: Tab 63.

THE WITNESS: One of the -- well. You didn't ask a question, so I'll -- I'll wait.

(Exhibit 40 was marked.)

THE COURT REPORTER: 40.

BY MS. NEWMAN:

Q. Okay. Mr. Cash, the e-mail I've just -- you've just been handed was sent from you back to Mr. Schwartz and Mr. Smith.

Do you see that?

A. Yes.

Q. Okay. And you -- this was sent on the same day that you received the e-mail in the last exhibit that we were looking at, right?

A. Correct.

Q. Okay. And you sent this e-mail in response to Credit Suisse's statements that they were not sure if they could raise five times leverage for QHC, right?

A. They said there was some concern about it. And I sent the e-mail because in No. 3, he wanted to go talk to Moody's, which a little challenging to sort of give Moody's a 4.8 leverage

93 (Pages 366 - 369)

Page 370

with 500 million dollars of term bonds which could be very expensive.

And it didn't make sense to me that you'd even think about showing the term loan dropping $300 million and the bonds going up to 150 million. That just didn't make any business sense and I didn't see the value on February 23rd, 2016 to going back to Moody's. We'd been to Moody's and SNB in December, so -- and as a result, I didn't want him to take a 4.0 leverage to Moody's and I -- I didn't want to start bussing that transaction.

And then we suggested maybe, you know, you've got some good banks in here and you have to all spread the risk, do you need more banks to help spread the risk to help get this done?

Q.    That would have reduced the fees that Credit Suisse would have earned, right?

A.    Could have.

Q.    So you were telling them that you don't want to discuss anything -- anything at four times. If needed, just get more banks in and reduce the fees that Credit Suisse was --

A.    I didn't say --

Page 371

Q.    -- going to --

(Unintelligible overlapping.)

MR. ORSECK:  Object to form.

THE WITNESS:  I didn't say reduce the fee. He asked the question could or could not, I don't know.

BY MS. NEWMAN:

Q.    Right.

A.    But what I did not like was the bonds going up a hundred -- on this page.

Q.    Right.

A.    It just didn't -- it didn't make sense to go to a rating agency and make that if it was something that you didn't want to do. We ended up doing 4.8, which is a little higher than the 4.5.

Q.    Did you have any conversations with Mr. Smith or Mr. Schwartz or anyone else at Credit Suisse in this e-mail?

A.    I don't remember. We may have talked about it. It's eight years ago.

Q.    Sure.

A.    We could or could not have.

Q.    Do you know if you talked to them about the idea of bringing in other banks?

Page 372

A.    I mentioned it to them here and I don't think they -- I don't remember. It was eight years.

But, clearly, we had been working hard to take the bonds down. They were $550 million at one time in the model, one of the models you pulled out here. We got it down to 400, and for them to recommend to go back a hundred, it made no sense. The bonds were the hardest thing to sell. Because the -- the -- the other term loans had security. And it's a much cheaper rate.

I mean, the -- the rate back in November was probably 6-and-a-half or 7 and -- or -- and then it turned out to be somewhere around 8 on the final rate.

MS. NEWMAN:  64.

THE WITNESS:  Because we cut the debt down.

(Exhibit 41 was marked.)

THE COURT REPORTER:  41.

BY MS. NEWMAN:

Q.    Okay. You've just been handed an e-mail chain among you, Rachel Seifert, Roman Ottinger, Mr. Culotta, and Mr. Hammons.

Page 373

Do you see that?

A.    Yes.

Q.    Okay. And if you look at the bottom e-mail on the first page that's not redacted, you can see that you-all are talking about what QHC's market cap will be.

Do you see that?

A.    Correct. Yeah.

Q.    Okay. Is market cap, as it's being used in these e-mails, the same thing as equity value?

A.    It's the stock price times another share, so if that's what you mean by equity value....

Q.    Okay. Well, you didn't know what the stock price was going to be at this time for QHC, right?

A.    Correct.

Q.    So you're trying to figure out what the market cap would be?

A.    Yeah.

Q.    Okay. And Mr. Hammons says in the middle that even though QHC may be 10 percent of EBITDA, it will have a lower leverage than CHS.

Do you see that in the middle

Page 374

e-mail?

A.   I see that, yes.

Q.   Okay.  And so he's saying you can't just assume 10 percent of CHS's market cap in order to determine QHC's market cap because QHC will have lower leverage.

Do you see that?

A.   Yes.

Q.   Okay.

A.   Not substantially, but it's going to have lower leverage.

Q.   Okay.  And at the top e-mail, you say:  Said -- "Said another way, one turn less" -- "one turn of less debt leverage is 250 in market cap over to QHC.  That is why we need to put five times on QHC."

Do you see that?

A.   Yeah.

Q.   And that's because if you put four times debt leverage on QHC, that would mean that there would be $250 million less for CHS -- that would be paid if it has a dividend to CHS, correct?

MR. ORSECK:  Foundation.

THE WITNESS:  There wasn't a --

Page 375

there was never a dividend paid.  This is --

BY MS. NEWMAN:

Q.   Okay.  I'm just using --

A.   -- just distribution.

Q.   -- your language, Mr. Cash.

A.   Well, the Separation Agreement calls it a distribution.  It's a partial consideration.  The Form 10 doesn't call it a dividend.  A dividend was never declared.

What -- what was confusing here was Kevin was trying to explain her -- her simple math didn't work.  And we had a test we had to sort of make sure we were going to be okay with.

And what I was trying to say was: Hey, we -- we talked about five times, five times.  It seems like looking at this test, we'd be better off at five times the leverage than something less than that.  We meet the test --

Q.   I'm just asking you about the e-mail at the top, sir.

A.   Yeah.  I said:  One time turn is 250 million in leverage.  I don't think -- I think we ought to stay at five times because we're trying to meet this earnings test disclosure that

Page 376

we look like we made it under Kevin's comment -- comment here.

Q.   So what did you mean when you said "250 market capital of the QHC"?

A.   It didn't need to be at -- that we didn't need the other 50 million if we lowered the leverage.

Q.   What do you mean, "We didn't need the" --

A.   If your leverage was five times and you'd have $400 million of market cap under the 6-and-a-half times, less that five times debt, 1-and-a-half times 260 million gets you close to 400 million.  That met the test.  We don't need to have it have $650 million to meet a test.

That's what I interpret this to mean.

Q.   Okay.  It's your language.

MS. NEWMAN:  66.

(Exhibit 42 was marked.)

THE COURT REPORTER:  42.

BY MS. NEWMAN:

Q.   Okay.  I'm handing you an e-mail chain between you and Mr. Miller, copying Mr. Smith, from March 23rd of 2016.

Page 377

In the bottom e-mail, Mr. Miller is talking about his disappointment in the rating from Moody's for the QHC -- for QHC.  And he says towards the middle of the paragraph:  "As you know, we have a challenge to turn around the cash flow projections from PYs, and my hope is a lower rate would drive a better chance for positive cash flow, better CapEx, and operating flexibility.

Do you see that?

A.   Yes.

Q.   Is PY "Prior Year"?

A.   That would be my understanding.

Q.   Okay.  And do you know what Mr. Miller was talking about when he said:  As you know, we have a challenge to turn around the cash flow from prior years?

A.   We had some pretty high AR days and then you had some special settlements in 2015, which hurt the cash flow.

But the -- the C rating was on the bonds, you know.  I think we had a B.  Good rating on the term loans.  We were trying to limit the bonds as much as possible, and we -- it needed probably a little bit better growth in cash flow if it was reasonable in presentations to the

95 (Pages 374 - 377)

Page 378

rating agency.

I believe the rating agency presentation -- and I saw it -- had a little more focus on the divestitures, improving the company versus recruiting doctors and trying to grow volume and trying to manage expenses. The -- the rating actually had been more impressed if you felt like reasonably you could do a better job of operating the hospitals. Clearly the divestitures is a strategy, the pay down debt and improve your margin, but that may have been a little better focus on that in the presentation, and it would be Tom describing how he's going to make the hospitals better.

Q. Do you think that they're -- their -- you could have projected better growth and cash flow on the projections that you already had?

A. They did a better job in the very first projection that Mike and Jim did. I mentioned the July 2015 had better operating projections and nothing about divestitures and nothing about acquisition.

Q. Before the 2015 results came in, right?

Page 379

A. They were close. I mean --

Q. Uh-huh.

A. -- we ended up making 275, and it was 266. It was a little late to try to make that change. And the overall bond increased to what we thought would probably happen. We thought it was going to be about 10 percent without looking at some of the other financing done in Nashville. It turned out to be 11 -- 11 point 5/8ths, which that period of time was about $7 million before taxes, and probably 4 million after taxes.

(Exhibit 43 was marked.)

THE COURT REPORTER: 43.

THE WITNESS: They did get a stable rating, which was good.

BY MS. NEWMAN:

Q. Okay. Mr. Cash, you've been handed an e-mail chain between Michael Culotta, Roman Ottinger, Kevin Hammons, and Megan -- Megan Moody. You are not on this chain.

At the bottom e-mail on the first page, Ms. Moody is talking about malpractice credits and in the e-mail above that, Mr. Hammons talks about the way in which the insurance should be booked when determining EBITDA for the first

Page 380

quarter of 2016.

Do you know anything about this way in which insurance was booked, insurance credits were booked, for the first quarter of 2016?

MR. ORSECK: Objection.

THE WITNESS: They -- they did -- they tried to make sure that its cost percentage of revenue was comparable to what it was in 2015.

BY MS. NEWMAN:

Q. That was a change from the way it had been done in prior years? Do you know?

A. The -- the first quarter, there's not a lot of credits because you don't have a lot of history. You just started in January. So I -- I don't think it was a significant change. It may -- I don't know for sure.

Q. Okay. So you don't know if it was change from prior years?

A. I don't -- I know that we make an estimate of an increase in our malpractice and Workers' Comp and health, and in the first quarter, we generally vote what the budget is, which is quite often close to what it was in the

Page 381

prior year. And they booked the same percentage as 2015, I believe, but, you know, if it's something came along to -- to show that that was too much or too little, you may not be in a position to recognize that margin.

Q. I'm asking you a very simple question, which is: Do you know if what they did for the first quarter of 2016 was a change in methodology from prior years?

A. I'm not [sic] exactly recall what was done in March of 2015. I don't remember that allocation -- how the allocation was exactly done 12 months prior to first quarter.

Q. Okay. All right.

(Exhibit 44 was marked.)

THE COURT REPORTER: 44.

BY MS. NEWMAN:

Q. Mr. Cash, have you seen this document before?

A. Yes.

Q. Can you identify it for the record, please?

A. It's an action by Rivkin sent in lieu of a meeting of the directors of Quorum. I think it was -- you don't have a Signature page or

96 (Pages 378 - 381)

Page 382

the date here. I think it was on April 29th, but that's my recollection.

Q. We do have a Signature page.

A. Oh, you do?

Q. Yeah. It's -- the Bates ending -336. Or we should.

MR. HAVELES: Yeah. There is there.

THE WITNESS: Yeah, April 29th.

BY MS. NEWMAN:

Q. Okay. Mr. Cash, you were a director from Quorum from the time it first had directors until right after the spin was consummated, right?

A. Yes.

Q. As a director of Quorum, what did you understand your fiduciary duties to be?

MR. ORSECK: Object to form.

THE WITNESS: I don't specifically recall my legal responsibilities of QHC. I can tell you what we did, but I don't recall exactly chapter and verse of fiduciary responsibility.

We tried to hire the best

Page 383

advisors we could, and Credit Suisse and Deloitte to do an audit, PwC to help look at the fair market value of the TSAs. We brought in KPMG to make sure that the accounting was done as reasonable as possible. We had a solvency opinion done by Duff & Phelps. We did tax matters and TSA agreements, a long list of things that were in the April 1st resolution documented.

And from that, we -- we believe it was in the best interest of the company to proceed forward with the spin.

BY MS. NEWMAN:

Q. During the time in which you sat on the Quorum board, Quorum never held an actual board meeting, correct?

A. We were members of a lot of corporations. I see Rachel quite -- quite often. I thought there was a board meeting sometime in the -- the winter of 2016. I might be mistaken. I thought we had -- I thought we had one annual meeting for every subsidiary.

Q. You think you had an in-person --

Page 384

a meeting for QHC?

A. We -- I know we had one for our subsidiaries. I thought we would have had one for QHC, but I don't specifically recall.

But our practice was usually one meeting with Rachel and the other direct -- most of the other directors.

Q. Okay. All actions that were taken by the Quorum board, though, were done through written consents in lieu of board meetings like this one, right?

A. Yes, but there was -- there was a -- I think it was admit -- referenced either here or in the April 1st, about a February board meeting. The -- these -- these were -- these were written consent.

Q. Okay. The Quorum board never considered any materials in connection with this consent, did they?

A. I'm not for sure if I understand the question.

Q. Did the Quorum board -- was -- did Dr. Health (phonetic) ever make a presentation to the Quorum board?

A. We -- we had had an attachment --

Page 385

written consent accepting the original draft of April 1st on -- Rachel and I both signed that as a written consent along with all the other requirements, Form 10, financing, et cetera.

And so I think we did have a conclusion to accept that. It was later updated to April 26th, which I don't think the Quorum board met, but I don't know if the Quorum board -- I don't remember if -- if we met specifically with the final resolution. I know the board of CHS did.

Q. Okay. The Quorum board never met to consider the updated Duff & Phelps --

A. I don't --

Q. -- solvency --

A. -- I don't --

Q. -- opinion?

A. -- I don't recall.

Q. You don't recall that?

A. No.

Q. Okay. Did -- Duff & Phelps conclude that QHC would be solvent and adequately capitalized after paying the dividend or distribution to CHS? Correct?

A. That is corr- -- the -- the

97 (Pages 382 - 385)

Page 386

distribution to CHS, they had two different -- had one done in early April. Then they finalized it through final numbers sometime, I think, April 26th. But I'm not for sure of that date.

Q. Okay.

A. April 1st and later one in April --

Q. Okay.

A. -- with the final number.

Q. Would CHS have been able to consummate the spin if it had not been able to procure a solvency opinion saying that QHC would be solvent, able to pay its debts, and adequately capitalized after paying the distribution or dividend to CHS?

A. It was in C -- well, the thought process we heard from the Bass Berry lawyers that we shouldn't --

MR. ORSECK: Hold on. Just don't share legal advice. The question was if you know, could the spin have happened without a solvency opinion.

THE WITNESS: I believe we would -- I believe it was our belief that we wanted to have a solvency opinion before

Page 387

the spin was finalized.

(Exhibit 45 was marked.)

THE COURT REPORTER: 45.

BY MS. NEWMAN:

Q. Mr. Cash, this is an e-mail exchange between you and Mr. Culotta, copying Kevin Hammons and Gretchen Hommrich.

In the first e-mail in the chain, Mr. Culotta is talking about whether CHS should include a slide on QHC's 2016 first quarter performance and CHS's 2016 first quarter earnings call?

Do you see that?

A. Yes.

Q. Okay. And Mr. Culotta wrote: I am concerned that we had only filed the Form 10 with the six month numbers and that pushdowns were mostly booked in the due numbers.

Do you see that?

A. Yes.

Q. Do you know what that means?

MR. ORSECK: Objection.

THE WITNESS: I think what he's saying is that there was not pushdowns in the first quarter of -- of 2015, I

Page 388

believe is what he's trying to say.

BY MS. NEWMAN:

Q. Okay.

A. Because the question was we own QHC on March 31st. We're going to do a conference call. We're going to get asked the question about QHC's numbers in our first quarter.

And we tried to answer that as easily as possible by doing a one-page slide that showed just what we thought basic revenue, EBITDA, et cetera, and a couple of footnotes.

Mike said okay. Then he thought about it and he's got some concerns about what was in a $13 million dollar pickup in a quarter one year ago and some -- some hit this quarter and he -- he thought it would be -- silence would be better. It's pretty hard to be silent when you owned it. So we -- we put a very minimal amount of information on it.

Q. Okay. Let's take a break. I'm maybe done or close to done. Let's take a five-minute break.

A. Okay.

THE VIDEOGRAPHER: Okay. Off the record at 5:28 p.m.

Page 389

(Brief recess observed.)

THE VIDEOGRAPHER: We are returning to the record. The time is 5:36.

EXAMINATION

BY MR. HAVELES:

Q. Good afternoon, Mr. Cash. My name is Peter Haveles. I'm from Akerman, LLP, the attorneys for Quorum Health Corporation, and I'm going to ask you some questions this afternoon and see where we go and then see what happens afterwards amongst the parties.

A. Okay.

Q. Let me first start a quick question. On your e-mails, you show two titles for yourself. You see President of Financial Services at CFO of Community Health Systems. Could you just tell me what those two titles signify, if they're different positions?

A. I was named the President in 2014. I've always been the Executive VP and CFO, and I got a promotion to President. We bought HMA, and they said that same President -- since there's another President, I said President of Financial Services doing basically the job I did

98 (Pages 386 - 389)

Page 390

before. I just got a promotion and a title change.

Q. Okay. Thank you very much.

Was there any discussion at the time QHC was formed about whether anyone other than you and Ms. Seifert should be named as directors since the transact -- formation of QHC was to facilitate a spinoff?

A. I don't recall any other discussions. There's -- there's other officers within the company and Marty Schweinhart and -- was one and Jim Doucette was one. But there may have been a discussion later in April about adding some -- another director, because we added another director.

Q. When you say April, you mean April 2015 or '16?

A. Sometime in April of '16.

Q. Okay.

A. When they got -- I think we added another director.

Q. QHC was formed back in 20- -- 2015, correct?

A. I think it was formed -- correct. Correct. There was --

Page 391

Q. Okay. So at that time, was there discussion about anyone outside of the CHS organization being named as a -- as a director?

A. I don't recall any discussions.

Q. Okay. And then in September 2015, am I correct, there was a public announcement that Mr. Culotta and Mr. Miller were going to become officers of the -- the CFO and CFO [sic] of Quorum after the spinoff was consummated, correct?

A. It was CEO and CFO. I think you said CFO twice.

Q. Okay. Thank you for making that correction.

So was there any thought about naming either Mr. Culotta or Mr. Miller as CFO and CEO, respectively, as of September 2015 when that announcement was made?

A. I don't recall any discussion that -- that -- Rachel and I may have had a discussion. I don't recall it.

Q. Was there a reason why they weren't put into their positions immediately to help facilitate the implementation of a spinoff?

A. I think what we decided, A, it

Page 392

was August. We thought -- we thought we'd get the deal done by December 15th [sic]. We were very focussed ourself on our consolidated ourself, which included QHC, and we didn't want Tom and Mike to have to take on duties that could be handled inside the company by Rachel and myself.

Q. What -- I thought I heard you testifying earlier that Mr. Culotta was being very -- was very actively involved in the productions and presentations for lenders. So wasn't he already spending a lot of time on spinoff stuff, regardless if they -- whatever position you pointed him to in the last three to four months of calendar year 2015?

A. He -- he was the investor relations guy. And I stepped in and did a lot of that investor relations activity. He did do a lot of work around QHC, and I was accommodating and helping him go do that. But I don't remember discussion about having him get any type of directorship responsibility.

Q. Well --

A. Or director responsibility.

Q. Okay. And what about Mr. Miller, why wasn't Mr. Miller made the CEO as of that

Page 393

time, so when he made presentations and was contemplated to make presentations later in the year to lenders, he already had that title and position of authority?

MR. ORSECK: Foundation.

THE WITNESS: We didn't think it was necessary for him to not still have his existing responsibility, and he could go through the rating agency presentation and say I was going to be the CEO when the spinoff happened and he went to some investor relations -- investor meetings with us in New York and California, and it worked just fine, without him having to leave his current responsibility.

BY MR. HAVELES:

Q. Am I correct that Mr. Miller continued in his role as a Division President up until the time of the spinoff?

A. That's correct.

Q. And am I correct that Mr. Miller was advised that he should, you know, focus on his job as a Division President and not do anything in terms of working on planning or budgeting or

99 (Pages 390 - 393)

Page 394

taking steps to build out the QHC organization prior to the spinoff?

MR. ORSECK: Foundation.

THE WITNESS: That's not correct.

BY MR. HAVELES:

Q. Was he -- any limitations put on Mr. Miller's ability to take actions and do things in terms of preparing for the spinoff, other than sending him to meetings with lenders?

A. He was -- he was told he should not try to recruit people, other than the staff that we selected.

They were going to go to QHC and Wayne and I had been in a spinoff in 1993 that got very, very difficult to try to -- and there was recruiting and a lot of issues when someone had to step up. And Wayne decided he didn't want Tom nor Mike to be recruiting inside the company, we -- that we were going to pick people that were going to go there. We thought there were good people that were talented people, and that was one thing he was told not to do. But Wayne never said that you can't do this, you can't do that.

He could have meetings -- he had meetings. He had discussions. But he can walk

Page 395

and chew gum at the same time and run QHC or run his Division 5 and work on QHC just like several of the others --

Q. So --

A. -- of the key management.

Q. -- recruitment was the only limitation placed on him?

A. That was my understanding. He was not supposed to do any recruiting.

Q. Well, you just mentioned you made the -- you and -- made the -- you and Mr. Smith made the decisions about who should go to Quorum. Since Mr. Culotta and Mr. Miller were going to be the CFO and CEO, did you consult with them to get their opinions and views about who to select to go to the organization so they had a management team with whom they were comfortable --

A. We --

Q. -- prior to making those decisions?

A. I think there were -- they were made aware of it. Mike asked if he could go recruit externally for his Chief Accounting Officer. We gave him authority to do that.

Page 396

Tom Miller did not like the choice of Marty Smith, and he wanted someone else who, at the time, was the Senior VP of Human Resources. And Wayne told him: I don't want you trying to recruit people other than the ones that -- that both Marty Sweinheart, I and Wayne looked at and had chosen.

Q. Now, am I correct that in November of 2015, there was a public announcement that you had -- that CHS had identified individuals who would be new members of the Quorum board upon the spinoff?

A. I thought it was October '15.

Q. Okay. October '15?

A. There's 30 people on the list that was sent around to -- inside the company, I believe.

Q. Well, I'm talking about the announcement of who the new board would be.

A. Oh. The new board was in November.

Q. Yes. That was my question.

A. I thought you were talking about the managers.

Q. No, I'm talking about the board,

Page 397

sir.

A. The new board.

Q. Why weren't they -- those individuals appointed to the board in 2015 so that there was an independent board to take into account the interests of the new corporation that was to be created by the spinoff?

A. We felt like Rachel and I, and we added one independent director to -- to the directorship. I think they signed this 429 resolution, and we -- we took that approach to it.

Q. You didn't add Mr. Feinstein till mid-April 2016, to the board, correct?

A. I think that -- it was sometime in April.

Q. And that was after the April 1 written consent that approved all the transactions that would facilitate the spinoff, correct?

A. Correct.

Q. So prior to it, be it in November or any time prior to April 1st, did anyone give you consideration to putting independent directors on the board, prior to approving things that would create rights and obligations for the new company and the shareholders of that new company?

100 (Pages 394 - 397)

Page 398

MR. ORSECK: Objection.

THE WITNESS: I don't remember anyone. I don't remember anyone -- any board member that was selected in November ever asking: Hey, can I be on the board sooner? Can I be a director sooner?

There was nothing internally generated by them, nor did we have anyone that said: Hey, let's do this.

BY MR. HAVELES:

Q. Well, I'm not asking of the new board members. I'm asking: Did you and Ms. Seifert, as the existing board members, give any consideration as to whether an independent director should be appointed to the board in order to take into account the interests of new Quorum and new Quorum shareholders?

A. I don't recall. I just would add that we used PwC to look at the fair market of the TSAs. We had KPMG do a lot of work on the Balance Sheet. We had Duff & Phelps do the work, and we thought we could manage that transaction to its completion.

Q. One last question before we have

Page 399

to break, since, you know, we have to deal with Mr. Orseck's need to get to the airport so he can get home. And that is in connection with the decisions that the board was making. You and Ms. Seifert, did you ever consult with Mr. Miller and Mr. Culotta about the resolutions that were going to be signed in -- throughout calendar year 2016 in connection with the spinoff to see if they had any problems or objections to what was going to be approved by those resolutions?

MR. ORSECK: Objection.

THE WITNESS: Well, those resolutions dealt with a lot of matters and the TSAs were well disclosed. And as I said, we used PwC, and I'll go through what we did.

We had -- I think we had mentioned to Mike that we're going to have a Solvency Agreement. He probably already spent time talking to Duff & Phelps. Mike was very involved in the financing activity and -- and the various projections and models.

Mr. Miller signed the Form 10 as the CEO of -- future CEO of Quorum.

Page 400

They both approved the -- the guidance for the first year of 2016 and in in -- March. So there's a lot of things that they did that we consulted with and --

BY MR. HAVELES:

Q. That wasn't my question, though.

A. But I'm -- we did a lot of things in lieu of adding them to the board.

Q. That wasn't my question. My question is: Did you consult with them to see if they had any problems with or objections to any of the terms of the agreements in debt financing that were being approved in the various resolutions that were adopted in January and then in April when only you and Ms. Seifert were on the board?

A. I believe we did consult with Mike about the financing. He had -- I'm sure he looked at the credit agreement, because it was his credit agreement. Tom would look at the Form 10 which was there. I believe Culotta looked at the Solvency Agreement. So bits and pieces. A lot of work was done with them -- with them being involved in it.

Q. Are you sure that Mr. Culotta was shown drafts of the -- or final versions of the

Page 401

Solvency Agreement prior to the spinoff?

A. He -- he was interviewed with Duff & Phelps, I believe, along with Kevin Hammons and myself.

I don't know if he saw the final draft or not.

Q. Do you know if he saw any of the materials before the spinoff of -- from Duff & Phelps, other than giving the factual interview to allow Duff & Phelps to do its job?

A. I don't know the distribution of it.

Q. All right. We need to break now so Mr. Orseck can leave for the airport, which I'm happy to accommodate.

MR. HAVELES: We are going to keep this deposition open. May be readily resolved informally, it may not be, and may require assistance of the Court. But one way or another, I am not completed with my questions.

MR. ORSECK: Would the court -- would the videographer tell us how much time we've been on the record?

THE VIDEOGRAPHER: Can we go off

101 (Pages 398 - 401)

Page 402

the record to do that?

MR. ORSECK: Okay.

THE VIDEOGRAPHER: All right. Off the record at 5:49 p.m.

(Brief recess observed.)

THE VIDEOGRAPHER: Back on the record at 5:50.

That concludes today's testimony, and we're off the record at 5:50 p.m.

FURTHER DEPONENT SAITH NOT.

(Proceedings concluded at 5:50 p.m.)

Page 404

Gary A. Orseck, Esq.

Gorseck@kramerlevin.com

October 18, 2024

RE: DANIEL H. GOLDEN, et al. vs. COMMUNITY HEALTH SYSTEMS, INC., et al.

10/10/2024, Larry Cash (#6930865)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-ny@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 403

REPORTER'S CERTIFICATE

I certify that the witness in the foregoing deposition, LARRY CASH, Corporate Representative, was by me duly sworn to testify in the within entitled cause; that the said deposition was taken at the time and place therein named; that the testimony of said witness was reported by me, a Shorthand Reporter and Notary Public of the State of Tennessee authorized to administer oaths and affirmations, and said testimony, Pages 9 through 402 thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said deposition.

IN WITNESS WHEREOF, I have hereunto set my hand this 18th day of October 2024.

_____
Carissa L. Boone, LCR No. 382
My License Expires: 6/30/2026

Page 405

DANIEL H. GOLDEN, et al. vs. COMMUNITY HEALTH SYSTEMS, INC., et al.

10/10/2024 - Larry Cash (#6930865)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

Larry Cash                 Date

102 (Pages 402 - 405)

Page 406

DANIEL H. GOLDEN, et al. vs.
COMMUNITY HEALTH SYSTEMS, INC., et al.
10/10/2024 - Larry Cash (#6930865)

     ACKNOWLEDGEMENT OF DEPONENT

  I, Larry Cash, do hereby declare that I
have read the foregoing transcript, I have made any
corrections, additions, or changes I deemed necessary as
noted above to be appended hereto, and that the same is
a true, correct and complete transcript of the testimony
given by me.

_____  _____
Larry Cash          Date
*If notary is required

     SUBSCRIBED AND SWORN TO BEFORE ME THIS
     _____ DAY OF _____, 20___.


     _____
     NOTARY PUBLIC

Veritext Legal Solutions
212-279-9424     www.veritext.com     212-490-3430

## &

**&** 2:4,9,18 8:5 9:16 35:3 143:23,23 144:20 343:6 383:7 385:13 385:21 398:22 399:20 401:3,8 401:10

## 1

**1** 4:10,23 6:1,5 6:7,10 9:8 17:9 17:10 94:24,25 95:1,1 129:19 219:18 231:12 259:9,16 265:17 268:20 277:13 286:18 339:22 353:2,2 363:17 364:5 376:13 397:16
**1.225** 364:7
**1.3** 364:14
**1.315** 357:20
**1.325** 361:15
**1.375** 357:19 361:16
**1.5** 339:22
**1.6** 165:2,5
**1.8** 339:23
**1/15/2016** 5:15
**1/27/2016** 7:4
**10** 1:24 4:10,16 5:3,6,22 8:4 66:1 100:24

101:14 102:6 111:22,25 112:3,11,13,18 112:21 113:1 113:11,13 124:22,23 125:3 131:4 134:12 135:16 142:11 143:5 143:12,20 148:13 149:9 149:18 150:23 152:15,17,21 165:1 190:22 197:4 200:5 218:6 240:6 241:8,16 244:18 249:14 250:1 255:21 257:24 258:16 265:13 277:6 289:9 291:19 309:22 334:16 339:3,3,15,19 347:9 365:17 368:9 373:23 374:4 375:9 379:7 385:4 387:16 399:24 400:19
**10,000** 40:9,11
**10.1** 114:13
**10.2** 78:20
**10/10/2024** 404:5 405:2

406:2
**100** 86:19 127:23,25 128:2 161:2 320:17 324:17 324:20 332:7
**10005** 2:19
**10010** 2:5
**10020** 2:15,24 3:6
**101085** 6:4
**101495** 6:6
**102** 4:20
**103** 227:21 228:7
**104** 224:10 244:24
**106** 225:12 246:13
**107** 4:21 260:1
**109** 331:14,16
**10:44** 102:13
**10:58** 102:17
**10th** 9:3
**11** 1:4 4:4 5:4 6:22,24 38:8 84:25 96:5 107:10 115:21 137:17 142:6,7 191:1 192:11 235:7,16 261:2 261:10,11 296:22 297:15 298:2,16,21 299:1 302:20

310:3 322:25 323:6,20 332:7 339:1,7 379:9 379:9
**11.9** 120:16
**11/11/2015** 7:1
**11/13/15** 329:8 329:19 330:4
**11/15/2015** 4:20 6:19
**11/16/2015** 6:20
**11/18/2015** 7:2
**11/20/2015** 6:7
**11/23/15** 108:17
**11/23/2015** 4:21 5:3 108:19 109:1 113:9 114:4
**11/24** 139:9
**11/24/15** 132:19 135:22
**11/24/2015** 5:1
**11/3/2015** 4:14
**110** 28:8
**113** 332:5
**114630** 6:16
**114636** 6:16
**115652** 4:19
**115657** 4:19
**116945** 4:20
**118835** 6:19
**118837** 6:19

**119** 4:23
**11th** 358:9
**12** 4:21 5:7
  27:18,19,20,23
  27:25 28:11,14
  49:6 87:10
  105:11 106:11
  115:5 124:11
  125:18 154:16
  154:17,20
  156:13,19
  158:15 159:18
  161:12,16,17
  161:21,22
  163:4,9 164:9
  165:6 192:18
  192:21,22
  193:20,24
  226:16 229:15
  246:18 247:12
  254:5,10
  266:14 289:21
  294:5 296:6
  309:20 329:14
  335:10 357:17
  358:20 381:13
**12.3** 113:14
  114:13 266:14
**12.9** 266:16
**12/1/2015** 6:17
**12/31/15**
  260:25
**12/31/2015** 5:9
**120** 288:4
  340:9

**121** 179:2
**123** 5:1
**124** 5:3
**125** 234:18
  315:15 329:1
  334:20 336:7
**1251** 2:14,23
  3:5
**1285** 5:10
**12:28** 185:20
**13** 5:9 6:2 7:12
  41:10 49:6,7
  79:11 98:4
  120:8 123:12
  124:12,13
  167:13,14
  221:3 226:16
  232:8 269:20
  272:12 388:14
**13's** 152:24
**13.5** 266:15
**1375** 357:25
  359:23
**14** 5:1,9,11
  49:7 76:10
  79:11 97:25
  99:11 104:9
  105:14 106:17
  114:25 115:2
  125:19 127:7
  128:21 130:10
  142:5 172:24
  172:25 173:3
  190:17 210:24
  211:4 222:4

232:8,9,23
237:18 247:20
254:8 268:2,16
269:2,3,14,20
270:2 272:12
328:10 349:2
**14's** 152:24
**14.3** 127:2
**14.5** 126:25
**14.5.** 127:8
**14.53** 268:8
**14.7** 120:17
**140** 222:16
  314:25 321:9
  321:25 340:16
**141** 267:23
  268:1
**142** 5:4
**14th** 102:23
  103:11 104:14
  278:14 279:24
**15** 5:10,13,17
  6:4 22:17
  35:23 42:14
  49:7 97:25
  99:2,11 105:14
  106:18 114:25
  115:3 121:8
  123:21 125:10
  125:14,24
  127:12 130:3
  130:10 147:19
  154:7 174:19
  174:22 175:1,4
  178:2 179:17

183:24,25
184:10 192:17
193:17 207:15
210:24 211:4
219:17 221:7
222:4 228:10
231:25 232:9
232:23 237:18
247:20 259:21
260:16 261:11
268:16 269:2,3
269:14 270:3
272:15 294:8
294:20,22
298:7 328:10
331:18,21
349:2,24
396:13,14
**15.6** 268:8
**15.7** 87:10
**150** 8:6 9:16
  324:17,19
  370:6
**154** 5:7
**155** 260:2
**15th** 279:25
  320:24 361:3
  392:2
**16** 5:15 7:14
  42:20 92:5
  97:23 98:4
  105:14 106:11
  127:2 147:20
  150:2 174:17
  174:22 175:2,3

**[16 - 2013]**                                                    Page 3

177:25 179:18 183:4 185:25 186:1,4 187:7 187:8 192:14 192:18 193:4 207:15 212:3 216:3 231:9 260:25 261:2 261:12,15 269:12 280:5 287:11,24 288:3 294:7,22 298:8 331:22 332:2 343:8 344:6 349:24 390:17,18

**16.65** 268:8

**16.7** 266:15

**167** 5:9

**17** 4:10 5:7,17 6:8 45:3 81:21 84:7 98:4 167:12 194:21 212:4 216:3 267:24 269:6 269:16 273:20 280:25 285:4 287:12 350:24

**17.68** 268:9

**172** 5:11

**17443** 5:12

**17444** 5:12

**1747** 70:16

**17820** 5:3

**18** 5:19 13:20 13:21 45:3 67:8,19 87:14 105:12 110:15 110:24 111:3,7 111:8 121:6,9 122:19 129:20 129:22 132:2,6 172:22 195:7 212:4 268:8 273:14 281:2 288:15 289:21 294:5 296:7 305:9 309:21 404:3

**18.7** 268:9

**180** 330:9

**183** 5:13

**186** 5:15

**18th** 403:18

**19** 5:20 6:14 13:22,25 45:6 87:14 105:12 121:6,9 122:19 183:23 199:6 199:13 212:4 237:13 268:9 281:2

**190** 35:19 107:5 354:11

**191** 237:23

**194** 5:17

**1940** 152:10 153:7

**195** 5:19

**199** 5:20,22

**1993** 394:14

**1999** 105:11

**1:10** 185:24

**1st** 284:9 311:3 383:10 384:14 385:2 386:6 397:21

**2**

**2** 4:12 5:15 45:7,10 84:14 97:5,8 120:22 121:1,14,21 122:18,19 179:22,24,25 180:10,12 181:2 183:1 201:4 207:17 313:21 315:1,9 315:10,13,22 329:14 338:25 339:5 344:2,12 344:23 345:9 346:6 351:4 353:7,21

**2.178** 279:5

**2.5** 91:22

**2.7.** 78:21

**2/23/2016** 7:6,8

**2/29/15** 331:17

**20** 5:22 45:6 64:7,8 121:6,9 121:9 122:19 178:11 199:9

201:22 228:8 233:21 237:13 246:2 259:19 259:21 260:16 260:16,19 268:9 272:24 281:2 297:11 316:20,24 320:25 341:1 390:22 406:15

