**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>QUORUM HEALTH CORP.,<br>Reorganized Debtor | Chapter 11<br><br>Case No. 20-10766 (BLS) |
| DANIEL H. GOLDEN, as Litigation Trustee of the QHC LITIGATION TRUST and WILMINGTON SAVINGS FUND SOCIETY, FSB, solely in its capacity as Indenture Trustee<br>Plaintiffs,<br>v.<br><br>COMMUNITY HEALTH SYSTEMS, INC.; CHS/COMMUNITY HEALTH SYSTEMS, INC.; REVENUE CYCLE SERVICE CENTER, LLC; CHSPSC, LLC; PROFESSIONAL ACCOUNT SERVICES, INC.; PHYSICIAN PRACTICE SUPPORT, LLC; ELIGIBILITY SCREENING SERVICES, LLC; W. LARRY CASH; RACHEL SEIFERT; ADAM FEINSTEIN; AND CREDIT SUISSE SECURITIES (USA) LLC,<br>Defendants. | Adv. Pro. No. 21-51190 (BLS)<br><br>Re: Adv. Docket Nos. 346, 347, 350, 351, 355, 356, 375, 378, 380, 406, 409, 411. |

# OPINION (i) DENYING MOTION TO EXCLUDE EXPERT TESTIMONY AND (ii) DENYING MOTIONS FOR SUMMARY JUDGMENT FILED BY THE CHS DEFENDANTS AND ADAM FEINSTEIN[1]

[1] This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(a) and § 1334(b). Although this matter involves non-core issues, the Bankruptcy Court has authority to enter an order in this matter. *See O'Toole v. McTaggart (In re Trinsum Grp., Inc.)*, 467 B.R. 734, 738 (Bankr. S.D.N.Y. 2012) ("[B]oth before and after *Stern v. Marshall*, it is clear that the bankruptcy court may handle all pretrial proceedings, including the entry of an interlocutory order dismissing fewer than all of the claims in an adversary complaint."). Further, a bankruptcy court may enter a final order without offending Article III so long as the parties consent. *Buchwald Cap. Adv. LLC v. Schoen (In re OPP Liquidating Co., Inc.)*, 2025 WL 513283, *2 n. 18 (citing *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 686 (2015)); *see also* Del. Bankr. L.R. 7008-1 (in the absence of a statement that a party does or does not consent as required by Fed.R.Bankr.P. 7008, the party waives the right to contest the authority of the court to enter a final order or judgment).

Quorum Health Corporation and related entities (the "Debtors") filed chapter 11 bankruptcy petitions in this Court on April 7, 2020. The Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization (the "Plan") was confirmed by the June 30, 2020 Order of this Court.[2] The confirmed Plan established the QHC Litigation Trust (the "Trust") at the request of the holders of certain Senior Notes to investigate potential causes of action and to prosecute or settle, on behalf of the Trust's beneficiaries, all claims and causes of action of the Debtors or their bankruptcy estates that were transferred to the Trust. On October 25, 2021, Daniel H. Golden, as Litigation Trustee of the QHC Litigation Trust (the "Trustee") and Wilmington Savings Fund Society, FSB ("WSFS" or the "Indenture Trustee") filed a Complaint against Community Health Systems, Inc. ("CHS"), related entities and officers of CHS, and Credit Suisse Securities (USA), LLC. The CHS Defendants[3] have filed a motion seeking summary judgment[4] on the remaining claims asserted against them in the Trustee's Complaint for Illegal Dividend (Count 13), Breach of Contract (Count 12), Unjust Enrichment (Count 15) and Fraudulent Transfer (Counts 3-8).[5]

---

[2] Main Case No. 20-10766, Docket No. 556 (the "Confirmation Order").

[3] The CHS Defendants consist of Defendants Community Health Systems, Inc. ("CHS"); CHS/Community Health Systems, Inc. ("CHS-2"); Revenue Cycle Service Center, LLC; CHSPSC, LLC; Professional Account Services, Inc.; Physician Practice Support, LLC; Eligibility Screening Services, LLC; W. Larry Cash; and Rachel Seifert.

[4] The CHS Defendants' Motion for Summary Judgment is filed at Adv. Docket No. 346. Credit Suisse Securities (USA) LLC ("Credit Suisse") filed a Motion for Summary Judgment at Adv. Docket No. 357. The Summary Judgment Motion filed by Credit Suisse which will be addressed by this Court in a separate opinion.

[5] By previous Opinion and Order, the Court granted the CHS Defendants' motion to dismiss Counts 1 and 2 of the Complaint, concluding that the transfer fell within the safe harbor provisions of Bankruptcy Code Section 546(e). *See* 2023 WL 2552399 (Bankr. D. Del. March 16, 2023) (the "Motion to Dismiss Opinion"). In the Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment, p. 120 n. 380, the Plaintiffs write that they "do not oppose Defendants' motion for summary judgment with respect to the claim for aiding and abetting illegal dividend, claims related to TSA payments, or the avoidance claim relating to the Term Loan Amendment Fee."

Adam Feinstein, a former director of the Debtor, also filed a motion for summary judgment on Count 13 (Illegal Dividend) and Counts 5-8 (Fraudulent Transfers).[6]

The CHS Defendants assert that discovery in this case has failed to produce sufficient evidence to support the central theory underlying the Plaintiffs' claims: that is, that Quorum Health Corporation ("Quorum" or "QHC") was hopelessly insolvent as of the date of its spin-off from CHS. Instead, they claim that all evidence (including, most notably, market evidence) demonstrates that Quorum was solvent at the time of the spin-off. The CHS Defendants argue that the Plaintiffs base their case on the testimony of their expert, Patrick Allen, who (according to the Defendants) discards contemporaneous projections of Quorum's future performance and relies on his own projections that were created nearly a decade later. They, along with Defendants Adam Feinstein and Credit Suisse, have also filed a *Daubert* Motion to exclude the testimony of Patrick Allen.[7]

The Plaintiffs oppose the *Daubert* Motion and the Summary Judgment Motions. The Trustee notes that his expert is a healthcare investment banking professional with more than 20 years of experience forecasting hospital results and performing hospital company valuations. The Trustee argues that Mr. Allen's testimony, based on reliable and well-accepted methods of valuation practice, easily satisfies the threshold for admissibility under the Federal Rules of Evidence. Further, the Plaintiffs oppose the Summary Judgment Motions, arguing that the motions offer a one-sided portrayal of the record based on omission and distortion. The

[6] Adam Feinstein filed a Motion for Summary Judgment at Adv. Docket No 350. To the extent that Mr. Feinstein's arguments for summary judgment overlap with the CHS Defendants' arguments, he is considered to be included in references to the "CHS Defendants." The CHS Defendants' Summary Judgment Motion and Mr. Feinstein's Summary Judgment Motion are jointly referred to herein as the "Summary Judgment Motions."

[7] The *Daubert* Motion to Exclude Testimony of Patrick Allen Pursuant to Fed.R.Evid. 702 was filed by the CHS Defendants, Adam Feinstein and Credit Suisse at Adv. Docket No. 355 (the "*Daubert* Motion").

Plaintiffs argue that there is ample evidence - - which the CHS Defendants fail to address - - supporting their allegations that CHS manipulated the CHS Spin-Off Projections[8] and furnished those manipulated projections to financial advisors and used them to mislead the market about Quorum and its prospects. The Plaintiffs contend that genuine issues of fact pervade this case and they urge the Court to reject the Summary Judgment Motions and permit this dispute to go to trial.

For the reasons stated herein, the Court will deny (i) the CHS Defendants' Summary Judgment Motion; (ii) Mr. Feinstein's Summary Judgment Motion; and (iii) the *Daubert* Motion to Exclude the Testimony of Patrick Allen.

## **UNDISPUTED MATERIAL FACTS**[9]

CHS is a publicly traded hospital company that, prior to the Spin-Off, managed approximately 194 facilities, consisting of 190 general acute care hospitals and four rehabilitation or psychiatric hospitals located across 28 states.[10] On August 3, 2015, CHS announced plans to spin-off 38 hospitals to Quorum Health Resources (the "Spin-Off").[11] The rationale for the Spin-Off was described, in part, as follows:

> The CHS Business and QHC Business have distinct operating, business and financial characteristics. In making the determination to pursue the Separation, CHS's Board of Directors noted that the Separation would permit CHS to focus on its portfolio of larger hospitals and allow QHC to focus its attention and

---

[8] *See* n. 16, *infra.*

[9] The pleadings before the Court each contain separate detailed proposed "undisputed material facts," but the Court finds many of the Plaintiffs' and Defendants' versions of proposed facts are far from undisputed. The Court endeavored to include only neutral facts in this background and will examine the proposed undisputed facts in more detail in the Discussion that follows.

[10] CHS Form 10-Q for three months ended March 31, 2016 at 47, 49, attached as Ex. 1 to Declaration of Deborah J. Newman in Support of Plaintiffs' Opposition to Defendants' Motions for Summary Judgment (Adv. Docket Nos. 399 - 402 (redacted) or Adv. Docket Nos. 381, 383, 384, 385 (filed under seal)). Exhibits attached to the Newman Declaration will be referred to herein as "Pl. Ex. #."

[11] CHS Form 8-K (8/3/2015), Pl. Ex. 25.

> financial resources on hospitals in smaller markets, primarily located in cities or counties having fewer than 50,000 people. CHS's management believes the Separation will realign CHS's two businesses into two focused companies that, in the future, will be able to respond to market demands more quickly and take advantage of growth opportunities more effectively than now.[12]

CHS and Quorum effectuated the Spin-Off through a Separation and Distribution Agreement (the "SDA").[13] Under Section 2.07 of the SDA, Quorum (or its subsidiaries) agreed to enter into certain financing agreements, including:

(i) approximately $400 million aggregate principal amount of 11.624% Senior Notes due 2023 (the "Senior Notes");

(ii) senior term loan credit facilities in an aggregate principal amount of approximately $880 million, with an available revolving credit facility of up to an aggregate of approximately $100 million (the "Term Loans"); and

(iii) an asset-based revolving credit facility providing for up to an aggregate principal amount of approximately $125 million (the "Revolver").[14]

The financing transactions would, among other things, provide funds to make a cash distribution to CHS-QHC Bridge Company LLC, an indirect wholly-owned subsidiary of CHS, in an amount equal to approximately $1.21 billion.[15]

As part of its planning for the Spin-Off, CHS prepared a financial forecast of Quorum's anticipated performance for the five-year period following the transaction (2016-2020), known as the "CHS Spin-Off Projections."[16] Those projections were (i) provided to ratings agencies for

---

[12] Credit Suisse Business Purpose Letter at CHSG00259338, Pl. Ex. 7.

[13] Separation and Distribution Agreement, attached as Ex. 13 to the Declaration of Gary Orseck in Support of Motions for Summary Judgment and to Exclude Expert Testimony of Patrick Allen (Adv. Docket No. 365 (redacted) or Adv. Docket No. 348 (filed under seal)). Exhibits attached to the Orseck Declaration will be referred to herein as "Def. Ex. #."

[14] *Id.* at Schedule 2.07 (the "QHC Debt").

[15] *Id.* The $1.21 billion cash transfer, referred to as the QHC Cash Distribution in the SDA, is referred in the Complaint as the "Spin-Off Dividend."

[16] Fleck Model, 17th Draft, Pl. Ex. 9.

their assignment of credit ratings to Quorum and its debt;[17] (ii) furnished to Duff & Phelps, which relied on the CHS Spin-Off Projections in rendering the Duff & Phelps Solvency Opinion;[18] and (iii) provided to Credit Suisse and other "relationship banks" that underwrote and syndicated the QHC Debt to the market.[19]

In March 2016, Quorum made presentations to potential investors to raise the QHC Debt. Ultimately, Quorum raised approximately $1.28 billion in QHC Debt, consisting of the Term Loan of $880 million and Senior Notes with a $400 million aggregate principal amount.[20]

The Spin-Off was consummated on April 29, 2016, and the $1.21 billion Spin-Off Dividend was paid that day. At the time of the Spin-Off, the assets transferred from CHS to Quorum were reported to have a book value of approximately $2.3 billion.[21] QHC's Form 10 also reported that the Quorum hospitals owed CHS an intercompany debt balance of approximately $1.8 billion, which was extinguished by the Spin-Off Dividend.[22] Payment of the Spin-Off Dividend and related transaction fees left Quorum with less than $16 million of cash on its balance sheet immediately after the transaction closed.[23]

After the Spin-Off, Quorum performed at a loss almost immediately. On May 11, 2016, Quorum issued its own 10-Q, disclosing a pre-tax net loss of more than $6.3 million.[24] On August 10, 2016 (less than four months after the Spin-Off), Quorum reported that its results for

[17] Quorum Rating Agency Presentation at CHSG00116727-34, Pl. Ex. 44
[18] Duff & Phelps Opinion Letter at CHSG00399681, Pl. Ex. 45.
[19] *See, e.g.,* QHC Relationship Bank Update Materials at CHSG00539430, Pl. Ex. 47.
[20] *See, e.g.,* April 1, 2016 Board Consent, Pl. Ex. 15.
[21] QHC's Amendment No. 6 to Form 10 filed 4/1/2016 at F-4, Def. Ex. 10.
[22] *Id.* at F-4, F-15. The intercompany debt "represents CHS' historical investment in QHC, cost allocations from CHS to QHC, the net effect of transactions with QHC, including capital expenditures, and cash transferred from QHC to CHS under CHS' management program. … The intercompany indebtedness of QHC with CHS will be extinguished concurrent with the Distribution." *Id.* at F-15.
[23] Email dated 4/28/2016 re: Latest Funds Flow, Pl. Ex. 138.
[24] QHC Form 10-Q for period ended March 31, 2016 at 15, Pl. Ex. 140.

the second quarter of 2016 widely missed expectations, with a net loss of more than $243 million.[25] Quorum also revised its 2016 earnings guidance down from a range of $265 - $275 million to a range of $175 - $200 million.[26]

On April 7, 2020, Quorum and its affiliated companies filed chapter 11 bankruptcy petitions in this Court.[27] Quorum's then-Chief Financial Officer Alfred Lumsdaine submitted a Declaration in support of the petitions in which he explained that Quorum was operating with a highly levered balance sheet:

> While the Company's business is fundamentally healthy and functional, the Debtors are operating with a highly levered balance sheet, and have been since the Company's inception, given the size and expenses of the business and current industry dynamics. Specifically, at the end of the quarter ending June 30, 2016, the Company's first quarter operating, the Company had over $1.23 billion in long-term funded debt obligations and a quarterly adjusted EBITDA of 29.2 million. In the aggregate, these factors led to a liquidity shortfall and negatively impacted the Company's ability to operate its business at the high standard it is known for while simultaneously servicing in excess of $130 million in annual debt-service obligations.[28]

## PART I: DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PATRICK ALLEN

The Court turns first to Defendants' *Daubert* Motion, which seeks to exclude the testimony of Plaintiffs' expert, Patrick Allen. Mr. Allen is a Managing Director in Cain Brothers' Investment Banking group and has over 20 years of experience advising on hospital and

[25] QHC Form 10-Q for period ended June 30, 2016 at 28, Pl. Ex. 143.
[26] QHC Form 99.1 dated 8/10/2016 at 3, Pl. Ex. 144.
[27] Voluntary Petition of Quorum Health Corp, Case No. 20-10766, Pl. Ex. 152.
[28] Lumsdaine First Day Decl. at ¶5, Pl. Ex. 153.

healthcare-related transactions.[29] In his career, Allen has prepared hundreds of different hospital projections, models, and forecasts and has authored numerous valuation reports and fairness opinions.[30]

Here, Mr. Allen was retained to provide expert opinions on (i) the reasonableness of financial projections created by Community Health Systems Inc. ("CHS") in connection with Quorum's 2016 spin-off, and (ii) the financial condition of Quorum Health Corporation ("Quorum") when the spin-off occurred.[31] As to the CHS financial projections, Mr. Allen concluded the projections were objectively unreasonable because they:

> (i) included growth assumptions for Quorum that were inconsistent with the historical performance of the hospitals that were spun-off into Quorum and existing trends in the hospital industry, (ii) omitted costs that CHSI knew or should have known Quorum would incur following the Spin-Off, and (iii) were based on other assumptions that were knowingly erroneous, inconsistent with known historical data and industry trends, and/or were not realistic by any objective standard.[32]

After concluding the CHS financial projections were unreasonable, Mr. Allen prepared his own set of projections.[33]

Mr. Allen employed three separate valuation methodologies in analyzing the financial condition of Quorum as of the Spin-off date. These methodologies included a discounted cash flow ("DCF") analysis, a comparable companies analysis, and a precedent transaction analysis.[34]

Defendants challenge how Mr. Allen applied each of the above methodologies, as well as his threshold decision to rely upon his own projections for the DCF and comparable companies

---

[29] Decl. of Robert S. Loigman in Support of Plaintiffs' Opposition to Defendants' Motion to Exclude the Testimony of Patrick Allen ("Loigman Decl."), Adv. D. I. 379, Ex. 1, Expert Report of Patrick Allen (the "Allen Report"), at 2.

