# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>QUORUM HEALTH CORPORATION, *et al.*,<br><br>Debtor. | Chapter 11<br><br>Case No. 20-10766 (BLS) |
| DANIEL H. GOLDEN, AS LITIGATION TRUSTEE OF THE QHC LITIGATION TRUST, AND WILMINGTON SAVINGS FUND SOCIETY, FSB, SOLELY IN ITS CAPACITY AS INDENTURE TRUSTEE,<br><br>Plaintiffs,<br>v.<br><br>COMMUNITY HEALTH SYSTEMS, INC.; CHS/COMMUNITY HEALTH SYSTEMS, INC.; REVENUE CYCLE SERVICE CENTER, LLC; CHSPSC, LLC; PROFESSIONAL ACCOUNT SERVICES, INC.; PHYSICIAN PRACTICE SUPPORT, LLC; ELIGIBILITY SCREENING SERVICES, LLC; W. LARRY CASH; RACHEL SEIFERT; ADAM FEINSTEIN; AND CREDIT SUISSE SECURITIES (USA) LLC,<br><br>Defendants. | Adv. Pro. No. 21-51190 (BLS)<br><br>**Reference Docket Nos. 350, 351, 352, 353, 433, 434** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ADAM FEINSTEIN'S MOTION FOR RECONSIDERATION**

YOUNG CONAWAY STARGATT & TAYLOR LLP

Michael S. Neiburg (DE No. 5275)
Christopher M. Lambe (DE No. 6846)
Rodney Square, 1000 North King St.
Wilmington, DE 19801
Tel.: (302) 571-6600
Fax: (302) 571-1253
mneiburg@ycst.com
clambe@ycst.com

ROLNICK KRAMER SECURITIES LITIGATION LLP

Marc B. Kramer (admitted *pro hac vice*)
Shane Kunselman (admitted *pro hac vice*)
One Pennsylvania Plaza, 34th Floor
New York, NY 10119
Tel: (212) 597-2800
mkramer@rksllp.com
skunselman@rksllp.com

*Counsel for Defendant Adam Feinstein*

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ........................................................................................................ 1

RELEVANT BACKGROUND ........................................................................................ 4

STATEMENT OF JOINDER ........................................................................................ 9

LEGAL STANDARD ........................................................................................ 9

ARGUMENT ........................................................................................ 10

I. The Court Misapprehended the Standard Under Delaware Law by Requiring That a Director's Reliance Under Section 172 Be Predicated on Actual Review of a Specific Surplus Determination ........................................ 10

A. Delaware Courts Have Held that the DGCL's Liability Shield Does Not Require Direct Review of an Advisor's Compliance Determination........ 11

B. No Authority Exists to Support a Contrary Meaning of Section 172 ....... 16

II. No Material Facts Are in Dispute Under the Correct Application of Delaware Law ........................................................................................ 17

CONCLUSION ........................................................................................ 18

**TABLE OF AUTHORITIES**

**PAGE**

**Cases**

*A-Tek Mech., Inc. v. KHW Servs., Inc.*,
2022 WL 18635745 (S.D. Cal. Oct. 13, 2022) ........ 9

*Cirillo Family Trust v. Moezinia*,
2018 WL 3388398 (Del. Ch. July 11, 2018) ........ 13, 14, 15

*Genworth Financial, Inc. Consolidated Derivative Litigation*,
2021 WL 4452338 (Del. Ch. Sept. 29, 2021) ........ 15, 16

*In re Chemours Company Derivative Litigation*,
2021 WL 5050285 (Del. Ch. Nov. 1, 2021) ........ 11, 12, 13, 14

*In re Conex Holdings, LLC*,
524 B.R. 55 (Bankr. D. Del. 2015) ........ 9

*In re Energy Future Holdings Corp.*,
575 B.R. 616 (Bankr. D. Del. 2017) ........ 9

*In re Energy Future Holdings Corp.*,
904 F.3d 298 (3d Cir. 2018) ........ 9

*In re JLM Couture, Inc.*,
2024 WL 3100775 (Bankr. D. Del. June 21, 2024) ........ 10

*In re RS Fit NW, LLC*,
2026 WL 2920735 (Bankr. D. Del. Sept. 29, 2026) ........ 10

*In re Walt Disney Co. Deriv. Litig.*,
906 A.2d 27 (Del. 2006) ........ 15, 17

*In re Zohar III, Corp.*,
675 B.R. 142 (Bankr. D. Del. 2025) ........ 10

*Massey v. Borough of Bergenfield*,
169 F.4th 188 (3d Cir. 2026) ........ 17

*McElrath v. Kalanick*,
224 A.3d 982 (Del. 2020) ........ 17

*Millington v. GEICO*,
2015 WL 7194462 (D. Del. Nov. 16, 2015) ........ 10

*S.P. Richards Co. v. Arora*,
2019 WL 4127147 (Bankr. D.N.J. Aug. 29, 2019) ........ 9

**Statutes**

DGCL § 172 .......... 10

**Other Authorities**

Leo E. Strine, Jr., *Documenting the Deal: How Quality Control and Candor Can Improve Boardroom Decision-Making and Reduce the Litigation Target Zone*, 70 BUS. LAW. 679 (2015) .......... 15