**20-10766** 1:3

**200** 157:1 268:12

**200,000** 28:8 177:2

**2000** 2:9 349:25

**20006** 2:10

**2007** 76:10

**201** 5:23

**2010** 28:3 47:3 266:15 350:2

**2010766** 9:14

**2011** 266:15 350:4

**2012** 35:18 266:16

**2013** 35:19 70:19 71:2,4 76:10 78:15 79:9 84:13,18 107:25 113:12 114:14,18 115:3 124:5 218:22,24

**[2013 - 2024]**                                                                 Page 4

222:11 223:6
232:21 266:16
268:15 269:24
**2014**   21:1,8
35:23 42:8
47:3 72:13
78:19,25 79:3
79:8 84:22
107:24 113:12
114:14,19
218:22,23
219:4,8 222:11
222:17,20
223:7 224:10
224:19,23
226:23 227:21
228:13 233:3
234:18 237:16
250:16 254:14
254:20,22
274:18,18
275:12,13
315:15 339:23
340:14,22,24
341:2 368:2
389:21
**2015**   4:10 6:14
20:22,24 21:9
21:10,12 22:15
30:24 35:2
42:8,20 44:2,9
44:20,21 71:1
71:3 72:3,13
74:3,24 75:17
79:18 84:10,14

84:18,21 94:18
97:8,18 99:6
102:23 103:11
103:13 104:14
106:10 131:1,7
131:20 137:17
148:4 152:11
152:16 157:14
165:1,2,10
174:15 176:3
177:22 178:11
180:19 182:4
182:21 183:11
184:12 192:9
192:17 193:3
194:3,6 216:3
218:24 219:22
219:24 220:13
222:11 223:7
224:10,18,23
225:13 227:22
232:14,21
233:7 237:16
242:4 247:25
248:6 251:22
252:13,16,18
255:1,3,7
257:5 259:17
260:16 268:13
275:14 278:14
279:6,9,20
280:6,16 283:3
283:14,19
284:5 311:4
313:16 314:1

339:23 340:14
340:24 352:18
377:18 378:21
378:24 380:10
381:2,11
387:25 390:17
390:23 391:6
391:17 392:14
396:9 397:4
**2015's**   298:10
**2016**   5:7 33:10
44:21 79:19
85:1,10 86:17
89:8 92:17
97:9 99:14,18
99:24 115:4
120:16 137:19
147:18 149:24
150:4 166:11
166:21,22
173:12 174:16
176:1 178:5,11
178:16 179:13
179:23 180:15
180:19 181:3
181:23 182:4
182:18,21
183:10 184:13
187:4 198:3,12
210:16 211:2
229:22 230:18
233:21 238:7
259:20 260:2
260:16 275:15
277:25 280:2

286:6,24
294:19 298:3,7
298:17,22
299:2 311:12
311:13 324:18
350:5 351:15
352:3,19
353:18 355:6,8
363:12 368:2
370:8 376:25
380:1,5 381:8
383:22 387:10
387:11 397:13
399:8 400:2
**2017**   76:23
85:5,8 120:17
123:1 150:1
205:5,25 267:8
267:8 268:8
271:23 277:7
277:13 281:6
**2017-2018**
263:20
**2018**   71:22
85:11 121:2
287:17
**2019**   85:11
121:2 287:18
**2020**   37:11
85:12 106:10
121:2,12,17
127:7
**2021**   271:24
**2024**   1:24 8:4
9:3 403:18

**[2024 - 30142]**

404:3
**20th**  313:16
**21**  5:18,23,23
  7:9,11 127:24
  201:20,21,23
  268:9 269:16
**21-51190**  1:12
**210**  237:21,23
**219**  289:13,15
**22**  5:17 6:1
  215:17 239:25
  240:1
**220**  87:11
  106:12 125:16
**228692**  4:17
**228705**  4:17
**22nd**  2:4
**23**  5:3 6:2
  248:12,13
**232725**  5:2
**232738**  5:2
**239203**  5:6
**239414**  5:6
**23rd**  257:17
  370:7 376:25
**24**  6:4,20
  210:25 225:13
  255:14
**240**  6:1
**248**  6:2
**249**  332:8
**24th**  124:5
  257:18
**25**  5:11,13 6:5
  7:4,6 15:14

28:5 185:10
219:10 254:7
257:25 258:1
272:15 319:24
320:17 358:24
359:3
**250**  35:24
  115:23 340:13
  359:16 374:14
  374:21 375:23
  376:4
**250,000**  177:8
**255**  6:4
**256,000**  176:23
**258**  6:5 357:18
  358:25
**259**  6:7
**259966**  5:24
**259973**  5:24
**25th**  75:17 91:6
**26**  6:7,14
  108:19 175:14
  194:13 231:13
  231:24 258:25
  259:1
**26.6**  173:25
  174:7
**260**  131:13
  359:11 376:13
**262**  6:8
**265**  35:24
**266**  359:16
  379:4
**26th**  283:11
  385:7 386:4

**27**  6:8 199:3
  262:16,24
  285:4 297:16
**272**  150:21
  191:4 222:23
**274**  6:10
**275**  131:12,16
  136:16 358:24
  359:1,6 379:3
**27th**  363:19
**28**  6:10 199:5
  273:25
**280**  359:14
**2800**  8:7
**282**  6:14
**285**  6:15
**289**  6:17
**28th**  91:9 92:8
**29**  6:14 67:15
  220:1 241:19
  282:18,19
  331:24
**29th**  99:18
  382:1,9
**2:00**  240:16
**2:46**  270:24

**3**

**3**  4:14 5:7 7:18
  18:1,17,20
  42:9,9,11 69:6
  69:9 77:15
  78:16 84:5,13
  112:14 137:6
  138:8 145:12
  145:16 146:4,5

151:10 153:1,4
153:5 174:15
175:13,18,20
185:8 271:15
289:12,19
315:2 317:13
317:25 368:10
369:23
**3.5**  79:18
**3.7**  79:19 85:9
**3.8**  85:10 97:9
  138:8 140:1,1
  141:15
**3/23/2016**  7:11
**3/3/2016**  7:9
**3/6/2016**  5:11
  5:13
**3/9/2016**  4:18
**30**  6:15 147:20
  147:21,21,23
  147:25 162:17
  163:18 228:1
  238:19 285:8,9
  286:12 314:25
  319:24 320:25
  329:2,13,15
  340:19 354:12
  396:15 404:16
**300**  254:6,12
  358:20 359:2
  370:5
**300,000**  177:3
**30125**  4:11
**30142**  4:11

**[30647 - 4000]**

**30647** 403:23
**30th** 70:19
**31** 6:17 244:9
    289:4,5 295:25
    299:2 310:14
**313** 6:19
**31574** 6:18
**318** 6:20
**31st** 85:1
    298:17 388:5
**32** 2:19 6:19
    201:19 313:8,9
**325** 359:13
**33** 6:20 318:23
    318:24 337:17
**336** 382:6
**339** 6:22
**34** 6:22 197:21
    234:19,19,19
    237:2 248:11
    315:16 321:18
    322:19 326:2
    327:12 330:18
    334:20 335:24
    336:6 339:10
    350:20,20
**34423** 6:14
**345** 6:24
**3460** 266:7
**34604** 6:9
**34606** 266:6
**34607** 267:19
**34610** 6:9
**35** 6:24 229:7
    255:12,13

316:18 321:8
    345:10,11
**35.576** 267:13
**357** 7:1
**35897** 7:13
**35899** 7:13
**36** 7:1 357:5,6
**36.4** 152:2
**36.4.** 152:17
**361** 7:2
**362** 7:4
**364** 7:6
**369** 7:8
**37** 7:2 257:20
    258:11,11,12
    361:7,8
**370526** 6:13
**370542** 6:13
**37067** 3:3
**372** 7:9
**375** 360:16
    362:3,16
**376** 7:11
**379** 7:12
**37th** 2:15
**38** 7:4 64:25
    79:5 96:5
    101:3 103:25
    107:6 144:18
    144:20 145:5
    211:25 214:15
    217:2,15
    362:24,25
**380** 144:2

**381** 7:14
**382** 403:24
**387** 7:18
**389** 4:5
**39** 7:6 262:15
    364:24,25
**39.754** 267:14
**3:01** 271:3
**3rd** 9:16
**3s** 289:13

**4**

**4** 4:16 17:2
    42:9,11 46:18
    73:15 75:10,13
    78:3 79:19
    80:10 92:19
    121:4,4 155:8
    156:19 157:13
    157:15 158:7
    175:10,14
    186:10 211:4,6
    237:16,20
    297:1 299:3
    315:10 328:24
    330:9 332:7
    333:10 337:21
    338:20 343:14
    343:16,22
    379:11
**4.0** 370:10
**4.5** 85:10
**4.5.** 371:16
**4.6** 85:11
**4.7** 85:11

**4.8** 196:25
    197:11 359:17
    360:21 362:10
    366:4 369:25
    371:15
**4/1/2016** 5:4
**4/23/14** 6:10
**4/24/2016** 7:12
**4/28/2016** 5:23
**4/5/2016** 5:20
**4/6/2016** 6:15
**40** 7:8 25:18
    87:18 211:1
    219:11 221:18
    222:19 234:15
    234:22,22
    235:3,4 236:8
    236:14,14,15
    236:16 237:3
    265:19 272:24
    273:9,24
    275:13 280:7
    286:1,5,7,12,22
    286:22 287:24
    288:3 314:2,5
    316:18 317:3
    321:8,21
    322:19 324:8
    326:3 327:17
    330:19,20
    334:18 369:6,7
**400** 372:8
    376:11,14
**4000** 3:3

**[402 - 66]**

**402**  403:11
**41**  7:9 92:19
  95:2 152:16
  282:17 372:20
  372:21
**417807**  6:25
**417812**  6:25
**42**  7:11 285:7
  329:15 376:20
  376:21
**42.06**  271:23
**429**  397:10
**43**  7:12 222:20
  310:8,9 333:5
  379:12,13
**43.5**  275:14,15
**434**  233:23
**44**  7:14 381:15
  381:16
**45**  4:12 7:18
  87:17 387:2,3
**45.89**  271:24
**45520**  6:21
**45522**  6:21
**46**  37:11 339:9
**47948**  5:21
**47949**  5:21
**48**  288:9
  367:18
**496183**  5:8
**496193**  5:8
**497480**  5:23
**497490**  5:23
**499749**  7:8

**499750**  7:7
**499752**  7:7
**499753**  5:14
**499767**  7:18
**4:21**  337:10
**4th**  2:10

**5**

**5**  4:18 6:17
  41:22 45:2
  47:6,12 52:4
  73:15 80:8
  81:2,4 112:16
  135:16 138:11
  138:12 141:18
  146:6 153:3
  156:19 157:5
  175:12 191:25
  192:5,18,23
  193:10,24
  195:19,23
  197:3,6,9,12
  198:22 200:4
  200:15 201:13
  265:13 275:12
  327:2,4 343:14
  343:16,19,21
  395:2
**5.2**  362:17
**5.3.**  362:17
**5/2/2016**  7:18
**5/8ths**  379:9
**50**  25:18 87:12
  121:11,17
  123:2 140:11
  141:4 164:20

165:5 168:17
  168:21 169:9
  169:23 235:2
  262:20 265:18
  265:19 268:13
  272:16 321:10
  321:21 324:9
  327:16 376:6
**500**  370:1
**51**  2:4
**53**  329:6,7
**531**  274:16
  276:8
**532**  276:9
**55**  356:24
**550**  372:5
**56**  149:1
  150:14,18
  190:24
**5778**  6:7
**577848**  4:13
**577868**  4:13
**5780**  6:7
**58**  329:11
  361:6
**581745**  4:15
**581748**  4:15
**582063**  5:15
**582068**  5:16
**582143**  7:4
**582146**  7:5
**5:28**  388:25
**5:36**  389:4
**5:45**  307:16

**5:49**  402:4
**5th**  274:18
  275:12

**6**

**6**  4:4,5,14,20
  5:5 7:1 63:13
  63:24,25 73:16
  102:7,21 143:5
  173:5,9,14,19
  174:4 202:10
  203:1 204:23
  218:3 229:22
  236:25 274:16
  372:14 376:12
**6.7**  85:6
**6/29/2015**  6:22
**6/30/2026**
  403:25
**60**  183:17
  238:19 329:18
  330:3 334:20
**608**  271:8,16
**60s**  136:14
**61**  237:16
  343:9 344:6
  362:23
**62**  330:7
  364:23
**63**  210:9 369:2
**64**  372:17
**65**  66:1 68:13
  149:1 186:10
**650**  376:15
**66**  175:11
  225:12 376:19

**67** 116:24 117:9 132:18 135:21 245:12
**68** 132:24 133:2,7 136:1
**69** 4:14
**692220** 7:11
**692223** 7:3
**692224** 7:3
**6930865** 404:5 405:2 406:2
**6a** 276:15
**6th** 2:23

## 7

**7** 4:12,21 5:4 5:20 7:8 20:7 63:25 69:4 73:15 107:11 107:12,15,15 126:6,8 130:23 130:25 133:1,2 216:4,4 218:3 281:18 334:19 334:21 372:14 379:10
**70** 79:3 133:3 136:1
**70108** 4:22
**70110** 4:22
**71** 134:24 135:9,15 259:19 260:15
**711333** 7:16
**711340** 7:17

**711719** 6:1
**711754** 6:1
**711755** 6:3
**711756** 6:3
**711762** 7:10
**711764** 7:10
**73** 228:2 229:3 239:24
**73's** 230:24
**75** 4:16 89:21 97:16
**75-80** 163:21
**77** 132:25 133:2,7 138:20 138:25
**78** 29:5
**79** 136:14

## 8

**8** 4:18,20,23 5:19 7:2 28:21 65:6 67:18 68:11 75:9 118:23,25 129:21 131:4 132:3,6 148:11 149:4 151:4,7 151:8 154:3 160:5 279:9,19 280:7,15 283:2 333:21 339:2 372:15
**8/14/2015** 6:8
**8/23** 256:5
**8/23's** 256:7

**8/23/2015** 6:1,2
**8/24** 256:5
**8/24/2015** 6:4
**8/25/2015** 4:16 6:5
**8/26/2015** 4:12 6:24
**8/28/15** 90:12
**8/4/2015** 4:10
**80** 4:18 25:16 140:17 141:8 220:2 221:3 287:2,25 288:4
**83** 224:9
**85** 221:3
**85978** 7:1
**86** 227:12
**88** 87:16 140:11 262:19 264:2 265:12 280:12 281:10 282:11 287:10 288:1,7

## 9

**9** 5:1 6:15,19 123:13,14,17 130:18 137:4 160:25,25 162:4 164:19 175:17 232:19 403:11
**9/30/15** 260:2 357:18 358:21
**90** 102:10 185:16

**91** 226:22 227:21 228:12
**923** 351:1
**932** 343:12
**940** 183:1
**95** 221:7,16,18 248:6 251:23
**96,000** 165:7,8 165:17
**97** 78:5
**98916** 6:23
**98977** 6:23
**99** 136:10

## a

**a.j.** 20:10
**a.m.** 8:5 9:2 102:13,17
**abandoned** 338:3,6
**ability** 18:8 65:15 366:9 394:7
**able** 19:10 34:20,21 35:10 35:12 36:13 40:1 88:11 104:8 123:21 125:9,14 128:18,19 130:2 152:7 197:23 199:15 199:17 261:8 261:22 290:10 290:21 292:12 296:13 364:18

386:10,11,13
**above** 125:19
  147:5 157:1
  168:16 192:8
  249:1 331:19
  334:18 364:14
  379:23 404:6
  406:7
**absolute** 227:9
**absolutely**
  353:1
**accept** 309:17
  385:6
**acceptable**
  205:12
**accepted** 317:3
**accepting**
  385:1
**access** 351:22
**accom** 12:13
**accommodate**
  12:13 401:15
**accommodati...**
  392:18
**accomplish**
  141:23 306:4
**accomplished**
  303:1
**account** 1:14
  178:15 179:12
  180:20 182:3
  182:17 229:21
  269:15 293:23
  348:15 397:6
  398:17

**accounted**
  156:8 183:2
  217:19 219:4
  220:16 345:3
**accounting**
  144:16 155:5
  217:16 220:19
  226:18 255:23
  257:13 345:8
  383:5 395:24
**accounts** 15:17
  15:21 52:14
  218:20 220:11
  227:10 229:14
  232:19 233:22
  234:11,12,13
  235:6,15,19,21
  237:14 238:17
  344:6 348:12
**accrual** 225:6
**accrued** 220:12
  224:6,18
  225:11
**accumulation**
  328:19
**accuracy** 404:9
**accurate** 23:21
  38:12 143:21
  258:16,18
  303:13
**accurately** 13:8
  112:3
**achieve** 261:8
  272:21

**achieved**
  131:18 359:6
**acknowledge...**
  406:3
**acknowledg...**
  404:12
**acquire** 344:8
  344:22
**acquired** 79:2
**acquires** 344:7
**acquis** 20:25
**acquisition**
  18:9 19:8
  20:25 223:1
  245:13 294:16
  294:17 329:12
  340:8 344:13
  378:23
**acquisitions**
  15:16,19 16:8
  19:14,18,23
  93:24 94:4,12
  218:16 222:16
  284:2 295:2
  312:5 329:21
  329:23 340:16
  340:22 351:24
**act** 29:7 72:14
  73:10 98:8
  114:23
**action** 7:14
  14:1 381:23
**actions** 60:12
  61:12,16 384:8
  394:7

**actively** 392:9
**activities** 69:22
  168:23 169:24
  222:23,24
  223:12,14,18
  223:21 241:14
**activity** 23:18
  166:19 354:22
  392:17 399:22
**actual** 78:14
  84:9 95:1
  112:6 114:11
  115:8 127:4
  145:18 166:23
  179:21 181:2
  183:19 185:5
  210:21 233:11
  233:14 237:1
  251:23 268:16
  294:3 321:17
  383:17
**actually** 19:2
  19:10 34:9
  38:10 50:11
  70:24 77:18
  81:9,19 83:17
  84:18 85:10,20
  92:18 93:1
  94:22 97:2
  110:23 116:6
  119:3,6 120:16
  145:17 146:11
  151:18,19
  160:23,24
  168:3,4 191:15

196:17 199:3 210:14 230:21 232:8 240:9,20 241:1 251:10 253:20 259:10 264:15 270:14 283:22 285:4 285:17 289:8 289:13 293:21 294:12 295:21 296:9 312:18 319:5 324:13 329:19 334:13 339:11,16 367:25 378:7

**actuals** 269:22

**ad** 270:2

**adam** 1:17 2:21 10:9

**add** 27:14 89:19 117:23 263:18 266:2 397:12 398:19

**added** 28:2,3,5 28:6 106:13 112:12,14 134:12 145:12 150:8 269:7 321:19 390:14 390:20 397:9

**adding** 390:13 400:8

**addition** 110:20 244:13 245:10

**additional** 105:23 106:1 137:7 252:13 264:11,17 279:19 341:10

**additionally** 191:22

**additions** 406:6

**address** 48:19

**addressed** 355:11,22

**addresses** 149:2

**adequate** 147:3 183:19 347:14

**adequately** 37:4 385:22 386:13

**adjus** 74:17

**adjust** 74:17 194:2

**adjusted** 46:22 46:22 47:3 77:22 91:3,23 92:9,20 95:4 114:9 129:23 129:24

**adjustment** 146:17 254:14

**adjustments** 254:17

**administer** 403:10

**administrative** 76:16

**admission** 77:22 91:23

**admissions** 46:22,23 47:3 54:17 86:18 92:21 93:18 95:4

**admit** 384:13

**adopted** 400:14

**adv** 1:11

**advance** 277:13

**advantage** 352:15

**advice** 30:15,16 358:14 386:20

**advised** 393:23

**advisor** 75:24 75:25 76:3,8 304:3

**advisors** 143:22 383:1

**affect** 66:8 88:4

**affected** 97:24 222:17

**affects** 342:11

**affirmations** 403:10

**affordable** 29:7 72:14 73:10 98:8 114:23

**afternoon** 45:13 389:7,10

**age** 65:11,20,23 66:1 68:12

**agencies** 32:15 33:25 368:21

**agency** 293:9 368:17 371:13 378:1,2 393:9

**agent** 76:16 219:15

**agents** 76:24

**ago** 50:3 59:2,9 190:15 230:8 231:4 238:3 342:21 349:3 371:21 388:15

**agree** 56:1 72:1 73:8 126:1 241:7 332:4 367:19

**agreed** 8:15 138:3,5

**agreeing** 72:19

**agreement** 151:12 301:11 301:21 311:7 375:7 399:19 400:18,19,21 401:1

**agreements** 5:17 151:15 191:23 383:8 400:12

**ah** 171:7

**ahead** 12:5,11 46:23 168:20 199:3

**ahh**  122:14
  148:16
**airplane**
  150:11 159:4,9
**airport**  399:2
  401:14
**akerman**  2:14
  10:6 389:8
**akerman.com**
  2:16
**al**  1:4 404:4,4
  405:1,1 406:1
  406:1
**alfred**  15:8
**allo**  177:25
**alloc**  349:4
**allocate**  184:13
  185:4 242:23
  279:18
**allocated**  44:4
  145:9 156:20
  157:14 158:16
  159:18 161:3
  164:22 165:9
  177:21,25
  178:1,4,21
  180:24 192:1,8
  222:16 243:20
  280:16 348:11
  352:22
**allocates**  168:9
**allocating**
  173:11 184:6,8
**allocation**  5:9
  27:10 146:15

147:12 156:3
157:10,12
158:15 163:5,9
164:10 169:10
178:23,24,25
184:11 192:14
192:15 193:20
289:25 349:4
349:13 352:9
352:12 381:12
381:12
**allocations**
  26:13 145:1
  148:9 168:7
  173:6 174:13
  175:9 176:15
  179:16 291:13
  348:24
**allot**  174:18
**allotted**  404:19
**allow**  196:9
  401:10
**allowed**  220:21
**allude**  165:19
**alternatives**
  363:7,12,18
**amendment**  5:5
  143:5,9
**amendments**
  76:21
**america**  76:11
**americas**  2:14
  3:5
**amount**  25:13
  27:18,22 28:10

37:7,9 40:15
50:1 165:9
192:6,8 198:4
198:5,12,13
207:24 281:15
305:14,19
331:5 349:7,8
358:12 360:19
364:13 388:18
**amounts**
  146:23 192:1
  232:6 346:13
**analysis**  5:17
  86:18 188:1
  189:13 239:7
  239:21 243:23
  243:25 244:4
  262:10,13
  281:20 289:22
  291:6 303:3,18
  303:21 304:25
  305:6 315:14
  322:15,17
  323:17,23,25
  325:23
**analyst**  69:13
  70:6
**analysts**  72:9
  273:2
**analytical**
  69:23 176:24
**anesthesia**
  202:4
**announced**
  42:14 268:20

278:21 311:6
**announcement**
  391:7,18 396:9
  396:19
**annual**  64:13
  151:9 383:23
**annualize**
  192:24
**annualized**
  174:4,8 200:13
**annually**  151:8
  192:1 354:13
**answer**  11:23
  11:24 12:4,5
  23:14 36:7
  67:4 103:14,15
  103:17 104:19
  134:20 147:7
  152:8 163:2
  178:8 187:18
  197:18 198:23
  198:24 200:15
  227:9,17 228:2
  236:13 238:10
  257:10 277:22
  303:22 306:24
  307:3,4,15
  308:7,11
  309:16,17
  317:25 330:18
  336:17 359:17
  360:4 367:11
  388:8
**answered**
  179:9

**answering**
  60:19 303:9
  307:6
**answers** 215:7
**anticipate**
  149:19 311:10
**anticipated**
  149:17 150:4
  150:12 166:9
  230:14 367:24
**anybody**
  322:15
**anyway** 278:4
**ap** 238:15,16
  334:25 335:3
**apart** 338:5
**apologies** 82:13
**apologize** 265:3
**apparently**
  256:6
**appeal** 41:6
**appear** 101:2
**appearances**
  2:1 9:23
**appears** 103:4
**appended**
  406:7
**applicable**
  404:8
**application**
  271:12
**appointed**
  397:4 398:16
**approach**
  347:21 397:11

**approaches**
  197:19
**appropriate**
  156:2 168:22
  250:5 259:12
  318:15 352:23
  358:19 360:19
**appropriately**
  144:22 308:4
**approval**
  275:22 277:19
  280:9,10,10,18
  312:2,6,13
**approvals**
  43:22 44:15
  278:5,8 280:14
**approve** 242:7
**approved**
  43:21 44:13,16
  219:8,20
  275:19,22
  276:24 397:17
  399:10 400:1
  400:13
**approving**
  397:23
**approximately**
  161:16,21
  168:17 191:25
  202:10 203:1
  224:9 275:14
  339:22 340:13
  353:2 365:18
**april** 13:20
  99:18 100:4

  192:17 382:1,9
  383:10 384:14
  385:2,7 386:2
  386:3,6,7
  390:13,16,17
  390:18 397:13
  397:15,16,21
  400:14
**ar** 137:8,24,25
  230:6,8,12
  234:5,6 261:3
  261:8,19
  330:15 334:13
  334:25 335:3
  377:17
**arbitration**
  13:21 274:5
  277:18 292:21
  293:5
**ardent** 15:9
**ardent's** 17:21
**area** 25:14
**areas** 49:20
**argue** 293:2
**argued** 59:18
**argumentative**
  324:7
**arkansas**
  327:10
**arose** 73:24
**arrangement**
  184:24
**arts** 41:4
**aside** 24:9
  80:12 85:8

  261:19 289:8
  357:1,3
**asked** 14:16
  38:10 45:19
  58:3 103:6
  136:24 180:3
  231:2 253:15
  256:18 257:13
  277:20 282:6,8
  295:20 311:1
  371:5 388:6
  395:23
**asking** 20:13,14
  21:5 22:2 35:7
  57:9,11,12
  60:17 61:4
  106:7 109:7
  111:12 122:9
  129:25 136:18
  159:15 164:4
  166:12,13
  170:13 179:7
  180:17,17
  182:10,13
  203:9 227:19
  235:11,23
  239:13 253:19
  289:1 303:7
  304:14,15
  305:23 306:21
  306:25 316:13
  319:11 325:3
  340:23 375:20
  381:6 398:5,12
  398:13

**asks** 23:8 29:20 29:21 41:17 314:10
**assess** 159:17 163:4,8 282:8 306:9,16 307:1 309:9
**assessment** 72:2
**asset** 338:11
**assets** 16:12 35:1 218:15 236:9
**assign** 155:13
**assistance** 401:19
**assistant** 103:1 103:2
**associated** 191:22 302:11
**assume** 11:20 12:18 65:4 141:14,15 177:17 197:7 234:10 288:7 298:25 314:24 332:14,16 347:7 374:4
**assumed** 84:25 234:14 295:21 296:23 324:3
**assumes** 259:18 296:18
**assuming** 197:17 198:4

234:12 236:3,5 236:22 238:24
**assump** 84:1 119:7
**assumption** 78:10 81:18 97:14 99:24 120:25 121:20 122:17 141:11 216:21 230:2 232:4 234:22 238:7,15 239:9 272:6 296:1 311:1 315:8,21 315:25 316:5,7 316:8,14 318:15 324:10 325:1 328:24 360:2
**assumptions** 83:14,18,20 86:7,9 87:22 88:16 97:1 100:21 101:12 101:20 104:16 122:22 157:18 166:5 216:9 238:8,16 239:12,18 259:22 260:14 298:9 313:22 313:25
**assured** 26:16
**attached** 23:4 130:25 142:15

263:14 363:6 365:10 404:11
**attaches** 80:17
**attaching** 285:18
**attachment** 4:13,15,18,22 5:1,5,12,15,20 6:9,16,21,23 7:4,6,13 17:17 45:25 77:4 78:3 81:6 108:5 113:18 126:13,16 186:6 199:13 240:9 241:1 265:2 285:24 325:19 342:24 345:17,19 364:6 365:15 384:25
**attempt** 208:3 266:2 297:14 308:15
**attempted** 206:4
**attempting** 179:19 195:17
**attending** 260:11
**attention** 50:10 214:16
**attorney** 403:14 404:13

**attorneys** 389:9
**attractive** 30:3 52:12,19,24,25 54:16 66:17 67:15,22 68:4 68:17
**attractiveness** 52:7
**aud** 147:21
**audit** 144:20,24 145:4,15 383:2
**audited** 179:3
**auditors** 112:15 255:24
**august** 6:14 75:17 91:6,8 92:7 242:4 257:3,17,17 283:11,14,19 284:4,5 392:1
**authorities** 280:11
**authority** 320:6 393:4 395:25
**authorized** 403:10
**available** 26:1 33:2,6,9 53:6 54:6 55:8 60:11 61:15 80:19 259:25 318:20 324:16 354:14 404:6
**avenue** 2:4,14 2:23 3:5 8:6

9:17
**average** 27:17
66:2 317:13
328:16,20
339:4,7
**averages** 101:4
209:5 335:10
**averted** 188:10
**aviation** 164:21
**aware** 19:18
34:5 167:8
182:22 206:5
207:25 208:21
209:2 211:14
239:2,6 243:25
273:14 294:18
301:8,12,17
304:16 348:18
356:16 395:23

**b**

**b** 2:3,22 368:12
377:21
**b3** 368:12
**b6** 196:17,17
**ba** 151:9
**back** 13:13
28:20 42:16,22
52:4 68:6
73:20 77:19
82:21 85:14,16
85:19,22 90:24
93:2 95:15
96:4,13,22
97:1 104:2,11
105:2 109:23

110:12 113:7
113:23,25
116:23 117:6
124:21 133:10
134:13 137:2
138:18 144:1
154:12 158:7
173:16 190:24
209:19,22
218:5 236:19
240:10 242:12
248:2 251:11
265:25 273:5
281:1 282:16
283:22 289:11
298:1 303:24
333:15 337:13
340:11 348:3
348:11,25
349:10,14,18
350:14,18
359:3 369:11
370:8 372:8,13
390:22 402:6
**backdrop**
366:7
**backed** 109:4,6
110:18 115:22
126:2 358:23
**backing** 109:12
109:17 110:8
126:21 128:23
**backs** 126:22
298:6,6

**bain** 45:12,19
46:8 52:5,19
55:7 56:14,18
56:21 57:22
58:10,16 59:8
59:12 60:16,22
67:22
**bain's** 55:16,18
**baked** 105:22
**baker** 231:9
247:19 340:17
341:5
**balance** 224:5
228:15 232:16
335:8 398:21
**balances** 238:5
238:17
**baldwin** 3:2
10:22,22 14:15
14:19 15:2
**bank** 38:4
76:11 136:9
177:13,23
304:1,5
**banker** 302:19
**bankers** 255:24
**banking** 38:4
75:23 76:24
**bankruptcy** 1:1
9:12
**banks** 32:16
33:25 34:11,15
36:9 76:6,11
77:3 94:3
370:14,16,23

371:25
**bar** 64:7
**bartow** 334:8,8
336:17,18
**bas** 235:3
**base** 194:3
323:9,19
**based** 30:20
63:17 87:5
99:4 104:16
129:24 156:4
157:18 160:20
161:4 168:10
169:10 187:10
216:21 223:11
224:19 243:16
289:22 290:8
290:21 291:6
291:18 297:12
298:10 315:14
319:24 324:21
330:14 331:1
334:19 337:21
352:12 353:13
**basic** 388:10
**basically** 28:22
53:23 125:6
169:4 338:2,5
352:25 389:25
**basing** 209:1
209:16
**basis** 79:9
84:20 86:19
87:11,12 97:13
103:8 106:12

120:24 121:11
121:17 123:3
125:13,16
127:13 151:9
158:18 159:21
162:11 192:13
207:16 211:18
230:2 232:4
234:15,19,22
236:14,16
238:7,25 261:7
271:19 272:1
274:23,25
275:3 297:11
299:14,22,24
314:3 321:18
322:19 326:2
326:11 327:3
327:13,16,17
328:24 330:18
338:20 342:2
342:11 347:25
348:3
**basketball** 39:7
**bass** 8:5 9:16
143:23 386:17
**bates** 81:8,10
81:12 142:11
144:1 150:19
150:21 186:10
191:4 266:6
271:8 274:16
276:7 289:12
289:15 343:11
382:5

**bearish** 72:6,7
**becoming**
292:16
**bed** 161:18
169:10
**beds** 87:19
160:21 161:4
161:10,15,16
168:11
**beginning**
24:25 38:11
305:25 366:2
**begins** 71:22
**behalf** 1:23
10:2,6,9
**behave** 308:4
**belief** 88:12
103:21 230:9
242:14 261:3,7
386:24
**believe** 13:2
14:3 15:17
21:23 22:14
34:15,24 69:23
76:15,20 91:5
101:24 109:10
111:24 140:7
147:16 148:8
148:19 157:11
158:5,10 161:9
163:13,15,17
179:16 180:25
185:9 186:18
189:11,13
190:2 219:24

225:19 232:1
235:9 243:24
246:16 247:22
249:16,16
260:8 261:15
265:18 269:10
280:24 298:10
300:12 308:13
308:19 312:14
312:15,20
314:2 323:12
325:4,23
327:12 337:16
339:1 353:19
353:23,25
368:23 378:2
381:2 383:11
386:23,24
388:1 396:17
400:16,20
401:3
**believed** 88:8
97:17 147:1
221:6 283:14
**benchmark**
37:13,16,17,24
**benchmarking**
128:17
**beneficial**
189:18
**benefit** 51:14
73:10 125:22
127:20 189:9
189:14 190:3,6
190:8,11

200:16 201:4,6
201:7 211:2
221:3 263:9
264:3,21,25
270:3
**benefit's**
127:21
**benefits** 125:20
163:22 206:20
210:15,25
212:2,14
213:21 214:12
214:20 216:14
216:23
**berry** 8:5 9:16
143:23 386:17
**best** 66:16
147:5,6 202:8
202:19,21,25
345:4,5 352:7
355:9 382:25
383:12
**better** 24:15
28:6 45:23
50:5,21,22
53:20,21 65:17
65:23,24 66:6
66:13,14 72:22
72:24 87:14
88:11,13 92:21
92:25 93:13,18
93:19 95:5,6,7
95:14,25 96:2
103:21,22
104:5 105:6

111:17 114:20
115:2 119:17
122:2 128:2,5
128:13,20,25
129:24 131:15
137:23 138:2
147:8 159:5
188:15 189:20
211:15,25
230:10 234:3
236:13,14,16
242:18,25
243:1 260:24
262:7 268:15
268:19 269:2
269:12 270:2
291:25 293:12
293:13,15
298:8 306:3
359:15 375:17
377:7,8,24
378:8,11,14,16
378:19,21
388:17
**beyond** 83:18
242:11
**big** 31:19 74:9
113:11 174:24
175:10,11
176:11 184:4
220:13 230:13
231:8 233:4
237:21 261:4
269:8 317:19
320:6 336:16

338:4 340:7
349:21 355:2,2
**bigger** 98:24
177:1 211:3
317:21
**biggest** 122:25
140:22 142:2
175:9 211:3
**billers** 187:17
**billion** 357:20
357:20 359:13
359:14 360:16
361:15,16
362:3,16 364:7
**bills** 238:25
**birmingham**
157:6,9,21
**bit** 17:1 22:17
23:15 24:4,7
24:15 26:14,15
26:16 27:2,3
29:2,11 41:8
45:1,2,5,23
59:19 65:23,24
66:5,5 74:11
74:15,16 77:23
87:14 91:24
92:13 93:18
95:14 104:5
105:6 121:18
122:2,5 128:2
128:13 130:9
130:10 131:15
137:25 138:2
145:14 152:24

152:24,25
156:25 165:20
168:21 175:15
205:23 210:19
211:9,14
213:14 214:25
217:3 220:7
225:5 229:7
261:12 277:3
305:23 317:18
317:25 339:6
377:24
**bits** 400:21
**bless** 120:14
**block** 52:6
90:11 290:22
**bls** 1:3,12 9:14
**blue** 79:11 81:9
81:14,22,23
82:2,6,10
**blurb** 23:8
24:21
**blvd** 3:3
**board** 7:15
30:24 31:2
103:14 112:15
149:14 164:21
165:24,25
265:17 275:19
275:22 282:16
383:17,18,21
384:9,10,14,17
384:22,24
385:8,8,10,12
396:12,19,20

396:25 397:2,4
397:5,13,23
398:4,6,13,14
398:16 399:4
400:8,15
**bond** 293:10
313:16 367:23
367:25 368:12
379:5
**bondroff** 75:16
264:20 314:10
314:16
**bonds** 370:1,5
371:10 372:5,9
377:21,23
**bonus** 163:22
225:6
**booked** 379:25
380:3,4 381:1
387:18
**books** 16:20
145:4 179:3,5
235:8,17
237:10,12,22
**boone** 8:16
9:20 403:24
**borrower**
368:1
**borrowings**
223:24 245:11
245:23 246:9
357:16
**boss** 256:6
292:14