[30] Loigman Decl., Ex. 2, Deposition Tr. of Patrick Allen 7/16/25 (the "Allen Tr."), at 20:7-10, Allen Report at 2.

[31] Allen Report at 1.

[32] *Id*.

[33] *Id*. at 49-74.

[34] *Id*. at 74-84.

analysis, rather than those created by CHS prior to the Spin-off. As to the DCF analysis, Defendants argue that Mr. Allen's methodology was unreliable because he used an exit multiple approach rather than the Gordon Growth Method for calculating Quorum's terminal value. Concerning Mr. Allen's comparable companies analysis, the Defendants raise three primary issues, in addition to his reliance on his own projections. These issues are: (i) Mr. Allen uses a forward-looking EBITDA multiple rather than a historical revenue multiple, (ii) the comparable companies selected by Mr. Allen are not actually comparable, and (iii) the EBITDA multiple selected by Mr. Allen was arbitrary. For Mr. Allen's precedent transaction analysis, the Defendants question his decision to use a revenue multiple and his decision to apply that multiple only to a certain sub-set of Quorum's hospitals while applying a lower multiple to other of Quorum's hospitals. Finally, Defendants challenge the admissibility of Mr. Allen's opinions concerning Quorum's capital adequacy and ability to pay debts as they come due. The Court will address each of these contentions after discussing the standards for admissibility of expert testimony.

## Legal Standard

Fed. R. Evid. 702 governs the admissibility of expert testimony by creating restrictions on qualification, reliability, and fit which must be satisfied by an expert's proponent by a preponderance of the evidence.[35] "Qualification requires 'that the witness possess specialized expertise.'"[36] The reliability inquiry tests whether the expert's opinion is "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"[37] Finally, the expert testimony must fit, meaning it is relevant to an issue in the case and helpful to

[35] Fed. R. Evid. 702; *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d. Cir. 2003).
[36] *Calhoun*, 350 F.3d at 321 (quoting *Schneider v. Fried,* 320 F.3d 396, 405 (3d Cir. 2003)).
[37] *Calhoun*, 350 F.3d at 321 (quoting *In re Paoli R.R. Yard PCB Litig*., 35 F.3d 717, 742 (3d Cir. 1994)).

the trier of fact in understanding that issue.[38] The inquiry under Rule 702 is flexible and is intended to focus on "principles and methodology, not on the conclusions that they generate."[39]

DISCUSSION

Here, Defendants focus their challenges on the second prong of the Rule 702 analysis, arguing that Mr. Allen's methodologies were unreliable. The Court notes that Defendants do not challenge Mr. Allen's qualifications or expertise, and they do not take issue with the three valuation methodologies he employed. Instead, they question certain decisions Mr. Allen made in performing the methodologies and, in one instance, they question the applicability of the methodology to the facts here. Before turning to these concerns, the Court will briefly address the expert's qualifications and the fit of his testimony.

As noted above, Mr. Allen has "over 20 years of experience advising public and private companies in a variety of merger and acquisition, capital raising, and strategic advisory transactions in the healthcare field."[40] He has "perform[ed] valuations that are used by Boards of Directors, regulatory agencies, and business owners in deciding the strategic directions of their organizations" and is "a frequent author in the healthcare industry."[41] The Defendants do not seriously challenge his experience and qualifications, and the Court is satisfied that Mr. Allen's extensive experience performing valuations and operating in this specific industry qualify him to testify on these matters.

Similarly, the Court believes that Mr. Allen's testimony will be useful in understanding the relevant issues and will be helpful to the Court for purposes of this case. The primary issue here is whether Quorum was insolvent at the time of the Spin-Off. To make this determination, a

---

[38] Fed. R. Evid. 702; *Calhoun*, 350 F.3d at 321.
[39] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993).
[40] Allen Report at 2.
[41] *Id*.

valuation of the company will be necessary. The valuations that Mr. Allen seeks to testify on thus satisfy the "fit" prong of the Rule 702 analysis.

As noted, the Defendants strenuously oppose Mr. Allen's decision to generate his own set of projections for Quorum, rather than relying upon the CHS Spin-Off Projections. First, they argue that contemporaneous, market-tested projections are the most reliable form of valuation, so they should not have been disregarded. Second, they argue that the new projections prepared by Mr. Allen are purely subjective and easily prone to manipulation. Because Mr. Allen's own projections are the foundation for two separate analyses he performed, this decision is critical and must be addressed at the outset, separate from the analyses themselves.

"Although the Delaware Supreme Court has expressly declined to adopt a presumption in favor of any one valuation methodology over another, recent decisions of Delaware courts suggest a pecking order of methodologies for determining fair value."[42] These decisions imply that fair value should start with market evidence and that valuation techniques like the DCF or comparable companies analysis are the "second-best method when market-based indicators are available."[43] However, reliance on market evidence requires competitive, free-market dynamics, which may not always be present. Here, the first question is whether the CHS Spin-Off Projections, which were used to market Quorum's debt to potential investors, were adequately scrutinized by the market and free from internal manipulation such that they should be accepted by this Court as representative of fair value. If that is the case, these projections would be the best indicator of Quorum's fair value. But, if the CHS Spin-Off Projections were subject to

---

[42] *HBK Master Fund L.P. v. Pivotal Software, Inc.*, No. 2020-0165-KSJM, 2023 WL 10405169, at *21 (Del. Ch. Aug. 14, 2023).

[43] *Id*. (internal quotation marks removed).

"rampant manipulation" that was unknown to the market, as the Plaintiffs allege, it may be the case that Mr. Allen was justified in rejecting the CHS Projections.

For the proposition that the CHS Spin-Off Projections should have been used, Defendants rely on this Court's prior decision in *In re Samson Res. Corp*.[44] In *Samson*, this Court was asked to determine whether purchasers "g[ave] rise to a death spiral that led ultimately and directly to the company's bankruptcy filing" by allegedly paying over twice a company's fair market value and consequently burdening the company with more debt than it was able to service.[45] There, the Court explained that "[a] thing is worth what a willing buyer will pay to a willing seller following a proper marketing process."[46] To displace this presumption, a challenging party must show that "the marketing and sale process was irretrievably tainted or deeply flawed."[47] In *Samson*, that was not the case, and the Court noted that "the marketing and diligence process [] was thorough and comprehensive, run on both sides by some of the most sophisticated investors and professionals in the world."[48]

However, *Samson* involved a set of circumstances and a different procedural posture that limits its applicability to the transaction that occurred here. Importantly, *Samson* did not question the admissibility of expert testimony. Instead, it was a merits decision following a three-week trial at which the Court considered expert testimony, including valuation analyses that were already found to be admissible. The Court's ultimate conclusion that the sale price in *Samson* was the best indicator of fair value has no bearing on the *admissibility* of expert testimony, which involves an entirely different standard. Additionally, the type of transaction and the marketing

[44] *In re Samson Resources Corp*., 2023 WL 4003815 (Bankr. D. Del. June 14, 2023).
[45] *Id*. at *1.
[46] *Id*.
[47] *Id*.
[48] *Id*. at *2.

process involved in the two cases limits *Samson's* applicability here. *Samson* involved (in large measure) a true third-party sale with a lengthy diligence process, while Quorum was spun-off in a process entirely structured and controlled by its parent.

Because they believe CHS exercised potentially overweening and self-interested control over the Spin-Off, Plaintiffs argue the contemporaneous projections should be discarded in favor of more realistic and unmanipulated projections. Plaintiffs point out numerous potential issues in the CHS Spin-Off Projections that they allege resulted from internal manipulation and were not known to the broader market. These changes include:

> arbitrarily reducing the amount of time it would take QHC to collect receivables, increasing the rate at which QHC would attain an unprecedented 15% margin, doubling the amount of proceeds that QHC would realize from its divestiture of underperforming hospitals, reducing the projected annual dyssynergies from the Spin-Off, and lowering the projected cost of QHC's debt.[49]

At bottom, Plaintiffs allege that CHS was essentially on both sides of the transaction and was able to structure the Spin-Off, and formulate supporting projections, in a way that inured exclusively to its own benefit and did not necessarily reflect the true state of Quorum's finances or prospects post-transaction.

Defendants claim that the projections that Mr. Allen prepared and used were unreliable. Defendants correctly point out that post-hoc, litigation-driven projections can suffer from hindsight bias and other cognitive distortions.[50] Accordingly, courts must and do take care to view such projections with scrutiny and a measure of skepticism.

Mr. Allen's report lays out each of the factors he considered in creating his projections, which included Quorum's revenue growth over a three-year period immediately preceding the

---

[49] Pl. Mem. of Law Opp. *Daubert* Mot., Adv. D.I. 396, at 7-8 (citing Allen Report at 27-33).
[50] *See In re: IH 1, Inc*., No. 13-1996 (RGA), 2015 WL 5679724, at *2 (D. Del. Sept. 25, 2015).

Spin-Off, the condition of Quorum's hospitals, and the overall state of the hospital industry. Based on these factors, Mr. Allen determined that Quorum would achieve a modest growth rate of 2.5%. This figure contrasts with a growth rate of 3.8% that appears in the projections prepared by CHS at the time of the Spin-Off.[51]

Ultimately, Defendants do not approve of Mr. Allen's projections because they disagree with the conclusions they generate. However, Rule 702 asks the Court to evaluate methodologies, not conclusions. The fact that Mr. Allen's analysis could suffer from certain biases is true, but the Court cannot conclude at this time that any such bias infected his methodology. Ultimately, the possibility that Mr. Allen's projections may suffer from hindsight bias is more appropriately fodder for cross-examination than a basis to exclude his testimony altogether.

The Court turns to the three methodologies that Mr. Allen used to value Quorum at the time of the Spin-Off: (A) the DCF Analysis, (B) the comparable companies analysis, and (C) the precedent transactions analysis. As noted briefly above, these three approaches are widely accepted in the field for valuing a corporate enterprise.[52]

**(i) The DCF Analysis**

The DCF analysis is "widely considered the best tool for valuing companies when there is no credible market information and no market check[.]"[53] "A DCF requires three primary inputs: (1) a projection of future cash flows; (2) a terminal value; and (3) a discount rate."[54]

---

[51] Loigman Decl., Ex. 7, Expert Rebuttal report of Scott K. Phillips ("Phillips Report"), at 12-15.

[52] Aswath Damodaran, INVESTMENT VALUATION, TOOLS AND TECHNIQUES FOR DETERMINING THE VALUE OF ANY ASSET, at 11 (3d ed. 2012); Hon. Christopher S. Sontchi, "Valuation Methodologies: A Judge's View," 20 ABI L. Rev. 1, 2 (Spring 2012).

[53] *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd*, 177 A.3d 1, 38 (Del. 2017).

[54] *Kruse v. Synapse Wireless, Inc.*, No. CV 12392-VCS, 2020 WL 3969386, at *12 (Del. Ch. July 14, 2020).

In Mr. Allen's DCF analysis, he calculated the terminal value by using the exit multiple method. Under this approach, a valuation multiple is applied to the projected EBITDA for the final year of the projection period. Here, Mr. Allen selected a 6.0x multiple, which was the multiple derived from his comparable companies analysis.[55] For the discount rate, Mr. Allen calculated and applied a weighted average cost of capital ("WACC") which ranged from 9.5% to 10.5%. Applying this WACC to Quorum's projected cash flows and terminal value, Mr. Allen determined that Quorum's fair market value based on his DCF analysis ranged from $0.993 billion to $1.108 billion, with a midpoint value of $1.051 billion.[56]

The Defendants protest Mr. Allen's use of the exit multiple approach, rather than the Gordon Growth Method ("GGM"), for calculating terminal value. Defendants argue that the GGM is the industry standard and that Mr. Allen provided no basis for his decision to instead use the exit multiple approach. Defendants assert that application of the GGM here yields a Market Value of Invested Capital ("MVIC") in the range of $2.527 - $2.963 billion,[57] well beyond Mr. Allen's proposed valuation, and they fault Mr. Allen for failing to reconcile the different results realized from these two methods. Plaintiffs respond that Mr. Allen's choices are supported by both valuation literature and practice. In particular, Mr. Allen contends that the fixed perpetual growth rate assumed by the GGM is not applicable to certain industries and businesses that lack stable, predictable cash flows. In considering the highly regulated and competitive environment

---

[55] Allen Report at 77. Mr. Allen used the same 6.0x multiple for the DCF analysis in his Reply Report. Loigman Decl. Ex. 8, Exhibits to Allen Reply Report, Ex. 9.

[56] Allen Reply Report at 145. Mr. Allen's original DCF yielded a valuation range of $838 million to $939 million. Allen Report at 79. However, as explained in his Reply Report, he revised his Corrected Projections which modified his DCF valuation.

[57] Loigman Decl. Ex. 12, Expert Report of Prof. Jack F. Williams (the "Williams Report"), at 109, ¶ 234.

Quorum would operate in, Mr. Allen concluded the GGM would not provide a reliable or realistic value for the enterprise.

The Court finds that Mr. Allen's use of the exit multiple approach was permissible. Contrary to Defendants' assertions, Mr. Allen has sufficiently explained his rationale for using this approach and has pointed to numerous instances where it has been used in similar circumstances or cited to approvingly by other practitioners or courts. For example, Jack Williams, one of Defendants' experts, stated that "the use of exit multiples at the end of the projection horizon has strong advocates, and has been regularly consulted and often accepted by courts."[58] Similarly, Quorum's investment banker testified that he did not believe he had ever used a perpetuity growth model, like the GGM, in his 24 years of working in the industry.[59] At the confirmation hearing in this case, the Court approvingly referenced the use of the exit multiple approach under these circumstances because of the "uncertain future due to COVID, the testimony regarding overall hospital industry changes over time and, again, the challenges the company faces to ensuring a growing hospital growth."[60] Because the GGM assumes that a business will normally operate in perpetuity, it may make sense that a troubled business or a business in a troubled industry might use a different valuation method that accounts for volatility. And that is precisely what Mr. Allen did.

Defendants' arguments that Mr. Allen needed to check his results against those produced by the GGM are also unconvincing. Mr. Allen has established why he used the chosen method and that it is used by other practitioners under similar circumstances. Therefore, the Court is satisfied that Mr. Allen's methodology is sufficiently reliable. Defendants' protestations about

---

[58] Jack F. Williams, *Teaching Bankruptcy Valuations to Law Students and Other Unnatural Acts*, 39 EMORY BANKR. DEVS. J. 1, 94 (2023).