**INTRODUCTION**

Mr. Feinstein respectfully requests that the Court reconsider its order denying Mr. Feinstein's motion for summary judgment (Doc. No. 434 ("Order"); *see also* Doc. No. 433 ("Opinion")).[1] Although Mr. Feinstein respectfully disagrees with the Court's determination that Plaintiffs raised "genuine" evidentiary disputes by "sufficiently cit[ing] to items in the factual record that question or contradict Mr. Feinstein's Declaration" with respect to specific materials that Mr. Feinstein reviewed in the leadup to the Spin (Opinion at 45), Mr. Feinstein does not ask the Court to revisit those factual determinations. Instead, Mr. Feinstein asks the Court to revisit a narrow question of law: whether Section 172 requires a director who did not oversee the transaction to have personally reviewed an advisor's final compliance determination in order to "rely" on the advisor's handling of a specialized issue. Respectfully, neither the statutory text nor the Delaware decisions applying it impose that requirement. Rather, consistent with Delaware's policy of encouraging directors to rely on experts for specialized matters, the statute protects a broader range of reliance, which the undisputed evidence here establishes—even disregarding those aspects of Mr. Feinstein's testimony that the Court ruled are "contradict[ed]" with respect to his actual and direct consideration of the advisors' ultimate compliance determinations set forth in the Duff & Phelps report, among other documents.[2]

In denying Mr. Feinstein's motion for summary judgment, the Court implicitly adopted, without discussion, Plaintiffs' view that Section 172 protects Mr. Feinstein only insofar as he

---

[1] Capitalized terms not otherwise defined herein retain their definitions set forth in Mr. Feinstein's memorandum of law in support of his motion for summary judgment (Doc. No. 351 ("MSJ"); *see also* Doc. No. 409 ("Reply")). Citations to "Ex." refer to exhibits attached to the Declaration of Shane Kunselman in support of said motion (Doc. No. 352; *see also* Doc. No. 353 ("SUMF")), and "Pltfs' Ex." refers to exhibits attached to the Declaration of Deborah J. Newman in opposition thereto (Doc. No. 381).

[2] Notwithstanding the limited scope of this motion, Mr. Feinstein expressly preserves all rights to appeal or otherwise challenge all aspects of the Order through appropriate avenues.

literally saw or heard the specific, particular surplus figures and determinations reached by Quorum's advisors (chiefly, Duff & Phelps) and incumbent directors. But the DGCL does not require Mr. Feinstein to literally review the work product or specific conclusions of those persons in order to "rely" in good faith on their appropriate handling of surplus compliance. (*See* Doc. No. 430 ("Hrg. Tr.") at 73:21-78:7.) Indeed, the decisions cited by the parties interpret the DGCL to protect a director who is (1) aware that compliance determinations in a complex transaction are being handled by other directors and appropriate professionals and (2) unaware of any red flags suggesting problems in that undertaking. And Mr. Feinstein is aware of no decision that permits a claim to proceed against a director in such circumstances. The Order appears to be the first judicial decision ever to do so, making a sweeping change to the expectations of director reliance.

The Court's order muddles—or even reverses—the "sufficiency" and "necessity" inquiries, leaving the distinction of what a director *may* rely on and what a director *must* rely on without clarity. Under Delaware law, while it is *sufficient* that Mr. Feinstein reviewed the Duff & Phelps solvency opinion and the incumbent directors' April 1 Solvency Determination, it is not *necessary* that he reviewed those documents (or any other particular documents evincing any particular solvency conclusion) to come under Section 172's liability shield. Equally as *sufficient* are the undisputed facts that (1) Mr. Feinstein understood that the incumbent directors and appropriate advisors were attending to the legal and financial compliance facets of the Spin's complex structure (*e.g.*, solvency issues) and that (2) he was never apprised of any red flags as he was updated of the various transactional steps leading up to the Spin's consummation.

If the sufficiency-versus-necessity analyses were kept in line with prior Delaware cases, then—even crediting the Court's conclusion that Plaintiffs raised genuine evidentiary disputes as to whether Mr. Feinstein actually reviewed particular documents that expressly stated Quorum's

adequate surplus—Mr. Feinstein's motion should have been granted nonetheless. Only by departing from Delaware law and implicitly treating such particularized review as *necessary* to shield Mr. Feinstein did the Court reach its denial of the motion. Inasmuch as the Court found that directors must now show particularized review as a *necessary* condition of Section 172's liability shield, the Court has extensively altered duties under the DGCL in a way that no director prior to the Order could have anticipated.