**bot** 245:2
**bothered** 358:25
**bottom** 41:13 45:11 62:8 63:5 64:8,15 64:17,20 67:11 69:9 78:4,4 102:21 106:7 107:16 115:16 119:7,8 152:10 170:14 173:3 174:1 176:14 202:8,12 278:25 282:24 313:14 353:4 357:9 361:11 365:2 373:4 377:1 379:21
**bought** 150:10 340:5 341:1,7 341:8 389:22
**box** 185:11
**break** 12:10 102:9 184:11 185:17 337:3 388:20,22 399:1 401:13
**breakdown** 312:8
**breakout** 217:2 217:14
**brief** 89:23 102:14 270:25 337:7 389:1

402:5
**bright** 300:10
**bring** 167:17 253:20 322:5 322:11
**bringing** 272:4 371:25
**brings** 98:5 338:12
**broader** 290:15 291:4 292:2
**brought** 27:20 77:2 255:2,22 383:4
**bubbled** 354:24 355:2
**budget** 181:9 243:19 273:13 273:16,18 355:6 380:24
**budgeted** 198:4 198:12 354:19
**budgeting** 393:25
**budgets** 179:14 265:25 273:22
**build** 219:12 230:14 234:5 273:22 394:1
**buildup** 349:21
**built** 220:6 234:6 293:20 293:22
**bullet** 47:17 48:15 53:5

71:13 73:22 77:21 351:4,11 351:20 365:15 366:6
**bullets** 71:16
**bump** 220:3 236:21 237:1
**bunch** 97:22 340:16
**business** 26:17 26:21 27:5,6 28:23 29:12,15 39:21 54:13 62:20,24 63:7 98:19,23 100:4 103:18 186:20 186:21,22 187:17 228:23 253:2,3,20 254:25 306:2 311:22 351:22 370:6
**bussing** 370:11
**busy** 217:11
**buy** 49:21 234:13 235:22 235:22 311:21 313:2
**buyer** 334:5
**buyers** 295:17 322:12,12 323:6,14,15
**buying** 234:11 295:11,17 300:8,9 301:25

338:12,12
**bypass** 71:21
**byproduct** 50:20

**c**

**c** 51:16 165:2 172:9 377:20 386:16
**cadillac** 71:21
**cagr** 64:9,12
**cahill** 2:18 10:16,18
**cahill.com** 2:20
**calculate** 198:2 198:10
**calculated** 174:8 198:3 200:6,8 349:8 359:2
**calculates** 211:22 238:21
**calculating** 200:4
**calculation** 49:11 89:2 96:20,23 110:10 195:23 200:11 201:10 201:14 298:21
**calculation's** 125:18
**calculations** 136:7
**calendar** 392:14 399:7

**california** 219:7 227:15 233:2 247:21 252:17 253:22 338:4 358:22 359:3 393:14

**call** 4:11 15:1 17:24 18:4 38:13 256:14 256:14,17 257:12 259:12 260:10,12 299:14,19,25 375:9 387:12 388:6

**called** 256:17 256:21 257:11 341:5

**calling** 64:25 250:7

**calls** 187:18 204:22 375:8

**campbell** 277:17 280:13

**cancellation** 342:14,15

**candidates** 295:15

**cap** 157:1 373:6,9,20 374:4,5,15 376:11

**capable** 187:24

**capacity** 1:9

**capex** 41:13 42:1 138:8,14 139:1,13,25 140:5,8,11 141:15,17,23 245:20,24 246:3,6,7,9 283:1,7 330:10 331:1,4,6 377:8

**capital** 6:11 19:7 25:3 26:13,15 27:10 30:13,17,19 31:1 42:7,13 43:10,18 44:3 44:10,23 45:2 45:19 218:18 226:17,19,21 227:22 230:17 232:5 246:17 246:18 247:11 247:12 259:9 259:17,18,18 260:15 263:13 265:9 273:23 274:17,21 277:3,25 278:12 279:20 284:6 289:25 334:7,15 335:10 351:7 351:23 352:8,9 352:21 353:8 354:3,22

357:24 376:4

**capitalized** 37:5 385:23 386:14

**capitalizing** 18:9 19:8 29:21

**capped** 157:3

**caption** 8:11

**care** 22:16 24:5 26:17,20,25 27:4 28:23 29:1,7,13 39:18 66:15,16 72:8,9,10,14 73:10,14,19 98:3,8,22 114:23 186:17 189:21 325:24 326:14,15 333:14,19,20 337:22

**careful** 254:9

**carissa** 8:15 9:20 403:24

**carlyle** 281:24 282:8

**carried** 270:3

**carries** 317:6

**carry** 157:12

**carrying** 350:17

**carve** 253:10

**carveout** 144:8 144:13 145:7

145:17,24 146:22

**case** 1:3 9:13 54:23 163:7 281:16 284:2 348:2

**cases** 234:20 235:10 237:12

**cash** 1:17,22 2:7 4:3 8:2 9:9 10:14 11:2,9 13:7 16:16 17:9,16 31:22 34:10 35:4 45:9,10 51:1 56:12 69:8,9 75:12,13 80:4 80:15 81:4 82:17 84:24 90:16 102:19 102:20 107:14 107:15 119:1 123:16,17 136:18 137:7 137:12 139:10 141:13 142:10 154:20 167:24 173:2,3 177:12 177:23 184:2 186:3,4 190:22 195:9 199:11 199:12 200:3 201:25 209:22 210:14 215:14 217:21,22

221:6,15,21,22
221:22,24
222:12,17,22
222:23 223:8
223:11,13,17
223:22 226:4,7
227:21 228:8
228:13,16,20
228:22 230:16
231:3 234:23
234:25 235:1,5
240:3 241:7,22
242:5 244:13
244:21 246:5
246:16 247:10
248:5,15 249:8
250:16,19
251:5,13
252:13 253:1
253:20 255:2
255:17,22
256:25 257:1,2
258:8 259:5,25
260:7,22 263:5
265:2 271:5
274:2 282:21
285:3,11
286:18 302:10
308:9 309:18
313:11 315:3
315:17,19
330:20 337:12
340:6,20
345:13 347:14
347:15,25

348:10,16,21
350:10,15
357:8 361:10
363:2 365:2
369:9 375:6
377:5,7,15,19
377:24 378:17
379:17 381:18
382:11 387:5
389:7 403:3
404:5 405:2,24
406:2,4,12
**catchall** 170:10
**categories**
153:20 176:12
284:1
**category** 173:5
208:22
**cath** 269:7
270:13
**cause** 114:18
258:19 262:2
403:5,16
**caused** 78:25
141:13 228:1
237:19 242:6
358:10
**causing** 79:8
**cbo** 186:15,16
186:19 187:5
187:11,14,21
188:4,12,18
189:1,3 192:20
220:6

**cbos** 189:15
**ce's** 172:9
**cell** 196:17,17
196:20
**cells** 196:11
**center** 1:14
66:21,25
137:15 157:6,9
157:22 185:7
186:23 187:5
187:11,14,21
188:12,18
189:1,3 261:25
262:6,8 332:6
**centers** 187:2
192:21 193:3
193:16 230:10
234:4
**central** 137:15
186:20,21,22
**centralized**
175:6 185:6
**centralizing**
137:22 174:25
**ceo** 18:3 162:9
164:21 165:2,9
165:15,16
170:5,14,21,22
170:23,23
171:1,6,10,11
171:13,20
172:10 270:15
277:17 391:11
391:17 392:25
393:11 395:14

399:25,25
**ceo's** 162:9,11
162:12 170:12
171:1 172:9
**cer** 275:21
**certain** 37:6,9
40:15 160:19
196:10 241:9
248:4 297:22
305:15,16,20
348:13
**certificate** 8:11
403:1
**certify** 403:2,13
**cetera** 8:11
148:7 385:4
388:11
**cf** 171:5
**cfo** 15:8 164:21
170:21 171:6
172:17,20
260:1,5,6
272:7 273:4,5
335:6 389:17
389:21 391:8,8
391:11,12,16
395:14
**cfo's** 171:15
172:16,18
**cfos** 272:7
**ch** 162:11
223:9 322:24
**chain** 4:12,14
4:16,18,20,21
5:1,3,11,13,20

5:23 6:1,2,4,5,7
6:8,14,17,19,20
6:22,24 7:1,6,9
7:12 123:17
125:7 130:22
184:3 248:16
313:13 319:3
361:11 372:24
376:24 379:18
379:20 387:8
**challenge** 74:12
90:7 205:23
206:1 209:13
308:16 377:5
377:15
**challenged**
230:4 263:9
**challenges** 62:7
62:18 63:3,4,6
72:2
**challenging**
22:17 53:7,25
55:9,20 137:21
189:22 203:22
205:6 262:2
312:9 362:4
369:25
**chance** 377:7
**change** 23:18
38:6 122:25
137:12 139:5
140:23,23
180:20 219:5
222:4 227:6,6
227:10 228:14

230:23 232:5
238:14 259:23
282:1 330:14
331:11 340:24
359:5 379:5
380:12,17,20
381:8 390:2
405:4,7,10,13
405:16,19
**changed**
104:16 111:4
279:4 315:14
316:10 324:23
325:1 359:10
**changes** 90:11
91:8 110:24
132:19,24
133:4,6 135:22
136:6 139:9
179:11 182:2
182:19 183:7
218:15 241:15
259:19,24
329:7,19 330:4
330:25 331:8
331:17,17
404:10 406:6
**changing** 95:12
**chapter** 1:4
302:7 382:23
**characteristics**
338:22
**characterize**
53:1

**charge** 15:21
43:10 160:20
202:3 283:25
**chargeable**
168:23
**charged** 155:21
160:19 162:5
169:9
**chart** 47:8,11
56:4 68:7 99:7
99:9 108:10
109:12 115:15
266:9,20
**charts** 64:7
162:15 184:18
**cheaper** 372:12
**chesterfield**
338:9
**chew** 395:1
**chief** 144:16
395:24
**choice** 396:2
**chopping**
290:22
**chose** 329:3
**chosen** 327:8
396:7
**chs** 1:13 2:7
10:13 18:3
21:2 22:22
25:12,17 26:9
27:14 28:22
29:10 31:25
42:1 43:18
44:4,10 45:14

47:2,9,19 48:2
48:11,25 49:1
49:16,20 50:19
51:3,18 52:11
61:25 62:1
63:22 66:17
76:17 102:1,4
143:19,22
145:9 146:24
147:11 149:5
155:5 163:8
164:8 168:8,23
173:10 179:5
181:23 182:3
182:21 183:10
191:24 192:2
217:3 222:13
223:9,18
244:14 247:9
259:7 265:10
274:6,17,22
275:12 279:18
284:6 295:12
300:9 302:18
303:25 304:12
304:19 306:12
306:15,25
309:12,20
310:21 311:6
311:16 313:3
317:16 318:2
318:17,20
321:23 334:13
334:25 341:11
341:25 343:16

343:17,22,24
344:2,2,6,11,23
347:8,10,24
348:4,19,20
351:5,14,20
352:2 354:3
358:4,5 360:8
361:13 365:16
367:18,19
373:24 374:21
374:22 385:10
385:24 386:1
386:10,15
387:9 391:2
396:10
**chs's** 27:9
46:21 47:13,24
48:9,23 50:15
51:2,17 63:17
64:8,9 156:13
156:20 161:16
165:1,1,9
203:25 206:6
318:18 358:6
358:12 360:6
366:23 368:21
374:4 387:11
**chsg** 4:13,15,17
4:18,20,22 5:1
5:3,6,8,14,15
5:20,23,24 6:1
6:3,9,12,14,16
6:19,21,25 7:2
7:4,6,8,10,11
7:16,18

**chspsc** 1:14 3:2
**circled** 276:1,5
**circling** 241:13
**circumstances**
155:25 323:7
**cited** 71:13
**citigroup** 77:2
**city** 326:23
**civil** 8:9
**claim** 325:4
**claims** 189:22
**clarify** 269:25
**clarifying**
32:24
**class** 13:25
**classification**
170:24
**clear** 32:11,22
34:10 365:23
**clearly** 53:18
331:6 372:4
378:9
**clerks** 148:7
**click** 119:8
**close** 24:6
80:12 114:10
114:12 166:21
283:13 288:7
311:11 376:13
379:1 380:25
388:21
**closed** 99:17
233:18 279:25
312:19

**closer** 128:20
278:24 321:20
**coding** 184:16
184:16
**coffman** 45:11
45:12,17
**colleague** 10:4
10:10,17
**collect** 189:7
228:15,17,19
230:5 234:21
348:9
**collected** 16:16
228:24 252:18
**collecting**
234:4 236:11
253:22
**collection**
188:3
**collections**
187:15 261:23
**column** 48:15
275:21
**combined**
297:21
**come** 45:19
54:17 72:14
89:11 106:20
124:21 134:15
136:17 154:12
233:4 268:22
283:12 287:7
289:11 302:13
309:20 318:6

**comes** 54:14
55:3 114:3,4
135:21 184:5
195:19 200:15
215:2 236:9,10
242:11 243:19
273:6 320:15
331:17
**comfortable**
247:9 356:22
356:23 359:5
395:18
**coming** 16:4
39:9,14 97:22
205:6 217:22
234:23 268:22
270:7 298:10
**commencing**
8:4
**comment** 59:17
73:7 101:2
126:2 133:23
134:3 148:25
149:18 198:16
246:10 257:21
277:16 291:1,4
291:23 331:3
335:17,23
358:17 376:1,2
**commented**
42:3
**comments**
100:24 101:15
209:4 240:7,15
240:22 241:1,8

241:13,15
249:2 256:13
309:24,24
351:17 366:18
**committed**
286:16
**communicate**
60:23 61:8
311:2
**communicated**
293:6 329:24
**communities**
41:5,7 100:19
353:13
**community**
1:12,13 4:10
6:10 10:23
15:21 20:4,4
39:16 54:20
270:6 277:22
343:17,24
344:2 346:1
389:17 404:4
405:1 406:1
**comp** 146:16
205:9 225:20
380:23
**companies**
216:17
**company** 35:9
45:21,23 49:10
50:2 95:24
96:1 100:10
107:4 112:4,13
129:15 134:8

141:18 143:15
146:1 147:15
148:18 149:7
157:24 159:21
161:25 162:16
164:12 165:16
168:15 177:6
179:13 180:19
184:20 189:18
198:3,11 212:6
221:16 223:4
223:25 239:11
304:11 341:18
341:22 347:20
347:23 368:18
378:4 383:13
390:11 392:6
394:18 396:16
397:24,25
**company's**
168:7 195:23
**comparable**
207:16 227:13
232:10 380:9
**compare**
193:19 195:18
328:21 338:15
338:18
**compared**
53:18 101:3
174:15 198:11
237:4
**comparing**
56:2 192:22

**compatible**
352:10,13
**compe** 291:11
**compensation**
16:15,18,23
224:8,9,12,17
**competing**
352:15
**competitions**
351:6
**competitive**
53:7,25 55:20
289:23 291:12
**complete** 267:4
296:11 406:8
**completed** 8:19
141:4 267:5
277:12 281:6
288:13,19
296:12 336:16
401:21 404:16
**completion**
267:10 280:23
398:24
**compliance**
156:17 158:12
158:13
**complies** 20:8
24:19 41:11
46:1,19 63:15
65:8 67:10
77:5 126:17
144:3 150:15
151:21 155:10
160:7 186:8

190:25 224:4
241:20 244:11
245:1 246:14
248:21 313:15
314:23 319:4,7
319:18 339:20
343:10 345:18
350:25
**component**
174:9
**components**
288:23,25
**compounded**
64:12
**computer**
89:12 194:14
194:15 196:9
**concept** 273:6
**concern** 73:25
248:24 366:9
366:14,23
367:1,3 369:22
**concerned**
387:16
**concerning**
291:1
**concerns** 70:21
71:14 74:24
249:7 367:2
388:13
**conclude**
385:22
**concluded**
103:8 402:11

**concludes**
402:8
**conclusion**
309:5 312:21
385:6
**conclusions**
72:20
**conditions**
289:23
**conference**
15:12 388:5
**confidentiality**
301:11,20
**confirmed**
15:20
**conflicts** 351:8
351:9 352:7
**conform** 77:23
**confused** 111:3
**confusing**
289:14 375:11
**confusion**
33:21 173:13
**connection**
31:5,10 32:14
111:23 164:5
181:17 182:20
197:15 208:16
265:9 295:5
304:4 347:6
348:18,21
350:14 368:21
384:18 399:3,8
**cons** 37:10

**consent** 7:14
384:16,19
385:1,3 397:17
**consents**
384:10
**conservative**
237:4,8
**consider**
330:20 364:1
385:13
**consideration**
179:17 180:23
192:19 206:21
207:5 208:23
250:3 355:1
375:9 397:22
398:15
**considered**
25:15 121:20
166:23,25
167:6 180:25
206:16 246:3
321:17 355:3
356:9 384:18
**consistent**
18:10 38:23
161:7 176:11
**consolidated**
102:5 342:2,9
342:10 358:5
392:3
**constant**
214:21 259:20
**construction**
281:14,23

283:25
**consult** 395:14
399:5 400:10
400:16
**consultants**
243:6,8
**consulted**
400:4
**consulting**
45:20
**consummate**
351:5,15 352:3
386:11
**consummated**
35:12 36:13
38:1 76:19
382:14 391:9
**consummating**
50:15
**contact** 295:9
299:13
**contacts** 295:9
302:5
**contemplated**
364:6,8 393:2
**contemplating**
206:24
**contend** 299:7
**context** 130:6
**continuation**
71:19
**continue** 20:15
269:12 307:21
**continued**
73:11 258:17

366:7 393:19
**continues** 23:7
205:4
**contract**
174:22 202:5
338:5
**contracted**
205:1
**contracts** 39:19
200:22 202:3
205:6 208:2
**contributing**
99:16
**contribution**
172:3,6
**control** 353:7
353:21
**converged**
261:11
**conversation**
56:18,21 57:22
58:9,15 59:8
208:8 249:11
365:9
**conversations**
9:6 30:20,22
208:5,10,12,15
214:3,9,19,23
247:6 249:6,9
292:6 371:17
**conversion**
220:6
**conversions**
137:17,21
261:1,16,19,25

262:1,4,9
**convert** 192:16
  193:13,23
**converted**
  174:21 187:8
  192:12 194:6
  261:11,14,21
**converting**
  137:14
**copays** 71:20
**copied** 12:17
  13:1 89:19
  90:25 154:24
  311:5 330:1
  361:14
**copies** 77:10
  404:14
**copy** 80:7
  90:23 119:24
  142:11 194:17
  194:25 264:10
  274:11
**copying** 102:22
  363:3 365:5
  376:24 387:6
**corner** 70:17
  78:10 278:18
**corporate** 1:22
  8:2 44:15
  111:16,18
  145:6,8,9
  147:2,12,14
  158:21 159:2
  161:1 163:20
  168:7,9,20

172:6 173:6,10
174:17 175:3
175:13,23,25
178:16 179:12
181:24 182:3
341:12,13
403:3
**corporation**
  1:4 2:13 5:6
  7:16 9:11 10:7
  26:5 83:13,19
  143:5 389:9
  397:6
**corporation's**
  345:24
**corporations**
  383:20
**corr** 188:20
  385:25
**correct** 17:24
  17:25 18:4,5
  19:6,11 20:11
  26:11,23 27:12
  31:12,13 36:19
  36:24 38:1,13
  38:14,21 40:20
  40:20 50:19
  51:21 55:9
  56:14 58:13
  64:14,22 70:1
  73:3 76:1
  84:12,22 85:2
  85:25 87:24
  90:17 91:16
  93:11 94:4,22

95:9 96:17
98:15 108:17
109:9 110:1,2
110:9 111:1
112:7 118:24
120:20 127:5,5
131:6,22 132:3
137:1 140:13
141:12 142:25
143:1,18 144:5
144:6 145:2,10
145:11 146:2
146:16,25
147:16 149:9
151:5 155:21
155:22 156:14
156:15,21
159:13,14
160:22 162:6
162:11,25
164:22 166:3
172:20 176:4
178:12,17
181:18 183:6
183:13 186:24
186:24 188:20
189:3 191:19
192:9,10 194:8
194:9,10
195:25 197:4
198:10 200:11
204:2,3,6,13,16
208:18,19
216:7,24
219:25 222:13

222:25 223:9
224:10,11
227:11 228:10
228:13,21
232:21 241:16
241:17 244:18
244:19 246:10
248:1 254:1
258:8 264:8
266:10,16,17
266:25 267:5,6
267:10,16,17
268:4,9,10
269:16 271:20
271:21,24,25
274:13,14,19
275:10,17
276:22 277:9
278:21,22
279:16,23
280:18 282:12
284:7 287:20
292:23 293:18
293:19,19,25
295:23 296:3,4
296:7,8,21
297:1 299:3,4
300:16 309:13
313:6 314:19
314:20 317:14
317:15 319:14
319:15,19,25
320:1 321:5,12
325:21 337:23
347:11,19

352:3,4,19
353:1,18,22
355:7 356:3
358:4 360:10
361:18 364:7
364:14 365:24
366:23 367:21
368:18,19,22
369:17 373:8
373:18 374:23
383:18 385:24
390:23,24,25
391:6,10
393:18,21,22
394:4 396:8
397:13,18,19
406:8
**corrected**
247:22
**correction**
391:14
**corrections**
406:6
**correctly** 69:19
**corresponden...**
249:24
**cost** 63:9 73:21
73:23 74:3,6
74:21,25
112:12,17
147:4 148:23
155:12,20
156:1 159:18
159:19 163:10
163:21 164:11

169:9 174:17
174:19 175:25
177:2,21 184:5
187:10 188:2
188:13,14
189:2,12 190:1
190:3,8,11
191:22 195:18
195:18 197:21
206:3,9,11,11
206:16 207:3
208:13 216:13
216:15,15
239:3 281:10
281:22 282:11
302:11 306:16
380:8
**costs** 145:6,8
145:25 147:12
147:14 148:12
148:14 149:8
149:21 155:13
155:19 156:20
158:17 161:3
164:20 175:3
175:23 178:16
179:12 180:23
181:24 182:3
184:7 185:1
188:10,18
189:6 192:19
192:24 193:1
197:4 198:2,11
207:2,25
208:17 216:11

**counsel** 8:3
9:22 10:23
12:3 13:16,16
13:17 14:9,10
14:17,19,21
15:5,7 89:14
196:9,12
239:14 403:13
404:14
**count** 98:16
**county** 311:8
311:18
**couple** 19:19,21
22:12,19 28:3
49:22 98:9
140:6 150:6
157:2,16 170:3
174:18 178:7
189:20 230:7
234:7 253:7
299:16 304:23
340:4,11 341:4
359:12 388:11
**course** 25:25
146:6 225:9,18
**court** 1:1 8:16
9:12,19,25
11:22 81:2
107:12 118:24
120:12 123:14
124:23 142:7
154:17 167:14
172:25 183:25
185:25 201:21
201:23 240:1

248:13 258:1
259:1 262:24
282:19 285:9
289:5 313:9
318:24 342:20
345:11 357:6
361:8 362:25
364:25 369:7
372:21 376:21
379:13 381:16
387:3 401:20
401:22
**cover** 77:6,19
90:3,4,25
110:13 132:11
132:15 133:16
137:3 138:19
140:4 147:3
173:17 240:10
240:12 285:13
285:17 329:5
342:23
**coverage**
205:20
**covered** 26:21
166:24
**cp1** 28:4
342:25 351:21
**cp2** 28:4
**cpi** 351:5
**craig** 345:7
**cre** 317:3
**create** 31:4,9
50:25 60:1
62:7,19 63:5

**[create - debbie]**

72:15 74:16
397:24
**created** 31:5,10
31:24 32:14
50:13 144:14
205:23 222:6
265:9 336:11
346:14 397:7
**creating** 50:13
**creation** 347:17
**credit** 1:17 2:17
10:16,18 30:15
30:17,21,22,23
30:25 34:15
36:9 37:2,14
75:16,21 76:7
76:9,12,17,18
76:23 94:7
114:22 127:17
130:23 234:16
251:4,13 259:6
260:10 263:8
263:17 264:7
264:16,19
285:15,18
288:14 302:22
303:3,11,18
304:3 313:17
317:3 326:6
327:8 330:24
335:18,23
336:19 358:14
360:25 361:13
365:16,21
366:7,13,17,22

367:1,5 369:19
370:19,24
371:19 383:1
400:18,19
**credits** 379:23
380:4,15
**cs** 325:2 404:15
**cssu** 6:7
**culotta** 30:8,12
30:24 31:3,8
31:15 86:17
89:6 102:22
105:15,20
122:23 133:5
139:8 141:21
221:12,15
222:5 240:21
241:2,22
244:12 245:19
246:24 247:7
249:7 252:1
255:20,21
256:24 259:8
285:16 308:14
308:18 309:2,8
309:11,12
318:13 332:17
336:24 356:9
356:14 372:25
379:18 387:6,9
387:15 391:7
391:16 392:8
395:13 399:6
400:20,24

**culotta's** 240:7
246:9
**current** 68:23
226:1 237:15
237:21 259:17
289:23 291:11
366:7 367:13
393:15
**cushion** 281:15
**cushions**
282:15
**cut** 68:25 213:6
213:6 372:18
**cycle** 1:13 74:6
74:21
**cyh** 4:10

**d**

**d** 4:1
**daily** 347:25
348:3,21
350:15
**dallas** 327:10
333:13,17
337:22
**daniel** 1:7
404:4 405:1
406:1
**data** 83:19,20
100:18 154:1
157:6,9,22
176:24,24
225:7
**date** 43:14
45:14 59:2
100:6 256:4

299:10 305:14
311:20 382:1
386:4 405:24
406:12
**dated** 257:17
274:18 278:13
**dates** 278:6
308:16
**david** 3:8 9:18
**davis** 186:5
**day** 77:8
131:23 234:6
256:8 258:3
261:9 369:15
403:18 406:15
**days** 91:12 92:8
107:16 137:8,8
137:24,25
224:16,18
230:8,12
238:15,19
261:3,20,23
377:17 404:16
**dc** 2:10
**deal** 308:9
365:23 367:15
392:2 399:1
**dealing** 13:22
**deals** 225:2
314:12
**dealt** 399:13
**deb** 32:23
70:22 80:22
**debbie** 58:5
90:2 209:25

307:2
**deborah** 2:3
10:1 11:10
**deborahnew...**
2:5
**debt** 13:23
34:19,20 35:10
35:11 36:12
37:7,9,10,12,24
259:25 340:2
341:11,16,23
342:15 344:18
345:2 347:6,8
347:17,22
348:20 357:19
357:24 358:13
358:19 359:5
359:12,23
360:7,9,10,16
360:19 361:15
361:21 362:2,5
364:6,9,13,18
365:17 368:18
372:19 374:14
374:20 376:12
378:10 400:12
**debt's** 341:18
**debtor** 1:5
**debts** 386:13
**december** 35:2
85:1 279:25
283:12 295:25
298:17 299:2
311:3 331:18
364:19 368:24

370:9 392:2
**decent** 97:17
**decide** 30:13
42:17,23
**decided** 43:14
49:21 76:12
104:22 177:10
324:25 352:14
360:3 391:25
394:17
**decision** 30:19
31:2 43:8
321:5,21 324:3
332:23
**decisions**
395:12,21
399:4
**declare** 406:4
**declared**
375:10
**decline** 46:22
47:2,7 292:23
292:24,25
293:18,24
**declining** 22:22
86:23
**deductibles**
71:20
**deem** 68:3,4
**deemed** 406:6
**defendant** 2:17
2:21
**defendants**
1:19 2:7 10:13

**define** 67:22
**defined** 343:16
343:17,21,23
**definitely**
115:10,12
**definition**
67:24
**definitions**
343:21
**definitive** 311:7
**del** 241:23
**delaware** 1:1
9:13
**delay** 278:7
280:22 281:6
281:11,21
282:8
**delayed** 277:20
282:14
**delays** 241:23
242:5 277:18
277:21 281:16
**deloitte** 143:23
144:20 196:2
284:16,17,20
343:6 383:2
**deloitte's**
195:22
**demographic**
53:20 101:15
289:24 291:12
**demographic...**
52:13
**demonstrated**
86:16

**denying** 189:21
**department**
31:15 69:21
150:10 159:4
170:24 172:7
177:10 184:9
203:12 281:15
281:23 294:18
310:23 337:1
343:7
**departments**
150:7 157:22
161:1 168:16
168:21
**departure**
188:9
**depending**
44:14
**depends** 63:10
322:11
**deployment**
25:2
**deponent**
402:10 404:13
406:3
**deposed** 11:12
**deposing**
404:13
**deposition** 1:21
8:1,19 9:9,15
11:11 13:12,20
15:10,13 16:4
16:5 307:22
308:2 401:17
403:3,6,15,16

**depositions**
  209:7
**depreciation**
  349:12
**derived** 111:21
  113:10
**described** 72:5
  168:15 227:14
  254:18 293:8,9
  312:18 326:8
**describes** 72:24
  72:25
**describing**
  378:13
**description** 4:9
  324:23
**designed**
  362:18
**detail** 173:5
  200:10 264:11
  265:14
**detailing**
  262:11
**details** 198:6
  198:13 200:10
  201:9,13,17
  345:2
**deterior** 104:7
**determination**
  147:11
**determine**
  147:6 158:15
  164:9 280:22
  281:5,10,21
  323:18 374:5

**determined**
  146:20 155:25
**determines**
  279:18
**determining**
  318:14 328:15
  379:25
**deve** 87:6
**developed**
  352:7
**development**
  168:20
**dietary** 212:20
**dietitians**
  212:20
**difference**
  23:24 24:7,8
  40:13 102:4
  170:16,25
  187:9 188:2
  193:9,24 198:3
  198:12 218:22
  218:24 223:23
  224:23 342:3
**different** 27:15
  43:3,6,22
  57:24 61:17
  86:6 122:22
  150:8 157:18
  159:16 162:17
  164:5 179:8
  181:20 198:20
  213:11 277:3
  303:7 305:24
  323:4 339:13

  386:1 389:19
**differential**
  48:17
**differentiators**
  68:15
**differently**
  33:14
**difficult** 75:2
  311:21,24
  320:5 394:15
**digit** 324:25
**digits** 324:24
**diminishing**
  62:9
**direct** 147:21
  155:12 384:6
**direction** 82:22
  82:23,24,25
  336:13,14
**director** 32:6
  382:12,16
  390:14,15,21
  391:3 392:23
  397:9 398:6,16
**directors** 7:15
  112:16 145:13
  147:21,23
  148:1 164:21
  381:24 382:13
  384:7 390:7
  397:22
**directorship**
  392:21 397:10
**dis** 109:6,13
  110:4,9,15,19

  110:25 116:9
  116:12 123:22
  125:10,25
  126:2,19 127:4
  127:6 129:17
  130:3,8,8,11
  131:3,25 132:2
  132:5 191:17
**disagree** 59:17
  136:4
**disappeared**
  206:2
**disappointment**
  377:2
**discern** 290:10
**disclosed** 165:1
  197:4 399:14
**disclosing**
  303:13
**disclosure**
  290:9 296:6
  375:25
**disclosures**
  291:18
**discounted**
  71:22 73:13
**discounts** 239:4
**discuss** 33:15
  240:15 259:13
  259:22 370:22
**discussed** 133:3
  148:13 168:7
  195:19 205:7
  260:23

**discussing**
 257:2
**discussion**
 62:17 93:15,16
 132:20 133:12
 139:9 140:18
 229:11 232:17
 285:19 329:8
 330:4 363:5
 390:4,13 391:2
 391:19,21
 392:20
**discussions**
 249:25 251:2
 270:1 291:24
 390:10 391:4
 394:25
**disparity** 20:14
**dispute** 93:2
 133:6
**distributed**
 351:21
**distributing**
 343:14,14,15
 343:16,19,21
 343:22
**distribution**
 375:5,8 385:24
 386:1,14
 401:11
**district** 1:1
 9:13
**dives** 87:22
**divest** 31:21
 103:16 290:5

296:13
**divested** 88:20
 109:5,18 110:1
 110:9 125:21
 126:22 128:23
 234:10 235:7
 235:16 236:22
 237:2 328:9,23
**divestiture**
 96:15 103:24
 104:23 129:11
 289:21 291:3
 291:10 292:10
 292:13 295:14
 296:20,25
 298:17 299:1
 302:21 310:25
 311:11 313:22
 313:24 323:21
 338:21
**divestitures**
 15:18,19 16:9
 16:10,11 86:8
 86:11,13,20,22
 87:7,9,12,23
 89:7 93:17
 95:13,24
 103:19 105:21
 106:13,14
 120:19 125:17
 230:4 235:5
 295:3,6,17
 310:21 312:5
 325:15 331:11
 378:4,9,22

**dividend**
 374:22 375:1
 375:10,10
 385:23 386:15
**division** 43:4,7
 174:14,15
 175:17,18,20
 176:9 185:8,9
 265:23 393:19
 393:24 395:2
**divisional** 50:6
 272:20
**divisions** 43:3
 162:23 175:22
 175:24 176:11
 354:15 355:10
**doctor** 213:11
 217:18 268:25
**doctors** 54:19
 54:22 74:14
 97:21,22 99:10
 205:22 211:16
 213:15,16
 216:21 217:1,4
 217:10 270:8
 270:12,13
 378:5
**docu** 343:23
**document** 7:16
 17:19 22:1,7
 46:3,9,11,14,17
 56:13,23 58:12
 58:17,21 59:1
 59:9 70:15
 71:9 80:7 81:7

81:18 89:13
 108:23 111:14
 124:3,7,9
 125:6 133:20
 137:3 142:14
 142:17,18,24
 143:13 145:20
 146:8 154:20
 154:24 155:1,5
 167:21 169:22
 195:10,11,14
 195:15 196:2
 197:16 258:10
 263:7 265:4,6
 265:16 271:7
 274:7 286:1,8
 286:12 305:18
 339:13 342:19
 343:1,5,13,22
 343:23 344:18
 344:23 345:23
 345:24 346:22
 346:25 347:1
 350:21 356:25
 360:13 363:11
 365:3 368:11
 381:19
**documented**
 341:11 383:10
**documents**
 265:8 283:7
 284:25 317:10
**doing** 15:10
 39:5 80:1,2
 88:24 107:1

**[doing - e]**

127:18 136:6
140:12 147:19
155:7 175:4
187:25 188:23
216:17,18
261:16,25
265:25 268:17
273:13 281:3
294:21 295:5
300:21,24
323:24 349:23
360:21 366:4
371:15 388:9
389:25
**dollar** 148:22
362:5 388:14
**dollars** 121:9
140:17 141:8
215:6,8,22,23
339:4 370:1
**door** 217:22
**double** 272:15
**doubling** 97:9
99:14,25
**doucette** 30:10
30:11,13 31:9
31:14 32:6
102:22 132:25
133:8 136:2,11
139:6,8,10,11
141:22 177:16
214:6,10,19
285:16 311:4
313:18 314:22
319:8,9,11,11

320:23 325:2
325:10 329:23
357:11 390:12
**dr** 384:23
**draft** 77:15
81:21 130:23
130:25 240:6
241:8 255:21
385:1 401:6
**drafts** 92:14
400:25
**drain** 221:4
228:1
**drawings** 43:22
**drinks** 15:14
**drive** 18:9
29:12 65:20,23
65:24 93:18
104:23,24
214:17 215:3,6
215:8 377:7
**driven** 46:21
47:13
**driver** 259:25
**drivers** 259:23
**drives** 211:9
**driving** 272:5
**drop** 131:4
134:24 135:16
136:13 168:14
214:24 294:9
362:5 367:13
**dropped** 45:5
134:18 357:19

**dropping** 370:5
**drummel** 3:8
9:18
**dt** 5:10,17
**due** 74:7 86:20
87:7,8 225:8
225:16 283:1
339:22 387:18
**duff** 35:3 383:7
385:13,21
398:22 399:20
401:3,8,10
**duly** 11:3 403:4
**duties** 382:17
392:5
**dynam** 53:17
**dynamic** 53:25
55:20
**dynamics** 53:7
53:18 55:9

e

**e** 4:1,12,14,16
4:18,20,21 5:1
5:3,4,7,11,13
5:15,20,23 6:1
6:2,4,5,7,8,14
6:15,17,19,20
6:22,24 7:1,2,4
7:6,8,9,11,12
7:18 12:16,17
12:18,25 13:3
45:11,11 75:13
77:20 80:16
89:20 90:25
91:2 92:8

102:21,21
106:8,17
107:15,17,22
110:13,14
123:19 124:5
125:8 127:17
130:21,22
131:24 132:11
137:3 138:19
142:9,14 173:3
173:16,17
186:4 240:4,5
240:13,21
241:1 248:16
248:25 249:1
249:19,20,23
250:11,12
251:12,17
252:9 255:19
255:19 256:4,4
256:8,24
257:17 259:5
263:4,8,11,12
263:16,16
264:11,18
271:11 282:22
282:24 285:12
285:13,17
311:4 313:12
313:12,14,17
313:21 314:21
314:22 316:17
317:1,5,5,12
319:1,2,8
325:11 330:2