[59] Loigman Decl., Ex. 10, Deposition Tr. of Jay Shiland 6/12/2020, at 307:17-308:5.

[60] Loigman Decl., Ex. 9, Tr. of Hearing 6/29/2020, at 20:5-13.

Mr. Allen's failure to reconcile the results of the two methods, and even his decision not to use the GGM, are questions of the weight to be accorded to his testimony and his conclusions, not admissibility because they go to other alternatives he could have employed rather than the acceptable methodology that he chose to employ.

**(ii) The Comparable Companies Analysis**

The comparable companies analysis is a method of valuing a company that involves finding a set of comparable, publicly traded companies, calculating the ratio between each company's stock price and a measure of its income, such as EBITDA, and then adjusting those ratios to account for differences between the comparable companies and the company to be valued.[61]

In Mr. Allen's comparable companies analysis, he selected five guideline publicly traded companies with which to compare Quorum. He selected these companies based on their lines of business and bases of competition, noting that the small number of adequate guideline companies limited the peer set.[62] After calculating mean and median EBITDAs for the peer set, Mr. Allen states that he applied a discount to reach a 6.0x EBITDA multiple for Quorum. He testified that he applied the discount to the multiple in the peer set because he believed the hospitals from the peer set were in more urban markets and had better payor mixes, among other things.[63]

The Defendants raise three issues with the comparable companies analysis performed by Mr. Allen. These issues are that (i) Mr. Allen uses a forward-looking EBITDA multiple rather than a historical revenue multiple, (ii) the comparable companies selected by Mr. Allen are not actually comparable, and (iii) the EBITDA multiple selected by Mr. Allen was arbitrary.

---

[61] Allen Report at 79. *See also* Hon. Christopher S. Sontchi, "Valuation Methodologies: A Judge's View," 20 ABI L. Rev. 1, 11 (Spring 2012).

[62] Allen Report at 80.

[63] *Id.*

**(a) Allen's Use of the Forward-Looking EBITDA Multiple**

Here, Defendants argue that Mr. Allen's decision to use only a forward-looking EBITDA multiple was outcome determinative and contrary to authoritative literature. Instead, Defendants claim that Mr. Allen should have used both historical revenue and forward-looking EBITDA multiples and compared them against each other as checks on their accuracy.

Plaintiffs respond by pointing to case law supporting the approach adopted by Mr. Allen. In *In re Spansion, Inc.*, Judge Carey considered competing expert reports in seeking to appropriately value the debtor at a contested confirmation hearing.[64] In *Spansion*, three experts performed comparable company analyses with two of the experts relying solely on an EBITDA multiple and one using a combination of revenue and EBITDA multiples.[65] The senior noteholders' expert stated that, in that case, an EBITDA multiple was more appropriate because companies are valued based on how profitable they are, not based on their revenue volume.[66] The court found that one expert's "use of the revenue multiple caused its comparable company analysis, and overall valuation, of the Debtors to be too high."[67]

Relevant treatises cited in Plaintiffs' briefing also support usage of an EBITDA multiple in a comparable companies analysis. For example, one leading treatise quoted by Plaintiffs states that EBITDA multiples should be used in a comparable companies analysis because "[u]nlike backward-looking multiples, forward-looking multiples are consistent with the principles of valuation—in particular, that a company's value equals the present value of future cash flow, not sunk costs."[68] This aligns with Mr. Allen's report where he supports his decision to use an

[64] *In re Spansion, Inc.*, 426 B.R. 114 (Bankr. D. Del. 2010).
[65] *Id.* at 132.
[66] *Id*. at 132-33.
[67] *Id*. at 133.
[68] Pl. Mem. Opp. *Daubert* Mot., Adv. D.I. 396, at 23 (citing Tim Koller *et al.*, VALUATION: MEASURING AND MANAGING THE VALUE OF COMPANIES 378 (8th ed. 2025)).

EBITDA multiple by explaining that a company's future earnings are the best indicator of its value.

The Court also finds no fault in Mr. Allen's decision not to employ numerous types of multiples. In *Spansion*, the court specifically rejected the expert's report who did rely on a combination of multiples in favor of two other experts who relied on a single EBITDA multiple.[69] The methodology followed by Mr. Allen is adequately supported by peers in the relevant community and has been used in and approved of by this Court in the past. Accordingly, the Court finds that Allen's use of only a forward-looking EBITDA multiple does not fatally compromise his comparable companies analysis.

**(b) Allen's Comparable Company Selection**

Defendants also question the companies selected by Mr. Allen for use in his comparable companies analysis. In performing his analysis, Mr. Allen selected a set of five companies to which he compared Quorum. These five companies generated median and mean multiples between 7.5x and 8.0x for 2016, and between 7.25x and 7.4x for 2017. Despite these ranges, Mr. Allen selected a multiple of 6.0x for Quorum. The Defendants argue that these companies are not truly comparable to Quorum if Quorum's EBITDA must be adjusted that far below the reference group. Defendants claim this undermines the entire purpose of the exercise. Plaintiffs, on the other hand, contend that the five companies Mr. Allen identified were comparable in that they were all publicly traded "pure-play acute care hospital operators."[70] Plaintiffs justify Mr. Allen's decision to discount Quorum's EBITDA relative to its peers because they claim Quorum was disadvantaged relative to the other hospitals in the group.

---

[69] *Spansion,* 426 B.R. at 133.
[70] Allen Report at 80.

The five comparable companies selected by Mr. Allen were CHS, HCA Healthcare, Inc., Lifepoint Health, Inc., Tenet Healthcare Corporation, and Universal Health Services, Inc. Defendants' own expert found that the selections by Allen were "reasonable" and met his own selection criteria which included "industry, size, operating and geography, among other factors."[71] Defendants' expert further noted that these five hospitals were also selected as comparable companies for Quorum by at least 11 out of 12 sources he identified that report potential comparable companies.[72] Furthermore, "no other companies [were] selected by more than one source."[73]

The Court is satisfied that Mr. Allen's selection of comparable companies was reasonable. It may not always be the case, and is likely usually not the case, that there would be a set of identical publicly traded companies with which to compare the business being valued. Based upon the record here, Mr. Allen selected a set of companies that he reasonably believed were the most comparable to Quorum and thus were suitable for this analysis.

**(c) Mr. Allen's Selection of a 6.0x EBITDA Multiple**

Even if Mr. Allen selected a reasonable set of comparable companies, the Defendants question Mr. Allen's decision to discount Quorum's EBITDA below the range observed from the comparable companies. They submit that his decision was arbitrary and calls into question the credibility of his entire analysis and conclusion.

However, Mr. Allen offered support for his decision to discount Quorum's EBITDA. Specifically, he noted that Quorum suffered from a number of disadvantages relative to its peers, such as Quorum's focus on rural markets and its consistent cash flow challenges, that he

---

[71] Williams Report at 130, ¶¶ 284-85.
[72] *Id.*
[73] *Id.*

reasoned would cause Quorum to trade below the minimum multiple of the peer group.[74] This decision aligns with that made by analysts who evaluated Quorum at the time of the Spin-Off, with some settling on the same 6.0x EBITDA that Mr. Allen selected.[75]

The Court finds that the methodology employed by Mr. Allen in performing his comparable companies analysis was consistent with the requirements for admissibility under Rule 702. As noted above, the record reflects that the peer group Mr. Allen selected was among the only similar publicly traded hospitals available for the analysis. The fact that these hospitals are not perfectly identical to Quorum is not a fault in Mr. Allen's methodology, it is an unavoidable practical reality. Again, Mr. Allen's decision here to apply the discount rate relative to the peer set goes to the weight the Court should accord to his testimony and conclusions, not to its admissibility in the first place.

**(iii) The Precedent Transactions Analysis**

A precedent transactions analysis "involves identifying similar transactions, quantifying those transactions through financial metrics, and then applying the metrics to the company at issue to ascertain a value."[76] Here, Mr. Allen identified fifteen hospital acquisitions that occurred within the five years preceding the Spin-Off and that had transaction values exceeding $200 million. Like the comparable companies analysis, Mr. Allen determined that the hospitals in this

---

[74] Allen Report at 77, 80-81.

[75] Loigman Decl. Ex. 15, Susquehanna Financial Group's Market Research Report on Quorum dated June 8, 2015 at Bates stamp Williams_00002704 ("Our $14/share price target represents roughly 6.0x our 2017 EBITDA estimate of $286 mln."); Loigman Decl. Ex. 16, Credit Suisse's market research report on Quorum dated July 29, 2016 at Bates stamp Williams 00002850 ("Our $12 price target is based on a multiple of ~6x our 2017 EBITDA estimate."); Loigman Decl. Ex. 17, WhiteSand Research's market research report on Community Health Systems, Inc./Quorum Health Corp. dated Dec. 23, 2015 at 12 ("We value QHC at 6x FY 2016 EBITDA of $246 million, 20% discount to the average peer group multiple owing to lower margins.").

[76] *Merion Cap., L.P. v. 3M Cogent, Inc.*, No. CV 6247–VCP, 2013 WL 3793896, at *7 (Del. Ch. July 8, 2013) (quoting *Highfields Capital, Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 54 (Del. Ch. 2007)).

dataset were generally more valuable than Quorum based on their locations and per-facility revenue. He selected a 0.57x multiple, which was derived from the multiple identified for the first quartile of the hospitals in the dataset, and applied that multiple to the Quorum hospitals that were not to be divested. Next, Mr. Allen applied a 0.25x multiple to the hospitals that Quorum planned to divest.[77]

Defendants raise two issues with Mr. Allen's analysis. First, they criticize his decision to use a revenue multiple after previously rejecting the revenue multiple for purposes of his comparable companies analysis. Second, they question why Mr. Allen applied the selected 0.57x multiple to only certain of Quorum's hospitals rather than the whole group.

**(a) Mr. Allen's Decision to Use a Revenue Multiple**

Like the comparable companies analysis, Defendants' primary concern here is that Mr. Allen relied on a single multiple rather than considering both. They also question why, if he was only going to consider one multiple, he chose to use the revenue multiple in this instance and the EBITDA multiple in the other. For the same reasons explained above, the Court does not take issue with Mr. Allen's decision to rely upon a single multiple. As to Mr. Allen's choice to use the revenue multiple in this case, the Court is likewise satisfied.

In explaining this decision, Mr. Allen stated that in a precedent transactions analysis a revenue multiple is more appropriate because a buyer "is purchasing the revenue stream of a target, and will impose its own cost structure that is independent of the target's historical cost structure once the transaction closes."[78] In the context of the two analyses used here, this distinction seems sensible because the comparable companies analysis does not involve

[77] Allen Report at 83.
[78] Loigman Decl. Ex. 3, Reply Expert Report of Patrick Allen ("Allen Reply Report") at 156.

transactions that could cause a change in a company's cost structure, and when such a transaction does occur it may be necessary to control for the differences that result from cost structure.

Additionally, the use of revenue multiples in a precedent transaction analysis is not uncommon. For example, in *Kruse v. Synapse Wireless, Inc.,* the experts for both parties used a revenue multiple in their analyses, and in *Gentile v. SinglePoint Financial Corp*. the petitioners' expert used a revenue multiple.[79] In neither instance did the courts find that the precedent transaction analyses using a revenue multiplier was unreasonable.[80]

Here, the Court takes no issue with Mr. Allen's decision to rely solely on a revenue multiple in performing his precedent transactions analysis.

**(b) Mr. Allen's Application of the Chosen Multiple to a Subset of Quorum Hospitals**

Defendants contend that Mr. Allen may have double-counted poor performance in his precedent transactions analysis by failing to look at the individual hospitals involved in each of the precedent hospital acquisitions. In Mr. Allen's analysis, he selected a 0.57x revenue multiple based on the precedent transactions, which included all the hospitals from each of those transactions. Then, he selected an even lower 0.25x multiple for the low-performing hospitals that Quorum planned to divest. Defendants argue that this approach could artificially depress Quorum's revenue multiple because it cherry-picked Quorum's better performing hospitals to compare against hospitals in acquisitions that may have included poor-performing hospitals.

---

[79] *See Kruse v. Synapse Wireless, Inc*., No. CV 12392-VCS, 2020 WL 3969386, at *10-*11 (Del. Ch. July 14, 2020) ("The two experts largely agree on Synapse's revenue baseline and that a revenue multiplier should be used to calculate enterprise value, and neither uses facially unreasonable methods in selecting that revenue multiplier."); *Gentile v. SinglePoint Fin., Inc*., No. CIV.A. 18677-NC, 2003 WL 1240504, at *6 -*7 (Del. Ch. Mar. 5, 2003).

[80] However, the *Kruse* court noted that one expert's revenue multiplier was nearly 27 times larger than the others, resulting in valuations nearly $200 million apart. *Kruse*, 2020 WL 3969386 at *11. The *Kruse* court rejected both analyses since the experts made convincing objections to each other's models that were not effectively rebutted. *Id.*

Essentially, Defendants believe Mr. Allen should have either applied the chosen multiple to all the Quorum hospitals or removed the low-performing hospitals from the acquisitions included in the dataset if he planned to create a separate multiple for the subset of Quorum's hospitals that it planned to divest.

Plaintiffs respond that Mr. Allen's selection of the first quartile revenue multiple would mitigate any concerns of undervaluing Quorum because Quorum's average hospital, excluding those to be divested, actually had a lower net revenue than the worst hospital system in the dataset. So, if Mr. Allen had planned to value all of Quorum's hospitals together, he would have needed to use a multiple lower than 0.57x. Plaintiffs also explain that it would have been impossible for Mr. Allen to analyze individual hospitals involved in the precedent transactions because many of the transactions involved private entities and transaction data would thus be unavailable.

Importantly, in an impairment analysis conducted by KPMG for Quorum, it also separately analyzed the hospitals to be divested and applied a 0.25x revenue multiple to those hospitals.[81] This is strong evidence supporting Mr. Allen's decision to also analyze these hospitals separately. In light of this approach's acceptance by other valuation practitioners and the justification provided by Mr. Allen, the Court finds that his methodology was reliable.

**(iv) Mr. Allen's Testimony on Capital Adequacy and Ability to Pay Debts as They Come Due**

Finally, Defendants seek to exclude Mr. Allen's testimony on Quorum's ability to pay debts as they come due and its capital adequacy. Defendants first argue that these opinions should be excluded because they rely entirely upon Mr. Allen's projections, rather than the CHS

[81] Loigman Decl. Exs. 13-14 KPMG Impairment Study for Quorum dated Sept. 30, 2016 at DT 00002521-2523.

projections. But the Court has already concluded that Mr. Allen's decision to rely on his own projections was permissible, so this argument fails. Defendants will have every opportunity at trial to cross-examine Mr. Allen regarding his decision to develop a set of projections, as well as the projections themselves.

Defendants also claim that Quorum's continued operation for four years after the Spin-Off is evidence that it was adequately capitalized and able to pay its debts. Mr. Allen, on the other hand, claims that Quorum's continued operations are not dispositive of the issues because he argues Quorum barely limped along for four years because it was undercapitalized and unable to pay its debts as they came due.

As Quorum's CEO explained in his first day declaration, Quorum was operating with a highly levered balance sheet and faced challenges servicing its debt obligations as early as its first operating quarter following the Spin-Off in 2016.[82] In light of Quorum's capital structure and operational struggles, Mr. Allen's opinions are not insupportable. Accordingly, the Court finds that Mr. Allen may also testify as to Quorum's capital adequacy and its ability to pay debts as they come due following the Spin-Off. Accordingly, for the reasons set forth above, the Motion to Exclude the Testimony of Patrick Allen will be denied.