Because particularized review is not required (the default) barring red flags (the potential exception), it was Plaintiffs, not Mr. Feinstein, who necessarily needed to show the existence of known red flags to trigger closer scrutiny of Mr. Feinstein's particularized review and whether it was reasonable in light of those warning signs. But Plaintiffs made no attempt to do so. Indeed, Plaintiffs do not dispute that Mr. Feinstein understood that the transaction was structured for Quorum to emerge with a sustainable debt load and that experienced advisors were engaged to assist the incumbent directors with the requisite legal and financial analyses. And Plaintiffs have identified no evidence of infirmities or red flags brought to Mr. Feinstein's attention. He was therefore entitled to rely on the fact that the competent persons appointed to ensure the Spin was structured, financed, and executed with compliant surplus were in fact doing their jobs. That he *also* reviewed their specific findings and conclusions provides additional support, but it is not a legal necessity in these circumstances. Hence, under a correct application of Delaware law, his actual, particularized review is not a "material" fact in this case—regardless of whether limited documentary corroboration otherwise puts Mr. Feinstein's actual review in genuine "dispute" under Third Circuit law.

Accordingly, Mr. Feinstein respectfully requests that the Court reconsider its Order in such respects and, upon reconsideration, grant Mr. Feinstein's motion for summary judgment.

## RELEVANT BACKGROUND

As set forth in his underlying summary judgment briefing, Mr. Feinstein is a healthcare finance industry veteran who was recruited in late 2015 to serve on Quorum's Board as an independent director upon its emergence from the Spin the following year. In the approximately five months from when he was recruited until consummation of the Spin, Mr. Feinstein received comprehensive information about the contours of the Spin and the advisors that would be assisting the incumbent directors and management in addressing each of the numerous legal and financial requirements to accomplish the Spin, including: auditing Quorum's carveout financial statements for requisite Form 10 reporting (Deloitte); preparing comprehensive presentations demonstrating Quorum's anticipated financial strength (including ample assets in excess of liabilities) to assist with raising the requisite debt to finance the Spin (Credit Suisse); valuing Quorum's assets and conducting a solvency analysis (Duff & Phelps); and otherwise ensuring the Spin's legal compliance (Bass Berry). Given that Mr. Feinstein would formally be appointed to the Board only ten days prior to the Spin, most of those activities and determinations would take place out of his direct view, but he received periodic updates from the incumbent directors about the advisors' work as the transaction progressed without any apparent issues.

The undisputed evidence of Mr. Feinstein's reliance on the incumbent directors and advisors' work to ensure compliance with the DGCL's solvency requirements falls primarily into three categories:

**1. Evidence that Mr. Feinstein knew appropriate advisors were engaged to ensure all legal and financial requirements were satisfied.** In addition to Mr. Feinstein's own testimony regarding the engagement of the various advisors (Ex. 1 ¶¶ 18, 53 (Bass Berry); *id.* ¶ 30 (Deloitte); *id.* ¶ 42 (Duff & Phelps); *id.* ¶ 32 (Credit Suisse)), numerous documents and communications corroborate that Mr. Feinstein was aware of the advisors engaged to structure and

accomplish the Spin.

- At the January 2016 New Directors Orientation, Bass Berry presented regarding the Spin's legal requirements.[3] (Ex. 4.) Rachel Seifert (one of Quorum's incumbent directors and CHSI's then-general counsel) presented along with Hal McCard (Quorum's incoming general counsel) and Bass Berry during the "Legal" portion of the New Directors Orientation (*id.*; Ex. 5 at -6516), and she testified that the solvency requirements—for which Duff & Phelps had been engaged in December 2015—would have been included in such discussions as "part and parcel" with discussions of various SEC obligations for public companies:

  **Q:** [Y]ou had seen your first draft of a solvency presentation from Duff & Phelps in December [2015], when there was thought that a transaction might happen in the December-January time frame, correct?

  **A:** Yes.

  **Q:** Did you discuss with any of the prospective board members, the Duff & Phelps' analysis of solvency for Quorum at this meeting?

  . . .

  **A:** I just do recall . . . that **the requirements for the spinoff would have been discussed, perhaps by Jay Knight from Bass Berry** . . . **as part and parcel of their obligations** as a publicly traded company.

  (Pltfs' Ex. 210 at 192:7-24 (cleaned up) (emphasis added).)

- Larry Cash (Quorum's other incumbent director) also testified that he specifically communicated to Mr. Feinstein that Duff & Phelps had been engaged circa December 2015, as well as updates regarding Deloitte's ongoing audit of Quorum's carveout financial statements:[4]

  **A: I did have conversations with Adam** . . . at the end of 2015 and into '16. And what that was was **keeping him up-to-date on what's going on with the audit**, going on with the financial statements, **[and that] Duff & Phelps had done work in December [2015]**.

  (Ex. 18 at 418:1-6 (cleaned up) (emphasis added).)

- Bass Berry's continued attention to legal requirements was further communicated to

[3] Plaintiffs expressly concede that Mr. Feinstein attended the New Directors Orientation. (Hrg. Tr. at 113:21-22 ("[Y]es, there is evidence that he attended the January orientation.").)

[4] Notwithstanding Plaintiffs' contention "that the emails or calendar invites between Mr. Feinstein and Mr. Cash that were produced in discovery do not reflect any intent to discuss Quorum's finances" with particularity (Opinion at 45), Plaintiffs have never challenged or controverted Mr. Cash's sworn testimony that he generally advised Mr. Feinstein that Deloitte and Duff & Phelps were engaged to work on the Spin.