**[e - employees]**

342:23 345:14
357:9,10 358:4
358:4 359:20
359:22 361:11
361:11,12,14
361:20 363:3
365:3,4 369:9
369:15,18,23
371:19 372:24
373:4,10 374:1
374:12 375:21
376:23 377:1
379:18,21,23
387:5,8 389:15
405:3,3,3
**e.g.** 62:8,8
**earlier** 49:9
57:8 98:2
121:7 138:10
159:3 174:21
234:9 310:12
392:8
**early** 103:12
105:1 147:19
148:3 263:10
269:11 294:16
349:24 368:23
386:2
**earned** 370:19
**earning** 217:24
217:25
**earnings** 4:11
72:17 375:25
387:11

**easily** 311:12
388:9
**ebitda** 35:20,20
86:24 87:14
88:5 100:2,14
103:14 104:19
104:20,24
107:24 111:17
114:9 121:1
122:4,18,18
128:13,24
129:11 131:1,7
131:20 136:13
219:21 254:5
254:17 263:19
266:13 268:6,6
268:14 271:23
273:17 281:1
290:20 294:9
298:10,22
303:4 304:6,21
306:10,17
314:18 315:8
315:11,21
318:2,16,17
319:13 322:25
324:22 328:4
329:12 331:2
338:25 339:1
349:11 357:18
359:15 362:2
373:24 379:25
388:10
**economy** 22:13

**ed** 202:9,25
203:5,10,20
205:18,22
208:1,13,17
211:15
**eds** 208:1
**edward** 2:18
10:15 69:10
**effect** 63:5 89:7
268:21
**effects** 218:16
**effort** 144:16
155:4 368:22
**efforts** 278:7
**eight** 59:2,9
67:14 109:18
109:25 110:8
110:20 115:17
115:19 116:6
125:22 126:22
190:15 192:17
193:14,23
203:25 294:13
295:22 296:2
296:21 310:4
323:1 333:4,4
371:21 372:3
**either** 43:4
44:21 49:20
72:10 136:1
141:20 165:23
165:24 176:6
213:4 236:10
263:5 265:19
384:13 391:16

403:14
**elected** 364:1
**electronic** 77:7
79:24 80:2
**electronically**
80:20
**elements** 45:21
**eligibility** 1:16
**eliminate**
341:22 351:6
**eliminated**
341:19
**eliminating**
48:25
**elizabeth** 10:17
284:10
**emanuel** 2:4
10:2 11:10
**embedded**
161:2
**emergency**
42:14 43:1
54:14,15 66:11
203:11 205:21
**emerging** 48:16
**emoss** 2:20
**employed**
66:10 213:14
217:4
**employee** 202:2
217:1 224:7,8
224:12,16
**employees**
71:21 146:24
309:13

**employment** 66:12,13 68:13 72:21

**en** 243:9

**enable** 353:7 354:5

**enabled** 220:21

**endeavor** 11:24

**endeavored** 38:12

**ended** 25:18 29:11 131:12 140:3 144:21 144:21 179:23 234:21 235:3 236:15 264:24 326:2,17 327:17 338:6 360:21 362:2 362:10 366:3 371:15 379:3

**ends** 78:4 186:10 351:1

**enhanced** 18:8 25:2

**enlightening** 240:10

**ensemble** 243:9

**entail** 170:6

**entire** 140:15 288:20

**entirely** 253:18

**entities** 344:8

**entitled** 403:5

**entity** 344:21

**environment** 71:23 73:13

**equipment** 341:8

**equity** 19:17,22 69:13 373:11 373:14

**equivalent** 147:13 158:17 159:19 163:10 164:11 365:17

**er** 72:23 150:10 202:4

**errata** 404:11 404:13,16

**especially** 24:14 88:3 265:12 364:19

**esq** 2:3,3,8,8,13 2:18,22,22 3:2 3:4 404:1

**essence** 145:4

**essentially** 40:14

**established** 56:13 95:3 114:3 126:19 146:10

**establishes** 344:12

**estate** 158:4

**estimate** 166:18 202:19 202:25 380:22

**estimated** 138:2 191:25

**estimates** 131:3 168:22

**et** 1:4 8:11 148:7 385:4 388:11 404:4,4 405:1,1 406:1 406:1

**evanston** 28:16 28:17

**event** 15:9 341:10

**events** 252:12 253:1,19 255:2

**evident** 50:7

**ex** 110:3,19

**exact** 58:1,2 99:8 121:10 221:2 242:9 314:8

**exactly** 37:9,13 57:15 100:13 105:13 114:11 157:2 161:18 294:10 356:6 381:10,12 382:22

**examination** 4:4,5 11:6 389:5

**examined** 11:3

**example** 162:9 314:11

**excel** 4:23 5:19 5:22 89:17 132:13,15 195:5

**except** 8:12 52:13 66:18 125:7

**excerpt** 274:17

**excess** 34:25

**exchange** 387:6

**excuse** 16:10 19:7 21:12,17 44:4 87:6 94:7 106:1 120:13 121:24,24 126:20 141:16 150:1 163:5 174:22 176:20 230:17 267:4 299:24 317:12 322:24 341:2

**execute** 366:9

**executing** 366:14

**execution** 311:6

**executive** 165:21 166:14 166:16 306:18 310:22 353:11 389:21

**executives** 166:14

**exhibit** 4:10,12 4:14,16,18,20

4:21,23 5:1,3,4
5:7,9,11,13,15
5:17,19,20,22
5:23 6:1,2,4,5,7
6:8,10,14,15,17
6:19,20,22,24
7:1,2,4,6,8,9,11
7:12,14,18
17:6,10 45:7
45:10 69:6,9
75:10,13 77:13
80:8,10,24
84:6 90:23
102:7,20
107:11,12,15
117:20,24
118:1,10,15,17
118:18,23,25
123:13,14,17
124:22,23
125:3 126:4,6
126:8 142:6,7
154:16,17,20
167:13,14
172:24 173:3
183:24,25
185:25 186:1,4
190:18 191:1
194:21 195:7
199:6,9,12
201:20 239:25
240:1 248:12
255:14 257:25
258:25 262:16
262:24 273:25

274:3,4,11
282:18 285:8,9
289:4 310:14
313:8,9 318:23
337:17 339:10
345:10 350:20
357:5 361:7
362:24 364:24
369:6,16
372:20 376:20
379:12 381:15
387:2
**exhibits** 4:8,9
185:15
**existed** 53:16
187:24
**existence** 187:1
366:20
**existing** 61:14
353:9 393:8
398:14
**expand** 353:9
354:5
**expanding** 99:1
**expansion** 29:6
29:14 98:18
**expect** 211:24
214:15 319:12
**expectation**
242:5,14,19
243:2,15
270:10 346:12
346:17
**expectations**
217:18

**expected** 18:8
191:24 252:14
265:24 273:18
289:24
**expenditure**
42:7 44:23
**expenditures**
246:17 247:11
**expense** 145:15
156:3,17 165:9
180:13 204:15
204:21 205:9
206:5,6 207:14
208:4,23
211:10 212:14
214:20 216:9
219:21 354:22
**expenses** 62:9
112:2,4 114:21
121:5 122:2,3
145:9 152:10
152:15 156:8
157:22 166:21
168:9 170:8
172:1 173:10
179:17,21,24
180:11,12
181:3 182:17
182:20 183:1,3
183:10,18
185:5 191:22
205:16 207:9
212:10 302:14
354:18 355:5
355:16 356:15

378:6
**expensive**
24:11 45:5
370:2
**experience** 35:5
**experiencing**
180:19
**expires** 403:25
**explain** 40:6
260:22 294:10
375:12
**explained**
360:17
**explains** 155:11
160:18,25
164:20 168:2
**expressed**
228:11 249:7
**extent** 246:11
**external** 13:16
14:21
**externally**
395:24
**extra** 16:15,16
16:18,23
112:12 129:13
145:14 147:4
149:21 183:17
235:1 304:12
315:3
**extremely**
66:10
**eyes** 90:7 171:7

**f**

f 150:19
f1 143:25
f20 151:20
f4 224:2 339:18
f6 218:10
facilitate 390:8
  391:24 397:18
facilities 69:2
  157:25 168:18
  169:24 176:15
  179:23 261:14
  297:12 326:1
  338:10 339:7
  352:22 353:9
facility 104:4
  115:1,2 311:21
  338:3 339:6
  344:12 348:24
fact 37:2 51:16
  104:17 214:14
  214:19 322:24
  328:13 367:17
factor 93:17
  206:9 208:4
  368:17
factored 88:9
  93:15,20
  127:19 206:12
  211:2 230:9
  231:8
factors 65:9,12
  65:15 68:4,8
  88:3 99:13,16

factual 401:9
fails 404:18
failure 280:17
fair 25:12
  27:18,22 28:10
  50:1 55:6
  147:10 162:13
  207:24 281:15
  290:16 383:3
  398:20
fairly 24:6
  176:11 200:12
  227:13 259:20
fall 64:16,17
  260:15
fallbrook
  337:25 338:2
falls 230:18
familiar 11:15
  70:5 153:23
  251:15 346:22
famous 262:18
  262:19
fast 56:7
faster 23:11
  56:5 104:9
  106:5,18 122:4
  123:21 125:10
  125:15,24
  130:3,9 214:17
  217:11 234:5
favorable
  70:11,12 101:2
  101:15

favorite 262:22
february 5:7
  166:9 370:7
  384:14
fed 75:19
federal 8:8 38:4
fee 5:9 147:5
  151:23 152:16
  152:19,21
  160:9,18,20
  161:2,24 162:6
  166:17 168:10
  371:5
fees 202:4
  302:16 370:18
  370:24
feinstein 1:17
  2:21 10:10
  397:12
fell 338:5
felt 378:8 397:8
fiduciary
  382:17,23
figure 321:23
  373:19
figures 327:20
file 118:14
  342:9
filed 9:11
  111:22 387:16
files 81:11
  155:6
fin 76:22
final 80:17,19
  84:2,7 88:17

89:10 92:16,16
96:25 97:6
113:4 120:5,5
127:20 142:10
143:7 359:18
372:16 385:10
386:3,9 400:25
401:5
finalized 386:2
  387:1
finan 146:7
finance 69:22
  246:17 247:11
financed 34:19
finances 189:24
financial 35:21
  36:1 51:6
  108:19 144:5
  146:11,18
  147:13 155:5
  268:14 289:22
  291:7 301:23
  302:7 346:2
  389:16,25
financials
  111:22 112:3
  112:21 144:8
  144:14 145:7
  145:17,25
  146:22 179:3
  244:18 359:9
  359:10
financing 19:15
  19:22,23 20:1
  30:3,3 31:1

34:12,21 35:5
76:1,4,16
363:7,11
364:21 366:10
366:14 379:8
385:4 399:22
400:12,17
**find** 68:8 70:25
82:14 130:25
133:22 243:12
322:11,12
365:10
**fine** 97:3 196:4
196:13 229:12
293:3 393:14
**fingers** 118:5
**finish** 11:23,24
12:11 37:20
44:6 55:17
96:12 99:23
101:9 122:15
148:17 193:1
212:13 307:22
308:2
**finished** 87:15
94:15 100:17
134:20 166:8
269:21 305:2
**firm** 176:22
**first** 11:3 17:5
19:19,21 20:13
23:7 29:22
30:4 47:16
48:15 71:12,12
72:4 73:20

77:14 80:2,6
88:10 90:24
98:9 99:22,23
100:1,10,13,17
103:20 104:20
127:14 168:1
173:6,11 178:7
198:15 202:11
215:2,13
251:11 252:10
256:4 259:5
267:9,14
269:21 274:10
286:17 289:9
294:19 295:1
295:25 296:1
305:21,21
311:16 313:12
314:22 317:6
319:2,10,16
331:24 345:23
351:4 352:6
353:5 361:12
361:14 365:15
365:15 373:4
378:20 379:21
379:25 380:4
380:14,23
381:8,13
382:12 387:8
387:10,11,25
388:7 389:14
400:2
**fiscal** 231:25
242:8,9,20

274:18
**fit** 272:23 362:4
**five** 137:18
141:1 151:15
187:7 274:10
337:2 358:15
358:16 360:20
360:25 361:4
362:2,8,15,19
362:21 364:3
365:18,23
366:3 367:6
369:20 374:15
375:16,16,18
375:24 376:10
376:12 388:22
**fixed** 236:9
**flat** 210:24
216:3
**fleck** 31:25
32:1,5 33:23
75:14 77:20
91:3,14 92:9
93:3 96:16
102:22 107:23
130:22,25
132:5,18,23
135:25 137:6
138:3,14 139:4
139:22 167:8
182:16 208:6,8
208:10,16
209:2 214:4
263:17 264:15
274:4 281:4

282:24 308:21
314:24 317:11
329:24 336:15
357:10 361:12
**fleck's** 108:5
110:14 123:19
314:21 317:5
**flexibility**
377:8
**flip** 85:16
126:15
**flipped** 221:2
**floor** 2:4,10,15
3:6
**florida** 203:21
318:5 327:11
**flow** 215:15
221:6,15,21,22
222:17 223:12
226:4,7 231:3
242:5 244:13
244:21 248:5
249:8 256:25
257:1,3 259:25
260:7 286:18
347:14 377:6,8
377:16,19,24
378:17
**flowing** 231:15
348:3
**flows** 241:22
246:16 247:10
250:16,19
251:6,13
255:22

**focus** 48:17 49:19,23 50:5 50:22 51:13 102:2 107:2 129:13 186:9 196:10 218:14 259:5 263:15 309:25 353:8 378:4,12 393:23

**focussed** 29:17 50:25 107:3,4 160:12,15 189:23 358:18 362:11 392:3

**focussing** 190:7

**folks** 10:20

**follow** 363:5 365:9

**followed** 9:24 30:16 94:1,3

**following** 36:12 37:5 230:1,18 273:18 279:12 289:21 296:7 310:4

**follows** 11:4 230:21

**foot** 146:4

**footnote** 64:15 67:12 85:3 146:5 148:19 229:4 231:7,12 238:3

**footnoted** 145:19 146:7 149:21

**footnotes** 388:11

**forced** 277:21

**foregoing** 403:3 406:5

**forget** 149:1 174:14 285:4

**form** 5:6 8:13 22:8 28:25 32:4 35:13 36:17 40:25 51:24 53:12 55:10 60:9 61:2,10 62:15 63:1 66:1 86:5 88:1 91:17 100:22,24 101:13,21 105:24 111:22 111:25 112:2 112:11,13,18 112:21 113:1 113:11 121:22 122:17 142:11 143:5,11,20 148:13 149:9 149:11 150:22 152:15,17,21 165:1 178:19 182:23 190:22 197:4,5 200:5 218:6 222:14

223:10,19 227:23 240:6 241:8,16 244:5 244:18 247:2 249:14 250:1 253:5 255:21 257:24 258:15 263:23 279:21 284:18 289:9 291:19 294:24 297:2 302:3 306:11 309:22 318:8 332:15 339:15,19 347:9 353:24 363:13 365:17 371:3 375:9 382:18 385:4 387:16 399:24 400:19

**forma** 5:17 112:21 115:14 145:12,19 148:21,24 266:21,23

**formalities** 8:10

**formas** 112:11 112:24

**format** 205:1

**formation** 390:7

**formed** 338:19 344:8,22 346:18 390:5

390:22,24

**former** 202:2

**formulated** 100:21 107:6

**formulating** 101:7,12,19

**forth** 85:17 305:11 348:4 350:17

**forward** 45:13 74:25 75:1 86:10 87:2 88:11,14 151:9 151:11 157:12 158:18 159:20 162:16 163:12 164:12 198:14 206:17 208:4 213:2 230:15 232:6 238:25 260:25 270:3 302:25 304:11 361:19 383:13

**forwarding** 240:6

**found** 43:23 83:5

**foundation** 48:4 49:3 52:22 54:3 55:24 56:24 57:3,18 59:15 88:22 91:18 93:5 95:21 96:18 112:9

114:5 128:9
141:19 165:12
167:2 170:18
171:3,23
183:15 247:15
250:23 257:8
284:19 287:8
290:13,24
291:21 297:3,8
299:6 304:9,17
311:9 312:24
322:8 323:2
328:6 346:20
354:7 355:19
365:25 374:24
393:5 394:3
**four** 49:6,6
79:4,7 99:22
99:23 140:25
141:1 176:16
234:17 237:1
283:15 286:8
305:5 315:14
319:25 326:1
327:7 328:23
329:1,3 330:17
333:5,16
335:13 336:5
338:15,19,24
339:5 340:5
370:22 374:20
392:13
**fourth** 86:17
136:13 163:24
173:20 206:15

219:8,21
246:15 254:8
254:14,22
326:13 358:21
**frame** 249:10
303:14 305:15
305:16,20
308:11,12,17
309:9,21
**frankel** 2:9
**franklin** 3:3
**free** 58:6
221:21,22
244:13 255:22
285:3 286:18
286:18 300:3,7
**friday** 259:12
320:24
**front** 125:6
271:9 285:14
**fsb** 1:9
**full** 79:11 80:18
125:22 146:23
155:21 192:13
192:14,21,22
193:24 267:9
289:18 295:25
352:6
**fully** 39:1,4,12
**function**
186:23
**functions**
162:18 164:10
168:16 187:23
187:24

**fund** 1:8 19:17
222:12 223:8
223:17 227:22
228:22 245:12
245:20,24
246:9 344:12
350:10
**fundamental**
227:19
**funded** 44:10
**funding** 44:13
279:19 281:11
**funds** 70:11,12
352:15
**funny** 191:5
**further** 111:15
277:23 279:19
315:14 402:10
403:13
**future** 129:10
149:19 166:10
166:19 167:10
252:14 262:4
265:25 266:3
399:25
**fyi** 241:24

**g**

**gaap** 346:2
**gabe** 196:5
197:17
**gap** 46:21
**garen** 201:25
202:2
**gary** 2:8 10:12
14:14,23 17:13

69:13 70:6
72:19 83:2
135:13 262:25
307:23 404:1
**general** 353:12
**generally** 16:12
26:14,16 27:5
30:16,19 39:24
39:25 47:25
48:10 65:16
70:8 74:11
197:13,17
214:6 272:8
322:22 341:13
350:16 380:24
**generate**
267:13
**generated**
121:8 137:7
246:16 247:10
342:7 398:9
**gentleman**
15:20,23
**getting** 19:16
50:9 73:14
86:14 92:8
93:14 105:8
119:2 128:11
129:2 157:14
227:16 233:3
234:24 277:19
280:14 362:12
362:13
**give** 12:1 45:14
45:21 65:17

**[give - going]** Page 38

79:25 80:6
114:22 130:20
142:19 149:23
231:12 250:2,2
312:12 343:11
369:25 397:21
398:14
**given** 36:9
136:11 253:25
311:13 322:23
366:7 368:16
406:9
**gives** 341:10
349:12 352:13
**giving** 302:6
401:9
**glass** 167:18
**glasses** 171:9
**go** 12:4,11
15:11 30:1
38:18 43:21,24
46:8 49:10
51:5,11 54:21
58:20 61:15
66:11 68:6
81:21 82:4,15
83:18 95:15
96:4,13,22
97:1,9,15
104:2 109:11
111:19 116:23
116:23 119:9,9
127:11 130:19
133:9,9,18,18
135:9,15

136:13,19
141:13 151:20
158:18 159:20
173:16 196:20
197:21 204:15
209:18,22
210:8,16,18
212:14 216:4
226:4 229:21
232:6,15
233:23 238:25
243:12 248:2
248:19 265:17
265:25 267:18
276:12 280:11
301:22 302:24
304:11 319:6
324:19 329:4,4
329:5 333:15
348:14 358:10
358:18 364:10
369:24 371:13
372:8 389:11
392:19 393:9
394:13,20
395:12,16,23
399:15 401:25
**goes** 23:5 69:24
126:25 127:7,8
268:1 311:10
325:2
**going** 9:2 11:13
11:14 12:15,17
15:11 17:4
19:3 23:18

25:8 32:12,16
32:18 33:1
34:18 35:9
36:4,7,11
37:18 39:8
43:5 44:7
46:15 48:24
50:16 51:14,15
51:17 52:20
53:17 58:25
60:1 61:13,15
71:11 74:2,25
75:1,18 76:3
77:7,9 79:24
79:25 80:1
81:17 82:4,5
82:15,17,21
83:17 86:10
87:2 88:11,14
88:19 89:9,15
90:6,9 93:17
93:21 94:12
95:8 97:14
98:6,10,18,22
98:23 99:13
102:12 104:12
116:22,23
117:15 118:13
118:16 119:6
129:10 130:9
131:17 134:22
136:16 138:21
140:16 141:7
142:13 144:7
146:24 147:21

149:20 151:9
151:11,18
153:18 154:11
157:17,24
158:16 162:10
162:15,16,22
162:22 163:11
163:19,20
164:12 165:20
175:6 177:4,12
177:17 178:7
180:5 182:18
183:3 184:20
185:3,5,19
186:9 190:21
193:14,19
194:12,13,16
196:7,10
197:22 198:14
199:7 204:5,16
204:19 205:2
207:2,25 208:2
208:22 209:5
210:15 213:1,2
216:22,22
220:9 223:5
226:12 228:15
229:21,25
230:15 233:6
236:3,5 242:6
242:15,16
243:3,15 244:3
247:3 254:12
255:18 258:6
259:4 260:25

261:8,22 262:9
262:20 264:16
265:22 270:11
270:23 271:6
273:16 274:2
276:20 277:12
281:22 282:9
282:16 285:2,3
285:5 286:23
287:24 288:3,3
289:8 290:11
291:19 292:10
292:22 294:3
294:13 295:18
295:24 296:20
296:25 297:19
298:7,8 299:15
300:11 301:8
301:19 303:24
307:2,5,10,14
307:16,18,20
307:22 308:1
316:17 322:24
323:5,13,15
324:19 337:5
339:13,14,15
344:1 347:2,13
350:17,19
358:15,16,25
359:1,6 360:3
370:5,8 371:1
371:10 373:16
374:10 375:14
378:13 379:7
388:5,6 389:10

391:8 393:10
394:13,19,19
395:14 399:7,9
399:18 401:16
**golden** 1:7
404:4 405:1
406:1
**golf** 16:2
**good** 9:1 11:9
22:21 49:5
55:1 63:4
64:24 90:4
97:17 102:9
104:6 105:5
107:5 117:21
171:8 185:16
188:23 214:16
219:15 234:25
235:4 262:3
268:22 270:2
270:14 272:9
272:18 294:8
322:12,12,13
370:14 377:21
379:15 389:7
394:20
**goodwill** 145:3
**gordon** 2:18
281:24
**gorseck** 2:11
404:2
**gotten** 19:22
129:22 149:25
166:10 178:22
178:24,25

184:23 235:1
256:8 263:13
**government**
219:15 242:11
**grants** 149:16
**graph** 47:1
**great** 11:8 13:6
56:9 64:5
78:13 171:9
210:11 226:9
337:19
**greater** 27:10
27:19,23,25
28:10,12 99:11
181:2 223:13
223:22 328:15
351:22 362:21
**greg** 310:24
**gretchen** 387:7
**grev** 84:21
**grew** 114:20,21
**gross** 219:9,11
**ground** 11:14
261:13
**group** 87:6
104:4 343:14
343:14,15,16
343:19,21,22
**group's** 352:14
**grow** 23:11
56:7 65:15,18
92:11,19 95:3
106:17 120:7
120:11 121:1
122:18,19

220:2 230:1
378:5
**growing** 98:24
122:4,4 129:6
206:3
**grown** 21:24
121:18 204:10
204:11
**grows** 120:21
**growth** 18:9
21:23 25:1
46:21,23 47:10
49:5 53:20,20
56:5,10 64:13
65:11,17 66:6
66:12,13,20
68:7,12,13
71:19 72:21,21
73:7,9 77:23
77:24 78:15,20
78:25 79:17
84:10,17,21
85:5,9 86:1,3
86:13,15,23,24
87:2,5,7,14,21
88:4,5,16,18
91:4,15 92:10
92:12 93:19
95:16,25 96:11
96:14,17 97:5
97:14 98:6,7
98:11,12,21
99:14,22,25
100:9,21,25
101:1,12,19

105:23 121:3
121:21,25
128:13 212:16
268:20 272:9
351:24 377:24
378:16
**guaran** 217:19
**guarantee** 40:7
213:5,5 215:24
216:13,16
217:10,17
**guaranteeing**
40:8,15
**guarantees**
40:3,5 216:18
216:24 217:1
**guess** 194:15
202:8,22
231:19 287:13
335:6
**guessing**
240:16
**guidance** 33:10
33:12 158:23
166:20,22
400:1
**gum** 395:1
**guy** 72:11
294:16 342:12
392:16
**guys** 41:17
264:11 273:2

**h**

**h** 1:7 2:13
404:4 405:1,3
406:1
**h30** 196:20
**half** 54:17
94:15,24,25
121:4 168:19
222:25 266:8
266:20 353:2
372:14 376:12
376:13
**halfway** 275:6
275:7 286:22
**halo** 268:21
**hammons**
122:23 133:13
144:15 200:8
250:12 259:8
345:8 372:25
373:22 379:19
379:23 387:7
401:3
**hand** 70:16
78:9 83:7
102:20 278:18
403:18
**handed** 45:10
69:9 75:13
80:24 102:20
107:15 123:17
154:19 173:2
186:4 199:12
240:4 256:5
258:15 274:4

342:19,20
361:11 363:3
365:3 369:10
372:23 379:18
**handful** 187:6
**handing** 376:23
**handle** 43:15
187:15
**handled** 15:17
16:8 392:6
**hands** 295:13
**handwritten**
274:7
**handy** 126:5
154:14
**hanging** 252:20
**happen** 48:18
49:13 78:24
105:10 212:3,3
212:4 218:12
254:15 265:24
297:19 299:15
307:18 379:6
**happened**
15:10,13 30:20
99:6 182:15
219:4 225:17
254:20 269:12
294:10 341:16
386:21 393:11
**happening**
22:13 99:21
225:9 246:1
**happens**
254:16 389:11

**happy** 401:15
**hard** 80:6
119:24 194:17
194:25 267:25
297:21 320:7,9
320:11 372:5
388:17
**harder** 326:21
**hardest** 320:16
320:16 372:10
**harris** 325:24
326:12 327:10
333:13,17
337:22
**haveles** 2:13
4:5 10:5,5
81:11 83:10,15
124:4,17 126:6
171:5,9 382:7
389:6,8 393:17
394:5 398:11
400:5 401:16
**haven** 332:6
**hca** 53:19,19
60:3 272:7
273:2
**hca's** 56:9 66:5
**head** 89:14
252:24
**heading** 63:21
66:20 83:10,12
275:21
**health** 1:4,12
1:13 2:13 4:10
5:5 6:10 7:16

9:11 10:7,23
15:21 20:4,5
26:4 83:13,19
143:4 156:17
175:11 178:23
184:15 277:22
343:17,24
344:2 345:24
346:1 380:23
384:23 389:9
389:17 404:4
405:1 406:1
**healthcare**
15:12 69:12
311:9 312:24
367:21 368:2
**hear** 12:2
233:12 336:1,2
341:20
**heard** 37:8
250:6 386:17
392:7
**hearing** 8:14
209:4 292:21
**hedge** 70:11,12
**held** 383:17
**help** 19:16
48:18,25 49:8
51:5 53:6,17
62:22 72:17
76:3 83:3
89:12 97:20,23
117:17 119:2
129:10 144:25
173:15 196:11

197:22 209:20
212:11 223:18
243:6,10
257:14 260:22
343:6 353:12
370:16,16
383:2 391:24
**helped** 72:14
**helpful** 134:22
277:24
**helping** 332:25
392:19
**helps** 331:6
**hereto** 406:7
**hereunto**
403:17
**herman** 2:8
14:23 15:1,3
**hershey** 2:3
10:4 17:4,13
89:17 90:1
117:12,17,23
118:2,9,14,19
118:22 119:1
119:14,18
124:6,10,13,20
132:12,16
133:24 134:6
138:23 185:11
191:1 194:19
195:4 209:21
209:24 210:2,5
210:10 226:6
227:4 229:10
258:12,24

310:9,14 333:1
337:16
**hey** 256:18
264:20 273:20
360:18 375:16
398:5,10
**high** 27:9,16,17
360:8,8 367:23
377:17
**higher** 24:4
26:13 29:2
66:2 79:1,8
91:15 92:12,12
92:13 96:17
98:11 191:25
207:3 328:19
330:20 367:24
368:5 371:15
**highest** 367:20
368:1
**highlight**
253:11
**highly** 87:22
**hindsight** 150:6
**hingtgen's**
272:18
**hire** 76:17
216:22 382:25
**hired** 211:16
243:6,10,11
**historical** 77:24
86:3 88:18
95:16 96:11,14
108:15 109:2
111:20 112:2,6

112:7,20 113:2
129:2,6 146:17
157:12 164:9
266:9,13
273:15 325:3
**historically**
27:9 72:5,6
145:8 156:21
158:16 159:19
163:10 230:11
239:1 243:17
244:1 293:1
**historicals** 91:4
92:11 108:15
109:19 113:10
**history** 20:1
35:18 88:12,14
95:23 231:13
380:16
**hit** 261:13
388:15
**hm** 21:3 202:9
203:1,13,20
204:8,9
**hma** 20:24 21:3
22:23 32:8
76:11 79:2
245:12 340:5
341:1 389:23
**hmos** 242:24
243:13
**hold** 70:25
115:15 199:3
218:23 229:8
237:17 255:13

305:1 307:8
386:19
**holders** 13:23
**holmes** 102:23
103:1
**home** 399:3
**hommrich**
387:7
**honestly** 13:9
250:16
**hope** 377:6
**hoped** 50:22
363:16
**hopefully**
243:20
**hoping** 259:11
**hospital** 24:1
27:15 42:16
43:1 60:2
62:23 66:9
70:20 72:19
73:2 74:24
79:12,14
137:22 141:18
144:18 155:20
155:21 156:1
160:21 168:11
181:13,19
187:13,20
188:3,4,5,11,11
188:17,19,25
189:2,10
190:13 192:19
203:14 204:10
205:19 208:13

208:17 212:6
212:18 214:1,1
253:2 266:13
267:3,21 268:7
268:12,15
272:3,17
292:21 296:19
296:24 298:13
301:14,17,25
302:1 304:7,21
305:7,21,22
306:1,1,10,17
311:7,17 312:4
312:13,21
313:6 315:11
320:7,10,17
323:8,9,19
326:16,19,21
333:14,21
338:7 344:7,8
344:22,24
348:14 349:9
350:9 351:22
355:6
**hospital's**
65:15 175:5
181:5 187:11
204:15 266:9
**hospitalist**
203:15
**hospitalists**
203:16 204:18
**hospitals** 16:20
20:21,22,24
21:2,7,7,21,22

22:23 25:7,10
25:19 26:5,9
26:10,24 27:1
27:9,11,19,23
27:25 28:4,10
28:16,22,24
29:3,4 31:22
40:22,23 42:8
43:2 47:19,25
48:1,10,11,19
48:24,25 49:20
50:1,5,8,9
54:20 56:3
60:6 63:18,19
63:19,23 64:8
64:9,16,24
65:1 67:15,15
68:24 71:18
72:3,7,9 79:2,3
79:4,5 84:25
88:13,19,20
92:21,25 93:13
93:19 95:5,6,7
95:7,14,17
96:2,5,15,17
100:20 101:3
103:16,19
104:1,5,18
105:17 106:4
107:2,5,7,25
109:5,18,25
110:8,20
115:17,20
116:6 120:25
125:21,22

126:22 128:11
128:12,14,24
128:25 129:14
137:15,18
144:18,21
145:5 155:19
156:3 157:2
160:19 161:3
164:22 168:10
168:24 169:10
173:11 174:21
175:1,3 178:22
179:15 180:25
181:8 184:6,11
186:17 187:4
187:10 192:11
193:2,6 194:6
204:1,4 211:25
214:15 217:3
217:15 222:11
223:7 230:5
234:11,17
235:7,16,20
236:22 237:2
245:13 255:3
261:11,18,20
262:7 289:20
290:6,9,11,15
290:17,19
291:2,9,17,17
292:11,18
293:7,17,24
295:7,12,22
296:14,15,22
297:15,16,19

**[hospitals - improving]** Page 43

297:20,24
298:2,16,21
299:1,12,19
300:1,8 301:2
301:6,8 302:12
302:20 303:4
304:2,22 305:5
305:12,14,19
306:3 308:14
310:3 313:2,5
314:18 315:8
315:15,22
317:21 318:2
318:16,18
319:13,25
320:14 321:18
322:1,5,18,25
323:6,20
324:12,18,22
324:24 325:12
328:4,9,14,22
329:2,12 330:8
330:17 331:2,7
332:6,7,12,18
333:4 334:22
335:9,13 336:6
338:15,16,19
338:20,22
340:5 352:10
352:13 354:5,5
354:10,12,12
354:19 378:9
378:14
**hours** 230:7

**house** 10:23
13:16 14:9,9
14:17,18
**housed** 153:20
**hpg** 134:12
200:16,22
201:4,6
**hrr** 66:21,25
67:6
**huh** 29:9 60:4
67:13 91:7
129:5,8 140:24
142:12 181:10
193:18,22
252:6 264:4
265:1 283:20
357:2 379:2
**human** 396:3
**hundred**
371:10 372:9
**hurt** 377:19
**hypothetical**
34:23 35:8,14
36:19 322:10
**hypothetically**
112:1

**i**

**idea** 371:25
**identification**
155:15 156:1
292:15
**identified**
144:17 148:3,6
148:23 155:14
159:2 162:18

173:14 289:20
291:2,9,15
294:11 308:14
330:17 337:20
355:24 396:10
**identify** 10:20
14:12 28:18
143:2 176:23
291:23 295:14
297:18 354:3
381:21
**illi** 253:21
**illinois** 28:5
43:2 79:12
203:21 204:1
219:14,23
227:15 233:4
241:23 242:6,9
242:15,23
243:3,13,15,17
247:23,24
252:19 253:12
320:10,17,19
320:22
**illustrations**
364:9
**imagine** 280:3
**immediately**
355:22 391:23
**impact** 109:18
200:21 236:23
280:22
**impacted**
241:23 281:11

**implementati...**
391:24
**implications**
48:16
**implies** 74:20
**implying** 74:7
**important**
249:16 254:4
259:24 300:14
368:13,17
**impressed**
378:7
**improve** 26:4
50:16 51:17
60:6 61:18
69:1 86:23
242:6,15,16,20
297:11 353:11
378:10
**improved** 87:5
87:6 88:16
137:24 242:17
269:13
**improvement**
87:10 120:8
121:11 122:5
125:23 127:24
137:8 211:10
234:6
**improvements**
60:1 103:24
105:2 127:16
353:8 354:4
**improving** 51:2
103:18 378:4

**incentive** 300:11

**include** 61:12 86:25 145:25 146:4,23 148:9 273:17 302:11 328:3 330:15 365:16 387:10

**included** 142:9 145:7,17 147:2 152:19,20 182:9 200:5 206:21 215:20 325:16 338:1 392:4

**includes** 236:22 240:7

**including** 71:18 259:7

**incoherent** 253:17

**income** 40:2,5,7 40:16 66:3,6,6 82:19 210:21 213:5,5 215:12 215:24 216:12 216:15,18,23 216:25 217:10 217:17,19 254:22 342:14 348:24,25 349:8,9,16,17 350:18

**incorporate** 166:5,16

354:20

**incorporated** 178:14 181:14 207:21 355:17 356:2,6

**incorporating** 104:16

**incorrect** 132:2 140:12 141:11 172:13 297:8 315:25 316:8

**incorrectly** 357:12

**increase** 86:9 86:11,12 87:1 149:25 166:11 166:20 167:10 173:5,10 175:5 175:10,13 179:18 180:17 184:5 203:7,19 204:20 205:9 205:17,22,24 205:24 206:3,9 206:11,14 211:5 213:15 213:18,20 217:6 223:24 238:5 245:11 246:8 281:13 281:22 282:9 315:2 380:22

**increased** 145:25 149:16 157:13 175:24

182:3,20 183:10 202:9 203:1 205:11 213:2 301:7,16 351:24 357:25 358:7 360:1,7 366:8 379:5

**increases** 73:15 149:15 150:3 159:3,8 166:10 166:13 175:22 176:10 178:16 178:20 179:12 180:18,21 181:23 204:8 204:23 206:21 206:22 207:20 212:9