## PART II –THE SUMMARY JUDGMENT MOTIONS

### Legal Standard

Rule 56 of the Federal Rules of Civil Procedure, made applicable by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

[82] Main Case No. 20-10766, Docket No. 24 at 2-3.

to judgment as a matter of law."[83] At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.[84]

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."[85] And "[w]hen the moving party has carried its burden . . .the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."[86]

"A factual dispute is 'genuine' if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[87] "A factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'"[88] "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."[89] "[I]t is important to remember that, '[w]hile the individual pieces of evidence alone may not suffice to make out the claims asserted, [the court] must view the record as a whole picture.'"[90]

---

[83] Fed. R. Civ. P. 56(a).

[84] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

[85] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

[86] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (internal quotation omitted).

[87] *Razak v. Uber Tech., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020), *amended*, 979 F.3d 192 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[W]here there are genuine questions of material fact that need resolution, these questions must go to a fact-finder." *Id.*

[88] *Id.*

[89] *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2505. *See also Knopick v. Connelly*, 639 F.3d 600, 606 (3d Cir. 2011) (The court must "view the record and draw inferences in a light most favorable to the non-moving party.").

[90] *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 91 (3d Cir. 2008) (quoting *Abramson v. William Paterson Coll. Of N.J.*, 260 F.3d 265, 276 (3d Cir. 2001)).

## DISCUSSION

A. The Illegal Dividend Claim (Count 13).

Count 13 of the Trustee's Complaint alleges that Quorum lacked an adequate surplus or net profits from which to issue the Spin-Off Dividend, thereby making it illegal. Under the Delaware General Corporation Law ("DGCL"), a corporation may pay dividends only out of its surplus or, if it has no surplus, out of its net profits for the fiscal year in which the dividend is paid or the preceding fiscal year.[91] If a corporation willfully or negligently issues a dividend in violation of the DGCL, the directors under whose administration the dividend was paid shall be held jointly and severally liable to the corporation, and to its creditors in the event of insolvency or dissolution, for the full amount of the dividend unlawfully paid.[92] Shareholders who knowingly receive an illegal dividend may also be liable.[93]

The CHS Defendants assert three reasons for granting summary judgment in their favor on the illegal dividend claim: (i) the Trustee is precluded from pursuing the claim by Quorum's unsuccessful pre-bankruptcy arbitration against CHS; (ii) the record shows that the Spin-Off Dividend was not a one-way "dividend" transaction, but a distribution in return for the assets transferred to Quorum by CHS as part of the complex spin-off exchange; and (iii) even if the distribution was a dividend, there is ample evidence in the record supporting the Quorum Board's capital surplus determination. The Trustee disputes each of these contentions for reasons that will be explored in more detail below.

---

[91] 8 Del. C. §§ 170, 173.

[92] 8 Del. C. § 174.

[93] Section 174(c) of the DGCL "suggests that the shareholder will be liable for any amount received by him but only if he had notice that the dividend was unlawful. Stated another way, shareholder liability requires bad faith." *MC Asset Recovery, LLC v. S. Co.*, 2009 WL 10666059, *11-12 (N.D. Ga. Feb. 5, 2009) (quoting *PHP Liquidating, LLC v. Robbins*, 291 B.R. 592, 597-98 (D. Del. 2003) a*ff'd sub. nom. In r*e *PHP Healthcare Corp.*, 128 F. App'x 839 (3d Cir. 2005)).

(1) Claim Preclusion.

The CHS Defendants assert that in a 2017 arbitration proceeding, Quorum claimed that certain Transition Service Agreements ("TSAs") between Quorum and CHS were unconscionable, and that CHS had tortiously interfered with Quorum's prospective economic advantage based on the same conduct underlying the claims now asserted in the Plaintiffs' Complaint.[94] The CHS Defendants note that the arbitration panel rejected Quorum's claims after two weeks of evidentiary hearings, and review of numerous exhibits and briefs.[95] The CHS Defendants argue that claim preclusion prevents the Trustee from repackaging the same allegations into a new lawsuit to assert an illegal dividend claim that Quorum already had an opportunity to press in the arbitration.

The Plaintiffs, however, assert that claim preclusion cannot apply here because there is no privity between the prepetition debtor and the Trustee, especially when, as here, the interests of prepetition Quorum and the Trustee are not aligned. The Plaintiffs claim that Quorum had no incentive in the arbitration to challenge the Spin-Off Dividend as illegal. Doing so, the Plaintiffs argue, would require conceding that Quorum was insolvent at its inception, which at that time would have "sounded a death knell for the Company."[96] After the bankruptcy case was filed, however, the Trustee was properly incentivized to assert the illegal dividend claim to enhance recoveries for Quorum's creditors.

Claim preclusion bars a claim where (i) there was a final judgment on the merits in a prior lawsuit; (ii) the prior suit involved the same parties or their privies; and (iii) the present suit

[94] Quorum Post-Arbitration Br. at 50-96, Def. Ex. 74.

[95] Arbitration Award at 6-7, Def. Ex. 75. The panel also rejected Quorum's claim that the TSAs were unconscionable. *Id.* at 4.

[96] Pl.'s Mem. In Opposition to the Def. Mot. for Summary Judgment, Adv. Docket No. 380, at 53.

is based on the same causes of action as a prior suit.[97] In analyzing these elements, courts "focus on the central purpose of the doctrine, to require a plaintiff to present all claims arising out [of] the same occurrence in a single suit … [to] avoid piecemeal litigation and conserve judicial resources."[98] Accordingly, "[c]laim preclusion [also] gives dispositive effect to a prior judgment if a particular issue, although not litigated, could have been raised in the earlier proceeding."[99]

The CHS Defendants assert that the arbitration award was a final judgment on the merits. Other courts in this Circuit have agreed, deciding that arbitration awards "are generally accorded preclusive effect if the same issues or claims are later raised in court proceedings."[100] "To hold otherwise would permit those dissatisfied with the results of arbitration to file suits alleging the same claims or defenses, rendering arbitration 'substantially worthless.'"[101]

When considering whether the prior suit was based on the same causes of action, courts follow a "transactional" approach which requires a plaintiff to 'present all claims arising out [of] the same occurrence [or transaction] in a single suit."[102] The CHS Defendants claim that the arbitration's tortious interference claim and this adversary's illegal dividend claim are based on the same allegations of misconduct, including (i) allowing substantial deterioration Quorum's assets pre-Spin-Off; (ii) creating inflated and unrealistic post-Spin-Off projections to raise $1.2

[97] *Williams v. Atlantic Law Group, LLC*, 174 F.Supp.3d 874, 879 (D. Del. 2016) (citing *United States v. Athlone Indus., Inc.*, 746 F.2d 977, 983 (3d Cir. 1984)).

[98] *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 277 (3d Cir. 2014)(citing *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 260 (3d Cir. 2010)).

[99] *Williams*, 174 F.Supp.3d at 879 (quoting *Corestates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 194 (3d Cir. 1999)); *see also Blunt*, 767 F.3d at 277 ("'[R]es judicata [or claim preclusion] bars not only claims that were brought in the previous action, but also *claims that could have been brought.'"* (emphasis in original)).

[100] *USG Cos., Inc. v. Advantage Sales & Mktg. LLC*, 2018 WL 3117545, *4 (D. Del. June 25, 2018) (citing *Sheet Metal Workers Int'l Ass'n Local Union No. 27 v. E.P. Donnelly, Inc.*, 673 F. Supp. 2d 313, 320-21 (D.N.J. 2009)).

[101] *Id.* (citing 18B Charles Allen Wright et al., FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 4475.1 (2d ed. 2018)).

[102] *USG Cos.,* 2018 WL 3117545, *5 (citing *Blunt*, 767 F.3d at 277)).

billion in debt; (iii) imposing a "crushing debt load" on Quorum to fund the Spin-Off Dividend; and (iv) leaving Quorum over-leveraged and cash-strapped immediately following the Spin-Off, leading to financial distress.

However, even assuming the first two elements of the claim preclusion analysis are met here, it is the third element – privity – that is in dispute. The Plaintiffs' main argument for opposing the preclusive effect of the arbitration award is that the Trustee cannot be the privy of pre-bankruptcy Quorum. [103] The Plaintiffs rely on the Third Circuit's decision in *Montgomery Ward*, which concluded that a trustee in bankruptcy is not simply the successor-in-interest to the debtor because the trustee also represents the general creditors' interests. Thus, the legal relationship between the trustee and the pre-bankruptcy debtor is incomplete, particularly when the interests of the creditors diverge from those of the debtor."[104]

The CHS Defendants, however, argue that when considering preclusion, this Court should distinguish between estate claims (*i.e.*, claims which previously belonged to the prepetition debtor and become part of the bankruptcy estate through Bankruptcy Code § 541) and creditor claims (*i.e.*, claims brought under the trustee's avoiding powers).[105] When pursuing estate claims, the trustee stands in the shoes of the debtor and is subject to the same defenses that a defendant could have raised if the action had been filed by the debtor.[106] The CHS Defendants contend that Quorum's illegal dividend claim is an estate claim and, therefore, the subject to the defense of claim preclusion.

[103] As in *Montgomery Ward*, this Court uses the terms "privy" or "privity" in the broad sense "to say that the relationship between the one who is a party on the record and another is close enough to include that other within res judicata." *In re Montgomery Ward, LLC*, 634 F.3d 732, 737 n. 6 (3d Cir. 2011).

[104] *Montgomery Ward*, 634 F.3d at 738.

[105] *See Off'l Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 356 (3d Cir. 2001).

[106] *Id.* (internal punctuation and citations omitted).

However, the Third Circuit considered claim preclusion in the *Montgomery Ward* opinion without distinguishing between estate claims and creditors' claims. Because the Third Circuit's opinion is binding precedent, a closer review of that decision is warranted here.

In *Montgomery Ward*, the debtor filed a chapter 11 bankruptcy petition in 1997 ("Ward I") with the goal of continuing operations. The Ward I debtor assumed a "Lease and Sublease Agreement" and settled the lessor's proof of claim for unpaid real estate taxes and common area maintenance ("CAM") expenses. In 2000, the reorganized debtor filed a second chapter 11 bankruptcy petition ("Ward II") with the goal of winding down operations and liquidating assets. The Ward II debtor rejected the Lease and Sublease Agreement in its plan. The lessor filed a claim for rejection damages, including unpaid CAM expenses. The Ward II debtor objected to the lessor's claim, and the Plan Administrator (who was later appointed to represent the Ward II estate) filed a supplemental objection asserting that the Lease and Sublease Agreement was a structured financing, not a true lease. The lessor argued that the Ward I plan confirmation order - - which provided for assumption of the Lease and Sublease Agreement under Bankruptcy Code § 365 - - precluded the Plan Administrator from challenging the Lease and Sublease Agreement on principles of *res judicata*, equitable estoppel, and waiver.

The Third Circuit determined that the Ward II debtor, as trustee of the new estate, was not the same party as the Ward I debtor.[107] The Third Circuit recognized that "nonparty claim preclusion applies if the nonparty had a substantive legal relationship with a party [to the prior proceeding], and a successor in interest has such a relationship with its predecessor."[108] But, in bankruptcy matters, the Third Circuit required further analysis of the particular facts, deciding:

---

[107] *Montgomery Ward*, 634 F.3d at 737.
[108] *Id.*

> [E]ven though a trustee in bankruptcy has a substantive legal relationship with the pre-bankruptcy debtor, the trustee is not simply the successor in interest to the Debtor: he represents the interests of all creditors of the Debtor's bankruptcy estate. Because the Trustee also represents the general creditors' interests, the legal relationship between the trustee and the pre-bankruptcy debtor is incomplete, particularly when the interests of the creditors diverge from those of the debtor.[109]

Thus, the *Montgomery Ward* Court concluded that the Plan Administrator, representing the interests of the Ward II general creditors when challenging the Lease and Sublease Agreement, was not in privity with the Ward I debtor.[110] Therefore, claim preclusion did not prevent the Plan Administrator from arguing that the Lease and Sublease Agreement was a structured financing.[111]

Similarly, here, Quorum's prior interests in opposing the TSAs and asserting the tortious interference claims in the arbitration are not aligned with the current Trustee's interest in pursuing the illegal dividend claim on behalf of the creditors. As noted by the Trustee, it would have been against Quorum's interest as an operating entity to claim that it was insolvent when the Spin-Off Dividend was paid, so Quorum did not file an illegal dividend claim. Now, representing the interests of creditors in a bankruptcy context, the Trustee does not have a completely aligned legal relationship with pre-bankruptcy Quorum. Accordingly, the Trustee is not in privity with pre-bankruptcy Quorum and claim preclusion does not apply to bar the Trustee from pursuing the illegal dividend claim.

---

[109] *Id.* at 738 (internal punctuation and citations omitted). *See also Maxus Liquidating Trust v. YPF S.A. (In re Maxus Energy Corp.)*, 2019 WL 647027, *5 (Bankr. D. Del. Feb. 15, 2019) (following *Montgomery Ward* and concluding that a trustee was not in privity with the prepetition debtor and, therefore, the trustee was not precluded from asserting claims that the prepetition debtor did not assert in prior state court litigation.).

[110] *Montgomery Ward*, 634 F.3d at 738-39. Although the *Montgomery Ward* court did not discuss estate versus creditor causes of action, challenging the lease as a financing arrangement rather than a true lease would be a debtor claim that passed into the estate under Bankruptcy Code § 541, rather than a Chapter 5 creditor cause of action.

[111] *Id.* at 739. The Court also held that, due to the Plan Administrator's lack of privity with the Ward I debtor, the Ward I debtor's actions neither waived nor equitably estopped the Plan Administrator from challenging the Lease and Sublease Agreement. *Id.*

(2) Dividend vs. Distribution.

The CHS Defendants contend that the Plaintiffs' illegal dividend claim fails because the Spin-Off Dividend was not actually a "dividend" in form or substance. The CHS Defendants argue that: (i) the distribution was not a dividend because the Quorum Board never formally declared that it was a dividend under Delaware law; and (ii) the record before the Court establishes that the distribution was not a one-way payment to a shareholder, but was part of a bilateral exchange, in which Quorum transferred the Spin-Off Dividend and, in return, received assets and forgiveness of debt from CHS. The Plaintiffs dispute the CHS Defendants' portrayal of the record, asserting that certain documents, read together, show that Quorum declared the distribution to be a dividend. The Plaintiffs also claim that a complete review of the record supports their argument that the Spin-Off was not a negotiated sale and Quorum did not receive fair value in return for the Spin-Off Dividend.