Mr. Feinstein on April 1, 2016, as was Credit Suisse's role as financial advisor and investment banker. (Ex. 27 at -7305 ("Credit Suisse and UBS Securities LLC are serving as financial advisors and Bass, Berry & Sims PLC and Bradley Arant Boult Cummings LLP are serving as legal advisors in connection with the separation and distribution of QHC.").)

- Mr. Feinstein also received multiple updates about the bond "road show"—where Credit Suisse and Quorum's management presented Quorum's financial condition and outlook to prospective lenders, who ultimately provided the financing. (Exs. 9, 11, 13, 14.)

- When Mr. McCard solicited Mr. Feinstein's signature to approve the Distribution, Mr. McCard advised that Ms. Seifert and Mr. Cash—*i.e.*, the two incumbent directors who had previously advised Mr. Feinstein regarding the Spin's legal requirements and that Bass Berry, Deloitte, and Duff & Phelps were advising with respect thereto—had already indicated their approval. (Ex. 31.)

Plaintiffs have not disputed these facts. Plaintiffs' argument against summary judgment focused on the asserted lack of documentary evidence to "corroborate" that Mr. Feinstein in fact reviewed the advisors' final determinations of Quorum's specific surplus amount; Plaintiffs have never disputed that Mr. Feinstein was generally aware that Deloitte, Credit Suisse, Duff & Phelps, or Bass Berry had been engaged to address Spin matters within each of their respective professional competencies. As set forth above, such facts are corroborated by documents and testimony, and Plaintiffs identified no contrary evidence.

**2. Evidence that Mr. Feinstein was never apprised of any "red flags" indicating that the incumbent directors and advisors were not appropriately ensuring that the Spin was structured to ensure Quorum's solvency.** In addition to Mr. Feinstein's own testimony that he had no reason to suspect impropriety infecting the incumbent directors and advisors' work (Ex. 1 ¶¶ 46-48, 52-54, 57-58), the record contains no evidence that anyone raised a concern with Mr. Feinstein. Plaintiffs cited no such evidence in their briefing, nor argued that Mr. Feinstein might have been aware of the misconduct that Plaintiffs allege against CHSI insiders. (MSJ at 15; Reply at 11; Hrg. Tr. at 72:13-73:9.) In contrast, Mr. Feinstein received multiple updates indicating that

Quorum's finances were in good order, including a "financial outlook" update in March 2016, stating that Quorum's projected EBITDA remained as strong as had been presented at the New Directors Orientation. (*Compare* Ex. 9 at -7797 (2016 projected Adjusted EBITDA of $265-$275 million), *with* Ex. 5 at -6504 (2015 Pro Forma Adjusted EBITDA of $256.8 million).) Management had instructed at the New Directors Orientation that such Adjusted EBITDA figures provide a "more accurate representation of the Company's liquidity" compared to other financial metrics, including with respect to "the Company's ability to incur and service debt." (Ex. 5 at -6504.) Management echoed that sentiment in the March 2016 EBITDA update: "This is a key piece as we go forward with financing this venture." (Ex. 9 at -7796.) Shortly before closing, Deloitte's auditors also confirmed to Mr. Feinstein that they had no "material written communications" beyond the management representation letter, indicating that Deloitte had not encountered anything problematic in its work to date. (Ex. 17.)

**3. Evidence that Mr. Feinstein directly reviewed the advisors' ultimate work product definitively showing that Quorum's post-Spin surplus, including the Form 10 carveout financial statements, the Duff & Phelps solvency analysis, and the incumbent directors' April 1 Solvency Determination.** Plaintiffs' arguments focused *solely* on this category, contending that it lacked sufficient corroborative evidence beyond Mr. Feinstein's testimony. Addressing and ultimately accepting Plaintiffs' argument, the Court's reasoning likewise focused solely on this category. At oral argument, the Court asked Plaintiffs' counsel how to "deal with" the issue that Plaintiffs are "asking [Mr. Feinstein] to prove a negative": "[T]he record does show, right, that these materials were available and made available, and he testified that he looked at them," and the Court identified that Plaintiffs' challenge hinges on "whether he's able to corroborate" his review of those materials. (Hrg. Tr. 115:11-17.) Ultimately, the Court accepted

Plaintiffs' corroboration-based argument—*i.e.*, that "except for his after-the-fact deposition testimony and his Declaration, the record lacks any evidence supporting Mr. Feinstein's claim that he actually reviewed or relied upon certain documents and conversations to determine that Quorum had sufficient capital surplus for the Spin-Off Dividend" (Opinion at 44)—and concluded that Plaintiffs "sufficiently cited to items in the factual record that question or contradict Mr. Feinstein's Declaration" in such respects (*id.* at 45).