**increasing** 71:20 129:11 205:15 208:17 212:10 260:1

**incremen** 197:3

**incremental** 148:12,14 197:3 198:2,11 200:4 272:5 273:17

**incur** 146:1 147:14 148:15 148:18 159:20 163:11 164:11 185:3 188:19 192:7

**incurred** 159:12 161:3 182:18 183:4 185:6

**incurring** 35:10 175:2 189:6 207:2

**indebtedness** 342:14

**indenture** 1:9

**independent** 397:5,9,22 398:15

**index** 4:8 144:4

**indicate** 133:3 277:10,11

**indicating** 81:20 82:7 90:24 113:19 137:4 218:7 240:11 271:10

**indicator** 35:21

**indicting** 82:9

**individual** 129:15 190:13 347:22

**individuals** 396:11 397:4

**industry** 70:20 73:3 74:25 205:16 208:1 209:5,6,8 272:6 367:21

**inflation** 211:5 211:15

**inflationary** 180:23
**inflow** 253:2
**info** 107:25
**informally** 401:18
**information** 112:14 129:24 143:15,17,20 144:19 156:17 156:18 157:6 163:23 184:15 250:1 254:11 273:12 284:17 302:1 311:2 318:19 324:15 356:8 388:19
**infrastructure** 352:11,14
**inherent** 351:7
**initially** 140:9
**initiatives** 353:12
**inpatient** 23:10 23:16,25 24:3 24:10,13,13,14 101:18,23 102:3
**input** 31:16,17 31:18,20 310:1
**inside** 95:24 277:19 392:6 394:18 396:16
**insights** 47:18

**insolvent** 34:18 34:25 35:10 36:11
**instance** 149:13 348:19
**instances** 302:17 334:24 335:2
**instruct** 137:12 138:14
**instructed** 12:4 91:14 132:4 135:10
**instructing** 96:16
**instruction** 93:3 136:11 332:12
**insufficient** 247:13
**insurance** 26:22 145:1,14 146:15 175:10 175:11 178:23 205:20 379:24 380:3,3
**intend** 80:23 258:6 296:11
**intended** 133:3 148:14
**intent** 148:8
**intentionally** 301:22
**intents** 353:20

**intercompany** 340:2 342:8,15 344:5,23 345:2 345:25 347:6,8 347:17,21,22 348:15,20 349:14,18 350:11,13,16
**interest** 295:11 299:17 345:25 349:12 367:20 383:12
**interested** 41:4 299:25 301:24 302:6 403:15
**interesting** 21:4
**interests** 397:6 398:17
**internal** 351:6
**internally** 246:16 247:10 398:8
**interpret** 376:16
**interrupt** 135:11 270:18 307:11,12
**interrupting** 307:21
**intervenor** 10:7
**interview** 401:9
**interviewed** 401:2

**introduce** 17:5 39:15,20 118:10
**inventory** 16:13 234:12 236:10
**invest** 353:10
**investing** 222:24 223:12 223:21
**investment** 41:18 75:23 255:24 302:18 302:19 304:1,4 352:12
**investor** 91:21 92:2,14 168:19 221:19 248:10 251:21 286:9 286:14,18 293:10 302:23 303:6 326:9 392:15,17 393:12,13
**investor's** 367:2
**investors** 253:11 285:20 285:25
**invoice** 155:14
**involved** 159:23 200:3 200:17,20 201:2 251:1 321:4 324:2

392:9 399:21
400:23
**ip** 338:4,4
**ipad** 116:25
**island** 79:11
**issue** 74:10,16
220:19 228:16
237:21 243:23
250:7 253:12
255:6 256:25
257:1 258:8
303:19 306:6
**issued** 136:10
**issues** 73:2,21
73:24 74:3,25
75:5 174:16
200:25 219:23
255:22 257:14
291:12 394:16
**it'd** 233:14
**item** 167:8
207:10,10
355:2
**items** 123:7
162:14 169:7,8
170:3 176:16
248:5

### j

**j.p.** 69:13
**jack** 2:8 14:23
**jackson** 186:16
186:18
**january** 79:3
149:24,25
150:1 166:11

187:4 277:13
284:9 294:17
363:12,17,19
364:19,20
380:16 400:14
**jason** 325:15
325:22 328:1,7
328:10 333:15
337:13
**jersey** 311:8
312:8 320:8,12
320:15
**jherman** 2:11
**jim** 30:25 31:14
32:6 103:6
136:11 139:8
139:10,10
140:15 141:21
141:21 177:16
214:5,6 239:10
239:10,10
311:1 314:22
316:17 378:20
390:12
**job** 72:22
188:23 303:20
378:8,19
389:25 393:24
401:10
**jobs** 208:19
**johnson** 328:1
333:15 337:13
**joint** 269:11
289:24 291:12

**joshua** 41:13
**jr** 2:13
**julie** 45:11
**july** 30:24
103:13,20
104:11,20,22
105:2 361:3
378:21
**jump** 113:12
114:18 220:13
**jwd** 132:19,20
329:8 330:4

### k

**k** 2:9 165:1
**karotkin** 3:4
10:25,25
**keep** 16:14
80:12 82:15,16
82:21 154:14
243:21 261:24
292:15 334:13
362:19,20
401:17
**keeping** 25:18
**keeps** 261:25
**ken** 10:4 89:11
119:15,17
196:11 209:20
285:4 294:15
299:8 302:15
306:3,5 310:1
310:5 323:23
330:1
**ken's** 197:22

**kenhershey** 2:6
**kenneth** 2:3
**kept** 15:17
25:12 95:11
140:8 179:4
235:15 334:25
350:17
**kev** 159:24
199:21
**kevin** 122:23
133:13 134:4
134:15 136:6,6
144:15 147:7
158:20 159:22
160:1 196:5,5
197:19 198:20
199:21 200:6,8
240:16 250:4
255:23 256:17
345:8 375:12
379:19 387:7
401:3
**kevin's** 158:23
163:16 309:24
376:1
**key** 47:18 69:12
78:10 81:17
83:13,18,19
84:1 97:1
119:7 212:25
395:5
**kind** 27:15 41:6
44:14 50:9
52:6 61:19
88:24,25 177:5

188:13,14
254:3 272:22
275:6 303:21
**king** 294:15
299:8 300:18
301:2,5 306:3
306:5 310:1,5
319:9,11,23
323:24 330:1
**king's** 302:15
**km** 145:2
**kmp** 145:2
**kmpg** 145:3
**knew** 37:15,23
38:6 107:3
148:4 149:20
291:18
**know** 11:12,18
11:19 12:10
13:3 19:4,24
19:25 28:1,3
28:15 34:14
37:12,13,19
38:3 41:3 42:6
42:13 43:24
44:13,18,22
46:10 53:14
57:6 62:23
64:22,24 65:1
65:5 72:22
77:18 87:9
93:1,11,22
100:23 104:3
113:3 114:19
116:6,16

126:21 127:15
127:16 130:1
138:15 139:6
139:16,22
141:8,20
145:14 147:17
148:25 151:18
152:18,21
153:2,10,11
154:3 155:3
158:19,21
159:25 160:3
161:22 162:1
162:17 163:3,8
164:8,14,16
165:8,13,15
167:9 168:4
169:25 170:5
170:20,25
171:19 174:7
177:7,16,20
178:8,10,13
181:4 183:6,16
189:14 195:13
195:16 196:2
197:11 198:9
200:9 206:4
207:10,19
208:1 209:3
217:14 219:3
220:1,16 221:5
228:3 231:17
231:18 238:9
238:13,19,23
239:15,17,18

239:20 241:10
243:25 246:24
247:4 249:13
250:18,24
251:8 252:7
256:1,10 258:5
258:14 262:22
265:13 273:1,2
281:4,7,7,9
282:6,7,13,13
284:11,12,16
285:4,24 286:2
286:2,15 287:6
287:21,23
288:5,8,12,16
288:22 289:1,2
289:7 291:22
292:12 294:7
294:25 300:3,5
300:7,16,19
301:1,1,4,10
303:16,22,23
306:7,8 309:8
309:23 310:5
311:2,16,19
312:8,8,17,23
313:4,5,24
314:6,8 317:1
318:10,11
319:5 322:2
323:23,24
324:12,14,16
324:21 325:9
325:13 326:5,7
326:7,24,25

327:19,23,24
329:2,20 331:7
332:11,21
334:2,4 335:5
336:8 340:1,12
342:4,8,13,16
342:17 343:3
344:24,25
346:17 347:4,5
349:1,15,24
356:5,10,12,19
356:21 364:10
366:25 367:2
368:4,5 370:14
371:6,24
373:15 377:5
377:13,15,21
380:2,13,18,19
380:21 381:2,7
384:2 385:8,10
386:21 387:21
393:23 399:1
401:5,7,11
**knowing**
273:21
**knowledge**
208:3 209:7,9
209:10,11,13
355:1,9
**known** 56:8
148:24
**knows** 292:21
**kpmg** 145:1
383:4 398:21

**[kramer - liability]**

**kramer** 2:9,22 2:23 10:8,8,9

**kramerlevin....** 2:11,11 404:2

**kunselman** 2:22 10:11

**l**

**l** 8:15 329:19 403:24

**lab** 202:5 269:7 270:14

**label** 328:1,1

**labor** 73:21,23 74:3,6,12,25

**laid** 187:20 200:12

**landscape** 71:20

**language** 151:3 351:3,10 362:11 375:6 376:18

**laptop** 117:4

**large** 20:25 25:10 32:8 43:15 65:21 114:18 220:21 253:8 264:12 265:9,11 338:4 354:23 362:5

**largely** 131:2

**larger** 50:8 212:22 272:3 328:14

**larry** 1:16,22 2:7 4:3 8:1 9:9 10:13 11:2 60:25 71:7 90:15 116:1 118:4 139:10 195:5 231:16 248:24 255:23 307:8 363:5 403:3 404:5 405:2,24 406:2 406:4,12

**late** 42:14 44:2 44:9 147:19 284:5 287:12 320:24 368:24 379:4

**laugh** 237:5

**laughing** 307:25

**lawyers** 15:16 386:17

**lc** 90:11,15 132:20 329:8 330:4

**lcr** 403:24

**lead** 71:15 99:13 105:22

**leading** 318:3 351:24

**leaking** 355:12 355:23

**lease** 338:12

**leased** 338:10

**leases** 305:7

**leave** 111:16 124:18 360:15 393:15 401:14

**leaving** 232:11

**ledger** 341:12 341:12,14

**ledgers** 347:22

**lee** 31:24 32:1,5 32:7 88:24 89:23 94:6,8 103:6 116:15 122:21 138:3 139:22 140:10 167:8 182:16 182:25 207:23 211:13 263:9 281:1 308:21 325:4 331:8 336:15

**left** 47:8,17 65:10 78:9 140:6 278:15 278:16,18

**legal** 255:23 302:16 344:7 382:20 386:20 404:23

**lehigh** 325:25 326:12 327:11 333:13,18 334:7,10,10,12 337:22

**lenders** 33:7 392:10 393:3

394:9

**letters** 357:24

**level** 40:4,9 188:11

**levels** 204:8 205:12

**leverage** 357:25 358:7 358:10,12,16 358:18 359:24 360:6 362:8,15 362:19,21 365:18,24 366:10,15 367:7,18 369:21,25 370:10 373:24 374:6,11,14,20 375:18,23 376:7,10

**levers** 62:9

**levin** 2:9

**liabilities** 16:15 35:1 144:24 179:2 218:16 220:12 224:6 225:11,20,24 236:12 237:15 237:22 321:20 334:16,17 350:17

**liability** 179:5 237:24 350:12 350:14

**licen** 161:9

**license** 403:25

**licensed** 160:21
161:4,10,12,14
161:15,16,18
168:11 169:10

**lieu** 7:15
381:24 384:10
400:8

**lif** 105:9

**lifepoint** 50:3
52:13 66:18
104:2,3 105:5
105:6,10
106:22,23
128:17,18

**likelihood**
292:18 301:7
301:16

**likely** 290:10
291:19 299:15
310:2

**likewise** 66:7

**limit** 377:22

**limitation**
395:7

**limitations**
394:6

**limited** 143:16
352:8,15

**line** 4:2,9 20:13
23:7,7 25:1
29:23 30:5
58:16 60:8,23
62:6,8,8 63:5

73:21 86:3
91:4 92:10,15
92:18,19 94:20
94:21 95:2
108:9 109:14
110:5,13,19,24
126:19 127:4
135:15,21
162:14 167:7
168:5 172:19
206:20 207:10
207:10 215:17
215:17,21
218:14,21
220:12 224:7,9
224:22 225:12
229:15 263:18
267:2 275:23
278:24 329:5,7
329:18 330:3,7
331:16,16
332:5 333:21
352:6 405:4,7
405:10,13,16
405:19

**lined** 38:18

**lines** 109:8

**lining** 295:8

**list** 28:17
163:18,19
292:10,13
305:4,11 325:5
325:9 328:2
333:15 334:1
383:9 396:15

**listed** 18:3
20:10 65:10
113:2,3,4
115:4,8 132:24
151:23 156:19
157:23 162:4
162:14,19,20
164:10 176:16
275:6 309:21
318:7 325:12
336:6

**listen** 249:17
249:21

**listing** 317:11

**lists** 156:7
333:4

**litigation** 1:7,8
9:11 13:22,24
14:1 231:24
244:22 246:5
247:18 253:8
260:21 340:4
341:3

**little** 17:1 22:17
23:15 24:4,6
24:15 26:14,15
27:2,3 29:2,11
38:25 39:2
41:2,8 42:4
43:21 45:1,2,5
45:23 59:19
62:19 65:23,24
66:5,5,13,14
74:11,15,16
78:3 87:13

91:24 92:13
93:18 94:16
95:14 100:1
101:25 104:5,9
105:6 111:2
121:18 122:1,4
122:5 125:24
128:1,13 130:9
130:10 131:15
137:16,21,24
138:1 145:14
152:23,24,25
156:25 165:20
168:21 175:15
200:16 205:23
207:16 210:19
211:9,14
213:14 214:25
217:3,10 220:7
225:5 229:7
230:4,12
231:13 239:4
254:2 261:12
262:2 272:13
275:7 277:3
278:24 289:14
290:14 292:2
305:23 310:13
315:3 317:18
317:25 339:6
341:3 359:15
369:24 371:15
377:24 378:3
378:11 379:4
381:4

**live**  41:7
**llc**  1:14,14,15
  1:16,18 3:2
**llp**  2:4,9,14,18
  2:23 389:8
**loan**  136:10
  338:11 370:4
**loans**  92:6
  367:22 372:11
  377:22
**lobby**  243:11
**lobbying**
  242:22
**local**  280:11,14
  280:17
**located**  9:16
  100:20 312:6
**location**  9:15
**locations**  53:19
**lock**  332:6
**lola**  186:5
**lomic**  357:11
**lomicka**  69:10
  69:24 70:3,4
  139:10 311:4,5
  313:18 357:14
  357:15,16
**lomicka's**
  310:20
**lon**  106:6
**long**  39:24
  74:22 75:1,4
  103:5,6,9,10
  142:18 151:11
  225:24 226:2

256:12 304:20
305:24 349:15
383:9
**longer**  40:21
  41:2,8 187:1
  188:19 189:5
  217:19 254:23
  277:12 287:14
  299:9 312:20
**look**  13:19
  26:13 35:18
  45:13 48:14
  70:14 78:2
  88:18 95:16
  96:8 97:2 98:1
  99:21 100:4,9
  100:12,18
  101:11,17
  105:16 107:18
  116:24 126:3
  126:12 130:17
  132:10 138:18
  142:20 152:4
  160:25 173:16
  190:21 196:13
  206:15 207:13
  209:18 214:11
  214:11 218:5
  224:6 226:11
  226:12,16,22
  257:15 258:9
  263:6 272:13
  278:23 282:4
  289:14 296:10
  304:19 314:21

317:4 318:17
319:10 324:15
334:14 337:12
342:24 354:15
357:9 373:3
376:1 383:3
398:20 400:19
**looked**  101:6
  101:22 107:17
  122:17 168:8
  191:8 196:19
  227:14 239:12
  249:1 254:4,5
  261:19 274:13
  318:20 325:11
  396:6 400:18
  400:20
**looking**  20:13
  22:6 24:20
  29:16 35:22
  45:20 47:17
  52:5 67:12
  70:15 77:20
  78:5 84:5
  85:14,19,22,23
  90:21 92:19
  113:8,17,23
  119:24 122:13
  122:16 123:18
  125:7 126:5
  127:3 128:3,4
  150:5 154:22
  155:1 166:20
  184:3 191:15
  205:11 207:8

208:4 210:13
211:17,20
220:11 244:18
245:7 271:6
275:20 276:3
283:7 285:3
295:7 325:20
339:7 350:22
353:5 357:17
363:20,20
368:11 369:16
375:17 379:7
**looks**  81:19
  136:15 218:2
  252:18 255:6
  267:24 275:24
**lose**  239:3
**losing**  128:12
**loss**  129:2,4,6,9
  129:11 234:17
  321:17 322:18
  323:9 325:24
  325:24,25,25
  336:18 339:5,7
  342:1
**losses**  104:25
  290:17 291:3
  291:15 292:1,3
  292:9 294:11
  297:20 305:6
  315:15 327:7
  330:18 342:7
**lost**  74:21
  226:25 227:1
  294:6,7

**lot** 11:13 15:18 35:4 49:25 54:13 55:19 72:15 97:25 102:2 103:16 103:23 138:1 146:14 177:8 205:21 206:16 212:21 218:3 241:10 242:22 249:9 268:15 270:1 272:19 273:1,22 295:13 302:5 309:14 314:12 363:19 367:14 380:15,15 383:19 392:11 392:16,17 394:16 398:21 399:13 400:3,7 400:21

**lots** 27:16 367:13

**low** 27:16,17 107:18 136:14 324:24

**lower** 26:9 27:11 47:9 70:16 72:16 84:18,21 86:1 86:14,15 131:9 133:14 212:1 230:12 266:20 325:5,10 331:1

364:17 373:24 374:6,11 377:6

**lowered** 359:11 359:12,13 361:21 376:6

**lowest** 47:19 48:1,10 63:17 98:13

**ltm** 260:2

**lunch** 185:21

**lynd** 15:24,25 188:7 189:17 244:7 262:12

**lynne** 175:19

**m**

**m** 83:14

**made** 30:23 31:2 33:2,5 58:5 62:3 116:10 131:12 140:7,23 141:25 144:23 147:11 165:2 165:16 179:11 180:20 182:2 182:20 183:7 213:1 254:13 256:14,16 291:18,24 298:9 308:22 317:2 321:21 330:14,16 331:7 332:22 332:22 335:18 335:24 347:18

351:18 360:2 360:17 365:22 372:9 376:1 391:18 392:25 393:1 395:10 395:11,12,23 406:5

**madison** 2:4

**magnifying** 167:17

**mail** 4:12,14,16 4:18,20,21 5:1 5:3,4,7,11,13 5:15,20,23 6:1 6:2,4,5,7,8,14 6:15,17,19,20 6:22,24 7:1,2,4 7:6,8,9,11,12 7:18 12:17,18 12:25 13:3 45:11,11 75:13 77:20 80:16 89:20 90:25 91:2 92:8 102:21,21 106:8,17 107:15,17,22 110:13,14 123:19 124:5 125:8 127:17 130:21 131:24 132:11 137:3 138:19 142:9 142:14 173:3 173:16,17

186:4 240:4,5 240:13,21 241:1 248:16 248:25 249:1 249:19,20,23 250:11,12 251:12,17 252:9 255:19 255:19 256:4,4 256:8 259:5 263:4,8,11,12 263:16,16 264:11,18 271:11 282:22 282:24 285:12 285:13,17 311:4 313:12 313:12,14,17 313:21 314:21 314:22 316:17 317:1,5,5 319:1,2,8 325:11 330:2 345:14 357:9 358:4,4 359:20 359:22 361:11 361:11,12,14 361:20 363:3 365:3,4 369:9 369:15,18,23 371:19 372:24 373:4 374:1,12 375:21 376:23 377:1 379:18 379:21,23

387:5,8
**mail's** 257:17
**mailing** 130:22
  357:10
**mails** 12:16
  256:24 317:12
  342:23 373:10
  389:15
**main** 22:20,24
  51:8,9 220:4
  259:22
**maintained**
  50:2
**maintenance**
  42:13 140:5
  352:21,24
**major** 6:11
  71:21 284:22
**majority** 47:18
  161:1 203:19
  283:15 346:13
**make** 32:22
  39:17,18 40:12
  40:15 43:7
  54:15 56:4
  59:25 72:4
  93:25 96:16
  111:19 128:24
  129:22 130:11
  131:13 134:3
  136:16 137:11
  137:12 142:10
  143:19 145:2
  146:17 193:5
  197:23 206:10

207:20 226:17
240:17 254:12
265:21 276:3
287:23 308:9
326:21 331:10
342:3 358:19
359:4 360:7
362:3 370:3,6
371:12,13
375:14 378:13
379:4 380:8,21
383:4 384:23
393:2
**makes** 331:3
**making** 32:11
  121:20 353:8
  379:3 391:13
  395:20 399:4
**malpractice**
  175:9 178:25
  225:20 379:22
  380:22
**man** 27:4 157:5
  300:10
**manage** 177:17
  211:25 265:22
  306:19 378:6
  398:23
**managed** 22:16
  24:5 26:17,20
  26:25 27:4
  28:23 29:1,13
  39:18 43:6
  66:15,16 72:7
  72:9,10 73:14

73:19 98:2,22
189:21 212:17
239:11 260:25
**management**
  5:9 30:2,7
  42:17,22 43:11
  44:15 50:10,24
  54:21 72:19
  88:10 105:4,5
  107:6 143:24
  147:5 151:23
  152:16,19,20
  155:12,24
  156:18 157:5
  157:25 160:9
  160:18,20
  161:2,24 162:5
  163:17 166:17
  168:10 174:18
  174:23 177:13
  177:23 179:15
  184:15 203:14
  203:15,16
  205:19 208:13
  208:17 214:16
  352:8 353:7
  395:5,17
**manager**
  187:17 188:7
**managerial**
  351:7,8
**managers**
  148:7 396:24
**managing**
  72:23 168:18

169:24
**manipulate**
  118:5
**manpower**
  306:16
**marc** 2:22 10:8
**march** 76:22
  92:4,5 100:7
  166:9 233:15
  368:25 376:25
  381:11 388:5
  400:3
**margin** 26:4
  27:9,11,25
  28:5 49:9
  50:21 70:20
  71:13 87:9,18
  88:4 89:2
  96:20 104:6,25
  105:11 106:5
  106:11,17
  107:24 108:10
  109:2,2,13
  110:3,8,19,23
  110:23 111:17
  113:6,8 114:2
  115:4 116:11
  120:6,8,21
  121:1,12,24
  122:5,18 123:2
  126:18 127:24
  128:2 211:10
  241:21 245:20
  272:8,12,14,14
  272:24,25

297:10 320:17 324:24 378:11 381:5

**margins** 26:9 26:14 27:15,16 50:15 51:2,5 51:11,14,17 96:3 107:18 108:16 112:7 113:2 116:9 120:7 126:21 127:3,11 157:16 266:13 268:6,7 271:23 272:2,3,22

**marion** 28:5 115:1 320:16 320:19

**mark** 80:23 117:25 118:17 118:17 194:16 194:17 258:22

**marked** 17:10 45:7,10 69:6 75:10 80:8 102:7,20 107:11 118:25 123:13 124:18 124:22 142:6 154:16 167:13 172:24 183:24 186:1 194:21 195:7 199:6,9 201:20 239:25 248:12 255:14

257:25 258:25 262:16 273:25 282:18 285:8 289:4 313:8 318:23 339:10 345:10 357:5 361:7 362:24 364:24 369:6 372:20 376:20 379:12 381:15 387:2

**market** 39:15 52:7 53:8 55:20 56:6 67:23,23 68:4 68:20,23 295:10 299:12 300:1 301:2 364:13 366:7,8 366:19 367:6 367:13 373:6,9 373:20 374:4,5 374:14 376:4 376:11 383:3 398:20

**marketed** 301:15

**marketing** 158:8 176:22 177:9 301:6 351:23

**marketplace** 368:9

**markets** 20:16 20:16 21:24,25

23:9,17,17 25:3,7,11,13,17 25:19,20,21 26:2 47:14,15 49:22 50:22 52:12,19,20,24 52:25 53:2,22 53:22 54:1,7,8 54:9,19 55:21 61:20 62:4,4 66:17 67:15,16 68:25 203:21 205:12 364:15

**marketshare** 68:23

**marking** 117:19

**markings** 274:8

**marlboro** 338:8,9

**marlette** 200:23 201:2

**marty** 43:4,9 43:24 185:9 269:10 277:24 281:24 282:25 283:2 295:12 356:7 390:11 396:2,6

**massive** 31:16 31:17,19

**master** 6:12

**matches** 152:14

**materials** 384:18 401:8

**math** 65:1 96:6 375:13

**matter** 9:10

**matters** 76:18 76:20 309:15 383:8 399:13

**mayo** 29:17

**mc** 132:19

**mccarthy** 259:6 259:11

**mean** 16:18 21:9 32:13 42:21 53:11 60:12 61:24 66:4 71:1 74:8 92:24 93:13 116:18 129:18 139:18 145:21 147:24 148:22 150:18 153:13 155:2 174:8 176:7 185:2 200:13 209:6 212:21 287:9 299:23 321:15 334:6 336:9 343:1 361:24 362:12 372:13 373:13 374:20 376:3,8,17 379:1 390:16

**meaning** 214:24 215:3

**means** 55:15 60:8 62:14,24

72:6 93:11 130:4 223:16 387:21

**meant** 15:19 16:9 24:12 53:15 55:15 56:22 57:10,17 58:11 59:4,12 59:22 95:7 103:20 121:4 130:1,7,14 167:17 221:25

**measured** 64:9

**media** 9:8

**median** 66:3,6

**medicaid** 29:6 29:12,14,14 63:7 72:16 98:1,3,7,12,18 98:21,25 99:1 219:7,14,19,19 219:23 227:15 230:14 233:2 243:18 252:19 253:12 255:5

**medical** 184:18

**medicare** 24:4 24:15 98:23 100:25

**meet** 14:22,25 15:3,6 58:19 217:18,21 278:5 375:19 375:25 376:15

**meeting** 7:15 165:24,25 170:8 381:24 383:18,21,24 384:1,6,15

**meetings** 13:15 171:21 384:10 393:13 394:9 394:24,25

**megan** 133:4 248:22 282:25 357:16 379:19 379:19

**member** 398:4

**members** 383:19 396:11 398:13,14

**memo** 155:6,11 168:8 316:20

**memorial** 311:7,17 333:20

**memory** 286:16

**mention** 15:10 16:3

**mentioned** 15:11 112:25 112:25 159:3 174:21 192:11 234:9 292:7 372:1 378:21 395:10 399:18

**meridian** 3:3

**mesquite** 325:24 326:12

326:16,21,23 326:24,25

**met** 11:10 14:8 15:5 376:14 385:8,9,12

**method** 155:13 155:15

**methodology** 5:10 381:9

**michael** 259:6 379:18

**microphones** 9:4

**mid** 397:13

**middle** 47:2 151:5,22 155:23 168:3 191:14 193:13 194:6 245:2,3 266:22 346:6 373:23,25 377:4

**migration** 69:1

**mike** 15:24,25 30:24 86:16 122:23 133:5 139:8,10 141:21 188:7 189:17 221:5 221:11,12,14 244:6 249:10 249:17 250:3,6 251:20 262:12 292:7 323:24 324:16 332:16

332:22 378:20 388:12 392:5 394:18 395:23 399:18,21 400:17

**mike's** 240:15 241:15 248:3 249:2,21 309:23 336:12 336:14

**millennium** 74:7,21

**miller** 30:9,12 31:4,8 43:5,8 43:17,23 150:7 255:20 257:23 356:7 376:24 377:1,14 391:7 391:16 392:24 392:25 393:18 393:22 395:13 396:1 399:5,24

**miller's** 394:7

**million** 28:8 35:19,24,24 87:16,17 110:15,24 112:15,16 115:23 121:9 127:23,25,25 128:2 129:20 129:22 131:4,4 131:12 132:3 134:12 135:16 135:17 136:16

**[million - model]**

| | | | |
|---|---|---|---|
| 140:11,11,17 | 229:3,22 231:9 | 340:9,13,16,19 | **mitchell** 173:4 |
| 141:4,8 145:13 | 231:14,24 | 357:19 358:21 | 175:19 |
| 145:16 146:4,6 | 233:23 234:18 | 358:24 359:4 | **mitigated** |
| 146:6 148:11 | 237:16,16,20 | 359:16 362:5 | 131:2 |
| 149:4 151:4,7 | 245:12 246:2 | 370:1,5,6 | **mix** 53:21 |
| 151:8,10 | 248:6 251:23 | 372:6 374:21 | 67:25 68:1 |
| 152:17 153:1,3 | 254:6,8,12 | 375:23 376:6 | 101:18 102:3 |
| 153:4,5 154:4 | 259:19,19,21 | 376:11,13,14 | **mkramer** 2:24 |
| 157:1 165:2,5 | 260:1,2,15,16 | 376:15 379:10 | **mod** 138:19 |
| 173:5,9,14,19 | 260:17,19 | 379:11 388:14 | **model** 33:23 |
| 173:25 174:4 | 262:19,20 | **million's** 220:1 | 75:15,19,20 |
| 175:10,12,14 | 264:2 265:12 | **mind** 55:4 | 77:15 80:18,19 |
| 175:14 179:2 | 265:13,18,19 | 233:5 261:24 | 80:21 82:5,16 |
| 179:22,24,25 | 267:13,15,23 | 319:22 320:15 | 84:2,4,5,7,8 |
| 180:10,12 | 268:1,13,13 | **minded** 291:14 | 85:9,23 86:2 |
| 181:2 183:1,2 | 273:20 275:13 | **mine** 90:8,9 | 87:16,21 88:17 |
| 183:17 191:25 | 275:13,15 | **minimal** 388:18 | 89:11,22 90:19 |
| 192:5,18,23 | 277:6 279:5,9 | **minimized** | 90:22 91:5,13 |
| 193:10,24 | 279:19 280:7 | 293:16 | 93:16,20 94:4 |
| 195:19,23 | 280:12,16 | **minute** 71:6 | 97:1,6,16 |
| 196:25 197:3,7 | 281:11,18 | 263:16 337:2 | 100:5,6,16 |
| 197:9,12 | 282:11 283:2 | 388:22 | 104:17,21 |
| 198:22 200:4 | 286:22,23 | **minutes** 102:10 | 105:3 106:15 |
| 200:15 201:3,4 | 287:3,10,24,25 | 185:16 342:21 | 108:1,17,19 |
| 201:13 202:10 | 288:1 314:25 | **mis** 157:10,21 | 109:1,6,9 |
| 203:2 204:23 | 314:25 315:16 | **misspoke** | 113:9 114:4,10 |
| 211:1,1 218:3 | 320:18 321:9 | 202:18 | 120:6 122:21 |
| 220:2 221:3,3 | 321:25 324:17 | **misstates** | 126:20 127:16 |
| 221:4,7,16,18 | 324:17,20 | 360:12 | 127:20 130:23 |
| 221:18 222:16 | 329:1,2,14,15 | **mistake** 205:10 | 131:1 138:12 |
| 222:20,23 | 330:9,9 332:7 | **mistaken** | 138:14,19 |
| 224:9,10 | 334:19,20,21 | 383:22 | 140:9,10,13,23 |
| 225:12,13 | 336:7 338:25 | **misunderstood** | 141:14 152:5,7 |
| 227:13,21,21 | 339:2,3,4,4,5 | 253:14 269:1 | 152:11,16,20 |
| 228:1,3,7,12 | 339:23,23 | | 153:1,4,21,25 |

**[model - navigate]**                                        Page 56

154:4 181:20 200:25 206:8 209:23 210:13 226:5,14 229:9 229:18 234:8 234:10,14 235:6 238:20 238:21,23 259:17 263:19 264:21 281:8 285:2 287:12 288:14 294:4 294:12 295:20 296:18 297:14 297:17,18,21 297:22 298:1 298:12,20,25 308:13,15,16 313:18 316:25 317:2 320:24 329:4 330:25 331:4 333:4 334:3 361:21 361:24 362:4,7 362:12,13,14 372:6

**models** 32:7 372:7 399:23

**moment** 19:2 335:20

**mon** 254:21

**monday** 15:9

**money** 40:5 44:18 141:25 218:3 219:14

223:4 242:10 242:11,23,24 243:20 287:11 294:6,7 347:15 348:3,9

**month** 40:10,11 149:14 180:1 278:19,20 357:18 387:17

**month's** 254:10

**months** 40:1,3 40:10 74:13 99:22,23 100:11,14,17 140:25 141:1 178:7 192:17 192:18,21,22 193:6,14,21,23 193:24 213:6 246:19 247:13 254:5 283:15 289:21 294:5 294:13 295:22 296:2,7,21 299:16 305:9 309:21 310:4 323:1 381:13 392:13

**moody** 133:4 240:4,5,14 284:16 357:10 379:20,22

**moody's** 369:24,25 370:8,9,11

377:3

**morgan** 69:13

**morning** 9:1 11:9 259:12

**moss** 2:18 10:15,15 117:19 118:20

**motivation** 353:18

**move** 48:17

**moved** 153:16

**movement** 23:15 213:14

**moves** 89:14

**moving** 80:9 127:23

**multiple** 297:1 299:3 315:1,2 315:9,13,23 317:13 318:15 324:4 326:12 327:2 328:18 328:25 329:13 330:15 333:5 333:10 337:21 338:20 362:19 364:4

**multiply** 165:5 165:6

**mute** 9:6

**mysterious** 257:1

**n**

**n** 4:1

**naftalis** 2:9

**name** 9:18 15:22 20:10,14 23:8 243:7 284:14 299:14 299:21,24 389:8

**named** 389:20 390:6 391:3 403:7,16

**names** 14:3,4 148:6

**naming** 391:16

**naples** 162:21 162:22

**narrow** 291:14 291:25

**nashville** 8:7 9:17 379:8

**national** 66:2 101:4

**native** 81:11 84:1 89:10,15 117:20 118:18 194:17 196:8 196:14 199:8

**natural** 37:19

**nature** 23:9 39:22 87:20 187:18 262:1

**navigate** 89:12 119:7,12

**near** 327:21

**nearby** 186:17
295:10 323:8

**nearly** 97:9
99:25

**necessarily**
60:12 65:22
197:15 205:2
212:19 228:16

**necessary**
352:24 354:4
393:7 406:6

**need** 12:10
17:11 22:11
37:3 39:8 40:4
44:15 91:20
102:9 105:16
117:12 119:2
161:25 162:10
162:16,22,23
177:12 184:20
194:13 195:4
228:20,20,22
240:15 265:13
282:1 307:11
308:3 322:4
334:18 337:2
340:6 370:15
374:15 376:5,6
376:8,14 399:2
401:13

**needed** 37:6,25
50:5 106:4
139:1 146:16
211:14 321:9

331:5 352:21
353:9 354:16
355:10 356:9
370:23 377:23

**needs** 48:16
62:20 227:22
353:13

**negative** 74:6
74:20 85:6
86:24 130:12
140:23 189:10
218:22 226:22
230:22 232:7
232:10 244:13
290:20 303:4
304:6,20
306:10,17
314:17 315:8
315:21 318:2
318:16,17
319:13 322:25
324:22 331:1
338:25 339:2

**negatives** 72:25
73:1

**negotiated**
319:25

**neighborhood**
87:17 238:18

**net** 46:22 47:10
77:22 78:15
84:17,21,21
91:15,22 92:9
92:21 95:5
97:4,14 138:8

156:4,13
188:21,22
189:9,10,14
218:16 219:10
222:22,23
236:11,23
245:11 267:2,3
267:14,15
321:20 327:15
345:24 348:24
348:25 349:4,8
349:9,16,17
350:18

**network** 25:14
25:15 49:20,23
50:8 51:13
352:11,14

**networking**
334:7 335:10

**never** 13:2 19:9
19:13 72:18
93:24 250:6
251:7 278:6
319:22 364:8
375:1,10
383:17 384:17
385:12 394:22

**nevertheless**
342:4

**new** 2:5,15,19
2:24 3:6 26:1
39:14 42:16,22
44:3,10 50:24
77:2 87:19,19
87:19 97:22

145:25 149:13
159:4 200:22
211:15 216:21
270:4 311:8
312:8 320:8,15
344:7,8,21,22
393:13 396:11
396:19,20
397:2,6,24,25
398:12,17,18

**newman** 2:3
4:4 10:1,1 11:7
11:10 14:20
17:2,7,11,15
18:15,19,23,25
21:11 22:25
29:8 32:9 33:4
33:8,17,19,22
34:5,8 36:3,21
41:9 45:8 48:7
49:14 52:3
53:4,13 55:5
55:13 56:11
57:2,11,16,24
58:8,23 59:10
59:20 60:13,21
61:3,21 62:21
63:12 69:4,7
70:24 71:3,10
75:8,11 80:11
80:14,25 81:4
81:5,13,16
82:3 83:2,12
83:16 85:15,18
85:20,21 87:3

88:6 89:3,24
90:3,5 92:1
93:8 96:7,24
101:5 102:6,11
102:18 105:25
107:10,13
112:23 113:24
114:6 116:3
117:2,5,14,21
117:25 118:7
118:12,16
119:3,5,15,21
120:1,3,14,15
121:23 123:12
123:15 124:2,8
124:11,14,15
124:24 126:7,9
126:11 128:22
132:14,17
134:1,5,9,21,23
135:1,4,8,13,14
138:21,24
142:3,5,8
150:13,20,24
151:1 154:6,10
154:18 164:3
164:18 165:14
167:4,12,15
169:14,20
170:19 171:7
171:12 172:4
172:14,22
173:1 179:6
183:5,21,23
184:1 185:10