The Court's review begins with the argument over the form of the Spin-Off Dividend. The CHS Defendants claim that the Quorum board needed to formally declare a dividend for it fall within § 174 of the DGCL and, they assert, the operating documents governing the Spin-Off, together with the Board's resolutions approving the distribution, did not characterize the $1.2 billion payment as a cash dividend. They assert that the SDA described the transfer as the "QHC Cash Distribution" which was paid "in partial consideration for the ultimate transfer of the QHC Assets to QHC."[112]

The CHS Defendants contend that Delaware law does not permit claims for "constructive dividends."[113] Recognizing the need to maintain corporate formalities under Delaware corporate law, the Delaware Court of Chancery has noted that "[t]he declaration of a dividend is a specific

[112] SDA, Def. Ex. 13 at § 2.07(b).
[113] *Quadrant Structured Prod. Co., Ltd. v. Vertin*, 102 A3d 155, 201-02 (Del. Ch. 2014).

corporate act governed by specific sections of the DGCL."[114] The Chancery Court has cautioned against expanding the illegal dividend statute to cover other transactions between a corporation and its stockholders, noting that Delaware courts have rejected efforts to recast compensation or management fees paid to insiders as dividends. [115]

The Plaintiffs argue in response that the illegal dividend claim here does not assert such "constructive dividends." Instead, the Plaintiffs argue that the Quorum Board's April 1 and April 29 Consents, when reviewed with related documents, declared the Spin-Off distribution to be a corporate dividend. The Plaintiffs note that the Board's April 1 Consent described the "Spin-Off Financing Distributions" as being made "in accordance with the QHC Financing Transactions and the Plan of Separation, in each case as defined and set forth in the [SDA]."[116] The finance transaction documents for the Spin-Off then refer to the distribution as a dividend. In particular, the Credit Agreement provides:

> The proceeds of the Term Loans made on the Closing Date are to be used by the Borrower solely (a) *to pay a dividend to CHS* in an aggregate amount not to exceed $1,225,000,000.00 (the "CHS Dividend").[117]

And the Senior Notes Offering Memorandum states:

> [W]e intend to use the net proceeds from this offering of the notes, together with new borrowings under our Credit Facilities described under "Description of Certain Indebtedness – Credit Facilities," *to pay a special dividend to CHS*, to pay the fees

---

[114] *Id.* at 202 (citing 8 Del. C. §§ 170, 172, 173, 174).

[115] *Id.* (citing *Horbal v. Three Rivers Holdings., Inc.*, 2006 WL 668542, at *3 (Del. Ch. Mar. 10, 2006) and *Keenan v. Eshleman*, 2 A.2d 904, 912 (Del. 1938)). The *Quadrant* Court also noted: "Rather than expanding the statutory sections governing dividends and stock redemptions to other types of transactions, Delaware law evaluates claims about improper transfer payments and self-dealing under the rubric of fiduciary duty." *Id.*

[116] April 1 Consent, Pl. Ex. 15 at CHSG00700422. The SDA defined the QHC Financing Transactions in Schedule 2.07 as the QHC Term Loan, the QHC Revolver and the Senior Notes. SDA, Pl. Ex. 21 at CHSG00000287.

[117] Credit Agreement between Quorum Health Corporation, the Lenders, and Credit Suisse AG, as Administrative Agent and Collateral Agent dated April 29, 2016, Pl. Ex. 12 at QHCBK_040589 (emphasis added).

> and expenses related to the Spin-Off and the Transactions and for cash on hand to remain with us for working capital purposes.[118]

The Plaintiffs also assert that the April 29 Consent provided that the transfer of assets from CHS to Quorum was a "capital contribution" – not a sale – and authorized the Spin-Off Dividend as a "cash distribution," not a purchase price.[119] Moreover, the Plaintiffs claim that Quorum called the distribution a dividend in public SEC filings. For example, Quorum's Form 10-Q for quarterly period ended March 31, 2016, stated: "[t]he net proceeds [of the Notes] were used by us, together with the borrowings under the Senior Facilities, which includes the Term Facilities issued at 98.0% of par value, *to pay a $1.2 billion special dividend to CHS on April 29, 2016*."[120]

The opposing parties can each point to language in the documents to support their respective positions. But inconsistent language alone will not solve this question.[121] Instead, courts will look to the substantive economic effect of a particular transaction. As one court has written:

> Preservation of capital to pay creditor indebtedness before distribution is made to stockholders is a fundamental doctrine in Delaware law. Thus, the substantive economic effect of a particular transaction that depletes the debtor's assets and transfers them to shareholders may be actionable as unlawful dividends.[122]

---

[118] Senior Note Offering Memorandum, Pl. Ex. 16 at CHSG00708396 (emphasis added).

[119] April 29 Consent, Pl. Ex. 20 at CHSG0071133-35.

[120] Quorum Form 10-Q, Pl. Ex. 171 at 28 (emphasis added).

[121] A company should not be able to evade the illegal dividend statute by referring to a dividend as a "distribution." *See U.S. Bank Nat'l Assoc. v. Verizon Comm'cn., Inc.*, 817 F.Supp.2d 934, 946 (N.D. Tex. 2011) (agreeing that authority interpreting Delaware's unlawful dividend statute looks to the substance of the transaction rather than labels). At the same time, a transfer should not be deemed a dividend because employees mischaracterized it as a dividend. *See In re IAC/InterActive Corp.*, 948 A.2d 471, 511 (Del. Ch. 2008) (deciding that it would be inappropriate to conclude that a proposed spin-off constituted a stock dividend merely because the term "dividend" was misused in a board presentation and in draft press releases; "[i]importantly, there is nothing in the record to suggest that IAC or its counsel ever took the position that the proposed spin-off was a stock dividend.").

[122] *AT&T Corp. v. Walker,* 2006 WL 2927659, *2 (W.D. Wash. Oct. 12, 2006) (applying Delaware law) (citing *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 1001 (S.D.N.Y. 1991); *See also Off'l Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Grp., Inc. (In re Buckhead Am. Corp.)*, 178 B.R. 956, 972-74 (D. Del. 1994)); *In re Musicland Holding Corp.*, 398 B.R. 761, 783-84 (Bankr. S.D.N.Y. 2008) (applying Delaware law).

The CHS Defendants contend that the "economic reality" of the Spin-Off transaction shows that the distribution was part of a bilateral exchange in which Quorum transferred the funds to CHS in return for 38 hospitals and other assets with a book value of $2.3 billion, together with forgiveness of $1.8 billion of intercompany debts.[123] The CHS Defendants further argue that the Spin-Off Dividend was one subcomponent - - step 42 of 51 - - of a complex transaction "structured as a divisive reorganization under Sections 355 and 368 of the Tax Code."[124] They claim billions of dollars went in both directions and the distribution cannot be viewed in a vacuum.

Plaintiffs, on the other hand, respond that the Spin-Off Dividend was a one-way payment from Quorum to CHS, it was not part of a sale or exchange. They assert that the amount of the Spin-Off Dividend was not tied to the value of the assets contributed to Quorum or the amount of intercompany debt Quorum owed CHS, but was based only on how much debt Quorum could raise.[125] They also assert that the record shows that the SDA describes the transfer of assets from CHS to Quorum as a capital contribution[126] and that Quorum's Form 10 filed with the SEC did not describe the intercompany indebtedness as being repaid; instead, it was described as being "extinguished" concurrent with the distribution.[127] The Plaintiffs contend that CHS historically did not demand repayment of the intercompany indebtedness.[128]

[123] *See, e.g.,* SDA, Def. Ex. 13 at § 2.07(b); Deloitte Tax Step Plan, Def. Ex. 89 at 53.
[124] Deloitte Step Plan, Def. Ex. 89 at CHSG00563202; Deloitte Tax Opinion, Def. Ex. 91at CHSG00563010.
[125] Subramanian Tr. July 11, 2025, Pl. Ex. 19 at 117:6 – 119:20; 120:12 – 121:5.
[126] *See, e.g.,* April 1 Consent, Pl. Ex. 15; April 29 Consent, Pl. Ex. 20.
[127] Quorum's Form 10, Pl. Ex. 30 at CHSG00239325.
[128] Hammons Tr. (Oct. 10, 2024), Pl. Ex. 23 at 220:8-19, 225:22-226:3.

The Plaintiffs have pointed to sufficient evidence to demonstrate that there is a material factual dispute as to whether the Spin-Off Dividend was a dividend in substance. Therefore, at this stage of the proceeding, the Court cannot grant summary judgment on this issue.[129]

(3) Capital Surplus.

The CHS Defendants claim that "overwhelming evidence" indicates that Quorum had a surplus as of the Spin-Off and argue that the Plaintiffs have not provided meaningful evidence to the contrary. To support their position, the CHS Defendants point to contemporaneous market evidence, opinions of third-party professionals, as well as Quorum's own historical, audited financial statements - -all of which, they claim, support the Quorum Board's capital surplus determination.

The Plaintiffs respond, however, that whether a surplus existed as of the Spin-Off is a fact-intensive inquiry that cannot be resolved on summary judgment. The Plaintiffs argue that the CHS Defendants ignore evidence that CHS manipulated data (including, for example, the allegedly inflated and unrealistic CHS Spin-Off Projections), which tainted the evaluations of Quorum performed by market analysts, investors, and third-party professionals.

The CHS Defendants' initial argument is that market evidence available at the time of the Spin-Off shows that Quorum had a surplus to support a dividend payment. First, they rely on documents showing that institutional investors performed extensive due diligence in connection with Quorum's debt issuance and subsequently loaned Quorum $1.28 billion (including $400 million in unsecured notes), demonstrating their faith in Quorum's value. Further, the CHS Defendants cite to evidence showing that the market's real-time valuation of Quorum was reflected in a market capitalization of $372 million on the first day of trading following the Spin-

[129] *See MC Asset Recovery, LLC v. S. Co.*, 2009 WL 10666059, *12-14 (N.D. Ga. Feb. 5, 2009) (applying Delaware law).

Off. They argue that the Court should "give significant deference to marketplace values,"[130] and "absent a showing that there has been a clear market failure, the behavior in the marketplace is the best indicator of enterprise value."[131]

The Plaintiffs respond that market evidence cannot represent the true value of an enterprise when material information is withheld from the market.[132] Among other things, the Plaintiffs assert that market did not know that:

- CHS was able to get Quorum through the loan syndication process only by manipulating the CHS Spin-Off Projections to show greater cash flow than realistically achievable;[133]

- The solvency opinion Quorum obtained in connection with the Spin-Off was predicated on the inflated CHS Spin-Off Projections;[134]

- Quorum's Form 10 understated the standalone costs that Quorum would bear as an independent company;[135]

- The Form 10 disclosed that Quorum would be "able to fund future routine capital expenditures with cash flows generated from operations," notwithstanding that Quorum's incoming Chief Financial Officer thought that was impossible and recommended striking that language from the document;[136] and

[130] *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del 2002).
[131] *In re Bos. Generating, LLC*, 440 B.R. 302, 325 (S.D.N.Y. 2010).
[132] *In re Emerging Commc'ns, Inc. S'holder Litig.*, 2004 WL 1305745 (Del. Ch. May 3, 3004).
[133] The Plaintiffs cite to numerous notes, emails and deposition testimony of CHS Finance Director Lee Fleck which they argue shows that Mr. Fleck was under intense pressure to continuously change the CHS Spin-Off Projections to account for greater cash flow to achieve the required level of debt paydown in the projections. *See* Pl. Mem. in Opposition to Def. Mot. for Summary Judgment (Adv. D.I. 380) ("Pl. Mem. Opp. SJ") at 19-29. However, the Defendants argue that Fleck also testified at times that the Credit Model's revenue projections were "reasonable" and "doable," and that he prepared post-Spin-Off analyses showing Quorum had a positive equity value. *See* Def. Mem. in Support of Summary Judgment (Adv. D.I. 347) at 26 (citing, *e.g.*, Def. Exs. 31, 87, 88). It is not appropriate to weigh Mr. Fleck's credibility on a summary judgment motion. *Miller v. ANConnect LLC*, Adv. No. 18-50633 (JTD), 2024 WL 606517, *1 (Bankr. D. Del. Feb. 13, 2024) (citing *Landau v. Lamas,* No. 3:15-CV-1327, 2018 WL 8949295, *8 (M.D. Pa. Oct. 4, 2018) ("When we consider a motion for summary judgment it is axiomatic that we may not weigh the evidence submitted or judge the credibility of the witnesses." (internal punctuation omitted)).
[134] Pl. Mem. Opp. SJ at 75-77 (citing Pl. Exs. 17, 193).
[135] Pl. Mem. Opp. SJ at 16-19 (citing, *e.g.*, Pl. Exs. 23, 30, 31, 32, 33).
[136] Culotta Comments to Form 10, Pl. Ex. 41 at CHSG00711749.

- CHS was able to obtain only a Caa1 (speculative grade) rating from Moody's for its Senior Notes by promising the ratings agency that – contrary to its disclosed business plans – 100% of the proceeds of Quorum's divestitures would be used to pay down its debt, rather than to reinvest in the business.[137]

The Plaintiffs also note that the trading price of the Senior Notes immediately fell below par once Quorum released results from its first quarter as a standalone company, reporting a significant downward revision to its guidance projection of 2016 EBITDA and goodwill impairment.[138] This adjustment, the Plaintiffs claim, demonstrates that Quorum's initial market capitalization was predicated on its inflated guidance and other distortions and omissions that precluded an accurate assessment by the public markets of the company's intrinsic value.

The CHS Defendants argue in reply that the Plaintiffs have not provided actual *evidence* to distrust the market's analysis. They argue that "virtually no market participants ever saw the CHS Spin-Off Projections," although the Plaintiffs assert that the relationship banks that syndicated Quorum's debt to third parties received them. The CHS Defendants argue that it is not plausible that institutional investors or market analysts were "fooled" by the 2016 Guidance, since it was only one piece of many items (such as Quorum's historical operating results, its leverage, its business plan, and industry headwinds) that were weighed and considered by the market in reaching its conclusions as to Quorum's value. The CHS Defendants, for example, argue that this Court should instead consider market evidence of Quorum's solvency in subsequent months and years after the Spin-Off.

The parties each cite to portions of the record which they claim supports their positions on whether Quorum had a surplus that could support a dividend. The CHS Defendants downplay

[137] Credit Suisse CRM Report, Pl. Ex. 178 at CSSU_QUORUM_00008891.
[138] QHC Form 99.1 dated 8/10/2016, Pl. Ex. 144.

the adequacy of the CHS Spin-Off Projections, arguing that numerous third-party advisors provided solvency analyses only *after* independently vetting those projections, while the Plaintiffs argue that testimony and language in the advisors' reports cast serious doubt on whether the advisors actually performed such stress-tests. The Plaintiffs also discredit the opinions of the CHS Defendants' expert as predicated on the flawed CHS Spin-Off Projections and other assumptions which the Plaintiffs dispute. Meanwhile, the Defendants discredit the Plaintiffs' expert for using outcome-driven valuations prepared in hindsight that contradict the contemporaneous market evidence.

Although each side vigorously argues that the other side's evidence is insufficient to create a genuine dispute of material fact, the Court disagrees. A review of the briefing and exhibits filed with the Court underscores the factual nature of the disagreement over whether Quorum had a surplus to support the Spin-Off Dividend payment. As discussed above, the Plaintiffs' expert witness testimony is admissible under a *Daubert* analysis. Summary judgment motions that present a "battle of the experts" generally are not susceptible to resolution prior to the presentation of evidence, including testimony, at trial.[139] At the summary judgment stage, where the Court is obliged to "view the record and draw inferences in a light most favorable to the non-moving party,"[140] and not weigh competing evidence to determine the truth of the

---

[139] *Transcenic, Inc. v. Google, Inc.*, 2014 WL 7275835, *2 (D. Del. Dec. 22, 2014) (citing *Transonic Sys., Inc. v. Non-Invasive Med. Techs. Corp.*, 143 Fed Appx. 320, 330 (Fed. Cir. July 25, 2005) (noting "expert testimony [was] sufficient to raise a genuine issue of material fact resisting summary judgment"); *Goldman v. Standard Ins. Co.*, 341 F.3d 1023, 1036 (9th Cir. 2003) (denying summary judgment because determination of "[w]ho is correct in this battle of experts is not for [the Court] to decide"); *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1364 (Fed. Cir. 1998) (affirming denial of summary judgment based on "summary judgment papers …not [being] sufficient to resolve the differences in expert opinion")).

[140] *Knopick v. Connelly*, 639 F.3d 600, 606 (3d Cir. 2011).

matter,[141] the Court concludes that there are genuine issues of fact on the surplus issue to be determined at trial.