Aside from finding that Mr. Feinstein insufficiently corroborated "that he actually reviewed or relied upon certain documents and conversations" specifically evidencing Quorum's surplus, however, the Court did not address whether the other two categories of evidence regarding Mr. Feinstein's (fully corroborated) reliance on various advisors nonetheless shields Mr. Feinstein from liability under Section 172. Respectfully, that omission appears to reflect a misapprehension of Delaware law, under which a director's actual review of an advisor's compliance determination is a *sufficient* but not *necessary* condition—and while the parties often focused on the evidence of Mr. Feinstein's actual review, this was done in the context of whether he had fulfilled that *sufficient* condition. That sufficient condition had high salience (undoubtedly because Plaintiffs understood it was *sufficient* to defeat their claims, and they focused their arguments accordingly), but nothing in the evidence provided converted that sufficient condition into a *necessary* one. Accordingly, Mr. Feinstein seeks reconsideration of his summary judgment motion on that basis: even discounting the evidence that Plaintiffs say is uncorroborated and the Court thereupon determined is "disputed" (*i.e.*, the third category above), the remaining unchallenged and corroborated evidence nonetheless shields Mr. Feinstein from liability under Delaware law.[5]

[5] Mr. Feinstein maintains that binding Third Circuit precedent forecloses any requirement that Mr. Feinstein's sworn account of events be "corroborated" by e-mails or any other evidence (*see* Reply at 3-9), and he contends that the Court erred in crediting Plaintiffs' suggestion that a dearth of

## STATEMENT OF JOINDER

CHSI Defendants are concurrently moving for reconsideration of the Order in certain other respects, including that the Order misapplies binding Third Circuit precedent in concluding that Plaintiffs' unlawful dividend claim is not precluded as a matter of law. Mr. Feinstein joins in CHSI Defendants' motion insofar as the facts and arguments set forth therein warrant summary judgment in favor of Mr. Feinstein as well.

## LEGAL STANDARD

Bankruptcy courts analyze motions for reconsideration of their interlocutory orders under either Federal Rule of Civil Procedure 59(e), made applicable to bankruptcy cases by Federal Rule of Bankruptcy Procedure 9023, *see In re Conex Holdings, LLC*, 524 B.R. 55, 58 (Bankr. D. Del. 2015); *In re Energy Future Holdings Corp.*, 575 B.R. 616, 627-28 (Bankr. D. Del. 2017), *aff'd*, 904 F.3d 298 (3d Cir. 2018), or under Federal Rule of Civil Procedure 60(b), as applied by Federal Rule of Bankruptcy Procedure 9024, *see S.P. Richards Co. v. Arora*, 2019 WL 4127147, at *1 (Bankr. D.N.J. Aug. 29, 2019). Moreover, this Court has the "general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment" under Rule 7054 (incorporating Federal Rule of Civil Procedure 54(b)). *See Conex*, 524 B.R. at 58 n.4; *see also A-Tek Mech., Inc. v. KHW Servs., Inc.*, 2022 WL 18635745, at *1 (S.D. Cal. Oct. 13, 2022). Indeed,

---

corroborating e-mails creates a *genuine* evidentiary dispute requiring a credibility determination at trial. Indeed, Plaintiffs' contention that it is "highly unusual" that Mr. Feinstein did not receive various Spin-related documents via e-mail is not supported by any evidence in the record. (Hrg. Tr. at 115:18-19.) Plaintiffs do not cite any authority for this proposition in their briefing, nor did Plaintiffs adduce any expert evidence on that question of standard corporate practices. In contrast, Defendants' *unrebutted* corporate practices expert testified that "it is not surprising" that Mr. Feinstein would elect to receive Spin materials primarily in hardcopy. (Ex. 35 n.126; *see also* Pltfs' Ex. 19 at 181:22-182:11 (similar).) Accepting for present purposes the Order's conclusion that a mere dearth of corroboration is sufficient to defeat summary judgment, however, Mr. Feinstein relies herein only on evidence that is undisputed *and* "corroborated" to show that summary judgment is nonetheless warranted under the correct application of Delaware law. (*See* Hrg. Tr. at 81:19-84:25.)

"a court may permit reconsideration of an interlocutory order whenever consonant with justice to do so." *In re Zohar III, Corp.*, 675 B.R. 142, 145 (Bankr. D. Del. 2025) (internal quotation marks and brackets omitted).

Reconsideration is warranted when a party identifies "a substantive mistake of law or fact," including, for example, if the Court "applied the wrong statute, ignored binding precedent, or misinterpreted legal standards." *In re RS Fit NW, LLC*, 2026 WL 2920735, at *7 (Bankr. D. Del. Sept. 29, 2026). Hence, while reconsideration generally "is not properly grounded on a request that a court rethink a decision already made," it is warranted where the movant identifies a "need to correct a clear error of law." *In re JLM Couture, Inc.*, 2024 WL 3100775, at *1 (Bankr. D. Del. June 21, 2024) (internal quotation marks omitted). In other words, reconsideration is "appropriate where a court . . . has made an error not of reasoning but of apprehension" of what the law is. *Millington v. GEICO*, 2015 WL 7194462, at *1 (D. Del. Nov. 16, 2015).