185:13,18
186:2 190:17
190:20 191:2,3
194:12,20,24
195:2,6,8
196:15,24
197:10,23,25
199:2,7,10
201:19,22,24
202:16,20,23
202:24 209:20
209:22 210:1,3
210:8,11,12
222:18 223:15
224:1 226:8,10
227:1,7 228:6
229:6,12,13
232:2,15,18
239:24 240:2
244:8 247:5
248:11,14
251:3 253:13
255:12,15
257:9,20 258:4
258:11,13,23
259:3 262:15
262:21,25
263:3,24
270:19,22
271:4 273:9,10
273:24 274:1
279:22 282:17
282:20 285:1,7
285:10 287:16
288:9,11 289:6

290:18 291:5
292:4 295:4
297:4,25
299:11 302:9
304:13,18
305:10 306:14
307:5,13,19,23
308:1,8 309:7
310:8,10,15,18
310:19 313:10
318:9,25
322:14 323:16
324:11 327:18
328:12 331:13
331:15 332:19
333:2 336:10
337:11,18
339:9,11,17
345:12 346:23
354:1,17
355:25 356:11
357:7 360:23
361:6,9 362:23
363:1,24
364:23 365:1
366:5,21 367:4
367:10 369:2,8
371:7 372:17
372:22 375:3
376:19,22
379:16 380:11
381:17 382:10
383:15 387:4
388:2

**nice** 28:3 41:7
**night** 15:9
**nine** 64:25
330:8
**nobody's**
257:18
**non** 50:1 62:22
331:24
**nonattractive**
67:23 68:18
**nondivested**
120:25
**nonevent** 342:9
**nonprofit**
323:15
**nonsalaries**
205:3
**nonsalary**
207:15
**nonurban**
20:16,22 21:7
21:21 23:11,17
25:11,17,19,20
40:22 49:18,22
60:2,6 68:22
**normalized**
71:19 73:7,9
250:16,19
251:5,13
357:18
**normally** 235:1
**nos** 144:1
**notary** 8:16
403:9 406:13
406:19

**notation** 133:1
133:2 176:13
180:1
**note** 9:4 11:15
168:2,2,15
169:5 180:6
197:20 249:16
257:16 267:7
267:11 404:10
**noted** 135:4
406:7
**notes** 74:5
131:1
**notice** 8:10
**notwithstandi...**
212:7 281:6
**nov** 103:10
**november**
102:23 103:11
104:13,21
106:14,15
124:5 320:23
358:9 359:9
372:14 396:9
396:21 397:20
398:5
**number** 39:17
48:18 65:9
70:16 78:3,19
79:8 81:9,10
94:19 95:11
98:25 106:21
109:5 111:3
115:22 124:10
129:20 130:8,8

130:24 132:2,3
135:11 148:5,5
149:8 153:8
156:7 160:21
161:4 165:6
168:11 173:19
174:1,4,8
175:11 190:18
192:6 193:5
196:25 197:2
197:12 200:4
201:1,1 211:18
211:21 218:3
219:9,10,11
221:21 224:21
224:22 230:1
232:5,20
238:20 259:7,7
265:20 289:20
290:17 314:9
322:2 327:4
337:14 340:18
359:18 361:12
368:10 386:9
**numbers** 21:14
21:14 81:12
99:8 111:20
112:20 114:9,9
120:17 121:10
128:4 129:2,7
174:10 215:2,4
216:3 217:7
224:13 247:20
251:24 386:3
387:17,18

388:7
**nurses** 212:20
**nw** 2:9
**nwc** 334:6
**ny** 2:5,15,19,24
3:6 404:15

**o**

**o** 172:9
**oaths** 403:10
**object** 22:8
28:25 32:4
35:13 36:16
40:25 51:24
53:12 55:10
60:9 61:2,10
62:15 63:1
86:5 88:1
91:17 100:22
101:21 105:24
121:22 134:25
135:2 149:11
178:19 182:23
197:5 222:14
223:10,19
227:23 244:5
247:2 253:5
263:23 279:21
284:18 294:24
297:2,7 302:3
306:11 318:8
332:15 353:24
363:13 371:3
382:18
**objection** 36:17
48:3 49:2 54:2

55:23 57:3,18
58:5 59:5,14
88:21 93:4
95:20 112:8
128:8 163:14
164:15 165:11
167:1 169:17
170:17 171:2
172:11 183:14
202:15,17
250:22 257:7,8
297:7 299:5
322:7 324:6
327:5 328:5
346:19 356:4
360:12 366:16
366:24 367:9
380:6 387:22
398:1 399:11
**objections** 8:12
12:3 399:9
400:11
**objectives**
141:24
**obligation**
236:6 340:12
**obligations**
397:24
**observation**
360:18
**observation's**
219:25
**observed**
102:14 185:21
270:25 337:7

**[observed - okay]**

389:1 402:5
**obtain** 351:22
**obtained** 19:22
**obviously**
38:11 105:21
141:10 142:19
152:18 174:9
189:2
**occur** 314:12
**occurs** 242:8
**october** 1:24
8:4 9:3 70:19
74:3 148:4
234:17 359:8,9
396:13,14
403:18 404:3
**odd** 25:16
359:16
**offering** 368:12
**offhand** 46:5
100:3 228:4
268:1
**office** 162:9,11
162:12 170:12
170:14,21,22
170:22 171:1,1
171:11,15
172:9,10,16,19
186:20,21,22
187:17 300:25
**officer** 144:16
395:25
**officers** 149:15
390:10 391:8

**offices** 8:5
**officials** 311:14
**offset** 63:8
123:21 125:10
125:25 129:16
130:3 131:24
132:1
**oh** 10:3 14:18
17:7,11,13
19:2 79:13
80:25 81:19
83:1 90:4
113:21 124:2
133:1,19
191:10 199:3
199:20 202:20
203:11 217:23
221:24 226:8
227:2 255:12
258:5 262:17
262:25 268:24
271:13 276:3
286:10 310:10
335:4 357:4,11
382:4 396:20
**okay** 11:8 12:9
12:21,24 13:4
13:6,11,18,24
14:7,12,21,24
15:2,6,22,25
16:7,25 17:16
17:18,23 18:1
18:6,23 19:1,7
19:12,20 20:6
20:6,9,12,20

21:4,16 23:1,5
23:14,21,24
24:9,17,20,25
25:6,20,24
26:3,8,12,20,24
27:4,8,13 28:9
28:20 29:20,25
30:7,11,18
31:3,17,23
32:10,19,20
34:3,17 35:7
36:4,6,22
37:15 38:3,8
38:15,22 39:2
39:11,23 40:21
41:10,12,21,25
42:6 44:17,22
45:9,17,24
46:8,12,18,20
47:1,5,8,12
48:14,22 49:15
50:14,18 51:1
51:15 52:4,18
53:5,11 55:6
55:14 56:12,16
56:20 60:7
61:1,22,24
62:2,6 63:13
63:16 64:2,3,5
64:15 65:3,6
65:14 66:19,25
67:2,8,20,21
68:10,14 69:3
69:8,24 70:2,8
70:13,18 73:1

73:12,17 75:7
75:12,20 76:5
76:14,17,25
77:6,11,18
78:2,8,13,19,24
79:6,17,23
80:5,13 81:3,6
82:10,12,21
83:4,15,17,21
83:24,24 84:13
84:17,20,24
85:4,8,14 86:1
87:4 88:7,15
89:4,9,16,25
90:6,15,18,21
91:12 92:7,18
92:24 93:9,12
93:12 94:2,10
94:14 95:2,10
95:15 96:25
97:13 98:17
99:3,3,17,20
100:8,15,18
101:17 102:12
102:19 103:4
104:12 105:9
105:15,20
106:16,25
107:9,14 108:4
108:8,9,14,25
109:11,17,22
110:3,7,12,22
111:5,6,9,20
112:1 113:6,6
113:21 114:17

**[okay - okay]**                                                          Page 61

| | | | |
|---|---|---|---|
| 114:24 115:4,7 | 153:14,18 | 194:1,11,11,16 | 231:1,22,23 |
| 115:11,14,20 | 154:2,5,6,13,19 | 194:20 195:3,9 | 232:3,13,19 |
| 115:24 116:17 | 155:3,8,18,23 | 195:13,16,24 | 233:6,9 234:1 |
| 116:19,22 | 156:7,12,16,16 | 196:4,7,12,16 | 234:8 235:19 |
| 117:10 118:12 | 156:24 157:4 | 197:2,11,20 | 236:19 237:6,9 |
| 118:22 119:20 | 157:20 158:11 | 198:1,9,18 | 237:13,13 |
| 119:22 120:4 | 158:14,24 | 199:1,5,25 | 238:1,4,11,23 |
| 120:21,24 | 159:15,25 | 200:9,17,20 | 239:6,23 240:3 |
| 121:14,19 | 160:5,14 161:7 | 201:8,12,18,25 | 240:20,25 |
| 123:5,8,11,16 | 161:11,20,23 | 202:7 203:13 | 241:3,6,18 |
| 124:8,25 125:4 | 162:8,13 163:2 | 203:16,25 | 242:13 243:7 |
| 125:5 126:12 | 164:19,19,25 | 204:4,14,20 | 243:14,22 |
| 127:5 129:3,16 | 165:3,15 166:1 | 205:4 207:18 | 244:3,9,20,24 |
| 129:25 130:13 | 166:4 167:11 | 208:14,25 | 245:8,9,19 |
| 130:16,20,21 | 168:1,1,14 | 209:15,18 | 246:12,12 |
| 131:7,19,23 | 169:15 170:4,9 | 210:3,10,11,13 | 248:15,19 |
| 132:4,10,10,18 | 170:11 171:20 | 211:23 212:23 | 249:5 250:10 |
| 132:23 135:1 | 172:5,8,15,21 | 213:12,23 | 250:15 251:4 |
| 135:13,25 | 173:9,15,24 | 214:3,7 215:1 | 251:10,19 |
| 136:8,18 137:1 | 174:3 175:16 | 215:11,14,16 | 252:4,6,21,25 |
| 137:2,6,11 | 175:21 176:1,5 | 215:25 216:20 | 255:11,12,16 |
| 138:4,7,13,18 | 176:13,19 | 217:5,13 218:1 | 256:10,15,20 |
| 138:18,25 | 177:4,20 | 218:5,14,19,20 | 256:23 259:4 |
| 139:4,20,25 | 178:10,14 | 219:3 220:8,11 | 260:5,9,13 |
| 142:4,16,21 | 179:7 180:7 | 220:16,20 | 262:14 263:4 |
| 143:2,6,18,25 | 182:12 184:2 | 221:9,14 222:2 | 263:15,25 |
| 144:4,7,8,9,13 | 184:17,25 | 222:5,10,19 | 264:4,9,23 |
| 145:6,16,24,24 | 185:13 186:3 | 223:2 224:2,5 | 265:1,8,15 |
| 146:9,13,19,22 | 186:14,25 | 224:21 225:1,4 | 266:5,8,12,19 |
| 147:10 148:11 | 187:3,9,13,19 | 225:8,11,16,22 | 266:19 267:1,7 |
| 149:3 150:14 | 188:1,10 189:9 | 225:25 226:3,9 | 267:12,18,20 |
| 150:16,25 | 190:4,7,16 | 226:13,21 | 268:5,11 |
| 151:2,7,17,17 | 191:2,11,13 | 227:3,18 | 269:13 270:5 |
| 151:22 152:4,6 | 192:5 193:8,12 | 228:12 229:1,5 | 270:16,19,23 |
| 152:14 153:12 | 193:15,25 | 229:20 230:16 | 271:5,13,17,22 |

272:1 273:7
274:2,9,15
275:2,5,11,18
276:10,11,14
276:16,20,23
277:2,6,10
278:9,12,19,23
279:3,17 280:1
280:6,15,21
281:9 282:7,21
283:6,10,17,19
284:4,13,15
285:6,11,15,23
286:4,17,21
287:2,6 289:3
289:10,18
290:4,8 291:16
293:14 295:16
295:18 296:5
296:18 298:19
298:24 300:5
301:5 302:10
303:2,24 306:5
306:8,15 307:9
307:12,23
308:3,5,6,20,23
309:19 310:1,7
310:7,20 311:3
311:23 312:1
312:17,17
313:1,11 314:4
315:6 316:22
317:4,16 318:1
318:6,14,22
319:1,22 320:3

321:7,13,23
322:4,20,23
325:14 327:1
327:19 328:2
328:21 329:7
329:11 330:3,7
330:13,22
331:9,12 332:3
332:5,20,24
333:3,9,17,24
334:5,10,12
335:5,12
336:23 337:2,4
337:12,20,25
338:14 339:20
340:1,10 341:1
341:9 342:4,13
342:18 343:3,8
343:25 344:3,4
344:11,17,21
345:13,16,22
346:6,11 347:2
347:24 348:2,7
348:17 349:7
349:22 350:7,9
350:13,19,19
350:23 351:3
351:19 353:4,4
353:17,21
354:2 355:4
356:14,20
357:8,23 358:3
358:6,11
359:19 360:5
360:24 361:2,5

361:10 362:22
363:2,10,25
364:5,6,12,22
365:2,8,14,21
366:6 367:17
368:7,10 369:1
369:9,14,18
372:23 373:3,9
373:15,22
374:3,9,12
375:4,14
376:18,23
377:13 379:17
380:19 381:14
382:11 384:8
384:17 385:12
385:21 386:5,8
387:15 388:3
388:12,20,23
388:24 389:13
390:3,19 391:1
391:5,13
392:24 396:14
402:2
**old** 2:19
**older** 66:10
90:8
**once** 39:3,13
40:11 43:20
144:17 165:16
217:18,21
234:24 242:9
262:5 267:3,4
273:3 292:21
293:2 359:12

**one's** 257:17
294:9
**ones** 43:5 292:1
326:10,17
396:5
**op** 272:18
**open** 118:21
401:17
**opera** 41:4
**operate** 45:22
88:13 320:5,7
320:9
**operated**
230:10
**operating**
103:21 112:5
125:23 207:14
210:25 218:15
222:23 223:14
223:17 267:9
270:15 292:22
320:14,21
338:22 355:12
355:23 377:8
378:9,21
**operation**
158:5 338:7
**operational**
351:8
**operations**
222:12 223:8
248:6 260:7
338:3
**operator**
272:19

**opine** 302:19
304:1,5 306:5
**opinion** 32:17
293:5 306:21
383:7 385:17
386:12,22,25
**opinions**
395:15
**opportunities**
18:10 19:9,15
212:1 289:25
**opportunity**
65:18 68:25
142:19
**options** 55:19
**oral** 12:1
**order** 37:25
130:19 191:10
191:12 198:1
198:10 367:17
374:5 398:16
**ordinary** 225:9
225:17
**oregon** 28:7
274:12 279:23
**organization**
391:3 394:1
395:16
**original** 21:2
35:3 88:10
102:1 114:9
195:18 196:6
197:20 303:25
324:20 364:3
385:1

**originally**
104:10,10
131:11,16
138:2 150:9
264:2
**orseck** 2:8
10:12,12,19
14:14,16,23
15:3 17:12,14
18:13,17,22
21:9 22:8,10
28:25 32:4,23
33:5,11,18,20
34:3 35:13
36:16 40:25
48:3 49:2
51:24 52:22
53:12 54:2
55:10,23 56:24
57:5,14,21
58:1,13 59:5
59:14 60:9,19
60:25 61:2,10
62:15 63:1
70:22 71:1,5
80:9,13,22
81:3,25 83:4,6
86:5 88:1,21
91:17 93:4
95:20 96:18
100:22 101:21
105:24 112:8
113:22 114:5
116:1,25 117:4
118:4 119:13

119:16,23
120:2 121:22
123:25 128:8
134:19,25
135:3,6,10
141:19 149:11
150:18,22
163:14 164:15
165:11 167:1
169:12,17
170:17 171:2
171:23 172:11
178:19 182:23
183:14 194:22
194:25 195:3
196:13,22
197:5 202:15
202:18,21
222:14 223:10
223:19 226:25
227:2,23
231:16,19,22
244:5 247:2,15
250:22 253:5
257:7 258:21
259:2 263:23
279:21 284:18
287:8 290:13
290:24 291:21
294:24 297:2,7
299:5 302:3
304:9,17 305:1
306:11 307:2,8
307:10,17,20
307:24 308:3

318:8 322:7
323:2 324:6
327:5 328:5
332:15 346:19
353:24 354:7
355:19 356:4
360:12 363:13
365:25 366:16
366:24 367:9
371:3 374:24
380:6 382:18
386:19 387:22
393:5 394:3
398:1 399:11
401:14,22
402:2 404:1
**orseck's** 399:2
**ottinger** 240:4
240:6,14
248:22 250:10
250:12 252:8
372:25 379:19
**ought** 91:24
93:23 94:18
214:23 249:17
250:2 375:24
**ourself** 392:3,3
**outcome**
189:20 403:16
**outer** 259:21
260:17
**outlier** 137:25
**outline** 278:6
**outlined** 52:1

**outlook** 69:12
**outpatient**
23:16,25 24:5
24:11,16 54:25
101:18,23,24
102:3
**outreach**
353:12
**outside** 225:9
225:17 391:2
**outweighed**
335:3
**overall** 78:25
79:9 121:11
207:9 379:5
**overallocate**
185:1
**overby** 310:24
**overcome** 53:7
53:17,25 55:8
55:19
**overhead**
111:16,18
147:2 158:22
159:2 168:9
175:13
**overlapping**
309:6 371:2
**overly** 293:6
**overstated**
112:7
**owe** 347:15
**owed** 346:1
347:9 348:20
348:20

**own** 112:5
129:15 177:17
187:16 200:15
213:25 308:22
312:20 360:10
366:23 388:4
**owned** 388:18

**p**

**p.m.** 185:20,24
240:16 270:24
271:3 337:6,10
388:25 402:4,9
402:12
**page** 4:2,9 18:1
18:17,20 20:7
24:18 28:21
29:16 38:8,15
41:10,14 46:16
46:18 47:2,12
52:4 56:17,17
58:21,21 59:1
59:1 63:13,24
64:20 65:6,10
66:19,23 67:8
67:11,18,19
68:9,11 69:10
71:12 73:18,20
77:7,15,19
78:2,4,5 79:18
81:20 82:20
83:11,13 84:4
84:6 89:21
90:3,19,24
96:21 101:13
107:16 108:9

113:7,15,16,17
113:20,23
119:9 126:13
126:15 133:18
143:25 148:20
149:1 150:14
151:5,23 155:8
155:24 156:19
157:5 158:7
160:5,9,25,25
162:4,4 164:19
168:1,3 169:3
173:4,14
176:14 180:1
186:10,11
190:24 191:15
202:8,14
215:16 218:10
223:6 224:2
240:10,11
241:19 244:9
244:24 246:12
248:20 251:11
251:11 256:12
259:6 262:18
266:6 267:18
267:20 271:7
271:18 274:16
275:7,8 276:13
276:21 278:10
286:1,5,7,8,12
286:17,22
289:12,19
313:13 314:22
317:6,7,7

319:3,6,10,17
333:3 339:18
343:8 344:6
345:23 346:6
350:24 352:5
357:9 361:12
364:5 365:15
371:10 373:4
379:22 381:25
382:3 388:9
405:4,7,10,13
405:16,19
**pages** 57:7
80:17,20 81:19
82:5 83:18
89:21 156:19
241:9,10,12
274:10,10
285:18,24
340:11 403:11
**paid** 37:12
216:22 219:22
224:15,20
227:16 233:3
236:1 237:24
244:23 300:11
348:10 349:5
350:14 368:1
374:22 375:1
**paper** 77:10
90:22 339:2
**paragraph**
18:6,16 160:8
191:16 245:3,9
245:15,16

246:15 252:9
289:19 296:11
344:5 346:7,12
352:6 353:5
377:4
**parent** 179:4
223:4,25
245:11,23
246:7 304:11
339:22 341:18
341:22 347:23
**park** 338:8,9
**part** 25:8,13
42:20 76:2
144:24 161:24
174:23 177:18
184:21,22,24
263:13 269:11
270:9,12
294:19 295:1
322:22 323:14
331:24 353:17
**partial** 79:10
192:15 375:8
**participated**
17:23
**particular**
58:16 352:9
353:6 355:5
**particularly**
23:9 259:24
**parties** 259:12
389:12 403:14
**partners** 205:8

**parts** 33:13
288:23
**passed** 104:3
**past** 307:16
**patch** 365:9
**patient** 176:23
229:14 276:6
278:24
**patients** 24:11
26:21,25 40:18
65:19 74:14
212:19 218:20
229:21
**pause** 118:13
118:17
**pay** 98:14,19
98:21 189:2,5
213:8,9,11
223:4 236:6
239:4 242:24
242:24 243:13
246:7 348:13
348:25 349:6,9
349:14 360:9
367:20 378:10
386:13
**payable** 220:12
234:12 235:20
235:21 237:14
238:17 344:23
345:25,25
**payables** 236:1
236:4,6,24
237:10 239:11
327:15 348:10

**paydown** 37:7
37:9,10,24
220:22
**paydowns**
231:12
**paying** 219:16
238:24 385:23
386:14
**payment** 72:17
**payments**
242:12
**payor** 63:4
66:16 98:13
**payroll** 74:17
74:18 212:1
224:15,18
225:3,7 348:11
**payroll's**
224:20
**pdf** 79:25
**peers** 46:23
47:10 52:12,15
63:23
**pending** 12:12
319:21
**pennsylvania**
318:4 326:15
327:9 333:14
333:23
**penultimate**
23:6 245:10
**people** 15:14
16:1 38:18
39:9,9 40:22
46:13 118:19

122:22 130:24
148:4,5 162:18
163:18,19
187:17,20
200:7 205:19
205:20 234:16
254:11 259:7
265:22 283:14
295:8 299:13
299:15 302:6
361:13 394:11
394:19,20,21
396:5,15
**percent** 25:17
25:18 27:18,19
27:20,23,25
28:5,11,14
29:5 37:11
41:22 42:10
45:2 47:6 64:7
64:9 66:2
73:16 78:16,20
79:18,19,19
84:13,14 85:9
85:10,11,11,12
87:10,11,18
91:22 94:24,25
97:8,10 98:1,3
98:4,5,24
101:24 104:9
105:11,14
106:11,18
115:5 120:22
121:1,4,15,21
122:19 123:21

125:10,15,19
125:20,24
126:25 127:12
128:21 130:3
138:8,11,12
140:1,2,6
141:18 156:13
156:19 157:13
157:15 158:15
159:18 161:2
161:12,16,18
161:19,21
163:5,9,21
164:10,20
165:5,6 168:17
168:21 169:9
169:23 175:13
207:17 211:4,6
234:20,22
235:3,4 236:8
236:14,25
237:2,3 266:14
266:15,15,16
268:8,8 271:23
271:24 272:12
272:15,24,25
314:5 315:16
316:19,21,24
317:3 319:12
319:24 320:17
320:25 321:1,8
321:10,21,22
324:9,9 326:3
329:13 333:5
334:16,18,20

334:21 335:11
335:24 336:7
353:3 368:9
373:23 374:4
379:7
**percentage**
25:10 27:10
28:11 29:13
42:7 44:24
65:21 66:17
78:21 98:20
108:11 113:8
114:2 161:15
211:11,18,21
212:2,15
214:21,24
215:1,3,3,7
236:21 294:8
325:4,6,10
380:9 381:1
**percentages**
109:3 210:22
215:9
**perception**
209:11
**perfect** 197:24
261:16
**perform** 88:11
156:3 292:18
**performance**
21:1,6 47:14
47:15 51:6
104:1 137:16
143:16,17
190:6 261:17

262:2,6 266:2
266:10 267:21
269:14 271:19
273:15 289:23
291:7 293:17
293:24 297:13
298:2 338:23
387:11
**performed**
303:3
**performers**
86:25
**performing**
47:19 48:1,11
63:17 234:4
290:20
**period** 44:11
72:13 238:4,6
293:18,24
322:5 379:10
**periods** 22:18
114:21
**permit** 351:21
**person** 62:23
158:2,6,7,13
159:5 200:24
201:9,13 324:2
345:1,4,5
383:25
**personally**
293:12
**perspective**
24:1 55:16,18
56:8 100:2,3
123:2 145:12

189:12 217:17
226:18
**peter** 2:13 10:5
126:9 171:8,15
389:8
**peter.haveles**
2:16
**petty** 348:15
**phelan** 284:10
284:15
**phelps** 35:3
383:7 385:13
385:21 398:22
399:21 401:3,9
401:10
**phenomenon**
205:16
**phone** 15:1
187:18 256:14
256:14,16
**phones** 9:7
**phonetic** 14:2
384:23
**physical** 54:25
**physician** 1:15
38:16,23 39:12
41:3 97:18
99:5 202:3,5
203:19 205:9
205:15 213:2,3
215:17,20,23
216:9,12 217:6
217:20
**physicians** 39:1
39:21 54:8,10

216:16,19 353:10

**pick** 9:5 242:12 266:1 394:19

**pickard** 345:7

**picked** 325:23 328:8

**picking** 332:18

**pickup** 358:22 388:14

**pieces** 104:13 400:21

**pipeline** 43:25

**piper** 3:5 11:1

**place** 44:14 129:14 151:12 159:24 179:18 231:25 232:12 237:1 253:9 281:19 284:9 403:6

**placed** 395:7

**places** 235:21 235:22

**plaintiff** 10:6

**plaintiffs** 1:11 1:23 2:2 8:3 10:3 14:6

**plan** 29:21 30:1 219:14 274:18 278:13 283:1,7 284:6 290:5 293:6 354:9,10 355:8

**planned** 266:2 284:22

**planning** 6:12 217:6 284:1 393:25

**plans** 274:21 355:16 356:2

**play** 16:2

**plc** 8:6

**please** 9:4,6,22 10:21 11:18,21 12:1,10 14:13 17:3,17 18:2 20:7 24:17 31:7 38:8 41:10 44:7 45:24 46:18 48:6 55:17 63:14 65:7 67:9 69:5 70:15 77:4,19 96:12 101:10 108:8 130:25 143:3,25 148:17 150:14 151:20 152:5 155:9 160:6 167:12 172:23 180:6 185:10 186:7 190:17 190:22 208:25 209:23 218:6 224:3 226:5 241:18 244:10 244:25 246:12

248:11,20 266:5 271:8 274:15 278:10 288:10 314:21 319:2 343:9 345:17 350:24 365:10 381:22

**plus** 121:9 147:22

**point** 97:5 102:9 104:13 104:15 111:7 121:11 131:16 141:7 147:17 147:18 187:3 206:25 259:23 314:11 326:11 327:3 348:23 349:15 360:15 361:14 363:22 367:5,16 379:9

**pointed** 171:18 392:13

**points** 86:19 87:11,12 91:20 91:25 92:20 95:4 106:12 121:17 123:3 125:17 234:15 234:19,22 236:14,17 285:19 297:11 314:3 321:19 322:19 327:13 327:16,17

330:19

**population** 53:20,21 54:9 56:4,7,10 65:10,17 68:7 68:12 72:21 100:25 101:1

**por** 108:9

**portfo** 47:20

**portfolio** 18:10 47:20 48:2,12 48:19 49:1 52:12

**portion** 108:10 108:25 184:12 207:15

**pos** 189:10

**position** 36:1 381:5 392:12 393:4

**positions** 389:19 391:23

**positive** 189:19 232:8 328:3 368:22 377:7

**possibility** 293:16

**possible** 38:13 155:12,18 156:2 253:18 289:20 291:3 291:10 296:20 296:25 377:23 383:6 388:9

**[possibly - pro]** Page 68

possibly 114:22
128:1 336:15
339:8 364:2
pot 206:11
potential
206:11,22
285:19 295:6
363:7
potentially
242:21 295:14
practicable
156:2
practice 1:15
16:12 89:20
213:19,25
384:5
practicing
268:23
preceding 56:3
273:16
predicated
87:22
predicts 115:16
predominantly
204:24 205:18
232:24 302:15
prefer 292:8
preferable
366:3
preliminary
363:6,11
365:10
premature
359:4

premise 362:7
premised
362:15
premises
212:25
prepare 13:11
354:13
prepared 33:23
248:8 252:1
274:22 275:3
328:3 343:3,6
346:24
preparing
159:16 200:18
200:21 269:15
394:8
present 3:1
presentation
23:3 30:23
46:16 48:23
52:5 91:21
92:2,14 221:19
248:10 251:21
274:11 286:9
286:14 293:10
293:11 303:6
326:9 335:15
361:3 378:3,12
384:23 393:10
presentations
248:8 302:23
303:12 318:13
377:25 392:10
393:1,2

presented
266:17 346:2
president 43:4
43:7 272:20
283:24 389:16
389:20,22,23
389:24,24
393:19,24
presidents 50:6
pressure 62:7
62:19 70:21
71:14 366:8
367:14
pretax 349:12
pretty 35:25
49:5 57:1
97:17 113:11
171:8 175:11
185:5 189:19
214:16 218:24
219:9 257:16
257:19 261:4
294:8,19
306:18,19
336:16 348:1
355:22 363:22
377:17 388:17
previous 13:14
13:18
previously
12:18 90:19
131:9 132:23
141:16 189:6
192:1 195:20
362:10

price 16:13
71:22 73:13
234:19 315:18
322:6,13,18
338:13 373:12
373:16
prices 319:25
pricing 62:8
primarily 24:2
31:24 35:20
245:12
primary 24:7
259:25 354:2
prime 311:8
312:24 313:2
prior 22:18
84:6 126:4
133:4 188:9
202:10 203:2,7
247:14 276:12
301:3,6,15
306:25 377:11
377:16 380:13
380:20 381:1,9
381:13 394:2
395:20 397:20
397:21,23
401:1
private 9:6
19:17,22 20:1
26:21 33:6
34:1,1,2 98:19
98:20
pro 1:11 5:17
72:7 73:19

112:11,21,24
115:14 145:12
145:19 148:21
148:24 168:10
266:20,23
**probably** 19:14
25:18 28:18
39:20 42:9
43:15 50:5
55:3 59:18
60:2 63:8 66:3
66:6 88:9
93:11 94:6,18
95:13 96:21
98:6,8 105:14
105:16 106:4
106:13 113:4
121:4,8 122:1
123:1,1 131:17
140:20,22
143:23 147:7
151:11,13
153:3,5,17
154:12 158:20
163:16,24
165:18 166:8
172:7 177:24
178:1 211:3,4
221:8 224:17
228:2 229:2
231:14 232:11
233:10,11
235:25 236:13
237:3 239:16
240:9 244:6,22

253:11 256:17
256:22 272:24
275:4 278:1
292:9,10
293:10 295:8
299:14 305:9
320:11 321:6
321:20 327:16
327:22 334:22
336:12,17,25
339:6 343:5
345:4,6 348:6
348:8 362:16
372:14 377:24
379:6,11
399:19
**problem**
243:15 276:18
333:1 352:10
**problematic**
12:6 354:25
**problems**
242:15 243:3
399:9 400:11
**procedure** 8:9
**proceed** 383:13
**proceedings**
402:11
**proceeds**
296:14 316:18
320:25 321:17
321:25 324:17
329:15 334:19
360:9

**process** 38:18
107:8 137:14
283:12 305:25
312:2 359:10
360:22 386:17
**procure** 386:12
**produced** 99:9
274:7
**productions**
392:9
**productive**
39:1,4 40:2
**productivity**
214:14,24
**professional**
1:14
**profile** 63:22
**profit** 56:2
130:11 185:7
297:20 304:23
304:24 320:7
320:10
**profitable** 27:5
28:23
**prog** 233:2
**program** 219:7
219:20 227:15
233:2 234:7
**programs**
202:9 203:1
204:9,9 230:14
353:12
**progress** 62:4
**project** 6:12
42:15,18,23,24

42:25 43:11,12
45:4,20 87:15
106:14 121:8
121:15 123:4
140:11,15
141:4 142:2
206:17 210:14
263:10,13,20
264:12 265:10
265:11,23
266:10,20,23
267:2,4,10,13
267:22,25
268:2,3,7,21
269:8 271:12
271:13,19
272:2,10,22
274:12 275:6
275:13,14,15
275:19 276:23
277:12,20,21
278:7 279:20
279:23 280:10
280:16,23
281:5,12,14,22
282:1,9 283:1
286:23 288:6
288:20 297:15
297:16 298:12
321:24
**project's**
140:16 288:1
**projected**
44:23 79:17
85:5 86:2

108:15 109:2
110:23 111:1
120:7,11 131:9
174:12 192:7
200:21 207:20
212:4,9 233:22
235:24 238:5
267:3,8,13,21
268:6,17
271:18,22
277:3,7 279:3
279:5 281:10
294:12 378:16
**projecting**
91:16 104:17
128:15 272:2
275:12
**projection**
88:10 103:13
110:22 115:7,9
115:10,13
122:7,8 179:21
180:9 181:8,12
181:20 182:25
206:7,20
207:11 208:24
216:20 235:13
238:4,6 260:14
261:22 297:23
378:20
**projections**
31:4,10,16,24
32:12,13,14,19
32:22,25 33:13
33:24 34:2,2,6

34:11,17 35:8
35:17,22 36:2
36:8,23 37:1,3
37:6,11,24
44:25 75:15,19
84:25 103:6,10
104:15 106:10
109:22 113:5
126:20,20
140:4 141:15
159:17 164:6
166:4,8,16
167:5 178:15
179:11,16
180:3,3,20,22
181:1,5,6,7,14
181:15,19
182:2 206:5,6
206:12 207:7
207:21 208:16
208:21 210:14
214:11 215:4
235:15,23,25
236:2,4 259:10
259:17 263:10
263:20 266:21
266:24 269:3
269:15,17
293:23 302:10
354:20,23
355:7,17 356:3
356:15,22
368:20 377:6
378:17,22
399:23

**projects**  6:11
42:18 43:15
44:2,3,9,10,12
85:9 265:18
281:16 282:14
284:6,22
288:13 310:24
**promotion**
389:22 390:1
**pronounce**
357:12
**pronounced**
20:17
**pronouncing**
357:12
**proof**  181:1
182:8,10
234:15
**properly**  25:2
**properties**
314:13,17
**property**  176:7
176:8,9
**proportional**
156:4
**protracted**
311:14
**provide**  143:14
143:14 310:1
319:12 328:8
**provided**  34:11
34:14 157:7
179:14 191:24
200:8 221:23
221:24 222:22

223:13,22
234:15 310:6
328:8 356:7
**provider**  39:17
233:1,2 242:25
358:22
**providers**
71:23 73:14
74:7
**psc.com**  3:7
**public**  8:16
34:6 63:23
89:6 134:8
143:14,15
149:7 284:24
292:16,17
296:5 324:15
391:6 396:9
403:9 406:19
**publicly**  33:2,6
33:9 141:17
278:21 311:6
324:19
**pull**  195:5
**pulled**  144:18
372:7
**purchase**
344:24
**purchasers**
234:10 236:3
**purchases**
341:6
**purchasing**
200:24 283:25
334:6

**purpose** 11:21
143:11 155:7
196:18 265:15
345:22
**purposes** 8:8
32:10,17 37:22
77:13 349:19
**pursue** 351:21
351:23
**push** 327:16
**pushdowns**
387:17,24
**pushed** 235:2
**put** 79:4 86:8
93:23 104:22
107:2 140:15
153:1,3 167:9
172:1,2 192:12
206:4 251:20
263:9 264:2,3
264:16 274:4
281:1,8 284:23
285:18 289:7
301:23 303:11
308:11,13,16
308:17 318:13
339:12 356:14
357:1,3 374:15
374:19 388:18
391:23 394:6
**puts** 282:15
**putting** 24:9
261:18 264:24
397:22

**pwc** 383:2
398:20 399:15
**py** 377:11
**pys** 377:6

**q**

**q1** 202:10
203:2,7
**q2** 4:10
**q4** 131:1,7,20
**qh** 50:15
**qhc** 1:8 4:11
5:9,12,17 6:4,6
6:23 7:1,13
19:2,4,9 25:8
25:10,16 27:16
27:25 28:9
29:3,4 31:4,9
34:18,20 35:18
36:10 37:4
42:15 43:11
50:2,13,15,24
50:25,25 51:16
52:21,25 53:2
75:15 79:4
103:6,10
107:24 108:19
112:12 121:12
137:17 143:24
144:5 145:9
146:1,25
147:14 148:15
148:17 149:7
149:15 156:12
156:20 157:2
157:23 158:16

159:10,19,20
161:11,25
162:10,15
163:4,9,11,17
164:11 165:10
165:21 166:14
166:15,16
176:14 177:4
177:12 179:3
179:15,23
184:19 191:24
192:1,7 200:21
201:7 204:1,5
213:1 216:22
217:5 222:11
223:7,16
227:20 236:5
238:24 252:13
255:2,21
261:15 263:19
279:25 283:2
284:3,6 290:5
294:19 300:9
308:12,12
309:15 314:24
319:12 320:14
321:24 322:24
323:23 339:22
340:17 341:11
347:10,18
353:21,25
354:4,12,23
357:17 358:13
358:19 360:20
362:8,15 363:7