Moreover, the Court also rejects the CHS Defendants' argument that the Court should defer to the Board's judgment on the issue of whether there was a capital surplus to pay a dividend. In *Chemours,* the Delaware Court of Chancery noted:

> As a general proposition, the DGCL "contains no prescriptions as to the form or manner of preparing and maintaining books of account and financial statements nor the manner in which the corporation values it assets for such purposes." As a result, "[t]he determination of the amount that is to be 'capital' and the amount that is to be 'surplus' is one that essentially is within the control and discretion of the board of directors."[142]

However, the *Chemours* Court explained that it would defer to a Board's surplus calculation "so long as [the directors] evaluate assets and liabilities in good faith, on the basis of acceptable data, by methods that they reasonably believe reflect present values, and arrive at a determination of the surplus that is not so far off the mark as to constitute actual or constructive fraud."[143] The evidence cited by the Plaintiffs regarding manipulation of the CHS Spin-Off Projections, its effect on other financial data and the Duff & Phelps Solvency Opinion that was accepted by the Board through written consents with little analysis, has placed the Board's good faith into question.[144] At the summary judgment stage, the Court cannot weigh evidence or

[141] *Anderson*, 477 U.S. at 249.

[142] *In re the Chemours Co. Derivative Litig.*, 2021 WL 5050285, *16 (Del. Ch. Nov. 1, 2021) (quoting Balotti and Finkelstein, THE DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS, § 22 (4th ed. Dec. 2020 update). *See also Off'l Comm. of Unsecured Creditors of Color Tile, Inc. v. Blackstone Family Inv. P'ship, L.P. ( In re Color Tile, Inc.)*, 2000 WL 152129, *3 (D. Del. Feb. 9, 2000) (explaining in dicta that "[t]he directors …have almost unfettered discretion in defining the extent of the corporation's surplus.").

[143] *Id.* (quoting *Klang v. Smith's Food & Drug Centers, Inc.*, 702 A.2d 150, (Del. 1997)).

[144] Pl. Mem. Opp. SJ, Adv. D.I. 380, at 88-89.

determine Defendants' credibility about the process undertaken to approve payment of the Spin-Off Dividend.

(4) Whether Mr. Feinstein's approval of the CHS Dividend is protected by his good faith reliance on Quorum and its Advisors.

Defendant Adam Feinstein served as an independent director on Quorum's board of directors and as chairman of the board's audit committee between April 2016 and September 2017.[145] Mr. Feinstein has filed his own motion for summary judgment raising many of the same issues as the CHS Defendants' Motion for Summary Judgment. Mr. Feinstein's motion, however, also includes a separate argument requesting summary judgment in his favor on the illegal dividend claim on the ground that DGCL § 172 "fully protects" him from individual liability for approving an illegal dividend.[146] Section 172 provides:

> A member of the board of directors, or a member of any committee designated by the board of directors, shall be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of its officers or employees, or committees of the board of directors, or by any other person as to matters the director reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation, as to the value and amount of the assets, liabilities, and/or net profits of the corporation or any other facts pertinent to the existence and amount of surplus or other funds from which dividends might properly be declared and paid, or with which the corporation's stock might properly be purchased or redeemed.[147]

[145] Decl. of Adam Feinstein at ¶ 1, attached as Ex. 1 to Declaration of Shane Kunselman in Support of Adam Feinstein's Motion for Summary Judgment (Adv. Docket No. 352 (filed under seal)) (the "Feinstein Decl."). Exhibits attached to Kunselman's Declaration will be referred to herein as "Feinstein Ex. #."

[146] As noted above, section 174 provides that "[i]f a corporation willfully or negligently issues a dividend in violation of the DGCL, the directors under whose administration the dividend was paid shall be held jointly and severally liable to the corporation, and to its creditors in the event of insolvency or dissolution, for the full amount of the dividend unlawfully paid." 8 Del. C. § 174.

[147] 8 Del. C. § 172.

In his Declaration, Mr. Feinstein notes that he was asked to join Quorum's Board in anticipation of the company's spin-off from CHS.[148] He stated that he executed the April 29 Consent approving the Spin-Off Dividend after relying on the following:

- A two-day orientation for incoming Quorum directors, which included sessions devoted to "Overview and Timing of the Transaction," presented by incoming CEO Mr. Miller, and "Company Overview/Financials (Form 10)," presented by Mr. Miller and incoming CFO, Mike Culotta.[149]

- Quorum's Form 10 filed with the SEC regarding the Spin-off (including the sixth and final version, as well as earlier versions of the Form 10).[150]

- Multiple conversations with partners of Deloitte & Touche LLP ("Deloitte"), which audited the financial information in the Form 10 and would be engaged as Quorum's post-Spin-off auditor.[151]

- Quorum's earnings guidance published on March 22, 2016, which stated that the Company expected to earn $2.2- 2.3 billion in net operating revenues and $265-275 million adjusted EBITDA through year-end 2016.[152]

- The "road show" presentation made to prospective lenders for the debt Quorum was issuing in connection with the Spin-Off, which he understood had been prepared with the assistance of Credit Suisse, a well-regarded investment banking firm that was advising on the structure and financing of the Spin.[153]

- Multiple conversations with Mr. Miller, Mr. Culotta and Mr. Cash between January and April 2016 regarding the Spin-Off and Quorum's post-Spin financial outlook.[154]

---

[148] Feinstein Decl. ¶ 4.
[149] Feinstein Decl. ¶¶ 18-19; Feinstein Exs. 4 and 5.
[150] Feinstein Decl. ¶¶ 25-26; Feinstein Ex. 10.
[151] Feinstein Decl. ¶ 30, ¶¶ 39-40.
[152] Feinstein Decl. ¶ 27; Feinstein Ex. 9.
[153] Feinstein Decl. ¶¶ 31-32; Feinstein Ex. 12.
[154] Feinstein Decl. ¶ 19, ¶¶ 35-37, ¶ 41.

- The Duff & Phelps Solvency Opinion.[155]

- The April 1, 2016 Board Resolutions by then-incumbent Board members Mr. Cash and Ms. Seifert, which memorialized the Board's determination that, upon consummation of the Spin-off, Quorum's assets would exceed its liabilities, as calculated in compliance with DGCL and identifying the documents relied upon by the incumbent Board to make that determination (including the Form 10 and the Duff & Phelps Solvency Opinion).[156]

The Plaintiffs, however, argue that the statements in Mr. Feinstein's Declaration are not supported by the factual record. They assert that Mr. Feinstein merely "rubber-stamped" the Spin-Off Dividend in the April 29 Consent, without participating in any Board meetings.[157] The Plaintiffs contend that, except for his after-the-fact deposition testimony and his Declaration, the record lacks any evidence supporting Mr. Feinstein's claim that he actually reviewed or relied upon certain documents and conversations to determine that Quorum had sufficient capital surplus for the Spin-Off Dividend.

The Third Circuit has instructed that "a nonmoving party … cannot defeat summary judgment simply by asserting that a jury might disbelieve an opponent's affidavit to that effect."[158] On a summary judgment motion, once the moving party has demonstrated that there is no genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."[159]

[155] Feinstein Decl. ¶¶ 42-48.

[156] Feinstein Decl. ¶¶ 49-52; Feinstein Ex. 26 at CHSG00700407-00410.

[157] Mr. Feinstein was appointed after the April 1 Board Resolutions. The April 29, 2016 Consent was an "Action by Written Consent in Lieu of a Meeting of the Board of Directors of Quorum Health Corporation, Inc."

[158] *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 129 (3d Cir. 1998) (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)).

[159] *Id.* at 129 (citing Fed.R.Civ.P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Co.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986)).

The Plaintiffs point out that the April 29 Consent makes no reference to Board members having received or reviewed any documents prior to executing it and or that they made any determination regarding the existence of a surplus.[160] Further, the Plaintiffs argue there is no evidence in the record of Mr. Feinstein receiving the April 1 Board Consent or the Duff & Phelps Solvency Opinion. They note that Mr. Feinstein was not present at the pre-Spin-Off CHS Board Meeting on April 1, 2016, at which the Duff and Phelps Solvency Opinion (along with other documents) were presented to the Board and discussed.[161] The Plaintiffs observe that there are no emails in the record corroborating that Mr. Feinstein received documents or discussed Quorum's financial condition with anyone. Mr. Culotta testified that he did not speak to Mr. Feinstein during the period between the January 2016 director orientation and consummation of the Spin-Off.[162] The Plaintiffs contend that the emails or calendar invites between Mr. Feinstein and Mr. Cash that were produced in discovery do not reflect any intent to discuss Quorum's finances but instead identify other companies that Mr. Feinstein wanted to discuss with Mr. Cash.[163]

In deciding a motion for summary judgment, the Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."[164] Here, the Plaintiffs have raised more than a "metaphysical doubt"[165] about material facts and have sufficiently cited to items in the factual record that question or contradict Mr. Feinstein's Declaration. The Court finds that there is a genuine issue of material

---

[160] April 29 Consent, Newman Ex. 134.

[161] Minutes of Apr. 1, 2016 Meeting of CHS Board of Directors at CHS-R200209459; CHS-R200209461, Newman Ex. 211.

[162] Culotta Nov. 14, 2024 Tr. at 126:7-15, Newman Ex. 62.

[163] Feinstein Ex. 19 at AF_QHC00000460-0473.

[164] *Caruso v. Hofmeister (In re Revstone Indus., LLC)*, 2019 WL 2929328, *3 (D. Del. July 8, 2019) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

[165] *Ramirez v. Lora*, 2024 WL 4690911, *3 (3d Cir. Nov. 6, 2024) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

fact and therefore Mr. Feinstein's motion for summary judgment on the issue of whether he is fully protected under DGCL § 172 will be denied.

B. <u>The Breach of Contract Claim (Count 12).</u>

The Plaintiffs assert a breach of contract claim against CHS and CHS-2 (the "CHSI Defendants") alleging that they are liable for the unpaid amounts due on the Senior Notes under an "alter ego" theory. The Defendants seek summary judgment on this claim for three reasons: (i) they allege that the alter ego analysis should be considered as of the time of the Debtor breached the contract by failing to pay the Senior Noteholders, and not as of the contract's formation; (ii) even if the analysis is conducted as of April 2016, the Defendants contend that discovery has shown that CHS and CHS-2 were not alter egos of Quorum; and (iii) even if they were considered alter egos of Quorum in April 2016, no reasonable factfinder could conclude that the CHSI Defendants' conduct proximately caused Quorum's breach of contract nearly four years later. The Trustee disputes all three arguments.

"It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent is not liable for the acts of its subsidiaries."[166] "However, when shareholders or related entities abuse the corporate form, such that the company's acts can be attributed to its owner or affiliates, courts may employ the tool of equity known as veil-piercing to disregard the corporate entity and impose alter ego liability on its owners or affiliates."[167]

---

[166] *Blair v. Infineon Tech. AG*, 720 F.Supp.2d 462, 470 (D. Del. 2010) (quoting *United States v. Bestfoods*, 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (internal punctuation omitted)).

[167] *Eddystone Rail Co., LLC v. Bridger Logistics, LLC*, 2024 WL 3090882, *30 (E.D. Pa. 2024) (quoting *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001) (internal punctuation omitted)).

"[T]o succeed on an alter ego theory of liability, plaintiffs must essentially demonstrate that in all aspects of the business, the corporations actually functioned as a single entity and should be treated as such."[168] "This demonstration is made through a two-part test. Plaintiffs must show (1) that the companies operated as a single economic unit; and (2) the presence of an overall element of injustice or unfairness."[169] When analyzing the first part of this test, a court will consider a number of factors, including: (i) whether the subsidiary was adequately capitalized for the undertaking; (ii) whether the company was solvent; (iii) whether corporate formalities were observed; (iv) whether the dominant shareholder siphoned company funds; and (v) whether, in general, the company simply functioned as a façade for the dominant shareholder.[170] "A decision to disregard the corporate entity generally results not from a single factor, but rather some combination of them"[171]

(1) The timing of the alter ego analysis .

Before jumping in to analyze the alter ego factors, the CHSI Defendants argue that the Court must determine the appropriate time frame for the analysis. The Plaintiffs claim that the analysis should be conducted at the time the Senior Notes debt was incurred. The CHSI Defendants, however, argue that because the underlying cause of action is based on a breach of contract, the Court should analyze the alter ego factors at the time of the breach, not formation, of the contract. The CHSI Defendants claim that the breach occurred when Quorum filed its Chapter 11 petition in April 2020, which was four years after incurring the Senior Notes debt

[168] *Opioid Master Disbursement Trust II v. Covidien Unlimited Co. (In re Mallinckrodt PLC)*, 2024 WL 206682, *41 (Bankr. D. Del. Jan. 18, 2024) (quoting *Pearson*, 247 F.3d at 485).

[169] *Mallinckrodt*, 2024 WL 206682, *41 (quoting *Autobacs Strauss, Inc. v. Autobacs Seven Co., Ltd. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 555 (Bankr. D. Del. 2012)).

[170] *Maxus Liquidating Trust v. YPF S.A. (In re Maxus Energy Corp.)*, 641 B.R. 467, 551 (Bankr. D. Del. 2022) (citing *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, *12 (Del. Ch. Sept. 2, 2008)).

[171] *EBG Holdings*, 2008 WL 4057745, *12.

and, they claim, it is undisputed that CHS and CHS-2 had no corporate affiliation with Quorum after the April 2016 Spin-Off.[172]

An alter ego claim seeking to pierce the corporate veil "is not itself an independent cause of action, but rather is a means of imposing liability on an underlying cause of action."[173] A court will review the cause of action to identify the specific conduct for which the plaintiff seeks to hold the corporate parent liable. Moreover,

> The entire purpose of the doctrine is to hold responsible those who caused the company to engage in the challenged conduct, recognizing that the company had no real agency of its own and acted as a mere pawn of its owner(s) or a related entity. Thus, "a 'plaintiff seeking to pierce the corporate veil must demonstrate that a court in equity should intervene because the owners of the corporation exercised complete domination over it in the transaction at issue and, in doing so, abused the privilege of doing business in the corporate form, thereby perpetrating a wrong that resulted in injury to the plaintiff.'"[174]

In *Eddystone*, the Court identified the complained-of conduct (or "transaction at issue") as the subsidiary's breach of an agreement by failing to make payments to the plaintiff.[175] Because the *Eddystone* court found no evidence that any defendant owned or controlled the subsidiary at the time it stopped payments under the relevant agreement, the court would not hold the defendants liable as an alter ego for the breach of contract claim.[176]

---

[172] Pl.'s RFA Resps., Def. Ex. 34 at No. 205.

[173] *Blair*, 720 F.Supp.2d at 469 n. 10 (quoting *Peacock v. Thomas*, 516 U.S. 349, 354, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996)).

[174] *Eddystone Rail Co., LLC v. Bridger Logistics, LLC*, 2024 WL 3090882, *31 (E.D. Pa. Jun. 21, 2024) (quoting *City of Almaty v. Ablyazov*, 278 F.Supp.3d 776, 799 (S.D.N.Y. 2017)

[175] *Id.* ("Eddystone's claim only exists because [the subsidiary] didn't pay Eddystone. That non-payment under the [agreement] is the relevant breach (even if other conduct led to [the subsidiary's] inability to pay) and the lack of payment is the harm that Eddystone suffered.")