## ARGUMENT

### I. The Court Misapprehended the Standard Under Delaware Law by Requiring That a Director's Reliance Under Section 172 Be Predicated on Actual Review of a Specific Surplus Determination

Section 172's broad language reaches circumstances in which a director has a good-faith reason to believe that the company is compliant with surplus requirements. Of course, a particular "report" from an "expert" stating the specific "value and amount of the assets [and] liabilities" suffices. DGCL § 172. But so too does any "information" or "statements" from other directors or management as to "any other facts pertinent to the existence . . . of surplus." *Id.* Delaware courts have recognized that the supervising directors' engagement of appropriate professionals to address compliance issues in a complex transaction—including with respect to valuation requirements—are sufficient facts on which a non-supervising director may form a good-faith belief that such valuation requirements are, in fact, being appropriately addressed. Where a team of advisors is

brought in to ensure compliance with the innumerable laws and regulations implicating a complex transaction, it makes little sense to require that a non-supervising director actually review and approve each individual compliance determination, and that is not required by Delaware law. By addressing only the facts related to specific reports and figures, the Court's Opinion did not reach the undisputed facts regarding Mr. Feinstein's understanding of the advisors' engagement and role, which are independently sufficient under Delaware law.[6]

### A. Delaware Courts Have Held that the DGCL's Liability Shield Does Not Require Direct Review of an Advisor's Compliance Determination

Mr. Feinstein is aware of no other case that has allowed a claim against a director to proceed in contravention of Section 172's liability shield where a defendant director had no reason to believe that the particular legal requirements of a transaction were not being appropriately handled by the other directors and advisors appointed to do so. To the contrary, the cases cited in the parties' briefing shield directors from liability regardless of whether they physically reviewed the advisors' ultimate work product or conclusions. Unless apprised of a specific reason to distrust that the advisors (or other directors dispatched to address the matter) are appropriately discharging their duties to ensure compliance, a director need not personally review their individual determinations of compliance to "rely" on the advisors (or other directors) within the meaning of the DGCL's liability shield.

The Delaware courts' most salient exposition of Section 172 is set forth in *In re Chemours Company Derivative Litigation*, 2021 WL 5050285 (Del. Ch. Nov. 1, 2021). (*See* Hrg. Tr. at 77:1-

---

[6] There is no dispute that such a factual showing of specific reports and figures would independently defeat Plaintiffs' claims against Mr. Feinstein, which is why Mr. Feinstein's showing of such facts was the *exclusive* focus of Plaintiffs' corroboration-based counterarguments (and, in turn, the Court's reasoning). But Mr. Feinstein made clear that his review of the specific reports and figures was not the only basis for summary judgment in his favor (even if the most obvious). (*See* Hrg. Tr. at 73:21-78:7.)

8.) Exactly the same as this case, *Chemours* addressed a spin-off transaction wherein the "'spinco' (*i.e.*, Chemours) would pay a dividend [to the former parent company] funded with billions of dollars in debt." *Id.* at *4. Exactly the same as this case, the plaintiffs in *Chemours* alleged that that the spun-off assets-minus-liabilities were insufficient to sustain the spinco's debt load upon making the distribution, rendering the spinco insolvent from the start. Here, Plaintiffs allege that Defendants overstated the value of spun-off hospital assets, whereas the plaintiffs in *Chemours* alleged that the defendants understated the value of spun-off environmental liabilities. *Id.* at *14 ("The Plaintiffs contend that, because of the potential environmental liabilities, Chemours's net liabilities exceeded its net assets."). Thus, in *Chemours*, the Delaware Court of Chancery directly answered the precise question posed by this case: in the context of a debt-financed spin-off transaction where a portion of such debt proceeds is distributed back to the parent and the spinco must otherwise retain sufficient assets-minus-liabilities (*i.e.*, "surplus") to sustain its debt load upon emergence, what level of comfort must directors obtain that the emerging spinco meets that requirement to be fully shielded from liability under Section 172?[7]

The Order could be read to suggest that such comfort must be predicated on physical receipt and review of particular documents evidencing requisite surplus. But the Delaware Court of Chancery said just the opposite: that the record "does not demonstrate that the Director Defendants ever reviewed or were [specifically] advised as to the Company's 'capital' or 'surplus'" does not pierce Section 172's liability shield. *Id.* at *20. Instead, the *Chemours* court held that it was

[7] The plaintiffs in *Chemours* challenged only additional dividends made in the wake of the spin-off because liability for the initial distribution to the parent company upon consummation of the spin-off was challenged in separate proceedings. *Id.* at *1. Nonetheless, the pertinent question remained whether the directors had reason to believe that the spun-off liabilities had been so greatly understated as to render the company insolvent upon the spin-off (such that they should have revisited the spin-off solvency analyses before making further distributions). *Id.* at *19.

sufficient that the directors were generally advised by the company's management and financial advisors—accounting for liquidity "constraints" posed by the spun-off environmental liabilities—that the challenged distributions nonetheless "complied with Delaware law." *Id.* In other words, general advice that the transactions were appropriately and lawfully structured in consideration of the environmental liabilities was sufficient to assure the directors that the company had not, in fact, been rendered insolvent by the spin-off's allocation of assets and liabilities.