365:11 367:19
367:19 368:22
369:21 373:17
373:23 374:5
374:15,16,20
376:4 377:3,3
382:21 384:1,4
385:22 386:12
388:5 390:5,7
390:22 392:4
392:18 394:1
394:13 395:1,2
**qhc's** 42:19
78:15 112:4
120:7 158:17
161:15 165:15
200:22 226:17
245:24 249:8
260:14 293:6
360:7 373:6
374:5 387:10
388:7
**qhr** 247:18
260:20 341:5
**qlt** 6:18
**quality** 158:7
352:23 354:22
**quantum**
365:17
**quarter** 20:17
20:22,24 21:8
73:24 74:10,12
75:2,3,3 86:17
100:1 131:8
136:13 163:25

**[quarter - rather]**

173:6,11
206:15 207:3
219:8,21 254:8
254:14,22
311:12,13
358:9,22 380:1
380:4,14,24
381:8,13
387:10,11,25
388:7,14,15
**quarter's**
254:23
**question** 11:17
11:20,23 12:5
12:12 16:7,17
34:4 36:5,8
38:9 41:12
44:6 48:6
51:16 55:17
57:3,19,25
58:2,2,8 60:17
60:20 61:5
67:4 96:12
99:23 101:9
116:2 117:22
122:15 147:8
159:6 169:13
170:1 179:8,10
181:22 182:1
203:10 223:6
227:20 231:2
232:3 236:19
242:3 253:15
282:15 295:19
295:20 303:8,9

303:25 304:14
305:24 306:24
307:1 309:16
315:19 316:1,2
319:21 322:10
322:16 345:7,8
369:4 371:5
381:7 384:21
386:20 388:4,6
389:15 396:22
398:25 400:6,9
400:10
**questions** 8:13
15:15 142:14
152:7 153:19
241:14 273:2
307:3,6,15
308:11 347:3
350:20 389:10
401:21
**quick** 90:9
257:16,19
389:14
**quickly** 127:12
128:6
**quinn** 2:4 10:2
11:10
**quinnemanue...**
2:5,6
**quintile** 64:17
64:18
**quit** 219:16
**quite** 41:2,5
45:4 56:1
72:17 117:11

126:1 245:4
292:19 380:25
383:20,20
**quorum** 1:4
2:13 5:5 6:7
7:16 9:10 10:7
18:8 19:3,4
26:4,9 28:24
29:21 42:8
43:6 44:24
48:17,24 49:4
49:18 50:9
62:3 64:16,25
67:14 83:13,19
101:25 102:5
131:24 143:4
187:4 274:6
342:13 345:24
346:8,13 354:3
364:7 381:24
382:12,16
383:17,17
384:9,17,22,24
385:7,8,12
389:9 391:9
395:12 396:11
398:17,18
399:25
**quorum's**
30:13 65:25
207:14

| r |
| --- |
| **r** 405:3,3 |
| **r2** 14:2,3 |

**rachel** 1:17
372:24 383:20
384:6 385:2
391:20 392:6
397:8
**radiology**
202:4
**raise** 30:2
31:22 34:21
316:18 321:7,9
324:3 367:18
368:18 369:20
**raised** 324:16
367:19
**raising** 34:19
320:24
**ran** 219:14
247:20
**range** 271:23
**ranged** 266:13
**raskin** 41:13
**rata** 168:10
**rate** 25:1 64:13
66:8 68:13
78:25 230:6
367:23,25
368:1,5,8
372:12,13,16
377:7
**rates** 24:10,13
24:13 77:24
79:17 86:1,4
367:20 368:4
**rather** 211:18

**rating** 293:8 368:12,16,17 368:22 371:13 377:2,20,22 378:1,2,7 379:15 393:9
**ratings** 32:15 33:25 368:21
**reach** 40:9
**read** 22:10,11 59:16 71:7 72:5 73:18 74:4 101:8,13 101:14 169:11 169:16,18 203:8 204:24 209:6 351:11 404:9 406:5
**readily** 318:20 401:18
**reading** 8:18 58:3 59:11,16 108:21 209:3 231:21 255:6
**real** 74:20 158:3 230:13 269:8 358:18
**realistic** 103:5 103:9 236:17 272:8
**reality** 288:18
**realize** 106:6 265:23 296:14 321:25

**realized** 322:6
**reallocate** 157:18
**reallocated** 187:23
**reallocates** 242:11
**really** 98:16 101:10 104:6 178:10 198:16 201:12 249:17 266:23 270:2 270:14 272:18 273:20 338:10 354:24,25
**realtime** 17:5 58:4
**reason** 13:7 175:5 221:2 232:22 272:23 293:14 351:14 352:2 365:21 391:22 404:11 405:6,9,12,15 405:18,21
**reasonable** 31:18,20 209:5 209:8 250:5 258:16,18 272:16 303:12 303:15 313:23 324:10 331:5 377:25 383:6
**reasonably** 40:2 378:8

**reasoning** 281:3
**reasons** 49:16 50:19 51:3,7,8 51:10,18,23 52:1 220:4 351:5,20
**recall** 22:15 46:2,5,6 58:15 59:7 62:17 84:24 88:23 89:1,5 100:13 100:14 139:19 155:2 161:11 218:11 238:10 248:16 251:4 257:1,2 260:9 260:11 265:3 307:7 337:14 343:2 355:21 381:10 382:20 382:22 384:4 385:18,19 390:9 391:4,19 391:21 398:19
**recalling** 21:15
**recap** 17:21
**receipt** 404:17
**receivable** 15:18,21 218:21 228:15 229:15,21 232:20 233:22 234:11,14 235:7,16

**receivables** 16:14,19 144:22 220:2 227:25 228:17 228:17 234:21 236:1,11,23 260:24 321:19 322:21 326:4 327:15 330:21 347:13,21 349:21
**received** 12:18 13:2 34:16 46:6,7 56:14 163:9 369:15
**receiving** 91:13
**recent** 207:3 325:15
**recently** 76:12 260:18
**recess** 102:14 185:21 270:25 337:7 389:1 402:5
**recipient** 12:16 13:1
**recognition** 254:21
**recognize** 381:5
**recognized** 219:20 254:7
**recollection** 11:16 22:4 157:19 158:25

172:1 191:14
249:6 258:7
315:7,20,24
316:5,14,23,23
321:18 358:20
359:1 382:2
**recommend**
364:11 372:8
**recommendat...**
367:15
**recommended**
361:4
**recon** 251:23
**reconciled**
251:23
**reconciliation**
221:17 222:6
**reconciliations**
221:6
**reconciling**
248:4
**record** 9:2,23
32:10,11,24
33:16 34:7
37:22 58:6
83:25 102:13
102:16 135:5
143:3 180:5,6
185:20,23
229:11 232:17
270:24 271:2
337:5,9 344:22
381:22 388:25
389:3 401:24
402:1,4,7,9

**recorded** 9:9
**records** 145:5
**recruit** 39:3
40:22 54:10
394:11 395:24
396:5
**recruited** 39:13
99:11 216:19
270:13
**recruiting**
38:17,24 39:4
39:6,7,8 97:18
99:5,5 212:10
213:2,4 215:17
215:21 216:10
216:12 217:6
217:20 218:4
378:5 394:16
394:18 395:9
**recruitment**
353:11 395:6
**recurring**
151:8
**redacted** 373:5
**reduce** 132:5
138:14 139:1
139:13 261:3
261:23 370:24
371:4
**reduced** 131:2
131:3,8,20
140:10 184:5
370:18
**reduction**
230:7 261:4,8

**reductions** 63:9
138:8
**refer** 19:3 25:7
32:12,18 39:21
42:16,22 43:10
75:18 144:7
180:5 226:19
344:1
**reference** 25:6
25:22 246:1
**referenced**
326:8 384:13
404:6
**references**
256:24
**referencing**
325:21
**referral** 323:9
323:19
**referrals** 214:1
323:11
**referred** 238:2
255:17 344:17
**referring** 14:1
16:21 20:3
25:12 30:8
32:21 33:1
45:18 81:8
92:3 180:4,8,9
184:7 199:14
325:11 366:23
**refinancing**
76:21,22
**reflect** 112:3

**reflected** 88:17
108:16,16
110:25 113:1,9
147:12 149:9
180:18 181:24
207:7 347:9
**reflects** 316:16
**refresh** 11:16
191:13 249:5
258:7 315:6,20
316:4,22,23
**refreshed** 22:6
**refreshes**
315:24 316:13
**regarding**
87:23 100:19
216:9 274:12
318:15 365:11
**regardless**
40:16 299:9
352:22 392:12
**regards** 9:10
**regional** 333:13
333:17 337:22
**regulation** 38:5
**regulations**
38:7
**regulatory**
280:11,18
312:2,5,12
320:6
**rehab** 54:25
**reimbursement**
24:4,6,10

**reindel** 2:18
**related** 168:19
  172:8,15
  345:25
**relating** 151:4
**relations**
  168:19 392:16
  392:17 393:12
**relationship**
  358:12
**relative** 216:3
**relatively** 63:7
  166:21 212:21
  238:12
**reliable** 99:25
**relocate** 215:23
**rem** 89:5
**remain** 88:19
  214:21 216:4
  255:25
**remained** 235:7
**remaining**
  79:20 93:19
  95:14 128:14
  128:24 349:17
**remains** 259:20
**remember**
  20:20,23 21:6
  21:13,14,16,20
  22:3,20,24
  24:8 27:24
  28:11,17,19
  49:11 58:25
  59:7 67:1,2,6
  67:21,25 74:2

74:23 75:4
93:7 94:19
99:8 100:3
105:13 112:22
121:10,17
122:20,24
123:7 129:21
130:1,14
138:17 139:7
139:12,14
140:17 148:20
154:23 158:3
161:17 172:12
177:18 188:8
190:18 199:19
201:5 208:7,9
211:5 214:22
217:2 220:18
220:21 221:2
222:3 228:5
230:25 231:4
242:9 249:11
249:19,23
250:7 251:22
256:13 257:12
258:20 263:7
263:11 265:19
284:14 285:13
312:25 340:18
350:1,3,6
355:9 371:20
372:2 381:11
385:9 392:19
398:2,3

**remind** 37:18
  261:6
**remote** 2:8,22
**removed** 26:5
  282:25
**removing**
  116:6 284:5
**renewal** 205:7
**reoccur** 151:13
**repaid** 348:19
**repay** 346:13
**repayment**
  260:1
**repeat** 48:5
  295:19
**rephrase**
  293:21
**replicate**
  242:21 252:14
**reported**
  342:14 346:8
  403:8
**reporter** 8:17
  9:19,25 11:22
  81:2 107:12
  118:24 120:12
  123:14 124:23
  142:7 154:17
  167:14 172:25
  183:25 185:25
  201:21,23
  240:1 248:13
  258:1 259:1
  262:24 282:19
  285:9 289:5

313:9 318:24
342:20 345:11
357:6 361:8
362:25 364:25
369:7 372:21
376:21 379:13
381:16 387:3
403:8
**reporter's**
  403:1
**reporting**
  251:24
**represent**
  80:16 83:25
  148:14 152:9
  161:20 164:25
  165:4 168:16
  192:6 224:13
  274:3 343:15
**representative**
  1:22 8:2
  147:20 403:4
**represents**
  228:7
**request** 12:13
  108:6 251:16
**requested**
  69:11 70:9
  196:3 251:7,8
  251:14
**requesting**
  251:5
**require** 157:24
  177:4 312:5
  401:19

**required** 38:7
143:13 406:13
**requirement**
66:11
**requirements**
246:18 247:12
290:1 385:4
**requiring**
208:2
**reran** 320:24
**reserved** 8:13
**resolution**
256:9 383:10
385:10 397:11
**resolutions**
399:6,10,13
400:13
**resolve** 256:19
257:14
**resolved**
219:17 252:19
257:18,23
401:18
**resolving**
344:12
**resources**
168:18 352:9
396:4
**respect** 70:8
183:9 310:21
**respectively**
227:22 391:17
**respiratory**
74:14

**respond** 29:25
106:16 159:6
357:24
**responded**
255:25 256:7
**responds**
105:15 319:23
320:23
**response** 30:5
108:6 123:19
127:10 184:4
369:19
**responses** 12:1
**responsibilities**
382:21
**responsibility**
382:24 392:21
392:23 393:8
393:16
**rest** 38:4 175:8
236:10 341:6
**result** 253:1
370:10
**resulted** 47:9
252:13
**results** 78:14
88:14 103:22
105:7 115:15
131:8 183:19
267:9 292:22
302:8 358:9
378:24
**retain** 236:5
302:18 303:25

**retained** 304:5
**retaining**
236:23
**retention**
353:11
**return** 26:16
205:11 265:24
342:9,10
352:12 404:13
404:16
**returning**
71:18 73:7,9
102:16 185:23
271:2 337:9
389:3
**returns** 62:10
**rev** 211:8
213:16 268:19
**revenue** 1:13
23:25 24:13
28:8 29:2,5
41:22 42:1,7
44:24 46:22
47:10 49:5
65:22 77:22
78:15,20 84:9
84:17,21 85:9
86:12,15,22
87:1,5,6,18
88:16,18 91:3
91:15,22 92:10
92:21 95:5,16
95:25 96:1,11
96:14,16,21
97:5,14,25

98:2,4,5,6,11
98:16 99:14,21
99:24 100:3,9
100:21 101:12
101:19 102:3
104:24 105:23
107:24 114:20
115:22 121:3
121:21 122:2,3
122:6 127:22
128:1 138:9
140:2 141:18
156:13 157:18
161:17,22
211:11,19
212:2,15,16
213:16,24
214:2,17,21
219:18,19,21
234:18,23
235:4 236:8,21
263:19 264:17
267:2,3,14,15
268:13,19
272:5,6,9
281:1 297:1
299:2 314:25
315:1,9,16,22
317:13,24
319:12,24
320:18,25
321:1,9,19
322:19 324:3
326:3,12 327:2
327:20 328:17

328:22,24
329:13 330:9
330:10,14,19
332:8 333:5,10
334:15,20
335:11 336:7,8
337:21 338:20
353:3 380:9
388:10
**revenue's**
211:9
**revenues** 156:4
211:22
**review** 6:11
89:22 195:21
195:22 263:13
296:12 311:15
404:7
**reviewed** 68:9
153:25 303:6
**reviews** 22:1
71:9 108:23
142:16 169:22
249:24 258:10
263:7 317:10
**revised** 195:18
**revisit** 103:7
**rice** 20:10 23:5
**rid** 86:14
128:12 129:3,9
234:25
**right** 17:2 19:5
19:10 26:10
27:11 28:24
30:9,21 32:2

34:13,22 35:5
35:12 36:14
37:7 40:17
42:2 46:5 47:3
47:10 48:2,15
49:1,16 50:16
52:21 53:6
54:1 55:4,15
55:21 56:18,19
59:24 60:8,23
61:14 64:13
65:2,4 68:19
70:16 75:8
78:4 79:23
82:7 83:24
84:18 85:4,6
85:12,24 86:4
89:9 90:6,10
90:16,19 91:4
91:10 95:8,18
99:18 100:3
102:6 105:23
106:8 108:6
109:3,24
110:17,19
111:23 114:1
115:8 116:5,22
118:2 120:19
120:22,23
121:19 122:7
124:3,7,14
125:18 126:14
127:9 131:10
131:21,25
132:1,6 133:23

134:16 135:6,7
135:7,20 137:3
141:5,11
146:12,12
151:15 153:15
159:11 160:16
162:7,24
165:19 166:6
172:22 174:1,5
174:6 179:22
181:7,13 189:4
189:7 194:4,18
196:7 197:18
200:1,1 202:13
213:9,17,21
218:9,13
221:13 222:21
222:24 223:5
223:18 226:18
227:4,8 228:3
230:2 232:22
232:25 233:7
233:19 242:3
251:25 254:24
263:2 264:8
266:9,21
267:25 270:21
274:15 279:11
280:7 290:6,12
293:7 294:14
298:4 302:12
318:22 324:4
328:16 329:18
331:19 334:14
342:18 347:2

351:16 366:15
366:22 367:8
368:3 369:16
369:21 370:19
371:8,11
373:17 378:25
381:14 382:13
382:14 384:11
401:13 402:3
**rights** 397:24
**rise** 340:2
341:10
**risk** 301:23
370:15,16
**rivkin** 381:23
**rksllp.com** 2:24
2:25
**road** 30:1
**role** 75:21 76:3
310:21 393:19
**roles** 76:1
**roll** 311:12
**rolnick** 2:23
10:8
**roman** 372:24
379:19
**roof** 355:12,23
**room** 10:20
14:10 42:14
43:1 54:14,16
66:11 203:11
205:21 355:12
355:23
**roughly** 25:17
125:16 210:24

**[roughly - says]**

| | | | |
|---|---|---|---|
| 234:18 338:25 358:24 | **s** | **salem** 311:8,8 311:18 312:20 | **saying** 27:8 28:21,22 47:24 |
| **rounded** 326:3 | **s** 174:23 405:3 | 313:5 319:20 | 48:9 49:7 |
| **routinely** 274:22 | **sadighi** 2:23 10:9 | 320:1,3 | 53:23 55:7 |
| **row** 52:6 114:3 | **safety** 352:21 | **salem's** 319:20 | 56:23 58:12,14 |
| 116:24 117:8 | 352:23 | **sales** 16:13 | 69:19 74:9 |
| 120:8 132:18 | **saith** 402:10 | 234:19 316:18 | 106:3,17 |
| 132:24 133:1,3 | **salaried** 213:10 | 317:12 318:17 | 125:14 127:11 |
| 136:1 138:20 | **salaries** 146:23 | 320:25 321:17 | 128:4 131:24 |
| 138:25 210:8 | 163:21 165:21 | 321:25 322:6 | 133:21 135:12 |
| 226:11 229:7 | 166:1,6,14,14 | 322:18 324:16 | 139:12 156:23 |
| 232:19 285:3 | 166:17 203:20 | 324:22 325:3,5 | 169:5 174:2 |
| **rows** 133:4,7 | 205:2 206:13 | 325:9 331:1 | 192:23 204:14 |
| 226:16 237:13 | 206:22 207:20 | 333:6 334:19 | 204:17 205:24 |
| **rules** 8:8 11:14 | 210:15,25 | **sam** 3:4 10:25 | 224:17 236:20 |
| **run** 15:8 | 211:14 213:21 | 229:9 | 249:21 250:7 |
| 138:12 347:21 | 214:12,17,20 | **samuel.karot...** | 263:17 269:2,2 |
| 395:1,1 | 216:14,19,23 | 3:7 | 273:20 288:2 |
| **running** 39:13 | 217:8,12 | **sandler** 3:5 | 360:5 363:18 |
| 105:6 138:11 | **salary** 149:14 | 11:1 | 374:3 386:12 |
| 212:18 261:13 | 150:3 159:3,8 | **sat** 149:5 | 387:24 |
| **rural** 27:1 | 166:10,10,13 | 383:16 | **says** 18:7 20:17 |
| 47:21,25 48:10 | 166:19 167:10 | **satisfaction** | 24:25 38:16,17 |
| 48:19,24 50:1 | 204:15,23 | 256:9 | 45:12 46:6,13 |
| 63:18,23 | 205:1 206:14 | **saturdays** | 46:20 47:13,18 |
| 326:16,19,23 | 206:20 207:25 | 348:5 | 48:13,16 49:13 |
| **russ** 10:22 | 211:1 212:10 | **save** 319:24 | 52:7,11 53:6 |
| **russell** 3:2 | 212:14 213:4,9 | **savings** 1:8 | 54:6 62:6 |
| 14:14,19 | 216:14 | 330:10 331:4 | 63:16,22 64:3 |
| **ryan** 75:15 | **sale** 293:18 | **saw** 50:14 | 64:16 66:19 |
| 264:10,20 | 296:14 312:13 | 128:17 251:17 | 67:14,24 70:18 |
| | 312:18 319:20 | 260:18 309:24 | 74:5 77:21 |
| | 319:25 320:2,4 | 343:1 378:3 | 78:9,10 83:19 |
| | 320:4 327:22 | 401:5,7 | 90:11 91:3,20 |
| | 334:13 | | 92:18,19 |

108:18 111:15
123:20 125:8
135:16 136:10
137:6 138:7,25
139:8,9 155:24
168:6,6,15
169:23 170:14
170:21 171:6
173:19 176:14
191:21 196:17
198:1 202:7,19
203:18 204:7
204:22 218:15
231:23 240:14
240:21 245:10
246:15 247:24
248:22 249:1
250:10,15
251:12 252:19
255:21 257:18
259:11,16
263:18 267:11
275:22,24
286:17 287:2
289:19 291:11
294:5 296:6,9
305:14,19
311:5 313:22
314:16 315:10
316:17 321:7
329:7,11,19,20
330:4,7 331:16
332:5 344:6,11
345:23 346:7
346:12 351:4

351:20 352:6
353:5 361:15
365:8,16 366:6
368:11 373:22
377:3
**scattered**
241:12
**scc** 174:17,22
174:23 188:4
**schedule** 89:6
196:6 197:8
198:16,20
199:12,14,18
227:14 259:11
325:15,21
326:6 327:25
330:23 333:11
334:19 335:13
336:9 337:13
337:13
**schedules** 89:1
104:3 197:9,19
281:17 316:12
**schuss** 69:16
**schussele** 69:11
69:16,17
**schwartz** 75:16
363:3,4,10
365:4,8 369:11
371:18
**schweinhart**
281:25 282:25
283:21,23
284:5 390:11

**screen** 118:6
119:25 180:10
194:14
**screening** 1:16
**scroll** 117:12
117:15 134:1
138:22 197:22
229:6 331:13
**seasonality**
75:3
**second** 18:18
18:20 20:22,23
21:8 22:16
24:20 25:1
27:22 36:17
52:6 67:3
70:25 73:18
74:4,19 77:21
81:6,14,21,22
81:23 82:1,6
90:11 103:25
108:8 110:13
113:7,15,16,17
113:20 115:15
130:20 133:1
160:11,13
169:19 186:9
199:4 203:8
204:24 218:23
219:13 220:24
229:8 237:17
245:17 248:20
251:11 262:18
263:6 267:15
273:8 277:16

289:18 311:12
313:13 317:6,7
319:3,6 335:16
335:22
**secret** 290:4
**secretaries**
148:6
**secretary**
172:20
**section** 149:2
351:3
**sections** 142:20
**sector** 69:12
368:2,2
**securities** 1:18
13:25
**security** 372:11
**see** 18:11,22,24
20:9,12,15,18
23:12,19 24:23
25:4 26:6,18
29:18,22 30:4
38:20 40:19
41:15,19,23
45:15 46:24
47:17,22 48:20
51:4 52:9,16
53:9 54:22
62:11 63:20
64:4,6,10,19
65:12 66:22,24
67:17,20 68:10
69:3,14 71:13
71:15,24 73:23
74:1 77:6,14

**[see - seifert]**

| | | | |
|---|---|---|---|
| 77:16,25 78:8 | 173:13,22 | 269:5,23 275:5 | 383:20 387:13 |
| 78:11,15,17,22 | 174:1,2,9 | 275:9,16,20 | 387:19 389:11 |
| 79:18,21 81:7 | 176:15,17 | 276:1,5,18,19 | 389:11,16 |
| 82:18,18 83:9 | 180:14 186:12 | 276:25 277:4,8 | 399:8 400:10 |
| 84:11,15 87:13 | 191:14,18 | 278:2,3,15 | **seeing** 45:13 |
| 90:13,25 92:22 | 192:3 196:21 | 279:1,4,7,10,14 | 46:2 89:1,5 |
| 96:8,13 97:11 | 197:21 198:7 | 283:4 285:21 | 94:22 117:8 |
| 99:21,24 100:5 | 199:1 200:7,25 | 286:19,25 | 175:22 179:13 |
| 100:9,12 | 202:11 203:3 | 287:4 290:2 | 181:23 182:4 |
| 102:24 105:18 | 203:23 204:12 | 295:9,9,10 | 182:21 183:10 |
| 107:19 108:2 | 205:5,13 | 296:16,17 | 199:19 248:16 |
| 108:12,18,20 | 210:17 213:12 | 299:25 302:5 | 249:23 263:7 |
| 108:24 109:12 | 214:14 215:16 | 308:6,10 | 263:11 358:17 |
| 109:15,20 | 215:18 216:2,6 | 313:19 314:14 | **seem** 123:20 |
| 110:5,13,16 | 217:23 218:1 | 315:4 317:8,8 | 125:9 195:25 |
| 113:13 114:15 | 218:17 219:1 | 319:10 321:2 | 313:22 |
| 115:5 116:5,7 | 220:12,14 | 321:11,14 | **seems** 321:9 |
| 116:8 118:19 | 225:14 226:3 | 325:7,17 329:9 | 375:17 |
| 119:8 120:8,9 | 226:11,22,24 | 329:16 330:5 | **seen** 17:19 46:4 |
| 122:3 123:23 | 227:2 229:7,8 | 330:11 331:19 | 90:18 92:15 |
| 123:24,25 | 229:23 230:20 | 332:9 333:7 | 96:1 142:24 |
| 124:1 125:11 | 231:7 233:22 | 335:9 339:24 | 154:20,22 |
| 126:18,23 | 233:24 237:14 | 344:9,14,19 | 167:21 195:9 |
| 127:1,2 131:5 | 237:14 240:8 | 346:4,9,15 | 195:11,14 |
| 132:21 133:15 | 240:18,21,23 | 347:3 351:10 | 196:1,6 197:8 |
| 134:14 135:19 | 241:4,25 | 351:13,25 | 198:16 252:11 |
| 135:23 137:9 | 244:15 245:3 | 352:16 353:15 | 263:5 264:19 |
| 139:2 148:2 | 245:14,18,21 | 357:21 358:1,8 | 265:4,6 282:22 |
| 151:22,25 | 246:20,22 | 361:17,22 | 285:12 302:22 |
| 152:8,12 | 248:23 249:3 | 363:8 365:6,12 | 308:15 335:12 |
| 154:24 155:16 | 250:13 256:3 | 365:19 366:11 | 342:24 345:14 |
| 156:5,10 | 256:18 259:14 | 368:14 369:12 | 345:19 368:8 |
| 160:10 161:5 | 260:3 263:8,21 | 370:7 373:1,5 | 381:18 |
| 164:23 168:12 | 264:1,13,20 | 373:7,25 374:2 | **seifert** 1:17 |
| 168:25 173:7 | 266:23 268:24 | 374:7,17 377:9 | 372:24 390:6 |

398:14 399:5
400:15
**select** 395:16
**selected** 76:8
296:19,24
394:12 398:4
**self** 98:14
**sell** 16:12
104:17 106:4
293:6 300:11
302:20 303:4
304:2,6,20
305:25 306:10
306:17 311:7
311:17 317:16
322:4,25
324:25 326:22
329:12 330:8
332:6 372:10
**seller** 19:15,22
19:25
**selling** 103:18
105:16 236:8,9
302:11 306:3
319:13 324:18
326:18 338:6
366:8 367:14
**sells** 314:25
**send** 118:14
173:4
**sender** 12:16
13:1
**sending** 75:14
249:19 255:20
284:17 363:11

394:9
**senior** 43:10
144:16 283:24
396:3
**sense** 116:11
129:23 190:10
287:23 370:3,7
371:13 372:9
**sensitive** 9:5
**sent** 107:16
249:20 316:17
325:5 330:24
336:19,24
369:10,14,18
369:23 381:23
396:16 404:14
**sentence** 18:18
18:21 74:5,19
130:6 191:20
191:21 202:12
203:3 204:24
204:25 245:10
245:17 246:25
296:10 344:15
353:6,22
**separate**
112:13 129:15
181:20 298:20
298:21
**separated**
50:11
**separating**
128:11
**separation**
353:7 375:7

**september**
254:6 278:13
279:24 313:16
313:25 391:5
391:17
**series** 12:15
**serve** 186:22
**served** 304:3
353:14
**service** 1:14
34:20 35:11
36:11 137:15
151:14 158:9
175:3 177:5,13
186:23 187:2,5
187:11,14,21
188:12,18
189:1,3 192:20
193:3,16 198:4
198:5,13
230:10 234:4
261:24 262:6,8
**serviced** 262:7
**services** 1:15
1:16 26:1
54:24 55:1
87:19 101:18
101:19 145:10
151:12 156:8
156:17 157:5,7
158:17 159:20
160:19 161:23
161:24,24
162:3,5 163:3
163:11 164:13

174:17,18
177:22,23
185:6 188:3
191:23 353:10
354:6 389:17
389:25
**servicing** 193:6
**set** 80:11
165:22 166:2
305:11 315:18
403:17
**setting** 85:8
**settlement**
231:9,13,24
246:1 247:19
260:20,20
340:17,18
341:5
**settlements**
231:8 232:11
237:25 244:23
245:25 246:3,5
247:18 253:8
260:19,21
340:4,8,17
341:4 377:18
**seven** 59:2,8
64:16 81:18
82:4 107:16
190:14 231:4
330:8
**several** 68:8
73:11 154:12
162:14 261:2
297:6 395:2

**sg2** 176:19,21
**sh** 117:22
**shane** 2:22
10:10
**share** 17:6
47:15 118:15
156:4 186:23
192:20 193:2
323:25 324:1
373:13 386:20
**shared** 32:15
33:25 187:2,5
187:11,14,21
188:12,18
189:1,3 193:16
285:24 326:6
368:20,23,24
**shareholder**
50:12 168:22
170:8 171:21
**shareholders**
397:25 398:18
**sharp** 272:18
**sheet** 81:9,14
133:16 224:6
232:16 335:9
398:22 404:11
**shelly** 69:11,16
**shifting** 66:21
66:21
**short** 100:2
322:5 359:11
**shortfall**
340:20

**shortfalls**
243:18
**shorthand**
403:8
**shorts** 130:23
**shot** 364:17
**show** 12:15,25
30:1 37:3,6,25
91:14 94:4
99:10 107:23
122:2 229:10
258:6 267:20
314:12 381:3
389:15
**showed** 36:20
36:24 37:1
91:22 103:13
235:13 248:3
327:8 388:10
**showing** 64:7,8
97:5 269:4
286:21 370:4
**shown** 34:18
35:9 36:10
85:5 95:23
111:21 152:15
345:23 400:25
**shows** 47:2,6,9
47:11 66:5
108:14 109:1
110:7,11 120:4
120:6 188:2
222:10 223:6
224:9 227:20
229:20 266:9

266:12 267:2,2
267:12 268:5
269:6 271:18
275:11 305:13
336:6 339:21
**sic** 18:2 23:10
24:21 35:20
39:4 57:12
63:18 70:19
87:7 92:8
120:6 137:12
145:3 147:19
151:9 157:16
165:16 172:9
194:14 201:4
203:12 205:10
225:13 381:10
391:9 392:2
**side** 23:10
24:16 34:2,6
65:10 89:14,15
339:12
**sign** 23:10
404:12
**signature**
381:25 382:3
403:23
**signed** 257:24
385:2 397:10
399:7,24
404:19
**significance**
65:14
**significant**
48:18 66:4

219:5,9 380:17
**significantly**
187:12 218:21
**signify** 389:19
**signing** 8:18
**silence** 388:16
**silent** 255:25
388:17
**similar** 50:3
104:1,4 218:25
351:17,17
**simple** 61:4
107:2 295:19
295:19 375:12
381:6
**simply** 237:21
363:17
**sims** 8:6 9:16
143:23
**single** 296:19
296:24 298:12
298:16 324:24
324:25
**sir** 22:2 43:16
60:16 143:10
150:17 154:21
166:13 167:20
175:16 181:4
182:11 183:7
183:22 189:23
203:9 245:6
316:9,11 336:4
367:11 375:21
397:1

**[sit - sorry]**

sit 46:10 221:1
sitting 21:14
  22:3 62:16
  123:9 255:10
situation 34:25
  35:15 254:3
six 39:25 40:3
  137:18 162:23
  187:7 261:11
  387:17
sixth 3:6
size 190:11
  272:9 334:15
skimmed 13:13
skip 199:2
  200:2 285:5
skipping
  168:20
skunselman
  2:25
slate 298:15
slated 95:8
  96:15 298:16
  299:1 302:20
  320:20 323:20
  328:22 338:16
  338:21
slide 23:3
  318:13 387:10
  388:9
slides 23:3
  99:10
slight 190:3
  232:7,9,10

slightly 121:5
  159:16 232:9
  361:21
slip 2:19
  137:16
slow 94:18,20
  94:21 98:22
  99:1 242:10
  261:1
slowdown
  247:21 280:13
slowed 42:19
  77:23 206:2
slower 238:24
  239:5
slowing 98:18
sma 47:20
small 25:3,7
  48:19 50:1
  63:23 157:16
  167:16 212:18
  212:21,22
  218:3 235:25
  238:12 323:9
smaller 23:16
  25:12,13,21
  31:21 47:20,25
  48:9,23 54:8
  63:19 66:17
  67:12 68:24
  232:6
smiling 307:24
smith 18:2
  24:21 38:11,16
  43:4,9 45:12

46:9,11 269:10
  277:24 295:13
  356:7 361:20
  361:20 363:4,4
  365:5 369:11
  371:18 376:25
  395:11 396:2
smith's 185:9
smorl 63:18
snb 370:9
sneezes 120:12
social 15:9
socially 16:2
society 1:9
sold 16:11,21
  85:1 95:8,17
  96:2 107:25
  235:8 290:12
  291:20 292:16
  292:22 293:25
  294:13 295:22
  295:24 296:6
  296:21,25
  298:2,17 299:2
  301:9,19
  304:22 305:12
  305:15,19,22
  305:22 306:1
  310:3 312:21
  312:23 314:13
  315:9,15,22
  318:2,16,21
  320:20 324:13
  330:9 332:13

solely 1:9
solutions
  404:23
solved 219:23
  243:4,16
  247:25 248:1
  255:5
solvency 32:17
  35:3 383:7
  385:15 386:12
  386:22,25
  399:19 400:21
  401:1
solvent 37:4
  385:22 386:13
somebody
  177:11 178:6
somewhat
  269:11
soon 363:15,23
sooner 74:8
  398:6,7
sorry 17:6
  18:14 37:21
  64:1 80:22
  81:1 94:25
  118:3 124:14
  130:16 132:15
  133:1,24
  150:17 201:7
  203:11 221:24
  233:12 245:6
  262:25 266:22
  270:17 276:14
  285:5 288:24

319:6 335:25

**sort**  35:17 39:6
  52:6 74:8,19
  105:2,3 200:14
  206:2,15
  208:20 242:10
  247:24 248:2
  262:4 272:16
  272:23 295:12
  369:25 375:14

**sounds**  111:3
  153:21

**source**  198:21
  223:23

**south**  8:6 9:17

**speak**  11:25

**speaking**  18:7
  37:19 38:13
  112:2

**speci**  208:15

**special**  348:12
  377:18

**specialist**  202:4

**specialized**
  353:10 354:6

**specialty**
  325:24 326:13
  326:15 333:14
  333:19,20
  337:21

**specific**  21:13
  21:15 59:8
  154:23 155:14
  155:19,20,25
  158:24 167:7

182:19 208:8
238:9,20
249:11 292:8
302:14 311:19
331:8,10

**specifically**
  28:1,19 31:20
  49:12 64:23
  93:7 95:22
  122:21 138:17
  139:13,19,22
  155:13 182:22
  183:9 203:20
  258:20 304:5
  355:11 382:20
  384:4 385:9

**specifics**
  257:12 293:13

**speculate**  178:9
  247:4 323:22

**speculation**
  300:15

**spend**  11:13
  41:22 42:1
  45:3 87:16
  168:17 169:23
  178:7 198:5
  273:22 275:12
  277:3 279:4
  280:8,11 283:2
  283:13,18
  284:9 287:25
  288:3,3 300:9
  301:6,15
  304:12 363:19

**spending**  42:19
  50:7 264:21
  274:17,21
  278:6,13 280:4
  280:6 284:6
  392:11

**spent**  42:4
  43:18 44:4,18
  171:22 176:23
  215:22,24
  227:20 277:7
  279:5,9 281:17
  281:18 283:16
  286:23 287:11
  287:24 288:6
  300:12 309:14
  340:16 399:20

**spin**  32:15,17
  34:12 35:2
  37:5 42:15
  49:16,17,19
  50:4,15,19,21
  51:3,17,20
  52:2 75:22,24
  99:17 111:23
  143:15 165:23
  166:2 213:1
  279:18 290:6
  290:12 294:14
  295:23 296:3,7
  299:9 301:3
  304:4 306:25
  310:4 318:3
  347:6 348:18
  351:15 353:18