[176] *Id.* at *33. The *Eddystone* court refused to find alter ego liability even though the plaintiff alleged that the related defendant corporations engaged in a "siphon and sell" scheme, in which the defendants transferred the subsidiary's assets and then sold the subsidiary, leaving it unable to make the payments under the agreement. *Id.* at 32. The *Eddystone* court determined that the "siphon and sell" conduct did not form the basis of the breach of contract claim. *Id. See also Lacey Marketplace Assoc. II, LLC v. United Farmers of Alberta Cooperative Ltd.*, 2015 WL 403165, *11 (W.D. Wash. Jan. 28, 2015)

The Trustee, however, relies on a decision in which the plaintiff sought to join a parent corporation as a defendant in an arbitration proceeding regarding the subsidiary's breach of contract, but the court denied the request after reviewing whether the parent owned or controlled the subsidiary at the time the agreement containing the arbitration provision was signed.[177] In *Tellium*, Corning was pursuing an arbitration proceeding against three companies (Astarte, AFN and Tellium) about certain technology that was the subject of agreements between Corning, Astarte and AFN. Tellium asked the district court to enjoin Corning from pursuing the arbitration against it, since it was not a party to the agreements. Corning alleged that Tellium influenced Astarte into making fraudulent representations in the agreements because Tellium was pursuing acquisition of Astarte during the negotiation of the agreements and Tellium conditioned the acquisition upon consummation of the Corning deal. Tellium acquired Astarte eight days after the agreements were executed. The district court granted Tellium's request for a permanent injunction, determining that Corning could not pursue an alter ego theory against Tellium in the arbitration because there was no evidence that Tellium exercised domination and control over Astarte prior to, or at the time of entry into, the agreements.[178]

The Trustee also relies on *Mallinckrodt*, in which the court denied a request to dismiss alter ego claims when the complaint adequately alleged that, prior to a spin-off, the parent and subsidiary functioned as a single entity and the subsidiary lacked the ability to stand on its

(“By the time [subsidiary] stopped paying rent, however, [subsidiary] was wholly owned by [another parent corporation] – not [defendant parent]. Plaintiffs cite no authority for their contention that [defendant parent] can be held responsible for liability that its former subsidiary incurred after the subsidiary was owned by a separate entity. After all, at that point in time, [defendant parent] could no longer fairly be described as [subsidiary's] alter ego.”)

[177] *Tellium, Inc. v. Corning Inc.*, 2004 WL 1403297, *4 (S.D.N.Y. Jun. 22, 2004).

[178] *Id.* at *4.

own.[179] The *Mallinckrodt* court also determined that the complaint adequately alleged an overall element of unfairness and injustice, writing:

> [T]he Trust has alleged facts that suggest that Covidien [the parent] both oversaw and actively participated in Mallinckrodt's [the subsidiary] aggressive opioid sales and marketing campaign, shared in massive profits, and then structured a spinoff that allowed Covidien to shield itself from liability and left Mallinckrodt without the resources to pay those who were harmed. Moreover, the facts allege that Covidien used the corporate form to perpetrate this injustice.[180]

The CHSI Defendants distinguish *Mallinckrodt* because it considered a tort claim and examined whether the alter-ego relationship existed when the tort was committed.[181] But in these cases, both tort and breach of conduct, the courts reviewed the relationship when the misconduct occurred or when the cause of action arose.

In this case, Count Twelve of the Amended Complaint describes the "complained of conduct" as CHS and CHS-2 using "Quorum's corporate form to perpetrate a fraud and injustice" when entering into the Senior Notes, then leaving Quorum balance sheet insolvent, inadequately capitalized, and unable to pay its debts - - the Senior Notes - - as they came due. "A breach of contract claim begins to accrue at the time the contract is broken, not at the time when actual damage results or is ascertained."[182] "Where a breach of contract is premised on a

---

[179] *Opioid Master Disbursement Trust II v. Covidien Unlimited Co. (In re Mallinckrodt PCL)*, 2024 WL 206682, *41 (Bankr. D. Del. Jan. 18, 2024).

[180] *Mallinckrodt*, 2024 WL 206682, *42.

[181] *See also Eddystone*, 2024 WL 3090882, *32 (when discussing *In re Maxus Energy Corp.*, 641 B.R. 467 (Bankr. D. Del. 2022), in which the liquidating trust based its alter ego claims upon alleged fraudulent transfers that harmed the company over many years, the *Eddystone* court concluded:

> Thus, *Maxus* stands for the unremarkable proposition that a corporate parent or grandparent may be held liable as an alter ego for conduct of a subsidiary that it directed when it exercised control over the subsidiary. Perhaps if Eddystone's alter ego claim were based upon the fraudulent transfers, then its reliance on *Maxus* would make more sense, but its alter ego claim is based on the alleged breach of the RSA [agreement] and that conduct occurred after [parent] sold [subsidiary].)

[182] *ECB USA, Inc. v. Savencia, S.A.*, 2020 WL 11762200, *16 (D. Del. Jul. 10, 2020) (quoting *AJZN, Inc. v. Yu*, 2015 WL 331937, *8 (D. Del. Jan. 26, 2015) (internal punctuation omitted)).

breach of pre-existing or contemporaneous representations and warranties, the breach occurs on the date of the contract's closing."[183] Thus, for this count, the Court will examine the relationship between Quorum and the CHSI Defendants when the Senior Note indebtedness was incurred.

(2) Whether CHS and CHS-2 were alter egos of Quorum?

The CHSI Defendants argue that discovery has confirmed that, pre-Spin-Off, CHS and Quorum shared a typical parent/subsidiary relationship. In response, the Plaintiffs argue that there is substantial evidence to meet the multi-factor test courts rely on to decide whether a corporation and its shareholder parent operated as a single economic entity.

*Adequate Capitalization/Solvency*: For the reasons discussed above, the Court has already determined that there are disputes of material fact regarding Quorum's solvency immediately after the Spin-Off.

*Corporate formalities*: The CHSI Defendants argue that the presence of overlapping officers and directors in CHS and Quorum pre-Spin-Off does not support a finding that the corporations operated as a single entity. The CHSI Defendants assert that their expert explained that using overlapping directors in a spin-off is expected and consistent with the basic tenet of corporate law that wholly-owned subsidiaries operate at the direction of their parent.[184] Their expert also remarked that the streamlined approval process used by the pre-Spin-Off Quorum Board (including acting via written consents in lieu of in-person meetings) was customary and efficient, given the control parents typically exercise over subsidiaries.[185] The CHSI Defendants claim that their expert's opinions are unrebutted because the Plaintiffs have not submitted an opinion by a corporate governance expert.

[183] *ECB USA, Inc. v. Savencia, S.A.*, 2025 WL 417738, *21 (D. Del. 2025) (citing *GRT, Inc. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, *16 (Del. Ch. July 11, 2011)).
[184] Subramanian Report, ¶¶ 59-63, 65, Def. Ex. 9.
[185] *Id.* at ¶¶ 68-72.

In response, the Plaintiffs argue the CHSI Defendants' expert's opinion applies to general corporate practices involving solvent subsidiaries, not to a transaction where the to-be-spun subsidiary raises more than a billion dollars to pay a dividend to its corporate parent.[186] The Plaintiffs also contend that the record before the Court shows that CHS interfered with Quorum's future management by preventing Quorum's officers from participating in creating the Spin-Off Projections or from preparing a budget for Quorum as a standalone entity until after the Spin-Off had closed.[187] This, they argue, impeded Quorum's ability to function on its own following the Spin-Off. It also helped to conceal the manipulation of the Spin-Off Projections and precluded Quorum's future management from question the unrealistic assumptions regarding revenue growth, operating expenses, capital expense and work capital that CHS built into the projections.[188]

On this record, the Court must resolve these issues of material fact at trial to determine whether CHS and Quorum's corporate governance in connection with the Spin-off was conventional or irregular.

*Siphoning Company Funds.* The CHSI Defendants note that siphoning is "the improper taking of funds that the owner was not legally entitled to receive."[189] As discuss in detail above, there are issues of material fact as to whether the payment of $1.2 billion from Quorum to CHS was an illegal dividend or a proper bilateral exchange of cash for assets and forgiveness of debt

[186] *Id.* at ¶ 68, n. 112.

[187] *See, e.g.,* Culotta Nov 14, 2024 Tr. at 80:1-82:8; 83:20-84:6; 185:16-185:23, Pl. Ex. 62. Culotta Nov. 15, 2024 Tr. at 264:18-265:15; Pl. Ex. 104. Fleck Oct. 28, 2024 Tr. at 46:20-23, Pl. Ex. 54.

[188] Culotta Nov. 14, 2024 Tr. at 83:24-84:11, Pl. Ex. 62. Miller Dec. 5, 2024 Tr. at 112:4-24, Pl. Ex. 99. Smith Oct. 24, 2024 Tr. at 175:5-176:3, Pl. Ex. 142.

[189] *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 557 (Bankr. D. Del. 2012) (quoting *In re The Heritage Organization, L.L.C.*, 413 B.R. 438, 517 n. 69 (Bankr. N.D. Tex. 2009)).

between Quorum and CHS. These issues prevent the Court from determining whether this alter ego factor is met on the summary judgment motion.

*Corporation as Façade.* "When a parent corporation exercises significant control over a subsidiary's operations and finances, an inference may arise that Defendants created a façade."[190] The CHSI Defendants argue that there is no evidence to support the claim that Quorum was a mere façade for CHS. They assert that the Senior Notes were marketed as Quorum's debt and no part of that debt was guaranteed by CHS. The CHSI Defendants claim that prospective creditors vetted the investment by reference to Quorum's historical financial performance, planned capital structure, business plan, and ability to repay.[191]

The Plaintiffs argue in response that the evidence shows that prior to consummation of the Spin-Off, CHS exercised complete dominance and control over Quorum, making every decision and controlling every aspect of the Spin-Off and the incurrence of Quorum's debt, including the Spin-Off Projections that were used to raise the Quorum debt and the determination of how much debt would be raised. The open issues prevent the Court from deciding whether this factor is met on the summary judgment motion.

(3) <u>Whether CHS and CHS-2's "alter ego" actions proximately caused the breach of contract?</u>

To prove the breach of contract claim, the Plaintiffs must establish: (1) the existence of a contract, (2) a breach of the contract, (3) and that the breach of the contract was the proximate cause of damages.[192] "In assessing damages for a breach of contract, the non-breaching party is

---

[190] *Autobacs Strauss*, 473 B.R. at 558 (citing *Blair v. Infineon Techs. AG*, 720 F.Supp.2d 462, 472 (D. Del. 2010)).

[191] *See* Senior Notes Offering Memorandum at 50-60, Def. Ex. 90.

[192] *Johnson v. Government Employees Insurance Company*, 2014 WL 2708300, at *1 (D. Del. June 16, 2014) (citing *VLIW Tech., LLC v. Hewlett–Packard Co.,* 840 A.2d 606, 612 (Del. 2003)).

entitled to recover damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made."[193]

The CHSI Defendants argue that the record has established that it is implausible that the alleged alter ego misconduct proximately caused of any breach of contract damages in 2020. CHS claims the record shows that the Senior Noteholders voluntarily invested in Quorum after the Spin-off when the Plaintiffs contend the market believed Quorum was insolvent. They allege that CHS's alleged misconduct and the Spin-Off Projections had no connection to Noteholders' decision to enter into contracts to purchase the Senior Notes.

The Plaintiffs respond that the evidence shows Quorum's ultimate default under the Senior Notes was the foreseeable result between CHS's abuse of the corporate form and manipulation of the Spin-Off Projections to Quorum's ultimate default. The Plaintiffs claim the alleged misconduct caused Quorum's struggles and near default within months of the Spin-Off, forcing Quorum to enter into costly amendments to its loan agreement and to dedicate virtually all of its available cash flows to debt repayment.[194] They argue that Quorum then survived only by focusing disproportionately on debt service obligations while cutting expenses and operating the hospitals in survival mode.[195] The Plaintiffs claim that there was never any reasonable prospect that Quorum would be able to meet the enormous maturity payments on its debt when they became due.

[193] *White Winston Select Asset Funds, LLC v. Good Times Rest., Inc.*, 2024 WL 2745174, *4 (3d Cir. Mar. 1, 2024) (quoting *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) (internal quotation marks omitted)).

[194] Lumsdaine Oct. 8, 2024 Tr. at 168:11-171:16, Pl. Ex. 151; Memo 4/30/17 from S. Hall re: April 2017 Debt Modification, Pl. Ex. 150;

[195] Lumsdaine Oct. 8, 2024 Tr. at 155:10-158:9.

The CHSI Defendants argue that events following the Spin-Off broke the causal connection between CHS's alleged misconduct and Quorum's inability to pay the Senior Notes. But courts have recognized:

> [E]ven if there is an intervening act, the causal chain is not automatically broken, as there may be more than one proximate cause to an injury. For an intervening act to break a causal chain, it must have been unforeseeable to the original tortfeasor. Whether an intervening act is unforeseeable and hence a superseding cause is normally a question for the trier-of-fact. Only in cases where no reasonable difference of opinion as to the conclusion to be reached on the question of whether an intervening cause is abnormal, unforeseeable, or extraordinarily negligent, should the question of proximate cause be determined by the Court as a matter of law.[196]

Causation is a fact-intensive inquiry.[197] The disputed facts before the Court cannot be determined on a summary judgment motion.

C. <u>The Unjust Enrichment Claim (Count 15).</u>

Count 15 of the Complaint asserts a claim for unjust enrichment arising from the $1.21 billion Spin-Off Dividend and over $150 million paid to CHS subsidiaries from May 2016 to the Petition Date under the Transition Service Agreements ("TSA"). The CHS Defendants seek summary judgment against the Plaintiffs on this claim on the grounds of (i) claim preclusion, (ii) standing, (iii) statute of limitations, and (iv) the payments were not unjust. For the reasons discussed in connection with the Illegal Dividend claim, preclusion is not applicable here

---

[196] *Halchuk v. Williams*, 635 F.Supp.2d 344, 347 (D. Del. 2009) (quoting *Duphily v. Del. Elec. Co-op., Inc.*, 662 A.2d 821, 829-31 (Del. 1995) (internal quotation marks omitted)).

[197] *Off'l Comm. of Unsecured Creditors v. Credit Suisse (In re Champion Enter., Inc.)*, 2011 WL 4481905, *8 (Bankr. D. Del. Sept. 17, 2011).

because there is no privity between the Trustee and pre-bankruptcy Quorum. The Court will examine the other three arguments.

(i) Standing

The CHS Defendants argue that the Trustee lacks standing to assert the unjust enrichment claim because the Litigation Trust Agreement excluded causes of action subject to prepetition security agreements from the assets transferred to the Trust.[198] Prepetition, Quorum granted a security interest to its lenders in "all General Intangibles" owned or thereafter acquired, which was defined to include "all … choses in action and causes of action now owned or hereafter acquired by any Grantor."[199]

The Plaintiffs, however, assert that the unjust enrichment claim is a *commercial tort claim* that cannot be subject to an after-acquired property clause under New York law, which governs the prepetition Lender Collateral Agreements.[200] The Uniform Commercial Code defines a commercial tort claim as "a claim arising in tort with respect to which …the claimant is an organization."[201] The CHS Defendants contend that unjust enrichment cannot be a commercial tort claim because it is often referred to as a quasi-contractual claim.[202] But as one court has noted:

> Unjust enrichment claims typically fall under one of two theories, (1) a quasi-contract theory of liability, in which case the unjust enrichment claim is brought as

[198] The definition of the term "Litigation Trust Assets" provided that it "shall not include any Cause of Action . . . that was subject to a valid, non-avoidable prepetition security interest issued by the Debtors." Litigation Trust Agreement at 1-2, Def. Ex. 78.

[199] Term Loan Guarantee and Collateral Agreement, § 4.01(vi); ABL Guarantee and Collateral Agreement § 4.01(vi) (collectively, the "Lender Collateral Agreements"), Def. Exs. 98-99.