Here, there is no dispute that Mr. Feinstein was aware of the pertinent assets (the spun-off hospitals) and liabilities (debt financing net of distributions to CHSI), as had been explained in detail at the New Directors Orientation (Ex. 5 at -6457-60) and publicly broadcast throughout the healthcare industry and Wall Street (*see, e.g.*, Exs. 3, 4, 8, 9, 10). Nor is there any dispute that Mr. Feinstein knew that reputable advisors had been engaged to address the numerous and complex legal and financial requirements to execute the spin—including, lawyers (Bass Berry), accountants (Deloitte), and valuation specialists (Duff & Phelps). As in *Chemours*, therefore, it is immaterial whether anyone ever told Mr. Feinstein that Quorum had sufficient "surplus" (a legal term of art under the DGCL) to satisfy Section 170, in particular; he was entitled to rely on his understanding that solvency requirements—be it under the DGCL, SEC regulations, or otherwise—were being appropriately addressed by the incumbent directors working closely with the lawyers and financial specialists.

Consonant with *Chemours*, *Cirillo Family Trust v. Moezinia*, 2018 WL 3388398 (Del. Ch. July 11, 2018), underscores that the DGCL's liability shield does not require a director to personally review another director's determination of legal compliance where the former director

is aware that the latter has engaged appropriate advisors.[8] (*See* Hrg. Tr. at 74:14-76:18.) There, the plaintiffs alleged that three directors unlawfully approved a defective stockholder notice in connection with a merger. *Cirillo*, 2018 WL 3388398, at *1. It was undisputed that the directors engaged competent outside counsel "with reasonable care to guide the [c]ompany through the [m]erger," including with respect to the contents of the allegedly defective notice. *Id.* at *14; *see also id.* at *5 ("[The] directors relied entirely on [counsel] with respect to the form and content of the [n]otice."). Like here, however, the plaintiffs in *Cirillo* argued that the summary judgment record lacked any evidence showing transmittal of the advisor's determination that the notice was compliant to the directors. *Id.* at *15. Indeed, only one of the directors (Tepper), who also served as general counsel, had interfaced at all with outside counsel regarding the notice, and the other two directors (Moezinia and Walter) testified that they "deferred" entirely to Tepper and that the three directors "never discussed the contents of the [n]otice among themselves." *Id.* at *5.

But the Delaware Court of Chancery found the plaintiffs' argument "puzzling, to say the least," and inconsistent with Delaware law, finding that "no authority that supports the bizarre proposition that relying on outside counsel to prepare the required documentation for a merger does not constitute relying on legal advice"—*even where two of the directors conceded that they never reviewed or were otherwise expressly told outside counsel's specific conclusion that the notice was compliant.* *Id.* at *15. Rather, as the Court of Chancery held, the DGCL's liability shield applies so long as a director is aware that other directors have engaged appropriate advisors to ensure compliance with matters falling within the advisors' professional judgment. *Id.* at *14.

---

[8] *Cirillo* addresses the DGCL's liability shield set forth in Section 141(e). Because Section 141(e) uses "nearly identical" language as Section 172 to shield directors from claims related to other statutory duties, cases addressing Section 141(e) are instructive with respect to the proper scope of Section 172's liability shield. *Chemours*, 2021 WL 5050285, at *20 n.263.

The court underscored that this interpretation of the statute aligned with the fundamental principle of Delaware law that "reliance by corporate directors on outside experts for specialized, technical, or esoteric matters should be encouraged and not condemned." *Id.* at *12 (citing Leo E. Strine, Jr., *Documenting the Deal: How Quality Control and Candor Can Improve Boardroom Decision-Making and Reduce the Litigation Target Zone*, 70 Bus. Law. 679, 680 (2015)). Thus:

> [I]t is logical that Walter and Moezinia would look to Tepper as the [c]ompany's [g]eneral [c]ounsel to oversee the legalities of providing notice of a transaction to stockholders. It also makes eminent sense that Tepper would assign responsibility for ensuring that the Notice complied with the requirements of Delaware law to the counsel specifically retained to advise the [c]ompany on the [m]erger.

*Id.* at *13. Here, likewise, it is expected that an incoming, independent director like Mr. Feinstein would look to the incumbent directors and management to "oversee the legalities" of structuring and vetting the Spin, with the support of Duff & Phelps, Bass Berry, and others "specifically retained to advise the [c]ompany on the [Spin]" to "ensur[] the Spin complied with the requirements of Delaware law"—including requirements as to solvency. He need not have literally reviewed Duff & Phelps's ultimate solvency determination to have appropriately "relied" on the incumbent directors and advisors in that manner within the ambit of the statute.[9]

*Genworth Financial, Inc. Consolidated Derivative Litigation*, 2021 WL 4452338 (Del. Ch. Sept. 29, 2021), is also instructive. There, directors of a life insurance company allegedly permitted the release of a presentation containing misleading figures regarding the company's long-term care ("LTC") claims experience and related adequacy of its LTC reserves. *Id.* at *18. In determining whether to apply the DGCL's liability shield, however, the Delaware Court of

---

[9] Indeed, Plaintiffs do not contest that other directors working more closely to a transaction are "other persons" on which Mr. Feinstein was entitled to rely as the existence of surplus. (MSJ at 29 (citing *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 60 (Del. 2006).) Plaintiffs argue only that such directors, together with their supporting advisors, did not convey sufficient "facts pertinent to the existence" of compliant surplus, DGCL § 172, absent corroboration that the surplus reports were literally placed in Mr. Feinstein's hands.