354:2 382:13
383:14 386:11
386:21 387:1

**spin's**  299:15

**spinoff**  28:2,4
  31:5,11 34:19
  35:11 36:10,12
  36:12 37:25
  44:2,9 48:23
  76:18 143:14
  149:13 176:14
  181:18 182:2
  278:20 281:19
  289:22 296:12
  341:17 346:14
  352:3 390:8
  391:9,24
  392:11 393:11
  393:20 394:2,8
  394:14 396:12
  397:7,18 399:8
  401:1,8

**split**  43:3

**spread**  323:4
  370:15,16

**spreadsheet**
  4:23 5:19,22

**springfield**
  6:12 28:7
  44:19 45:4
  87:15,23 115:2
  121:7,12,15
  122:13,16
  123:3,7 127:15
  127:16,20,21

140:8,9 142:1 262:19 263:10 264:21 266:3 270:1,1,6 274:12 277:19 283:1

**spun** 159:12

**stabilized** 230:10

**stable** 379:15

**staff** 147:3,22 148:6 163:16 177:15 187:16 212:17 257:13 394:11

**staffing** 204:8 205:15 284:3

**stalled** 280:17

**stamp** 118:9

**stamped** 142:11

**stand** 260:6

**standalone** 112:4 146:1 147:15 148:18 157:24 159:21 161:25 162:10 162:16 164:12 165:16 177:5 184:20 271:19 346:2

**stands** 90:15 200:14

**start** 44:7 46:15 71:12

168:4 184:10 213:7 280:10 307:6 338:16 339:13,15 370:11 389:14

**started** 28:3 99:1 165:19 174:25 184:10 234:24 294:16 294:18 301:2,5 311:17 380:16

**starting** 40:11 103:16 106:11 267:24 288:15 300:19 305:13

**starts** 23:6 81:23 317:5,7 346:8

**state** 9:22 25:14 219:15 311:14,22 312:16 320:5 403:9

**stated** 141:16 144:22,24 146:15

**statement** 23:22 82:19 127:13 210:21 223:12 231:3

**statement's** 215:12

**statements** 144:5 146:18 147:13 268:14

346:3 369:19

**states** 1:1 9:12 29:6 49:21 98:25 243:18 244:1 311:25 312:6 320:13 323:5

**statistics** 100:10 101:6 101:11

**stats** 97:19

**status** 78:10

**stay** 98:21 210:7,15 237:10 242:17 358:16,18 375:24

**stayed** 94:24 105:3 237:11 237:23

**staying** 130:18 235:3

**step** 93:2 283:22 394:17

**stephens** 9:20

**stepped** 281:25 392:16

**steps** 394:1

**steven** 75:16

**stewart** 363:4

**stick** 77:9

**sticking** 362:3

**stock** 19:16 149:16 373:12 373:16

**stopped** 300:20 342:25 350:8

**store** 46:21 47:10 77:22 78:20 84:20 92:20 95:4 107:25 115:15

**story** 229:2 230:25,25 231:3

**strange** 93:23

**strategic** 69:22 296:11 351:23 354:9,10 355:8 355:16 356:2

**strategies** 54:13 72:23 107:2 249:15 354:16,20

**strategy** 31:21 49:24 51:13 103:24 104:23 273:21 302:23 323:12 352:11 352:14 378:10

**street** 2:9

**stricken** 246:21

**strike** 149:4 161:13 163:5 181:24 246:25

**strong** 22:14 35:25

**structure** 30:14 30:17,19 31:1

**[struggle - sure]** Page 86

**struggle** 167:19
**stuff** 134:11
  277:25 300:20
  392:11
**style** 58:22
**subcategories**
  224:7
**subscribed**
  406:14
**subsequent**
  165:25 359:7
**subsequently**
  280:4
**subsidiaries**
  347:25 348:4
  384:3
**subsidiary**
  347:8 348:19
  383:24
**subsidies**
  205:11
**substantially**
  27:3 100:13
  205:8 367:23
  374:10
**succeed** 48:17
**success** 66:9
  272:19
**successes** 56:9
**successful**
  50:23 54:16
  60:2 76:22
  269:9 305:7
  323:8,18

**sudden** 46:14
**suffered** 70:20
**sufficient**
  222:12 223:8
  223:17 246:17
  247:11
**suggested**
  370:13
**suggestion**
  93:25 94:2
**suggestions**
  241:15 249:18
  249:21
**suisse** 1:17 2:17
  10:16,18 30:16
  30:17,21,23,23
  30:25 34:15
  36:9 37:2,14
  75:16 76:7,9
  76:13,18,23
  94:7 127:17
  130:24 234:16
  251:5,14 259:6
  260:10 263:8
  263:17 264:7
  264:16,19
  285:15,18
  302:22 303:3
  303:11,18
  304:3 313:17
  317:3 326:6
  327:9 330:24
  335:18,24
  336:19 358:14
  360:25 361:13

  365:16,22
  366:13,22
  367:5 370:19
  370:24 371:19
  383:1
**suisse's** 75:21
  366:18 367:1
  369:19
**suite** 8:6
**sullivan** 2:4
**sum** 174:15
**summarized**
  69:11
**summary** 70:9
  70:14 82:19
  89:22,23 154:1
  196:16 363:6
**summer** 13:21
  13:22,25 74:13
**sums** 153:7
**sunbury** 332:7
**sundays** 348:5
**supervision**
  31:15 252:5
**supp** 219:19
**supplement**
  219:7
**supplemental**
  219:19
**supplemented**
  244:14
**support** 1:15
  147:22 158:5
  222:13 223:9
  239:9 325:3

  333:9 334:3
  364:13 367:6
**supported**
  75:15 261:21
  272:21 317:2
  364:16
**supporting**
  197:7 325:5,10
**supposed** 151:8
  192:6 331:22
  395:9
**sure** 11:14
  32:11 33:17
  37:10 39:17,18
  44:13 46:4,7
  48:8 54:5 67:5
  72:4 73:6,8
  102:11 108:22
  138:23 140:7
  141:25 142:10
  143:19 144:23
  145:2 161:18
  169:21 171:25
  178:13 185:18
  193:5 198:21
  206:10 207:20
  210:20 220:25
  231:6 237:9
  265:22 270:22
  273:11 276:3
  277:15 278:11
  286:13 304:8
  304:10 333:12
  341:15 357:16
  358:19 360:7

367:6 369:20
371:22 375:14
380:8,18 383:4
384:20 386:4
400:17,24

**surgeries** 24:10
24:11

**surgery** 24:3,3
24:14

**surprised**
229:3

**swear** 8:17

**swearing** 9:24

**sweep** 347:25

**sweeps** 348:22
350:15

**sweinheart**
396:6

**switching**
185:15

**sworn** 11:3
403:4 406:14

**synergies** 109:6
109:13 110:4,9
110:15,19,25
116:9,12
123:22 125:10
125:25 126:2
126:19 127:4,6
129:17 130:3
130:11 131:3
131:25 132:5
191:17

**synergy** 130:8
130:8 132:2

**systems** 1:12,13
4:10 6:11
10:24 20:5
157:6 343:17
343:24 344:2
346:1 389:17
404:4 405:1
406:1

**t**

**t** 405:3,3

**tab** 5:10 17:2
69:4 81:18,22
81:24 82:2,6
82:11 84:1
90:1,4 97:1
102:6 119:7
120:8 132:13
132:14,15
152:5 154:7
167:12 185:10
190:17 194:12
194:13 196:17
199:3,5 201:19
209:24 215:15
226:4,7 232:16
285:3 329:5
369:2

**tailwinds** 53:6
53:16 54:6
55:8 59:18
60:10,11,11,15
61:12

**take** 19:2 38:25
39:2 40:10,21
41:1,8 61:13

61:16 70:14
71:6 74:14,14
86:11,21 93:2
96:4 102:9
104:12 108:22
124:16 129:14
185:3,16
192:18 207:2,4
208:3,23 236:3
237:1 246:6
248:4 273:12
273:13,15
283:22 284:9
297:14 302:20
304:2,6 305:25
342:24 348:10
351:11 354:25
370:10 372:5
388:20,21
392:5 394:7
397:5 398:17

**takeaway**
188:22

**takeaways**
69:12

**taken** 1:23 8:3
179:17,18
180:22 269:14
297:12 324:14
347:14 349:16
384:9 403:6

**takes** 38:17
39:12,24 43:21
261:12 303:4
306:9,17

334:22

**talented** 394:21

**talk** 16:25 34:6
214:6 249:14
359:19 369:24

**talked** 30:25
56:17 98:2
148:12 159:8
209:7 230:7
232:24 242:2
300:20 328:13
330:17 371:21
371:24 375:16

**talking** 19:5
24:2,22 25:23
25:25 33:10,11
33:22 34:1
38:16 46:15
50:6 52:19
110:15 132:12
144:11 151:4
179:25 180:2
203:6 221:11
221:20 222:7
249:14 250:18
250:20,25
252:8 254:19
256:1,11,24
314:17 373:5
377:2,14
379:22 387:9
396:18,23,25
399:20

**talks** 73:21
160:9 191:16

379:24
**target** 41:18
  42:1 141:17
  235:4 359:8
**targeted** 366:1
**tax** 71:22 233:1
  342:7,9,10,11
  342:12 343:7
  345:6 348:24
  349:3,4,6,13,19
  358:22 383:8
**taxes** 176:7,8,9
  349:5 379:10
  379:11
**taylor** 69:13
  70:6,19 71:13
  72:20 74:5
**taylor's** 72:1
**team** 30:2,7
  39:7 50:24
  88:11 105:4,5
  107:6 155:5
  214:16 395:17
**teams** 72:19
**technical** 152:6
**technology**
  23:18 341:7
**ted** 69:21,23,25
  311:1
**tell** 12:19 67:4
  94:5 140:14
  154:25 173:25
  199:15,17
  207:18 208:25
  216:8 239:16

267:7,25
285:18 290:21
309:10 311:20
362:6 382:21
389:18 401:23
**telling** 92:11
  136:23 264:16
  285:16 370:21
**ten** 304:22
  305:4,12
**tend** 63:18
**tendency** 70:10
  284:21
**tendering**
  130:17 263:1
**tennessee** 3:3
  8:7 9:17
  186:14,17,18
  403:9
**term** 75:1,4
  92:6 103:5,6,9
  103:10 136:10
  225:24 226:2
  367:22 370:1,4
  372:11 377:22
**terms** 151:15
  338:21 343:13
  393:25 394:8
  400:12
**test** 375:13,17
  375:19,25
  376:14,15
**testified** 11:4
  57:5,8,23
  132:24 135:25

139:5 140:19
141:16 261:6
277:18 278:4
280:13 292:20
293:4 297:5,10
338:19
**testify** 13:8
  231:17 239:17
  346:25 403:4
**testifying** 43:16
  44:1,8 51:2
  104:14 392:8
**testimony**
  13:14,18 58:14
  298:11 303:2
  402:8 403:7,11
  404:9,17 406:8
**testing** 5:9
**texas** 203:21
  204:4 326:24
  326:25 327:11
**text** 24:21
  29:17 52:6
  67:12 90:11
  145:21 148:13
  149:9
**th** 254:15
**thank** 12:14
  14:7 70:4
  116:4 125:2
  142:23 154:15
  181:21 183:22
  202:23 203:17
  210:3,23
  289:17 309:18

309:19 310:18
341:24 357:15
390:3 391:13
**thanks** 17:14
  123:20 125:9
  126:9 332:25
**that'd** 95:9
  252:2
**theory** 272:25
  273:1 294:1,2
  294:3
**therapy** 54:25
**thing** 12:9
  22:24 29:4
  89:19 135:12
  140:12 177:25
  219:13 273:8
  358:17 372:10
  373:10 394:21
**things** 22:13
  39:21 43:22
  60:5 68:22
  87:20 109:13
  122:12 129:1
  149:6 152:19
  153:16,20
  157:23 159:3,9
  159:9 162:15
  187:18 189:21
  217:9 230:3
  233:4 242:7
  248:2 249:15
  254:15 340:3,7
  348:13 352:25
  355:15 359:20

**[things - third]**                                                                      Page 89

383:9 394:7
397:23 400:3,7
**think**   12:19
19:20 22:11
23:2,4 25:9,11
25:23 29:5
31:19 35:15
37:10 42:3,11
43:2,7 49:8
50:21 53:15
56:1 59:3
61:11,16 62:3
65:25 67:3
68:10 69:9
72:12,12 76:23
77:1,12 79:3
80:21 82:16,17
82:18 83:1
85:23 86:7
87:4,16 91:21
94:16 98:10,17
99:3 101:1
104:14 106:3
106:10 111:7
111:25 112:19
112:25 113:11
115:1 116:10
118:4,23 119:4
123:9 125:23
127:11,18,25
128:5,7,10
129:23 131:11
131:12 134:4,5
134:21 136:5,5
136:14,25

137:4,17 138:3
138:10 139:24
139:25 143:7
145:11,16,18
146:7,10,21
147:1,4 148:24
149:6,17 150:5
150:9 153:16
155:4,6 156:22
157:10 159:22
159:24 160:1
160:25 168:8
169:4 170:7
171:20 173:24
174:14,20
175:18,19
176:8 177:14
177:19 178:3
179:8,19,21
180:16,23
182:5,14,16,24
185:9 187:7
189:16 191:7
191:21 192:10
195:22 196:18
201:3 205:10
206:19 207:6,8
207:13,24
208:12,21
209:9 211:6,12
211:13,20
215:6,8 219:22
220:24 227:12
227:16 228:24
229:8 230:3,8

233:14,15,19
234:2,6,15
236:16,20
239:13 242:17
243:1,5,9
248:9,9 249:20
250:4 251:25
252:3,17,22
253:14 254:7
254:12 255:8,9
258:17 260:18
260:23 261:3,5
269:7 272:8
273:21 274:24
281:16 284:15
287:10 288:15
289:13 290:19
291:16 293:1,9
293:12,15
294:4,21 297:5
297:9 301:14
301:21 302:24
302:25 303:12
303:13,14
305:13,18
307:13 308:22
310:15,24
317:20 320:19
322:16 324:10
325:20 326:11
327:8 328:18
329:25 330:1
330:16,23
331:4,21,23
332:22 335:14

336:18,20,23
340:8 341:14
342:7,10,17
343:1 349:20
350:21 353:6
354:15 358:23
360:24 362:18
363:17 364:15
370:4 372:2
375:23,23
377:21 378:15
380:17 381:25
382:1 383:25
384:13 385:5,7
386:3 387:23
390:20,24
391:11,25
393:6 395:22
397:10,14
399:17
**thinking**
106:22,23
111:11 131:13
295:1,2 300:21
300:22 301:4
331:4
**thinks**   221:15
**third**   8:6 18:6
18:15 53:5
74:12 75:2
82:10 85:22
86:2 90:22
91:13 108:9
114:3 131:8
160:8,11,14,15

**[third - times]** Page 90

160:17 191:16
245:3,9,15,16
311:13 351:19
351:20 352:6
358:9
**thought** 50:2,4
50:10,12,23,24
51:12 63:25
66:1 91:23
94:11,17 99:12
103:25 104:8
104:11 105:2,4
105:21 107:8
107:19 112:10
115:22 128:19
131:11,17
138:1 141:22
145:19 149:20
152:25 191:6,8
234:2 242:25
247:25 248:3
251:22 252:18
255:5 260:24
262:6 279:24
280:25,25
281:2,18
283:12 284:8
287:11 291:1
303:14 321:16
322:23 323:10
324:8 327:14
328:14 358:25
359:10 362:6
363:21 367:12
368:5 379:6,6

383:21,23,23
384:3 386:16
388:10,12,16
391:15 392:1,1
392:7 394:20
396:13,23
398:23
**thoughts** 45:22
249:18 365:10
**thousand** 54:9
**three** 49:5
91:12 92:8
98:7 100:11,14
100:17 109:8
123:3 137:8
230:8 234:6
247:14 261:4
261:23 287:3,7
297:24 305:6
329:13 332:6
332:12 392:13
**throneberry**
202:1,7 203:18
204:7 205:4
**throws** 238:21
**ti** 6:7
**tied** 155:20
**ties** 197:3
**till** 149:24
364:2 397:12
**tim** 200:23
201:1 272:18
**time** 9:7 11:13
12:10 18:3
35:1 36:1

39:12 43:8,19
50:8 56:20
57:10,22 58:9
62:9 70:9 72:8
73:3 74:22,23
80:2 102:13,16
104:6 108:22
109:9 111:7
115:18 130:1
131:16 144:17
147:17,18
168:18 169:23
185:16,20,23
198:15 205:16
206:1,25
207:24 211:6
211:25 214:13
216:17 237:22
242:4,13 243:2
249:10 252:10
252:12 253:1
253:19 255:2
257:3 261:12
270:18,24
271:2 272:11
272:20 277:17
278:13 295:13
300:10,12
302:15,19
303:3,14 304:1
304:5 305:11
305:15,16,20
306:9,25
308:11,12,17
309:9,13,15,21

313:25 314:5
315:7,20 316:6
316:8,15,21,24
321:24 322:5
323:1 324:15
327:21 329:14
337:5,9 341:9
348:23 349:15
351:11 352:8
360:15 361:19
362:10 363:20
364:12,16,20
367:16,21
372:6 373:16
375:22 379:10
382:12 383:16
389:3 390:5
391:1 392:11
393:1,20 395:1
396:3 397:21
399:20 401:24
403:6 404:18
**timeframe**
404:8
**times** 13:15
16:1 135:11
140:21 154:12
205:21 297:6
315:1,3,9,22
317:13 329:14
358:15,16
359:12,17
360:20,21,25
361:4 362:2,8
362:15 365:18

**[times - treasury]** Page 91

365:23 366:3,4 367:6 369:20 370:23 373:12 374:16,20 375:16,16,18 375:24 376:10 376:12,12,13

**timetable** 311:14

**timing** 365:11

**title** 390:1 393:3

**titles** 389:15,18

**today** 12:3,16 13:9 14:10 19:4 21:15 32:12,19 62:17 75:20 77:8 221:1 273:4 297:6 311:5 349:1 364:10

**today's** 13:12 402:8

**together** 15:14 80:1,3 167:20 226:17 274:5 285:19 297:24 318:13

**told** 37:2 94:3,6 94:8 136:24 140:14 324:19 394:10,22 396:4

**tom** 43:5,8,17 43:23 150:7

257:23 356:7 378:13 392:4 394:17 396:1 400:19

**tomorrow** 45:13

**tooele** 28:16,16

**took** 44:14 134:13 159:24 182:25 186:17 206:21 231:24 232:11 234:17 253:9 281:19 304:20 311:20 350:18 397:11

**top** 38:15 46:20 47:13 62:7 63:16,20 64:7 64:17 77:20 78:8 85:24 90:23 108:9,10 108:19,25 109:8,8 111:1 123:19 125:8 155:11 168:4 173:16 181:6 181:11 186:11 250:11 252:9 252:23 255:19 266:8 325:14 357:23 359:20 359:23 360:6 374:12 375:21

**topic** 260:10,12

**topics** 259:13

**total** 86:22 152:10,14 153:15 161:12 180:13 204:10 330:8 332:7 357:19 365:18 365:24

**totally** 196:4

**touche** 143:23 144:20 343:6

**towards** 29:20 41:13 72:3 144:1 155:23 191:20 202:8 245:3 313:14 377:4

**tower** 45:4 87:24 122:13 122:16 141:3 270:4,6 274:12 275:6 276:6 278:24 283:1 286:23 288:6 288:12

**traditional** 368:12

**trailing** 254:5 254:10 357:17 358:20

**transact** 390:7

**transaction** 35:16 37:5 105:10 143:14 311:15 322:22

344:18 346:14 351:6 363:15 364:3 370:12 398:23

**transactions** 32:8 35:5 314:11 342:8 363:21 397:17

**transcribed** 403:12

**transcript** 11:22 12:2 17:22 18:2 28:21 404:6,19 406:5,8

**transcription** 18:7

**transferred** 146:25 177:14 177:16 204:1

**transition** 151:14 191:23

**transitional** 151:12

**transitioned** 187:20 193:2

**transitions** 188:5,11,17 189:1

**translate** 98:11

**tre** 114:17

**treasury** 69:20 69:21 177:15 274:11 310:23 336:25

**treat** 194:5
341:25
**treated** 33:14
66:10
**treating** 16:19
**trend** 22:20
71:21 208:21
209:2
**trends** 20:15,21
21:16,17,18,19
21:21 22:19
47:13 53:8
54:1 55:21
208:20 209:11
289:24
**triad** 32:8
76:10
**tried** 19:25
35:16 42:1
206:8 208:22
292:15 294:9
380:8 382:25
388:8
**trouble** 196:11
243:21
**troubles** 244:1
**true** 37:1 221:6
221:15 352:18
406:8
**trust** 1:8
**trustee** 1:7,10
**truthful** 38:12
**try** 12:12 31:22
41:21 54:15,22
72:22,24 77:9

94:12 100:4
104:12 182:17
185:4 188:15
188:24 193:11
195:17 196:8
214:16 242:23
243:12 257:13
290:5 307:10
307:12,15
358:15 360:18
363:14 364:20
367:15 379:4
394:11,15
**trying** 49:23
60:16,22 61:8
70:24 127:12
153:2 170:15
177:24 185:1
206:17 226:22
231:12 311:17
321:23 322:25
362:1,7 373:19
375:12,15,25
377:22 378:5,6
388:1 396:5
**tsa** 5:17 112:16
133:13 134:3
135:16 136:9
146:6 158:9
177:18 184:21
184:22,24
198:2,6,11,14
199:24,25
200:13 383:8

**tsas** 157:8
192:7 201:16
383:4 398:21
399:14
**turn** 17:17 18:1
20:6 24:17
38:8 41:10
45:24 46:18
47:12 63:13
65:6 67:8 77:4
77:19 81:17
89:10 90:24
103:23 108:4,8
110:12 131:14
137:2 143:25
150:14 151:17
155:8 160:5
186:6 199:13
215:14 218:9
218:10 224:2
240:10 241:18
244:9,24
246:12 251:10
265:1 266:5
271:5,7 274:15
276:21 278:9
285:23 289:8
289:12 313:12
319:2,16
339:18 342:19
342:23 343:8
345:16 350:24
364:5 365:14
374:13,14
375:22 377:5

377:15
**turned** 95:1
111:8 129:20
131:14 181:3
183:18 207:9
359:14,15,16
372:15 379:9
**turning** 28:20
46:16 52:4
73:20 113:7
352:5
**twice** 29:10
272:9 317:19
391:12
**two** 14:4 33:13
43:5 64:7,17
64:24 76:11
82:9 83:18
88:3 91:20,24
92:20 95:3
99:13 129:1
157:4 170:15
170:16 174:19
194:22 204:4
213:11 216:11
217:9,11 220:3
222:9 224:7
230:3,6 233:4
265:21 276:14
287:3,6,13,14
287:17 289:13
305:6 311:20
317:11,12
318:7,12
325:12 330:8

340:4 386:1
389:15,18
**type** 61:19
63:10 104:4
125:20 137:20
216:16 250:1
323:13 347:8
351:17 392:20
**types** 27:6
314:12,13,17
**typewriting**
403:12
**typical** 311:25
319:20 320:2,4
**typically** 26:25
252:25 304:20
306:16 314:13

**u**

**u.s.** 346:2
**uh** 29:9 60:4
67:13 91:7
129:5,8 140:24
142:12 181:10
193:18,22
252:6 264:4
265:1 283:20
379:2
**ultimately** 31:2
115:21 257:22
288:6,18
359:13 367:18
**un** 202:5
298:23
**unable** 13:8
36:11 296:13

**unanticipated**
159:10
**unattractive**
53:3 54:1
55:21 67:16
68:3,5,23
**unclear** 12:7
**und** 48:22
272:25
**under** 8:8
20:13 23:8
29:6 31:15
36:15,18 39:25
40:3 47:18
48:15 78:14
135:21 157:7
158:22 197:20
207:17 252:5
272:25 336:12
336:14 351:3
376:1,11
**underlying**
197:12 200:10
260:13
**underperfor...**
52:14
**underperfor...**
290:6,10
291:17 293:7
293:17,23
295:21 314:18
**understand**
11:18,19 12:21
59:21 60:7,14
60:18 61:7

62:13,24
127:13 130:4
133:21 144:10
170:15 208:20
212:11 221:10
284:21 303:10
382:17 384:20
**understanding**
38:23 56:22
57:4,17,20
58:11 59:12
147:9 148:10
161:8 219:6
280:20 377:12
395:8
**understood**
57:9,12 59:3
270:6 281:14
298:23
**undertake**
265:10
**undertook**
144:15
**underwrote**
34:12 36:10
**unemployment**
21:23 66:8
68:13
**unfortunately**
56:6 72:15
141:13
**uninitiated**
62:23
**unintelligible**
309:6 371:2

**unique** 202:5
**unit** 9:8
**united** 1:1 9:12
**unknown**
166:19
**unpaid** 224:15
225:3
**unreasonable**
220:1
**unusual** 58:19
224:23,24
253:25 254:2
254:13 312:10
312:15
**update** 45:14
**updated** 75:14
368:25 385:6
385:13
**upped** 157:15
**upper** 78:9
278:18
**upside** 103:5,9
106:2,7
**urban** 20:16,21
21:6,22 26:24
40:23 68:24
**urbans** 23:10
**urquhart** 2:4
**usa** 1:18
**use** 54:20 67:24
68:4 76:12
77:7 79:24
89:15 199:8
204:18 228:8
259:18,19,20

260:15,22
285:2 316:20
321:21 329:13
352:7
**used** 32:16
35:21 37:14
76:9,10,12
77:2 176:23
181:15 222:24
228:13 230:16
236:7 237:3
238:20 245:12
245:24 246:9
259:18 272:7
274:5 322:19
326:10 334:8
344:24 348:23
373:10 398:20
399:15 404:19
**uses** 155:12
343:13
**using** 67:22
120:17 140:3
198:22 205:20
236:15 326:2
327:17 375:4
**usually** 86:13
95:24 225:6
238:18 242:7
335:10 384:5
**utah** 28:16
**utilized** 254:10

**v**

**v** 1:11
**vacations** 74:14
74:15
**value** 50:12,25
370:7 373:11
373:14 383:3
**variance** 66:4
173:21
**varies** 312:16
**various** 13:14
45:21 122:22
153:20 249:24
310:23 341:6
399:23 400:13
**vary** 176:7
**vast** 203:19
**vendor** 205:8
**venture** 269:11
289:24
**ventures**
291:13
**verification**
164:1
**verify** 335:7
404:9
**verifying**
144:21
**veritext** 9:21
118:15 404:14
404:23
**veritext.com.**
404:15
**verse** 302:7
382:23

**version** 75:14
77:8 79:25
80:17,18,19
84:1,2,3,5,7,7
85:22 86:2
88:17 89:10,10
90:22 91:13
96:25 97:6
120:5,5 251:5
251:13
**versions** 79:25
80:2 400:25
**versus** 20:16,21
21:7,22 52:15
68:17 79:9
101:18,23
104:22 106:11
107:24 166:22
178:11 183:11
188:4 192:14
195:18 198:13
210:21 224:20
269:3 378:5
**vesti** 296:20
**vice** 283:24
**video** 8:1 9:9
**videographer**
3:8 9:1,19
102:8,12,15
185:14,19,22
270:17,20,23
271:1 335:19
335:25 336:4
337:4,8 388:24
389:2 401:23

401:25 402:3,6
**videotape** 1:21
**view** 39:24 55:7
68:2 70:19
113:1 209:1,16
310:2,2 327:3
330:14
**views** 395:15
**violate** 301:22
**visit** 54:21
**vividly** 140:18
**voiced** 248:23
248:23
**vol** 62:18
**volatility** 366:8
366:19 367:14
**volume** 20:15
20:21 21:1,21
22:21,22,23
40:18 47:13,19
48:1,11 49:11
52:14 61:19
62:7,18,20
63:3,3,6,10,17
65:18,21,24
71:19 72:15,16
72:16 74:15
86:9,12,15
87:1 89:7,7
94:16 97:25
104:24 204:10
204:18 205:22
208:2 212:17
217:18 272:5,5
378:6

**[volumes - witness]**

**volumes** 204:9 204:16
**vote** 380:24
**vp** 43:10 144:17 389:21 396:3
**vps** 147:25
**vs** 404:4 405:1 406:1

**w**

**w** 1:16
**wait** 36:16,17 43:13 55:23 60:25,25 116:1 134:19,19,19 169:12 305:1 364:2 369:5
**waiting** 149:24
**waived** 8:12,20
**walk** 46:14 343:20 394:25
**want** 33:20 39:19 43:12,13 43:17 56:12 71:6 83:7 90:2 116:8 119:11 119:19 133:24 152:4 170:2 177:11 178:8 191:13 193:5 209:25 210:5,6 210:8 227:19 240:17 254:11 258:11,12 263:15 265:21

273:19 277:23 284:21 292:11 301:25 304:11 323:19 359:4 364:10 370:10 370:11,22 371:14 392:4 394:17 396:4
**wanted** 42:17 42:23 43:23 49:19 50:19 51:3,4,11,12,20 150:8 164:2 177:10 246:25 250:6 258:15 259:22 264:10 265:10 270:8 270:12 295:8 323:8 335:9 351:5,14,21 352:3 363:14 365:23 369:24 386:25 396:2
**wants** 368:18
**washington** 2:10
**way** 31:22 37:19 116:15 126:2 139:16 141:3 152:25 154:25 156:9 185:4 188:15 189:21 215:4 249:23 253:17 264:17 297:22

307:16 347:13 374:13 379:24 380:3,12 401:20 403:15
**wayne** 18:2 58:20 361:20 394:14,17,22 396:4,6
**ways** 213:11 243:12
**we've** 56:13 61:23,25 95:3 95:23 126:19 142:9 148:12 151:3 168:8 185:15 240:25 244:1 291:2,9 291:15 292:14 304:22 347:14 358:18 401:24
**weak** 71:19
**week** 348:8
**weight** 317:18 317:20
**weighted** 67:25 317:24
**weighting** 328:15,19
**went** 13:13 57:6 87:10 89:6 97:21 98:4 147:3 149:22 158:1,2 158:13 225:12 228:17 232:20

237:15 266:14 324:9 328:11 340:13,15 393:12
**west** 186:14
**what'd** 118:11
**whereof** 403:17
**whispering** 9:5
**whit** 29:17
**wide** 205:16 347:20
**wilmington** 1:8
**winter** 383:22
**wiseman** 10:17
**withdraw** 160:24 162:2 170:1
**witness** 4:3 8:17,19 9:25 10:13 11:5 14:18 18:18,24 20:8 21:10 22:1,9,12 24:19 29:1 32:5 35:14 36:18 41:1,11 46:1,19 48:5 49:4 51:25 52:23 54:4 55:11,25 56:25 58:18 59:6,16 60:10 61:1,11 62:16 63:2,15 65:8 67:10 71:8,8 77:5

**[witness - writes]**

82:1 83:5,8
86:6 88:2,23
89:18 91:19
93:6 95:22
96:19 100:23
101:22 108:23
112:10 118:11
119:11,20
124:1 126:10
126:17 128:10
134:2,7 141:20
142:16 144:3
149:12 150:15
150:25 151:21
154:8 155:10
160:7 163:15
164:16 165:13
167:3 169:18
169:22 171:4
171:10,24
172:12 178:20
182:24 183:16
186:8 190:25
196:23 197:6
222:15 223:11
223:20 224:4
227:5,24
231:18,20,23
241:20 244:6
244:11 245:1
246:14 247:3
247:16 248:21
250:24 253:6
257:21 258:2
258:10,14

262:17 263:2,6
284:20 287:9
290:14,25
291:22 294:25
297:9 299:7
302:4 304:10
305:3 306:12
307:9 308:5,6
310:17 313:15
314:23 317:10
319:4,7,18
322:9 323:3
324:8 327:6
328:7 332:16
335:21 336:2,5
339:20 343:10
345:18 346:21
350:25 353:25
354:8 355:20
356:5 360:14
363:14 366:1
366:17,25
369:3 371:4
372:18 374:25
379:14 380:7
382:9,19
386:23 387:23
393:6 394:4
398:2 399:12
403:2,7,17
404:8,10,12,18
**word** 31:19
61:11
**words** 55:12
157:13 204:25

206:18 207:1
**work** 35:3
45:14,17 69:21
69:23 70:9
88:24,25 141:7
145:3 147:19
150:4 158:1,14
158:20,21
159:1,7,17,23
159:23 163:4,8
163:17 164:9
166:7 175:1,4
175:6,7 177:15
182:17 184:16
187:25 189:16
189:20 196:8
197:18 200:24
206:8 221:19
243:13 248:3
258:17 280:21
281:9 294:16
295:14 299:8
300:13,13,19
306:9,13,15
307:1 309:9
310:25 338:14
338:18 339:2
342:25 361:21
361:25 362:4
362:12,13
363:22,22
365:16 375:13
392:18 395:2
398:21,22
400:22

**worked** 134:17
141:1,1 144:19
281:24 310:23
393:14
**workers** 146:16
225:20 380:23
**working** 32:6
38:19 107:6
140:10 218:17
222:8 226:17
226:19,21
227:22 230:17
232:5 246:18
247:12 251:12
259:9,16,18
260:15 294:18
300:8 309:15
334:15 362:20
372:4 393:25
**works** 69:18,20
196:5 244:2
**worksheet**
200:14
**worry** 17:7
282:16
**worse** 86:19
129:3 298:9
339:6
**would've** 35:15
**write** 257:16
313:17 325:14
341:25
**writes** 77:20
130:25 256:7
282:25 314:24

363:5
**writing** 69:10
256:6 264:9
365:22
**written** 7:14
93:10 241:22
243:22 262:10
273:14 384:10
384:16 385:1,3
397:17
**wrong** 124:9
173:25
**wrote** 72:8
132:19 244:12
245:19 249:16
387:15

**x**

**x** 4:1 305:22

**y**

**y** 275:24,25
305:22
**y'all** 43:12
**y's** 305:22
**yeah** 16:24
18:12 22:5,5
33:19 36:18
40:8 42:12,25
55:25 56:15
58:18,18,24
59:11,21,23,25
60:14 61:6
68:12,21 71:5
71:8 79:16
81:13,14,19,25

82:18 83:6,8
83:23 94:23
98:12,16 99:19
106:9,19,24
107:21 110:6
110:21 111:2
111:13 113:25
113:25 114:8
115:11,12,19
116:4 117:6,8
117:25 122:9
122:11 124:20
132:14,16
133:2,9,11,22
134:2,7,10
136:5,5,22
137:5 138:10
144:12 145:23
145:23 150:24
151:6 152:3,3
152:24 154:11
164:7 169:2,6
171:14,19
173:18 176:2
188:16 189:25
190:9,9,23
191:9 196:23
197:22,24
198:25 206:23
207:1 210:2,10
212:12 213:3
213:22 214:8
215:10 221:13
222:1 227:1,12
229:19 230:24

233:8,17,20
235:9,12,14,18
236:18 237:19
243:5 249:4
253:16,21,23
253:24 258:13
258:23,24
269:4 271:15
275:1 276:4
280:24 287:19
287:21 288:21
291:8 292:20
301:12 305:17
305:21 312:3
325:8 329:5
331:23 332:1
333:8 334:11
335:1,4,21,21
336:15,22
340:15,25
350:19 351:13
355:14 359:25
360:2,11 373:8
373:21 374:18
375:22 382:5,7
382:9
**year** 39:6,9
42:4 44:24
73:11 79:11,11
94:16 97:18
110:15 120:22
121:18 127:23
131:4 173:20
173:20 177:2,3
184:6,8 185:1

185:2 192:12
192:13,14,15
193:14,20
194:7 202:10
203:2,7 205:6
206:18 207:4
210:16 219:12
220:2 224:14
224:16,20
227:11 228:25
231:25 232:1
232:20 233:18
238:6 242:8,9
242:20 243:19
244:2 253:7
254:1,13 267:9
267:14,15
269:21,21
270:2,2 273:16
273:16,18
274:18,23
278:1,1 286:17
294:5 295:25
299:8 327:19
327:22 350:4
354:9 377:11
381:1 388:15
392:14 393:3
399:7 400:2
**year's** 152:23
**yearly** 274:23
274:25 275:3
**years** 19:19,21
49:6,6,22 50:3
59:2,9 73:11

**[years - zick]**

| | **z** |
|---|---|
| 79:20 98:5,7,9 103:14 104:20 105:12 111:1 112:6 115:2 121:21,25 123:3 131:3 137:7 140:1,2 151:15 190:15 193:7 216:5 230:1,19 231:4 232:6 234:7 247:14 252:14 253:1 254:16 259:22 260:17 266:1,3 279:13 287:3,7,13,14 287:17 304:23 311:20 318:3 349:3 371:21 372:3 377:16 380:13,20 381:9 | **zero**   329:12 **zick**   14:2,3 |

**yep**   209:21
  210:3 218:8
  249:22 259:2
**yesterday**
  365:9
**yields**   333:5
**york**   2:5,15,19
  2:24 3:6
  393:13
**young**   300:10

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.