[200] "A security interest does not attach under a term constituting an after-acquired property clause to … a commercial tort claim." N.Y. UCC § 9-204(b)(2). Although the contracts are governed by New York law, the parties agree that the unjust enrichment claim arises under and should be analyzed under Delaware law.

[201] N.Y. UCC §9-102(13).

[202] *Tolliver v. Christina Sch. Dist.*, 564 F.Supp.2d 312, 316 (D. Del. 2008) (Unjust enrichment "is a quasi-contract theory of recovery to remedy the absence of a formal contract.").

> an alternative to a breach of contract claim; or (2) a theory based on unlawful or improper conduct established by an underlying claim, such as fraud....[203]

The Court must review the theory behind the Trustee's unjust enrichment claim to determine whether sounds in tort or contract. Count 15 alleges that CHS and its subsidiaries were unjustly enriched through payments that were the result of the CHS-orchestrated Spin-Off based on fraudulent, manipulated Spin-Off Projections. The cause of action is not based on a breach of any contract (*i.e.,* the SDA and the TSAs) but instead alleges that the contracts exist only due to the fraudulent actions of the CHS Defendants. As a Delaware court determined:

> In evaluating an unjust enrichment claim, I must first determine whether a contract already governs the relevant relationship between the parties. If a contract comprehensively governs the parties' relationship, then it alone must provide the measure of the plaintiff's rights and any claim of unjust enrichment will be denied. *But when a plaintiff alleges that it is the contract itself, that is the unjust enrichment, the existence of the contract does not bar the unjust enrichment claim.* In other words, the contract itself is not necessarily the measure of the plaintiff's right where the claim is premised on an allegation that the contract arose from wrongdoing (such as breach of fiduciary duty or fraud) or mistake and the defendant has been unjustly enriched by the benefits flowing from the contract.[204]

Because the underlying nature of the unjust enrichment claim in this case does not sound in contract, it is a commercial tort claim that was transferred to the Trustee. As noted above, a commercial tort claim is not subject to an after-acquired property clause, the cause of action was not subject to the prepetition security interest and, therefore, the Trustee has standing to assert it.

---

[203] *Greenwald Caterers Inc. v. Lancaster Host, LLC*, 599 F.Supp.3d 235, 263 (E.D. Pa. 2022) (quoting *Whitaker v. Herr Foods, Inc.*, 198 F.Supp.3d 476, 492 (E.D. Pa. 2016)).

[204] *LVI Group Investments, LLC v. NCM Group Holdings, LLC*, 2018 WL 1559936, *16–17 (Del.Ch. 2018) (emphasis added) (internal citations and punctuation omitted).

(ii) <u>Statute of Limitations</u>

The CHS Defendants argue that the Plaintiffs' unjust enrichment claim is barred by Delaware's three-year statute of limitations and that discovery has shown that notice of the alleged wrongful acts underlying this claim prevents tolling. The Plaintiffs dispute this and argue that the evidence shows that the statute of limitations is tolled because fraudulent activity prevented the injury from being discovered.

The parties agree that the unjust enrichment claim is subject to Delaware's three-year statute of limitations.[205] The "cause of action 'accrues' under Section 8106 at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action."[206] Here, Count 15 alleges that the CHS Defendants orchestrated the Spin-Off based on the fraudulent Spin-Off Projections, which resulted in unjustly enriching the CHS Defendants with the $1.21 billion Spin-Off Dividend.[207] Thus, the cause of action accrued on April 29, 2016, upon the closing of the Spin-Off transaction,[208] which was more than three years prior to the petition date on April 7, 2020.

But the Plaintiffs assert that the tolling doctrine of fraudulent concealment[209] applies here and prevents the statute of limitations from barring their claim because CHS's fraudulent activity

---

[205] *Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, *15 (Del. Ch. Dec. 1, 2009) (citing 10 Del. Code § 8106(a)).

[206] *Id.* (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004)). *See also Miller v. Bradley (In re W.J. Bradley Mortg. Capital, LLC)*, 598 B.R. 150, 167 (Bankr. D. Del. 2019) ("The limitations period begins from the date of the alleged harm . . . [a]lleged harm means the moment the wrongful act accrues - - not when the harmful effects of the act are felt - - even if the plaintiff is unaware of the wrong.")

[207] Compl. ¶ 179. The Complaint also seeks recovery of more than $150 million in payments under the Transition Services Agreements ("TSAs"). However, the Plaintiffs have stated that they do not oppose Defendants' motion for summary judgment with respect to "claims related to the TSA payments." Pl. Br. at 120, n. 380.

[208] *Lehman Bros. Holdings, Inc. v Kee*, 268 A.3d 178, 196 (Del. 2021) (deciding that the unjust enrichment claim accrued at closing when the buyer received the defective deed, and not years later when a court decision confirmed that the deed was worthless).

[209] Delaware law recognizes three tolling doctrines: equitable tolling, inherently unknowable injuries, and fraudulent concealment. *Eugenia VI Venture Holdings, Ltd. v. MapleWood Holdings, LP (In re AMC Inv., LLC)*, 637 B.R. 43, 56 (Bankr. D. Del. 2022). The fraudulent concealment tolling doctrine

prevented the injury from being discovered. The evidence, they argue, shows that Quorum's management had little or no involvement in the creation of the Spin-Off Projections,[210] and so they were unaware of CHS's fraudulent manipulation of them. Prior to the Spin-Off, CHS instructed Quorum's future leadership to remain focused on their job responsibilities at CHS,[211] and prevented them from creating a corporate budget for Quorum[212] or otherwise preparing Quorum to operate as a stand-alone company.[213] The CHS Defendants disagree and argue that many senior executives who joined Quorum were aware of the Spin-Off Projections and reviewed every version of the Credit Model.[214] The conflicting testimony creates an issue of material fact that about the alleged fraudulent concealment that cannot be resolved on summary judgment.

The CHS Defendants also argue, however, that the record shows that any tolling of the statute of limitations ended when Quorum was on "inquiry notice" of its claim in 2016. Fraudulent concealment will suspend the statute of limitations only until the plaintiff's rights are discovered or until they could have been discovered by the exercise of reasonable diligence.[215] In other words, "no theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong."[216] The CHS

---

"requires an affirmative act of concealment by a defendant – an actual artifice that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry." *In re Dean Witter P'ship Litig.*, 1998 WL 442456, *5 (Del. Ch. 1998) (internal citations and punctuation omitted).

[210] Culotta 11/14/24 Tr. at 185:16-23, Pl. Ex. 62; Miller 12/5/24 Tr. at 57:17-19, Pl. Ex. 99.

[211] *See, e.g.,* 11/5/2015 Email from T Miller to Leadership Tem at Quorum Health Corporation re: Memo to Identified Quorum Leaders at QHC0019846, Pl. Ex. 96; 11/16 Email from M. Strawhacker to D. Adkins et al re: QHC Spin Off Communications at CHSG00470427, Pl. Ex. 100; Miller 12/4/24 Tr. at 21:8-18, Pl. Ex. 99; Cooper 10/15/24 Tr. at 75:7-14, Pl. Ex. 103.

[212] Miller 12/5/24 Tr. at 112:4-24, Newman Ex. 99; Culotta 11/14/24 Tr. at 83:24-84:11, Pl. Ex. 62.

[213] Miller 12/4/24 Tr. at 39:6-20; Pl. Ex. 99; Culotta 11/14/25 Tr. at 51:5-52:1, Pl. Ex. 104.

[214] Fleck 10/29/24 Tr. at 261:1-13, Pl. Ex. 128.

[215] *Dean Witter*, 1998 WL 442456, *5.

[216] *AMC Inv.*, 637 B.R. at 57.

Defendants claim that Quorum became aware of the alleged fraudulent activities in the fall of 2016 when: (i) Quorum received a letter from an aggrieved noteholder alleging misconduct in connection with the Spin-Off; and (ii) both Quorum and CHS were sued for securities fraud.[217] As a result, Quorum launched an investigation, which entailed more than 20 interviews and the collection of nearly 170,000 documents.[218] The CHS Defendants assert that Quorum's investigation concluded in March 2017, which was more than three years before the petition date (April 7, 2020), and found no colorable basis for a legal claim against the CHS Defendants.[219] The Plaintiffs dispute this timeline and argue that Quorum was not on notice of its claim at that time. Instead, the Plaintiffs argue that Quorum did not learn of the claim until it took discovery in the arbitration proceeding and filed its Answer and Counterclaims on August 22, 2017, which is within three years of the bankruptcy filing.[220] The issues of material fact about inquiry notice also prevent summary judgment on the statute of limitations issue.

(iii) Whether the payments were unjust.

"Unjust enrichment is 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"[221] "The elements of unjust enrichment are (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, [and] (4) the absence of justification."[222]

---

[217] $R^2$ Letter, Oreck Decl. Ex. 71; Zwick Compl., Oreck Decl. Ex. 97.

[218] 3/31/17 Letter to the Quorum Board at CHSG00385463-64, Oreck Decl. Ex. 109.

[219] *Id.*

[220] Quorum Answer and Counterclaims dated Aug. 22, 2017 at CHSG00495469, Pl. Ex. 84.

[221] *Young Women's Christian Ass'n of Rochester and Monroe Cnty. v. Hatteras Funds, LP*, 356 A.3d 459, 508 (Del. Ch. 2026)(quoting *Windsor I, LLC v. CWCap.Asset Mgmt., LLC*, 238 A.3d 863, 875 (Del. 2020)).

[222] *Id.* (quoting *Garfield v. Allen*, 277 A.3d 296, 341 (Del. Ch. 2022)).

The CHS Defendants argue that there was nothing "unjust" about Quorum's payment of the Spin-Off Dividend. They claim there is no dispute that Quorum received consideration exceeding the amount of the Spin-Off Dividend and that payment of this type of distribution as part of a spin-off adheres to standard principles of corporate governance.[223] As discussed earlier, the Plaintiffs dispute whether Quorum received fair consideration in return for the Spin-Off Dividend, which they argue was not tied to the value of the assets contributed to Quorum or the amount of intercompany debt between the entities but, instead, was based only on how much debt Quorum could raise.[224]

Moreover, the Plaintiffs repeat their argument that there is ample evidence showing that CHS knowingly manipulated the Spin-Off Projections and orchestrated the Spin-Off transaction to extract as large a dividend as possible from Quorum, regardless of the impact it would have on Quorum's ability to survive as a standalone company. The CHS Defendants respond again that the Spin-Off Projections were thoroughly vetted by independent third parties and that market evidence established Quorum's solvency in subsequent months and years after the Spin-Off . As previously discussed, the contradictory evidence cited by the parties raises numerous factual disputes underlying the question of whether the Spin-Off was "unjust." On this record, those issues cannot be resolved on summary judgment.

D. <u>The Fraudulent Transfer Claims (Counts 3-11).</u>

The CHS Defendants request summary judgment on the Plaintiffs' remaining claims that seek to avoid certain transaction fees, releases, and indemnification and arbitration provisions

[223] Subramanian Rpt. At ¶¶ 53-122, Oreck Decl. Ex. 9.
[224] Pl. Mem. Opp. SJ, Adv. D.I. 380, at 19-29.

associated with the Spin-Off.[225] The Defendants claim that the discovery has established Quorum's solvency at the time of the Spin-Off and shows that Quorum sustained its operations, paid its debts and withstood challenging market conditions for nearly four years after the Spin-Off. Moreover, the CHS Defendants assert that the Plaintiffs cannot demonstrate that Quorum received less than equivalent value for the transaction fees and for the indemnification and arbitration provisions in the SDA, all of which are customary features of a spin-off.

The Plaintiffs respond that there is substantial evidence in the record showing that Quorum was rendered insolvent by the Spin-Off and that CHS was only able to obtain a solvency opinion for Quorum by manipulating the Spin-Off Projections, which were provided to Duff & Phelps to serve as a basis for the solvency determination. Further, the Plaintiffs submit that there is evidence that Quorum was inadequately capitalized. The Plaintiffs assert that Quorum sustained its operations post-Spin-Off only because (i) its debt was structured to avoid significant amortization payments for year, and (ii) it abandoned ordinary operations and capital expenditures to focus disproportionately on debt repayment.

The Plaintiffs also contend that Quorum did not receive reasonably equivalent value in exchange for Transaction Fee transfers, releases or indemnification and arbitration obligations. The Plaintiffs assert that the record demonstrates that CHS caused Quorum (i) to pay Transaction Fees solely to effectuate a transaction that benefitted CHS at Quorum's expense, and (ii) to issue and incur the releases and indemnification and arbitration obligations solely to minimize the risk that Quorum would be able to hold CHS liable for its misconduct.

[225] Counts 3 – 8 of the Complaint. The Complaint does not specify which state's fraudulent transfer law is applicable here, but the CHS Defendants contend that because both Delaware and Tennessee have adopted the Uniform Fraudulent Transfer Act, there is no conflict and the Court may apply "the law of the forum state" - - *i.e.*, Delaware law. *See Kravitz v. Samson Energy Co., LLC (In re Samson Resources Corp.)*, 2023 WL 4003815, *24 n. 238 (Bankr. D. Del. June 14, 2023). The Court agrees.

After reviewing the parties' submissions and as described in detail earlier in this Opinion, the record thus far in this case raises numerous disputes of material fact about Quorum's financial condition at the time of the Spin-Off, as well as whether information was manipulated or withheld from the market leading up to the Spin-Off. Courts have recognized that analyzing whether a debtor received "reasonably equivalent value" in a transaction is largely a factual inquiry that requires courts to consider that totality of the circumstances.[226] A determination of the Debtor's solvency as of the Spin-Off presents a "battle of the experts," which cannot be resolved on summary judgment.[227]

Furthermore, the intentional fraudulent transfer claims cannot be resolved on the current record. There are issues of material fact to consider regarding the Plaintiffs' underlying theory that the Spin-Off was orchestrated by CHS, through manipulation of the Spin-Off Projections, to yield a dividend of more than $1.2 billion in cash and offloaded 38 of CHS's worst-performing and otherwise cash-draining hospitals, while leaving Quorum burdened with over $1.3 billion in debt, a cash balance of less than $15 million, and hospitals that were desperately in need of capital expenditures and operational improvements. The issue remains open as to whether CHS's pre-Spin-Off actions left Quorum with an enormous debt burden that left it with inadequate capital. All of this, the Plaintiffs argue, demonstrate an intent to hinder, delay and defraud Quorum's creditors. As recognized above, the court's function at the summary judgment

---

[226] *Litig. Trust of MDIP Inc. v. De La Rue Cash Sys. Inc. (In re MDIP Inc.)*, 332 B.R. 129, 133 (Bankr. D. Del. 2005) (*Mellon Bank, N.A. v. Off'l Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 147, 153 (3d Cir. 1996)). To determine whether a debtor has received reasonably equivalent value, courts will generally consider three factors: (i) whether the transaction was at arm's-length, (ii) whether the transferee acted in good faith, and (iii) the degree of difference between the fair market value of the assets transferred and the price paid. *R.M.L. Inc.*, 92 F.3d at 145.

[227] ***See*** **n. 138, *supra.***

stage is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.[228] The fraudulent transfer claims must go forward to trial.

## CONCLUSION

For the reasons discussed herein, the Court will deny (i) the *Daubert* Motion to Exclude the Testimony of Patrick Allen; (ii) the CHS Defendants' Motion for Summary Judgment; and (iii) Adam Feinstein's Motion for Summary Judgment. An appropriate Order will be entered.

FOR THE COURT:

BRENDAN LINEHAN SHANNON
UNITED STATES BANKRUPTCY JUDGE

Dated: October 20, 2026

[228] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).