Chancery made clear that the analysis did not begin and end with whether the directors sufficiently interrogated the presentation's LTC claims and reserves data at the meeting where it was approved. Instead, the court focused on the fact that such meeting was a culmination of a long and complex process involving numerous advisors: "the task [of setting insurance loss reserves] is complicated and requires extensive input from actuaries, accountants and other experts to get it right." *Id.* at *19. Hence, "even if" the directors were not entitled to rely on the final presentation itself in light of alleged misgivings, the court held that the directors were nonetheless protected from liability in light of their awareness that sophisticated advisers had been "present" and "addressing" issues regarding the company's LTC claims experience data—including providing updates that progress on "the LTC reserving process was 'at an advanced level'"—in the two-year period leading up to the allegedly misleading presentation. *Id.*

Here, too, the Section 172 inquiry does not begin and end with whether Mr. Feinstein appropriately interrogated the final presentation from Duff & Phelps. Instead, application of Section 172 in these circumstances is supported by the undisputed facts that Mr. Feinstein knew that numerous advisors engaged to ensure compliance had been vetting the Spin's complex transactional steps for over five months, with only positive updates along the way.

### B. No Authority Exists to Support a Contrary Meaning of Section 172

The cases discussed above provide the Delaware courts' most direct guidance on the question of whether the DGCL's liability shield applies where a director knows that other directors and advisors are addressing a complex transaction's compliance with statutory requirements. They indicate that liability is shielded regardless of whether the advisors' ultimate conclusion of compliance (with respect to one subpart of the overall transaction) is physically transmitted or otherwise directly communicated to the director. These authorities are consistent with the Delaware Supreme Court's guidance that the DGCL does not impose liability on later-added

directors or directors not closely involved in the particulars of a transaction where they are given no reason to distrust the work of the incumbent or more closely involved directors. *See, e.g.*, *McElrath v. Kalanick*, 224 A.3d 982, 989 (Del. 2020); *Disney*, 906 A.2d at 59-60. Neither Plaintiffs' briefing nor the Opinion identifies any case standing for the proposition that the DGCL's liability shield requires a director to actually review the advisors' various conclusions of compliance in order to rely on the fact that such advisors are adequately ensuring a transaction's compliance with matters within their professional competencies. Accordingly, even if the cases discussed above were not conclusive on the issue, there is no basis to conclude that the Delaware Supreme Court would adopt Plaintiffs' restrictive interpretation of Section 172. *See Massey v. Borough of Bergenfield*, 169 F.4th 188, 191 (3d Cir. 2026) ("When a federal court is asked to pass upon an unresolved state-law matter, [its] task is to predict how the highest court of that state would decide the relevant legal issue."). Respectfully, the Court should decline to do so here.

## II. No Material Facts Are in Dispute Under the Correct Application of Delaware Law

Once the proper construction of Section 172 comes into focus, summary judgment is warranted. Putting aside whether there is a genuine dispute as to whether he reviewed specific surplus figures, Mr. Feinstein need only show that he was (1) aware that the numerous and complex compliance determinations undergirding the Spin were being addressed by appropriate professionals working with the incumbent directors and (2) he was unaware of any red flags suggesting problems in that undertaking. The undisputed record establishes both elements. In addition to Mr. Feinstein's own uncontroverted testimony, both Ms. Seifert and Mr. Cash testified that Mr. Feinstein was informed of the numerous advisors brought on to ensure compliance—including legal counsel at Bass Berry and notable solvency specialists at Duff & Phelps—as corroborated by numerous documents providing only positive updates. Whatever inferences may be drawn from the e-mail record regarding Mr. Feinstein's receipt of particular documents, there

is no basis to infer his ignorance of the advisors' very *existence*. Indeed, nowhere in Plaintiffs' 120 pages of summary judgment briefing do they attempt to raise any dispute of these facts (and have now waived the opportunity to do so). Plaintiffs' *sole* argument is that Mr. Feinstein did not personally review the advisors' ultimate determinations. Under a correct reading of Section 172, however, that question is not material. Accordingly, the Court's Order denying summary judgment on that basis should be reconsidered.

## CONCLUSION

For the foregoing reasons, Defendant Adam Feinstein respectfully submits that the Court's Order should be reconsidered and complete summary judgment should be granted in Mr. Feinstein's favor.

Dated: November 3, 2026

/s/ *Michael S. Neiburg*
Michael S. Neiburg (DE No. 5275)
Christopher M. Lambe (DE No. 6846)
YOUNG CONAWAY STARGATT
& TAYLOR LLP
Rodney Square
1000 North King St.
Wilmington, DE 19801
Tel.: (302) 571-6600
Fax: (302) 571-1253
mneiburg@ycst.com
clambe@ycst.com

Marc B. Kramer
Shane Kunselman
ROLNICK KRAMER SECURITIES
LITIGATION LLP
One Pennsylvania Plaza, 34th Floor
New York, NY 10119
Tel.: (212) 597-2800
mkramer@rksllp.com
skunselman@rksllp.com

*Counsel for Defendant Adam Feinstein*